**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

| | |
|---|---|
| **American Federation of Teachers,** *et al.*, | |
| Plaintiffs, | |
| **v.** | |
| **U.S. Department of Education,** *et al.*, | Civil Case No. 1:25-cv-00628 |
| Defendants. | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A**</u>
<u>**PRELIMINARY INJUNCTION**</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

BACKGROUND ............................................................................................................ 2

LEGAL STANDARD ....................................................................................................12

ARGUMENT ................................................................................................................12

I.    Plaintiffs Are Likely to Succeed on the Merits....................................................... 12

   A.    The Letter Violates the First Amendment. .................................................. 12

      1.    The Letter squarely regulates "speech" and "association" within the meaning of the First Amendment. ........................................................................................ 12

      2.    The Letter discriminates based on viewpoint and content........................................ 15

        a.    The Letter imposes a viewpoint-based restriction. ................................................. 15

        b.    The Letter imposes a content-based restriction. .................................................... 18

      3.    The Letter Is Facially Overbroad. ........................................................................... 19

   B.    The Letter Is Unconstitutionally Vague in Violation of the Due Process Clause. ....... 20

      1.    The Letter fails to give fair warning of what it bans................................................. 21

      2.    The Letter lends itself to subjective interpretation and arbitrary or even discriminatory enforcement. ...................................................................................... 22

   C.    The Letter Violates the Administrative Procedures Act. ...........................................23

      1.    The Letter is Final Agency Action........................................................................... 23

      2.    The Letter is Arbitrary and Capricious. ................................................................... 24

        a.    The Department failed to provide an adequate explanation for its change in its positions. ................................................................................................................ 25

        b.    The Department Fails to Rely on Prior Factual Findings and Available Evidence.................................................................................................................28

        c.    The Letter fails to account for existing federal and state legal standards. .............29

        d.    The Department Failed to Consider Two "Important Aspect[s] of the Problem."..............................................................................................................31

        e.    The Department Failed to Consider the Reliance Interests of Schools and Educators................................................................................................................33

      3.    The Letter is Contrary to Constitutional Rights........................................................34

      4.    The Letter is Not in Accordance with Law and is in Excess of Statutory Authority. ...............................................................................................................35

     5.     The Letter is a Legislative Rule Requiring Notice and Comment Rulemaking. ................................................................................................35

II.   Plaintiffs Are Suffering Irreparable Harm. ........................................................36

III.  The Balance of the Equities and the Public Interest Favor Enjoining the Letter. ...............40

CONCLUSION.........................................................................................................................40

# TABLE OF AUTHORITIES

## Cases

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205 (2013) ........................................17

*Am. Acad. of Pediatrics v. Food & Drug Admin.*, 379 F. Supp. 3d 461 (D. Md. 2019)...............24

*Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.,* 25 F.4th 1 (D.C. Cir. 2022)........29

*Am. Fed'n of Tchrs. v. Bessent*, No. CV DLB-25-0430, 2025 WL 582063 (D. Md. Feb. 24, 2025) ........................................................................................................................41

*Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482 (D. Md. 2020)............................38, 39

*Bennett v. Spear*, 520 U.S. 154 (1997) ........................................................................................24

*Boos v. Barry*, 485 U.S. 312 (1988)..............................................................................................19

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.,* 89 F.4th 46 (1st Cir. 2023), *cert. denied*, 145 S. Ct. 15 (2024)..............................................................32

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.,* 996 F.3d 37 (2021)....................................................................................................................................32

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ..............................................................................20

*Chrysler Corp. v. Brown,* 441 U.S. 281 (1979) ............................................................................37

*City of Austin v. Reagan Nat'l Advert. Of Austin, LLC*, 596 U.S. 61 (2022)...............................19

*City of Columbus v. Cochran*, 523 F. Supp. 3d 731 (D. Md. 2021) .......................................26, 29

*Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864 (4th Cir. 2023), *cert. denied*, 218 L. Ed. 2d 71 (Feb. 20, 2024) ......................................................................................................31

*Coates v. City of Cincinnati*, 402 U.S. 611 (1971) .......................................................................22

*Cromer v. Brown*, 88 F.3d 1315 (4th Cir. 1996)...........................................................................16

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) ................................34

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)...................................................26, 29

*F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)........................................................21

*Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581 (4th Cir. 2012) ......................30

*Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002) .................................................41

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .......................................................21

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330 (4th Cir. 2021) ...............37, 41

*Legal Servs. Corp v. Velazquez*, 531 U.S. 533 (2001) ................................................17

*Loc. 8027 v. Edelblut*, No. 21-cv-1077-PB, 2024 WL 2722254 (D.N.H. May 28, 2024).......22, 23

*Loc. 8027, AFT-N.H., AFL-CIO v. Edelblut*, 651 F. Supp. 3d 444 (D.N.H. 2023). .....................14

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983) .........25, 26, 32

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) ...................................................................37

*Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68 (D.C. Cir. 2020)..................................37

*Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget*, Civil Action No. 25-239 (LLA), 2025 WL 597959 (D.D.C. Feb. 25, 2025) ..........................................................17

*Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109 (2022)...........................................36

*Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014)...................................25

*Nat'l Pub. Radio, Inc. v. Klavans*, 560 F. Supp. 3d 916 (D. Md. 2021) ...........................41

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) .................................................17

*Newsom v. Albermarle Cnty. Sch. Bd.*, 354 F.3d 249 (4th Cir. 2003) ............................20

*Nken v. Holder*, 556 U.S. 418 (2009) ....................................................................13

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No 1*, 551 U.S. 701 (2007).......................32

*Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013)........................................................41

*Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92  (2015) ..............................................37

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022) ...............................................................................................22

*PFLAG, Inc. v. Trump*, No. CV 25-337-BAH, 2025 WL 510050 (D. Md. Feb. 14, 2025)...........41

*POET Biorefining, LLC v. Env't Prot. Agency*, 970 F.3d 392 (D.C. Cir. 2020)............................24

*Porter v. Bd. of Trs. of N.C. State Univ.*, 72 F.4th 573, 582 (4th Cir. 2023)................................14

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015)................................................16, 19

*Ricketts v. Wake Cnty. Pub. Sch. Sys., WCPSS*, 125 F.4th 507 (4th Cir. 2025) ..........................31

*Ridpath v. Bd. of Govs. Marshall Univ.*, 447 F.3d 292 (4th Cir. 2006)..........................................13

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) .......................................................................15, 16

*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020) ....................................................................12

*Roman Cath. Diocese of Brooklyn v. Cuomo,* 592 U.S. 14 (2020)................................................37

*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ............................16, 18

*Rust v. Sullivan*, 500 U.S. 173 (1991) ..........................................................................................17

*Safe Extensions, Inc. v. F.A.A.*, 509 F.3d 593 (D.C. Cir. 2007)...................................................30

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521 (N.D. Cal. 2020)............17

*Sierra Club v. Env't Prot. Agency*, 955 F.3d 56 (D.C. Cir. 2020) ................................................25

*Smith v. Goguen*, 415 U.S. 566 (1974) .........................................................................................22

*Sorrel v. IMS Health, Inc.*, 564 U.S. 552 (2011) .........................................................................17

*Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023)..........................................3, 5, 31

*Tenn. Educ. Ass'n v. Reynolds*, 732 F. Supp. 3d 783 (M.D. Tenn. 2024)................................22, 23

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)............................................13

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) ................................................25

*United States v. Playboy Ent. Grp.*, 529 U.S. 803 (2000) ............................................................19

*UnitedSteel v. Mine Safety and Health Admin.*, 925 F.3d 1279 (D.C. Cir. 2019) ........................26

*Urofsky v. Gilmore*, 216 F.3d 401 (4th Cir. 2000).......................................................................15

*Vill. Of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982).....................21

*Virginia v. Hicks*, 539 U.S. 113 (2003)........................................................................................20

*Wash. Metro. Area Transit Auth. v. Loc. 689, Amalgamated Transit Union*, 818 F. Supp. 2d 888 (D. Md. 2011) ....................................................................................................30

*Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41 (D.D.C. 2016).....................33

*West Virginia v. Thompson*, 475 F.3d 204 (4th Cir. 2007)...........................................................25

*Wieman v. Updegraff*, 344 U.S. 183 (1952) .................................................................................15

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ......................................13

**Statutes**

20 U.S.C. § 1132-2 ......................................36

20 U.S.C. § 1232a ......................................36

20 U.S.C. § 3403 ......................................14, 36

20 U.S.C. § 3413 ......................................24

20 U.S.C. § 7906a ......................................36

42 U.S.C. § 2000d-1 ......................................40

5 U.S.C. § 706 ......................................24, 25, 35, 36

Pub. L. No. 96–88, 93 Stat. 668 (1979) ......................................36

Wash. Rev. Code Ann. § 28B.10.149 (West 2021) ......................................23

**Rules and Regulations**

34 C.F.R. § 100.5 ......................................31, 37

Exec. Order No. 14151 ("*Ending Radical and Wasteful Government DEI Programs and Preferencing*"), 90 Fed. Reg. 8339 (Jan. 29, 2025) ......................................17

Exec. Order No. 14173 ("*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*"), 90 Fed. Reg. 8633 (Jan. 31, 2025) ......................................17

**Other Authorities**

Derrick R. Brooms & Arthur R. Davis, *Staying focused on the goal: Peer bonding and faculty mentors supporting persistence in college*, 48 J. Black Studs. 305 (2017), https://perma.cc/4BWM-4D6U ......................................33

Dina C. Maramba & Patrick Velasquez, *Influences of the Campus Experience on the Ethnic Identity Development of Students of Color*, 44 Educ. & Urb. Soc'y 294 (2014), https://perma.cc/ZA3M-GQKB ......................................33

Hillary Parkhouse et al., *Multicultural education professional development: A review of the literature*, 89 Rev. Educ. Rsch. 416 (2019), https://perma.cc/V7RJ-LN2U ......................................33

Jasper Smith, *Ed. Dept.'s Broad DEI Warning Puts College Leaders in 'Enormously Complicated Situation'*, The Chronicle of Higher Ed. (Feb. 18, 2025), https://perma.cc/FN8J-3EA3 2025), https://www.chronicle.com/article/ed-dept-s-broad-dei-warning-puts-college-leaders-in-enormously-complicated-situation ......................................5

Jordan McPherson & Tyler Bagent, *Trump Administration's Anti-DEI Letter Causes Confusion, Anxiety*, The Rotunda (Feb. 19, 2025), https://perma.cc/H75X-KNFP ..........40

Letter from Craig Trainor, Acting Assistant Sec'y for C.R., U.S. Dep't of Educ., to Colleagues (Feb. 14, 2025), https://perma.cc/SF4T-WA33 (last accessed Feb. 21, 2025) ........................................................................................................................

Letter from Kristen Clarke, Assistant Att'y Gen., C.R. Div., U.S. Dep't of Just., and Catherine E. Lhamon, Assistant Sec'y for C.R., Off. for C.R., U.S. Dep't of Educ. (Aug. 14, 2023) ..........................................................................................................28

Megan Henry, *Ohio State University is closing its Office of Diversity and Inclusion*, Ohio Cap. J. (Mar. 3, 2025), https://perma.cc/GQ8E-Y82V ....................................40

Natalie Schwartz, *Trump Administration Cancels $400M of Columbia's Grants and Contracts Amid Antisemitism Probe*, Higher Ed Dive (Mar. 7, 2025), https://perma.cc/RK9J-DGCS ...........................................................................39

Or. Dep't of Educ. *Preliminary Description of the Proposed Social Emotional Learning Standards Framework for Oregon*, (Sept. 2022), https://perma.cc/XLT2-ZSCB ............32

Sch. Law Ctr., Race and School Programming, 6 (Sept. 25, 2023), https://perma.cc/2752-CRW3 ...............................................................................................................26

The PhD Project, *Enriching Education for All*, https://perma.cc/CMB9-U8QM (last accessed Mar. 24, 2025).....................................................................................7

U.S. Dep't of Educ. Nat'l Ctr. for Educ. Stats., *Public School Revenue Sources* (May 2024), https://perma.cc/ZY39-9KAS..............................................................35

U.S. Dep't of Educ., *End DEI Portal*, https://perma.cc/6VJF-NTY9 (last accessed Mar. 26, 2025.............................................................................................6, 17, 24

U.S. Dep't of Educ., *Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act* (Feb. 28, 2025), https://perma.cc/KB53-4SQ3 ..................................................................................6

U.S. Dep't of Educ., Off. for C.R., *Fact Sheet: Ensuring Educational Opportunities for All Students on Equal Terms 70 Years After Brown v. Board of Education*, https://perma.cc/5X43-BQNT ..................................................................................6

U.S. Dep't of Educ., Off. for C.R., *Fact Sheet: Harassment based on Race, Color, or National Origin on School Campuses* (July 2, 2025), https://perma.cc/GQA6-G752.............................................................................................................7

U.S. Dep't of Educ., Off. for C.R., Press Release, *Office for Civil Rights Initiates Title VI Investigations into Institutions of Higher Education* (Mar. 14, 2025), https://perma.cc/8PP4-GUJB .......................................................................38, 40

U.S. Dep't of Educ., Off. for C.R., *Resolving a Hostile Environment Under Title VI: Discrimination Based on Race, Color, or National Origin, Including Shared Ancestry or Ethnic Characteristics*, https://perma.cc/52LW-MH3E (last visited Mar. 25, 2025)..........................................................................................................7

U.S. Dep't of Educ., Off. of C.R., Fact Sheet: Diversity and Inclusion Activities Under Title VI (Jan. 2023), https://perma.cc/4G25-JKZJ .........................................28

U.S. Dep't of Educ., Off. of the Under Sec'y, *Strategies for Increasing Diversity and Opportunity in Higher Education* (Sept. 28, 2023), https://perma.cc/XTP4-SRAL .........28

U.S. Dep't of Educ., Press Release, *DOJ, HHS, ED, and GSA Announce Initial Cancelation of Grants and Contracts to Columbia University Worth $400 Million* (Mar. 7, 2025), https://perma.cc/FV3F-ELR7 ...............................................................40

U.S. Dep't of Educ., *Questions And Answers Regarding The Supreme Court's Decision In Students For Fair Admissions, Inc. v. Harvard College And University Of North Carolina* (Aug. 14, 2023), https://perma.cc/8QTR-8PMD ...............................7, 30

Vincent DiFonzo, Young America's Foundation Files Complaint Against Gettysburg College to Department of Education, The Gettysburgian (Mar. 21, 2025), https://perma.cc/P7QW-5LQF ..........................................................................................24

Millions of educators, students, and schools have experienced significant harm since February 14, 2025, when the U.S. Department of Education (the "Department") published a Dear Colleague Letter[1] (the "Letter") that flipped longstanding civil rights law on its head. The Letter has thrown states, school districts, and educators into confusion and forced them to chill their own expression for fear of investigation and losing critical federal funds. The Letter labeled large swaths of curriculum as toxic, decreed critical student support programs stigmatizing and insidious, and asserted that race may not be a consideration in any aspect of campus life. This Letter immediately destabilized learning communities and the public servants who work to educate our children across the country.

The Letter purports to reiterate existing legal requirements. Instead, it co-opts existing constitutional protections and federal civil rights laws, intended to reduce discrimination and promote equality, to assert that remedial efforts by schools and educators to uphold these laws and broaden educational opportunities are themselves discriminatory.

Besides being contrary to the civil rights laws central to our country's democracy, the Letter also imposes harmful policies on our country's children. By threatening schools and educators for teaching U.S. history, and targeting voluntary celebrations of cultures and communities, the Department is not protecting our classrooms. The Letter's assertions are contrary to the ideals that serve as this country's foundation. Barring educators and their students from exploring ideas and joining student groups that permit them to share in each other's cultures and build community, deprives them of critical parts of their education. Schools, from pre-K to college, are where we learn about our world and each other. Students not only acquire knowledge and

---

[1] Letter from Craig Trainor, Acting Assistant Sec'y for C.R., U.S. Dep't of Educ., to Colleagues Letter from Craig Trainor, Acting Assistant Sec'y for C.R., U.S. Dep't of Educ., to Colleagues (Feb. 14, 2025), https://perma.cc/SF4T-WA33 (last accessed Feb. 21, 2025), Ex. 11, PLFS-114.

develop skills, but also wrestle with hard truths and engage with those who may have different perspectives.

To stop the harms that this Letter is already working across the country, Plaintiffs seek a preliminary injunction. This request is supported by declarations from a national teachers union, a Maryland teachers union, a national association of sociologists, an Oregon K-12 school district superintendent, higher education professors in Maryland, Pennsylvania, Washington, and a public high school teacher in Maryland.

**BACKGROUND**

**The Dear Colleague Letter**

On February 14, 2025, the Acting Assistant Secretary for Civil Rights Craig Trainor sent the Letter to all educational institutions that receive federal financial assistance from the Department of Education. Letter at 1. The Letter purports to "clarify and reaffirm the nondiscrimination obligations of schools and other entities that receive federal financial assistance" required by Title VI, "the Equal Protection Clause of the United States constitution, and other relevant authorities," following the Supreme Court's 2023 decision in *Students for Fair Admissions v. Harvard* ("*SFFA*"), 600 U.S. 181 (2023). Letter at 1-2.

*Constraints on Nondiscriminatory Teaching and Learning.* The Letter alleges that educational institutions "toxically indoctrinate[] students with the false premise that the United States is built upon 'systemic and structural racism' and advance[] discriminatory policies and practices," and that proponents of such seek to "smuggl[e] racial stereotypes and explicit race-consciousness" into "everyday training, programming, and discipline." Letter at 2. The Letter provides no evidence or support for these conclusions. *Id*. Many topics foundational to our

country's history, like slavery or the Civil Rights movement, necessarily touch on race, and many are mandated by state and local standards and curriculum requirements.

*Constraints on Nondiscriminatory Student Groups, Support for Students, and Diversity, Equity, and Inclusion Programming.* The Letter claims that DEI programs "deny students the ability to participate fully in the life of a school" because they "frequently preference certain racial groups and teach students that certain racial groups bear unique moral burdens that others do not" and "stigmatize students who belong to particular racial groups based on crude racial stereotypes." Letter at 3. The Letter does not provide support for these assertions. The Letter goes on to claim that "using race" in any decisions related to any "aspects of student, academic, and campus" is prohibited by Federal law without providing any context, and despite case law concluding such practices may be permitted. Letter at 3. This language arguably expands current law to prohibit meetings of student groups and affinity groups, graduation ceremonies, and the establishment of housing that is open to all but focused on recognizing, celebrating, or exploring a particular heritage or culture. It also may prohibit centers of student life that are common on campuses across the country—such as a Jewish Cultural House, or an Afro-American Cultural Center—which provide support, community, and mentorship to students from historically marginalized groups, an important ingredient to retention and success in education.

*Prohibitions on Admission Practices.* The Letter concludes that "relying on non-racial information as a proxy for race" also "violates the law." Letter at 3. It argues that, for example, it would be "unlawful for an educational institution to eliminate standardized testing" if one of its motives is to "increase racial diversity." *Id*. The Letter does not cite any statute, regulation, or case law that authorizes the Department to prohibit schools from engaging in such activities, or any basis to assert that non-racial information *is* used as a proxy for race. The Letter relies on *SFFA*,

which explicitly contemplates and permits a university "considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise," *SFFA*, 600 U.S. at 230. By contrast, the Letter suggests that such consideration is likely "in fact, motivated by racial considerations" and may constitute "race-based decision-making." Letter at 2. Further, the Letter claims that any (1) differentiation or reliance on race, (2) decisions motivated by racial considerations, or (3) use of non-racial information as a proxy for race in decisions related to "admissions" and a host of other activities may be discrimination. If this were the law, it would subject vast amounts of legal activities to enforcement under the Letter, including, for example, efforts to recruit students of all races and backgrounds, as well as all income levels, geographic location, and other forms of diversity. *See id.* But it is not.

*Threat of Enforcement Reverberates Across the Country.* The Letter instructs that the Department will "take appropriate measures to assess compliance with the applicable statues and regulations based on the understanding embodied in this letter beginning no later than [February 28, 2025]." Letter at 3. It states that educational institutions must take steps to ensure they comply with "existing civil rights laws," but adds the gloss that the law should be interpreted as understood in the Letter. Letter at 4. Immediately, schools across the country were thrown into confusion and alarm by this sea change.[2]

### End DEI Portal

Even though the Department has long had a portal through which complaints of discrimination can be submitted to the Office for Civil Rights ("OCR"), the administration launched a new portal on February 27, 2025—www.EndDEI.ed.gov—to "identify potential areas

---

[2] Jasper Smith, *Ed. Dept.'s Broad DEI Warning Puts College Leaders in 'Enormously Complicated Situation'*, The Chronicle of Higher Ed. (Feb. 18, 2025), https://perma.cc/FN8J-3EA3, Ex. 12, PLFS-119.

for investigation."[3] The portal allegedly aims to be a place to report "illegal discriminatory practices at institutions of learning."[4] The portal seeks information on schools that participate in diversity, equity, and inclusion efforts, which it equates to "divisive ideologies and indoctrination."[5]

**The FAQs**

On February 28, 2025, the Department published a "Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act"[6] ("FAQs") document that was "intended to anticipate and answer questions in response" to the Letter. The FAQs warn schools to avoid creating a "racially hostile environment" but do not provide an explanation of what that means or reference the well-established relevant legal standards. The FAQs arguably state that simply discussing controversial topics or challenging issues is enough to establish a hostile environment and legal liability.[7] While the FAQs acknowledge the First Amendment limitations on federal control of school curricula, they also assert without support that certain curricula, such as social-emotional learning and culturally responsive teaching, are discriminatory.

The Department has, in the past, repeatedly explained the applicable legal standard under Title VI. For example, in May 2024, the Department published guidance entitled "Ensuring Educational Opportunities for All Students on Equal Terms 70 Years After Brown v. Board of Education."[8] On August 14, 2023, the Department published guidance entitled "Questions and

---

[3] U.S. Dep't of Educ., *End DEI Portal*, https://perma.cc/6VJF-NTY9 (last accessed Mar. 26, 2025), Ex. 13, PLFS-126 .
[4] *Id.*
[5] *Id.*
[6] U.S. Dep't of Educ., *Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act* (Feb. 28, 2025), https://perma.cc/KB53-4SQ3, Ex. 14, PLFS-130.
[7] *Id.*
[8] U.S. Dep't of Educ., Off. For C.R., *Fact Sheet: Ensuring Educational Opportunities for All Students on Equal Terms 70 Years After Brown v. Board of Education*, https://perma.cc/82A2-2TL3 (last visited Mar. 24, 2025), Ex. 15, PLFS-130.

Answers Regarding the Supreme Court's Decision In *Students For Fair Admissions, Inc. v. Harvard College And University Of North Carolina*.[9] On July 2, 2024, the Department published a fact sheet entitled "Harassment based on Race, Color, or National Origin on School Campuses."[10] In January 2025, the Department last reviewed guidance titled "*Resolving a Hostile Environment Under Title VI: Discrimination Based on Race, Color, or National Origin, Including Shared Ancestry or Ethnic Characteristics*."[11] However, all of these guidance documents (and many more) explaining the Title VI legal standards have been recently removed from the Department's website. Neither the Letter nor the FAQs discuss or reference these guidance documents, explain whether those past guidance documents have been rescinded, or attempt to explain the Department's stark departure from their approach.

**Enforcement Begins**

On March 14, 2025, the Department announced 51 new Title VI investigations following the Letter. Forty-five of the investigations were based on allegations that colleges and universities (institutions of higher education or "IHEs") violated Title VI by partnering with The Ph.D. Project, a non-profit working to "expand the pool of workplace talent by developing business school faculty who encourage, mentor, and support tomorrow's leaders."[12] The announcement of these investigations notes that they "can result in the loss of federal funds." More than 20 of the schools targeted for investigation employ Plaintiffs' members.

---

[9] U.S. Dep't of Educ., *Questions And Answers Regarding The Supreme Court's Decision In Students For Fair Admissions, Inc. v. Harvard College And University Of North Carolina* (Aug. 14, 2023), https://perma.cc/8QTR-8PMD, Ex. 16, PLFS-140.
[10] U.S. Dep't of Educ., Off. for C.R., *Fact Sheet: Harassment based on Race, Color, or National Origin on School Campuses* (July 2, 2024), https://perma.cc/Z5JJ-V3WR, Ex. 17, PLFS-153.
[11] U.S. Dep't of Educ., Off. for C.R., *Resolving a Hostile Environment Under Title VI: Discrimination Based on Race, Color, or National Origin, Including Shared Ancestry or Ethnic Characteristics*, https://perma.cc/52LW-MH3E (last visited Mar. 25, 2025), Ex. 18, PLFS-163.
[12] The PhD Project, *Enriching Education for All*, https://perma.cc/CMB9-U8QM (last accessed Mar. 24, 2025), Ex. 19, PLFS-174.

**Harms**

The fallout from the Letter was immediate for educators and educational institutions across the country. For Plaintiffs and Plaintiffs' members, the Letter has: caused uncertainty about what work they can do; chilled their speech, conduct, and associational rights; created fears of investigation for lawful conduct; and threatened loss of federal funding.

*Uncertainty*. Plaintiffs and their members have no way of knowing whether the work they do may be found to run afoul of the Letter. For example, members of AFT and AFT-MD have described not knowing what is prohibited after reading the Letter and FAQs. *See* Ex. 1, AFT Decl. ¶ 28, PLFS-010, PLFS-010; Ex. 3, AFT-MD Decl. ¶ 30, PLFS-029. Individual educators who work at K-12 schools and IHEs do not know what courses and topics they can teach. Ex. 5, Gallagher Decl. ¶ 14, PLFS-057; Ex. 6, Blee Decl. ¶ 17, PLFS-069; Ex. 7, Jane Doe Decl. ¶¶ 8-9, PLFS-079; Ex. 8, Hamako Decl. ¶¶ 10-12, 23, PLFS-091. Rather than being able to focus on their students and their work, educators have had to spend significant time trying to interpret the Letter and anticipate compliance scenarios. *See* Ex. 9, John Doe Decl. ¶ 28, PLFS-106 ("Committees are being convened, faculty are being pulled into meetings, and time and resources are being allocated to address this massive change in guidance from the Department. This shift in institutional posture has burdened my time and capacity already. Instead of engaging in my substantive work, I have been forced to spend time and energy on determining if university policies and courses comply with the vague language of the Letter, largely to no avail. This is time that should be spent meeting with my students, furthering my research, or developing my courses."); *see also* Ex. 4, District 4J Decl. ¶ 42, PLFS-046 (describing alarm and fear at all levels of district staff and leadership, and teachers taking time to reach out leadership about the impact of the letter); Gallagher Decl. ¶¶ 25-28, PLFS-060; Jane Doe Decl. ¶ 16, PLFS-082.

*Chilled First Amendment Speech & Activities.* Plaintiffs and their members fear "they must self-censor their speech, including lectures, courses, programs, and other activities" due to the Letter. AFT Decl. ¶ 25, PLFS-009; *see* John Doe Decl. ¶ 27, PLFS-106. Topics and themes that have long been part of Plaintiffs' members' teachings are now potentially suspect and may require censoring. *See* Hamako Decl. ¶¶ 10-12, 22, PLFS-091; Blee Decl. ¶ 16, PLFS-069; Gallagher Decl. ¶ 27, PLFS-061 (noting the Letter's reach implicates teaching on race relations he has been doing for thirty years). The Letter also threatens to lead to the removal of critically important programs for students, like affinity and student organizations and peer tutoring programs. Jane Doe Decl. ¶ 22, PLFS-085 (describing how affinity groups and student organizations are sometimes the entire reason why students come to school). And teachers "who sponsor affinity groups or first-generation student organizations fear they will face investigation and prosecution," thus "depriv[ing] their students of an essential resource on campus, negatively impacting their ability to access academic and community support." Ex. 2, ASA Decl. ¶ 26, PLFS-020; *see* AFT Decl. ¶ 26, PLFS-010 (expressing similar concerns); AFT-MD Decl. ¶ 29, PLFS-029 (same); Hamako Decl. ¶¶ 10-12, 22, PLFS-091. At the IHE level, the Letter also targets race-neutral programming that addresses diversity, equity, and inclusion and that can be important vehicles for "essential cultural teachings and community for the entire population of [an IHE]" and which "allow[] for important discussions to happen across the student body." John Doe Decl. ¶ 32, PLFS-107.

For many, compliance requires "massive alterations to [their] courses, the elimination of faculty positions, a reduction in class sections, or even the folding of … department[s]." Hamako Decl. ¶ 12, PLFS-092. Because of the Letter, courses "could be removed, research could be stalled or never started, and articles won't be published or accepted." John Doe Decl. ¶ 27, PLFS-106. For the field of sociology, the Letter's reach extends to every aspect of their work, as many ASA

members teach and perform research related to race and ethnicity, "such as health disparities, economic inequality, or community development." ASA Decl. ¶¶ 18-19, PLFS-018; *see also* Decl. ¶ 25, PLFS-072 (noting fundamental sociological concepts and baseline assumptions that underlie the field may be under threat from the Letter). Being forced to end "uninhibited fact-based discussions," and being prevented from "point[ing] students to reputable scholarship on these topics," means "a serious erosion of the academic integrity" of coursework, research, and the research of students. Blee Decl. ¶ 16, PLFS-069. It also means that the Letter is effectively dictating Plaintiffs' curricula. *See* District 4J Decl. ¶ 14, PLFS-035 (the Letter forces schools to pull back on their curriculum and efforts to promote critical thinking, equitable outcomes, and a sense of belonging for students).

In some cases, the Letter may conflict with state standards. For example, District 4J is required by state law to teach a Native American curriculum, a genocide curriculum, and use inclusive instructional materials and incorporate Social and Emotional Learning standards. District 4J Decl. ¶¶ 11-17, PLFS-034. Similarly, "all degree-seeking students attending a Washington state community or technical college are required to take a DEI and antiracism program" in accordance with "Washington State law RCW 28B.10.149." Hamako Decl. ¶ 7, PLFS-091. Given that discussion of these topics may be barred under the Letter, it is difficult for Plaintiffs to continue curriculum planning, which is a resource intensive process that is now impeded. *See* District 4J Decl. ¶ 13, PLFS-035.

*Fear of Investigation.* Plaintiffs and their members fear that their work will lead to investigations, forcing them and their "institution[s] into an impossible choice of deciding between continuing to teach in a free and proper manner or face the threat of a costly and drawn-out federal investigation." John Doe Decl. ¶ 28, PLFS-106; *see* District 4J Decl. ¶ 16, PLFS-036 (explaining

that complying with mandatory state curriculum topics may subject the District to investigation); Blee Decl. ¶ 12, PLFS-068 (discussing potential of costly investigation); Jane Doe Decl. ¶ 8, PLFS-079 (same); Hamako Decl. ¶ 16, PLFS-093 (same); Gallagher Decl. ¶ 20, PLFS-058 (same). The risk of investigation "negatively influenc[es] the work and careers" of Plaintiffs' members and "impact[s] the learning and future of their students by depriving them of essential courses and learning." AFT-MD Decl. ¶ 27, PLFS-028; *see* ASA Decl. ¶ 24, PLFS-019 (similar); John Doe Decl. ¶ 32, PLFS-107 ("I am deeply concerned that the threat of a federal investigation will result in my institution preemptively curtailing some or all of these meaningful programs and practices. Such steps would deeply harm the students and campus community.") Being subject to an investigation also risks devastating reputational consequences, for both individual educators and their institutions. *See* Gallagher Decl. ¶ 13, PLFS-056; John Doe Decl. ¶ 28, PLFS-106; Hamako Decl. ¶ 10, PLFS-091; Blee Decl. ¶ 12, PLFS-068.

The risk of potential investigation is increased by the 'End DEI' portal, which solicits discrimination complaints with misleading statements about DEI. *See* Blee Decl. ¶ 12, PLFS-068; Jane Doe Decl. ¶ 8, PLFS-079 (describing compounded risk due to "Department's apparent encouragement" of complaints from the public based on the Letter).

*Risk of Funding Loss.* Plaintiffs fear the loss of federal funding for their institutions. John Doe Decl. ¶ 12, PLFS-102; Blee Decl. ¶ 21, PLFS-071; AFT-MD Decl. ¶ 31, PLFS-029; Hamako Decl. ¶ 23, PLFS-095; ASA Decl. ¶ 25, PLFS-019; AFT Decl. ¶ 24, PLFS-009. The threat itself is enough to negatively affect programming. For example, IHEs will feel "pressure to preemptively end some or all" programs that the Department might target. Blee Decl. ¶ 36, PLFS-075; John Doe. Decl. ¶ 21, PLFS-104 ("[T]he threat of the Dear Colleague Letter language may force my institution to proactively take action to prevent any reduction in federal funds"). Obvious targets

are identity-oriented cultural centers, which may be "close[d] []entirely instead of risking having federal funds revoked." Hamako Decl. ¶ 31, PLFS-098. At the high school level, schools "may be forced to choose between offering [culture and race-related] courses and maintaining the high standards of [their programming] or eliminating them to keep . . . federal funding safe from the threat of the Dear Colleague Letter." Jane Doe Decl. ¶ 20, PLFS-084.

The loss of funds would be devastating. For example, if federal funding were eliminated, Plaintiff District 4J will be unable to provide critical services to its students, including those with high academic needs and those with disabilities. District 4J Decl. ¶ 38, PLFS-044. The immediate effect of the loss of funding would require the district to "shorten the school year, depriving students of instruction time and care; layoff dozens and dozens if not more than 100 educators, increasing class sizes at all levels; reduce course offerings and enrichment programs; and delay curricular purchases, stagnating instructional materials for teachers." *Id* at ¶ 40, PLFS-045. For one Plaintiff member's institution, a loss of funding would likely mean cutting the Asian American and Native American Pacific Islander-Serving Institutions Program, "which would decimate programming at [his school]." Hamako Decl. ¶ 23, PLFS-095. For Plaintiffs' and their members nationwide, the losses will have widespread effects and put their own jobs at risks. John Doe Decl. ¶ 27, PLFS-106 ("My institution relies significantly on federal funding, and losing that funding would result in issues across the board."); AFT-MD Decl. ¶ 30, PLFS-029 (noting risk to members' jobs); ASA Decl. ¶ 27, PLFS-020 (same); Hamako Decl. ¶ 10, PLFS-091 (noting risk to his job); Gallagher Decl. ¶ 13, 14, PLFS-056 (same); Blee Decl. ¶ 12, PLFS-068 (same); Jane Doe Decl. ¶ 8, PLFS-079 (same).

**LEGAL STANDARD**

To obtain a preliminary injunction order, the moving party must "establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)) (cleaned up). In cases against the government, the balance of equities and public interest factors merge into a single inquiry. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

**ARGUMENT**

I.  **Plaintiffs Are Likely to Succeed on the Merits.**

Plaintiffs are likely to succeed on the merits that the Letter violates the First Amendment because the Letter discriminates on the basis of viewpoint and content, and is overbroad. Plaintiffs are likely to succeed on the merits of their Fifth Amendment claim because the Letter is so vague and overbroad it fails to provide reasonable notice of the conduct that is prohibited and invites arbitrary enforcement, putting Plaintiffs in an impossible position as to how to do their jobs and serve their students.

Plaintiffs are also likely to succeed on the merits of their Administrative Procedure Act claims. The Letter is arbitrary and capricious, contrary to constitutional rights, not in accordance with law, and is in excess of statutory authority. Moreover, it was required to be promulgated through notice and comment rulemaking.

A.  **The Letter Violates the First Amendment.**

1.  ***The Letter squarely regulates "speech" and "association" within the meaning of the First Amendment.***

Government cannot "intimidate [educators] into silence" without implicating the First Amendment and unlawfully chilling speech. *See Ridpath v. Bd. of Govs. Marshall Univ.*, 447 F.3d

292, 316 (4th Cir. 2006) (cleaned up). The Supreme Court has long held that "[n]either students [n]or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). The overbroad and vague terms and concepts that the Letter seeks to outlaw, *see infra* Sec. 1.B, along with the Letter's claim that these concepts "emanate[] throughout every facet of academia," Letter at 1, reveal the Letter's true goal to intimidate educators into silence and force them to shed their rights. *See Loc. 8027, AFT-N.H., AFL-CIO v. Edelblut,* 651 F. Supp. 3d 444, 453 (D.N.H. 2023) ("*Edelblut I*").[13]

The Letter does not hide that it regulates "speech" and "association" within the meaning of the First Amendment and attempts to stamp out disfavored views. It expressly restricts how educators and educational institutions speak about the history of the United States, "systemic and structural racism," and how race may impact a person's experiences. Letter at 2. By its terms, the Letter applies to "all [] aspects of student, academic, and campus life," the "school environment," and the "life of a school." Letter at 2-3; *see also, e.g.*, Jane Doe Decl. ¶ 8, PLFS-079 (describing fear that Letter will prevent her sponsoring a cultural group at school); District 4J Decl. ¶ 31, PLFS-042 (noting that teachers and staff serve as advisors to affinity groups). Likewise, it seeks to limit associations with other like-minded people and entities by prohibiting organizations and programs oriented around disfavored viewpoints about diversity, equity, inclusion, and social justice. If educators or institutions violate the Letter's terms, they face enforcement, including "loss of federal funding." Letter at 3-4.

---

[13] Even where such expression is not protected by the First Amendment, it is the responsibility of the state and local governments to determine curriculum; the federal government is restricted by law from controlling curriculum. *See, e.g.*, 20 U.S.C. § 3403(b) (federal government has no authority to "direct[], supervis[e], or control … curriculum"). The Letter creates a tension for schools and teachers who are required to teach certain topics that are seemingly prohibited by the Letter. Hamako Decl. ¶ 7, PLFS-091 (describing a Washington State requirement that his course meets that seemingly conflicts with the language of the Letter).

In this Circuit, Plaintiffs' members at IHEs are entitled to particular First Amendment protection when their expression "relate[s] to scholarship or teaching." *Porter v. Bd. of Trs. of N.C. State Univ.*, 72 F.4th 573, 582 (4th Cir. 2023). Here, there is no question that the Letter intrudes into core aspects of the professor's academic pursuits. *See* Blee Decl. ¶ 12, PLFS-068 (describing the Letter as "a direct threat to [her] career, [her] field, and [her] specialization," and that her research "may be viewed by the Department . . . as 'toxically indoctrinating' students.") Likewise, "almost any aspect of [one of AFT's member's] academic activities could threaten [their institution's] federal funding" based on the Letter. Hamako Decl. ¶ 24, PLFS-096 ("The Center and the Program I work with at my institution both provide robust programming and events for students on campus . . . address[ing] a wide range of issues including reparations, social justice change, and racial equity."). John Doe Decl. ¶ 29, PLFS-106. ("I believe that the programming of the Center . . . may be considered by the Department of Education to be DEI programs or serving as explicit race-consciousness under the language of the Dear Colleague Letter.").

And for Plaintiff District 4J, Justice Frankfurter acknowledged the need to protect schools from government interference 75 years ago. In rejecting a government loyalty test for teachers, he explained the centrality of academic freedom to preserving democracy:

> To regard teachers–in our entire educational system, from the primary grades to the university–as the priests of our democracy is therefore not to indulge in hyperbole.… It is the special task of teachers to foster those habits of open-mindedness and critical inquiry which alone make for responsible citizens. . .They must have the freedom of responsible inquiry, … into the checkered history of social and economic dogma. . . . . to assure which the freedoms of thought, of speech, of inquiry, of worship are guaranteed by the Constitution of the United States against infraction by national or State government.

*Weiman v. Updegraff*, 344 U.S. 183, 196-97 (1952) (Frankfurter, J., concurring); *see also Urofsky v. Gilmore*, 216 F.3d 401, 413 (4th Cir. 2000) ("[T]he First Amendment protects values of academic freedom.").

The Letter's restrictions on the freedom of association fare no better. "[T]he stifling effect on the academic mind from curtailing freedom of association [by penalizing membership in a group with a disfavored view] is manifest." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 607 (1967). This right includes expressive association, including association while engaging in First Amendment activities. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984); *see also, e.g.*, *Cromer v. Brown*, 88 F.3d 1315, 1331 (4th Cir. 1996) ("The right to associate in order to express one's views is 'inseparable' from the right to speak freely." (cleaned up)).

The infringements on speech and association set forth in the Letter can only be justified by "compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623. No such interests exist here.

### 2. The Letter discriminates based on viewpoint and content.

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). Yet that is precisely what the Letter does. Such regulation is presumptively unconstitutional. *Id.*

#### a. The Letter imposes a viewpoint-based restriction.

The First Amendment prohibits "[t]he government . . . from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. Doing so is a "blatant" and "egregious" violation of the First Amendment. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 168 (2015). The government has "no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Id.* at 163 (cleaned up). This is particularly true in education, especially higher education,

because "[o]ur Nation is deeply committed to safeguarding academic freedom," and such freedom is "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 683.

The new administration has a clear perspective on issues of diversity, equity, inclusion, and social justice.[14] But the government may not put a thumb on the scale in favor of its preferred view:

> [The government's] failure to persuade does not allow it to hamstring the opposition. [It] may not burden the speech of others in order to tilt public debate in a preferred direction. . . . [T]he general rule is that the speaker and the audience, not the government, assess the value of the information presented.

*Sorrel v. IMS Health, Inc.*, 564 U.S. 552, 578-79 (2011) (cleaned up).

Nor can the government use its power of the purse to restrict expression of disfavored views. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205, 214 (2013). Courts routinely strike down conditions on federal funding in this context. *See, e.g.*, *id.* at 218-19 (citing *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)); *Legal Servs. Corp v. Velazquez*, 531 U.S. 533, 547-49 (2001); *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 542 (N.D. Cal. 2020). The government simply "'cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise.'" *Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget*, Civil Action No. 25-239 (LLA), 2025 WL 597959, at *17 (D.D.C. Feb. 25, 2025) (citing *Agency for Int'l Dev.*, 570 U.S. at 215) (finding that "[b]y appearing to target specific recipients *because* they associate with certain ideas, [the federal government] may be crossing a constitutional line" in violation of the First Amendment); *see also Nat'l Rifle*

---

[14] *See, e.g.*, *End DEI Portal*, *supra note* 3; Exec. Order No. 14151 ("*Ending Radical and Wasteful Government DEI Programs and Preferencing*"), 90 Fed. Reg. 8339 (Jan. 29, 2025), Ex. 20, PLFS-179; Exec. Order No. 14173 ("*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*"), 90 Fed. Reg. 8633 (Jan. 31, 2025), Ex. 21, PLFS-184.

*Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024) (finding government official "could not wield her power. . . to threaten enforcement actions against [entities] in order to punish or suppress" a disfavored viewpoint).

The Letter is unconstitutional on both grounds—it attempts to regulate speech through direct viewpoint discrimination *and* by conditioning funding based on the viewpoint. The Letter openly targets "particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at 829. After a litany of unsupported allegations about the "discriminatory" expression captured through diversity, equity, and inclusion, the Letter—in order to "hamstring" those that disagree, *Sorrel*, 564 at 552—announces that the Department "will no longer tolerate" such expression. Letter at 3. Nor does it attempt to disguise that it is targeting specific expression based on "motivating ideology," a practice expressly prohibited in *Rosenberger*, 515 U.S. at 829. By its terms, the Letter targets only "[p]roponents" of diversity, equity, and inclusion and "nebulous goals such as diversity," "social justice, or equity." Letter at 3. The Letter inaptly characterizes these concepts as "a shameful echo of a darker period" of de jure racial segregation, Letter at 1, characterizing their expression as "toxic[] indoctrinat[ion]," *id.* at 2, making unsupported accusations that proponents "smuggl[e] racial stereotypes" into programming, *id.* at 2, describing "DEI programs" as "insidious" discrimination that "stigmatize[s] students," *id.* at 3, and tagging diversity, equity, inclusion, and social justice as "overt and covert racial discrimination." *Id.* at 3. The punishment for engaging in the expression or association that the government disfavors is straightforward: "appropriate measures" including "loss of federal funding." Letter at 3, 4.

By contrast, the Letter explicitly *permits* educators to develop lessons that denounce social justice, condemn diversity, or present equity in a neutral or negative light. And any educator could associate with denouncers of these concepts through official organizations or programs. By the

Letter's terms, such efforts can continue to rely on federal funding. Through the Letter, Defendants have effectively excluded educators, including Plaintiffs and their members, from expressing their disagreement of the government's favored viewpoint—that diversity, equity, and inclusion are "insidious" forms of discrimination. Letter at 3.

### b. The Letter imposes a content-based restriction.

Even if the Letter were viewpoint neutral, it would still be content-based discrimination because it distinguishes permissible from impermissible speech "based on 'the topic discussed or idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. Of Austin, LLC*, 596 U.S. 61, 74 (2022) (quoting *Reed*, 576 U.S. at 171). Content-based restrictions are presumptively unconstitutional. *Reed*, 576 U.S. at 163; *see also United States v. Playboy Ent. Grp.*, 529 U.S. 803, 818 (2000) ("It is rare that a regulation restricting speech because of its content will ever be permissible."). A government action that "single[s] out specific subject matter for differential treatment" is "content-based." *City of Austin*, 586 U.S. at 69 (quoting *Reed*, 576 U.S. at 169).

The Letter's prohibitions are *not* content-agnostic. Pursuant to the Letter, "[o]ne category of speech has been completely prohibited . . . [while o]ther categories of speech . . . are permitted." *Boos v. Barry*, 485 U.S. 312, 319 (1988). Certain content regarding our country's history is permitted, while any speech about "structural racism" in our country's history is not. Letter at 2. And more broadly, any speech or association related to the benefits of diversity, equity, and inclusion is clearly disfavored and could be viewed, under the terms of the Letter, as banned. Not only is disfavored content prohibited, it can lead to the loss of critical funding necessary to support entire educational institutions. By contrast, expression on topics beyond the scope of the Letter can continue, relying on the federal funding along the way. And because much of the educational content *prohibited* by the Letter is *required* by state laws, the stakes for Plaintiffs could not be

higher. *See* District 4J Decl. ¶¶ 11-19, PLFS-034 (describing Oregon's education and operations requirements that conflict with the Letter); Hamako Decl. ¶ 7, PLFS-091 (describing Washington State's community and technical college requirement that students complete a DEI and antiracism program).

The government may not, under threat of loss of funding, exclude specific content—here any discussion of diversity, equity, inclusion, or related concepts—from public discourse, no matter how strongly the government disfavors the viewpoint or the content.

### 3. The Letter Is Facially Overbroad.

The Letter also violates the First Amendment because it is facially overbroad. The overbreadth doctrine allows challenges where, like here, a government action's "very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973); *see also Newsom v. Albermarle Cnty. Sch. Bd.*, 354 F.3d 249, 257 (4th Cir. 2003) ("[T]hose who desire to engage in legally protected expression . . . may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid") (cleaned up). A facially overbroad prohibition punishes "a substantial amount of protected speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118-119 (2003) (cleaned up).

Even if the Letter has any "plainly legitimate sweep," *Broadrick*, 413 U.S. at 615, it pales in comparison to the substantial amount of protected expression that it punishes. The Fourth Circuit has previously struck down overbroad limitations on speech in such a context. In *Newsom*, the Fourth Circuit held that a dress code was unconstitutionally overbroad where its ban on depicting weapons would target significant amounts of constitutionally protected expression, including "symbols, images, and political messages that are entirely legitimate and even laudatory." 354

F.3d at 259-60. So too here. The amount of protected speech chilled by the Letter, *see supra* at 8-9, is substantial. For example, as described by Plaintiff ASA, "[t]he Letter appears to prohibit not only lectures, analysis, and research explicitly dealing with questions of race and ethnicity—including structural and systemic discrimination—but all the subsequent downstream sociological topics as well. Under the restrictions laid out by the Letter, our members are unable to even have basic conversations about general sociological issues such as public health policy, economic inequality, or community development without the fear of a government enforcement action." ASA Decl. ¶ 22, PLFS-019. The Letter's vagueness only exacerbates its fatal overbreadth. *See infra*, Sec. 1.B.

**B. The Letter Is Unconstitutionally Vague in Violation of the Due Process Clause.**

Underlying the void for vagueness doctrine are "at least two connected but discrete due process concerns." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("*Fox Television II*"). First, parties must "know what is required of them so they may act accordingly." *Id.*; *see also Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("Vague laws may trap the innocent by not providing fair warning."). Second, clear guidance is needed to ensure "those enforcing the law do not act in an arbitrary or discriminatory way." *Fox Television II*, 567 U.S. at 253 (*citing Grayned*, 408 U.S. at 108-09).

The requirement to avoid vagueness is particularly high where, as here, the governmental action "threatens to inhibit the exercise of constitutionally protected rights," such as "the right of free speech or of association." *Vill. Of Hoffman Ests. v Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *see also Edelblut I*, 651 F. Supp. 3d at 459–60 (finding rigorous vagueness review required for government action plausibly restricting extracurricular speech in schools).

*1. The Letter fails to give fair warning of what it bans.*

The Letter fails to provide definitions and objective standards for assessing discrimination purportedly in violation of Title VI. The Letter does not define the words "diversity," "equity," "inclusion" or "DEI" and fails to describe "DEI programs" that it says are discriminatory. *See, e.g.*, *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1286 (N.D. Fla. 2022) (finding a list of banned "divisive concepts" impermissibly vague). It does not explain the difference between meaningful discussion and "toxic indoctrination." It does not detail what constitutes "race-based decision making" or what types of information serve "as a proxy for race."

These omissions are significant: the Letter targets concepts devoid of concrete definition. For example, there is no clear, shared understanding of what constitutes "DEI," rather it is a concept with "contestable moral and political content." *Tenn. Educ. Ass'n v. Reynolds*, 732 F. Supp. 3d 783, 807 (M.D. Tenn. 2024). Consequently, determining what constitutes a prohibited "DEI program" necessitates a subjective assessment. *See, e.g., Smith v. Goguen*, 415 U.S. 566, 578 (1974) (finding statute with operating term "treats contemptuously" was subjective and "simply ha[d] no core"); *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (finding statute with operating term "annoying" was vague "in the sense that no standard of conduct is specified at all").

As a result, Plaintiffs are left to guess whether their conduct, expression, or association will lead to termination of federal funds for their educational institutions. *See* Am. Compl. 70 (providing examples of activities that may or may not violate the terms of the Letter); *see supra* at 7.[15] This uncertainty is "untenable." *Loc. 8027 v. Edelblut*, No. 21-cv-1077-PB, 2024 WL 2722254, at *12-13 (D.N.H. May 28, 2024) ("*Edelblut II*") (finding provisions that did not define

---

[15] Adding to the confusion and uncertainty is the fact that multiple Department guide related to racial and national origin discrimination have been removed from the Department's website, *see* Am. Compl. ¶ 75 n.21, leaving regulated parties both without useful information about governing law and unsure whether such information can still be relied upon.

key terms or clarify what it meant to "teach" a banned DEI-related concept rendered the line between acceptable and unacceptable discussion unclear, and left teachers "in the untenable position of having to wager their careers on a guess or else refrain from discussing matters that implicate the banned concepts altogether.").

Moreover, the Letter forces Plaintiffs' members and District 4J to decide whether to comply with licensure, professional requirements, and state laws or jeopardize their institution's federal funding. For example, in Oregon, teachers are required by state law to teach a Native American curriculum, a genocide curriculum, use inclusive instructional materials, and incorporate Social and Emotional Learning standards, and no later than the 2026 academic year, to teach ethnic studies, a requirement that is already partially implemented in District 4J. District 4J Decl. ¶¶ 11-18, PLFS-037. Similarly, in Washington State, all degree-seeking students attending a state community or technical college are required to take a DEI and antiracism program. *See* Wash. Rev. Code Ann. § 28B.10.149 (West 2021); Hamako Decl. ¶ 7, PLFS-091. The Letter puts institutions and teachers in the impossible position of deciding whether to risk state consequences or federal consequences; there seemingly is no way to comply with both. *See Edelblut I,* 651 F. Supp. 3d at 462 (finding that the conflict between state curriculum requirements and bans on teaching certain concepts created a "Hobson's choice").

### 2. The Letter lends itself to subjective interpretation and arbitrary or even discriminatory enforcement.

The Letter's ambiguity will allow OCR to exercise unfettered discretion to initiate an investigation and to determine whether a program or activity violates federal civil rights law, as it is misconstrued under the Letter. *See Edelblut II*, 2024 WL 2722254, at *12 (finding law's lack of clarity "sow[ed] confusion and le[ft] significant gaps that can only be filled in by those charged with enforcing the [the law], thereby inviting arbitrary enforcement" in violation of the

constitution); *Tenn. Educ. Ass'n*, 732 F. Supp. 3d at 807–08 (explaining act's inclusion of "value-laden" terms maximized enforcement discretion and was a "quick route to unconstitutional ambiguity"). Indeed, the Department is already empowering the public to aid in that effort by encouraging them to file complaints against purported violators of these amorphous concepts.[16] Being subject to a lengthy and costly investigation is devastating to educators and educational institutions, even absent an ultimate finding of discrimination. *See supra* at 10. Accordingly, the Letter is unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause.

### C. The Letter Violates the Administrative Procedures Act.

#### 1. The Letter is Final Agency Action.

As an initial matter, the Letter is final agency action subject to judicial review. 5 U.S.C. § 706. An agency's action is final when it (1) represents "the consummation of the agency's decisionmaking process," and (2) conclusively determines legal "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotations omitted). An agency action is "immediately reviewable when it gives notice of how a certain statute will be applied even if no action has yet been brought." *Am. Acad. of Pediatrics v. Food & Drug Admin.*, 379 F. Supp. 3d 461, 487 (D. Md. 2019) (cleaned up).

The Letter is signed by the Acting Assistant Secretary for Civil Rights, the Department official with statutory authority for enforcing civil rights laws. 20 U.S.C. § 3413(a); *see POET Biorefining, LLC v. Env't Prot. Agency*, 970 F.3d 392, 404 (D.C. Cir. 2020) (finding that approval by agency official who was "no mere subordinate" was evidence of finality). The Letter itself, rather than the underlying statute, creates obligations by promising to "assess compliance . . . based

---

[16] *See End DEI Portal*, *supra note* 3. For example, those who oppose "DEI" practices have started to file complaints with OCR against diversity-related programming. *See* Vincent DiFonzo, *Young America's Foundation Files Complaint Against Gettysburg College to Department of Education*, The Gettysburgian (Mar. 21, 2025), https://perma.cc/P7QW-5LQF, Ex. 22, PLFS-191.

on the understanding embodied in this letter." Letter at 3. The Letter thus sets forth the "'interpretation' and 'guidance' of the agency," *POET Biorefining LLC*, 970 F.3d at 404, and binds not only the Department's enforcement staff but also the regulated community, who are subject to the penalty of losing federal funding if they do not comply. *See U.S. Army Corps of Eng'rs v. Hawkes Co*., 578 U.S. 590, 600 (2016) (finding agency action was final where failure to conform leaves the regulated party at risk of significant criminal and civil penalties). Department investigations announced March 14 explicitly reference the Letter, further confirming its status as a final agency action. *See Sierra Club v. Env't Prot. Agency*, 955 F.3d 56, 63 (D.C. Cir. 2020) (noting that "whether the agency has applied the guidance as if it were binding on regulated parties" is relevant to prong two of the *Bennett* test) (quoting *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014)).

## 2. The Letter is Arbitrary and Capricious.

Under the APA, agency action that is arbitrary and capricious shall be set aside as unlawful. 5 U.S.C. § 706(2)(A). An agency's decision is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *West Virginia v. Thompson*, 475 F.3d 204, 212 (4th Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)). Here, the letter is arbitrary and capricious because it fails to acknowledge or explain the Department's changed position, rely on prior factual findings and available evidence, account for existing federal and state legal requirements, consider important aspects of the problem, and grapple with the substantial reliance interests.

While an agency may have latitude to change its policies, that "flexibility" has "limits." *United Steel v. Mine Safety and Health Admin.*, 925 F.3d 1279, 1284 (D.C. Cir. 2019). An agency must "display awareness that it is changing position" and "show that there are good reasons" for its new policy. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("*Fox Television I*"); *see also City of Columbus v. Cochran*, 523 F. Supp. 3d 731, 754 (D. Md. 2021) (finding agency action arbitrary and capricious when the agency failed to articulate why it changed policy "suddenly, and in contradiction to its previous position"). When an agency fails to do so, it has "entirely failed to consider an important aspect of the problem." *State Farm.*, 463 U.S. at 43; *Encino Motorcars*, 136 S. Ct. at 2126 (An "[u]nexplained inconsistency" in agency policy is sufficient to render agency action arbitrary and capricious.") (citation omitted). Here, the Department fails to acknowledge, much less explain, the stark conflict between this Letter and its prior guidance on Title VI and *SFFA*. The Department has changed positions, in conflict with previously-issued guidance, in three key areas of education in which Plaintiffs engage: teaching and learning; student groups, support, and DEI programming; and higher education practices following *SFFA*.

*Teaching and Learning.* The Department previously took the position that "absent allegations of discrimination," OCR did not involve itself in complaints "based on the content of a school's academic course material or related discussions."[17] Its prior position was that "instruction in or training on the impact of racism or systemic racism" was not categorically

---

[17] U.S. Dep't of Educ., Off. of C.R., *Race and School Programming*, 6 (Sept. 25, 2023), https://perma.cc/2752-CRW3, Ex. 23, PLFS-196.

prohibited by Title VI.[18] The Letter, on the other hand, categorizes such lessons as toxic indoctrination. Letter at 2.

The Department previously had a policy, grounded in case law, that a hostile environment was present where harassment constituted "unwelcome race-based conduct that, based on the totality of circumstances, is subjectively and objectively offensive and is so severe or pervasive, that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity."[19] In providing examples of what did and did not meet that standard, the Department stated that an elementary school "that requires all student to read a book about race discrimination and racial justice" would, "absent other facts, not raise allegations that warrant investigation under Title VI."[20] Nor would a history curriculum that "requires all students to take one Mexican-American history class before graduation," because "OCR would have no reason to regard a Mexican-American history class as objectively offensive in a way that creates a racially hostile environment."[21] The Department also previously stated that asking "students to participate in small group discussions" focused on racial and ethnic identity, absent additional allegations, would not warrant investigation under Title VI.[22]

The Department, via the Letter and FAQs, changed those positions without explanation. Without describing any governing standard, the Letter asserts that lessons on "systemic and structural racism" have "toxically indoctrinated students." Letter at 2. The Letter's prohibition on "racial stereotypes," while failing to define that term, arguably encompasses curriculum that focuses on a particular race, culture or ethnicity. The FAQs state that "social-emotional learning"

---

[18] *Supra* note 17, at 2.
[19] *Id*. at 9.
[20] *Id*. at 6-7.
[21] *Id*. at 7.
[22] *Id*. at 8.

and "culturally responsive teaching" often "veil discriminatory policies," and that "mandating courses, orientation programs, or trainings that are designed to emphasize and focus on racial stereotypes," is school-on-student harassment under Title VI. FAQs at 5-7.

*Student Groups, Student Support, DEI programming*. Previous guidance found it both lawful and laudable for universities to, for example, "develop[] comprehensive support programs to increase retention and completion rates, particularly for students with the greatest needs," who are more likely to be students of color; and "ensure[] campuses provide a welcoming and supportive environment for students from all backgrounds through affinity groups [and] diversity, equity, and inclusion (DEI) programming." [23] And the Department's previous "Fact Sheet: Diversity & Inclusion Activities Under Title VI,"[24] stated that Title VI does not categorically prohibit "diversity, equity, and inclusion training," "cultural competency training," or investigations or reports concerning "racial disparities within a school." *Id*. at 2. Now the Department's policy is the opposite.

*SFFA*. Two months after *SFFA*, the Department and DOJ jointly issued Frequently Asked Questions ("Joint FAQs").[25] The Department stated that "nothing in the *SFFA* decision prohibits institutions from continuing to seek the admissions and graduation of diverse student bodies, including along the lines of race and ethnicity, through means that do not afford individual applicants a preference on the basis of race in admissions decisions." Joint FAQs at 3. The Joint FAQs advise that "targeted outreach, recruitment, and pipeline or pathways programs" to

---

[23] U.S. Dep't of Educ., Off. of the Under Sec'y, *Strategies for Increasing Diversity and Opportunity in Higher Education* (Sept. 28, 2023), https://perma.cc/XTP4-SRAL, Ex. 24, PLFS-215.

[24] U.S. Dep't of Educ., Off. of C.R., *Fact Sheet: Diversity and Inclusion Activities Under Title VI* (Jan. 2023), https://perma.cc/4G25-JKZJ, Ex. 25, PLFS-282.

[25] *Supra* note 8. The FAQs were accompanied by a Dear Colleague Letter, explaining the views of the Department and DOJ, *see* Letter from Kristen Clarke, Assistant Att'y Gen., C.R. Div., U.S. Dep't of Just., and Catherine E. Lhamon, Assistant Sec'y for C.R., Off. for C.R., U.S. Dep't of Educ. (Aug. 14, 2023) ("Dear Colleague Letter"), Ex. 26, PLFS-285.

encourage applicants from underrepresented backgrounds are lawful, and that "SFFA does not require institutions to ignore race when identifying prospective students for outreach and recruitment." *Id.* at 3-4. The Joint FAQs advised that race-neutral efforts to increase "equal opportunity for all students," such as eliminating legacy admissions, are lawful. *Id.* at 5. Now, without explanation, the Department's position is exactly the opposite: that institutions violate *SFFA* and Title VI if they are "motivated by racial considerations" to "increase racial diversity." Letter at 2-3. The Letter implies that attempting to increase diversity in any form is itself unlawful discrimination and specifically identifies race-neutral practices to increase diversity as unlawful. Letter at 2 (describing "DEI" as "a discriminatory practice"); *id.* at 3 ("It would . . . be unlawful for an educational institution to eliminate standardized testing to . . . increase racial diversity").

In sum, the Department's many reversals, without acknowledgment or explanation, render the Letter arbitrary and capricious. *See Fox Television I*, 556 U.S. at 515; *see also City of Columbus*, 523 F. Supp. 3d at 754.

> **b. The Department Fails to Rely on Prior Factual Findings and Available Evidence.**

An agency action is arbitrary and capricious where its justification lacks support or contradicts facts before it. *See e.g., Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.,* 25 F.4th 1, 10 (D.C. Cir. 2022) (finding agency acted arbitrarily when there was no "factual basis" for its conclusions).

The Department does not provide any support for the factual assertions at the heart of its argument. *See* Letter at 2-3 (discussing the prevalence of racism and "toxic indoctrination" at schools and that DEI preferences some races, without any factual evidence). Indeed, the factual assertions in this Letter (*e.g.,* that "DEI programs . . . frequently preference certain racial groups and teach students that certain racial groups bear unique moral burdens that others do not . . .

[and] deny students the ability to participate fully in the life of a school") contradict prior factual conclusions.[26] The Department's bald statements about purportedly pervasive "discrimination" are simply "unsupported assertion[s]" that cannot support the agency's decision-making. *Safe Extensions, Inc. v. F.A.A.*, 509 F.3d 593, 605 (D.C. Cir. 2007). In this way, it is also clear that the Letter's rationale is mere pretext for the administration's actual goal of eliminating ideologies, practices, and programming with which it disagrees no matter the cost. *See supra*, Sec. 1.A.2.a.

> *c. The Letter fails to account for existing federal and state legal standards.*

Relatedly, the Department fails to grapple with the case law that informs how courts interpret Title VI or with the Department's own Title VI regulations. *See Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012) ("A material misapprehension of the baseline conditions existing in advance of an agency action can lay the groundwork for an arbitrary and capricious decision."). While the Letter claims to enforce "applicable" civil rights statutes and regulations, it fails to actually describe or address the applicable legal standards from cases or regulations,[27] and to the extent it does, it misstates them. It is not enough to "indicat[e] in boilerplate language" that the relevant statutory factors were considered. *Wash. Metro. Area Transit Auth. v. Loc. 689, Amalgamated Transit Union*, 818 F. Supp. 2d 888, 899 (D. Md. 2011) (cleaned up).

---

[26] *Questions and Answers, supra* note 8, at 3-4 (describing how pathway programs that promote and maintain a diverse student applicant pool allow institutions to better attain student body diversity and its related educational benefits).

[27] This is in sharp contrast to prior guidance issued by the Department, which laid out the legal standards. *Resolving a Hostile Environment Under Title VI: Discrimination Based on Race, Color, or National Origin, Including Shared Ancestry or Ethnic Characteristics*, *supra* note 11 (outlining the correct legal standard for racial harassment claims); *Harassment based on Race, Color, or National Origin on School Campuses, supra* note 10 (same); *Race and School Programming*, *supra* note 17 (explaining multiple legal standards, including the standard for differential treatment claims). These resources, along with dozens of others that relate to racial harassment, are no longer available on the Departments website. *See* Am. Compl. ¶ 75 n.21.

For example, the Department claims *SFFA* "applies more broadly" than its holding so as to give the baseless impression that any acknowledgement of race or "DEI"-related activity is unlawful, but provides no analysis or reasoning for this conclusion, which in fact contradicts *SFFA* itself. *See SFFA*, 600 U.S. at 181 ("[N]othing in this opinion should be construed as prohibiting universities from considering an applicant's discussion of how race affected his or her life."). Similarly, the Department either ignores or misstates the standard for determining whether a racially hostile environment exists. *Compare Ricketts v. Wake Cnty. Pub. Sch. Sys., WCPSS*, 125 F.4th 507, 521 (4th Cir. 2025) (setting forth standard); *with* FAQ 9 at 6 (discussing racially hostile environments with no articulation of the relevant legal standard). In FAQ 13, after referring to the *Arlington Heights* analysis for determining whether an act was motivated by a racially discriminatory purpose, the Department adds an additional factor divorced from the case law and seemingly aimed at punishing schools for prior legal behavior. FAQ 13 ("A school's history and stated policy of using racial classifications and race-based policies to further DEI objectives, 'equity,' a racially oriented vision of social justice, or similar goals will be probative in OCR's analysis of the facts and circumstances of an individual case."). Without the correct legal context, particularly the standard applying to racial harassment claims, schools are left to believe that lawful activity—such as affinity groups or classroom discussions acknowledging structural racism—is unlawful.

Furthermore, the Department's position that it is unlawful to implement race-neutral policies to increase diversity contradicts its *own* regulations, *see* 34 C.F.R. § 100.5 (explaining schools "may properly give special consideration to race, color, or national origin to make the benefits of its program more widely available to such groups, not then being adequately served"), as well as this Circuit's precedent, *see Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 885–

86 (4th Cir. 2023), *cert. denied*, 218 L. Ed. 2d 71 (Feb. 20, 2024) (finding efforts to "improve racial diversity and inclusion by way of race-neutral measures" is a "practice that the Supreme Court has consistently declined to find constitutionally suspect").[28] Therefore, because the Department diverges from applicable case law and attempts to change it with no statutory basis or adequate explanation, its actions are arbitrary and capricious.

> d. *The Department Failed to Consider Two "Important Aspect[s] of the Problem."*

An agency action is arbitrary and capricious if the agency "failed to consider an important aspect of the problem." *State Farm,* 463 U.S. at 43. Here, the Department failed to consider: 1) the critical role that states and localities play in education (and the Department's own lack of authority), and 2), the impact of reversing longstanding approaches to Title VI interpretation and enforcement on underserved communities and students facing discrimination.

The Department fails to consider how the Letter undermines state and local educational prerogatives. Many states and localities, which have primary responsibility over education, have put into place practices that the Letter seemingly prohibits. *See, e.g.*, District 4J Decl. ¶¶ 11-17, PLFS-034; Hamako Decl. ¶ 7, 23, PLFS-091. Neither the Letter nor the FAQs address any of the rationales states have cited for implementing such programs.[29] *See, e.g.*, FAQ at 3 (indicating

---

[28] *See, e.g., Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.,* 89 F.4th 46, 62 (1st Cir. 2023), *cert. denied*, 145 S. Ct. 15 (2024) ("*Bos. Parent II*") ("There is nothing constitutionally impermissible about a school district including racial diversity as a consideration and goal in the enactment of a facially neutral plan"). *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No 1,* 551 U.S. 701, 789 (2007) (finding "[s]chool boards may pursue the goal of bringing together students of diverse backgrounds and races" through means such as "drawing attendance zones with general recognition of the demographics of the neighborhood; . . . [and] recruiting students and faculty in a targeted fashion. "); *see also Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.,* 996 F.3d 37, 48 (2021) ("*Bos. Parent I*").

[29] For example, after passage of an Oregon bill requiring the development of social emotional standards ("SEL"), an advisory group put together a description of proposed SEL standards in Oregon with an in-depth discussion of the data and research behind the proposed standards. Or. Dep't of Educ. *Preliminary Description of the Proposed Social Emotional Learning Standards Framework for Oregon*, (Sept. 2022), https://perma.cc/XLT2-ZSCB; *see e.g.*, p. 17 (stating that studies found "that compared to the control groups, the students who participated in SEL ...demonstrated significantly improved social and emotional skills, attitudes, behavior, and academic performance

without explanation that "social-emotional learning" is discriminatory). Likewise, the Department fails to acknowledge the statutory limitations on its authority—namely, that it cannot dictate institutional and educational programs and curricular choices—and enforcement of the Letter contravenes those provisions. *See infra*, Sec. 1.C.4.

Similarly, the Department failed to consider the potential harm to students of the changes that would be required by this Letter. This includes the harm from shifting curriculum away from what states and localities have determined is of the most benefit to all students;[30] the harm from lost opportunity to learn about difficult topics in history through discussion of systemic racism,[31] *see e.g.,* Gallagher Decl. ¶ 23, PLFS-060; the harm of the loss of diversity, equity, and inclusion programs and other related student supports;[32] and the harm to all students, especially minority students, in the Department's new approach to enforcing civil rights protections under Title VI.[33] *See Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 68 (D.D.C. 2016) (noting courts have "not hesitated to reject agency determinations . . . when an agency ignores factual matters").

---

that reflected an 11- percentile-point gain in achievement . . . Additionally, strong SEL abilities are associated with long-term outcomes such as increased graduation rates, greater college completion, and ability to obtain stable employment") (cleaned up), Ex. 27, PLFS-289.

[30] *See id.*

[31] *See, e.g.*, Hillary Parkhouse et al., *Multicultural education professional development: A review of the literature*, 89 Rev. Educ. Rsch. 416 (2019), https://perma.cc/V7RJ-LN2U (reviewing studies that show improved outcomes for students with teachers that receive multicultural education professional development), Ex. 28, PLFS-357.

[32] *See, e.g.*, Dina C. Maramba & Patrick Velasquez, *Influences of the Campus Experience on the Ethnic Identity Development of Students of Color*, 44 Educ. & Urb. Soc'y 294, 310 (2014), https://perma.cc/ZA3M-GQKB (concluding that programs that help students develop their racial and ethnic identities have many benefits, including the "development of their analytical and critical thinking skills, problem solving, and communications skills"), Ex. 29, PLFS-417; Derrick R. Brooms & Arthur R. Davis, *Staying focused on the goal: Peer bonding and faculty mentors supporting persistence in college*, 48 J. Black Studs. 305, 322 (2017), https://perma.cc/4BWM-4D6U (finding that involvement in student organizations such as a Black Student Union and mentoring programs led to enhanced educational experiences and that "students continue to desire increased diversity on college campuses."); Ex. 30, PLFS-442.

[33] *Resolving a Hostile Environment Under Title VI: Discrimination Based on Race, Color, or National Origin, Including Shared Ancestry or Ethnic Characteristics, supra* note 11 (describing examples of OCR resolving complaints of racial and national origin discrimination, noting primarily instances of discrimination against minority populations); *id.* at 7 (describing reported racial harassment against a black student that included calling the student the "n" word, a "slave," "blackie," and "cotton picker").

"When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (cleaned up). The Department fails to do so here. Plaintiffs and educational institutions nationwide have been operating according to the understanding of Title VI and the Equal Protection clause embodied in the case law, regulations, and the Department's prior guidance for decades. Countless curricular and extracurricular activities have been developed based on those understandings. For Plaintiffs and Plaintiffs' members, this includes courses, student programming, and faculty positions. *See* Hamako Decl. ¶ 12, PLFS-092 (conforming with the Letter would involve "massive alterations to our courses, the elimination of faculty positions, a reduction in class sections, or even the folding of [the] department"); Gallagher Decl. ¶ 27, PLFS-061 (describing the Letters' implications for teaching race relations, which he has been doing for thirty years); Blee Decl. ¶ 25, PLFS-072 (noting fundamental sociological concepts and baseline assumptions that underlie the field are under threat from the Letter); District 4J Decl. ¶ 41, PLFS-045 (describing the long-term planning required to run the district and how the Letter throws that into doubt). Forcing schools and educators, including Plaintiffs, to potentially fully overhaul their curriculum, programming, and teaching positions imposes steep costs, particularly as the Letter requires institutions to come into compliance on a very short timeline, which makes it likely that schools either cannot offer replacement programming or the replacement is cobbled together quickly and may not achieve instructional goals as effectively. *See* District 4J Decl. ¶ 13, PLFS-035 (discussing how putting in place new standards "involv[es] large numbers of stakeholders, review and piloting of instructional materials, selection of materials, teacher training and ultimately, implementation of the curriculum in the

classroom"). Moreover, many schools rely on programs that may now considered unlawful under this Letter to meet other legal requirements—for example, District 4J and Plaintiff member's community college are required by state law to offer certain courses that broadly fall under a "DEI" banner. District 4J Decl. ¶¶ 11-17, PLFS-034; Hamako Decl. ¶¶ 7, 23, PLFS-091.

The risk of loss of federal funding heightens these reliance concerns. Federal financial assistance makes up an average of 11% of *all funding for all* K-12 schools across the country, and in some places, much more.[34] For example, Plaintiff 4J received $40 million in funds from the Department in 2021-2022. The threat of pulling those federal funds is as serious a threat to students (and their parents) in this country as is imaginable. *See supra* at 10-11, District 4J Decl. ¶ 40, PLFS-045 (explaining drastic effects of spending cuts). This leaves regulated entities, and Plaintiffs, in the impossible position of being forced to overhaul programming in an accelerated timeframe—harming students and teachers while potentially risking violations of federal law and state curriculum requirements—or risk the devastating loss of federal funding. Whatever the new administration's policy priorities with respect to civil rights enforcement, it does not have carte blanche to ignore the reliance interests created by the Department's prior policy guidance.

### 3. *The Letter is Contrary to Constitutional Rights*

When final agency action is contrary to constitutional rights, the APA requires it to be "set aside." 5 U.S.C. § 706(2)(B). As explained above, *supra*, Sec. 1.A & 1.B, the Letter violates the First and Fifth Amendments and, therefore, the APA.

---

[34] U.S. Dep't of Educ. Nat'l Ctr. for Educ. Stats., *Public School Revenue Sources* (May 2024), https://perma.cc/ZY39-9KAS, Ex. 31, PLFS-465; *id*. at 1 (elementary and secondary public schools received $101 billion in federal funds in 2021-2021).

### 4. The Letter is Not in Accordance with Law and is in Excess of Statutory Authority.

The APA requires that courts "hold unlawful and set aside agency action" that is "not in accordance with law" or is "in excess of statutory . . . authority." *Id.* § 706(2).

When Congress passed the Department of Education Organization Act ("DEOA"), Pub. L. No. 96–88, 93 Stat. 668 (1979), establishing the Department of Education, it made clear that the Department is not authorized "to exercise any direction, supervision, or control over the curriculum, program of instruction,. . . or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution." 20 U.S.C. § 3403(b). As described above, the Letter does exactly that, by directing what educators and institutions can teach in ways that are not required by Title VI. *See supra*, Sec. 1.C.2.c; *see e.g.*, Letter at 3 (prohibiting teaching on structural racism because it "toxically indoctrinate[s] students"). As such the Department has exceeded its authority. *See Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided.").

Similarly, several additional federal statutes that govern the administration of federal education programs prohibit the Department's control over curriculum and related programs. *See* 20 U.S.C. § 1232a; 20 U.S.C. § 7906a(a); 20 U.S.C. § 1132-2. For the same reasons discussed above, the Letter is not in accordance with these laws.

### 5. The Letter is a Legislative Rule Requiring Notice and Comment Rulemaking.

The Letter must be held unlawful and set aside because it is a legislative rule unlawfully promulgated without notice and comment rulemaking. *See* 5 U.S.C. § 706(2)(D). Legislative rules are "statement[s] of general or particular applicability and future effect" that "implement, interpret,

or prescribe law or policy," and have the "force and effect of law." *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 95–96 (2015). In particular, contradicting an existing regulation is a hallmark of legislative rules "manifesting [an agency's] intent to . . . speak with the force of law." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020). Here, the Letter directly contradicts the Department's existing regulations implementing Title VI, 34 C.F.R. § 100.5(i), and is thus by definition a legislative rule.

## II.    <u>Plaintiffs Are Suffering Irreparable Harm.</u>

To establish irreparable harm, plaintiffs must show that they will suffer harm that is "neither remote nor speculative, but actual and imminent,'" and that is irreparable, meaning that it "cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019). Where there is a "prospect of an unconstitutional enforcement," irreparable injury is established. *Air Evac EMS, Inc. v. McVe*y, 37 F.4th 89, 103 (4th Cir. 2022) (citation omitted). Likewise, showing a strong likelihood of success on constitutional claims establishes irreparable harm. *Roman Cath. Diocese of Brooklyn v. Cuomo,* 592 U.S. 14, 19 (2020); *Leaders of a Beautiful Struggle v. Balt. Police Dep't,* 2 F.4th 330, 346 (4th Cir. 2021) ("It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

As shown above, Plaintiffs have established a likelihood of success on their First Amendment and Due Process constitutional claims in addition to showing Defendants' violations of the APA. The irreparable harm flowing from Defendants' unlawful action generally falls into four categories: chilled speech and association, threat of investigation and corresponding reputational harm, loss of the right to comment, and the threat of loss of funds.

*Chilled Expression and Association.* Due to the Letter, Plaintiffs fear that they must suppress their speech, and potentially eliminate any teaching, program, activity, lesson, association, office, or research that could fall under the Letter. *See supra* at 8-9*, see e.g.*, AFT Decl. ¶ 25, PLFS-009 ("AFT members are worried they must self-censor their speech, including lectures, courses, programs, and other activities" due to the Letter); AFT-MD Decl. ¶ 27, PLFS-028; Hamako Decl. ¶ 10-12, 22, 31, PLFS-091; John Doe Decl. ¶ 25, PLFS-105; Jane Doe Decl. ¶ 16, PLFS-082. The Letter's vagueness, and the failure of the FAQs to clarify Plaintiffs' obligations, have magnified the chilling effect, as Plaintiffs and their members have no way to know whether the work they do may be found to run afoul of the letter. *See supra* at 7, AFT Decl. ¶ 28, PLFS-010; Gallagher Decl. ¶ 14, PLFS-057; Blee Decl. ¶ 17, PLFS-069; AFT-MD Decl. ¶ 20, 30, PLFS-027; Hamako Decl. ¶ 10-12, 23, PLFS-091.

*Threat of Investigation.* Plaintiffs fear that the work that they are doing could lead to an investigation. See *supra* at 9-10, *see e.g.*, John Doe Decl. ¶ 28, PLFS-106; District 4J Decl. ¶ 16, PLFS-036; Gallagher Decl. ¶ 20, PLFS-058; Blee Decl. ¶ 12, PLFS-068; Jane Doe Decl. ¶ 8, PLFS-079; Hamako Decl. ¶ 16, PLFS-093. The risk of potential investigation is increased by the Departments introduction of the "End DEI" portal. *See supra* at 10. Investigations into Plaintiffs would also risk severe reputational harm. *Id*. This risk is also not "remote or speculative"; the Department has opened investigations into 51 universities following issuance of the Letter.[35]

*Loss of Right to Comment.* A party suffers irreparable harm due to their inability to participate in notice and comment procedures." *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 500–01 (D. Md. 2020). If given the chance, District 4J would have submitted a comment,

---

[35] Press Release, U.S. Dep't of Educ., *Office for Civil Rights Initiates Title VI Investigations into Institutions of Higher Education* (Mar. 14, 2025), https://perma.cc/8PP4-GUJB, Ex. 32, PLFS-472.

and AFT and ASA would have submitted comments on behalf of their members. *See* District 4J Decl. ¶ 44, PLFS-046; ASA Decl. ¶ 28, PLFS-020; AFT Decl. ¶ 29, PLFS-011.

*Threat of Loss of Funds.* The loss of federal funding threatened in the letter, in addition to its chilling effects, *see supra* 10-11, would constitute "severe economic loss[]," and may require a school "to shutter operations that provide critical" services or resources, which is sufficient to show irreparable harm. *Ass'n of Cmty. Cancer Ctrs.*, 509 F. Supp. 3d at 501. For example, if federal funding were removed, the fallout would be enormously damaging. *See supra* at 10-11, District 4J Decl. ¶ 39, 40, PLFS-045; Hamako Decl. ¶ 23, PLFS-095; John Doe Decl. ¶ 27, PLFS-106. If funding were terminated, Plaintiffs' members' employment would be in jeopardy, particularly in cases where a member's conduct or expression was found to contribute to the funding termination. AFT-MD Decl. ¶ 30, 31, PLFS-029 (noting risk to members' jobs); ASA Decl. ¶ 27, PLFS-020 (same); Hamako Decl. ¶ 10, PLFS-091 (noting risk to his job); Gallagher Decl. ¶ 13, PLFS-056 (same); Blee Decl. ¶ 12, PLFS-068 (same); Jane Doe Decl. ¶ 8, PLFS-079 (same).

No amount of money damages will be able to repair the harm, as the loss of federal funding would lead to entire programs, centers, departments, or services being dismantled or shut down. Plaintiffs' fears are not remote or speculative. While in the past, educational institutions rarely lost federal education funding absent a thorough investigation and the availability of due process, under the current administration, decisions related to funding termination have proceeded much more quickly and with less transparency.[36] Billions of dollars of Department of Education grants and contracts have already been terminated with no notice. Am. Compl. ¶ 8. On March 7, the Department of Education, in conjunction with other agencies, announced that it was terminating

---

[36] Natalie Schwartz, *Trump Administration Cancels $400M of Columbia's Grants and Contracts Amid Antisemitism Probe*, Higher Ed Dive (Mar. 7, 2025), https://perma.cc/RK9J-DGCS ("The cancellation comes only four days after the probe into the Ivy League institution was announced."), Ex. 33, PLFS-479. OCR investigations and enforcement have typically taken months to years.

$400 million in funding to Columbia University, notifying the University only four days prior that it would be investigating the school.[37] On March 14, 2025, the Department announced investigations into 51 universities related to the Letter.[38] These actions give Plaintiffs, and any other regulated party, every reason to fear severe repercussions if they do not immediately comply with the Letter.

Overall, the Letter's impact is not just devastating for Plaintiffs but has ripple effects across the education landscape.[39] Given the looming investigation and funding threat, schools, colleges, and universities are assessing their programs with deep apprehension and uncertainty regarding what the Department will do.[40] Some schools have already felt forced to sacrifice valued staff, initiatives and programs.[41] The fallout from this Letter has already had widespread effects, and absent injunctive relief, the impermissible bind the government has created for Plaintiffs and educational institutions writ large will continue: self-censor and lose constitutional rights, or be targeted for investigation and risk losing all federal education funding.

---

[37] Press Release, U.S. Dep't of Educ., *DOJ, HHS, ED, and GSA Announce Initial Cancelation of Grants and Contracts to Columbia University Worth $400 Million* (Mar. 7, 2025), https://perma.cc/FV3F-ELR7, Ex. 34, PLFS-484. This announcement appears to contradict Title VI's requirements, which provide that the government may not cut off federal funding until it has conducted a program-by-program evaluation of the alleged violations, provided recipients with notice an "opportunity for a hearing," limited funding cutoff to the particular program or part where noncompliance was found, and submitted a report explaining its actions to relevant committees in Congress at least thirty days before funding can be stopped. 42 U.S.C. § 2000d-1. This administration's disregard of the law underscores the enormous risk faced by Plaintiffs and all regulated entities.
[38] Press Release, U.S. Dep't of Educ., *Office for Civil Rights Initiates Title VI Investigations into Institutions of Higher Education*, *supra* note 35.
[39] Nat'l Ctr. for Educ. Stats., *Public School Revenue Sources*, *supra* note 34; *supra*, Sec. 1.C.2.e.
[40] Jordan McPherson & Tyler Bagent, *Trump Administration's Anti-DEI Letter Causes Confusion, Anxiety*, The Rotunda (Feb. 19, 2025), https://perma.cc/H75X-KNFP, Ex. 35, PLFS-489.
[41] *See, e.g.* John Bach, *President Pinto shares message regarding future of DEI at UC*, UC Cincinnati (Feb. 21, 2025), https://perma.cc/Z8XV-4JCV, Ex. 36, PLFS-493 (describing that the university President determined that because "the federal government has effectively outlawed DEI programs," and the university "relies on federal funding," it was "untenable" not to take action, including by "removing references to DEI principles across university websites, social media and collateral materials," and "evaluating jobs and duties related to DEI and examining [] DEI programming, initiatives and projects"); Megan Henry, *Ohio State University is closing its Office of Diversity and Inclusion*, Ohio Cap. J. (Mar. 3, 2025), https://perma.cc/GQ8E-Y82V, Ex. 37, PLFS-496 (explaining that The Ohio State University is closing its Office of Diversity and Inclusion and the Office of Student Life's Center for Belonging and Social Change, and eliminating sixteen professional staff positions in advance of the enforcement deadline for the Letter).

### III. The Balance of the Equities and the Public Interest Favor Enjoining the Letter.

The Government "is in no way harmed by issuance of a preliminary injunction which prevents [it] from enforcing restrictions likely to be found unconstitutional[,] [i]f anything, the system is improved by such an injunction." *Leaders of a Beautiful Struggle*, 2 F.4th at 346 (*citing Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)); *see also PFLAG, Inc. v. Trump*, No. CV 25-337-BAH, 2025 WL 510050, at *23 (D. Md. Feb. 14, 2025). Likewise, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Am. Fed'n of Tchrs. v. Bessent*, No. CV DLB-25-0430, 2025 WL 582063, at *14 (D. Md. Feb. 24, 2025) (internal citation omitted). Rather, "the public interest favors protecting constitutional rights," *id.*, particularly in the context of eliminating infringements on free speech rights, *see Nat'l Pub. Radio, Inc. v. Klavans,* 560 F. Supp. 3d 916, 929 (D. Md. 2021) (noting that there is a "well-settled public interest in the freedom of expression"). Here, for the same reasons that Plaintiffs are likely to succeed on the merits, equity requires relief.[42]

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiff's Motion and issue a preliminary injunction consistent that requested in the Proposed Order.

---

[42] The Court should exercise its discretion to waive or set at $0 the security requirement of Fed. R. Civ. P. 65(c) because Defendants will face no monetary injury from any relief ordered by the Court. *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) ("[T]he district court retains the discretion to set the bond amount as it sees fit or waive the security requirement." (citations omitted)). In similar cases, courts in this jurisdiction and others have determined bond unnecessary. *See, e.g.*, *PFLAG, Inc. v. Trump*, 2025 WL 510050, at *23 (declining to require a bond); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 2025 WL 597959, at *18  (declining to set a bond).

Dated: March 28, 2025

Respectfully submitted,

*/s/ Victoria S. Nugent*

Victoria S. Nugent (Bar No. 15039)
Madeline H. Gitomer +
Brooke Menschel (Bar No. 31492)
Rachel F. Homer (Bar No. 31490)
Andrew Bookbinder (Bar No. 31486)
Kali Schellenberg**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
vnugent@democracyforward.org
mgitomer@democracyforward.org
bmenschel@democracyforward.org
rhomer@democracyforward.org
abookbinder@democracyforward.org
kschellenberg@democracyforward.org

*Counsel for Plaintiffs*

+ Application for full admission pending
** Admitted *Pro hac vice*

## CERTIFICATION OF SERVICE

I hereby certify that on March 28, 2025, I electronically filed this document with the Court by using the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.

*/s/Victoria S. Nugent*_____
Victoria S. Nugent (Bar No. 15039)
Counsel for Plaintiffs
