# EXHIBIT 6

PLFS-065

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **American Federation of Teachers,** *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**U.S. Department of Education,** *et al.*,<br><br>Defendants. | Civil Case No. 1:25-cv-00628 |

## DECLARATION OF KATHLEEN BLEE

I, Kathleen Blee, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am over eighteen years old, of sound mind, and fully competent to make this declaration.

2. I am a member of the American Sociological Association.

3. The American Sociological Association is a national professional membership association for sociologists.

4. American Sociological Association members include students, faculty, and people working in government agencies and non-profit and private organizations.

5. I became a member of the American Sociological Association in 1980.

PLFS-066

## My Work as a Faculty Member

6. I currently serve as a Distinguished Professor of Sociology at the University of Pittsburgh, in Pittsburgh, Pennsylvania.

7. I have served as a Professor of Sociology at the University of Pittsburgh since 1996 and have served as a Distinguished Professor of Sociology since 2007.

8. I have held higher education academic teaching positions since 1981.

9. I have held a number of administrative positions at the University of Pittsburgh, including as the Director of the Women's Studies Program from 1996 to 2001, Department of Sociology Chair from 2008 to 2011, Associate Dean for Graduate Studies and Research at the Dietrich School of Arts and Sciences from 2012 to 2017, Senior Associate Dean at the Dietrich School of Arts and Sciences from May 2017 to August 2017, Co-Director of the University of Pittsburgh/Carnegie Mellon University Collaboratory Against Extremism Research and Action Center from 2021 to 2023, and the Bettye J. and Ralph E. Bailey Dean of the Dietrich School of Arts and Sciences from 2017 to 2023.

10. I currently conduct research on racial extremist movements including the Ku Klux Klan and the neo-Nazi movement. My areas of focus are social movements, especially racist, anti-Semitic, and far-right movements in the U.S. and Europe, racial violence, and microsociology.

11. I also currently teach graduate independent study classes at the University under the title "Gender and the Far-Right. Outside of these classes, much of my current role involves working with graduate students one-on-one to develop their dissertations on the intersection of race and far-right social movements.

12. The Department of Education Dear Colleague Letter is a direct threat to my career, my field, and my specialization. My research directly addresses the role of "systemic and structural racism" in the U.S. and Europe in the form of current and historic structures of racism. On a much more basic level, I'm concerned that even fundamental sociological concepts and baseline assumptions that underlie the field–and all my research–may be viewed by the Department of Education as "toxically indoctrinating" students. Based on the language in the Letter, the Department of Education may initiate a costly investigation of me and the college on this basis, putting at risk the college's funding, the college's institutional reputation, my professional reputation, and my job. That risk is increased by the Department's recent opening of an "End DEI" portal, which encourages anyone potentially misled by the language of the Letter to file a complaint with the Department, thereby prompting an investigatory process.

13. The Department's frequently asked questions document ("FAQs"), issued in connection with the Dear Colleague Letter, does not change my concerns or provide me with any additional clarity on whether my work and the work of my institution will be subject to an enforcement action by the Department of Education.

### The Impact of the Letter on my Students

14. The effects of the Dear Colleague Letter would be devastating to my students. It's hard to overstate how my primary interactions with my students all rest on the well-established sociological premise that there are racial inequalities in the world that manifest in different ways, including through racist and violent political movements.

15. Being able to freely discuss these topics is essential to my teaching, research, and the effective learning of my students. Graduate students are given a lot of leeway in

developing their dissertation topics. As a professor of race and social movements, I am sought out by students who are already highly interested in developing a thesis that centers issues of race. My graduate students look to me to guide them in their research and dissertations, both in the classroom and in one-on-one settings. The dissertation projects of my students are largely focused on racial extremist movements. These projects include a dissertation on white supremacist group leadership and decision-making based on data collected from the Charlottesville rally trial and a dissertation examining elements of extremism and racism in far-right political movements. Faculty members, including myself, rely on the ability to discuss issues of race and racism with students through uninhibited fact-based discussions. We must retain the autonomy to point students to reputable scholarship on these topics. Anything less would be a serious erosion of the academic integrity of my courses and research and the research of my students.

16. My teaching and the dissertations I supervise also directly implicate the role of "systemic and structural racism" in the U.S. and Europe by addressing racist social and political movements. While I believe that my course and the research of my students is completely legal under state and federal law, I am concerned that this work may be viewed by the Department of Education as "toxically indoctrinating" students under the vague description provided by the Dear Colleague Letter.

17. Further, the FAQs only created more confusion for me regarding what courses and topics the Department of Education might enforce against moving forward. The FAQ document repeatedly states that the law will be enforced "consistent with the First Amendment," but then lists a variety of higher education activities that I understood to be protected under

the First Amendment, and identified them as potentially creating a "hostile environment." It is not clear to me whether my course content and the research I supervise would be interpreted as extreme practices and open to investigation by the Department of Education.

18. Given the alarmist language regarding teaching around racial and ethnic issues from the Department of Education beginning with the Dear Colleague Letter, I have little faith that the Department would hesitate to open up an investigation into my course or the dissertation work of my students if their mischaracterization of the law is allowed to stand. At present, the language in the Letter and the FAQ document are so broad that anything relating to "DEI" may be implicated.

### The Impact of the Letter on my Career and my Ability to Teach

19. Even without an Office of Civil Rights complaint being opened, the threat of arbitrary enforcement based on the Dear Colleague Letter has already impacted my thought process as I approach my graduate student class and student dissertations.

20. My career specialization focuses on racial extremism. Because the Dear Colleague Letter states that discussions of systemic and structural racism are toxic indoctrination, it is difficult to consider any parts of my research or coursework not being implicated by the Letter. My course has readings such as *Racing the Nation: Towards A Theory of Reproductive Racism* by Sophia Siddiqu, *How Threat Mobilizes the Resurgence and Persistence of US White Supremacist Activism: The 1980s to the Present* by Pete Simi, Robert Futrell, and Adam Burston, and *Beyond "Leaderless Resistance"? Toward a Typology for White Supremacist Extremist Leadership* by Joseph Stabile.

PLFS-070

21. Due to the nature of my work and research, it's difficult for me to conduct even basic discussions with my graduate students or assign these fundamental course readings without being concerned that I could be engaging in actions implicated by the language of the Dear Colleague Letter. I do not believe there could be a version of my course or student advising that would not involve the understanding that the United States was built upon systemic and structural racism. At the same time, I fear that if I don't adjust or stop my course, education funding for me and my school could be at jeopardy.

22. I am concerned about these issues already without having an investigation by the Department of Education. I am afraid that even without a formal investigation by the Department, the University of Pittsburgh will experience pressure to end my class, to temper or curtail my research, or to funnel students away from my department because the University of Pittsburgh is concerned that federal funding will be pulled due to perceived conflicts between my work and the language in the Dear Colleague Letter. Given that institutions of higher education throughout the nation have already begun implementing changes to their programs, it's difficult to imagine the University of Pittsburgh won't face pressure in some form about my course and research as long as there is a perception that the Dear Colleague Letter implicates work like mine.

23. It feels like the Dear Colleague Letter presents both me and my school with an impossible choice where we need to compromise our institutional and personal values, or face the threat of losing federal funding. This is made worse by the confusion surrounding what is and is not implicated by the language of the Dear Colleague Letter and the FAQs document. I don't know if my work is considered to be toxically indoctrinating students by the Department of Education, but I am afraid the University

will experience pressure to act broadly and permanently change or shut down my teaching and research in an attempt to avoid losing federal funding.

**The Impact of the Letter on Student Instruction, Development, and Support at the University of Pittsburgh**

24. The Sociology Department at the University of Pittsburgh has a lecture series dedicated to current sociological research, much of which involves studies of racial and ethnic issues. I frequently attend these lectures to better inform my own coursework, research, and ability to advise my students. I also encourage my students to attend so they can expand their perspectives on these topics and supplement their own research and dissertation work.

25. The lecture series focuses on the two main research emphases of the faculty of the Sociology Department at the University of Pittsburgh: the study of social movements and the study of politics and culture. Lectures cover research on such topics as social and cultural movements in support of or opposed to racial equity, environmental justice, and equitable access to housing and education. These topics all relate directly or indirectly to race and ethnicity.

26. These lectures are critical to the intellectual and social vitality of the university. They are open to all students, community members, and students of other institutions, not just members of a single course or department. Not only do these lectures critically engage students on relevant and timely issues, but they also overlay onto many fields of study, beyond sociology, at the university. These lecture series foster open discussions and a greater understanding in the campus community.

27. These lectures could be considered part of DEI programs or include discussions of race-consciousness that the Department could find violates the Dear Colleague Letter. Though these lectures contribute to students' academic progress, I am worried that they could also lead to civil investigation, prosecution, and loss of funding.

28. The University of Pittsburgh Center for Race and Social Problems frequently hosts events on issues of race, class, and identity. I regularly have my students attend talks at the Center to develop their dissertations and research. I also often attend events at the Center to continue developing my understanding of the field and keep up with new developments and research.

29. I am concerned that programming by the Center for Race and Social Problems may be targeted by the Department of Education as a "discriminatory practice" based on the Dear Colleague Letter's language describing DEI programming as a vehicle for "smuggling explicit race-consciousness." Events hosted by the Center serve to inform my research and teaching as well as the learning and research of my students and I believe the programming complies with state and federal law. Regardless, I worry that under the language of the Dear Colleague Letter, the Department of Education could open an investigation into the Center or cause the University to preemptively take steps to change or close the Center to foreclose any chance of an OCR investigation.

**The Impacts of the Letter on Campus Life at the University of Pittsburgh**

30. As a professor, I appreciate the diversity of students and faculty at the University of Pittsburgh. This matters because we are trying to provide the opportunity for students to understand things from diverse perspectives and knowledge-bases. If the faculty are too

PLFS-073

similar to each other or to the students, the students receive a narrower educational experience. The goal is to present our students with a variety of new ways to understand information and let them develop their own points of view.

31. This approach is vital for teaching in the field of sociology and consistent with a university education.

32. When I served as the Dean of the Dietrich School of Arts and Sciences, I implemented a faculty recruitment process dedicated to broadening the pool of applicants. This involved advertising more widely, focusing on recruiting faculty from a wider range of graduate programs, and using more holistic approaches to assessing applications. Our goal was in part to better identify qualified individuals from backgrounds traditionally not represented, or adequately represented, on the faculty. This increased the diversity of our faculty applicants and recruits.

33. I am concerned that the Department of Education may interpret such efforts to broaden our faculty recruitment as recruiting using proxies for race, as interpreted by the language of the Dear Colleague Letter. I believe the process complies with state and federal law. Regardless, I worry that under the expansive language of the Dear Colleague Letter, the Department could open a broad investigation into the University or cause the University to preemptively take steps to reverse the changes to decrease any chance of an investigation by the Department. This would undo years of progress and best practices around faculty recruitment that have improved the University faculty roster. The individuals recruited through our modernized process have deeply enriched the University community and benefited our students and faculty members tremendously.

PLFS-074

34. Similarly, a more holistic approach was implemented in the graduate application process, resulting in a more diverse graduate student body. Ensuring that students are exposed to a wide range of perspectives from their fellow students as well as their faculty is essential to developing their critical thinking skills and their foundation for graduate study.

35. Unfortunately, under the Dear Colleague Letter's sweeping language, I worry that this could be interpreted as deploying proxies for race in the graduate admissions process despite complying with state and federal discrimination law. As a result, I worry that under the language of the Dear Colleague Letter, the Department of Education could open an investigation into the holistic admissions changes or cause the University to preemptively take steps to change or eliminate the process to preempt any chance of an OCR investigation. Such steps would return these graduate programs back to an admissions process that relied on a narrower range of indicators of likely success in graduate study. Under the current system, admission committees are able to assess broader forms of students' preparation for graduate study in a particular field, such as relevant work experience. A return to the old system would undo those gains, negatively impacting our students and graduate programs.

36. I rely on support from the University for resources to bolster my students and the health and long-term success of my department. The field of sociology functions as an ecosystem and the Dear Colleague Letter's vague language calls into question so many aspects of this science and profession. The Dear Colleague Letter's language looms over everything from graduate classes and dissertations to faculty research and campus lecture series. I am deeply concerned that the threat of revoked federal funding will lead the University of Pittsburgh to experience pressure to preemptively end some or all of these

meaningful programs and practices. Any such steps would have a ripple effect on my department and my ability to offer my students the best resources to let them thrive.

Pittsburgh, PA  
March 26, 2025

_____  
Kathleen Blee

PLFS-076