# EXHIBIT 8

PLFS-089

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**American Federation of Teachers,** *et al.*,

                Plaintiffs,

**v.**

**U.S. Department of Education,** *et al.*,

                Defendants.

**Civil Case No. 1:25-cv-00628**

## DECLARATION OF ERIC HAMAKO

I, Eric Hamako, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am over eighteen years old, of sound mind, and fully competent to make this declaration.

2. I am a member of the American Federation of Teachers.

3. I became a member of the American Federation of Teachers in 2014, ten-and-a-half years ago.

### My Work as a Faculty Member

4. I am a tenured faculty professor of American Ethnic Studies and Multicultural Studies in the Equity and Social Justice Department at Shoreline Community College in Washington State.

PLFS-090

5.  I have been in my position at Shoreline for the last 10 years. I began as a faculty instructor and in 2017 I was awarded tenure and the title of professor. I began my first position as an Adjunct Faculty member in 2008 at Smith College.

6.  I teach a course called American Ethnic Studies 101. I was hired to teach this course, formerly called Multicultural Studies 105, and it is the only course I have taught since coming to Shoreline. This course is heavily subscribed every quarter, with approximately 180 students enrolled in six or seven sections.

7.  In accordance with Washington State law RCW 28B.10.149, all degree-seeking students attending a Washington state community or technical college are required to take a DEI and antiracism program. Shoreline, via our Vice President of DEIA, has stated that my course meets the state's DEI and antiracism program requirement.

8.  American Ethnic Studies addresses race and ethnicity in many different ways. I teach about: master and counter narratives; social hierarchies; intersectionality; and systemic and structural racism in U.S. society.

9.  I am also in the process of developing a new course on fascism. Among other things, the course will help students learn to recognize characteristics of fascism that appear in movies and in political discourse.

10. The Dear Colleague Letter appears to implicate both my American Ethnic Studies course and my developing course on fascism. Both courses focus on systems of discrimination, the history of oppression, and social and political power dynamics. Based on the language in the Letter, the Department of Education may perceive these courses as "discriminatory practices" and initiate a costly investigation of me and the college, putting at risk the college's funding and my job. That risk is multiplied given any person

PLFS-091

misled by the language of the Letter can file a complaint with the Department, thereby prompting an investigatory process. Such an investigation could have a long-term impact on my professional reputation in the field as well as the reputation of Shoreline throughout the state as an academic institution.

11. While I believe that the coursework and syllabus for both classes are nondiscriminatory under state and federal law, I am concerned that I will either need to censor the topics discussed in my current course, or my new fascism course will not be allowed to go forward because of institutional concerns regarding threats to federal funding that have presented in the Dear Colleague Letter. This is made worse by the confusion surrounding what is and is not permitted under the language of the Dear Colleague Letter and the recently issued Frequently Asked Questions ("FAQs") document.

12. I am also afraid my college will broadly ask faculty to try to comply with the Letter in an attempt to avoid losing federal funding. This could involve massive alterations to our courses, the elimination of faculty positions, a reduction in class sections, or even the folding of my department. I'm concerned that the college could decide that the Equity and Social Justice Department could draw the attention of the Department of Education for being too focused on systemic and structural racism in the U.S. under the language of the Dear Colleague Letter. Rather than wait for that to happen, I worry that my college will quietly start to wind down the department.

**The Impact of the Letter in My Classroom and on my Students**

13. Diversity in all of its forms is essential to my course. I think it is vital to expose my students to diverse opinions, life experiences, and perspectives.

PLFS-092

14. In class we have discussions about identity, racism, relevant historic and current events, and power structures within the country. We practice the skills of perspective taking and critical thinking and engage in historical context analysis.

15. In my classes, I encounter many students who go about their daily lives and say what they see in the world is not depicted in much of their other classes and coursework. The function of my class is to help my students understand and make sense of the things they are seeing in our country. Classes like mine affirm the lived experiences of many students when their experiences may not be reflected back to them by other parts of the college. This allows them to connect with their education on a much deeper level. For students who don't already view the world in this way, the course unlocks a wider context around diversity and the broader experiences of people throughout the U.S. This can occasionally include difficult, but ultimately valuable, discussions.

16. These discussions and readings from my class may be viewed by the Department of Education as encouraging explicit race-consciousness in my students under the language of the Dear Colleague Letter. I am afraid that if I continue to teach my class, I could risk a costly investigation and the loss of federal education funding. Alternatively, I am also concerned that these invaluable classroom discussions may be proactively banned by the college in an effort to avoid controversy, investigation, and loss of federal funding.

17. My classes are also an opportunity for students to engage directly with each other in meaningful ways. They connect with each other on cultural issues, allowing them to feel that their education connects to their lives and form bonds with their classmates. This fosters greater rates of participation and increases feelings of solidarity among students. Students are much more likely to come to class if someone notices they weren't in class

4

PLFS-093

yesterday and ask why with genuine interest or concern. I worry that banning particular

topics or discussions in class may fundamentally alter the ability of students to connect in

the same way. I worry that if read broadly, the language of the Dear Colleague Letter

could label my course discussions as encouraging race-consciousness in a way that

conflicts with the guidance of the letter.

18. Some students initially enroll in my course because of the curriculum requirement, but

after they complete the course, many students express how much they learned from and

appreciated the course.

19. While I believe that the class I teach and the state requirement it fulfills are compliant

with state and federal discrimination law, the broad language of the Letter suggests

otherwise. I am afraid that all the things that make my course so valuable to my students,

such as the vibrant discussion of cultural issues with each other, are exactly what puts the

course at risk of being targeted as encouraging race-consciousness, either by the

Department of Education, complainants acting under its guidance, or preemptively by the

college.


**The Impact of the Letter on my Career and my Ability to Teach**

20. The threat of arbitrary enforcement based on the Dear Colleague Letter has already

impacted my thought process and approach for the syllabus for my current class and for

the additional class I am developing even without an Office of Civil Rights ("OCR")

complaint being opened. I am concerned that Shoreline may move to end my course even

without an investigation in an attempt to preemptively prevent federal funding from being

withdrawn.

PLFS-094

21. My current syllabus has readings on a wide range of topics and many sources, including *The complexity of identity: "Who am I?"* by Beverly Daniel Tatum, *Readings for Diversity and Social Justice: An Anthology on Racism, Antisemitism, Sexism, Heterosexism, Ableism, and Classism* by Adams, Blumenfeld, Carmelita, and Casteñeda, and *Police Shootings Won't Stop Unless We Also Stop Shaking Down Black People* from Mother Jones by Jack Hitt. I have been grappling with whether there is a way to change my course teachings to come into compliance with what I think the Dear Colleague Letter requires and if so, whether I should.

22. At a fundamental level, the Letter appears to prohibit the central themes of the course I teach. One of five "course learning outcomes" is to "identify examples of institutional racism in a given social problem." Another is to "describe how socioeconomic systems have affected your life differently from people in other social groups." I am fearful that though these outcomes do not violate state or federal law, the Department of Education may view my course as violating the language of the Letter by addressing systemic and structural racism, and as a result my course may represent a threat to the college's federal funding.

23. My current course exists in concert with a state law requiring DEI and antiracism programming. I feel that the Dear Colleague Letter places both me and my school in an impossible situation where we need to choose between compliance with state law requirements and our institutional and personal values, or face the threat of losing federal funding. We are not allowed to operate without being in compliance with this state law, but losing federal funding would be devastating to Shoreline. I am concerned that the Department of Education would cut our Asian American and Native American Pacific

6

PLFS-095

Islander-Serving Institutions Program grant, which would eliminate valuable programming at Shoreline. This situation is made worse by the confusion surrounding what is and is not permitted under the Dear Colleague Letter. I am afraid my institution will act broadly to try to comply with the Letter in an attempt to avoid losing federal funding out of fear that DEI content may be viewed as banned by the language of the Letter.

24. The Dear Colleague Letter is so broad that I am worried that almost any aspect of my academic activities could threaten Shoreline's federal funding. For example, I am part of a public email listserv focused on diversity issues across Washington State Community Technical Colleges. In an effort to recruit professors and other staff from communities that may be underrepresented, job postings are often circulated on this listserv. If I were to circulate a job posting, or flag one for Shoreline, I worry that such an act would be viewed as violative of the language in the Letter as either a proxy for race in admissions or factoring in race for recruitment.

25. Not understanding what is and is not acceptable under the Department of Education Dear Colleague Letter has been further compounded by the FAQs document as well. While I previously understood that these kinds of activities were protected under the First Amendment, the FAQs document seems to explicitly list some activities as banned. The uncertainty is paralyzing and deeply distressing.

### The Impact of the Letter on Student Support at Shoreline Community College

26. Shoreline provides academic and social support for students in a variety of ways. These include through programming from the WAVES (Worthy of Achievement, Validation,

PLFS-096

Empowerment, and Success) Center for Asian American Native Hawaiian Pacific Islanders ("API").

27. The WAVES Center is the hub for the WAVES support program that focuses retention strategies needed for success throughout students' identity development and empowerment in community college. At the heart of the program, WAVES aims to increase academic support by stabilizing students in the community as it guides its students on a clear pathway to success.

28. WAVES provides a College 101 course that explores nontraditional college success strategies (identity development with an Ethnic Studies approach, trauma supports, and advocacy work). This College 101 course also has embedded new student orientation, peer tutoring, peer mentors, mental health support, and an opportunity to schedule an appointment with an advisor to complete an Education Plan.

29. Additionally, the API student center at Shoreline provides a full-time culturally competent support staff member available to support students regarding academics, financial aid, and campus life. The API student center also has peer mentoring, informative and cultural quarterly workshops, socials, and events, as well as scholarships and community space. The center keeps in mind the needs of students that the broader campus may not be attuned to, and its support of community and academic excellence helps with retention.

30. As a teacher at Shoreline, it is helpful that I can rely on the WAVES Center as a resource for my students. If the WAVES Center's activities, or its existence altogether is shut down, I would be less effective in my job and have fewer resources to offer to my students in need of support.

PLFS-097

31. Despite the WAVES Center being open to all, I am afraid that the various API-specific WAVES Center features could be singled out as perpetuating racial stereotypes and explicit race-consciousness into training and programming as interpreted by the broad language of the Dear Colleague Letter. Even absent an OCR complaint, I'm concerned that Shoreline would reduce the services offered at the WAVES Center or close it entirely instead of risking having federal funds revoked for conflicting with the language of the Dear Colleague Letter.

**The Impact of the Letter on Campus Life at Shoreline Community College**

32. My department also hosts a public lecture series dedicated to addressing ethnic and racial issues. I have given a lecture titled: "'Zombie Orientals Ate My Brain!' Anti-Asian and Anti-Muslim discrimination in contemporary zombie film and fiction."

33. Additional lectures at Shoreline include a talk on white supremacy and "anti-woke" backlash, a lecture on Filipino-American neocolonialism, as well as a talk by a Native American educator and photographer.

34. While I believe that this programming is compliant with state and federal discrimination law, these lecture topics, including my focus on Anti-Asian and Anti-Muslim discrimination, could be challenged under the interpretations of law expressed in the Dear Colleague Letter as addressing systemic and structural racism in America. I frequently encourage my students to attend these lectures and I attend them myself to better inform my coursework and teaching. I'm afraid that lectures like these may be foreclosed in the future due to the risk that the topics seemingly conflict with the language of the Dear Colleague Letter and could result in federal funds being revoked.

9

PLFS-098

Shoreline, WA
March 26, 2025

_____
Eric Hamako

10

**PLFS-099**