# EXHIBIT 16

PLFS-145

 

# QUESTIONS AND ANSWERS REGARDING THE SUPREME COURT'S DECISION IN *STUDENTS FOR FAIR ADMISSIONS, INC. V. HARVARD COLLEGE AND UNIVERSITY OF NORTH CAROLINA*

## OVERVIEW

On June 29, 2023, the U.S. Supreme Court held that Harvard College and the University of North Carolina ("UNC") violated the Fourteenth Amendment of the U.S. Constitution and Title VI of the Civil Rights Act of 1964 ("Title VI") by impermissibly using race in their undergraduate admissions processes.  See *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, No. 20-1199; *Students for Fair Admissions, Inc. v. University of North Carolina et al.*, No. 21-707 ("*SFFA*").  [Link to decision.]  Specifically, the Court held that UNC's consideration of individual students' race violated the Fourteenth Amendment's Equal Protection Clause, which applies to public colleges and universities.  The Court reaffirmed that Title VI requires all colleges and universities that receive federal financial assistance—public and private—to comply with the same requirements imposed by the Equal Protection Clause.  And the Court held that Harvard College's consideration of individual students' race violated those requirements as well.

This document provides institutions of higher education with information about the Court's decision.  The Departments of Justice and Education will continue to address all complaints of race discrimination by applying the relevant legal standards under civil rights statutes and will vigorously enforce civil rights protections, including prohibitions against racial discrimination.  We hope you find the Questions and Answers below to be helpful in implementing lawful admissions programs on your campus, consistent with the recent decision.[1]

## QUESTIONS AND ANSWERS

**Q1:** **What did the Supreme Court decide?**

In *SFFA*, the Supreme Court held that Harvard College and UNC's admissions programs unlawfully considered individual students' race in determining whether to offer those students admission.  The Court held that the schools' asserted interests in the educational benefits of

---

[1] The contents of this Q&A document do not have the force and effect of law and do not bind the public or impose new legal requirements, nor do they bind the Departments of Education and Justice in the exercise of their discretionary enforcement authorities.  This document is designed to provide information to the public regarding existing requirements under the Constitution and under Title VI and its implementing regulations.  It does not address areas other than the application of these requirements to higher education admissions.

1

August 14, 2023
**PLFS-146**

 

diversity—including, among other things, training future leaders, preparing graduates to thrive in an increasingly pluralistic society, promoting the robust exchange of ideas, fostering innovation and problem-solving, and encouraging respect, empathy, and cross-racial understanding—were not sufficiently measurable and could not "be subjected to meaningful judicial review." 600 U.S. __ (2023) (slip op. at 23). The Court held that the admissions programs also failed to articulate a meaningful connection between the means they employed and the goals they pursued. And the Court further held that the programs disadvantaged some racial groups and employed racial stereotypes by treating the fact of an applicant's race alone as saying something meaningful about the applicant's lived experiences or what qualities the applicant could bring to a campus environment. Finally, the Court held that the programs lacked a "logical end point" that would guide courts in determining when the schools' diversity goals had been achieved and the use of race in admissions was no longer necessary. *Id.* at 30 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 342 (2003)).

The Court noted that its opinion did not address the permissibility of considering race in admissions to the Nation's military academies, "in light of the potentially distinct interests that military academies may present." *Id.* at 22, n.4. The Court's opinion also did not address many other admissions practices that do not involve the use of race.

**Q2:   In what ways can institutions of higher education consider an individual student's race in admissions?**

The Court in *SFFA* limited the ability of institutions of higher education to consider an applicant's race in and of itself as a factor in deciding whether to admit the applicant.

The Court made clear that "nothing in [its] opinion should be construed as prohibiting universities from considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise." *Id.* at 39. This means that universities may continue to embrace appropriate considerations through holistic application-review processes and (for example) provide opportunities to assess how applicants' individual backgrounds and attributes—including those related to their race, experiences of racial discrimination, or the racial composition of their neighborhoods and schools—position them to contribute to campus in unique ways. For example, a university could consider an applicant's explanation about what it means to him to be the first Black violinist in his city's youth orchestra or an applicant's account of overcoming prejudice when she transferred to a rural high school where she was the only student of South Asian descent. An institution could likewise consider a guidance counselor or other recommender's description of how an applicant conquered her feelings of isolation as a Latina student at an overwhelmingly white high school to join the debate team. Similarly, an institution could consider an applicant's discussion of how learning to cook traditional Hmong dishes from her grandmother sparked her passion for food and nurtured her sense of self by connecting her to past generations of her family.

August 14, 2023
**PLFS-147**

 

In short, institutions of higher education remain free to consider any quality or characteristic of a student that bears on the institution's admission decision, such as courage, motivation, or determination, even if the student's application ties that characteristic to their lived experience with race—provided that any benefit is tied to "*that student's*" characteristics, and that the student is "treated based on his or her experiences as an individual[,]" and "not on the basis of race." *Id.* at 40.

Those institutions of higher education that do not consider the race of individual applicants when making offers of admission might not need to make any changes to their current admissions practices in light of the Court's decision. But institutions that do consider race in the manner that the Court addressed will need to re-evaluate their current practices to ensure compliance with the law as articulated in the *SFFA* decision.

**Q3:** **Can institutions of higher education continue to take other steps to achieve a student body that is diverse across a range of factors, including race and ethnicity? If so, how?**

Yes, institutions of higher education may continue to articulate missions and goals tied to student body diversity and may use all legally permissible methods to achieve that diversity. As noted above, schools can continue to use strategies that remove barriers and expand opportunity for all. This includes considering the full range of circumstances a student has faced in achieving their accomplishments, including financial means and broader socioeconomic status; information about the applicant's neighborhood and high school; and experiences of adversity, including racial discrimination. In particular, nothing in the *SFFA* decision prohibits institutions from continuing to seek the admission and graduation of diverse student bodies, including along the lines of race and ethnicity, through means that do not afford individual applicants a preference on the basis of race in admissions decisions. Indeed, seeking to enroll diverse student bodies can further the values of equality of opportunity embedded in the Fourteenth Amendment and other federal civil rights laws. While the decision does not specifically address the steps institutions may continue to take to achieve diverse student bodies, existing practices that can lawfully be used include but are not limited to the following:

**Targeted Outreach, Recruitment, and Pathway Programs**

To promote and maintain a diverse student applicant pool, institutions may continue to pursue targeted outreach, recruitment, and pipeline or pathway programs (referred to here as "pathway programs"). These programs allow institutions to take active steps to ensure that they connect with a broad range of prospective students—including those who might otherwise not learn about these institutions and their educational programs or envision themselves as potential candidates for admission. By ensuring that the group of applicants they ultimately consider for admission includes a robust pool of talented students from underrepresented groups, institutions

3

 

better position themselves to attain the student body diversity and related educational benefits they seek.

The Court's decision in *SFFA* does not require institutions to ignore race when identifying prospective students for outreach and recruitment, provided that their outreach and recruitment programs do not provide targeted groups of prospective students preference in the admissions process, and provided that all students—whether part of a specifically targeted group or not—enjoy the same opportunity to apply and compete for admission. Such outreach and recruitment efforts can remove barriers and promote opportunity for all, and institutions remain able to permissibly consider students' race when engaged in those efforts.

In identifying prospective students through outreach and recruitment, institutions may, as many currently do, consider race and other factors that include, but are not limited to, geographic residency, financial means and socioeconomic status, family background, and parental education level. For example, in seeking a diverse student applicant pool, institutions may direct outreach and recruitment efforts toward schools and school districts that serve predominantly students of color and students of limited financial means. Institutions may also target school districts or high schools that are underrepresented in the institution's applicant pool by focusing on geographic location (e.g., schools in the Midwest, or urban or rural communities) or other characteristics (e.g., low-performing schools or schools with high dropout rates, large percentages of students receiving free or reduced-price lunch, or historically low numbers of graduates being admitted to the institution).

In addition to outreach and recruitment programs, institutions may offer pathway programs that focus on increasing the pool of particular groups of college-ready applicants in high school and career and technical education programs. The structure and scope of pathway programs vary significantly across institutions. An institution may partner with a particular school or student-centered organization and offer mentoring or other programming throughout the school year to enhance students' academic exposure. It may also host summer enrichment camps for students attending nearby public schools.

An institution may consider race and other demographic factors when conducting outreach and recruitment efforts designed to provide information about a pathway program to potential participants. If an institution awards slots or otherwise selects students for participation in its pathway program based on non-racial criteria (e.g., all 11th graders at a particular high school are able to participate, or all 10th graders in a geographic area with a certain GPA may apply), the institution may give pathway program participants preference in its college admissions process. As with college and university admissions, institutions may not award slots in pathway programs based on an individual student's race without triggering the strict scrutiny that *SFFA* applied (though institutions may permissibly consider how race has shaped the applicant's lived experience in selecting participants).

 

### Collection of Demographic Data

Data containing demographic information about an institution's student applicant pool, student admissions outcomes, and student enrollment and retention provide institutions with critical information related to their programs and objectives. Such data convey a range of information about students, including their race/ethnicity, age, sex, gender identity, citizenship, Tribal affiliation, disability, geographic background, language proficiency, socioeconomic status, family background and parental education level, and military background. Institutions may continue to collect this information and use it for a variety of purposes, so long as that use is consistent with applicable privacy laws and ensures that demographic data related to the race of student applicants do not influence admissions decisions. For example, an institution's review of the demographic breakdown of student applicants can be used to help the institution develop, review, and refine outreach, recruitment, and pathway programs targeted to the institution's needs. Likewise, reviewing demographic data related to student admissions outcomes can aid institutions in ensuring that their admissions practices do not discriminate based on any protected characteristics or create other artificial barriers to admission. Finally, an institution's understanding of the demographic breakdown of the students who ultimately enroll and graduate (and those who do not) may provide useful context for its development, review, and assessment of student programming needs (whether academic, co-curricular, social, or financial).

In collecting and using data, institutions should ensure that the racial demographics of the applicant pool do not influence admissions decisions. As stated above in Question 2, admissions officers need not be prevented from learning an individual applicant's race if, for example, the applicant discussed in an application essay how race affected their life. However, the Court criticized the practice of institutions adjusting their admissions priorities dynamically in response to demographic data on the race of students in the admitted class. The Court's decision does not prohibit institutions from reviewing such data for other purposes, but institutions should consider steps that would prevent admissions officers who review student applications from using the data to make admissions decisions based on individual applicants' self-identified race or ethnicity.

### Evaluation of Admissions Policies

Nothing in the Court's decision prohibits institutions from carefully evaluating their policies to best determine which factors in a holistic admissions process most faithfully reflect institutional values and commitments. For example, an institution committed to increasing access for underserved populations may seek to bring in more first-generation college students or Pell-grant eligible students, among others. In addition, nothing in the decision prevents an institution from determining whether preferences for legacy students or children of donors, for example, run counter to efforts to promote equal opportunities for all students in the context of college admissions.

August 14, 2023
**PLFS-150**

 

Similarly, institutions may investigate whether the mechanics of their admissions processes are inadvertently screening out students who would thrive and contribute greatly on campus. An institution may choose to study whether application fees, standardized testing requirements, pre-requisite courses such as calculus, or early decision timelines advance institutional interests.

The Court's decision likewise does not prohibit admissions models and strategies that do not consider an individual's race, such as those that offer admission to students based on attendance at certain secondary or post-secondary institutions or based on other race-neutral criteria. For instance, institutions may admit all students who complete degree programs at certain types of post-secondary institutions (e.g., community colleges and other institutions that are more likely to enroll students from economically or educationally disadvantaged backgrounds) and meet certain criteria (e.g., minimum GPA). Where feasible, institutions may also admit all students who graduate in the top portion of their high school class. These sorts of admission programs that do not consider an applicant's race in and of itself can help ensure that opportunities are distributed broadly and that classes are made up of students from a wide range of backgrounds and experiences.

As part of their holistic review, institutions may also continue to consider a wide range of factors that shape an applicant's lived experiences. These factors include but are not limited to: financial means and broader socioeconomic status; whether the applicant lives in a city, suburb, or rural area; information about the applicant's neighborhood and high school; whether the applicant is a citizen or member of a Tribal Nation; family background; parental education level; experiences of adversity, including discrimination; participation in service or community organizations; and whether the applicant speaks more than one language.

**Student Yield and Retention Strategies and Programs**

Ensuring that institutions of higher education are open to all includes not only attracting, admitting, and matriculating a diverse student body, but also retaining students from all backgrounds. To that end, it is important that students—particularly those who are underrepresented—feel a sense of belonging and support once on campus. An institution may, consistent with the federal laws the Departments of Justice and Education enforce, foster this sense of belonging and support through its office of diversity, campus cultural centers, and other campus resources if these support services are available to all students. An institution may also offer or support clubs, activities, and affinity groups—including those that have a race-related theme—to ensure that students have a space to celebrate their shared identities, interests, and experiences, so long as the clubs, activities, and affinity groups are open to all students regardless of race. Similarly, an institution may host meetings, focus groups, assemblies, or listening sessions on race-related topics if all interested students may participate, regardless of their race.

August 14, 2023
**PLFS-151**

 

---

    If you have further questions, please contact the Department of Education's Office for Civil Rights (800-421-3481 or ocr@ed.gov) or the Department of Justice's Educational Opportunities Section (877-292-3804 or education@usdoj.gov).

August 14, 2023
**PLFS-152**