# EXHIBIT 23

PLFS-196



# Race and School Programming

## U.S. Department of Education
## Office for Civil Rights

## August 2023

**U.S. DEPARTMENT OF EDUCATION**
**400 MARYLAND AVE. S.W.**
**WASHINGTON, DC 20202**
[www.ed.gov](www.ed.gov)

## Notice of Language Assistance

**Notice of Language Assistance**: If you have difficulty understanding English, you may, free of charge, request language assistance services for this Department information by calling 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), or email us at: Ed.Language.Assistance@ed.gov.

**Aviso a personas con dominio limitado del idioma inglés**: Si usted tiene alguna dificultad en entender el idioma inglés, puede, sin costo alguno, solicitar asistencia lingüística con respecto a esta información llamando al 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o envíe un mensaje de correo electrónico a: Ed.Language.Assistance@ed.gov.

**給英語能力有限人士的通知**: 如果您不懂英語，或者使用英语有困难，您可以要求獲得向大眾提供 的語言協助服務，幫助您理解教育部資訊。這些語言協助服務均可免費提供。如果您需要有關口譯 或筆譯服務的詳細資訊，請致電 1-800-USA-LEARN (1-800-872-5327) (聽語障人士專線：1-800-877-8339),或電郵: Ed.Language.Assistance@ed.gov.。

**Thông báo dành cho những người có khả năng Anh ngữ hạn chế**: Nếu quý vị gặp khó khăn trong việc hiểu Anh ngữ thì quý vị có thể yêu cầu các dịch vụ hỗ trợ ngôn ngữ cho các tin tức của Bộ dành cho công chúng. Các dịch vụ hỗ trợ ngôn ngữ này đều miễn phí. Nếu quý vị muốn biết thêm chi tiết về các dịch vụ phiên dịch hay thông dịch, xin vui lòng gọi số 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800- 877-8339), hoặc email: Ed.Language.Assistance@ed.gov.

**영어 미숙자를 위한 공고**: 영어를 이해하는 데 어려움이 있으신 경우, 교육부 정보 센터에일반인 대상 언어 지원 서비스를 요청하실 수 있습니다. 이러한 언어 지원 서비스는 무료로제공됩니다. 통역이나 번역 서비스에 대해 자세한 정보가 필요하신 경우, 전화번호 1-800- USA-LEARN (1-800-872-5327) 또는 청각 장애인용 전화번호 1-800-877-8339 또는 이메일주소 Ed.Language.Assistance@ed.gov 으로 연락하시기 바랍니다.

**Paunawa sa mga Taong Limitado ang Kaalaman sa English**: Kung nahihirapan kayong makaintindi ng English, maaari kayong humingi ng tulong ukol dito sa inpormasyon ng Kagawaran mula sa nagbibigay ng serbisyo na pagtulong kaugnay ng wika. Ang serbisyo na pagtulong kaugnay ng wika ay libre. Kung kailangan ninyo ng dagdag na impormasyon tungkolsa mga serbisyo kaugnay ng pagpapaliwanag o pagsasalin, mangyari lamang tumawag sa 1-800- USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o mag-email sa: Ed.Language.Assistance@ed.gov.

**Уведомление для лиц с ограниченным знанием английского языка**: Если вы испытываете трудности в понимании английского языка, вы можете попросить, чтобы вампредоставили перевод информации, которую Министерство Образования доводит до всеобщего сведения. Этот перевод предоставляется бесплатно. Если вы хотите получить более подробную информацию об услугах устного и письменного перевода, звоните по телефону 1-800-USA-LEARN (1-800-872-5327) (служба для слабослышащих: 1-800-877- 8339), или отправьте сообщение по адресу: Ed.Language.Assistance@ed.gov.



**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE FOR CIVIL RIGHTS

THE ASSISTANT SECRETARY

August 24, 2023

Dear Colleague:

I write to clarify the circumstances under which recipients of federal financial assistance from the U.S. Department of Education (Department) can – consistent with Title VI of the Civil Rights Act of 1964 (Title VI) and its implementing regulations – develop curricula or engage in activities that promote racially inclusive school communities.[1] This guidance responds to recent increases in the number of complaints and requests for technical assistance from school communities that the Department's Office for Civil Rights (OCR) has received on these issues.

This guidance includes examples to help school communities assess their Title VI legal obligations and protections. These examples do not dictate the outcome of any particular matter OCR may investigate; rather, in each case, OCR engages in an individualized analysis of the particular facts at issue.

OCR recognizes that schools, colleges, and universities that receive federal financial assistance from the Department may be subject to state or local laws, in addition to the federal laws that OCR enforces. This guidance does not address state or local laws.

This guidance reaffirms that the Department, including OCR, does not mandate, direct, or control curricula except to the extent authorized by law.[2] It is the province of states, localities, and educational institutions to make determinations regarding curricular and programming choices, including academic course materials and related discussions. Notwithstanding this authority, the laws enforced by OCR apply to all of a recipient's programs and activities.[3] Therefore, when OCR receives a complaint alleging discrimination under the laws OCR enforces, including Title VI,

---

[1] Throughout this guidance, and consistent with the language of Title VI, "race" or "racial" includes race, color, and national origin. *See* 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.").

[2] *See, e.g.*, Section 103(b) of the Department of Education Organization Act, 20 U.S.C. § 3403(b) ("No provision of a program administered by the Secretary or by any other officer of the Department shall be construed to authorize the Secretary or any such officer to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, over any accrediting agency or association, or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system, except to the extent authorized by law."); Section 438 of the General Education Provisions Act, 20 U.S.C. § 1232a ("No provision of any applicable program shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, or over the selection of library resources, textbooks, or other printed or published instructional materials by any educational institution or school system, or to require the assignment or transportation of students or teachers in order to overcome racial imbalance.").

[3] 20 U.S.C. § 1221(d); 42 U.S.C. § 2000d-4a.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

PLFS-199

OCR evaluates the educational institution's relevant actions or inactions, which may include its choice of curricula, to determine if there is a violation of the law.[4]

The contents of this guidance do not have the force and effect of law and do not bind the public or create new legal standards. This document is designed to provide clarity to the public regarding existing legal requirements under Title VI and its implementing regulations. The Department has determined that this document provides significant guidance under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007).

## I.    Legal Standards under Title VI

Title VI states: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[5] As the Supreme Court recently confirmed, Title VI prohibits racial classifications that would violate the Equal Protection Clause of the Constitution.[6] All educational institutions, including pre-K, elementary, and secondary public schools and school districts, and public and private colleges, universities, and other postsecondary institutions that receive federal financial assistance, are required to comply with Title VI. Although Title VI also extends to other entities that receive federal financial assistance from the Department and protects certain other individuals,[7] this guidance focuses on students and their interactions with school administrators, faculty, teachers, and other students.

Discrimination based on race, color, or national origin includes discrimination based on a person's actual or perceived race, color, or national origin.[8] Such discrimination may be based on the country or world region from which a person or their ancestors come; a person's limited English proficiency or status as an English learner;[9] or a person's actual or perceived shared ancestry or ethnic characteristics, including those associated with membership in a specific religion (such as Hinduism, Judaism, Islam, or Sikhism).[10]

---

[4] 34 C.F.R. § 100.7(c) (OCR "will make a prompt investigation whenever a … complaint, or any other information indicates a possible failure to comply with this part."). Consistent with 34 C.F.R. § 100.7(a), OCR also conducts periodic compliance reviews.

[5] 42 U.S.C. § 2000d.

[6] *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 143 S. Ct. 2141, 2156 n.2 (2023) (hereinafter *SFFA*).

[7] For example, Title VI also prohibits racial discrimination by schools against parents and adult volunteers. Employees are also protected by Title VI in limited circumstances. *See* 34 C.F.R. § 100.3(c).

[8] *See Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 548 (3d Cir. 2011).

[9] *See Lau v. Nichols*, 414 U.S. 563, 568-69 (1974).

[10] *See T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 354-55 (S.D.N.Y. 2014) (concluding that discrimination based on shared ancestry and ethnic characteristics is prohibited by Title VI). For more information about Title VI's protection against discrimination based on a student's actual or perceived shared ancestry or ethnic characteristics, or citizenship or residency in a country with a dominant religion or distinct religious identity, please visit: https://www2.ed.gov/about/offices/list/ocr/sharedancestry.html.

Schools may violate Title VI when they separate students based on race or treat individual students or groups of students differently based on race.[11] As described in more detail below, schools also may violate Title VI when they create, encourage, accept, tolerate, or fail to correct a racially hostile educational environment.

### A. Unlawful Express Racial Classifications

School programs – including the implementation of curricula or the establishment, recognition, or support of a school group, club, or other extracurricular organization – that treat individual students differently based on their race are subject to "strict scrutiny" review under Title VI.[12] To survive strict scrutiny, a school must demonstrate that any use of an individual student's race is "narrowly tailored" to further a "compelling" interest.[13] Strict scrutiny is a demanding standard of review that requires a careful and fact-specific analysis.

### B. Racially Discriminatory Application of Facially Neutral Policies

Racial discrimination can occur when a school implements or enforces a facially race-neutral policy or practice in a manner that treats students differently based on their race.[14] For example, a school could violate Title VI if it enforces its race-neutral rules related to extracurricular activities in a way that makes it harder for students of a particular race to form a club or hold activities because of their race.

OCR frequently uses the following three-step test to determine whether a school treated similarly situated students differently based on race in violation of Title VI:[15]

1. Did the school treat a student or group of students of a particular race differently from a similarly situated student or group of students of another race? If **no**, then OCR would **not** find sufficient evidence to determine that the school has engaged in different treatment based on race under this framework. If **yes**, then move to step two:

---

[11] 34 C.F.R. § 100.3(b)(1)(iii).

[12] See SFFA, 143 S. Ct. at 2156 n.2 (analyzing Harvard's admissions program under Equal Protection Clause in light of prior holdings that racial discrimination by school districts that violates the Equal Protection Clause also violates Title VI).

[13] SFFA, 143 S. Ct. at 2162. The Supreme Court has held that compelling interests may not just be "plainly worthy" or "commendable goals," but must also be "sufficiently coherent for purposes of strict scrutiny" so that they can "be subjected to meaningful judicial review." Id. at 2166. Compelling interests may not be "standardless." Id.

[14] See, e.g., Yick Wo v. Hopkins, 118 U.S. 356 (1886); Cobb v. The Rector & Visitors of Univ. of Virginia, 69 F. Supp. 2d 815, 830–31 (W.D. Va. 1999) (concluding that student alleged sufficient facts to support a claim of racially biased prosecution for honor code violations where the student alleged that similarly situated students of a different race were not prosecuted and the decision to prosecute was invidious and in bad faith).

[15] See also McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), a case under Title VII of the Civil Rights Act of 1964 (Title VII) that sets forth a three-part test that also applies in the Title VI context. The Department uses the McDonnell Douglas test in its administrative enforcement as one way to determine whether an institution has engaged in prohibited intentional discrimination. See also Xu Feng v. University of Delaware,785 Fed. Appx. 53 (3rd Cir. 2019) (applying McDonnell Douglas to a Title VI claim); U.S. Dep't of Justice, Civil Rights Division, Title VI Legal Manual 44-46 (Apr. 22, 2021).

2. Can the school articulate a legitimate, nondiscriminatory reason for the different treatment? If **no**, OCR could find that the school has discriminated on the basis of race. If **yes**, then move to step three:

3. Is the articulated reason for the different treatment a pretext for discrimination (*i.e.*, not the true reason for the school's actions)? If **yes**, OCR could find that the school has engaged in discrimination based on race.

Additionally, to determine whether a school acted with a racially discriminatory purpose, OCR also may consider other factors, such as the racial impact of the challenged action, the historical background of the decision, the specific sequence of events leading up to the challenged decision, departures from normal procedures, and legislative or administrative history.[16] The relevance of the factors will vary based on the context.

Under these approaches, if it is determined a school acted, at least in part, because of race, color, or national origin, OCR would apply strict scrutiny to the school's conduct.

## C. Racial Harassment and Hostile Environment

The existence of a racially hostile environment that is created, encouraged, accepted, tolerated, or left uncorrected by a school can constitute discrimination on the basis of race in violation of Title VI.[17] As OCR has articulated many times, OCR could find a Title VI violation in its enforcement work if: (1) a hostile environment based on race existed; (2) the school had actual or constructive notice of the hostile environment; and (3) the school failed to take prompt and effective steps reasonably calculated to (i) end the harassment, (ii) eliminate any hostile environment and its effects, and (iii) prevent the harassment from recurring.[18]

OCR interprets Title VI to mean that the following type of harassment creates a hostile environment: unwelcome race-based conduct that, based on the totality of circumstances, is subjectively and objectively offensive and is so severe or pervasive, that it limits or denies a

---

[16] *See, e.g.*, *Village of Arlington Heights v. Metro Housing Development Corp.*, 429 U.S. 252, 266-68 (1977).

[17] *See Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 670 n.14 (2d Cir. 2012) (discussing school district liability for student-to-student racial harassment and failure to address hostile environments under Title VI) (relying on *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 639-44 (1999) (discussing student-on-student harassment standards for damages actions under Title IX of the Education Amendments of 1972 (Title IX)) and *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 280-90 (1998) (discussing teacher-on-student harassment standard for Title IX)); *Monteiro v. Tempe Union High School Dist.*, 158 F.3d 1022, 1032-35 (9th Cir. 1998) (finding plaintiffs sufficiently alleged a violation of Title VI under a hostile environment theory where students were called racial epithets by their peers and school officials refused to accept complaints and refused to take any action to end the racist misconduct); *Doe v. Los Angeles Unified Sch. Dist.*, No. 16-cv-305-CAS (JEMx), 2017 WL 797152 (C.D. Cal. 2017) (applying the hostile environment standard in *Monteiro*) ("To prove a violation of Title VI's prohibition on racially hostile environments, a party must show: (1) the existence of a racially hostile environment, (2) of which a recipient of federal funds had notice and (3) failed to adequately redress.").

[18] *See* Racial Incidents and Harassment against Students at Educational Institutions: Investigative Guidance, 59 Fed. Reg. 11,448, 11,449 (Mar. 10, 1994), *available at* http://www.ed.gov/about/offices/list/ocr/docs/race394.html; OCR's Guidance on Schools' Obligations to Protect Students from Student-on-Student Harassment on Basis of Sex; Race, Color and National Origin; and Disability at 2, 4, 6 (Oct. 2010), *available at* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf.

person's ability to participate in or benefit from the recipient's education program or activity (*i.e.*, creates a hostile environment).[19] Harassing conduct need not always be targeted at a particular person in order to create a hostile environment.[20] The conduct may be directed at anyone, and the harassment may also be based on association with others of a different race (the harassment might be referencing the race of a sibling or parent, for example, that is different from the race of the victim whose access to the school's program is limited or denied).[21] Additionally, a hostile environment may take the form of a single victim and multiple offenders.

Whether harassing conduct creates a hostile environment must be determined from the totality of the circumstances.[22] Relevant factors for consideration may include, but are not limited to, the context, nature, scope, frequency, duration, and location of the race-based harassment, as well as the identity, number, age, and relationships of the persons involved. Generally, the less pervasive the harassing conduct, the more severe it must be to establish a hostile environment under Title VI. For example, in most cases, a single isolated incident would not be sufficient to establish a Title VI violation. However, in some cases, a racially hostile environment requiring appropriate responsive action may result from a single severe incident.[23]

---

[19] In addition to the guidance cited in note 18, *supra*, see *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 639-44 (1999) (discussing student-on-student harassment standards for damages actions under Title IX of the Education Amendments of 1972 (Title IX)) and *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 280-90 (1998) (discussing teacher-on-student harassment standard for Title IX). In analyzing racial harassment claims, OCR relies on the legal principles articulated in cases under Title VII and Title IX. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 694-698 (1979) (stating that Title IX was modeled on Title VI.); *Franklin v. Gwinnett Cty. Public Schs.*, 503 U.S. 60, 75 (1992) (applying Title VII principles to Title IX case).

[20] This standard is well established under Title VII case law, on which courts often rely for interpreting Title VI. *See Waltman v. International Paper Co.*, 875 F.2d 468, 477 (5th Cir. 1989) (all sexual graffiti in office, not just that directed at plaintiff, was relevant to plaintiff's claim); *Hall v. Gus Construction Co.*, 842 F.2d 1010, 1015 (8th Cir. 1988) (evidence of sexual harassment directed at others is relevant to show hostile environment); *Walker v. Ford Motor Co.*, 684 F.2d 1355,1358-59 (11th Cir. 1982) (hostile environment established where racial harassment made plaintiff "feel unwanted and uncomfortable in his surroundings," even though it was not directed at him).

[21] *See Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 892 (11th Cir. 1986) (Title VII) ("Where a plaintiff claims discrimination based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of *his* race.); *Chacon v. Ochs*, 780 F. Supp. 680, 681 (C.D. Cal. 1991) (Title VII) (applying *Parr* to an incident of racial harassment); EEOC Compliance Manual, Section 15: Race & Color Discrimination (2016), *available at* https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination. For examples, see OCR's Guidance on Schools' Obligations to Protect Students from Student-on-Student Harassment on Basis of Sex; Race, Color and National Origin; and Disability at 2, 4, 6 (Oct. 2010), *available at* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf.

[22] *See Hendrichsen v. Ball State Univ.*, 107 F. App'x. 680, 684 (7th Cir. 2004) (Title IX case); *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033 (9th Cir. 1998); *Elliott v. Delaware State Univ.*, 879 F. Supp. 2d 438, 446 (D. Del. 2012).

[23] *Compare Vance v. Spencer County Public School District*, 231 F.3d 253, 259 n.4 (6th Cir. 2000) (quoting *Doe v. School Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 62 (D. Me. 1999) ("Within the context of Title IX of the Education Amendments Act of 1972, a student's claim of hostile environment can arise from a single incident")); *Barrett v. Omaha National Bank*, 584 F. Supp. 22 (D. Neb. 1983), *aff'd*, 726 F.2d 424 (8th Cir. 1984) (Title VII) (sexually hostile environment established by sexual assault). *See also* Racial Incidents and Harassment against Students at Educational Institutions: Investigative Guidance, 59 Fed. Reg. 11,448 (Mar. 10, 1994), *available at* http://www.ed.gov/about/offices/list/ocr/docs/race394.html; EEOC Policy Guidance on Current Issues of Sexual Harassment, No. N-915.050 (Mar.19 1990) and cases cited therein, *available at* https://www.eeoc.gov/laws/guidance/policy-guidance-current-issues-sexual-harassment.

To redress a hostile environment, a school has a legal duty to take prompt and effective steps that are reasonably calculated to: (1) end the harassment, (2) eliminate any hostile environment and its effects, and (3) prevent the harassment from recurring.[24] OCR evaluates the appropriateness of the responsive action by assessing whether it was reasonable, timely, and effective.[25] The appropriate response to a hostile environment based on race must be designed to redress fully the specific problems experienced as a result of the harassment.[26] In the case of multiple offenders, it is not a defense to discipline only the first student when the totality of the circumstances indicate the school has a broader, environmental issue, and the school's response should be adjusted appropriately to address the larger school environment.

## II.     School Curricula and Programming

Federal law recognizes that elementary, secondary, and postsecondary schools, school districts and states make curricular and programming choices based on the professional judgment of educators, administrators, and school boards.[27] In enforcing Title VI, OCR does not involve itself in complaints based on the content of a school's academic course materials or related discussions absent allegations of discrimination.[28]

The examples included below are intended to provide guidance about how OCR may consider complaints in this area where the school is a recipient of federal financial assistance. These examples do not predict or determine the outcome of any particular complaint that OCR might receive. Each of these examples is purely hypothetical. These examples discuss tentative OCR actions based on limited hypothetical information and, therefore, should not be construed as definitive statements or binding requirements to be applied identically under similar circumstances. For each example, we have identified potential actions OCR could take; however, these examples have no binding effect on how the Department can exercise its enforcement discretion. OCR always analyzes the totality of the factual circumstances presented in each individual case.

- Example 1: A local news outlet reports that a nearby public elementary school has launched a new program that requires all students to read a book about race discrimination and racial justice from a list created by the school. OCR receives a complaint alleging that the school is violating Title VI.

  *OCR may decline to open an investigation based on this complaint.* On its face, the requirement to participate seems to apply to all students, and the complaint did not allege

---

[24] *See* note 18, *supra.*

[25] *See also* Racial Incidents and Harassment against Students at Educational Institutions: Investigative Guidance, 59 Fed. Reg. 11,448, 11,450 (Mar. 10, 1994), *available at* http://www.ed.gov/about/offices/list/ocr/docs/race394.html. OCR interprets its regulations consistent with the requirements of the First Amendment to the U.S. Constitution, and all actions taken by OCR must comport with First Amendment principles. No OCR regulation should be interpreted to impinge upon rights protected under the First Amendment or to require recipients to enact or enforce codes that punish the exercise of such rights.

[26] *Zeno*, 702 F.3d at 670 n.14.

[27] *See* note 2, *supra.*

[28] *See* notes 2 and 3, *supra.*

that any students had been excluded from the program or treated differently based on race. The complaint also included no allegations suggesting that the school's program was subjectively and objectively offensive and created a racially hostile environment. Absent other facts, the complaint likely does not raise allegations that warrant investigation under Title VI.

- <u>Example 2</u>: As a part of its new history curriculum, a school district now requires all students to take one Mexican-American history class before graduation. OCR receives a complaint from the parent of a student in the district alleging that the class violates Title VI because it is offensive to non-Mexican-American students who may not want to take the class.

- *OCR may decline to open an investigation based on this complaint.* The complaint alleges all students, regardless of race, are required to take the class, and contains no allegations that the school district enforced the policy differently for students of different races. Even though the complaint alleges some students may find the class subjectively offensive, absent additional specific facts, OCR would have no reason to regard a Mexican-American history class as objectively offensive in a way that creates a racially hostile environment under Title VI. Thus, the complaint likely does not raise allegations that warrant investigation under Title VI.

### A. Separation of Students and Different Treatment Based on Race

OCR generally will open an investigation under Title VI where there are allegations that the use of a curriculum or program separates students or otherwise treats them differently based on their race. Title VI regulations specifically prohibit "separate treatment in any matter related to" a person's receipt of services or any other benefit of the school program.[29] In almost all circumstances, separating students based on race violates Title VI even if programming for each group is identical.[30]

Similarly, a school curriculum or program may include group discussions or other activities that focus on race and might also divide students into smaller groups to discuss related topics, as long as the school does not require or deny participation in those groups based on race or assign students to groups based on race.[31]

- <u>Example 3</u>: The curriculum for a college course requires that students of different races read different materials based on their race. The college also requires that students complete different written assignments and participate in different discussion groups based on their race. When asked why the college assigned different materials, the college stated that students often feel more comfortable reading works by authors of their own race. A student in the course files a complaint with OCR alleging race discrimination.

---

[29] 34 C.F.R. § 100.3(b)(1)(iii).

[30] *See SFFA*, 143 S. Ct. at 2160*; Brown v. Bd. of Educ.*, 347 U.S. 483, 495 (1954) ("Separate educational facilities are inherently unequal.").

[31] *See* note 30, *supra*.

*OCR would have reason to open an investigation based on this complaint.* Because the complaint alleges specific facts that suggest that the college treated students differently based on race, including in the assignment of reading materials, written assignments, and discussion groups, further investigation may be warranted.

If OCR's investigation confirms these allegations, OCR would apply the strict scrutiny standard; examine whether the college's decision to treat students differently based on race furthers a compelling interest, and, if so, whether the college's actions were narrowly tailored to achieve that interest. Given the college's lack of a stated compelling interest, the college's division of students by their individual race into race-exclusive discussion groups, and the college's assignment of different reading materials based on individual students' race, OCR could find that the college's practice is unlawful as the practice appears to fail to satisfy strict scrutiny.

- Example 4: A high school teacher provides the class with a list of articles about racial and ethnic identity. The teacher then asks students to participate in small group discussions focused on how the articles relate to different aspects of students' life experiences. Each small group discusses all the listed articles and considers the same list of discussion questions provided by the teacher. The teacher does not assign any student to a discussion group based on race. A parent files a complaint alleging that the school is in violation of Title VI.

*OCR may decline to open an investigation based on this complaint.* The complaint does not allege that any student was treated differently based on race. The complaint also does not include facts indicating that a reasonable person would find the assignment offensive, or that any student felt limited in their participation in the school's educational program. Absent other facts, the complaint likely does not raise allegations that warrant investigation under Title VI.

Example 5: In the wake of race-based violence on campus directed against Asian students, a college's Asian American Student Alliance establishes recurring facilitated discussion groups for concerned students with a licensed counselor. The Asian American Student Alliance is a recognized student group that is open to all students. The events are advertised via flyers and on the campus intranet as a "safe space for students to discuss hate incidents against Asian students." A white student files a complaint alleging that the college is promoting separation of students based on race by permitting the Asian American Student Alliance to establish recurring events for concerned students because all the students who participate are Asian.

*OCR may decline to open an investigation based on this complaint.* The complaint does not allege that the college treated students differently or separated students based on race. Both the Asian American Student Alliance and the events are open to all students. Absent other facts, the race-related theme of a student group or its programming is typically not sufficient to support a Title VI violation finding. The fact that most or all members of a group, or most or all participants at an event, belong to a particular racial or ethnic group likely does not raise Title VI concerns if the group and/or event is open to all students.

## B. Race-Based Hostile Environment

OCR may investigate allegations that race-related curricula create a hostile environment. Curricular content creates a hostile environment if, based on the totality of the circumstances, it is subjectively and objectively offensive, and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity. The use of content that promotes hateful or demeaning racial stereotypes or violence toward people of a particular race can create a racially hostile environment for students, even if the content is not targeted at a specific person. OCR may investigate such complaints to determine whether a hostile environment existed and, if a hostile environment is found, whether the school took reasonable, timely, and effective action in response to the hostile environment.

- <u>Example 6</u>: A high school history teacher covering a unit on World War II develops a lesson plan to teach that the Holocaust did not really happen. He asks all his students to question how the assigned textbook depicts Adolf Hitler and to write a paper on how people of Jewish ancestry caused economic and other societal problems in Germany. He also asks individual students to reenact different episodes from that time period. The reenactments require several students to play the part of Nazi guards who are portrayed as patriots who were "only trying to preserve a unified and culturally cohesive German society."

  Parents of a student in the class file a complaint with OCR alleging that the teacher's activities were antisemitic and that their child, who is of Jewish ancestry, was offended by the activities, was uncomfortable attending the class, and was beginning to skip it.

  *OCR would have reason to open an investigation based on this complaint.* While OCR does not typically involve itself in schools' decisions regarding curriculum, the complaint alleges specific facts that, if true, include conduct by the teacher that could be both objectively and subjectively offensive; and either sufficiently severe or pervasive (or both) to limit or deny the ability of the student to participate in or benefit from the services, activities, or opportunities offered by the school.

  Although Title VI does not cover discrimination based on religion, it does cover discrimination based on a person's actual or perceived shared ancestry or ethnic characteristics, which may include characteristics associated with specific religious groups.[32] Thus, antisemitism, as alleged by these facts, is something that OCR could investigate. Further, OCR could investigate this claim even though the teacher did not target students who were of Jewish ancestry, as harassing acts need not be targeted at a particular person in order to create a hostile environment.

  If OCR's investigation confirms these allegations, it could find that the class was a hostile environment, especially if the facts indicate the teacher's conduct limited the student's ability to benefit from the school's program by preventing the student from participating in class or caused them to begin skipping class. If the school district failed to take prompt and effective steps reasonably calculated to (1) end the harassment, (2) eliminate any

---

[32] *See* note 10, *supra.*

hostile environment and its effects, and (3) prevent the harassment from recurring, OCR could find a violation of Title VI.

### III.    Other School Programming

Title VI generally does not restrict schools from holding assemblies, meetings, focus groups, or listening sessions to hear about students' experiences with race in the school or surrounding community, or to hear students' ideas about creating an inclusive school community with attention to race or other aspects of identity that affect students' experiences at the school or in the world. OCR recognizes that schools often utilize such events or groups with the aim of *preventing* violations of Title VI, such as unjustified different treatment of students based on race and racially hostile environments.

Title VI generally requires schools to ensure that all their students, regardless of race, have an equal opportunity to participate in any educational programs and activities, including meetings, focus groups, and listening sessions.[33] Restricting students' participation based on their race would raise significant concerns and trigger strict scrutiny under Title VI. If, however, the school provides an opportunity for all interested students to participate regardless of race, hosting meetings, focus groups, or listening sessions on race-related topics likely would not, by itself, raise concerns under Title VI.

- Example 7: In the wake of several high-profile police shootings of Black victims, a public school announces that it will convene an assembly for its Black students in order to provide a forum for them to express their frustrations, fears, and concerns. On the day of the event, several white students ask to participate, but school officials turn them away, saying that the program was designed specifically for Black students. OCR later receives a complaint from a parent alleging that the assembly violated Title VI by excluding students based on race.

  *OCR would have reason to open an investigation based on this complaint.* Because the complaint alleges specific facts suggesting that the school limited students' participation based on their race, further investigation may be warranted. If OCR's investigation confirms these allegations, OCR would apply the strict scrutiny standard, analyzing whether the school's decision to limit participation in the assembly on the basis of race furthered a compelling interest, and if so, whether the school's actions were narrowly tailored to achieve that interest. If the school could not proffer a compelling interest for excluding students on the basis of race, OCR could find that the school's actions violated Title VI. If a compelling interest was identified, OCR would evaluate whether the exclusion meets the narrow tailoring requirement of strict scrutiny.

### IV.    Extracurricular Programming, Activities, and Organizations

Title VI does not generally restrict a school from sponsoring or recognizing extracurricular activities and spaces with race-related themes. Many schools across the country have a long history of offering clubs and activities designed to ensure that students can celebrate their identities and interests and talk through common experiences in a supportive environment. Extracurricular

---

[33] 34 C.F.R. § 100.3(b)(1)(iv).

groups, spaces, and activities that are formed around the goal of sharing common interests and experiences, including those that have a race-related theme, and which are open to all students regardless of race, will generally not raise concerns under Title VI. In addition to providing support and friendship for students who participate, these activities and spaces may demonstrate to current and prospective students that the school has a supportive, welcoming atmosphere. As long as they are open to all students regardless of race, such school-sponsored activities and spaces will generally not raise concerns under Title VI.

A decision to restrict membership or participation in activities and spaces based on race, however, would raise significant concerns and trigger strict scrutiny under Title VI. In determining whether an opportunity to participate is open to all students, OCR may consider, for example, whether advertisements or other communications would lead a reasonable student, or a parent or guardian, to understand that all students are welcome to participate. OCR also is mindful that, in some circumstances, such as an activity promoting hateful or demeaning racial stereotypes or violence towards people of a particular race, extracurricular activities that have a race-related theme have the potential to create a hostile environment that could warrant investigation under Title VI.

A school generally may also offer or recognize programs focused on the experience of particular racial groups, including mentorship programs, fellowships, leadership trainings, and similar opportunities, except where the activity or opportunity limits participation based on race or creates a hostile environment. Generally, if opportunities are open to all students regardless of race, then the school likely has not adversely impacted students based on an individual's race or violated Title VI. Additionally, a program does not violate Title VI merely because it focuses its recruitment efforts on students of a particular race or national origin if the program is open to all students without regard to race or ethnicity.[34]

- Example 8: A public school recognizes a student group, the African American Students Association, which was founded by students seeking a forum to discuss issues that may be of particular interest to African American students. The group has hosted speakers who are knowledgeable about African American history and culture and organized field trips to participate in African American cultural activities. All students are welcome to participate in meetings and events organized by the group. The parent of a white student files a complaint with OCR alleging that the school has violated Title VI by recognizing a race-themed student group.

  *OCR may decline to open an investigation based on this complaint.* The complaint does not allege facts suggesting the existence of a racially hostile environment or that students were excluded from the group based on race. A student group is not subject to heightened legal scrutiny under Title VI because of the race-related theme of the group, if students are not excluded or treated differently based on race. Even if one or more students found

---

[34] *Cf. Fisher v. Univ. of Texas* (*Fisher II*), 579 U.S. 365, 385 (2016) (suggesting that "outreach efforts to African-American and Hispanic applicants" is a "race-neutral alternative" to race-based admissions preferences); *see also, e.g., Weser v. Glen*, 190 F. Supp. 2d 384, 399 (E.D.N.Y. 2002) ("[E]ven if the Law School's recruiting and outreach efforts were 'race conscious' in being directed at broader recruiting of minorities and women, such efforts would not constitute discrimination[.]"), *aff'd*, 41 F. App'x 521 (2d Cir. 2002); *Allen v. Ala. State Bd. of Educ.*, 164 F.3d 1347, 1352 (11th Cir. 1999), vacated on joint motion of the parties, 216 F.3d 1263 (11th Cir. 2000); *Honadle v. Univ. of Vermont*, 56 F.Supp.2d 419, 427-28 (D. Vt. 1999).

recognition of the student group subjectively offensive, there are no facts to suggest that the existence of the group is objectively offensive. Additionally, the complaint does not include facts indicating that the complainant or any other student was limited in their participation in the school's educational program as a result of the existence of this student group. Absent other facts, the complaint likely does not raise allegations that warrant investigation under Title VI.

- Example 9: OCR receives a complaint from a parent alleging that the school district is discriminating on the basis of race by supporting groups and activities that limit their concerns to problems faced more often by people of a certain race, or otherwise focus on people of that race. In the complaint, the parent cites the district's recognition of two support groups for Black students and their parents; the district's sponsorship of an event called "National Black Parents Involvement Day"; and the district's use of focus groups to solicit community feedback. While the groups and event expressly limit their agendas and focus to Black students and/or parents, none of the groups or events exclude or limit individuals' participation based on race. The school's website and promotional materials state that the groups and events are open to all in the school community.

  *OCR may decline to open an investigation based on this complaint.* In this example, the recognition of groups or events, or the use of focus groups, that limit their agendas to focusing on Black students and/or parents may not warrant an investigation under Title VI because they do not exclude individuals, or limit their participation, based on their race and they do not advertise and promote them as such. The complaint also does not allege facts suggesting the existence of a racially hostile environment.

- Example 10: A high school allows students to create student groups that meet during study hall periods during the day. A group of students at the school creates the Irish Cultural Club to discuss Irish history and issues important to Irish Americans. A second group of students at the school creates the Italian Cultural Club for a similar purpose. The Irish Cultural Club hosts an annual St. Patrick's Day celebration during one of its meetings during the school day. The celebration includes a screening of a documentary about Irish history, and the club pays for Irish snacks for the group. In its advertising, the Irish Cultural Club notes that only students of Irish ancestry are allowed to attend the event. Although students without Irish ancestry can be members of the Irish Cultural Club, the club has decided to limit participation in this annual event to individuals with Irish ancestry, based on "limited classroom space" and "a small snacks budget." The Italian Cultural Club hosts a "Pasta Night" where students in the club serve dinner in the school cafeteria. The Italian Cultural Club advertises that all students are welcome but only the first 50 students will get food. The vast majority of students who attend the event are of Italian descent. A student who has no Irish or Italian ancestry files a complaint alleging that the school discriminated against her by allowing the Irish Cultural Club and Italian Cultural Club to treat students differently on the basis of national origin.

*OCR would have reason to open an investigation based on this complaint with regards to the Irish Cultural Club.* While a student group is not subject to heightened legal scrutiny under Title VI because of the national-origin-related theme of the group and its programming, an investigation regarding the Irish Cultural Club may be warranted because the complaint alleges specific facts regarding the exclusion of students from the St. Patrick's Day event on the basis of national origin. Even if a student group is generally open to all students, it may still raise Title VI concerns if the group holds activities that are exclusive to students based on their national origin. If OCR's investigation confirms these allegations, OCR would apply strict scrutiny to the decision to limit attendance at the event on the basis of national origin and assess evidence to determine whether the limitation was narrowly tailored to achieve a compelling interest. If the school could not proffer a compelling interest for excluding students on the basis of individual ancestry or national origin, OCR could find that the school's actions violated Title VI. If a compelling interest was identified, OCR would evaluate whether the exclusion meets the narrow tailoring requirement of strict scrutiny.

*OCR may decline to open an investigation based on this complaint with regards to the Italian Cultural Club.* As stated above, a student group is not subject to heightened legal scrutiny under Title VI because of the national-origin-related theme of the group and its programming. Further investigation is likely not warranted because the event was open to all students, without regard to national origin or ancestry, and the limitations on serving food were not based on national origin or ancestry. OCR could find that the high school did not violate Title VI on the basis of the Italian Cultural Club's actions.

- Example 11: A parent files a complaint alleging that the school district discriminated by creating a high school mentorship program intended to encourage all students, but particularly students from historically marginalized groups, to take more rigorous courses. As part of the program, mentors and mentees engage in discussion about challenges that students from historically marginalized groups encounter both inside and outside the classroom. Participation is completely voluntary. Black and Latino students are encouraged to participate, but the program is open and welcoming to all students and is widely advertised as such.

*OCR may decline to open an investigation based on this complaint.* A program that is open to all students regardless of race or ethnicity is not subject to heightened legal scrutiny under Title VI merely because it focuses its recruitment efforts on students of a particular race or national origin. Absent other facts, the complaint likely does not raise allegations that warrant an investigation under Title VI.

- <u>Example 12</u>: A group of white students at a small college forms a student group, American Youth Association (AYA). The AYA is open to all students and advertises itself as a group for any students seeking a forum to discuss social issues, including opposition to immigration. The AYA meets regularly and sponsors numerous events. The AYA invites a white nationalist figure to speak at an AYA event on campus and publicizes the event using flyers and an announcement in the school newspaper. Due to the nature of the speaker, numerous students attend the event to protest. During the event, the speaker endorses violence against students of color and leads students in chanting "You will not replace us." The speaker refers to the group of protesters using a racial slur directed at Black individuals and says that they do not belong on campus. These incidents become widely known in the school community. The following week, a campus building is graffitied overnight with the same racial slur that was used by the speaker at the AYA event. These incidents also become widely known in the school community. Several students stop attending classes because they feel uncomfortable and unsafe on campus. A Black student who was present at the event files a complaint with OCR alleging that the college violated Title VI by failing to respond to a racially hostile environment.

  *OCR would have reason to open an investigation based on this complaint.* As stated above, a student group is not subject to heightened legal scrutiny under Title VI when it is open to all students. However, because the complaint alleges specific facts that suggest that one or more students may have experienced a hostile environment, further investigation may be warranted. If OCR's investigation confirms the white nationalist's chanting, endorsement of violence, and use of a racial slur in reference to students at the event and the graffitied racial slur, these actions collectively could constitute harassing conduct that is subjectively and objectively offensive as well as so severe or pervasive that it limits or denies a student's ability to participate in or benefit from the services, activities, or opportunities offered by that college.[35] If the evidence obtained during the investigation indicated that the college, having actual or constructive knowledge, failed to take prompt and effective steps reasonably calculated to (1) end the harassment, (2) eliminate any hostile environment and its effects, and (3) prevent the harassment from recurring, OCR could find a violation of Title VI.

As discussed above, schools are responsible under Title VI for ensuring that all students, regardless of race, have an equal opportunity to participate in all educational programs and activities. This Title VI responsibility includes schools applying all their standards in an evenhanded way. If a complaint alleges racially discriminatory enforcement of a school policy by identifying similarly situated students of different races who were treated differently, OCR may investigate whether the school had a legitimate, nondiscriminatory reason for the different treatment.[36] If the school proffers a legitimate, nondiscriminatory reason for the different treatment, OCR would decide whether that reason is the true reason for the school's actions, or whether it is a pretext for racial discrimination.

---

[35] The First Amendment does not protect speech that is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).

[36] *See* Section I.B., *supra*.

- <u>Example 13</u>: In order to get official recognition as a college student group, students must submit an application that includes written by-laws and identifies a tenured professor as their faculty advisor. A group predominantly composed of Latino college students files an application, including written by-laws, at the beginning of the academic year to secure official recognition for a new Latino Student Union on campus. A few weeks later, the college's Office for Community Life informs the students that their application was denied because their proposed faculty advisor, an adjunct professor, was not tenured. The students file a complaint with OCR, alleging that they were treated differently than students who applied to get official recognition for a Photography Club, whose membership is mostly white students but is open to anyone. While the Photography Club's application had identified a tenured professor as their faculty advisor, it had failed to include written by-laws. The college's Office for Community Life nonetheless granted official recognition to the new Photography Club.

    *OCR would have reason to open an investigation based on this complaint.* Because the complaint alleges specific facts suggesting that the college treated the predominantly Latino student group's application for official recognition differently than the predominantly non-Hispanic white student group's application, further investigation may be warranted. The student groups are similarly situated because the predominantly Latino student group's failure to provide the name of a tenured professor as its faculty advisor is comparable to the predominantly non-Hispanic white student group's failure to provide written by-laws. The school treated them differently because both student groups submitted applications that failed to meet all the college's requirements, but only one student group was rejected. If OCR's investigation confirms these groups were treated differently, OCR would analyze whether the college had a legitimate, nondiscriminatory reason for its decision to recognize the Photography Club, notwithstanding the absence of written by-laws, while failing to recognize the Latino Student Union due to its identification of an adjunct professor. If the college had no legitimate, nondiscriminatory reason for treating these groups differently, OCR could find a violation under Title VI. If the college provided a legitimate, nondiscriminatory reason, OCR would consider whether the articulated reason was a pretext for racial discrimination. If OCR found that the nondiscriminatory reason offered by the college is pretextual, OCR could find that the college engaged in intentional discrimination.

## V.     Conclusion

OCR recognizes that many schools, colleges, and universities offer spaces and activities for students and others to share ideas, receive support, and discuss common experiences in order to cultivate inclusive communities that feel welcoming to students from populations that have traditionally been underserved. This guidance clarifies that a school-sponsored or recognized group or program with a special emphasis on race, such as a student club or mentorship opportunity, that is open to all students, typically would not violate Title VI simply because of its race-related theme. Extracurricular activities and spaces that are open to all students regardless of race and do not create a racially hostile environment will generally not raise concerns under Title VI, regardless of whether such activities or spaces have a race-related theme.

OCR is available to provide technical assistance to institutions, organizations, and members of the public that request assistance in complying with any aspect of the civil rights laws OCR enforces, including those issues addressed in this letter. If you have any questions or would like technical assistance, please contact the OCR office serving your State or territory by visiting https://ocrcas.ed.gov/contact-ocr. You may also contact OCR's Customer Service Team at 1-800-421-3481 or at ocr@ed.gov. If you require language assistance, you may contact OCR by calling 1-800-USA-LEARN (1-800-872-5327). Additional resources are available on www.ed.gov/ocr, including prior policy statements, reports, resolution agreements, manuals, brochures, and many other materials.

Thank you for your commitment to providing an educational environment free of race, color, national origin, sex, disability, and age discrimination to our nation's students.

Sincerely,

Catherine E. Lhamon
Assistant Secretary for Civil Rights