**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| **American Federation of Teachers,** *et al.*, | |
| Plaintiffs, | |
| **v.** | |
| **U.S. Department of Education,** *et al.*, | **Civil Case No. 1:25-cv-00628** |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR AN**
**EXPEDITED PRELIMINARY INJUNCTION & APA § 705 STAY OF CERTIFICATION**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

BACKGROUND .................................................................................................................3

    The Certification Announcement and Letters....................................................................3

    The Certification Form ......................................................................................................4

    The Consequences .............................................................................................................5

    Prior Certifications............................................................................................................6

    Irreparable Harm ...............................................................................................................6

LEGAL STANDARD..........................................................................................................9

ARGUMENT .......................................................................................................................9

    I.      Plaintiffs Are Likely to Succeed on the Merits.....................................................10

          A.    The Certification Is Unconstitutionally Vague in Violation of the Due Process Clause. ...........................................................................................10

               1.    The Department of Education Has Not Given Regulated Entities Fair Warning .............................................................................11

               2.    The Certification is Ripe for Arbitrary Enforcement....................16

          B.    The Certification Violates the First Amendment.......................................16

          C.    The Certification Violates the Administrative Procedures Act. ................20

               1.    The Certification is Final Agency Action....................................20

               2.    The Certification is Not in Accordance with Law and is in Excess of Statutory Authority. ................................................................21

               3    The Certification is Arbitrary and Capricious. ............................23

                     a.    The Department failed to provide an adequate explanation for its change in its positions. .............................................24

                    b.    The Department fails to rely on prior factual findings and available evidence. ...........................................................28

                    c.    The Certification fails to account for existing federal and state legal standards. .......................................29

                    d.    The Department failed to consider two "important aspect[s] of the problem." ...............................................................30

                    e.    The Department failed to consider the reliance interests of

schools and educators. ......................................................32

f.    The Certification is Contrary to Constitutional Rights......32

g.    The Certification was Issued Without Observance of
Procedure Required by Law.................................................32

II.    Plaintiffs Are Suffering Irreparable Harm. ........................................33

III.    The Balance of the Equities and the Public Interest Favor Enjoining
the Certification. ....................................................................................35

A.    Nationwide Injunction Is Necessary. .......................................36

CONCLUSION..............................................................................................................37

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205 (2013) ........................................17

*Air Evac EMS, Inc. v. McVe*y, 37 F.4th 89 (4th Cir. 2022) ...........................................................33

*Am. Acad. of Pediatrics v. Food & Drug Admin.*, 379 F. Supp. 3d 461 (D. Md. 2019)...............20

*Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.,* 25 F.4th 1 (D.C. Cir. 2022)........28

*Am. Fed'n of Tchrs. v. Bessent*, No. CV DLB-25-0430, 2025 WL 582063 (D. Md. Feb. 24, 2025)......................................................................................................................................36

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) ........................34

*Ass'n of Cmty. Cancer Ctrs. V. Azar*, 509 F. Supp. 3d 482 (D. Md. 2020)...................................36

*Bennett v. Spear*, 520 U.S. 154 (1997) ...........................................................................................20

*Boos v. Barry*, 485 U.S. 312 (1988)................................................................................................19

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.,* 89 F.4th 46 (1st Cir. 2023), *cert. denied*, 145 S. Ct. 15 (2024)..............................................................12, 30

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.,* 996 F.3d 37 (2021) ......................................................................................................................................12, 30

*Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928 (D. Md. 2020).............................................9

*Cent. Radio Co. v. City of Norfolk, Va.*, 811 F.3d 625 (4th Cir. 2016) ...................................19, 20

*Chicago Women in Trades v. Trump*, No. 25 C 2005, 2025 WL 933871 (N.D. Ill. Mar. 27, 2025)......................................................................................................................12, 13, 18

*City of Columbus v. Cochran*, 523 F. Supp. 3d 731 (D. Md. 2021) .......................................24, 28

*Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864 (4th Cir. 2023), *cert. denied*, 218 L. Ed. 2d 71 (Feb. 20, 2024)....................................................................................................12, 30

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) ................................32

*Elrod v. Burns*, 427 U.S. 347 (1976) ..............................................................................................33

*Encino Motorcars v. Navarro*, 579 U.S. 211 (2016) ......................................................................24

*Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581 (4th Cir. 2012) ......................29

*Frisby v. Schultz*, 487 U.S. 474 (1988) ........................................................................19

*Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002) ................................35

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)..........................................10, 11, 12

*HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021) ......................................................36

*Honeyfund.com v. Desantis*, 622 F. Supp. 3d 1159 (N.D. Fla. 2022), *aff'd* 94 F.4th 1272
    (11th Cir. 2024)..........................................................................................................20

*In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517 (4th Cir. 2003) ..............................9

*Labrador v. Poe by & through Poe,* 144 S. Ct. 921 (Mem), 932 (2024)......................36

*Leaders of a Beautiful Struggle v. Balt. Police Dep't,* 2 F.4th 330 (4th Cir. 2021) ...............33, 35

*Legal Servs. Corp v. Velazquez*, 531 U.S. 533 (2001)...................................................17

*Loc. 8027 v. Edelblut*, No. 21-cv-1077-PB, 2024 WL 2722254 (D.N.H. May 28, 2024).......12, 16

*Mayor of Balt. v. Azar*, 973 F.3d 258 (4th Cir. 2020)...................................................28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983) ....23, 24, 28, 30

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*,
    915 F.3d 197 (4th Cir. 2019)......................................................................................33

*Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget*, Civil Action No. 25-239 (LLA),
    2025 WL 597959 (D.D.C. Feb. 25, 2025)..............................................................17, 18

*Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014)..................................21

*Nat'l Pub. Radio, Inc. v. Klavans,* 560 F. Supp. 3d 916 (D. Md. 2021) ........................36

*Nat'l Rifle Ass'n of Am. v. Vullo*, 49 F.4th 700 (2d Cir. 2022).......................................18

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) .................................................18

*Nken v. Holder*, 556 U.S. 418 (2009) .............................................................................9

*Ohio v. Env't Prot. Agency*, 603 U.S. 279 (2024) ........................................................28

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No 1*, 551 U.S. 701 (2007)..................12, 30

*Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013)..............................................................36

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218 (N.D. Fla.
    2022)..........................................................................................................................13

*PFLAG, Inc. v. Trump*, No. CV 25-337-BAH, 2025 WL 510050 (D. Md. Feb. 14, 2025).....35, 36

*Pub. Citizen, Inc. v. Lew*, 127 F. Supp. 2d 1 (D.D.C. 2000) .........................................................33

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015) ................................................................17, 20

*Republican Party of Minn. v. White*, 536 U.S. 765 (2002) ..............................................................19

*Ridpath v. Bd. of Govs. Marshall Univ.*, 447 F.3d 292 (4th Cir. 2006).........................................16

*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020) ..............................................................9, 29, 36

*Roman Cath. Diocese of Brooklyn v. Cuomo,* 592 U.S. 14 (2020)..................................................33

*Rust v. Sullivan*, 500 U.S. 173 (1991) .............................................................................................17

*Safe Extensions, Inc. v. F.A.A.*, 509 F.3d 593 (D.C. Cir. 2007).....................................................29

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521 (N.D. Cal. 2020).......13, 18

*Sessions v. Dimaya*, 584 U.S. 148 (2018) .......................................................................................11

*Sierra Club v. Env't Prot. Agency*, 955 F.3d 56 (D.C. Cir. 2020) ..................................................21

*Tenn. Educ. Ass'n v. Reynolds*, 732 F. Supp. 3d 783 (M.D. Tenn. 2024)......................................13

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)..............................................16

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) ..................................................21

*United States v. Longhi,* 575 F.3d 458 (5th Cir. 2009);...................................................................14

*United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008)....................................................................14

*United States v. South Carolina*, 720 F.3d 518 (4th Cir. 2013)........................................................9

*United States v. Williams*, 553 U.S. 285 (2008) .............................................................................10

*UnitedSteel v. Mine Safety and Health Admin.*, 925 F.3d 1279 (D.C. Cir. 2019) .........................24

*Universal Health Servs., Inc. v. United States ex rel. Escobar,* 579 U.S. 176 (2016).................15

*Vill. Of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982)......................11

*West Virginia v. Thompson*, 475 F.3d 204 (4th Cir. 2007).............................................................23

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ........................................................................9

**Statutes**

31 U.S.C. § 3729 .................................................................................................................14

44 U.S.C.  3501 .......................................................................................................6, 21, 22

5 U.S.C. § 705 .......................................................................................................................9

5 U.S.C. § 706 .................................................................................................20, 21, 23, 32

**Other Authorities**

78 Am. Jur. Proof of Facts 3d 357 § 2 ...............................................................................15

Amy Pritchard Williams et al., *The False Claims Act May Be the Next Weapon in the Trump Administration's War on DEI*, Troutman Pepper Locke LLP (Mar. 3, 2025), https://perma.cc/NC4L-JTJC ........................................................................................15

Andrew R. Turnbull, *President Trump's DEI Certification for Federal Contractors Creates Significant FCA Risk*, Morrison Foerster: Gov't Contracts Insights (Feb. 6, 2025), https://perma.cc/X367-8RE7 ..............................................................................16

Dep't of Educ. & Dep't of Just., *Questions and Answers Regarding the Supreme Court's Decision In Students for Fair Admissions, Inc. v. Harvard College and University Of North Carolina* (Aug. 14, 2023), ................................................................................25

Dep't of Educ., Off. for C.R., Assurance of Compliance – Civil Rights Form, OMB Approval No. 1870-0503, https://perma.cc/9A9G-RHA6 .....................................6, 22

E-mail from Off. for C.R., Department of Education Title VI Compliance Certification (Apr. 3, 2025 .................................................................................................................3

Ja'han Jones, *At Confirmation Hearing, Linda McMahon Refuses to Say Black History Courses Will Be Allowed*, Yahoo News (Feb. 14, 2025), https://perma.cc/PM36-A84V..........11

Md. State Dep't of Educ., *Maryland Every Student Succeeds Act (ESSA) Consolidated State Plan*, at 13 (Jan. 10, 2018), https://perma.cc/HKX3-8YUJ ..............................31

Off. of Mgmt. & Budget, *Supporting Statement for a Paperwork Reduction Act Submission.,* OMB No. 1870-0503 (revised June 11, 2024 ...........................6, 22, 23

Or. Dep't of Educ., *Oregon's Consolidated State Plan Under the Every Student Succeeds Act* (Aug. 30, 2017), https://perma.cc/2TQV-BBMA................................................31

Press Release, Dep't of Educ., ED Requires K-12 School Districts to Certify Compliance with Title VI and Students v. Harvard as a Condition of Receiving Federal Financial Assistance (Apr. 3, 2025), https://perma.cc/7WBU-T8QN ............................3, 4, 29

U.S. Dep't of Educ., Off. for C.R., *Race and School Programming* 8 (Sept. 25, 2023 ..........26, 27

U.S. Dep't of Educ., Off. of C.R., Fact Sheet: Diversity and Inclusion Activities Under
Title VI (Jan. 2023), https://perma.cc/4G25-JKZJ ..................................................................27

U.S. Dep't of Educ., Off. of the Under Sec'y, *Strategies for Increasing Diversity and
Opportunity in Higher Education* (Sept. 28, 2023), https://perma.cc/XTP4-SRAL .................27

U.S. Dep't of Educ., *Reminder of Legal Obligations Undertaken in Exchange for
Receiving Federal Financial Assistance and Request for Certification under Title VI
and SFFA v. Harvard* (Apr. 3, 2025), https://perma.cc/AF2G-ZL69 ............................... *passim*

### Regulations

34 C.F.R. § 100.5 ..................................................................................................................19, 30

## INTRODUCTION

This past Thursday, April 3, the Department of Education shocked the country's school districts and state education departments with its most recent step to dramatically, and impermissibly, enforce the Department's new interpretation of Title VI: notifying state education agencies (SEAs) that within 10 days they, and every school district (also "local education agencies" or "LEAs") in their jurisdiction, must certify compliance with the Department's interpretation of Title VI and *Students for Fair Admission v. Harvard*. Through this new Certification, the Department is chilling protected expression and association, imposing an unlawful vague and overbroad requirement, and threatening to enforce yet another impermissible condition on federal funding.

The Department's action is the latest development in a series of actions stemming back to the Dear Colleague Letter (Ex. 11, PLFS-114) that prompted this lawsuit. For nearly two months, the Department has consistently undermined well-established understandings of civil rights law and threatened to impose significant penalties on schools and educators that fail to conform to the Administration's rendering of race-based discrimination. While the Department has some ability to change positions and enforcement priorities, it cannot change the law. The Department can, of course, take only constitutional actions, and its changes in position must be in accordance with laws passed by Congress and interpreted by the courts. And the Department must follow the proper procedure to make such changes. It has met none of these fundamental requirements. Rather, this latest action is a pretext to achieve two clearly stated Administration goals: upending public education in this country and eliminating diversity, equity, and inclusion in society. As the Department's actions are escalating, absent immediate Court involvement, Plaintiffs, and the students and educators they represent will suffer significant, ongoing, irreparable harm.

1

In particular, for SEAs and LEAs, the Department has set up a "heads I win, tails you lose" scenario. School districts are required to make an impossible choice in a matter of days: they can either sign the Certification, despite not knowing the meaning of its key terms and having serious concerns about its legality, or they can decline to sign the Certification, which the Department has indicated is a material condition for the continued receipt of federal financial assistance. If they sign, they subject themselves to potential False Claims Act enforcement by the government and third parties, as well as breach of contract claims. If they do not sign, the Department may view that as noncompliance with its interpretation of Title VI and terminate federal funding. Whatever they decide, the result could be devastating for their schools and students. And educators face a similar impossible choice: should they chill their speech and potentially violate their state education and curricular standards to attempt to comply with the Certification in hopes of protecting their school? Or should they continue to teach based on longstanding Title VI and anti-discrimination case law and guidance, and risk investigation and a loss of federal education funding? For them, too, there is no good choice.

At bottom, the Certification is coercive and has no legitimate legal basis. SEAs and school districts already provide assurances to the Department that they will comply with Title VI. The Department points to no authority on which it relies to request this additional certification from school districts, because there is none on which to rely. There is also nothing that permits the Department to take this action without going through the proper statutory process for publishing and distributing this kind of certification.

To stop the harms being caused by this Certification across the country, Plaintiffs respectfully request that this Court enjoin the Defendants from enforcing this new certification requirement until this Court has an opportunity to fully consider the issues involved.

**BACKGROUND**

**The Certification Announcement and Letters**

On April 3, 2025, the U.S. Department of Education announced that it "sent letters to State Commissioners overseeing K-12 State Education Agencies (SEAs) requiring them to certify their compliance" with "Title VI of the Civil Rights Act and the responsibilities outlined in Students for Fair Admissions v. Harvard."[1] The Department described the certification as required in order "to continue receiving federal financial assistance."[2]

The letters, sent via e-mail, state in their entirety:

> Within ten (10) days, please sign and return the attached certification along with the certifications of your Local Education Agencies (LEAs). Furthermore, within these ten (10) days, please report the signature status for each of your LEAs, any compliance issues found within your LEAs, and your proposed enforcement plans for those LEAs. Thank you for your prompt attention to this matter.[3]

In the press release announcing this demand, Acting Assistant Secretary for Civil Rights Craig Trainor, speaking for the Department, states that "[F]ederal financial assistance is a privilege, not a right."[4] Secretary Trainor describes the certification as "an important step toward ensuring that states understand—and comply with—their existing obligations under civil rights laws and *Students v. Harvard*."[5] Without providing any evidence, or even examples, he asserts that "many schools flout or outright violate" their legal obligations; a way schools "violate" their Title VI legal obligations is "by using DEI programs to discriminate against one group of

---

[1] Exhibit 41, Press Release, Dep't of Educ., ED Requires K-12 School Districts to Certify Compliance with Title VI and Students v. Harvard as a Condition of Receiving Federal Financial Assistance (Apr. 3, 2025), https://perma.cc/7WBU-T8QN, PLFS-552.
[2] *Id.*
[3] Exhibit 42, E-mail from Off. for C.R., Department of Education Title VI Compliance Certification (Apr. 3, 2025), PLFS-557.
[4] Press Release, ED Requires K-12 School Districts to Certify Compliance with Title VI and Students v. Harvard as a Condition of Receiving Federal Financial Assistance, *supra* note 1, PLFS-553.
[5] *Id.*

Americans to favor another based on identity characteristics."[6] There are no examples of what types or kinds of DEI practices purportedly do this given, nor are there any prior discrimination findings based on these practices cited against K-12 schools.

According to the press release, the certification is purportedly sent pursuant to the Department's authority to ensure recipients of federal funding comply with federal civil rights laws.[7] No specific law or statute empowering the Department to send this certification is cited.

In introducing this new certification, the Department did, however, explicitly reference its February 14, Dear Colleague Letter ("Letter") as well as the Frequently Asked Questions published on February 28, 2025 ("FAQs").[8]

**The Certification Form**

The Certification form is titled "Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and *SFFA v. Harvard*" and is dated April 3, 2025.[9] The form does not include an OMB control number.

The form includes an initial certification as follows:

> On behalf of _____[SEA/LEA], I acknowledge that I have received and reviewed this Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and SFFA v. Harvard. I further acknowledge that compliance with the below and the assurances referred to, as well as this certification, constitute a material condition for the continued receipt of federal financial assistance, and therefore certify our compliance with the below legal obligations.[10]

---

[6] *Id.*

[7] *Id*.

[8] *Id*

[9] Exhibit 43, U.S. Dep't of Educ., *Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and SFFA v. Harvard* (Apr. 3, 2025), https://perma.cc/AF2G-ZL69.

[10] *Id*.

Below the certification is a space to fill in signature, date, and "Title and District or State."[11]

Following the certification are the "assurances" referenced therein, which do not follow the mold of certifications that are typically required by the federal government. The assurances the Department has presented to every SEA and LEA in the country include editorial commentary criticizing unnamed "equity mandates" by the Biden Administration, selective quotes from *SFFA*, and a few broad assertions, unsupported by any authority, suggesting that DEI programs are illegal.

In particular, the Department suggests *SFFA's* holding is that "the Equal Protection Clause and Title VI prohibit **race-based action**, with only the narrowest of exceptions."[12] However, the Department does not, and could not, point to anything in *SFFA* that defines "race-based action" in the context of K-12 schooling or indeed anything in the decision that suggests it applies to K-12 education at all. The Department also states that "any violation of Title VI— including the use of Diversity, Equity, & Inclusion ("DEI") programs to **advantage one's** [sic] **race over another**—is impermissible," and that "[t]he use of **certain DEI practices** can violate federal law."[13] But there, too, the Department provides no additional information as to what constitutes "advantaging" one race over another or what "certain DEI practices" violate federal law. Finally, the assurances proclaim that "[t]he continued use of **illegal DEI practices** may subject the individual or entity using such practices to serious consequences,"[14] again providing no information on what will be considered as "illegal DEI" in the context of these assurances.

**<u>The Consequences</u>**

---

[11] *Id.*
[12] *Id.* at 2 (emphasis added).
[13] *Id.* at 3 (emphasis added).
[14] *Id.* (emphasis added).

At the end of the assurances, the Department enumerates consequences for the "continued use of illegal DEI."[15] The assurances do not state whether these consequences apply to other purported violations of Title VI. Thus, by the terms of the Certification, the consequences only apply to "continued use of illegal DEI."[16] The listed consequences are: (1) termination of funds under Title VI; (2) prosecution for breach of contract and restitution; and, (3) liability and prosecution under the False Claims Act, including treble damages.

**Prior Certifications**

SEAs and LEAs are familiar with the process of submitting assurances to the Department. Prior certifications have been reviewed and approved by OMB, consistent with the requirements in the Paperwork Reduction Act. 44 U.S.C. §§ 3501 *et seq*. The Department has previously represented to OMB that federal funding recipients need only complete one Assurance of Compliance per entity,[17] and that "no persons are required to respond to a collection of information unless [it] displays a valid OMB control number."[18]

**Irreparable Harm**

The Certification puts LEAs in an impossible bind: they are forced to choose between certifying compliance with non-discrimination policies that the current Administration has radically changed without fully explaining or not certifying compliance knowing that failure to do so may result in loss of federal funds. *See* Ex. 38, District 4J Cert. Decl. ¶ 32, PLFS-508; Ex. 39, AFT Cert. Decl. ¶ 20, PLFS-536. And both options create substantial risks of investigation and prosecution for any LEA that continues programming associated with diversity, equity, and

---

[15] *Id*.

[16] Id.

[17] Exhibit 44, Off. of Mgmt. & Budget, *Supporting Statement for a Paperwork Reduction Act Submission,* OMB No. 1870-0503 (revised June 11, 2024), PLFS-564.

[18] Exhibit 45, *See, e.g*. Dep't of Educ., Off. for C.R., Assurance of Compliance – Civil Rights Form, OMB Approval No. 1870-0503, https://perma.cc/9A9G-RHA6, PLFS-575.

inclusion values or objectives that is consistent with statutes and decisional law. *See* District 4J

Cert. Decl. ¶ 20, PLFS-505; AFT Cert. Decl. ¶¶ 16, 20, PLFS-536-537.

As with the initial Dear Colleague Letter, the threat of immediate enforcement based on

certification or non-certification chills Plaintiffs' First Amendment expression. *See* District 4J

Cert. Decl. ¶ 33, PLFS-508; AFT Cert. Decl. ¶ 19, PLFS-536. In this way, the Certification

causes the same harms related to K-12 education that Plaintiffs raised in their Memorandum in

Support of Preliminary Injunction, Doc. No. 31-1 (March 28, 2025) ("March 28,

Memorandum"). For example, just as with the Letter, Plaintiffs do not know what activities will

run afoul of the Department's new position, and whether their work will subject them and their

institution to investigation, or to potential loss of funding. *See* March 28, Memorandum at 7;

AFT Cert. Decl. ¶ 15, PLFS-536; District 4J Cert. Decl. ¶ 17, PLFS-505. As a result, Plaintiffs

fear they must suppress speech, and potentially eliminate any teaching, program, activity, lesson,

association, office, or research that the Department could decide falls under its broad view of

prohibited DEI. *See* March 28, Memorandum at 8, 37; District 4J Cert. Decl. ¶ 33, PLFS-508;

AFT Cert. Decl. ¶ 19, PLFS-536. If they are subject to investigation or funding is removed, their

reputations, careers, and essential programming is threatened. March 28, Memorandum at 9-11,

37-38; AFT Cert. Decl. ¶ 17, PLFS-536 (noting risk to members' jobs); District 4J Cert. Decl. ¶¶

30-31, PLFS-507.

Here, the stakes are raised even higher. The Department has threatened to claw back

already given funds, and invoked the False Claims Act, which is an incredibly serious risk to

schools, *see infra* Sec. I.A.1; District 4J Cert. Decl. ¶¶ 18-19, 25, PLFS-505. The financial risks

this represents trickle down to all members of K-12 education, as any educator's speech could

potentially trigger enforcement or FCA litigation. AFT Cert. Decl. ¶¶ 18, 21, PLFS-536–PLFS-537.

As described by District 4J Superintendent Colt Gill, "[t]he certification requirement represents not only a doubling down of the Department's changes to its prior interpretations of Title VI but a new and threatening mode of enforcement." District 4J Cert. Decl. ¶ 25, PLFS-506. In his "long experience in public education administration, including as the head of a state education agency, the Department has provided assistance to departments of education and local school districts, and even when finding districts out of compliance, the Department's focus has been the pursuit of voluntary correction plans." District 4J Cert. Decl. ¶ 25, PLFS-506. Up until now, he was "unaware of any time the Department has ever ended funding for a district, clawed back funding, characterized a district's interpretation of Title VI as "fraud," paved the way for False Claims Act enforcement, and impliedly threatened criminal prosecution." District 4J Cert. Decl. ¶ 25, PLFS-506.

District 4J estimates that the amount of federal funding it will have received over the most recent three years is almost $80 million dollars. District 4J Cert. Decl. ¶ 29, PLFS-507. If the district lost federal funding, even for one year, the District would need to lose "two weeks' instruction time, or – alternatively – the district would have to lay off approximately 110 teachers (about 10% of the teacher workforce), or some other combination of lost instruction time, staff layoffs and program reductions." District 4J Cert. Decl. ¶ 30, PLFS-507. Were the district to have to return three years of funding, or face treble damages of a similar amount, "the district would be shattered." District 4J Cert. Decl. ¶ 31, PLFS-508. It "would require layoffs of over half the teacher workforce or the shuttering of district schools for 55 days (or some similarly

destructive combination)", a "devastating and unprecedented event, that would greatly harm [the] district's students, families, and . . . educators." District 4J Cert. Decl. ¶ 31, PLFS-508.

## LEGAL STANDARD

Granting a preliminary injunction can "protect the status quo," "prevent irreparable harm during the pendency of a lawsuit," and give the Court time to "render a meaningful judgment on the merits." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (*quoting In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003)). To obtain a preliminary injunction, the moving party must "establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)) (cleaned up).In cases against the government, the balance of equities and public interest factors merge into a single inquiry. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

In APA cases, courts may "issue all necessary and appropriate process to . . . preserve status or rights pending conclusion of the review proceedings" when doing so is "necessary to prevent irreparable injury." 5 U.S.C. § 705. The standard for relief under Section 705 is the same as for a preliminary injunction under Federal Rule of Procedure 65(a). *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 949-50 (D. Md. 2020).

## ARGUMENT

The Department's coercive Certification violates federal law and the constitutional rights of those caught in their crosshairs. In the Department's zeal to enforce its new interpretation of Title V—first articulated in the Letter, and now being further implemented in the Certification— it has created an impossible bind for our nation's educators. As Plaintiffs demonstrate below, they

are likely to succeed on the merits of their claims, likely to suffer irreparable harm in the absence of preliminary relief, the balance of equities tips in their favor, and a nationwide injunction is in the public interest in order to prevent further damage from Defendants' actions.

**I.    Plaintiffs Are Likely to Succeed on the Merits.**

The Certification is an application of the Department's new position on Title VI and *SFFA*, which is encapsulated in the Letter. Like the Letter, the Certification is undoubtedly vague. It fails to provide notice of what conduct violates the Certification, and it invites arbitrary enforcement. It also violates the First Amendment because it discriminates on the basis of viewpoint and content, and is overbroad.

Plaintiffs are also likely to succeed on the merits of their Administrative Procedure Act claims. The Certification is arbitrary and capricious on its face, lacking factfinding, reasoning, and explanation. It is contrary to constitutional rights, not in accordance with law, and is in excess of statutory authority. Moreover, it was issued without observance of the proper procedure required.

**A. The Certification Is Unconstitutionally Vague in Violation of the Due Process Clause.**

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see also United States v. Williams*, 553 U.S. 285, 304 (2008) ("Vagueness doctrine is an outgrowth . . . of the Due Process Clause of the Fifth Amendment"); *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("[C]larity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment.").

"[A]t least two connected but discrete due process concerns" underly the void for vagueness doctrine. *Fox Television*, 567 U.S. at 253. First, that parties "know what is required of them so they may act accordingly *Id.*; *see also Grayned v. City of Rockford*, 408 U.S. 104, 108

(1972) ("Vague laws may trap the innocent by not providing fair warning."). Second, that clear guidance is needed to ensure "those enforcing the law do not act in an arbitrary or discriminatory way." *Fox Television*, 567 U.S. at 253 (*citing Grayned*, 408 U.S. at 108-09). In that way, the void-for-vagueness doctrine "is a corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not." *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018).

Where the governmental action "threatens to inhibit the exercise of constitutionally protected rights," such as "the right of free speech or of association," the requirement to avoid vagueness is particularly high. *Vill. Of Hoffman Ests. v Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *see also Loc. 8027, AFT-N.H., AFL-CIO v. Edelblut*, 651 F. Supp. 3d 444, 459–60 (D.N.H. 2023) ("*Edelblut I*") (finding rigorous vagueness review required for government action plausibly restricting extracurricular speech in schools).

### 1. The Department of Education Has Not Given Regulated Entities Fair Warning

In the Certification, the Department takes the position that Title VI and *SFFA* prohibit "race-based" actions, practices that "advantage one race over another," and "certain DEI practices."[19] The Department gives no further information as to what these prohibitions mean in practice. Most fundamentally, what types of "DEI practices" does the Department consider illegal, and why? According to the Department, does a cultural affinity group, open to all, "advantage one race over another? Is having a black history module in history course allegedly a "race-based" action? There is simply no answer to these questions based on the language of the Certification, or the Department's Dear Colleague letter and FAQs.[20] The reference to *SFFA* only confuses the

---

[19] April 3, 2025 Certification of Compliance Request from OCR, Ex. 43, *supra* note 9, at 2, PLFS-559.
[20] *See* Ja'han Jones, *At Confirmation Hearing, Linda McMahon Refuses to Say Black History Courses Will Be Allowed*, Yahoo News (Feb. 14, 2025), https://perma.cc/PM36-A84V ("Linda McMahon . . . was unsure during her confirmation hearing when asked whether Black history courses could run afoul of the new administration.").

meaning of these concepts, particularly as they would apply to K-12 schools, and any activities outside of college admissions, given that *SFFA* simply does not address these issues. Moreover, the Department's interpretation of *SFFA* adds an additional layer of uncertainty because it stands in contrast to relevant Supreme Court precedent and what courts in the Fourth and First Circuit have already found to be permissible post-*SFFA*.[21]

The Certification's undefined and legally ungrounded prohibited practices could encompass almost any conceivable aspect of a school's curriculum and programming, forcing LEAs and SEAs to guess whether their practices violate the Department's interpretation of Title VI, leading to the inevitable chill of a broad swath of activity. *See Grayned*, 408 U.S. at 108 ("Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone… than if the boundaries of the forbidden area were clearly marked."). As a result, LEAs and SEAs "must either take steps now to revise their programmatic activity" to avoid running afoul of these broad prohibitions, "decline to make a certification and thus lose their [funding], or risk making a certification that will be deemed false and thus subject [them] to liability under the False Claims Act." *Chi. Women in Trades v. Trump*, No. 25 C 2005, 2025 WL 933871, at *8–9 (N.D. Ill. Mar. 27, 2025). This puts them in an "impossible," *id.*, and constitutionally "untenable" position, *Loc. 8027 v. Edelblut*, No. 21-cv-1077-PB, 2024 WL 2722254, at *12-13 (D.N.H. May 28, 2024) ("*Edelblut II*") (finding provisions that did not define key terms or clarify what it meant to "teach"

---

[21] *See, e.g., Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 885–86 (4th Cir. 2023), *cert. denied*, 218 L. Ed. 2d 71 (Feb. 20, 2024) (finding efforts to "improve racial diversity and inclusion by way of race-neutral measures" is a "practice that the Supreme Court has consistently declined to find constitutionally suspect"); *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.*, 89 F.4th 46, 62 (1st Cir. 2023), *cert. denied*, 145 S. Ct. 15 (2024) ("*Bos. Parent II*") ("There is nothing constitutionally impermissible about a school district including racial diversity as a consideration and goal in the enactment of a facially neutral plan"). *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No 1*, 551 U.S. 701, 789 (2007) (finding "[s]chool boards may pursue the goal of bringing together students of diverse backgrounds and races" through means such as "drawing attendance zones with general recognition of the demographics of the neighborhood; . . . [and] recruiting students and faculty in a targeted fashion."); *see also Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.*, 996 F.3d 37, 48 (2021) ("*Bos. Parent I*").

a banned DEI-related concept left teachers "in the untenable position of having to wager their careers on a guess or else refrain from discussing matters that implicate the banned concepts altogether").

Courts across the country have already found that similarly broad bans on DEI-related topics are impermissibly vague. For instance, the Northern District of Illinois determined that a certification requiring that a grantee "does not operate any DEI programs that 'violate any applicable Federal antidiscrimination laws'" had a serious problem: the "meaning of this is left entirely to the imagination." *See Chi. Women in Trades*, 2025 WL 933871, at *8. The court faulted the government for failing to "define the term 'DEI'," let alone what might make any given 'DEI' program violate Federal anti-discrimination laws." As the Court said, "[t]he answer is anything but obvious." *Id.* at *7. Similarly, here in Maryland, the court in *National Association of Diversity Officers in Higher Education v. Trump* ("*NADOHE*") found that executive orders which did not define operative terms such as "DEI," "illegal DEI," "or "illegal discrimination or preferences," or "identify the types of programs or policies the administration considers 'illegal'" were unconstitutionally vague.[22] No. 125-CV-333-ABA, 2025 WL 573764, at *1 (D. Md. Feb. 21, 2025), *opinion clarified*, No. 1:25-CV-333-ABA, 2025 WL 750690 (D. Md. Mar. 10, 2025). *See also Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1286 (N.D. Fla. 2022) (finding banned "divisive concepts" impermissibly vague); *Tenn. Educ. Ass'n v. Reynolds*, 732 F. Supp. 3d 783, 807 (M.D. Tenn. 2024) (similar); *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 542 (N.D. Cal. 2020) (similar); *Edelblut II*, 2024 WL 2722254, at *9 (similar).

---

[22] While the Fourth Circuit stayed the District Court's entry of a preliminary injunction in *NADOHE*, the reason for the stay does not apply to the issues here. This present matter is purely a challenge to final agency action rather than to executive orders. In *NADOHE*, the Fourth Circuit stayed the preliminary injunction, in part, because it was not clear *at that early stage* how the agencies would implement the executive orders.

Moreover, the Certification creates an impossible situation for LEAs, who are subject to state standards that may conflict with the vague bans contemplated by the Certification. For example, in Oregon, teachers are required by state law to teach a Native American curriculum, a genocide curriculum, use inclusive instructional materials, and incorporate Social and Emotional Learning standards, and no later than the 2026 academic year, to teach ethnic studies, a requirement that is already partially implemented in District 4J. District 4J Decl. ¶¶ 11-18, PLFS-035–PLFS-038. The Certification puts LEAs, including District 4J, and teachers in the impossible position of deciding whether to risk state consequences or federal consequences, with no way to comply with both. *See Edelblut I,* 651 F. Supp. 3d at 462 (finding that the conflict between state curriculum requirements and bans on teaching certain concepts created a "Hobson's choice").

Furthermore, the chilling effect of the vague Certification is deliberately amplified by its invocation of the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et al.* The Certification warns that "continued use of" undefined "illegal DEI practices" may have "serious consequences" and expressly cites the False Claims Act.[23] The Certification states that "[u]nder the FCA, violators face penalties including treble damages and civil penalties of thousands of dollars per violation."[24] When a false certification is alleged, treble damages can be based on the entire amount paid out under the contract or grant as damages. *United States v. Longhi,* 575 F.3d 458 (5th Cir. 2009); *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008). The reference to the False Claims Act ties into the language of the certification itself, which states: "compliance with . . . the assurances . . . constitute a material condition for the continued receipt of federal financial assistance."[25] Materiality is a factor in false certification FCA claims. *See* 31 U.S.C.A. § 3729(B), (G); *Universal*

---

[23] April 3, 2025 Certification of Compliance Request from OCR, PLFS-559, *supra* note 9, at 4.
[24] *Id*.
[25] *Id*. at 1.

*Health Servs., Inc. v. United States ex rel. Escobar,* 579 U.S. 176 (2016) (establishing "demanding" FCA materiality standard).[26] The FCA also has a unique *qui tam* element, allowing private individuals to file and prosecute a lawsuit in the name of the United States. *See* 78 Am. Jur. Proof of Facts 3d 357 § 2. The *qui tam* provisions further accentuate the risk for recipients of federal funds by exposing them to suit from any private individual or group, including organizations looking to pursue an ideological agenda.

Even where there is no meritorious claim, the threat of FCA litigation can exert a strong *in terrorem* effect. Defending FCA cases can be extraordinarily expensive and burdensome, and often take a long time to resolve, including the time built in for the government to investigate *qui tam* claims to determine whether it will take over the action. *See* 31 U.S.C.A. § 3730 (describing FCA procedure and extendable 60-day time period for investigation). SEAs and LEAs will feel pressured to avoid engaging in protected First Amendment speech and conduct relating to lawful DEI activities to avoid the costs of defense, the possibility of losing government funding, and the magnitude of potential liability. As one law firm noted in advising its clients about these new certifications in the employment context:

> Any company that has found itself on the receiving end of an FCA investigation or qui tam lawsuit from an FCA relator understands how costly it can be. Not only is there the risk of treble damages under the FCA, but internal investigations and defense costs can easily accumulate into the millions of dollars. Add to that the potential for being barred from future government contracts and substantial reputational damage, and it is no surprise that companies are eager to avoid running afoul of the FCA. . .Companies will need to take a broad view when identifying policies, practices, or programs that DOJ may construe as advancing DEI. . . [A]nything in a company's hiring practices, team compositions, external communications, or other employment-related practices that could be interpreted by this administration as discriminatory or preferential to certain groups could result in FCA risk or liability.[27]

---

[26] *Id*. at 1.
[27] *See* Amy Pritchard Williams et al., *The False Claims Act May Be the Next Weapon in the Trump Administration's War on DEI*, Troutman Pepper Locke LLP (Mar. 3, 2025), https://perma.cc/NC4L-JTJC. *See also* Andrew R.

### 2. The Certification is Ripe for Arbitrary Enforcement

The lack of clarity in the Certification gives the Government and individuals empowered by the False Claims Act expansive discretion to initiate investigations and lawsuits thereby inviting arbitrary enforcement. *See Edelblut II*, 2024 WL 2722254, at *12 (finding law's lack of clarity "sow[ed] confusion and le[ft] significant gaps that can only be filled in by those charged with enforcing the [the law], thereby inviting arbitrary enforcement" in violation of the constitution); *Tenn. Educ. Ass'n*, 732 F. Supp. 3d at 807–08 (explaining act's inclusion of "value-laden" terms maximized enforcement discretion and was a "quick route to unconstitutional ambiguity."). Subjecting SEAs and LEAs to lengthy and costly investigations and putting them in the position of losing a substantial portion of their budget based on undefined or ill-understood concepts is a gross violation of due process rights.

### B. The Certification Violates the First Amendment.

Government cannot "intimidate [educators] into silence" without implicating the First Amendment and unlawfully chilling speech. *See Ridpath v. Bd. of Govs. Marshall Univ.*, 447 F.3d 292, 316 (4th Cir. 2006) (cleaned up). The Supreme Court has long held that "[n]either students [n]or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

The overbroad and vague concepts that the Certification seeks to outlaw reveal that the Certification's aim is to intimidate educators into silence and force them to shed their rights. *See*

---

Turnbull, *President Trump's DEI Certification for Federal Contractors Creates Significant FCA Risk*, Morrison Foerster: Gov't Contracts Insights (Feb. 6, 2025), https://perma.cc/X367-8RE7("[T]he [Executive] Order does not define 'DEI' or provide context on what this administration believes might be an 'unlawful' DEI program. . . . [G]iven this administration will likely take a broad view of what DEI programs are 'illegal,' it is critical now to inventory and audit existing and proposed DEI initiatives[,] . . . ranking currently lawful DEI programs by risk level (*i.e.*, high, medium, low). . . .").

*Edelblut I,* 651 F. Supp. 3d at 453. Without any support or explanation, the Certification attempts to paint all diversity, equity, and inclusion initiatives as "illegal" and suggest that they "violate federal law," and that their "continued use" may subject a school district to termination of federal funding, breach of contract suits, and False Claims Act investigations and penalties. Adding the word "illegal" before DEI is little solace when "illegal DEI" is vague and undefined.

The Certification—as the Letter did before it— takes aim squarely on proponents of diversity, equity, and inclusion, a clear instance of viewpoint discrimination. And it makes explicit what will happen to recipients of federal financial assistance whose speech or association somehow connect them to these deeply held values: their funding—or their district's funding—will be terminated, and they may face civil liability.

The First Amendment prohibits "[t]he government . . . from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Doing so is a "blatant" and "egregious" violation of the First Amendment. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 168 (2015). The government has "no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Id*. at 163 (cleaned up). And because no federal law prohibits the use of programs or activities that further the values of diversity, equity, and inclusion, this threat of federal funding termination can be viewed as nothing other than the government putting its thumb on the scale in favor of its preferred view.

And the government is prohibited from doing so. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205, 214 (2013). Courts routinely strike down conditions on federal funding in this context. *See, e.g.*, *id.* at 218-19 (citing *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)); *Legal Servs. Corp v. Velazquez*, 531 U.S. 533, 547-49 (2001); *Santa Cruz Lesbian & Gay Cmty. Ctr.*,

508 F. Supp. 3d at 542. The government simply "'cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise.'" *Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget*, Civil Action No. 25-239 (LLA), 2025 WL 597959, at *17 (D.D.C. Feb. 25, 2025) (citing *Agency for Int'l Dev.*, 570 U.S. at 215) (finding that "[b]y appearing to target specific recipients *because* they associate with certain ideas, [the federal government] may be crossing a constitutional line" in violation of the First Amendment); *see also Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024) (finding government official "could not wield her power. . . to threaten enforcement actions against [entities] in order to punish or suppress" a disfavored viewpoint). The Certification openly targets "particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at 829.

The Certification threatens a range of severe penalties including but very much not limited to the threat of terminating federal funding. The Supreme Court has made clear that the government may not use the "threat of invoking legal sanctions and other means of coercion" to suppress disfavored speech, as such coercive action would violate the First Amendment. *Nat'l Rifle Ass'n of Am.*, 602 U.S. at 176. In determining whether the Certification is "is reasonably understood to be a coercive threat," a court considers four factors under a totality-of-the-circumstances analysis. *Id.* These factors include: "(1) word choice and tone; (2) the existence of regulatory authority; (3) whether the speech was perceived as a threat; and, perhaps most importantly, (4) whether the speech refers to adverse consequences." *Id.* at 189 (quoting *Nat'l Rifle Ass'n of Am. v. Vullo*, 49 F.4th 700, 715 (2d Cir. 2022)); *see also Chi. Women in Trades v. Trump*, 2025 WL 933871, at *6. The Certification's word choice and tone is notable here—it chooses words that fail to give schools and educators any guidance on what is or is not prohibited, and its tone is threatening, not supportive or collaborative, particularly because the timeline under which the Certification is

required is incredibly accelerated. Further, though there is regulatory authority to point to under Title VI, it certainly does not undergird these actions, as nothing in those regulations prohibit the use of diversity, equity or inclusion activities. Indeed, the regulatory authority at issue states that schools "may properly give special consideration to race, color, or national origin to make the benefits of its program more widely available to such groups, not then being adequately served." 34 C.F.R. § 100.5. Third, it is incontrovertible that school districts and educators viewed this Certification as a threat; they were immediately thrown into panic about whether and how to respond. And finally, the Certification lists many adverse consequences that could be imposed on a school district that either fails to certify or fails to comply with the Department's unsupported view of what Title VI prohibits. Each of these four factors overwhelmingly supports the conclusion that the Certification is an impermissible tool, used by the government to suppress speech.

The Certification also imposes content-based restrictions. The Certification singles out only "DEI" for the listed consequences, suggesting that it—unlike other programs—warrants a higher level of scrutiny than any other activities. By its terms, no other Title VI violations will be subject to the same treatment. Pursuant to the Certification, "[o]ne category of speech has been completely prohibited . . . [while o]ther categories of speech . . . are permitted." *Boos v. Barry*, 485 U.S. 312, 319 (1988).

Further, the Certification is "unconstitutionally overinclusive" because it "'unnecessarily circumscrib[es] protected expression.'" *Cent. Radio Co. v. City of Norfolk, Va.*, 811 F.3d 625, 633 (4th Cir. 2016) (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 775 (2002)); *accord Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (regulation must "target[] and eliminate[] no more than the exact source of the 'evil' it seeks to remedy"). The Certification could have identified the actual conduct it prohibited, but it did not. That leaves Plaintiffs to question whether their

programs, speech, and activities connected to DEI are lawful. The Certification Requirement is also overinclusive because, to the extent the savings clause operates at all, it covers conduct that is already illegal under existing antidiscrimination laws—all of which impinge less upon protected expression than does the Certification Requirement. *See, e.g.*, *Honeyfund.com v. Desantis*, 622 F. Supp. 3d 1159, 1179 (N.D. Fla. 2022), *aff'd* 94 F.4th 1272 (11th Cir. 2024) (finding law not narrowly tailored because it prohibited conduct "[t]hat is already illegal"). At the same time, the Certification is "fatally underinclusive" because it "leav[es] appreciable damage to [the government's] interest unprohibited." *Cent. Radio Co*., 811 F.3d at 633 (quoting *Reed*, 576 U.S. at 172). Notably, the Certification singles out for punishment "certain DEI practices" but does not seek to punish other violations of Title VI in the same way.[28]

## C. The Certification Violates the Administrative Procedures Act.

### 1. The Certification is Final Agency Action.

The Certification is final agency action subject to judicial review. 5 U.S.C. § 706. An agency's action is final when it (1) represents "the consummation of the agency's decisionmaking process," and (2) is one "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotations omitted). An agency action is "immediately reviewable when it gives notice of how a certain statute will be applied even if no action has yet been brought." *Am. Acad. of Pediatrics v. Food & Drug Admin*., 379 F. Supp. 3d 461, 487 (D. Md. 2019) (cleaned up).

Much like the Letter, the Certification itself—not the underlying statute—is an action from which legal consequences will flow. The Certification sets forth the "'interpretation' and 'guidance' of the agency," *POET Biorefining LLC v. Env't Prot. Agency*, 970 F.3d 392, 404 (D.C.

---

[28] April 3, 2025 Certification of Compliance Request from OCR, PLFS-559, *supra* note 9, (certification) at 3.

Cir. 2020), and states that a district "acknowledge[s] that compliance with the below [interpretation of Title VI]" and the Certification itself "constitute a material condition for the continued receipt of federal financial assistance." Because the Certification states that a district "certif[ies] its] compliance with the below legal obligations," which go well beyond what Title VI requires, this is a new obligation from which legal consequences—potentially severe ones, like a False Claims Act penalties or termination of Title I funding—will flow. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 600 (2016) (finding agency action was final where failure to conform leaves the regulated party at risk of significant criminal and civil penalties); *see also Sierra Club v. Env't Prot. Agency*, 955 F.3d 56, 63 (D.C. Cir. 2020) (noting that "whether the agency has applied the guidance as if it were binding on regulated parties" is relevant to prong two of the *Bennett* test) (quoting *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014)).

### 2. *The Certification is Not in Accordance with Law and is in Excess of Statutory Authority.*

The APA requires that courts "hold unlawful and set aside agency action" that is "not in accordance with law" or is "in excess of statutory . . . authority." *Id.* § 706(2). As the Certification extends well beyond the bounds of Title VI and its implementing regulations at the Department, it is in excess of the statutory authority conferred on the Department, for the same reasons described in Plaintiff's March 28, Memorandum. *See* March 28, Memorandum at 35. Additionally, Defendants issued the certification not in accordance with the Paperwork Reduction Act or laws that govern when and how a certification may be required.

The Paperwork Reduction Act aims to "minimize the paperwork burden" that the government may require for various institutions, including "educational and nonprofit institutions, Federal contractors, State, local and tribal governments, and other persons resulting from the collection     of     information     by     or     for     the     Federal     Government.").

An agency that proposes to collect information first conducts its own "evaluation of the need for the collection of information" and the burden collecting such information would create. *Id.* § 3506(c)(1)(A)(i). Frequently, the agency is also required to publish a "sixty-day notice" in the Federal Register to solicit comments on the agency's proposal. *Id.* § 3506(c)(2)(A). After considering comments and making any revisions, the agency submits the proposed collection of information to OMB and publishes a second Federal Register notice. This notice announces the start of OMB's review and begins a 30-day comment period. *Id.* §§ 3507(a)-(b). OMB may not act on the agency's request until after the comment period has closed. *Id.* § 3507(b).

Before approving a proposed collection, OMB must "determine whether the collection of information by the agency is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility." *Id.* § 3508. Once OMB grants approval, the agency may proceed with its collection, and OMB issues a control number that must be displayed on the collection-of-information form. *Id.* §§ 3507(a)(2), (3).

For prior Assurances of Compliance – Civil Rights forms, the Department has sought and obtained approval by OMB under the PRA.[29] Indeed, this form includes the statement that "[a]ccording to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number." *Id.* Based on this alone, the Certification is unlawful.

But beyond that, the Certification is at odds with what the Department represented to the government less than a year ago in its *Supporting Statement for a Paperwork Reduction Act Submission.*[30] That OMB submission states that "Respondents only need to sign the Assurance of Compliance – Civil Rights Certificate form once . . . and the signed forms apply to all future

---

[29] *See* Ex. 45, *supra* note 18, PLFS-575.
[30] Ex. 44, *supra* note 17, PLFS-564.

applications by the respondents for Federal financial assistance from, or funds made available through, the Department. Once OCR has a completed Assurance of Compliance – Civil Rights Certificate from a respondent, OCR does not ask that respondent again for another completed form." *Id.* at 5. Yet less than a year later, the Department again asks not just the SEAs, but each school district as well, to complete an additional certification. Except in this instance, it is one not authorized by law, and not issued in accordance with the PRA.

Further, the Department's Title VI regulations require an assurance that any application of federal financial assistance "shall, as a condition to its approval . . . contain or be accompanied by an assurance that the program will be conducted . . . in compliance with all the requirements *imposed by or pursuant to this part.*" 34 C.F.R. 100.4(a)(1) (emphasis added). The Department points to no authority under which it is permitted to require a certification of adherence to certain prohibitions that do not appear in the Title VI statute or regulation.

### 3. *The Certification is Arbitrary and Capricious.*

Under the APA, agency action that is arbitrary and capricious shall be set aside as unlawful. 5 U.S.C. § 706(2)(A). An agency's decision is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *West Virginia v. Thompson*, 475 F.3d 204, 212 (4th Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)). Here, the Certification is arbitrary and capricious because it fails to acknowledge or explain the Department's changed position, rely on prior factual findings and available evidence, account for

existing federal and state legal requirements, consider important aspects of the problem, and grapple with the substantial reliance interests.

> a. *The Department failed to provide an adequate explanation for its change in its positions.*

The failure to provide a reasoned explanation for issuance of the Certification is especially dubious because the positions taken in the Certification are not "a new policy created on a blank slate." *F.C.C. v. Fox Television Stations*, 556 U.S. 502, 515 (2009) ("*Fox Television I*"). Instead, it is a reversal of years of guidance that has consistently taken a significantly different position. While an agency may have latitude to change its policies, that "flexibility" has "limits." *United Steel v. Mine Safety and Health Admin.*, 925 F.3d 1279, 1284 (D.C. Cir. 2019). An agency must "display awareness that it is changing position" and "show that there are good reasons" for its new policy. *Fox Television II*, 556 U.S. at 515; *see also City of Columbus v. Cochran*, 523 F. Supp. 3d 731, 754 (D. Md. 2021) (finding agency action arbitrary and capricious when the agency failed to articulate why it changed policy "suddenly, and in contradiction to its previous position"). When an agency fails to do so, it has "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43; *Encino Motorcars v. Navarro*, 579 U.S. 211 (2016) (An "[u]nexplained inconsistency" in agency policy is sufficient to render agency action arbitrary and capricious.") (citation omitted). The Certification suffers from the same deficiencies as the Letter; it represents an abrupt and unexplained departure from the Department's prior positions on diversity, equity, and inclusion programs, and an abrupt shift in position on the scope and holding of *SFFA v. Harvard*. The Department, through both the Certification and the Letter, have reinvented what Title VI requires, and without explanation or support, now demands that school districts comply with their reinterpretation, at risk of losing federal funding or the threat of federal investigation

24

and penalty, or third-party suit. The Department fails to acknowledge, much less explain, the stark conflict between this Certification and its prior guidance on Title VI and *SFFA*.

Two months after *SFFA*, the Department and DOJ jointly issued Frequently Asked Questions ("Joint FAQs").[31] The Department stated that "nothing in the *SFFA* decision prohibits institutions from continuing to seek the admissions and graduation of diverse student bodies, including along the lines of race and ethnicity, through means that do not afford individual applicants a preference on the basis of race in admissions decisions." Joint FAQs, PLFS-148. The Joint FAQs advise that "targeted outreach, recruitment, and pipeline or pathways programs" to encourage applicants from underrepresented backgrounds are lawful, and that "SFFA does not require institutions to ignore race when identifying prospective students for outreach and recruitment." *Id.* at PLFS-148–PLFS-149. The Joint FAQs advised that race-neutral efforts to increase "equal opportunity for all students," such as eliminating legacy admissions, are lawful. *Id.* at PLFS-145. Now, without explanation, the Department's position is exactly the opposite. With no explanation or examples, the Department states that the "continued use of illegal DEI practices may subject the individual or entity using such practices to serious consequences."[32]

As stated, *supra* Section I.A, this short statement, tied to extraordinarily significant potential consequences, is impermissibly vague. It does not explain what it considers "DEI practices," nor which ones are illegal. Contrast this with prior guidance, that provides specific examples and is rife with supporting evidence.

Most of the Department's guidance addressing *SFFA* was targeted at institutes of higher education—an acknowledgement of what the Court said itself in its opinion: "These cases involve

---

[31] Dep't of Educ. & Dep't of Just., *Questions and Answers Regarding the Supreme Court's Decision In Students for Fair Admissions, Inc. v. Harvard College and University Of North Carolina* (Aug. 14, 2023), Ex. 16 ("Joint FAQs"), PLFS-145.
[32] April 3, 2025 Certification of Compliance Request from OCR, PLFS-559, *supra* note 9, at 3.

whether a university may make admissions decisions that turn on an applicant's race." *SFFA*, 600 U.S. at 208.

But guidance published a month after *SFFA* included several positions that the Certification completely disregards and turns on their face. Take the following statements:

- "The fact that most or all members of a group, or most or all participants at an event, belong to a particular racial or ethnic group likely does not raise Title VI concerns if the group and/or event is open to all students."[33] Title VI generally does not restrict schools from holding "listening sessions to hear about students' experiences with race in the school or surrounding community, or to hear students' ideas about creating an inclusive school community with attention to race or other aspects of identity that affect students' experiences at the school or in the world." It notes that such events or groups are often utilized "with the aim of preventing violations of Title VI, such as unjustified different treatment of students based on race and racially hostile environments."[34]

- "Extracurricular groups, spaces, and activities that are formed around the goal of sharing common interests and experiences, including those that have a race-related theme, and which are open to all students regardless of race, will generally not raise concerns under Title VI. In addition to providing support and friendship for students who participate, these activities and spaces may demonstrate to current and prospective students that the school has a supportive, welcoming atmosphere."[35]

- "A school generally may also offer or recognize programs focused on the experience of particular racial groups, including mentorship programs, fellowships, leadership trainings, and similar opportunities, except where the activity or opportunity limits participation based on race or creates a hostile environment. Generally, if opportunities are open to all students regardless of race, then the school likely has not adversely impacted students based on an individual's race or violated Title VI."[36]

- "A program does not violate Title VI merely because it focuses its recruitment efforts on students of a particular race or national origin if the program is open to all students without regard to race or ethnicity."[37]

---

[33] U.S. Dep't of Educ., Off. for C.R., *Race and School Programming* 8 (Sept. 25, 2023), Ex. 23, PLFS-206.
[34] *Id.* at PLFS-208.
[35] *Id.* at PLFS-208–PLFS-209.
[36] *Id.* at PLFS-209.
[37] *Id.*

- OCR concluded it may decline to open an investigation in the following situation, concluding it does not allege facts that warrant investigation under Title VI. "A public school recognizes a student group, the African American Students Association, which was founded by students seeking a forum to discuss issues that may be of particular interest to African American students. The group has hosted speakers who are knowledgeable about African American history and culture and organized field trips to participate in African American cultural activities. All students are welcome to participate in meetings and events organized by the group."[38]

- Similarly, the guidance concludes that "creating a high school mentorship program intended to encourage all students, but particularly students from historically marginalized groups, to take more rigorous courses" likely does not raise allegations that warrant an investigation under Title VI, even if "as part of the program, mentors and mentees engage in discussion about challenges that students from historically marginalized groups encounter both inside and outside the classroom[, as long as p]articipation is completely voluntary."[39]

Any one of these examples could be considered "illegal DEI" under the Certification, but the school districts required to sign it would have no way to know.

The Certification also departs from the positions in many other prior guidance documents, despite them being targeted at institutes of higher education. One guidance found it both lawful and laudable for universities to, for example, "develop[] comprehensive support programs to increase retention and completion rates, particularly for students with the greatest needs," and "ensure[] campuses provide a welcoming and supportive environment for students from all backgrounds through affinity groups [and] diversity, equity, and inclusion (DEI) programming."[40] And the Department's previous "Fact Sheet: Diversity & Inclusion Activities Under Title VI,"[41] stated that Title VI does not categorically prohibit "diversity, equity, and inclusion training," or

---

[38] *Id.*
[39] *Id.* at PLFS-211.
[40] U.S. Dep't of Educ., Off. of the Under Sec'y, *Strategies for Increasing Diversity and Opportunity in Higher Education* (Sept. 28, 2023), https://perma.cc/XTP4-SRAL, Ex. 24, PLFS-215.
[41] U.S. Dep't of Educ., Off. for C.R., *Fact Sheet: Diversity and Inclusion Activities Under Title VI* (Jan. 2023), https://perma.cc/4G25-JKZJ, Ex. 25, PLFS-282.

investigations or reports concerning "racial disparities within a school." *Id*. at 2. The Certification appears to conflict with almost all of this guidance, with no explanation, or even acknowledgement of the shift.

The reasons mentioned by the Department for issuing the Certification have not been "reasonably explained," nor are they substantively reasonable. *See Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024). In sum, the Department's many reversals, without acknowledgment or explanation, render the Certification arbitrary and capricious. *See Fox Television I*, 556 U.S. at 515; *see also City of Columbus*, 523 F. Supp. 3d at 754.

> *b. The Department fails to rely on prior factual findings and available evidence.*

The APA requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action including 'a rational connection between the facts found and the choice made.'" *Mayor of Balt. v. Azar,* 973 F.3d 258, 275 (4th Cir. 2020) (quoting *State Farm,* 463 U.S. at 43); *see also Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.,* 25 F.4th 1, 10 (D.C. Cir. 2022) (finding agency acted arbitrarily when there was no "factual basis" for its conclusions).

The Department examines no data to support numerous of its claims at the heart of the Certification, including that through its "equity mandates" the Biden Administration "concluded, wrongly, that the touchstone of an individual's identity is not challenges bested, skills built, or lessons learned but the color of their skin."[42] It provides no factual basis for the assertion that diversity, equity, and inclusion programs "advantage one's race over another," or that they can "violate federal law."[43] In its announcement of the Certification, the Department neither cites nor examines any data to support its claim that it has "seen too many schools flout or outright violate" their obligations under federal antidiscrimination law, "including by using DEI programs to

---

[42] April 3, 2025 Certification of Compliance Request from OCR, PLFS-559, *supra* note 9, at 3.
[43] Id.

discriminate against one group of Americans."[44] The Department's bald statements about purportedly pervasive discrimination are simply "unsupported assertion[s]" that cannot support the agency's decision-making. *Safe Extensions, Inc. v. F.A.A.*, 509 F.3d 593, 605 (D.C. Cir. 2007). Further, this kind of "categorial predictive assessment" is not "a satisfactory explanation" for a decision that eliminates the possibility of individualized determinations based on an individualized assessment of relevant facts, *Roe*, 947 F.3d at 224. In this way, it is also clear that the Department's rationale is mere pretext for the Administration's actual goal of eliminating ideologies, practices, and programming with which it disagrees no matter the cost. *See supra* I.B.

### c. The Certification fails to account for existing federal and state legal standards.

The Department asks for school districts to certify compliance with *SFFA*, but misapprehends its holding and fails to account for the current federal and state legal standards. *See Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012) ("A material misapprehension of the baseline conditions existing in advance of an agency action can lay the groundwork for an arbitrary and capricious decision.").

*SFFA* prohibits raced-based college admissions programs. *SFFA*, 600 U.S. at 230. It does not, however, outlaw diversity, equity, and inclusion programs. The Certification makes a glaring leap from SFFA's central holding (that university admissions programs "may never use race as a stereotype or negative" and fail to pass strict scrutiny if they do) to a conclusion that the "continued use of illegal DEI practices may subject [a school district] to serious consequences."[45]

The vast majority of diversity, equity, and inclusion activities are race-neutral and open to all, particularly following *SFFA*; the Department's Certification never addresses this reality.

---

[44] Press Release, ED Requires K-12 School Districts to Certify Compliance with Title VI and Students v. Harvard as a Condition of Receiving Federal Financial Assistance, *supra* note 1, PLFS-553.
[45] April 3, 2025 Certification of Compliance Request from OCR, *supra* note 9, at 3, PLFS-559.

Furthermore, the Department's position that it is unlawful to implement race-neutral policies to increase diversity contradicts its *own* regulations, *see* 34 C.F.R. § 100.5 (explaining schools "may properly give special consideration to race, color, or national origin to make the benefits of its program more widely available to such groups, not then being adequately served"),[46] as well as this Circuit's precedent, *see Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th at 885–86 (finding efforts to "improve racial diversity and inclusion by way of race-neutral measures" is a "practice that the Supreme Court has consistently declined to find constitutionally suspect"). It conflicts with other case law post-*SFFA. See, e.g., Bos. Parent II,* 89 F.4th at 62 ("There is nothing constitutionally impermissible about a school district including racial diversity as a consideration and goal in the enactment of a facially neutral plan"). And it is not consistent with the binding Supreme Court precedent that governs K-12 school admission programs. *See Parents Involved in Cmty. Schs.*, 551 U.S. at 733 (Roberts, C.J.) ; *see also id.* at 789 (Kennedy, J., concurring) (finding "[s]chool boards may pursue the goal of bringing together students of diverse backgrounds and races" through means such as "drawing attendance zones with general recognition of the demographics of the neighborhood; . . . [and] recruiting students and faculty in a targeted fashion."); *see also Bos. Parent I,* 996 F.3d at 48. Therefore, because the Department diverges from applicable case law and attempts to change it with no statutory basis or adequate explanation, its actions are arbitrary and capricious.

> d. The Department failed to consider two "important aspect[s] of the problem."

An agency action is arbitrary and capricious if the agency "failed to consider an important aspect of the problem." *State Farm,* 463 U.S. at 43. Here, as with the Letter, the Department failed

---

[46] Violating regulations constitutes an APA 706(2) violation. *Deese v. Esper*, 483 F. Supp. 3d 290, 314 (D. Md. 2020) (plaintiffs could proceed with APA claim where they alleged that agency policy conflicted with its regulations).

to consider: 1) the critical role that states and localities play in education, including their responsibilities to further equity under federal law, and 2), the impact of reversing longstanding approaches to Title VI interpretation and enforcement on underserved communities and students facing discrimination. *See* March 28, Memorandum at 31-32.

In addition to the reasons described in the March 28, Memorandum at 31-32, here, the Department suggests in the Certification that federal education law, including the Every Student Succeeds Act (ESSA), prohibits diversity, equity, and inclusion programming. But state plans on implementation of the statute, which are submitted to and reviewed by the Department, frequently reference activities related to diversity, equity and inclusion. For example, the Maryland Consolidated State Plan states that in instances in which a student group (which under ESSA plans may be identified by race) is "not proficient, not making adequate progress toward proficiency, or not graduating then the accountability system should highlight equity gaps."[47] It also states that the state will provide technical assistance to school systems on cross-cultural awareness. The Oregon Consolidate State Plan lists as its first commitment, "Prioritizing and Advancing Equity," notes that a school system should "[r]ecognize diversity as an asset," and states that the SEA will use technical assistance "shaped by an equity lens… and include culturally responsive evidence-based practices."[48] Any of these activities could arguably fall under the Department's targeting of "illegal DEI." The Department fails to consider how the Certification would impact state's obligations (in an effort to comply with federal statute) to implement their state plans, and the effect of the Department's change position on students.

---

[47] Md. State Dep't of Educ., *Maryland Every Student Succeeds Act (ESSA) Consolidated State Plan*, at 13 (Jan. 10, 2018), https://perma.cc/HKX3-8YUJ (also stating that "the MSDE has a strong commitment to equity").
[48] Or. Dep't of Educ., *Oregon's Consolidated State Plan Under the Every Student Succeeds Act* (Aug. 30, 2017), https://perma.cc/2TQV-BBMA.

   *e. The Department failed to consider the reliance interests of schools and educators.*

"When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (cleaned up). For many of the same reasons described in Plaintiffs' March 28, Memorandum, the Department fails to do so here. *See* March 28, Memorandum at 33-34.

   The Department's timeline for certification makes a mockery of the reliance interests of those affected. It necessitates that LEAs take a hatchet approach to their diversity, equity, and inclusion programming; there is no time to carefully scalpel what might be prohibited under the Department's new position. Nor is there time to examine the interaction of these cuts with potential state and local programming requirements. Whatever the new Administration's policy priorities with respect to civil rights enforcement, it does not have carte blanche to ignore the reliance interests created by the Department's prior policy guidance.

   *f. The Certification is Contrary to Constitutional Rights*

   When final agency action is contrary to constitutional rights, the APA requires it to be "set aside." 5 U.S.C. § 706(2)(B). As explained above, *supra* I.A-I.B, the Certification violates the First and Fifth Amendments and, therefore, the APA.

   *g. The Certification was Issued Without Observance of Procedure Required by Law.*

   The Certification must be held unlawful and set aside because it was issued without observance of procedure required by law. *See* 5 U.S.C. § 706(2)(D). As explained above, *supra* I.C.2, collections of information are subject to the Paperwork Reduction Act, which sets forth the procedure that must be observed to issue the Certification. While the PRA does not provide a

private right of action, litigants may be able to include PRA noncompliance as part of an APA claim. *Pub. Citizen, Inc. v. Lew*, 127 F. Supp. 2d 1, 7 (D.D.C. 2000) ("Within this framework, the Court reviews defendants' compliance with the FOIA and [Paperwork Reduction Act] provisions under the Administrative Procedure Act …"). Because the Department wholly ignored this requirement, the action violates this provision of the APA as well.

## II. __Plaintiffs Are Suffering Irreparable Harm.__

To establish irreparable harm, plaintiffs must show that they will suffer harm that is "neither remote nor speculative, but actual and imminent,'" and that is irreparable, meaning that it "cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019). Where there is a "prospect of an unconstitutional enforcement," irreparable injury is established. *Air Evac EMS, Inc. v. McVe*y, 37 F.4th 89, 103 (4th Cir. 2022) (citation omitted). Likewise, showing a strong likelihood of success on constitutional claims establishes irreparable harm. *Roman Cath. Diocese of Brooklyn v. Cuomo,* 592 U.S. 14, 19 (2020); *Leaders of a Beautiful Struggle v. Balt. Police Dep't,* 2 F.4th 330, 346 (4th Cir. 2021) ("It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

As shown above, Plaintiffs have established a likelihood of success on their First Amendment and Due Process constitutional claims in addition to showing Defendants' violations of the APA. As such, the Certification causes the same harms related to K-12 education that Plaintiffs raised in their Preliminary Injunction, *see* March 28, Memorandum at 7-11, 36-39, and further magnifies them.

And time is of the essence. The Department's issuance of the Certification is yet another step in applying immense pressure to school districts and educators to force them to adopt the Department's baseless interpretation of Title VI. If LEAs and SEAs do not comply, they risk the immediate cessation of federal funding, as the Department has represented that the certification is "requir[ed]" "to continue receiving federal financial assistance."[49] Having to decide between two losing options constitutes irreparable injury because "very real penalty attaches to [Plaintiffs] regardless of how they proceed." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009) (finding irreparable harm where plaintiffs faced a "Hobson's choice" between 1) "refus[ing] to sign [a] likely unconstitutional…agreement[]" and losing "customer goodwill" or their business, or 2) "sign[ing] an agreement to conditions which are likely unconstitutional," which would "disrupt and change the whole nature of its business in ways that most likely cannot be compensated with damages alone").

In addition, the Certification adds an additional layer of harm based on its threat of clawing back federal funding, and purposefully setting up jurisdictions to be targets for FCA litigation. For Plaintiff District 4J, as an entity faced with the choice of signing or not signing the certification, the harms are even more imminent and severe. While District 4J would already have to drastically cut their programming if federal funding were taken away—having to potentially pay triple the amount of that funding would fundamentally alter the school programming environment. District 4J Cert. Decl. ¶ 30-32, PLFS-507. That risk is so devastating, there is enormous pressure to try and comply with the certification. That would mean self-censorship, *id*. ¶ 33, loss of programming, *id*. ¶¶ 30-31, and having to make the impossible choice of complying with state and local requirements or federal ones, *id*. ¶¶ 5, 17-18.

---

[49] Press Release, ED Requires K-12 School Districts to Certify Compliance with Title VI and Students v. Harvard as a Condition of Receiving Federal Financial Assistance, *supra* note 1, PLFS-553.

Likewise, many AFT members work in states in which the SEA has already instructed that each school district sign and return the certification. AFT Cert. Decl. ¶ 17, PLFS-536. These members must self-censor or subject themselves and their school districts to severe penalties. And AFT members working in states that have not yet required their districts to sign the Certification hold a separate but equally significant fear—that the act of declining to sign the new Certification will result in rapid termination of their school's federal education funding. AFT Cert. Decl. ¶ 16, PLFS-536.

Like the Letter, this Certification is another tactic to force schools to take protective action that undermines their constitutional rights, and those of the educators they serve. AFT Cert. Decl. ¶ 19, PLFS-536 (describing schools ending programs for fear of federal reprisal). Absent injunctive relief, the impermissible bind the government has created for Plaintiffs and K-12 educational institutions will continue to tighten: self-censor and lose constitutional rights, or be targeted for investigation and litigation and risk losing all federal education funding on top of ruinous legal costs.

III. **The Balance of the Equities and the Public Interest Favor Enjoining the Certification.**

Because a preliminary injunction would merely require Defendants to respect statutory and constitutional law and maintain the status quo, the balance of equities and public interest tilt in Plaintiffs' favor and demand relief.

The Government "is in no way harmed by issuance of a preliminary injunction which prevents [it] from enforcing restrictions likely to be found unconstitutional[,] [i]f anything, the system is improved by such an injunction." *Leaders of a Beautiful Struggle*, 2 F.4th at 346 (*citing Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)); *see also PFLAG, Inc. v.*

35

*Trump*, No. CV 25-337-BAH, 2025 WL 510050, at \*23 (D. Md. Feb. 14, 2025). Likewise, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Am. Fed'n of Tchrs. v. Bessent*, No. CV DLB-25-0430, 2025 WL 582063, at \*14 (D. Md. Feb. 24, 2025) (internal citation omitted). Rather, "the public interest favors protecting constitutional rights," *id.*, particularly in the context of eliminating infringements on free speech rights, *see Nat'l Pub. Radio, Inc. v. Klavans,* 560 F. Supp. 3d 916, 929 (D. Md. 2021) (noting that there is a "well-settled public interest in the freedom of expression"). Further, it is of almost no burden to the Government when they cut federal funding to school districts, but such an action is an enormous burden to the states and localities that rely on such funding.

The public interest favors continuous and uninterrupted funding and encouraging educators to focus on educating their students-- not struggling with superfluous certifications or guessing what may or may not be permitted by the Department. The public interest also favors preventing funding and liability risks for school districts unless and until the government can demonstrate the legality of its actions. Here, for the same reasons that Plaintiffs are likely to succeed on the merits, equity requires relief.[50]

### A. Nationwide Injunction Is Necessary.

Only a nationwide injunction can afford Plaintiffs complete relief. The Fourth Circuit has authorized nationwide injunctions against executive actions if a nationwide scope "meet[s] the exigencies of the particular case." *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (quoting *Roe v. Dep't of Def.*, 947 F.3d at 231); see *Ass'n of Cmty. Cancer Ctrs. V. Azar*, 509 F. Supp. 3d

---

[50] The Court should exercise its discretion to waive or set at $0 the security requirement of Fed. R. Civ. P. 65(c) because Defendants will face no monetary injury from any relief ordered by the Court. *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) ("[T]he district court retains the discretion to set the bond amount as it sees fit or waive the security requirement." (citations omitted)). In similar cases, courts in this jurisdiction and others have determined bond unnecessary. *See,* e.g., *PFLAG, Inc. v. Trump*, 2025 WL 510050, at \*23 (declining to require a bond); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 2025 WL 597959, at \*18 (declining to set a bond).

482, 503 (D. Md. 2020) (collecting cases). The exigencies of this case require a nationwide injunction. AFT and ASA have members throughout the country who have been harmed by the Certification. *See* AFT Cert. Decl. ¶ 17, PLFS-536; *see Labrador v. Poe by & through Poe,* 144 S. Ct. 921 (Mem), 932 (2024) (Kavanaugh, J., concurring) (noting that even an injunction limited to plaintiffs may "have widespread effect" if the plaintiff is an "association that has many members"). In these exigent circumstances, no narrower injunction can provide complete relief.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiff's Motion and issue a preliminary injunction consistent with that requested in the Proposed Order, or an APA § 705 stay of the effective date of the Certification.

Dated: April 9, 2025

Respectfully submitted,
*/s/ Madeline H. Gitomer*
Madeline H. Gitomer (Bar No. 31518)
Kali Schellenberg**
Victoria S. Nugent (Bar No. 15039)
Rachel F. Homer (Bar No. 31490)
Andrew Bookbinder (Bar No. 31486)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
mgitomer@democracyforward.org
kschellenberg@democracyforward.org
vnugent@democracyforward.org
rhomer@democracyforward.org
abookbinder@democracyforward.org

*Counsel for Plaintiffs*
** Admitted *Pro hac vice*

37

**CERTIFICATE OF SERVICE**

I hereby certify that on the date below, I electronically filed the foregoing with the Clerk of the Court of the United States Court of the District of Maryland by using the CM/ECF system. I also certify that the foregoing document is being served on Defendant's counsel of record and that service will be accomplished by the CM/ECF system.

This 9th day of April 2025

/s/ *Madeline H. Gitomer*
Madeline H. Gitomer (Bar No. 31518)
*Counsel for Plaintiffs*