# EXHIBIT 38

**PLFS-500**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**American Federation of Teachers,** *et al.*,

Plaintiffs,

v.

**U.S. Department of Education,** *et al.*,

Defendants.

**Civil Case No. 1:25-cv-00628**

### DECLARATION OF COLT GILL

I, Colt Gill, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am over eighteen years old, of sound mind, and fully competent to make this declaration. I also have personal knowledge of the factual statements contained herein.

2. I am the Interim Superintendent of Eugene School District 4J. I have served in this role since April 2024.

3. I have nearly three decades of leadership experience in K-12 education, including service as the Oregon Deputy Superintendent of Public Instruction between 2017 and 2023, a position appointed by the Governor. The experience and knowledge I have acquired in Oregon K-12 education including at the statewide, policy-making level has provided me with an in-depth understanding of Oregon curricular and operational requirements for K-12 schools. I also possess a deep understanding of disparate educational outcomes for

1

students of color, students in poverty, disabled students, English language learners, and of the educational practices that support closing opportunity and achievement gaps amongst our student populations.

4. In my role as Interim Superintendent for Eugene School District 4J, I provide leadership for the district and I ultimately take responsibility for all areas of the district's operation. I provide executive leadership and administrative direction for all departments, services and programs, and I am responsible for proposing and implementing long-range plans for the district.

5. I have previously submitted a declaration to this court in support of plaintiff's Motion for Preliminary Injunction, Doc. No. 31, outlining my concerns that the Department's interpretation of the law in the Letter and FAQs sought to constrain, restrain and chill District 4J's selection and delivery of curriculum required by state law and district policy, and its efforts to create a climate of inclusion (including through programs such as affinity groups that while open to all students place individual racial identities at the forefront). A copy of that declaration is attached as Exhibit A and incorporated into this declaration.

**Eugene School District 4J**

6. Eugene School District 4J is a K-12 public school district in and around Eugene, Oregon. The district is governed by a seven-member, elected Board of Directors ("Board").

7. Approximately 16,000 students in grades K-12 attend schools in the district in 19 elementary school programs, eight middle schools, four comprehensive high schools, alternative high school programs, and five district-authorized public charter schools.

8. The district's overarching goal is to provide a great education for each student.

2

9.  To provide a great education for all students, district 4J must address the stark reality that historical oppression and inequality in access continues to impact the educational experiences and outcomes for students of color. Thus, district 4J has engaged in broad efforts to create supportive learning conditions for students of color, and in accordance with state academic standards has incorporated a good deal of curriculum addressing race and racial identity into its instructional practice.

## The Department of Education's Actions

10. The Department of Education has taken several recent actions that have a destabilizing effect on our district, including sending the February 14, 2025, Dear Colleague Letter ("the Letter"), the February 27, 2025, opening of a DEI complaint portal called "EndDEI.Ed.Gov," and the issuing the February 28, 2025, Frequently Asked Questions ("FAQs"). The Department then began investigations of dozens of educational institutions.

11. The Department's new position, as encapsulated in the Letter, is to brand DEI efforts as illegal, despite the fact that the Department had previously issued guidance on Title VI and *Students for Fair Admission v. Harvard* (SFFA), identifying multiple DEI activities as supportive of the nondiscrimination objectives of Title VI. The Letter was then followed by the FAQs which implied that curricular efforts were divisive and insidious forms of importing illegal discrimination.

## The Certification Requirement

12. Like other school districts who receive federal funding, district 4J has previously signed assurances required to receive federal grants such as that required for formula grants

3

**PLFS-503**

under the Elementary and Secondary Education Act (ESEA) as amended by the Every Student Succeeds Act (ESSA).

13. On or about April 3, 2025, I learned that the Department had announced that, as a material condition of continued receipt of federal funding, it would require state departments of education (SEAs) to sign a Certification form, certifying their compliance with Title VI and the Supreme Court case, *Students for Fair Admission v. Harvard* (SFFA) (as they are described in the Certification), within 10 days, and to collect certifications from their Local Education Agencies.

14. District 4J has not yet received guidance from the Oregon State Department of Education regarding the new certification requirement by the federal Department of Education, except to advise that LEAs discuss with the Oregon DOE before taking action.

15. In the press release announcing the Certification requirement, the Department noted that the background for the Certification was the Department's promulgation of the Letter and FAQs document, issued allegedly in response to widespread violations of Title VI including through the use of "certain DEI practices," though no examples of such practices or violations are given.

16. The Department's Certification threatens that the "continued use of illegal DEI practices" may subject the "individual or entity using such practices to serious consequences." The Department does not define "illegal DEI," but by citing its prior Letter and FAQs, doubles down on the vagueness in those documents. Without any explanation, the Certification also references the Biden administration's equity mandates, leaving education agencies to guess at its meaning.

4

17. Many details about district 4J's concerns with the Department's new approach to Title VI are set forth in the attached Exhibit, and will not be repeated at length here. In simple summary, district 4J believes that its compliance with multiple requirements in Oregon law related to curriculum selection and delivery, its programs that may disproportionately serve students from underserved backgrounds, and its efforts to create inclusive and supportive spaces for students of color are impeded by the Department's new position. This situation has created uncertainty about what the requirements are and fear of loss of funding.

18. Now, in the Certification, the Department is raising the stakes even higher. The consequences threatened by the Department include the termination of federal funding; litigation by the Department of Justice for the return of previously received funds; and liabilities and penalties under the False Claims Act ("FCA"), which include treble damages and civil penalties of thousands.

19. It is also my understanding that FCA claims may be prosecuted by third parties, who have a powerful financial incentive to bring such claims. In addition to financial incentives, it is clear that there are groups with an ideological opposition to diversity that may also be motivated to attempt to punish schools who do not share their belief system.

20. While the Department does not mention criminal sanctions, my understanding is that violations of the FCA can also be subject to criminal prosecution.

21. The Certification requires district 4J to certify that compliance with Title VI and the Supreme Court decision in *SFFA* is "material" to the continued or future receipt of federal payments, paving the way for FCA claims against district 4J. My understanding is

5

that FCA liability may arise when an agency knowingly violates a requirement that is known to be "material" to the United States.

22. The Department's interpretation of *SFFA* and Title VI in the Letter was widely criticized as inaccurate and overreaching, yet the Department now seeks district 4J's certification on compliance with Title VI and SFFA or face FCA and potential *fraud* claims, which dramatically increases the already chilling effect of the Department's position in the Letter and the FAQs.

23. The new certification requirement, when paired with the Letter, appears to be an attempt by the Department to exert federal control and limitations over state and local curriculums, programming, and teaching.

24. I believe it is unprecedented for the United States Department of Education to require a SEA or local school district to certify that it is in compliance with its (inaccurate) interpretation of a court decision and abrupt reversal of prior interpretations, let alone under the threat of prosecution under the False Claims Act or loss of funding.

25. The certification requirement represents not only a doubling down of the Department's changes to its prior interpretations of Title VI but a new and threatening mode of enforcement. In my long experience in public education administration, including as the head of a state education agency, the Department has provided assistance to departments of education and local school districts, and even when finding districts out of compliance, the Department's focus has been the pursuit of voluntary correction plans. I am unaware of any time the Department has ever ended funding for a district, clawed back funding, characterized a district's interpretation of Title VI as "fraud," paved the way for False Claims Act enforcement, and impliedly threatened criminal prosecution.

6

26. As a result of the Department's certification demand, two district 4J staff members have been required to divert their attention from other critical business to attend meetings on, communicate about, and conduct research about the demand. Already multiple hours have been spent on this endeavor. Similarly, the Chair of the School Board, who is an unpaid community volunteer, has been required to spend several hours on the same issues.

### The Certification Requirement Places District 4J in an Untenable Position

27. District 4J receives and heavily relies upon federal funding, the loss of which would be devastating to district 4J and the 16,000 students it serves.

28. In 2022-23, district 4J received $29.5 million dollars in federal funding. In the 2023-24 school year, district 4J received $34.5 million dollars in federal funding. Although the fiscal year 2024-25 is not closed, district 4J forecasts that it will receive approximately $14.9 million dollars in federal funding, approximately 5% of district 4J's general fund operating budget. District 4J is currently undergoing budget cuts and is in the process of creating a financially constrained budget for the 2025-2026 year.

29. To summarize, district 4J's anticipated three-year total amount in federal funding is almost $80 million dollars.

30. Were district 4J to lose federal funding, even for one year, the results would be devastating. For example, had district 4J not had federal funding for the present school year, I anticipate that students would have lost two weeks' instruction time, or – alternatively – district 4J would have to lay off approximately 110 teachers (about 10% of the teacher workforce), or some other combination of lost instruction time, staff layoffs and program reductions.

7

31. Were district 4J to face a requirement that it return, for example, the three most recent years of federal funding, or be subject to treble damages of a similar amount, district 4J would be shattered. Such an action would require layoffs of over half the teacher workforce or the shuttering of district 4J schools for 55 days (or some similarly destructive combination). This would be a devastating and unprecedented event, that would greatly harm our district's students, families, staff, and our educators.

32. The Department's Certification requirement places a heavy weight on district 4J and puts it in an impossible situation: either comply with the Department's inaccurate and broad interpretation of SFFA and attempt to understand and comply with its vague pronouncements on "illegal DEI," or lose federal funding upon which it desperately relies. Further, not only is district 4J under threat of a loss of funding by the Department, but the certification requirement exposes district 4J to lawsuits by third parties and severe penalties under the False Claims Act.

33. Because of the Certification's coercive effect, district 4J has to consider whether to chill a wide range of speech and activities in order to not potentially run afoul of the Department–and to make such determinations in an incredibly compressed timeframe. The Department gave the Oregon Department of Education and other State Education Agencies only ten days to review, sign, and return the Certification and to obtain Certifications from school districts including district 4J. I now understand there may be an additional ten-day extension, until April 23. Even with those additional days, this is an emergency situation for the district.

8

Eugene, Oregon
April 8, 2025
9 th

_____

Colt Gill

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **American Federation of Teachers**, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**U.S. Department of Education**, *et al.*,<br><br>Defendants. | **Civil Case No. 1:25-cv-00628** |

## DECLARATION OF COLT GILL

I, Colt Gill, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1.  I am over eighteen years old, of sound mind, and fully competent to make this declaration. I also have personal knowledge of the factual statements contained herein.

2.  I am the Interim Superintendent of Eugene School District 4J. I have served in this role since April 2024.

3.  I am a lifelong resident of Lane County and I have nearly three decades of leadership experience in K-12 education, including service as the Oregon Deputy Superintendent of Public Instruction between 2017 and 2023, a position appointed by the Governor.

4.  In my role as Interim Superintendent, I provide leadership for the district and I ultimately take responsibility for all areas of the district's operation. I provide executive leadership

1

and administrative direction for all departments, services and programs, and I am responsible for proposing and implementing long-range plans for the district.

5.  Eugene School District 4J is a K-12 public school district in and around Eugene, Oregon. The district is governed by a seven-member, elected Board of Directors ("Board").

6.  Approximately 16,000 students in grades K-12 attend schools in the district in 19 elementary school programs, eight middle schools, four comprehensive high schools, alternative high school programs, and five district-authorized public charter schools.

7.  Program options include strong and varied neighborhood schools, five K-12 language immersion programs (French, Japanese, two Spanish programs, and a Mandarin Chinese program (K-8)), other alternative schools, and an International Baccalaureate high school program on multiple campuses. There are also five publicly funded charter schools located in the Eugene School District.

8.  The district's overarching goal is to provide a great education for each student. The district is charged by the state of Oregon and the members of our community to provide each student with a great education that prepares them for life. The district approaches this goal by looking at measures of success as set by the district's Board.

9.  These measures of success include: on-time, four-year graduation rates for high school students; five-year completion rates by diploma or GED; third grade reading measures; middle school measurements; rates of 9th graders on-track for graduation; attendance rates; class participation rates; the breadth of class offerings and clubs: and other measures as suggested by the district. Additional benchmarks that measure the success of the district include teacher assessments of students, staff satisfaction, and student inclusion and satisfaction.

10. To provide a great education for all students, the district must address the stark reality that historical oppression and inequality in access continues to impact the educational experiences and outcomes for students of color. Thus, the district has engaged in broad efforts to create supportive learning conditions for students of color and in accordance with state academic standards has incorporated a good deal of race-conscious curriculum into its instructional practice.

### The Letter Directly Conflicts with State Education Requirements, Presenting the District with an Impossible Choice

11. State law and district policy and practice require instruction designed to promote knowledge of the histories, contributions and perspective of individuals who are Native American, or are of African, Asian, Pacific Island, Chicano, Latino, Middle Eastern or Jewish descent, and the creation of school cultures that support kindness, care, connection, equity, diversity and inclusion. Specific examples of these requirements follow.

12. In 2017, the Oregon State Legislature enacted House Bill 2845, and in 2019, House Bill 2023, requiring the adoption of ethnic studies into statewide academic content standards for Oregon public school students. These laws mandate the inclusion of ethnic studies in the K-12 social science in Oregon public schools, including the Eugene School District 4J by the 2026-27 academic year. These content standards require sufficient instruction on the histories, contributions and perspectives of individuals who are of specified racial and ethnic backgrounds. A copy of the law, ORS 329.045, that becomes fully operative for the 2026-27 school year is attached as **Exhibit 1.**

13. The district currently offers instruction meeting some of these ethnic studies academic content standards, and is actively preparing to fully implement them by the 2026-27 academic year. Among other things, within the next few months the district expects to formally launch the process of selecting curriculum and instructional materials to implement the new ethnic studies standards. This is a significant undertaking involving large numbers of stakeholders, review and piloting of instructional materials, selection of materials, teacher training and ultimately, implementation of the curriculum in the classroom. While we believe that our implementation of this law is nondiscriminatory under state and federal law, the Dear Colleague Letter seeks to constrain or restrain all or most of the ethnic studies instruction already offered by the district, and impedes the district's efforts to fully implement the ethnic studies curriculum as required by state law.

14. The Letter, the Frequently Asked Questions document ("FAQs") issued by the Department on or about March 1, 2025, the "End DEI" portal advertised by the Department to promote complaint filing without any description of what would be a legitimate civil rights complaint, the EO on "Radical Indoctrination," the United States's abrupt termination of millions of teacher training and other grants because they involved professional development on issues of equity, and the labeling of DEI as "illegal" are chilling and appear to be purposefully designed to cause public school districts including Eugene 4J to pull back on its curriculum and other efforts to promote critical thinking, equitable outcomes for students and a sense of belonging.

15. Oregon Revised Statute 329.493 mandates a K-12 Native American curriculum for Oregon public schools, including the Eugene School District 4J. While we believe that our implementation of this law is nondiscriminatory under state and federal law, most or

all of the teaching of the Tribal History/Shared History curriculum appears to be restricted by the Dear Colleague Letter.

16. In 2019, the Oregon State Legislature enacted Senate Bill 664 relating to instruction about the Holocaust and other genocides. This law, now codified at ORS 329.494, mandates K-12 education about the Holocaust and genocide in Oregon public schools, and is currently being implemented by the Eugene School District 4J. While we believe that our implementation of this law is nondiscriminatory under state and federal law, the teaching of Holocaust and other genocides curriculum may be restricted by the Dear Colleague Letter or otherwise subject our School District to complaints and investigations.

17. In 2023, the Oregon State Legislature also enacted revisions to Oregon Revised Statute 337.260. (A copy of the text that is operative for the 2026-27 academic year is at page 6 of **Exhibit 1**). These revisions mandate that public schools adopt textbooks and other instructional materials that adequately address the roles in and contributions to the economic, political and social development of Oregon and the United States by men and women who are "Native American . . . are of European, African, Asian, Pacific Island, Chicano, Latino, Middle Eastern or Jewish descent . . . . [or] are immigrants or refugees." While we believe that our implementation of this law is nondiscriminatory under state and federal law, I question whether the textbook adoption requirements will be interpreted by the Department as discriminatory based on broad language in the Dear Colleague Letter, criticizing the use of race as a factor in institutional programming, and claiming that schools are "smuggling racial stereotypes and explicit race-consciousness into everyday training, programming, and discipline."

18. Consistent with state law, the district has implemented racial equity and trauma informed
    practices into its social and emotional instruction. In 2021, the Oregon Legislature
    enacted House Bill 2166, which required the State Board of Education to adopt, and
    public school districts to implement, Social and Emotional Learning (SEL) learning
    standards and an SEL framework for K-12 students. (See pp. 3-4 of **Exhibit 1**). These
    standards are designed to be developmentally appropriate, align with mental health
    models, include racial equity and trauma-informed principles and practices within
    strengths-based multitiered systems of support, increase students' social emotional
    development, and promote school cultures that support kindness, care, connection,
    equity, diversity and inclusion. They are also designed to teach students self-awareness,
    awareness of others, critical thinking and understanding about the interaction between
    systemic social structures and histories, contributions and perspectives of individuals who
    are "Alaska Native, Native American, Black, African American, Asian, Native Hawaiian,
    Pacific Islander, Latinx or Middle Eastern; have disabilities; are immigrants or refugees;
    or otherwise have experienced disproportionate results in education due to historical
    practices." The district is implementing these standards, and believes its implementation
    is nondiscriminatory under state and federal law, however, I am alarmed by the
    Department's claims that social emotional learning may be "veil[ed] discrimination." I
    know of no basis to suggest, as the Department has, that social emotional learning is
    discriminatory or would create a hostile environment. The Department's portrayal of SEL
    curriculum as a subtle and potentially illegal form of discrimination is among a number
    of unsupported statements by the Department that, in combination with other actions by
    the Department, seeks to discourage, restrain and weaken the district in its efforts to (1)

create school cultures that are unapologetically inclusive and affirming of student's personal, cultural and racial identities, and (2) teach students understanding of and skill in navigating cultural differences. The Department's emphasis on "ending" DEI, and its warnings that programs that teach about racial experiences may be insidious forms of discrimination has caused the district concern that the Department will seek to label district instructional programming as illegal and hostile, and seek to end the district's federal funding.

**The Letter Conflicts with District Operations and Practices Required by State Law**

19. Oregon also has a public school education policy, commonly known as "Every Student Belongs," which bans specific hate symbols in Oregon public schools. Additionally, all public school districts are required to use restorative justice practices when responding to "bias incidents." This policy is codified in Oregon Revised Statute 339.347 and Oregon Administrative Rule 581-022-2312, and is implemented by the district in Eugene School Board Policy ACB and administrative regulation ACB-AR. This law and district policy requires that responses to a bias incident and the display of certain hate symbols include notifications to the community of students who are likely to be impacted, recognition of the impact of the act on the individual, and educational and other transformational responses for people who caused the harm. While we believe that our implementation of this policy is nondiscriminatory under state and federal discrimination law, statements within the Dear Colleague Letter and the unclear language of answer nine in the FAQs cause me concern that the Department will view the district's bias incident response policy as discriminatory as programs using non-racial criteria as "proxies" for race.

20. Oregon Revised Statute 329.711 and Oregon Administrative Rule 581-022-2307 require that each school district have an educational equity advisory committee made up of a majority of members who represent underserved backgrounds, including minority race and ethnicity, LGBTQ status, and disability status. The committee advises the superintendent and the school board on equity related challenges. We believe that such an equity committee is lawful and non-discriminatory under relevant state and federal law, but in light of the vague language of the Dear Colleague Letter, I am now concerned that the Department will interpret the District's compliance with state law concerning equity advisory committees as discriminatory and illegally based on racial distinctions or considerations.

**The Letter Directly Conflicts with District Development and Achievement Goals**

21. Oregon has a global literacy requirement as well as a critical thinking requirement. Combined these require students to demonstrate knowledge of diverse cultural, linguistic and artistic expressions. Our students need to stretch their minds and be taught how to appreciate and consider the perspectives of others. We support students around their learning of difficult topics and ensure our curriculum is tailored to the appropriate grade levels, but it is vital that our students be exposed to a diverse range of experiences and perspectives.

22. In pursuit of developing those critical thinking and global literacy skills, the School Board has established three goals for students in the district: 1) increasing equitable outcomes and achievements, 2) ensuring the safety and well-being of students and staff, and 3) proactively engaging with our community.

23. The first goal, increasing equitable outcomes and achievement, focuses on making it so that a student's demographic characteristics and where a student begins does not negatively determine or limit that student's success in school and life. To achieve this goal, the district works to proactively allocate resources in ways that support equitable student success and opportunity. A foundational method to support equitable outcomes are practices that allow students to see themselves in our curriculum. If we are forced to erase diversity from our classrooms and teaching, students will not feel a part of our system, our schools, and they're less likely to succeed and more likely to feel ostracized and underperform. Additionally, the Board tracks test scores and attendance rates for all students, and disaggregates the data and considers the scores and attendance rates for historically underserved racial and ethnic groups, to ensure that all students are receiving the support necessary to thrive. While we believe that our goals and programs are nondiscriminatory under state and federal discrimination law, these goals may be viewed as restricted by the language of the Dear Colleague Letter as interpreted by the Department of Education.

24. To achieve the district's goal to increase equitable outcomes and achievements, the district engages in a proactive approach, allocating efforts and resources to support equitable student access and opportunity and to create school cultures where all students can succeed. In practice this involves using classroom materials that are inclusive and representative, DEI efforts and leadership on campus to reflect our diverse student body, affinity groups at all levels of our schools, the district Educational Equity Advisory Committee, equity lens and equity budgeting, restorative and transformational justice efforts when it comes to discipline issues, and a safe and effective bias incident incident

9

reporting structure. We believe that all or most of these steps may be viewed as conflicting with the language of the Dear Colleague Letter by the Department of Education either explicitly as "DEI" activities or as programs "[r]elying on non-racial information as a proxy for race."

25. Similarly, the district also has a hate and bias reporting system in place to allow for better incident tracking and to reduce discrimination in the school district. Hate and bias incidents disproportionately involve issues relating to ethnicity or race. By highlighting those issues, we believe this program could be implicated by the language of the Dear Colleague Letter as a program using other measures as a "proxy for race" despite complying with state and local discrimination laws.

26. As mentioned previously, the district features an International Baccalaureate high school program on multiple campuses. The International Baccalaureate program focuses on a global curriculum that integrates ethnicity, culture, and global history. While we believe that the International Baccalaureate program is nondiscriminatory under state and federal law, elements of the program may be viewed by the Department as restricted by the language of the Dear Colleague Letter.

## The Letter Directly Conflicts with District Diversity, Culture, and Affinity Programs and Courses

27. The district has a wide range of student affinity groups, support groups, and coursework dedicated to cultivating a sense of belonging and allyship.

28. All students are welcome to join these affinity groups regardless of background, and participation and membership are voluntary. Depending on if there is sufficient interest from students, the affinity groups exist at elementary, middle, and high schools.

29. District wide, the affinity groups include: Black Student Union, Asian Pacific Islander, Gender Sexuality Alliance, Jewish Student Union, Latinx Student Union, Native American Student Union, and Neurodivergent groups. The district also has a NATIVES program funded by ESEA Title VI Indian Education Funds.

30. The district believes strongly that it is important to engage in cultural identity development. The groups serve multiple purposes in supporting students from exposing them to new perspectives, providing academic support, promoting leadership development, and engaging in service to the community.

31. Teachers and staff members serve as paid advisors to these groups in accordance with the CBA, and the student affinity groups all have meeting times during the school day blocked off as well as a designated budget for activities.

32. Additionally, each affinity group has a district level program coordinator dedicated to supervising the school level advisors and supporting each group at the district level.

33. We believe the Dear Colleague Letter seeks to weaken if not ban the district's student affinity groups based on race. A prior Dear Colleague Letter issued by the Department specifically identified affinity groups as a lawful practice, provided they are open to all, but the Letter of February 14, 2025 states that schools are prohibited from using race in "decisions pertaining to . . . all other aspects of student, academic, and campus life" and characterizes any race-conscious decision as harkening back to a "shameful echo of a darker period in the country's history."

11

34. All four comprehensive high schools in the district offer intensive academic and career counseling for all students. The counseling includes assistance navigating the financial aid process, college applications, and planning next steps after high school. Under the broad language of the Dear Colleague Letter, I am concerned that my counselors will be hesitant to have open and relevant conversations addressing race and identity with students, fearing those discussions would be considered engaging in "explicit race-consciousness" programming.

35. Each year, the school board sponsors a high school civil rights trip that students may take part in. The program is open to all students taking a class within the district's CTE program focused on exposing students to, and preparing students for, careers in education. Selection of students is only limited by enrollment in the class. For the trip this school year, students and staff traveled to locations of historical significance in the Civil Rights Movement including Selma, Birmingham, Greensboro, and visited the Equal Justice Initiative's Legacy Museum, devoted to telling the "history of the destructive violence that shaped our nation, from the slave trade to the era of Jim Crow and racial terror lynchings, to our current mass incarceration crisis" and to exposing the "tragic, false narrative of racial difference . . . that has resulted in centuries of racial bigotry and injustice." Students frequently describe this trip as the highlight of their academic journey. The trip culminates in a presentation to the school board once the students return. While we believe that this program is nondiscriminatory under state and federal discrimination law, it appears to be barred by the Dear Colleague Letter, even as clarified by the FAQs, which asserts that the district may be engaging in discrimination if it is

deemed to have assigned students "intrinsic guilt based on the actions of their presumed ancestors."

## The Letter Directly Conflicts with District Academic Support Programs

36. The district has academic support and data programs that we believe are implicated by the Dear Colleague Letter.

37. The district runs an after school academic intervention program, called Boosting and Enriching Students Today ("BEST"), that serves students most in need of academic support, seeking to bolster their performance in reading and math. While students are offered the opportunity to participate in the program based on their academic need, and race and ethnicity are not factored into the decision, the program benefits students from historically underserved populations at a greater rate. Recent program data show that students enrolled in these programs are more likely to be students of color and English Language Learners as compared to the student population not participating in the programs. While we believe this program is nondiscriminatory under state and federal law, we are concerned that the broad language of the Dear Colleague Letter may lead this program to be viewed as serving as a "proxy for race" by the Department of Education because it disproportionately serves students of underserved backgrounds.

## The Letter Creates Deep Uncertainty Regarding the District's Funding and Budget

38. The district receives significant federal funding. The federal funding is generally tied to particular uses, such as supporting education for students with disabilities or

13

economically disadvantaged students, after school or summer learning programs, safe
routes to school programs, or school meal programs.

39. State funding for education is prone to fluctuations driven by the state economy. Federal
funding for the district has served as a steadying force in the district's budget process.
Federal funding relies on census and poverty levels, which are much more predictable on
a year-to-year basis than state economic trends and unpredictable events that may require
the state to re-allocate its funds.

40. As a result, losing federal funding would be devastating to the school district. Coming out
of the COVID-19 pandemic, many school districts are facing reduced budgets already,
and federal funding cuts would make an already difficult situation nearly impossible. The
district particularly relies on federal funds to provide critical academic services to our
student body. Our significant federal funding sources include vital IDEA and Title I
funding to assist our low income students and disabled students who have specialized
education needs. A loss of federal funding would have an immediate and prolonged
negative impact on students, the community, staff and district programs. Without federal
funding, the district would be required to: shorten the school year, depriving students of
instruction time and care; layoff dozens and dozens if not more than 100 educators,
increasing class sizes at all levels; reduce course offerings and enrichment programs; and
delay curricular purchases, stagnating instructional materials for teachers. The loss of
federal funding would be nothing short of devastating to the district.

41. The district plans its budget well in advance of the fiscal year, allocating funds in a
variety of different ways to anticipate upcoming changes so we can better serve our
students. The sudden promulgation of the Dear Colleague Letter and the associated

Exhibit A to Declaration of Colt Gill (April 9, 2025) Page 24

enforcement and funding threats have created fear that the District may experience an abrupt loss in federal funding.

42. The vagueness of the Dear Colleague Letter appears designed to create uncertainty, alarm, and fear at all levels of district staff and leadership. Multiple teachers have already reached out to district leadership to ask about the impact of the Letter on their activities, and whether they should alter any of their lessons or other activities to conform with the Letter.

43. Unless the Letter is retracted or voided, the District will be irreparably harmed and face impossible choices. Right now, the Letter is inhibiting informed decision-making that would allow the school board to create policy, the superintendent to implement existing and new policy, the school leadership and board from creating accurate budgets, and teachers and administrators to carry out their daily lessons, curriculum, and advisory roles.

44. Had the Department of Education promulgated this Dear Colleague Letter via the standard notice and comment process, the district would have submitted a comment addressing how the language of the Letter would impact our work. During my time serving as the governor's Deputy Superintendent for Public Instruction, I submitted a comment on a rule proposed by the Biden administration. Our general counsel commented on a proposed rule by the State of Oregon Department of Education a number of years ago, and several staff members at the district have submitted comments on state and federal proposed rules. The district would have similarly commented here.

Eugene, Oregon
March 26, 2025

Colt Gill

15

**Source: https://www.oregonlegislature.gov/bills_laws/ors/ors329.html**

**ORS 329.045 Revision of Common Curriculum Goals, performance indicators, diploma requirements, Essential Learning Skills and academic content standards; instruction in academic content areas.** (1)(a) In order to achieve the goals contained in ORS 329.025, the State Board of Education shall regularly and periodically review and revise its Common Curriculum Goals, performance indicators and diploma requirements.

(b) The review and revision conducted under this section shall:

(A) Include Essential Learning Skills and rigorous academic content standards in mathematics, science, language arts, history, geography, economics, civics, higher education and career path skills, personal financial education, physical education, health, the arts and world languages.

(B) Involve teachers and other educators, parents of students and other citizens and shall provide ample opportunity for public comment.

(C) Encourage increased learning time. As used in this subparagraph, "increased learning time" means a schedule that encompasses a longer school day, week or year for the purpose of increasing the total number of school hours available to provide:

(i) Students with instruction in core academic subjects, including mathematics, science, language arts, history, geography, economics, civics, higher education and career path skills, personal financial education, the arts and world languages;

(ii) Students with instruction in subjects other than the subjects identified in sub-subparagraph (i) of this subparagraph, including health and physical education;

(iii) Students with the opportunity to participate in enrichment activities that contribute to a well-rounded education, including learning opportunities that may be based on service, experience or work and that may be provided through partnerships with other organizations; and

(iv) Teachers with the opportunity to collaborate, plan and engage in professional development within and across grades and subjects.

(c) Nothing in this subsection prevents a school district or public charter school from maintaining control over course content, format, materials and teaching methods.

(2) The State Board of Education shall continually review and revise all adopted academic content standards necessary for students to successfully transition to the next phase of their education.

(3)(a) School districts and public charter schools must offer students instruction in mathematics, science, language arts, history, geography, economics, civics, higher education and career path skills, personal financial education, physical education, health, the arts and world languages.

(b) Instruction required under paragraph (a) of this subsection must:

(A) Meet the academic content standards adopted by the State Board of Education; and

(B) Meet the requirements adopted by the State Board of Education and the board of the school district or public charter school. [Formerly 326.725; 1995 c.660 §6; 1999 c.200 §29; 1999 c.1029 §3; 2003 c.303 §5; 2007 c.858 §4; 2012 c.91 §17; 2013 c.15 §3; 2017 c.133 §1; 2017 c.263 §1a; 2021 c.178 §5; 2023 c.564 §6]

**Note:** The amendments to 329.045 by section 1, chapter 202, Oregon Laws 2019, become operative September 30, 2026. See section 2, chapter 202, Oregon Laws 2019. The text that is operative on and after September 30, 2026, including amendments by section 6, chapter 178, Oregon Laws 2021, section 1, chapter 328, Oregon Laws 2023, and section 7, chapter 564, Oregon Laws 2023, is set forth for the user's convenience.

**329.045.** (1)(a) In order to achieve the goals contained in ORS 329.025, the State Board of Education shall regularly and periodically review and revise its Common Curriculum Goals, performance indicators and diploma requirements.

(b) The review and revision conducted under this section shall:

(A) Include Essential Learning Skills and rigorous academic content standards in mathematics, science, language arts, history, geography, economics, civics, higher education and career path skills, personal financial education, physical education, health, the arts and world languages.

(B) Ensure that the academic content standards for history, geography, economics and civics include sufficient instruction on the histories, contributions and perspectives of individuals who:

(i) Are Native American;

(ii) Are of African, Asian, Pacific Island, Chicano, Latino, Middle Eastern or Jewish descent;

(iii) Are women;

(iv) Have disabilities;

(v) Are immigrants or refugees; or

(vi) Are lesbian, gay, bisexual or transgender.

(C) Involve teachers and other educators, parents of students and other citizens and shall provide ample opportunity for public comment.

(D) Encourage increased learning time. As used in this subparagraph, "increased learning time" means a schedule that encompasses a longer school day, week or year for the purpose of increasing the total number of school hours available to provide:

(i) Students with instruction in core academic subjects, including mathematics, science, language arts, history, geography, economics, civics, higher education and career path skills, personal financial education, the arts and world languages;

(ii) Students with instruction in subjects other than the subjects identified in sub-subparagraph (i) of this subparagraph, including health and physical education;

(iii) Students with the opportunity to participate in enrichment activities that contribute to a well-rounded education, including learning opportunities that may be based on service, experience or work and that may be provided through partnerships with other organizations; and

(iv) Teachers with the opportunity to collaborate, plan and engage in professional development within and across grades and subjects.

(c) Nothing in this subsection prevents a school district or public charter school from maintaining control over course content, format, materials and teaching methods.

(2) The State Board of Education shall continually review and revise all adopted academic content standards necessary for students to successfully transition to the next phase of their education.

(3)(a) School districts and public charter schools must offer students instruction in mathematics, science, language arts, history, geography, economics, civics, higher education and career path skills, personal financial education, physical education, health, the arts and world languages.

(b) Instruction required under paragraph (a) of this subsection must:

Exhibit 1 to Declaration of Colt Gill    2

(A) Meet the academic content standards adopted by the State Board of Education; and

(B) Meet the requirements adopted by the State Board of Education and the board of the school district or public charter school.

**Note:** Sections 2 and 5, chapter 202, Oregon Laws 2019, provide:

**Sec. 2.** (1) The amendments to ORS 329.045 by section 1 of this 2019 Act become operative on September 30, 2026.

(2) Notwithstanding the operative date set forth in subsection (1) of this section, the State Board of Education, no later than September 30, 2024, shall:

(a) Review existing academic content standards to determine if the academic content standards comply with the requirements of ORS 329.045 (1)(b)(B), as amended by section 1 of this 2019 Act; and

(b) If applicable, adopt or revise any academic content standards as necessary to ensure compliance with the requirements of ORS 329.045 (1)(b)(B), as amended by section 1 of this 2019 Act.

(3)(a) A school district must first offer instruction that meets the academic content standards of ORS 329.045 (1)(b)(B), as amended by section 1 of this 2019 Act, no later than the 2026-2027 school year.

(b) Nothing in paragraph (a) of this subsection prevents a school district from first offering instruction that meets the academic content standards of ORS 329.045, as amended by section 1 of this 2019 Act, at any time from the beginning of the social sciences instructional materials cycle adopted by the State Board of Education until the school year set forth in paragraph (a) of this subsection. [2019 c.202 §2]

**Sec. 5.** (1) The Department of Education shall provide professional development to teachers and administrators relating to:

(a) Academic content standards developed pursuant to ORS 329.494 (1), as amended by section 4, chapter 253, Oregon Laws 2019, to ensure that school districts are able to offer instruction that meets the academic content standards of ORS 329.494 (1), as amended by section 4, chapter 253, Oregon Laws 2019, no later than the 2026-2027 school year.

(b) Academic content standards adopted pursuant to ORS 329.045 (1)(b)(B), as amended by section 1, chapter 202, Oregon Laws 2019, and to the selection of textbooks under ORS 337.260, as amended by section 3, chapter 202, Oregon Laws 2019, to ensure that school districts are able to offer instruction that meets the academic content standards of ORS 329.045 (1)(b)(B), as amended by section 1, chapter 202, Oregon Laws 2019, no later than the 2026-2027 school year.

(2) The department may contract for the provision of professional development required by this section.

(3) The State Board of Education shall adopt rules that establish standards and any other criteria for the professional development required under this section. [2019 c.202 §5; 2023 c.588 §3]

(Temporary provisions relating to reviews of standards)

**Note:** Sections 4 to 6, chapter 518, Oregon Laws 2021, provide:

**Sec. 4. Social emotional learning standards and statewide social emotional framework; advisory group.** (1) The Department of Education, in consultation with the Department of Early

Learning and Care and the Teacher Standards and Practices Commission, shall convene an advisory group to propose for adoption by the State Board of Education:

(a) Social emotional learning standards for public school students in kindergarten through grade 12; and

(b) A statewide social emotional framework for public school students in kindergarten through grade 12.

(2) The standards and framework proposed by the advisory group must:

(a) Be developmentally appropriate;

(b) Align with other models and practices of the Department of Education related to mental health;

(c) Include racial equity and trauma-informed principles and practices within strengths-based multitiered systems of support;

(d) Increase public school students' social emotional development;

(e) Promote self-awareness, awareness of others, critical thinking and understanding regarding the interaction between systemic social structures and histories, contributions and perspectives of individuals who:

(A) Are Alaska Native, Native American, Black, African American, Asian, Native Hawaiian, Pacific Islander, Latinx or Middle Eastern;

(B) Are women;

(C) Have disabilities;

(D) Are immigrants or refugees;

(E) Are lesbian, gay, bisexual, transgender, queer, two-spirit, intersex, asexual, nonbinary or another minority gender identity or sexual orientation; or

(F) Have experienced disproportionate results in education due to historical practices; and

(f) Promote the creation of school cultures that support kindness, care, connection, equity, diversity and inclusion.

(3) The advisory group shall submit a report to the board that describes the proposed standards and framework. The board shall consider the report when adopting the standards and framework.

(4) Subject to the direction from the board, the Department of Education shall determine the number and frequency of meetings to be held by the advisory group prior to the submission of the report required under subsection (3) of this section. [2021 c.518 §4]

**Sec. 5. Timelines for standards and framework.** (1) The Department of Education shall convene the advisory group required by section 4 of this 2021 Act no later than September 1, 2021.

(2) The report required under section 4 of this 2021 Act must be submitted to the State Board of Education no later than September 15, 2022.

(3) The board shall adopt social emotional learning standards and the social emotional framework described in section 4 of this 2021 Act no later than September 15, 2023.

(4) The board shall require school districts to implement the standards and framework no later than July 1, 2024. [2021 c.518 §5]

**Sec. 6. Sunset.** Sections 4 and 5 of this 2021 Act are repealed on January 2, 2025. [2021 c.518 §6]

**Note:** Section 1, chapter 406, Oregon Laws 2021, provides:

Exhibit 1 to Declaration of Colt Gill    4

**Sec. 1. Review of social studies standards.** (1) No later than December 31, 2025, the State Board of Education shall review the social studies standards for kindergarten through grade 12.

(2) As part of the review required under subsection (1) of this section, the board shall consult with any combination of the following but must include at least one person who is:

(a) A public school student in any grade from grade 9 through 12;

(b) The parent of a public school student in any grade;

(c) A person who graduated from a public high school in 2015 or any subsequent year;

(d) A public school teacher in any grade from grade 9 through 12;

(e) An education advocate;

(f) A voting rights advocate;

(g) A representative of a culturally specific organization; and

(h) A representative of the Department of Education.

(3) When conducting the review, the board shall consider emphasizing civics education and making more accessible instruction related to:

(a) Voting rights and how to vote;

(b) Current and historical social movements;

(c) The roles of local governments and tribal governments; and

(d) The United States Constitution, the Oregon Constitution and the constitutional form of government in this country. [2021 c.406 §1]

Exhibit 1 to Declaration of Colt Gill    5

**Source: https://www.oregonlegislature.gov/bills_laws/ors/ors337.html**

REQUIRED TEXTBOOKS

**337.260 Textbooks on American history and government.** Every district school board, the State Board of Education and every committee or officer responsible for the adoption of textbooks for use in the public schools shall adopt textbooks on American history and government which adequately stress the services rendered by those who achieved our national independence, who established our form of constitutional government and who preserved our federal union. Respect for all people, regardless of race, color, creed, national origin, age, sex, or disability, and their contributions to our history and system of government shall be reflected in the textbooks adopted by the State Board of Education. [Amended by 1965 c.100 §265; 1975 c.754 §17; 1985 c.388 §2; 1985 c.709 §3; 1991 c.886 §14; 1993 c.45 §§304,305]

**Note:** The amendments to 337.260 by section 3, chapter 202, Oregon Laws 2019, become operative September 30, 2026. See section 4, chapter 202, Oregon Laws 2019. The text that is operative on and after September 30, 2026, including amendments by section 2, chapter 328, Oregon Laws 2023, is set forth for the user's convenience.

**337.260.** Every district school board, the State Board of Education and every committee or officer responsible for the adoption of textbooks and other instructional materials for use in the public schools shall adopt textbooks and other instructional materials on American history and government that adequately stress the services rendered by those who achieved our national independence, who established our form of constitutional government and who preserved our federal union. Textbooks and other instructional materials shall adequately address the roles in and contributions to the economic, political and social development of Oregon and the United States by men and women who:

(1) Are Native American;

(2) Are of European, African, Asian, Pacific Island, Chicano, Latino, Middle Eastern or Jewish descent;

(3) Have disabilities;

(4) Are immigrants or refugees; or

(5) Are lesbian, gay, bisexual or transgender.

**Note:** Section 5, chapter 202, Oregon Laws 2019, provides:

**Sec. 5.** (1) The Department of Education shall provide professional development to teachers and administrators relating to:

(a) Academic content standards developed pursuant to ORS 329.494 (1), as amended by section 4, chapter 253, Oregon Laws 2019, to ensure that school districts are able to offer instruction that meets the academic content standards of ORS 329.494 (1), as amended by section 4, chapter 253, Oregon Laws 2019, no later than the 2026-2027 school year.

(b) Academic content standards adopted pursuant to ORS 329.045 (1)(b)(B), as amended by section 1, chapter 202, Oregon Laws 2019, and to the selection of textbooks under ORS 337.260, as amended by section 3, chapter 202, Oregon Laws 2019, to ensure that school districts are able to offer instruction that meets the academic content standards of ORS 329.045 (1)(b)(B), as amended by section 1, chapter 202, Oregon Laws 2019, no later than the 2026-2027 school year.

Exhibit 1 to Declaration of Colt Gill      6

(2) The department may contract for the provision of professional development required by this section.

(3) The State Board of Education shall adopt rules that establish standards and any other criteria for the professional development required under this section. [2019 c.202 §5; 2023 c.588 §3]