**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| AMERICAN FEDERATION OF TEACHERS, *et al.* | |
| Plaintiffs, | |
| v. | Case No. 1:25-cv-00628-SAG |
| UNITED STATES DEPARTMENT OF EDUCATION, *et al.* | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

# **TABLE OF CONTENTS**

Introduction ............................................................................................................1

Background .............................................................................................................4

    I.    ED's Title VI Guidance Following the SFFA  Decision in 2023 .............4

    II.   ED's February 2025 Title VI Guidance and Reporting Portal...................5

    III.  This Litigation ............................................................................................7

Legal Standard .......................................................................................................9

Argument...............................................................................................................10

    I.    Plaintiffs lack standing and therefore Cannot Succeed on the Merits .....10

        A. Plaintiffs AFT, AFT-MD, and ASA cannot establish organizational standing...................................................................................................11

        B. Plaintiffs have failed to establish associational standing ...................12

        C. The Eugene School District also cannot establish standing................14

    II.   Plaintiffs cannot state a claim under the APA because they do not challenge any final agency action ...........................................................16

    III.  Plaintiffs are unlikely to succeed on the merits of their APA claims ......18

        A. The DCL does not violate the APA's notice and comment requirement.........................................................................................19

        B. The DCL is within ED's statutory authority and consistent with applicable law.....................................................................................19

C. The DCL is not arbitrary and capricious ..............................................20

IV.   Plaintiffs are unlikely to succeed on the merits of their Constitutional claims ..................................................................................................23

A. Plaintiffs Cannot Establish Likelihood of Success on Fifth Amendment Claims ..............................................................................................23

i. The DCL affords more notice than ED is required to provide before exercising its enforcement discretion ..............................................25

ii. The DCL is not vague because it clearly reiterates well-established prohibitions on discriminatory conduct .........................................26

B. Plaintiffs Are Unlikely to be Successful on Their First Amendment Claims ..............................................................................................27

i.   The DCL does not censor protected speech or intrude on academic freedom ..........................................................................................28

ii. ED's longstanding conditioning of federal funding on non-discrimination is not coercive .......................................................30

V.   Plaintiffs do not face irreparable harm .......................................................31

VI.   The balance of the equities weighs against an injunction ........................32

VII.   Any Injunction Should Be Narrowly Tailored and Permit Lawful Agency Action ..............................................................................................33

CONCLUSION ..................................................................................................34

# INTRODUCTION

This lawsuit challenges a Dear Colleague Letter ("DCL") issued by the U.S. Department of Education ("ED") on February 14, 2025 to explain ED's understanding of the preexisting requirements of the Equal Protection Clause of the Constitution and Title VI of the Civil Rights Act in accordance with the Supreme Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ("*SFFA*"). As it states explicitly, the DCL does not have the force or effect of law and does not bind the public or create new legal standards.

Nonetheless, three nonprofit associations purporting to represent educators in Maryland and across the United States, and one school District from Eugene Oregon, have filed suit challenging the DCL, a related "Frequently Asked Questions" ("FAQ") document, and an online portal for the public to report illegal discrimination; Plaintiffs contend that all three violate the First and Fifth Amendments to the U.S. Constitution and the Administrative Procedure Act ("APA"). Plaintiffs have filed two separate motions for preliminary injunction which are now before the Court. The first seeks an order enjoining ED from implementing or enforcing the DCL and FAQ, and requiring ED to remove the DCL, FAQ and public complaint portal from ED's website. The second asks the Court to stay any requirement that state school commissioners respond to an April 3, 2025 request from ED that they certify their compliance with Title VI.

Plaintiffs also ask that the Court order ED to remove all evidence of any post-January 20, 2025 Title VI guidance from its website, restore all pre-January 20, 2025 Title VI guidance removed from the website, *and* going forward, enforce Title VI only insofar as it is consistent with ED's pre-January 2020 guidance. This proposed relief goes well beyond the proper scope of a preliminary injunction and indicates that Plaintiffs seek not an injunction but a time machine – rewinding the clock to before *SFFA* was decided.

-1-

Through their second motion for preliminary injunction, Plaintiffs also contend that an April 3, 2025 requirement that each State's Commissioner overseeing K-12 schools certify compliance with Title VI on or before April 24, 2025, violates the First and Fifth Amendments and the APA. In this second April 9, 2025 motion for preliminary injunction, Plaintiffs seek to stay the deadline for compliance with the certification requirement, and to preclude ED from taking any action with respect to any State based on any response, or lack of response to ED's request. ECF 37.

Both motions for preliminary injunction should be denied as Plaintiffs cannot establish standing to challenge ED's actions, are unlikely to succeed on the merits of their claims and do not face irreparable harm, and the public interest weighs against an injunction halting ED's enforcement of the nation's civil rights laws.

With respect to the three Plaintiff membership organizations, they cannot establish standing based on either an organizational or an associational theory. They cannot establish organizational standing because they fail to demonstrate ED's issuance of the documents at issue is directly interfering with their core business activities; they fail to establish associational standing because they have not shown that any one of their members would have standing to sue in his or her own right. With respect to the Eugene Oregon School District, neither its purported confusion about how to reconcile ED's guidance regarding interpretation of a federal civil rights statute with state or local laws, nor its representations regarding the need to modify instruction to comply with federal law provide it with standing.

Moreover, all four Plaintiffs' alleged injuries are based on actions taken by the states or organizations that oversee them, speculative harm to their members or school district, or admitted self-censorship. Plaintiffs' contention that their members are "worried they must self-censor their

speech, including lectures, courses, programs, and other activities" due to the DCL, simply fails to allege a concrete harm that entitles them to standing. ECF 31-1 at 36. The worry that a future harm may occur is both hypothetical and highly speculative. Plaintiffs' allegations that the states or school commissioners that employ or direct them will issue guidance or requirements based on their understanding, or misunderstanding of ED's position is also insufficient for standing; even if they materialize, these harms flow from third parties, and are not directly traceable to ED.

Further, Plaintiffs' APA claims fail as a threshold matter because the DCL, FAQ, reporting portal, and certification requirement simply do not constitute final agency actions under the APA because they do not have the force and effect of law. Plaintiffs therefore cannot state an APA claim as a matter of law, and the Court lacks the jurisdiction to hear their claims.

On the merits, Plaintiffs' constitutional claims are unlikely to succeed because the DCL, FAQ, reporting portal, and certification requirement are not unconstitutionally vague and do not implicate speech protected by the First Amendment—they provide guidance from an executive agency regarding compliance with Title VI's existing prohibitions on racial discrimination.

Plaintiffs claim that the DCL, FAQ and related actions were arbitrary and capricious and that ED's guidance was required to go through notice-and-comment rulemaking; these claims are unlikely to succeed on the merits. Since the DCL meets the definition of an interpretive rule under the APA, the APA explicitly exempts it from notice-and-comment rulemaking. Moreover, the guidance, reporting portal and request for certification by ED are entirely consistent with its interpretive authority over Title VI and responsibility to ensure recipients of federal funding are not engaged in unlawful discrimination. ED's explanation of how it intends to exercise this enforcement discretion does not conflict with any other governing federal statutes or attempt to prescribe specific lesson plans or school curricula. Lastly, Plaintiffs cannot establish that the DCL,

FAQ, the reporting portal, or the request for certification are arbitrary and capricious based on their contention ED has failed to properly consider "the critical role that states and localities play in education" or the impact of the change in ED's "approaches to Title VI interpretation and enforcement on underserved communities and students facing discrimination." ECF 31-1 at 40. ED's guidance reflects a reasonable interpretation of Title VI in light of the Supreme Court's decision in *SFFA* and is rationally grounded in the longstanding principle that policies, programs and practices that classify on the basis of race are unlawful unless justified by a compelling interest.

Because Plaintiffs have not even demonstrated an injury-in-fact for Article III standing purposes, they cannot establish that they face any imminent, irreparable harm in the absence of injunctive relief. Finally, given that the public interest in diligent enforcement of the nation's civil rights laws is extraordinarily high, the balance of equities weighs against a preliminary injunction.

Accordingly, the Court should deny Plaintiffs' requests for preliminary relief.

## BACKGROUND

### I.     ED's Title VI Guidance Following the *SFFA* Decision in 2023.

To effectuate the promises of the Equal Protection Clause and Title VI of the Civil Rights Act of 1964, Federal agencies have published guidance and regulations to ensure that schools provide equal access to education regardless of a student's race. *See generally Nondiscrimination in Federally-Assisted Programs of the department of Health, Education, and Welfare—Effectuation of Title VI of the Civil Rights Act of 1964*, 29 Fed. Reg. 16298-305 (Dec. 4, 1964). The Department of Education Organization Act ("DEOA") recognized, among other things, that "there is a continuing need to ensure equal access for all Americans to educational opportunities of a high quality, and such educational opportunities should not be denied because of race." P.L. 96-88, Title I, § 101, Oct. 17, 1979, 93 Stat. 669, *codified at* 20 U.S.C. § 3401(2). In 2023, the Supreme Court decided *SFFA*, resolving two separate cases challenging the consideration of

applicants' race as a plus factor in their higher-education admissions by Harvard College and the University of North Carolina, which claimed that their practices were designed to achieve a diverse student body. 600 U.S. 181. The Court held that the schools' use of race violated the Equal Protection Clause of the Fourteenth Amendment. *Id.* The decision noted that the Court has to date recognized only two compelling interests the government may have in considering a person's race for purposes of satisfying strict scrutiny; the first is an interest in "remediating specific, identified instances of past discrimination that violated the Constitution or a statute," and the second is in "avoiding imminent and serious risks to human safety in prisons, such as a race riot." *Id.* at 207. In handing down its ruling, the Court announced that "[t]he time for making distinctions based on race had passed" and that "[e]liminating racial discrimination means eliminating all of it." *Id.* at 204, 206. The Court noted that "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI." *Id.* at 198 n.2 (quoting *Gratz v. Bollinger*, 539 U.S. 244, 276, n. 23 (2003)).

Following the decision in *SFFA*, ED issued a Dear Colleague Letter ("2023 DCL") and Frequently Asked Questions ("2023 FAQ") to provide guidance on how to comply with *SFFA*, and continue "to promote diversity and full inclusion". . . . Exhs. 15, 16; ECF 31-18, 31-19. That guidance also noted ED's "continued commitment to vigorous enforcement of Titles IV and VI of the Civil Rights Act of 1964 from early childhood through postsecondary education." *Id.* at 3. In September 2023, ED also released a more detailed guidance document entitled "Strategies for Increasing Diversity and Opportunity in Higher Education" that provided additional strategies to avoid discrimination in violation of civil rights laws. *See* Exh. 24 at ECF 31-27.

## II.    ED's February 2025 Title VI Guidance and Reporting Portal.

On February 14, 2025, ED issued the Dear Colleague Letter challenged in this case. Exh. 11 at ECF 31-14. It explains that Title VI forbids discriminatory practices in which "an educational

institution treats a person of one race differently than it treats another person because of that person's race." DCL at 2. The letter explains that the strict scrutiny analysis of Equal Protection, as well as the analysis of whether a school is in compliance with Title VI, will turn on a central question: does the school "treat[] a person of one race differently than it treats another person because of that person's race?" DCL at 2. The DCL also provides further detail regarding how ED understands Title VI to apply following *SFFA*; however, the DCL is explicit that its "guidance does not have the force and effect of law and does not bind the public or create new legal standards." *Id*. at 1, n.3.

On February 27, 2025, ED launched a public portal, https://enddei.ed.gov/, for parents, students, teachers, and the broader community to submit reports of illegal discriminatory practices, which ED could "utilize to identify potential areas for investigation" to determine whether those schools were engaging in discriminatory behavior. *See* March 1, 2025 Press Release, U.S. Department of Education Launches "End DEI" Portal (Feb. 27, 2025).[1]

On February 28, 2025, ED released a Frequently Asked Questions document "to anticipate and answer questions that may be raised in response to the [DCL]." Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act at 1 (Feb. 28, 2025), https://perma.cc/WK7Z-JBC2. On April 9, 2025, ED issued a revised version of the FAQs.[2] This updated document reiterates that ED's interpretations "do not have the force and effect of law and do not bind the public or impose new legal requirements." *Id*. at 1, n.3. It also reaffirms ED's commitment to "enforce[] federal civil rights law consistent with the First Amendment" and

---

[1]     *U.S. Department of Education Launches "End DEI" Portal*, February 27, 2025: https://www.-ed.gov/-about/-news/-press-release-/us-department-of-education-launches-end-dei-portal

[2]     *Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act*, April 9, 2025: https://-www.ed-.gov/-media/-documen-t/frequently-asked-questions-about-racial-preferences-and-stereotypes-under-title-vi-of-civil-rights-act-109530.pdf.

confirms that "[n]othing in Title VI, its implementing regulations, or the Dear Colleague Letter requires or authorizes a school to restrict any rights otherwise protected by the First Amendment." *Id*. at 6.

The DCL and FAQ articulate ED's concerns with diversity, equity, and inclusion ("DEI") *programs*—not concepts—and their susceptibility to treating individuals differently on the basis of race. But as the FAQs emphasize, a finding of discrimination will not turn on whether a school program uses "specific terminology such as 'diversity,' 'equity,' or 'inclusion.'" *Id*. Rather, all school programs—DEI or otherwise—"must consider whether [they] discourage[] members of all races from attending, either by excluding or discouraging students of a particular race or races, or by creating hostile environments based on race for students who do participate." *Id*.

On April 3, 2025, ED's Office for Civil Rights ("OCR") emailed a letter to all State Departments of Education directing that each State Education Commissioner certify their compliance with legal obligations under Title VI and *SFFA* and confirm they were not engaged in any illegal practices or programs that advantage one's race over another. *See* April 3, 2025, ED Email, Reminder of Legal Obligations Undertaken in Exchange for Receiving *Federal Financial Assistance and Request for Certification*. Exhs. 43, 43 at ECF 37-8, 37-9. On April 7, 2025, OCR sent a follow-up email notifying all recipients of the April 3 email that ED had granted all States and LEAs a 10-day extension through April 24, 2025 to review their programs and activities, and certify their compliance with Title VI's anti-discrimination requirements.

## III.    This Litigation.

On February 25, 2025, Plaintiffs American Federation of Teachers ("AFT"), American Federation of Teachers-Maryland ("AFT-MD"), and the American Sociological Association ("ASA"), filed a complaint for declaratory and injunctive relief against the United States

Department of Education as well as Acting Education Secretary Denise L. Carter[3] and Acting Assistant Secretary for Civil Rights Craig Trainor in their official capacities. *See* Compl., ECF No. 1. AFT, and ASA are national membership organizations; according to the Complaint they serve 1.8 million "education professionals" nationwide and 9,000 sociologists respectively. ECF 1 at ¶¶17-19. AFT-MD is described as a local AFT affiliate, purporting to represent approximately 18,000 Maryland educators at all levels of instruction. *Id.* at ¶19. The Complaint alleged that the DCL violated the Plaintiffs First and Fifth Amendment Rights, alleged that the DCL was a final agency action, and sought injunctive relief under the APA.

On March 5, 2025, Plaintiffs amended their complaint to add a new Plaintiff, Eugene Oregon School District 4J ("EOSD"), a K-12 public school district in Oregon serving approximately 16,000 students. ECF 14 at ¶22. The Amended Complaint includes new allegations that the FAQ and reporting portal also violate the First and Fifth Amendment, and various provisions of the APA. ECF 14 at ¶¶ 6, 45-49, 54-58, 76.

On March 28, 2025, Plaintiffs filed a motion for preliminary injunction alleging irreparable harm, and seeking an order: (1) removing and revoking the DCL and FAQ and blocking ED from initiating investigations, assessing compliance, or terminating any federal awards, contracts or obligations based on the DCL or FAQ, (2) blocking ED from implementing the DCL or reinstating it under a different name; (3) deactivating and removing the End DEI Portal from the ED website; (4) requiring that any ED investigation or enforcement regarding Title VI be consistent with the 2023 and 2024 ED guidance; (5) requiring that ED restore the 2023 and 2024 Title VI ED guidance its website, and restore all guidance that has been removed since January 20, 2025; (6) entering a

---

[3]     Pursuant to Rule 25 of the Federal Rules of Civil Procedure ("FRCP"), Secretary of Education Linda McMahon is automatically substituted for former Acting Secretary Carter.

preliminary injunction consistent with these terms to the maximum extent permitted by FRCP 65(d)(2). ECF 31-2.

On April 4, 2025, the American Civil Liberties Union of Maryland ("ACLU-MD") and PEN American, Inc. ("PEN") filed an Amicus Brief in support of Plaintiffs' Motion for Preliminary Injunction. ECF 34-1.

On April 9, 2025, Plaintiffs filed a second motion for preliminary injunction, alleging irreparable harm, specifically directed at ED's K-12 certification requirement. The second motion for preliminary injunction seeks: (1) an order holding the certification requirement in abeyance for an indeterminate amount of time; (2) enjoining ED or anyone acting on its behalf from initiating any investigations, assessments of compliance or taking any action against any educational institution, including pausing, freezing, cancelling or terminating any funding, awards, contracts or other obligations based on the certification, signed or unsigned; and (3) that any already signed certifications are null and void until further order of the Court. ECF 37-2.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (cleaned up). "A preliminary injunction may "only be awarded upon a clear showing that the plaintiff is entitled to relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22-24 (2008). Plaintiffs must satisfy four elements to show entitlement to a preliminary injunction: first, they must show that they are likely to succeed on the merits; second, that they will likely experience irreparable harm unless the court grants relief; third, that the balance of equities weighs in their favor; and fourth that an injunction is in the public interest. *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023), *citing Winter*, at 20. The last two factors – balance of the equities and analysis of the public interest, merge when the federal government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "Issuing a

preliminary injunction based only on a *possibility* of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a 'clear showing' that the plaintiff is entitled to relief." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017), citing *Winter*, at 22.

## ARGUMENT

## I.    Plaintiffs lack standing and therefore Cannot Succeed on the Merits

The constitutional criteria required to establish an Article III  "case[]" or "controvers[y]" include "[f]irst, an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) 'actual or imminent,' not 'conjectural' or 'hypothetical.'  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up).  "Moreover, as the Supreme Court has explained, if the "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed."  *See Lujan*, 504 U.S. at 561-62 (1992) (emphasis in original).

Here, Plaintiffs are not the "object" of the government action, and experience solely attenuated effects of the government's regulation of someone else and therefore "much more is needed" to demonstrate Article III standing. *Lujan*, *supra*.  They fall woefully short. Plaintiffs rely on two theories of injury: (1) organizational injury, i.e. alleging harm to their own organizational interests, and (2) associational injury, *i.e.* alleging harm on behalf of their members.  *See Southern Walk v. OpenBand*, 713 F.3d 175, 184 (4th Cir. 2013). Neither theory has merit.

**A.** **Plaintiffs AFT, AFT-MD, and ASA cannot establish organizational standing.**

First, Plaintiffs AFT, AFT-MD, and ASA ("the membership organizations") fail to demonstrate organizational standing because they have not demonstrated they are suffering or will imminently suffer any concrete, imminent, and direct harm due to the challenged guidance. "In determining whether [an organization] has standing [in its own right, courts] conduct the same inquiry as in the case of an individual: Has the plaintiff '"alleged such a personal stake in the outcome of the controversy" as to warrant his invocation of federal-court jurisdiction'?" *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982) (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977). An organization claiming standing in its own right must adequately allege that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Southern Walk*, 713 F.3d at 184. "[A]n injury to organizational purpose, without more, does not provide a basis for standing." *Id.* at 183.

Here, none of the membership organizations allege that they are suffering any concrete, organizational injuries due to the DCL, FAQ, complaint portal, or certification requirement. For example, in his declaration, General Counsel for AFT stated that the motion for preliminary injunction detailed "how the Department's issuance of the Dear Colleague Letter has impacted AFT members" while offering no specific facts about how the DCL directly impacted AFT in its own right. ECF 37-5 at 7. AFT-MD's declaration similarly includes a section describing how the DCL affects AFT-MD's members, but does not identify any direct concrete harm to AFT-MD itself. *See* ECF 31-6 at ¶¶ 26-31. The same is true for ASA. *See* ECF 31-5 at ¶¶ 24-28.

Plaintiffs' chief complaint is that the DCL generally frustrates their organizational missions.[4] But as the Supreme Court reiterated this past Term, to establish organizational standing, plaintiffs "must show far more than simply a setback to the organization's abstract social interests," and "impair[ment]" to plaintiffs' "ability to provide services and achieve their organizational mission" does not satisfy standing. *Food & Drug Admin. v. All. for Hippocratic Med.* (*FDA*), 602 U.S. 367, 394 (2024) (citations omitted). As such, Plaintiffs' general assertions of frustration are insufficient for purposes of Article III standing.

Having alleged no direct injury, the membership organizations cannot claim standing in their own right.

### B.     Plaintiffs have failed to establish associational standing.

Plaintiffs also fail to establish associational standing, which requires an association to show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343, (1977). Here, Plaintiffs have not even alleged facts which show that at least one of its members is actually suffering or will *imminently* suffer an injury in fact fairly traceable to ED's actions that is likely to be redressed by a favorable decision.

Instead, Plaintiffs describe theoretical and potential future harm that their members as (1) uncertainty, (2) chilled First Amendment speech and activities, (3) fear of investigation, and (4)

---

[4]     Plaintiffs' motion (ECF 31) argues that the DCL and FAQ have impacted "Plaintiffs and Plaintiffs' members" and has "caused uncertainty about what work they can do; chilled their speech, conduct, and associational rights; created fears of investigation for lawful conduct; and threatened loss of federal funding . . . . Plaintiffs and their members have no way of knowing whether the work they do may be found to run afoul  of the Letter." ECF 31-1 at 16.  They contend that "Plaintiffs and their members have no way to know whether the work they do may be found to run afoul of the letter." *Id*. at 46.

risk of funding loss.  *See* ECF 31-1 at 7-11.  Those categories can be broken down into subgroups for purposes of an injury-in-fact analysis: (a) fear of enforcement/investigation and (b) chilled expression. Both of these alleged harms are insufficient to establish injury-in-fact for standing purposes, primarily because they are speculative and subjective.

When plaintiffs seek to establish standing through a fear of future injury via investigation, they can show a sufficiently imminent injury in fact if they can show there is a credible threat of future enforcement that is not imaginary or wholly speculative. *See Babbitt v. United Farm Workers*, 442 U.S. 289, 298 (1979). In this case, however, such fears are wholly speculative because the DCL only restates existing law post *SFFA*. *See* ECF 31-14.  AFT, AFT-MD and ASA do not point to any evidence of a credible threat of future enforcement action against one of individual members; nor could they, as school systems would be the object of any potential Title VI investigation by ED; *not* the organization or their individual members.

To demonstrate injury in fact based on a fear that  their members speech or other expressive activities will be chilled, the chilling effect must be objectively reasonable and not subjective or speculative. *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013).  In this case, however, Plaintiffs express their fear of self-censorship in subjective and speculative terms, for example: "topics and themes that have long been part of Plaintiffs' members' teachings are now potentially suspect and may require censoring."  *See* ECF 31-1 at 8.

Plaintiffs' members' fears are also unreasonable because the DCL does not prohibit teachers from teaching certain books, the history of race, racism, and slavery, gender, or any other topic.  *See* DCL at 3 (advising schools to ensure their policies comply with civil rights laws, their programs do not use racial proxies, and that their contractors also comply—*not* addressing teachers or directing curricula change).  ED has long made clear that, pursuant to its statutory authority, it

does not "exercis[e] control over the content of school curricula." ECF 31-17, FAQ at 6. For these reasons, the Plaintiff membership organizations have failed to establish injury-in-fact.

Even assuming Plaintiffs suffered in injury, they cannot show that the injury is traceable to the DCL. The Supreme Court has emphasized that a "threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. 398 at 414. Both categories of injuries, fear of investigation and chilled speech, are based on speculation about what actions ED will take based on the DCL. However, the DCL is clear that it restates existing law, which ED is responsible for enforcing. Any such enforcement is not traceable to the issuance of the DCL. Indeed, Plaintiffs' use speculative language when describing this fear: "the risk of potential investigation is increased by the 'End DEI' portal, which solicits discrimination complaints with misleading statements about DEI." This risk, rests on speculation about the decisions of independent actors who may or may not use the complaint portal, underscoring the speculative, attenuated nature of any potential injury based on the DCL. *See Clapper*, 568 U.S. at 414. This attenuation, combined with the reliance upon third parties, makes it far from clear that these harms are "certainly impending." *Clapper*, 568 U.S. at 414.

**C.    The Eugene School District also cannot establish standing.**

The standing inquiry must be evaluated separately as to each defendant. *See Bostic v. Schaefer*, 760 F.3d 352, 370-71 (4th Cir. 2014) ("The Plaintiffs' claims can therefore survive Schaefer's standing challenge as long as one couple satisfies the standing requirements with respect to each defendant."). The Amended Complaint first asserting claims by Plaintiff EOSD is entirely

devoid of factual allegations *specifically addressing standing*.  *See* ECF 14.[5] Since EOSD bears

the burden to demonstrate that they have standing, their failure to plead facts which would establish

standing is fatal to their request for injunctive relief.  *See Disability Rts. S.C. v. McMaster*, 24 F.4th

893, 902 (4th Cir. 2022) (school district could not establish standing in suit against the governor

regarding statute that they contended would impact the availability of funds for disability

education, finding that the mere fact that the governor had a duty to enforce state laws and had

publicly endorsed and defended the statutes does not make him a proper defendant in every action

attacking the constitutionality of a statute).

To the extent their failure to plead standing is not fatal, Plaintiffs generally allege that

EOSD is impacted because: (1) Oregon state law requires that the state department of education

develop, and school districts implement certain subjects which they allege appear to be "in

conflict" with the DCL, which they contend "leaves school districts…unclear as to how to meet

their obligations under law while also protecting the federal funding that the [DCL] threatens" (*Id.*

at ¶¶53, 54); (2) that while the DCL specifically acknowledges protections for "First Amendment

freedoms and curriculum choices" the "vague explanation" of some terms in the DCL and FAQ

leave open the question of whether "a teacher ensuring that Black students are able to voice their

views during a discussion on slavery could still be prohibited by the Letter." *Id.* at ¶55.

These allegations are simply insufficient to establish standing by the EOSD.  A plaintiff's

injury satisfies the traceability element of standing when there is "a causal connection between the

injury and the [defendant's] conduct complained of" by the plaintiff. *Air Evac EMS, Inc. v.*

---

[5]    The Amended Complaint, ECF 14 at ¶ 22, alleges that Plaintiff Eugene School District 4J ("District 4J") is a K-12 public school district in Oregon's southern Willamette Valley that serves approximately 16,000 students including thirty-one public schools, and five publicly funded charter schools funded by the school district, and that "approximately 35% of students in District 4J are Black, Indigenous, Latino/a, or otherwise people of color."

*Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018). "While the defendant's conduct need not be the last link in the causal chain, the plaintiff must be able to demonstrate that the alleged harm was *caused by the defendant, as opposed to the 'independent action of some third party not before the court*.'" *Id.* (emphasis added) (quoting *Frank Krasner Enters., Ltd. v. Montgomery Cnty.*, 401 F.3d 230, 234 (4th Cir. 2005)). In addition, the threatened injury must be certainly impending; "allegations of possible future injury are insufficient." *Hierholzer v. Guzman*, 125 F.4th 104, 113 (4th Cir. 2025) citing *Buscemi v. Bell*, 964 F.3d 252, 259 (4th Cir. 2020). Here, the EOSD simply cannot establish direct traceability or certain and impending injury.

In sum, because Plaintiffs' alleged harms rely entirely upon unsubstantiated, subjective fears and attenuated chains of causation dependent upon actions that third parties may or may not take, no Plaintiff has shown the requisite harm to establish standing.[6]

## II. Plaintiffs cannot state a claim under the APA because they do not challenge any final agency action.

The APA directs courts to review "[a]gency action made reviewable by statute and final agency action."  5 U.S.C. § 704.  A plaintiff who fails to challenge "final agency action" fails to state an actionable claim under the APA. *Flue-Cured Tobacco Coop. Stabilization Corp. v. U.S.E.P.A.*, 313 F.3d 852, 857 (4th Cir. 2002) (EPA report was not "final agency action" and district court lacked subject matter jurisdiction to hear plaintiffs' claims). Final agency actions are those that "mark the consummation of the agency's decisionmaking process" and "by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted).  The DCL is explicit that it "does not have

_____

[6]      Defendants note that the doctrine of associational standing has been questioned in recent years, and there are doubts as to its continued viability.  *See, e.g.*, *All. for Hippocratic Med.*, 602 U.S. at (Thomas, J., concurring) ("Our third-party standing doctrine is mistaken. . . . . [A] plaintiff cannot establish an Article III case or controversy by asserting another person's rights. . . . Associational standing . . . is simply another form of third-party standing.").

the force and effect of law and does not bind the public or create new legal standards." DCL at 1, n. 3. Because the DCL does not have the force and effect of law, bind the public, or create new legal standards, it cannot plausibly have finally determined anyone's rights or obligations or had direct legal consequences.

Indeed, the DCL clearly and comfortably fits within the APA's definition of an "interpretive rule." 5 U.S.C. §§ 553(b)(A), (d)(2). An interpretive rule is "'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quoting *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 99 (1995)). Such rules do not have the force and effect of law, which distinguishes them from "legislative rules" that are subject to more rigorous procedures. *Id*. The purpose of interpretive rules is to provide notice to regulated entities of how an agency intends to exercise its enforcement discretion. "[I]nterpretative rules or statements of policy generally do not qualify [as final agency action] because they are not 'finally determinative of the issues or rights to which [they are] addressed.'" *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013) (quoting Judge Harry T. Edwards et al., *Federal Standards of Review* 157 (2d ed. 2013)). To the contrary, any legal consequences from an interpretive statement ultimately flow from the statute the statement interprets. *See Rhea Lana, Inc. v. Dep't of Lab.*, 824 F.3d 1023, 1028 (D.C. Cir. 2016) (finding that a letter from Department of Labor interpreting the Fair Labor Standards Act "created no new legal obligations beyond those the [statute] already imposed"). Here, any hypothetical legal consequences flow from Title VI and the Equal Protection Clause, not the DCL.

The DCL does no more than reiterate the agency's interpretation of Title VI. DCL at 1 (This letter "explains and reiterates *existing legal requirements* under Title VI of the Civil Rights Act of 1964" (emphasis added)). Moreover, the DCL expressly states that it does not have the

force and effect of law: it was not published in the C.F.R., and it did not rely on ED's rulemaking authority. *See Guedes v. BATFE*, 920 F.3d 1, 19 (D.C. Cir. 2019) (describing each of these as factors in evaluating whether a document is an interpretive rule).

The FAQ, which anticipates questions recipients may have regarding the DCL, is also not "final agency action" within the meaning of the APA for the same reasons the DCL is not. Like the DCL, the FAQ states, "[t]he contents of this Q&A document do not have the force and effect of law and do not bind the public or impose new legal requirements." FAQ at 1 n.3. And it too seeks only to "provide clarity about *existing law* for the benefit of the public." *Id*. (emphasis added). Finally, it also was not published in the C.F.R. and did not rely upon ED's rulemaking authority. *See Guedes*, 920 F.3d at 19.

Because the DCL is at most an interpretive rule that does not have the force and effect of law, and because neither the DCL nor the FAQs determine rights or obligations or have legal consequences, Plaintiffs have not established that they are challenging a "final agency action" within the meaning of the APA, and fail to state a valid cause of action under the APA. *NAACP v. Bureau of the Census*, 945 F.3d 183, 189 (4th Cir. 2019) (affirming dismissal of case challenging census plan, finding that district court correctly concluded that suit did not challenge a "final agency action").

## III.    Plaintiffs are unlikely to succeed on the merits of their APA claims.

Plaintiffs' APA arguments also are unlikely to succeed on the merits, as ED is vested with statutory authority to enforce the civil rights laws, and the DCL, FAQ, reporting portal and certification requirement are consistent with longstanding interpretation of Title VI and the Equal Protection Clause.

### A.    The DCL does not violate the APA's notice and comment requirement.

Plaintiffs' argument that the DCL is procedurally invalid because it did not go through notice-and-comment rulemaking applies the wrong procedural requirement.  While legislative rules must go through notice and comment, the APA explicitly exempts interpretive rules like the DCL from such procedures.  5 U.S.C. § 553(b)(A) ("Except when notice or hearing is required by statute, this subsection does not apply . . . to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice."); *see also Perez*, 575 U.S. at 105 ("the text of the APA makes plain: 'Interpretive rules do not require notice and comment.'").  "The absence of a notice-and-comment obligation makes the process of issuing interpretive rules comparatively easier for agencies than issuing legislative rules.  But that convenience comes at a price: Interpretive rules "do not have the force and effect of law and are not accorded that weight in the adjudicatory process."  *Perez*, 575 U.S. at 97.  As was just discussed, the DCL is an interpretive rule; therefore, it is exempt from notice and comment.  *Id.*

### B.    The DCL is within ED's statutory authority and consistent with applicable law.

Plaintiffs' argument that the DCL and FAQ are outside ED's statutory authority, and contradict applicable statutes and existing regulations implementing Title VI, are entirely without merit.

First, Plaintiffs contend that the DCL violates the DEOA. ECF 31-1 at 44, citing 20 U.S.C. § 3403(b) (ED shall not exercise "direction, supervision, or control" over, inter alia, "the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, over any accrediting agency or association, or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system).  However, they do not identify specific sections of any of the

documents that conflict with the DEOA. They merely state in conclusory form that the DCL violates the DEOA "by directing what educators and institutions can teach in ways that are not required by Title VI." ECF 31-1 at 44. *Second*, Plaintiffs' proffer, without support or argument, that the DCL runs afoul of "several additional federal statutes that govern the administration of federal education programs" which "prohibit the Department's control over curriculum and related programs." *Id.*, citing 20 U.S.C. §§ § 1132-2, 1232a, 7906a(a). Neither of these are true.[7]

The DCL merely informs schools that they must not discriminate among students when implementing their curricula and must avoid stereotyping and stigmatizing based on race. There is a critical distinction between ED prescribing curricula or exercising control over school administration and ED requiring that schools act in a nondiscriminatory manner in implementing their curricula and executing administrative decisions so that they avoid stereotyping and stigmatizing based on race. Plaintiffs' conflation of the two would leave little room for ED to enforce the civil rights laws.

### C.    The DCL is not arbitrary and capricious.

Plaintiffs contend that the DCL is arbitrary and capricious on the basis that it (1) fails to explain its departure from ED's prior guidance; (2) unreasonably interprets *SFFA*; and (3) fails to consider important aspects of the problem it addresses. ECF 31-1 at 24-34. Review under the arbitrary and capricious standard is "deferential," *Dep't of Com. v. New York*, 588 U.S. 752,773 (2019), and merely examines whether the agency's decision "was the product of reasoned decisionmaking," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463

---

[7]    Moreover, the DEOA should not be read in a manner that would frustrate Title VI's nondiscrimination requirements. *See 289 Kilvert, LLC v. SBC Tower Holdings LLC*, 133 F,4th 1, 3 (1st Cir. 2025) ("Simply put, we do not interpret a statute's text 'in a vacuum'; we read the words 'in their context and with a view to their place in the overall statutory scheme.'" (quoting *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016))); *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 500 (2018) (applying the interpretive "canon against reading conflicts into statutes").

U.S. 29, 52 (1983). Because the DCL's guidance is both reasonable and reasonably explained, *FCC v. Prometheus Radio Project*, 592 U.S. 414, 417 (2021), it satisfies the deferential "arbitrary and capricious" standard.

As observed by ED in the DCL, under the standard articulated in *SFFA*, many Diversity, Equity, and Inclusion programs *may* violate the Equal Protection Clause—and thus also Title VI—by introducing "explicit race-consciousness into everyday training, programming, and discipline." DCL at 1. As a result, DEI programs "frequently preference certain racial groups" in ways that make them more susceptible to discriminating based on race. *Id*. In making this observation, ED simply applied the longstanding principle that policies that distinguish or classify on the basis of race are not lawful unless justified by a fact-supported compelling interest.

On the issue of ED's prior guidance, the 2023 guidance Plaintiffs seek to resurrect—like the 2025 guidance at issue in this case—was at best an interpretative rule that does not have the force and effect of law. ED therefore is not required to provide any explanation for its "departure" from that guidance. But, to the extent there might be any such requirement, the DCL simply explains that it would be unlawful for schools to use practices that appear race neutral as a covert means of selecting or rejecting students because of their race, (2025 DCL at 2-3); this is exactly what the Supreme Court held would not satisfy strict scrutiny in *SFFA*, 600 U.S. at 230-31. ("[A] student must be treated based on his or her experiences as an individual—not on the basis of race.").

**Consistent with SFFA**. Plaintiffs' argument that the DCL and FAQ stand in "stark conflict" with both ED's prior guidance on Title VI and *SFFA* (ECF 31-1 at 34) is simply wrong. The guidance ED issued in 2023 after the holding in *SFFA* is not inconsistent with the DCL. The 2023 guidance makes clear, that a student must be "'treated based on his or her experiences as an

individual' and 'not on the basis of race.'" 2023 FAQ at 3 (quoting *SFFA*, 600 U.S. 231). This is precisely what the 2025 DCL says. DCL at 2 ("race-based decision-making . . . remains impermissible.").

    ***Important aspects of the problem.*** Plaintiffs' contention that the DCL and FAQ evidence ED's failure to consider important aspects of the problem fails because no such requirement applies to interpretative rules. Moreover, even if APA review applied here, the issues Plaintiffs have identified do not add up to an APA violation. As Plaintiffs correctly state, ED is not responsible for school curricula, and the 2025 DCL does not prescribe requirements for school curricula. So, ED need not have considered whether any given school district or teacher would need to change adjust a lesson plan or modify a planned discussion, or any costs plaintiffs would incur in doing so. ED also was not required to consider specific, potentially inconsistent, state or local standards as suggested by EOSD. ECF 31-17, at 40-41. To the extent there is an actual conflict between state requirements and *SFFA*, those state standards would be violative of the Fourteenth Amendment's guarantee of Equal Protection, and the supremacy clause. Similarly, Plaintiffs' argument on the lawfulness of a school district or college's decision to refrain from or reduce reliance on standardized testing also misses the mark. ECF 14, at ¶65 (asserting that the DCL suggests, without providing a legal basis, that "eliminat[ing] standardized testing" to increase racial diversity is unlawful). The DCL plainly prefaces the discussion on standardized testing by stating that "[r]elying on non-racial information as a proxy for race, and making decisions based on that [testing] information, violates the law." DCL at 3. It does not conclude or hold that *all* reasons for eliminating or reducing standardize testing would run afoul of Title VI. Because the DCL addresses all important parts of the problem and is consistent with *SFFA* and ED's earlier guidance, it is not arbitrary and capricious.

IV.    **Plaintiffs are unlikely to succeed on the merits of their Constitutional claims.**

Plaintiffs contend that the DCL, FAQ and certification requirement unconstitutionally vague, and therefore violate their Fifth Amendment rights; these claims are also unlikely to succeed on the merits. These claims are misplaced, as the framework relied on by Plaintiffs is meant to apply to binding actions with the force of law.  In any event, the DCL, FAQ and certification requirement are clear about the programs, practices and conduct that is prohibited: discrimination that treats a person differently on the basis of race.  Plaintiffs' First Amendment claims are also unlikely to succeed because the DCL, FAQ and instructions related to the certification requirement do not address speech or expressive activity, they simply reiterate the well-established principle that speech that amounts to racial harassment which creates a hostile environment is unlawful under Title VI; harassment—including race-based harassment—is conduct that the First Amendment simply does not protect.

A.    **Plaintiffs Cannot Establish Likelihood of Success on Fifth Amendment Claims**

As a preliminary matter, the void-for-vagueness doctrine under the Fifth Amendment is inapplicable here. As the Fourth Circuit clarified recently, while the Supreme Court has "evaluated and invalidated *statutes* for unconstitutional vagueness," it "has not extended those holdings beyond the statutory context." *Wills v. Pszczolkowski*, 125 F.4th 534, 539 (4th Cir. 2025) (emphasis added). The DCL cannot be deemed invalid under the void-for-vagueness doctrine because, as explained above, it is neither a statute nor does it have force of law. *Cf. FCC. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ( "[V]oid for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."). This limitation makes sense: a vaguely written statute or regulation raises due process concerns only where people

are required to comply with its dictates. *See id.* The same cannot be said for an agency interpretation that binds no one, having only "'power to persuade, [and] lacking power to control.'" *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 402 (2024) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Indeed, the Supreme Court has previously declined to apply the void for vagueness doctrine to non-binding documents, such as the federal sentencing guidelines. *Beckles v. United States*, 580 U.S. 256, 263 (2017) (holding "the Guidelines are not subject to a vagueness challenge under the Due Process Clause" because "they merely guide the exercise of a court's discretion."). Because the DCL, like the federal sentencing guidelines, has no binding effects, any analysis of it under the void for vagueness doctrine is misplaced. The Court should reject Plaintiffs' Fifth Amendment challenge on this ground alone.

Separately, the facial nature of Plaintiffs' Fifth Amendment challenge provides yet another threshold hurdle. In this Circuit, facial vagueness challenges under the Due Process Clause are categorically unripe for review. *See United States v. Sun*, 278 F.3d 302, 309 (4th Cir. 2002) (a facial vagueness challenge cannot arise under the Due Process Clause). The appropriate posture for Due Process vagueness challenges is as-applied. That is because "[o]bjections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988). Consistent with this Circuit's precedent, the Court should reject Plaintiffs' Fifth Amendment challenge as unripe without reaching its merits. *See Berry v. City of Portsmouth*, 562 F.2d 307, 312 (4th Cir. 1977) (rejecting a facial challenge for vagueness under the Due Process Clause as "premature"); *United States v. Cline*, 286 F. App'x 817, 820 (4th Cir. 2008) (because Cline could not assert a facial vagueness challenge under the Due Process Clause, "the court's review is . . . limited to whether Cline herself had fair notice that the statute proscribed

her conduct"). But even if the Court were to review ED's actions for vagueness, it should hold that ED's actions were not vague.

> **i.      The DCL affords more notice than ED is required to provide before exercising its enforcement discretion.**

Title VI authorizes ED to take enforcement actions when it believes a recipient of federal funding may be violating individuals' civil rights.  Under 42 U.S.C. § 4000d-1, "[e]ach Federal department and agency which is empowered to extend Federal financial assistance," including ED, is "authorized and directed" to effectuate Title VI by securing compliance through "the termination of or refusal to grant or to continue assistance."

There is no requirement that ED issue *any notice* of how it intends to use its enforcement discretion before it does so.  Throughout Title VI, Congress instructs when agencies are required to give recipients notice or opportunity for a hearing.  *See, e.g.*, 42 U.S.C. § 2000d-1 (allowing termination of funding only "after opportunity for a hearing"); *id*. § 2000d-5 (requiring ED to provide recipients notice of deferred action on any application for funds).  ED's own regulations also specify when notice is to be provided to recipients, and none of these notice requirements precedes the opening of an investigation. 34 C.F.R. §§ 100.7, 100.8, 100.10. Plainly, ED may lawfully exercise its enforcement discretion under Title VI without issuing the DCL, FAQ or certification request.  As such, Plaintiffs' contention that it is vague establishes a Fifth Amendment violation.  The Plaintiffs' point to no precedent supporting such a counterintuitive conclusion.  Nor would it be desirable, as a policy matter, for courts to find Fifth Amendment violations based on agencies providing *more notice* than regulated entities are entitled to receive; such a result could discourage agencies from efforts to increase transparency around planned exercise of enforcement discretion.

ii.     **The DCL is not vague because it clearly reiterates well-established prohibitions on discriminatory conduct.**

Plaintiffs contend the DCL fails to provide clear definitions and objective standards for assessing discrimination that violates Title VI, and is therefore vague.  ECF 31-1 at 21.  However, the DCL also is not unconstitutionally vague because it clearly describes ED's understanding of Title VI's prohibition on race discrimination.  As explained in the DCL, ED understands Title VI to forbid discriminatory practices in which "an educational institution treats a person of one race differently than it treats another person because of that person's race."  DCL at 2.  Plaintiffs rely heavily on a capacious reading of terms like "diversity," "equity," and "inclusion," arguing that the DCL's reference to those terms makes it unclear what activities will be the focus of ED's enforcement discretion.  However, the DCL does not define ED's understanding of the scope of prohibited conduct under Title VI by reference to "DEI."  Indeed, ED's corresponding FAQ document explains that "[w]hether a policy or program violates Title VI does not depend on the use of specific terminology such as 'diversity,' 'equity,' or 'inclusion.'"  FAQ at 6.

Moreover, the DCL is clear that there may be certain, albeit rare, exceptions when a school has a compelling interest in "remediating specific, identified instances of past discrimination that violated the Constitution or a statute," and its use of race is "narrowly tailored" to achieving that interest.  DCL at 2 (quoting *SFFA*, 600 U.S. at 207).  Further, ED has explained that "schools with programs focused on interests in particular cultures, heritages, and areas of the world would not in and of themselves violate Title VI, assuming they are open to all students regardless of race ….  Nor would educational, cultural, or historical observances . . . so long as they do not engage in racial exclusion or discrimination."  FAQ at 6.

Plaintiffs attempt to supplement their vagueness allegations by arguing that the newly launched complaint portal will result in arbitrary enforcement because it invites "students, parents,

teachers, and the broader community" to report illegal discriminatory practices at institutions of learning, which may be utilized to "identify potential areas for investigation." Complaint Portal, https://perma.cc/M9QD-7DUX.  However, ED has long solicited online reporting as a mechanism to enforce civil rights, consistent with report and investigation process. *See* 34 C.F.R. § 100.7(c) (ED will "make a prompt investigation whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply with this part."); *U.S. Dep't of Educ., Racial Incidents and Harassment Against Students*, https://perma.cc/A8N5-RUFM (Mar. 1994) (same); *U.S. Dep't of Educ., File a Complaint*, https://perma.cc/JMA6-UJVS. A report of discrimination is not the same as ED finding discrimination, and "assessment of school policies and programs depends on the facts and circumstances of each case."  2025 FAQ at 6.  Soliciting a *report* of discrimination is not the same as ED *finding* discrimination, and "assessment of school policies and programs depends on the facts and circumstances of each case."  FAQ at 5.  Online complaint forms are one of the methods ED has long used, and the new portal does not increase any likelihood of arbitrary enforcement.

In sum, because the DCL clearly describes a type of conduct that Title VI prohibits— differential treatment based on race—it is not vague and does not increase the risk of arbitrary enforcement, and the complaint portal does not change ED's longstanding commitment to independently investigating and assessing the facts reported in each case.

### B.    Plaintiffs Are Unlikely to be Successful on Their First Amendment Claims

Plaintiffs argue that the DCL effectively bans the expression of certain viewpoints because of its emphasis upon the Title VI compliance issues DEI programs often face.  This mischaracterizes what the DCL actually says and does.  The DCL is not focused on what schools may *say* about DEI—they remain entitled to take a positive view, negative view, or any other view on DEI—instead, the DCL focuses on what DEI programs often *do*—treat people differently on

the basis of race in a manner that constitutes discriminatory harassment.  *See* FAQ at 6 (the First

Amendment does not "relieve [schools] of their duty to respond to racial harassment that creates a

hostile environment."

Plaintiffs also argue that rather than directly suppress particular viewpoints, the DCL and

FAQ unlawfully coerce third parties that receive federal funding into doing so. (ECF 31-1 at 17;

37-1 at 18). This argument also fails, as it depends upon a doctrine that is limited to situations in

which a government official makes a specific threat of enforcement to a third party completely

unrelated to the conduct at issue.  *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024).

### i. The DCL does not censor protected speech or intrude on academic freedom.

The DCL does not "ban" any speech expressing any particular viewpoint.  Rather, it

describes a scope of *conduct* has been long prohibited by Title VI.  It is well settled that denying

a student an educational opportunity on the basis of race amounts to discrimination,  *see SFFA*,

600 U.S. 181,  and discrimination is illegal conduct, not protected speech, *see United States v.

Miselis*, 972 F.3d 518, 535 (4th Cir. 2020) ("The First Amendment protects speech (the sine qua

non of expression) as opposed to mere conduct."). It is no defense that creating a racially hostile

environment or engaging in racial harassment may involve speaking. After all, "[s]peech is not

protected by the First Amendment when it is the very vehicle of the crime itself." *Rice v. Paladin

Enterprises, Inc.*, 128 F.3d 233, 248 (4th Cir. 1997) (citation omitted) *see also Dambrot v. Cent.

Michigan Univ.*, 55 F.3d 1177 (6th Cir. 1995) (rejecting First Amendment argument that firing

teacher for his harassing use of racial epithet violated his free speech).

When speech is an integral part of a transaction involving conduct the government

otherwise is empowered to prohibit, such "speech acts" may be proscribed without much, if any,

concern about the First Amendment, since it is merely incidental that such "conduct" takes the

form of speech. *See Rice*, 128 F.3d at 248 ("[T]he First Amendment poses no bar to the imposition

of civil (or criminal) liability for speech acts…"); *Gartenberg*, 2025 WL 401109, at *12 ("[W]hen

a hostile environment claim is based on both protected speech and unprotected conduct, a court

must still consider the entire record in determining whether the harassment was discriminatory in

nature.").

While Plaintiffs' arguments focus heavily on academic freedom, they overlook the

important fact that *racial discrimination* is not part of academic freedom, and "free speech does

not grant teachers a license to say or write in class whatever they may feel like." *Mailloux v. Kiley*,

448 F.2d 1242, 1243 (1st Cir. 1971).  Indeed, as recipients of federal funds overseen by ED,

> colleges and universities are legally required to maintain a hostile-free learning
> environment and must strive to create policies which serve that purpose. While a
> professor's rights to academic freedom and freedom of expression are paramount in the
> academic setting, they are not absolute to the point of compromising a student's right to
> learn in a hostile-free environment. To hold otherwise under these circumstances would
> send a message that the First Amendment may be used as a shield by teachers who choose
> to use their unique and superior position to [] harass students secure in the knowledge that
> *whatever* they say or do will be protected.

*Bonnell v. Lorenzo*, 241 F.3d 800, 823-24 (6th Cir. 2001).

At the same time,  as ED's FAQ document makes clear, schools' implementation of

policies to protect against race-based hostile environment harassment must respect First

Amendment rights.  FAQ at 6 ("[ED] enforces federal civil rights law consistent with the First

Amendment of the U.S. Constitution. Nothing in Title VI, its implementing regulations, or the

Dear Colleague Letter requires or authorizes a school to restrict any rights otherwise protected by

the First Amendment.").  To the extent Plaintiffs or their members fear that educational institutions

will take actions *not* required by Title VI or ED, based on an incorrect understanding of the DCL,

Plaintiffs' complaints about potential infringement on academic freedom by third parties should

be directed at those institutions, not to ED.  Because discriminatory conduct effectuated by words

is neither protected speech nor an aspect of academic freedom, Plaintiffs' viewpoint censorship arguments lack merit.

### ii. ED's longstanding conditioning of federal funding on non-discrimination is not coercive.

The suggestion that the DCL, FAQ or certification requirement violate the First Amendment through coercion of a third party is also wrong.  The government is allowed to condition school funding on nondiscrimination. Indeed, the Supreme Court has long held that the government may condition the receipt of funds on "compliance by the recipient with federal statutory and administrative directives." *S. Dakota v. Dole*, 483 U.S. 203, 206 (1987) (citation omitted).  The government is also allowed to express its own viewpoint; "it is not barred by the Free Speech Clause from determining the content of what it says."  *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015).  For example, the expression of ED's views that concepts like structural racism are "toxic[]," DCL at 1, does not violate the free-speech rights of citizens who hold an opposite view.[8]  *See Walker*, 576 U.S. at 207 ("[I]t is the democratic electoral process that first and foremost provides a check on government speech.").  More importantly, the DCL does not threaten enforcement action against educational institutions that take a contrary view; it simply promises to "vigorously enforce the law on equal terms" under the principles of *SFFA*.  DCL at 3.  This is the same longstanding commitment to Title VI and Equal Protection that ED has always held. *See* 2023 DCL at 3 ("We close by noting our continued commitment to vigorous enforcement of Titles IV and VI of the Civil Rights Act of 1964 . . .. We will continue to use all enforcement tools at our disposal.").

---

[8]    The same is true of the online complaint portal which expresses ED's viewpoint that DEI is "divisive" and leads to "indoctrination."  Regardless of ED's views on DEI programs generally, the portal only solicits reports of "illegal discriminatory practices at institutions of learning." *See* U.S. Dep't of Educ., https://perma.cc/M9QD-7DUX.

With respect to enforcement, the DCL, merely explains ED's understanding of what Title VI requires of federal funding recipients. As the FAQs emphasize, ED's evaluation of whether a recipient is discriminating on the basis of race in its programs or activities "depends on the facts and circumstances of each case," FAQ at 5. Whatever ED's views of DEI programs generally, ED has made quite clear that its *enforcement* of Title VI will be based on whether schools are discriminating based on race, and not on any other factor. *Id.* Since the DCL only implicates enforcement insofar as it explains ED's understanding of Title VI's requirements, it does not violate the First Amendment.

## V.    Plaintiffs do not face irreparable harm.

The irreparable harm standard "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* [not merely possible] in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). Conclusory or speculative allegations do not establish a likelihood of irreparable harm." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991). The Court may deny Plaintiffs' motion solely based on their failure to show irreparable harm. *See Mountain Valley Pipeline, LLC v. W. Pocahontas Properties Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019). As explained above, Plaintiffs have not even demonstrated an injury in fact sufficient for Article III standing. Accordingly, they also have not demonstrated irreparable harm justifying preliminary relief. But "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

Virtually all of Plaintiffs' claimed harms are based on reactions to schools' efforts—or anticipated efforts—to avoid enforcement actions by ED. But, as explained above, both Plaintiffs' members and the schools that employ them misunderstand portions of the DCL. Their fear is not

enough; Plaintiffs "cannot manufacture" a showing of irreparable harm "merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416.

Plaintiffs' alleged harms are based on either self-censorship or a series of speculative future events taken by third parties that may or may not come to pass. *Supra* Section I. Additionally, an irreparable harm is one that "cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline*, LLC, 915 F.3d at 216 (citation omitted). Plaintiffs have made no such showing here. To the contrary, by statute and regulation, numerous steps aimed at ensuring compliance must occur before ED may withdraw funding. *See* 42 U.S.C. § 2000d-1; 34 C.F.R. §§ 100.6-.11.

## VI.     The balance of the equities weighs against an injunction.

Plaintiffs' likelihood of success on the merits and irreparable harm must be balanced against the government's own equities and the public interest. The balance of the equities and the public interest "merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting Nken, 556 U.S. at 435). The public interest in robust civil rights enforcement cannot be overstated. *SFFA*, 600 U.S. at 206. See *University of Pa., v. E.E.O.C.*, 493 U.S. 182, 193 (1990) ("Ferreting out…invidious discrimination is a great, if not compelling, governmental interest.")

Moreover, any injunction here would effectively limit ED, other federal agencies, and the President himself, from implementing the President's priorities consistent with their legal authorities. "Any time [the Government] is enjoined by a court from effectuating [laws], it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

**VII.    Any Injunction Should Be Narrowly Tailored and Permit Lawful Agency Action.**

It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Thus, should the Court decide to grant preliminary relief, it should be narrowly tailored. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  Accordingly, any preliminary injunction should explicitly confirm that all obligations in the injunctive order apply only with respect to the Plaintiffs and their members, and refrain from prescribing ED's future actions, or requiring ED to resurrect guidance from 2023. Any relief must leave intact the Executive's discretion to engage in further consideration of the topic at hand, implement new policies consistent with law, and enforce federal antidiscrimination laws. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021) ("[T]he choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch.").

Additionally, in light of the extraordinary breadth of Plaintiffs' requested relief, to the extent the Court issues any injunctive relief, the United States respectfully requests that such relief be stayed pending the disposition of any appeal that is authorized, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

Lastly, the Defendants also respectfully request that any injunctive relief accompany a bond under FRCP 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A bond is appropriate here given that any preliminary relief would potentially

mandate that the Executive spend money that may not be recouped once distributed. *See Department of Education v. California*, 604 U.S.---, 2025 WL 1008354, at *1 (U.S. Apr. 4, 2025) (staying the district court's order, which required ED to dispense funds on grant agreements, in part because plaintiffs did "not refute[] the Government's representation that it is unlikely to recover the grant funds once they are disbursed[, that no] grantee 'promised to return withdrawn funds should its grant termination be reinstated,' and the District Court declined to impose bond" (citation omitted)).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motions for preliminary injunction should be denied, or, if they are granted, should be narrowly tailored and limited to the Plaintiffs and their members.

Dated:   April 14, 2025                    Respectfully submitted,

                                           Kelly O. Hayes
                                           United States Attorney


                               By: _____/s/_____
                                           Ariana Wright Arnold
                                           DMD Bar No. 23000
                                           Charles R. Gayle
                                           DMD Bar No. 14706
                                           Assistant United States Attorneys
                                           36 S. Charles St., 4th Floor
                                           Baltimore, Maryland 21201
                                           Ariana.Arnold@usdoj.gov
                                           (410) 209-4813 (direct)
                                           charles.gayle@usdoj.gov
                                           (410) 209-4845 (direct)

                                           *Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

The forgoing Response was efiled via the Court's CM-ECF system and thereby served on

counsel of record.


/s/_____
Ariana Wright Arnold
Assistant United States Attorney