**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND NORTHERN DIVISION**

| | |
|---|---|
| AMERICAN FEDERATION OF TEACHERS, *et. al*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION, *et. al*,<br>*Defendants*. | No. 25-cv-00628-SAG<br><br>**AMICUS BRIEF OF STUDENTS FOR FAIR ADMISSIONS IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ i
STATEMENT OF INTEREST AND SUMMARY OF ARGUMENT ................................................ 1
ARGUMENT ........................................................................................................................................ 3
   I.    Federal law prohibits racial discrimination in education. .................................................. 3
   II.   The Letter and FAQ accurately reflect the prohibition on racial discrimination
       under the Equal Protection Clause and Title VI. ............................................................... 7
   III.  Plaintiffs badly misread the guidance documents. .......................................................... 10
CONCLUSION .................................................................................................................................. 14

# TABLE OF AUTHORITIES

**Cases**

*Brown v. Board of Education*,
  347 U.S. 483 (1954) ............................................................................................................... 3

*Grutter v. Bollinger*,
  539 U.S. 306 (2003) ............................................................................................................. 13

*Janus v. AFSCME*,
  585 U.S. 878 (2018) ............................................................................................................. 13

*Pleasant Grove City, Utah v. Summum*,
  555 U.S. 460 (2009) ............................................................................................................. 13

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) ............................................................................................................. 12

*Rice v. Cayetano*,
  528 U.S. 495 (2000) ............................................................................................................... 1

*Rumsfeld v. FAIR*,
  547 U.S. 47 (2006) ............................................................................................................... 12

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) ....................................................................................................... passim

**Statutes**

42 U.S.C. §2000d ........................................................................................................................ 4

**Other Authorities**

Am. Fed'n of Tchrs. Amicus Brief at 15, *SFFA v. Harvard*, No. 20-1199 ................................. 2

Press Release, Am. Fed'n of Tchrs. (June 29, 2023) ................................................................. 2

**Constitutional Provisions**

U.S. Const. amend. XIV, §1 ........................................................................................................ 3

**STATEMENT OF INTEREST AND SUMMARY OF ARGUMENT**

Students for Fair Admissions is a nonprofit dedicated to defending human and civil rights secured by law, including the right to be free from discrimination on the basis of race in higher-education admissions. SFFA is a membership group of more than 20,000 students, parents, and others who believe that racial classifications and preferences in college admissions are unfair, unnecessary, and unconstitutional. SFFA was the plaintiff in the landmark case challenging the use of race in admissions by Harvard College and the University of North Carolina. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023).

SFFA has a strong interest in this case. *Students for Fair Admissions* is one of the most important civil rights cases in the Supreme Court's history. It reaffirmed one of our country's "foundational principle[s]—the absolute equality of all citizens of the United States politically and civilly before their own laws." *Id.* at 201 (cleaned up). The Court recognized that "the Constitution is color blind," *id.* at 204, and that all "racial discrimination in public education"—including race-based admissions programs practiced at many universities—is illegal under the Constitution and Title VI. *Id.* at 204, 230-31. As the Court explained, "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Id.* at 208 (quoting *Rice v. Cayetano*, 528 U.S. 495, 517 (2000)). There is thus no room for "benign" racial preferences: "Eliminating racial discrimination means eliminating all of it." *Id.* at 206.

The Department of Education has issued guidance documents—including a Dear Colleague Letter and Frequently Asked Questions—that do nothing more than "explain[] and reiterate[] existing legal requirements" after *Students for Fair Admissions*. Letter at 1 (Dkt. 31-14). These documents explain, among other things, that all racial classifications are subject to "'strict scrutiny.'" *Id.* at 2 (quoting *SFFA*, 600 U.S. at 207). An individual's race "'may never be used against him' and 'may not operate as a stereotype' in governmental decision-making." *Id.* (quoting *SFFA*, 600 U.S. at 218). And the only

interest that is "sufficiently compelling in the educational context to justify race-based preferences [is] 'remediating specific, identified instances of past discrimination that violated the Constitution or a statute' committed by the specific educational institution in question." FAQ at 3 (quoting *SFFA*, 600 U.S. at 207), perma.cc/43EZ-ME6A. Nothing in these guidance documents should be controversial after *Students for Fair Admissions*.

Plaintiffs believe that *Students for Fair Admissions* was wrongly decided; that much is clear. At the Supreme Court, the American Federation of Teachers filed an amicus brief in support of Harvard, arguing that schools should be allowed to consider race "in order to ensure a level playing field by neutralizing sources of bias that systematically disadvantage some minority applicants." Am. Fed'n of Tchrs. Amicus Brief at 15, *SFFA v. Harvard*, No. 20-1199. When the decision was released, the AFT attacked the opinion as the product of "politically charged, regressive policymaking from the bench" and a "throwback to a cruel racist past" that would have "huge consequences for public life far beyond higher education." Press Release, Am. Fed'n of Tchrs. (June 29, 2023), perma.cc/H48R-UVGA.

Having lost at the Supreme Court, Plaintiffs have adopted a new tact: obtain a nationwide injunction that prohibits the federal government from enforcing the decision. To obtain this relief, the Plaintiffs engage in a wildly overblown misreading of the guidance documents. According to the Plaintiffs, the guidance documents restrict how teachers may speak "about the history of the United States" or "how race may impact a person's experiences," and prohibits teachers from having "classroom discussions" about racism. Mot. 13, 30. None of these assertions are remotely true. Search the guidance documents from front to back: They do not say what the Plaintiffs say they say.

Plaintiffs' overblown fears have no basis in the text of the guidance documents. Their motion should be denied.

**ARGUMENT**

Plaintiffs' lawsuit is badly flawed for all the reasons laid out by the United States. Plaintiffs lack standing because neither the organizations nor their members are injured by the guidance documents. They lack a cause of action because they do not challenge a final agency action. The guidance documents do not violate the Administrative Procedure Act or infringe on anyone's constitutional rights. And the Plaintiffs fail on the equities. Their requested relief is especially problematic. This Court cannot enjoin the enforcement of the nation's civil rights laws over highly speculative assertions of chilled speech.

In this amicus brief, SFFA focuses on why the guidance documents (the Letter and the FAQ) are in line with the Equal Protection Clause and Title VI. SFFA discusses the requirements of federal law, and the implications of *Students for Fair Admissions*. SFFA then explains how the Letter and FAQ accurately capture the state of the law. SFFA concludes by showing why Plaintiffs' fears that the enforcement of civil rights law will inhibit their ability to speak and teach freely are unjustified.

**I.      Federal law prohibits racial discrimination in education.**

Under the Fourteenth Amendment to the United States Constitution, no State shall "deny to any person ... the equal protection of the laws." U.S. Const. amend. XIV, §1. The Equal Protection Clause represents a "foundational principle—the absolute equality of all citizens of the United States politically and civilly before their own laws." *SFFA*, 600 U.S. at 201 (cleaned up). It provides "every American citizen, without regard to color, the protecting shield of law." *Id.* at 202 (cleaned up). "[W]ithout this principle of equal justice, … there is no republican government and none that is really worth maintaining." *Id.* (cleaned up). "The broad and benign provisions of the Fourteenth Amendment apply to all persons … ; it is hostility to race and nationality which in the eye of the law is not justified." *Id.* (cleaned up).

*Brown v. Board of Education* proclaimed that the right to public education "must be made available to all on equal terms." 347 U.S. 483, 493 (1954). *Brown* and subsequent Supreme Court

decisions "vindicate[d] the Constitution's pledge of racial equality." *SFFA*, 600 U.S. at 205. "These decisions reflect the core purpose of the Equal Protection Clause: doing away with all governmentally imposed discrimination based on race." *Id.* at 206 (cleaned up).

Enacted a decade after *Brown*, Title VI of the Civil Rights Act provides, "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d. "[D]iscrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI." *SFFA*, 600 U.S. at 198 n.2 (quotation marks omitted). Thus, Title VI extends the prohibition on racial discrimination contained in the Fourteenth Amendment to all schools that receive federal funds, public and private. *Id.*

*Students for Fair Admissions* built on *Brown*'s legacy, recognizing that "the Constitution is color blind," *id.* at 204, and that all "racial discrimination in public education"—including the race-based admissions programs practiced at "[m]any universities"—is unconstitutional. *Id.* at 204, 230-31 (quotation marks omitted). *SFFA* held that both Harvard's and the University of North Carolina's use of race in admissions violated the Equal Protection Clause and Title VI. *Id.* at 230. Both Harvard and UNC used a multi-stage admissions process that considered an applicant's race at every step of the process, including the admissions decisions themselves. *See id.* at 192-97. SFFA sued Harvard and UNC, arguing that their "race-based admissions programs violated" Title VI and the Fourteenth Amendment. *Id.* at 197-98.

In ruling for SFFA, the Court reiterated its precedent that any use of race in admissions "must survive a daunting two-step … 'strict scrutiny,'" and that "only two compelling interests" can justify it: "remediating specific, identified instances of past discrimination that violated the Constitution or a statute," or "avoiding imminent and serious risks to human safety in prisons." *Id.* at 206-07. Even with

4

a compelling interest, "race-based state action" is permitted only "in the most extraordinary case." *Id.* at 208. The Court examined Harvard's and UNC's race-based admissions under this standard and held that they failed it for multiple reasons. *Id.* at 213-25.

First, Harvard and UNC failed to justify their consideration of race by identifying compelling interests capable of being "subjected to meaningful judicial review." *Id.* at 214. The Court rejected all of Harvard's and UNC's asserted interests, including:

- "'training future leaders in the public and private sectors,'"
- "preparing graduates to 'adapt to an increasingly pluralistic society,'"
- "'better educating its students through diversity,'"
- "'producing new knowledge stemming from diverse outlooks,'"
- "'promoting the robust exchange of ideas,'"
- "'broadening and refining understanding,'"
- "'fostering innovation and problem-solving,'"
- "'preparing engaged and productive citizens and leaders,'"
- "'enhancing appreciation, respect, and empathy,'"
- "'cross-racial understanding,'" and
- "'breaking down stereotypes.'"

*Id.* None of these goals was "sufficiently coherent for purposes of strict scrutiny." *Id.*

Second, Harvard and UNC did not justify their use of race by "articulat[ing] a meaningful connection between the means they employ and the goals they pursue." *Id.* at 215. Specifically, it was not "evident … how assigning students to these racial categories and making admissions decisions based on them furthers the educational benefits that the universities claim to pursue." *Id.* at 216. Harvard's and UNC's racial categories of "Asian" and "Hispanic," for example, were too "imprecise" and thus "undermin[e]" rather than "promot[e]" the Universities' purported interests. *Id.* at 216-17.

Third, Harvard and UNC "used [race] as a 'negative'" factor in admissions. *Id.* at 218. Because "[c]ollege admissions are zero-sum," a "benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id.* at 218-19. This violates the Equal Protection Clause even if it impacts only "some … of the students they admit." *Id.* at 219.

5

Fourth, Harvard and UNC used race "as a stereotype." *Id.* at 218. "The point of [their] admissions programs [was] that there is an inherent benefit in … race for race's sake." *Id.* at 220. For example, "Harvard's admissions process rest[ed] on the pernicious stereotype that 'a black student can usually bring something that a white person cannot offer,'" and UNC argued that "race in itself 'says [something] about who you are.'" *Id.*

Fifth, Harvard's and UNC's use of race was a form of prohibited racial balancing. *Id.* at 221-24. While Harvard and UNC did not identify strict numerical benchmarks of minority student admissions, they sought "proportional representation" by seeking a "rough percentage of various racial groups." *Id.* Harvard's admissions officers also would review aggregate admissions data providing a "breakdown of applicants by race" during the admissions process so they could "'trac[k] how each class is shaping up relative to previous years.'" *Id.* at 194, 222.

Sixth, Harvard's and UNC's use of race lacked a "'logical end point.'" *Id.* at 221. It was impossible to know when considering race was no longer necessary to obtain the "educational benefits of diversity." *Id.* at 224. Harvard and UNC couldn't even identify a sunset date. *Id.* at 225. The Court also rejected Harvard's and UNC's argument that "universities are 'owed deference'" in their determination that they must "us[e] race to benefit some applicants but not others." *Id.* at 217. Harvard and UNC could not simply say, "'trust us,'" but needed to provide "an exceedingly persuasive justification that is measurable and concrete enough to permit judicial review." *Id.*

In invalidating the Harvard and UNC admissions programs, the Court agreed with SFFA that universities may consider "an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise." *Id.* at 230. But "universities may not simply establish through application essays or other means the regime" the Supreme Court held unlawful. *Id.* "What cannot be done directly cannot be done indirectly. The Constitution deals with substance, not

6

shadows, and the prohibition against racial discrimination is levelled at the thing, not the name." *Id.* (cleaned up).

## II. The Letter and FAQ accurately reflect the prohibition on racial discrimination under the Equal Protection Clause and Title VI.

The guidance documents issued by the Department of Education are fully in accord with the Equal Protection Clause, Title VI, and the Supreme Court's decision in *Students for Fair Admissions*.

**The Dear Colleague Letter**. The Dear Colleague Letter does nothing more than "clarify and reaffirm the nondiscrimination obligations of schools and other entities that receive federal financial assistance from the United States Department of Education." Letter at 1. Because the Plaintiffs distort what the Letter actually says, SFFA identifies some of the key quotations:

- "'[C]lassifying and assigning students based on their race' is lawful only if it satisfies 'strict scrutiny,' which means that any use of race must be narrowly tailored—that is, 'necessary—to achieve a compelling interest." Letter at 2 (quoting *SFFA*, 600 U.S. at 207).

- "[T]he Supreme Court has recognized only two interests as compelling in the context of race-based action: (1) 'remediating specific, identified instances of past discrimination that violated the Constitution or a statute'; and (2) 'avoiding imminent and serious risks to human safety in prisons, such as a race riot.'" *Id.* (quoting *SFFA*, 600 U.S. at 207).

- "Nebulous concepts like racial balancing and diversity are not compelling interests…. '[A]n individual's race may never be used against him' and 'may not operate as a stereotype' in governmental decision-making.'" *Id.* (quoting *SFFA*, 600 U.S. at 218)

- "Although *SFFA* addressed admissions decisions, the Supreme Court's holding applies more broadly. At its core, the test is simple: If an education institution treats a person of one race differently than it treats another person because of that person's race, the educational institution violates the law." *Id.*

- Federal law "prohibits covered entities from using race in decisions pertaining to admissions, hiring, promotion, compensation, financial aid, scholarship, prizes, administrative support, discipline, housing, graduation ceremonies, and all other aspects of student, academic, and campus life. Put simply, educational institutions may neither separate or segregate students based on race, nor distribute benefits or burdens based on race." *Id.*

- "[R]ace-based decisionmaking, no matter the form, remains impermissible." *Id.*

7

- "Relying on non-racial information as a proxy for race, and making decisions based on that information, violates the law. That is true whether the proxies are used to grant preferences on an individual basis or a systematic one. It would, for instance, be unlawful for an educational institution to eliminate standardized testing to achieve a desired racial balance or to increase racial diversity." *Id.* at 3

- "Other programs discriminate in less direct, but equally insidious, ways. DEI programs, for example, frequently preference certain racial groups and teach students that certain racial groups bear unique moral burdens that others do not. Such programs stigmatize students who belong to particular racial groups based on crude racial stereotypes. Consequently, they deny students the ability to participate fully in the life of a school." *Id.*

The letter warns that educational institutions should "(1) ensure that their policies and actions comply with existing civil rights law; (2) cease all efforts to circumvent prohibitions on the use of race by relying on proxies or other indirect means to accomplish such ends; and (3) cease all reliance on third-party contractors, clearinghouses, or aggregators that are being used by institutions in an effort to circumvent prohibited uses of race." *Id.*

**Frequently Asked Questions.** The following month, the Department issued its Frequently Asked Questions in order to "anticipate and answer questions that may be raised in response" to its Dear Colleague Letter. FAQ at 1. The FAQ correctly explains that, under *SFFA*, "Title VI is 'coextensive' with the Equal Protection Clause of the Fourteenth Amendment. In other words, discrimination based on race, color, or national origin by a public institution that violates the Equal Protection Clause of the Fourteenth Amendment also violates Title VI if committed by a private institution that accepts federal funds, and vice versa." FAQ at 2. The FAQ reaffirms that race may not be used as a "'stereotype or negative'" factor, and that to provide a benefit to a person because of the color of his or her skin in any "competitive or zero-sum process would necessarily disadvantage those of a different race." *Id.* at 2, 5 (quoting *SFFA*, 600 U.S. at 218). "Likewise, schools may not administer scholarships, prizes, or other opportunities offered by third parties based on race." *Id.* at

8

5. To segregate students based on race, including by providing separate "programming, graduation ceremonies, and housing," is also a violation of Title VI. *Id.*

Asking whether DEI programs are unlawful under *Students for Fair Admissions*, the FAQ makes clear that "whether an initiative constitutes unlawful discrimination does not turn solely on whether it is labeled 'DEI' or uses terminology such as 'diversity,' 'equity,' or 'inclusion.'" FAQ at 6. OCR's assessment of school policies and programs "depends on the facts and circumstances of each case." *Id.* Schools, of course, "may not operate policies or programs under any name that intentionally treat students differently based on race, engage in racial stereotyping, or create hostile environments for students of particular races." *Id.* But the FAQ does not prohibit teachings or instruction dealing with issues of race. For example, "schools with programs focused on interests in particular cultures, heritages, and areas of the world would not in and of themselves violate Title VI, assuming they are open to all students regardless of race. Nor would educational, cultural, or historical observances—such as Black History Month, International Holocaust Remembrance Day, or similar events—that celebrate or recognize historical events and contributions, and promote awareness, so long as they do not engage in racial exclusion or discrimination." *Id.*

In the FAQ, the Department also asked whether the Letter "mean[s] that students, teachers and school employees may not discuss topics related to race or DEI under Title VI." *Id.* The Department explained that "[n]othing in Title VI or its implementing regulations authorizes a school to restrict any rights otherwise protected by the First Amendment." *Id.* Nor can the Department "exercis[e] control over the content of school curricula." *Id.* At the same time, schools have an "obligation[] to refrain from creating hostile environments through race-based policies and stereotypes" and to "respond to racial harassment that creates a hostile environment." *Id.* Whether a "racially hostile environment exists" depends on "the facts and circumstances of each case." *Id.* For example, "an elementary school that sponsors programming that acts to shame students of a particular

9

race or ethnicity, accuse them of being oppressors in a racial hierarchy, ascribe to them less value as contributors to class discussions because of their race, or deliberately assign them intrinsic guilt based on the actions of their presumed ancestors or relatives in other areas of the world could create a racially hostile environment, by interfering with or limiting the students' ability to participate in or benefit from the school's program or activity." *Id.* at 6-7.

### III.     Plaintiffs badly misread the guidance documents.

To try to establish standing, Plaintiffs manufacture fears that have no basis in any fair reading of the guidance documents. For example, Plaintiffs fear that teaching "about difficult topics in history" such as "slavery [and] the Civil Rights movement" that "necessarily touch on race" will subject them to accusations of discrimination. Mot. 1-3, 8, 32; *see also id.* at 20 (arguing that the Letter forbids "lectures, analysis, and research explicitly dealing with questions of race and ethnicity" as well as "basic conversations about general sociological issues such as public health policy, economic inequality, or community development"). But teaching and discussing history and policy obviously does not violate the Equal Protection Clause or Title VI. Everyday classroom instruction—assuming it is "open to all students regardless of race"—would never "create[] a hostile environment based on race." FAQ at 6. Indeed, the FAQ explicitly says that the Department is prohibited from "exercising control over the content of school curricula." *Id.*

Plaintiffs claim that the guidance documents "give the baseless impression that any acknowledgement of race or 'DEI'-related activity is unlawful." Mot. 30. But that is not what the guidance documents say, nor the impression they give. "[W]hether an initiative constitutes unlawful discrimination does *not* turn solely on whether it is labeled 'DEI' or uses terminology such as 'diversity,' 'equity,' or 'inclusion.'" FAQ at 6 (emphasis added). Instead, the Department's "assessment of school policies and programs depends on the facts and circumstances of each case." *Id.*

10

Wholly absent from the Plaintiffs' motion is the Department's discussion of the practices they are actually concerned with. The FAQ identifies the "extreme practices" that could create a hostile environment under Title VI. They include:

- "requiring students to participate in 'privilege walks' that are designed to make them feel guilty about being part of a certain race,"

- "segregating [students] by race for presentations and discussions with guest speakers,"

- "pressuring [students] to participate in protests or take certain positions on racially charged issues,"

- "investigating or sanctioning [students] for dissenting on racially charged issues through DEI or similar university offices,"

- "mandating courses, orientation programs, or trainings that are designed to emphasize and focus on racial stereotypes," and

- "assigning [students] coursework that requires them to identify by race and then complete tasks differentiated by race."

*Id.* at 7. Plaintiffs never claim to have any intention of undertaking these "extreme practices." Nor do the guidance documents prohibit programs that "explor[e] ideas," "permit [students] to share in each other's cultures and build community," or "wrestle with hard truths and engage with those who may have different perspectives." Mot. 1-2. They identify conduct that deprive students of equal education opportunities by treating students differently based on race.

Plaintiffs claim that the guidance documents "subject vast amounts of legal activities to enforcement … , including, for example, efforts to recruit students of all races and backgrounds, as well as all income levels, geographic location, and other forms of diversity." Mot. 4. But the Letter makes clear that schools are free to promote diversity with regard to socioeconomic status, and discusses the use of proxies for race to ensure that the prohibition on race discrimination in education is not circumvented. Letter at 3; FAQ at 4. The guidance also repeats the Supreme Court's holding on essays: "'[N]othing prohibits universities from considering an applicant's discussion of how race

11

affected the applicant's life, so long as that discussion is concretely tied to a quality of character or unique ability that the particular applicant can contribute to the university.'" FAQ at 8 (quoting *SFFA*, 600 U.S. at 230). Schools "'may not simply establish through application essays or other means the regime we hold unlawful today'" because "'[w]hat cannot be done directly cannot be done indirectly.'" *Id.* (quoting *SFFA*, 600 U.S. at 230).

Plaintiffs claim that the guidance documents are similar to laws prohibiting teaching or discussing "'divisive concepts'" at a university. Mot. 21. But the guidance documents make clear that mere discussions of issues of race—especially at a university—will not be unlawful. FAQ at 7. It is the "extreme" practices that the guidance documents call out as troubling, such as "accus[ing] [elementary school students] of being oppressors in a racial hierarchy" or "ascrib[ing] to them less value as contributors to class discussions because of their race." FAQ at 6-7. Again, however, "[i]n all cases, the facts and circumstances of the discussion or activity will dictate the answer to that inquiry." *Id.* at 7. Moreover, Title VI prohibits only "discrimination," and it does not violate the First Amendment to punish speech incident to unlawful conduct. "Where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992). Instead, even when an action is clearly expressive, "it has never been deemed an abridgment of freedom of speech ... to make a course of conduct illegal" because some speech might be caught up in the ban. *Rumsfeld v. FAIR*, 547 U.S. 47, 62 (2006) (cleaned up). To take an example from the employment context, a ban on discrimination in hiring regulates conduct, not speech, even though it "will require an employer to take down a sign reading 'White Applicants Only.'" *Id.*

Indeed, instead of threatening protected speech, the Department goes out of its way to discuss the importance of free speech, which is *threatened* when schools apply double standards based on race. The FAQ explains that "schools must not discriminate against students based on race in how they

12

discipline or sanction students in response to complaints or allegations of harassment, or in response to speech that would be protected under the First Amendment, whether through use of 'bias response teams,' mandatory trainings, or compelled statements." FAQ at 7. The guidance thus discusses the rights of students of all races to speak their minds and to be free from being forced to express ideas that degrade themselves or others based on race. *See Janus v. AFSCME*, 585 U.S. 878, 893 (2018) ("When speech is compelled, … individuals are coerced into betraying their convictions. Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning.").

Plaintiffs express particular concern about the Department's criticisms of recent educational teaching regarding race. *See* Letter at 2 ("Educational institutions have toxically indoctrinated students with the false premise that the United States is built upon 'systemic and structural racism' and advanced discriminatory policies and practices"). Plaintiffs argue that these statements will chill teachers from addressing certain controversial topics related to race in their classroom. *See* Mot. 1-2, 14, 16-17, 37. But Plaintiffs ignore the rest of the Letter and the FAQ, where the Department provides its legal guidance on when educational practices violate Title VI and the Equal Protection Clause. Moreover, to the extent the Department is expressing *its own viewpoint* on curriculum, it is free to have one. "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009). Indeed, judges have long been critical of these types of race-based practices. *See, e.g., Grutter v. Bollinger*, 539 U.S. 306, 349 (2003) (Scalia, J., concurring in part and dissenting in part) (criticizing "universities that talk the talk of multiculturalism and racial diversity in the courts but walk the walk of tribalism and racial segregation on their campuses—through minority-only student organizations, separate minority housing opportunities, separate minority student centers, even separate minority-only graduation ceremonies").

\*   \*   \*

13

The Department's guidance documents are not vague or arbitrary documents that will trample on the First Amendment rights of Americans in schools. The enforcement of civil rights in schools is fully consistent with the right of free speech, and nothing in the Letter or FAQ creates an objectively reasonable basis for schools or teachers to fear that the constitutionally protected expression of controversial viewpoints will cause them to lose federal funding or face discipline. Rather, the guidance accurately reflects the requirements of the Equal Protection Clause and Title VI both before and after the Supreme Court's decision in *Students for Fair Admissions*.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for preliminary injunction.

Dated: April 14, 2025                              Respectfully submitted,

                                                   s/*Cameron T. Norris*

                                                   Thomas R. McCarthy (*pro hac vice* forthcoming)
                                                   J. Michael Connolly (*pro hac vice* forthcoming)
                                                   Cameron T. Norris
                                                   Julius Kairey (*pro hac vice* forthcoming)
                                                   CONSOVOY MCCARTHY PLLC
                                                   1600 Wilson Boulevard, Suite 700
                                                   Arlington, VA 22209
                                                   (703) 243-9423
                                                   tom@consovoymccarthy.com
                                                   mike@consovoymccarthy.com
                                                   cam@consovoymccarthy.com
                                                   julius@consovoymccarthy.com

                                                   *Counsel for Students for Fair Admissions*

**CERTIFICATE OF SERVICE**

      I certify that on April 14, 2025, I electronically filed the foregoing with the Clerk of the Court using the Court's ECF system, which will automatically send email notification to all counsel of record.

<em>s/ Cameron T. Norris</em>