**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| **American Federation of Teachers**, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Case No. 1:25-cv-00628 |
| **U.S. Department of Education**, *et al.*, | |
| Defendants. | |

**REPLY IN SUPPORT OF PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................... 1

II.   ARGUMENT............................................................................................................. 3

     A.    Plaintiffs have established standing and irreparable harm...................................... 3

     B.    Plaintiffs have shown a likelihood of success on the merits on their APA claims.. 6

        1.    The Letter is final agency action and a legislative rule. .................................. 6

          a.  The Letter satisfies both prongs of the Bennett test. ......................................... 7

          b.  The Letter is a legislative rule.......................................................................... 8

        2.    The Departments' actions violate the APA ..................................................... 10

          a.  Not in accordance with law and in excess of statutory authority.................... 10

          b.  Arbitrary and capricious................................................................................. 11

     C.    Plaintiffs have also shown a likelihood of success on their claim that the Letter and Certification are unconstitutionally vague. ..................................................... 12

        1.    The void for vagueness doctrine applies here..................................................... 13

        2.    The Letter and Certification are void for vagueness.......................................... 14

     D.    Plaintiffs have also shown a likelihood of success on their First Amendment claims. .................................................................................................................... 15

     E.    Balance of equites, scope of relief, stay of injunction, and bond ........................ 18

III.  CONCLUSION....................................................................................................... 19

## I.    INTRODUCTION

The Department of Education ("Department") may not accomplish its policy objectives by threatening and coercing countless educators into adherence or overhauling education policy without proper guardrails and public engagement. Yet in the two months since the Department's February 14, 2025, *Dear Colleague Letter* ("Letter"), Dkt. 31-14, millions of educators and schools have faced those threats and an unclear legal landscape, exacerbated by the Department's February 28, 2025, Frequently Asked Questions document ("FAQs"), Dkt. 31-17, and the April 3, 2025, Certification, Dkt. 37-9. In opposing Plaintiffs' motion for emergency relief to prevent further harm from the Department's actions, the Department has narrowed the questions before the Court significantly by failing to meaningfully contest District 4J's standing to challenge the Certification, which it concedes is final agency action and otherwise fails to defend on the merits. Defs.' Resp. in Opp'n to Prelim. Inj., Dkt. 42 ("Opp."). For those questions that remain, the Department fails to even address Plaintiffs' evidence or rebut Plaintiffs' arguments. Indeed, the Department has little defense to Plaintiffs' claims, instead asking the Court to deny the requested emergency relief based on circular arguments, blame shifting, and a demonstrably false insistence that nothing has changed.

*First*, the Department's arguments largely boil down to (1) that the Court and the public should blindly trust the Department's assessment of what constitutes unlawful discrimination, (Opp. at 5-7, 21, 23, 26) (citing the Letter as authority for its conclusion), and ignore guidance and Title VI case law to the contrary; (2) that the Department is empowered to impose conditions on speech and funding to prevent discrimination as the Department currently understands it (Opp. at 28-31); (3) that diversity, equity, and inclusion are unlawful (Letter at 1-2; FAQs at 5-7; Certification at 3-4; Opp. at 21); and (4) that thus the Letter, FAQs, Certification, and other

1

implementations cannot violate the Constitution or the Administrative Procedures Act. Besides being circular, the Department's argument rests on its own conclusory statements about diversity, equity, and inclusion: without that foundation, it necessarily fails.

*Second*, the Department asserts that any uncertainty about the Department's purpose is the sole fault of States, municipalities, school boards, and educators. (Opp. at 2-3, 13-14, 26-27). But this is contrary to the experience on the ground and the record before the Court. *See generally* Pls.' Mem ISO PI, Dkt. 31-1 ("PI Mem.") at 7, 39 & n.40, Pls.' Mem. ISO Expedited PI and APA § 705 Stay of Cert. Dkt. 37-1 ("PI Cert. Mem") at 6-7.

*Third*, the Department argues that the Letter, FAQs, and Certification do not represent any change from preexisting policy. But the Department undermines its own argument by opposing Plaintiffs' request to maintain the status quo. *See, e.g.*, Opp. at 1, 20. The record before the Court tells a very different story. A side-by-side comparison of the Department's Letter, FAQs, and Certification with preexisting guidance shows that the Department's actions do not represent incremental shifts, but instead a complete overhaul of the education landscape. For example:

| Department Policy Pre-Jan. 19, 2025<br>No Longer Publicly Available[1] | Current Department Policy |
|---|---|
| "[C]ampuses [should be] welcoming and supportive environment[s] for students through affinity groups; diversity, equity, and inclusion programming; and shared, accessible spaces." (Dkt. 31-28) | "DEI programs . . . deny students the ability to participate fully in the life of a school." (Letter 3) |
| "[I]nstitutions of higher education remain free to consider any quality or characteristic of a student that bears on the institution's admission decision, such as courage, motivation, or determination, even if the student's application ties that characteristic to their lived experience with race—provided that any benefit is tied to '*that student's*' characteristics, and that the student is 'treated based on his or her | "Federal law thus prohibits covered entities from using race in decisions pertaining to admissions, . . . [and a]lthough some programs may appear neutral on their face, a closer look reveals that they are, in fact, motivated by racial considerations," for example consideration of "students' personal essays, [and] writing samples." (Letter 2-3) |

---

[1] The guidances reflected in Dkt. 31-28, Dkt. 31-20, and Dkt 31-19 were all issued post-SFFA.

| | |
|---|---|
| experiences as an individual[,]' and 'not on the basis of Race.'" (Dkt. 31-20) | |
| "[D]iversity, equity, and inclusion training; instruction in or training on the impact of racial discrimination; cultural competency training; or other nondiscrimination trainings . . . [do not] categorically create a hostile environment on the basis of race" (Dkt. 31-19) | "DEI programs . . . frequently preference certain racial groups and teach students that certain racial groups bear unique moral burdens that others do not. Such programs stigmatize students who belong to particular racial groups based on crude racial stereotypes." (Letter 3) |
| "[I]nstruction in or training on the impact of racism or systemic racism" is not prohibited by Title VI. (Dkt. 31-29) | "[I]nstitutions have toxically indoctrinated students with the false premise that the United States is built upon 'systemic and structural racism' and advanced discriminatory policies and practices." (Letter 2) |

The Department ignores or mischaracterizes binding precedent and targets work that generations of educators, and Department employees, have done to dismantle racially exclusionary schools. The record reveals that the Department's actions are upending decades of law and policy while undermining schools dependent on public funds. Plaintiffs respectfully request that the Court issue a preliminary injunction to prevent the Department from doing so.

## II.    ARGUMENT

### A.  Plaintiffs have established standing and irreparable harm.

Defendants do not contest District 4J's standing to challenge the Certification, nor that it is suffering irreparable harm due to the Certification, nor could they. *See* PI Cert. Mem. at 6-8.

As to the Letter, Defendants nominally challenge District 4J's standing by arguing it was not properly pled in the Complaint—effectively conceding that District 4J has shown standing in its declaration. As Plaintiffs plainly plead sufficient factual allegations supporting District 4J's standing in the Complaint, *see e.g.*, Dkt. 1, Compl. ¶¶ 51, 54, 55, 59, 77, 100, 104, 120-124, 126-129, 132, 133, 138, 139, these arguments can be easily dispensed. Because only one plaintiff needs standing for the case to proceed, no further inquiry into standing is necessary. *Outdoor Amusement*

*Bus. Ass'n., Inc. v. Dep't. of Homeland Sec.*, 983 F.3d 671, 681 (4th Cir. 2020) (cleaned up). Nonetheless, the Associational Plaintiffs have established their standing as well.

Plaintiffs AFT, AFT-MD, and ASA have asserted associational, not organizational, standing. The enforcement threatened by Defendants directly impacts Associational Plaintiffs' members. The Letter itself vaguely prohibits "teach[ing]" DEI content, Letter at 3, and the Certification threatens "serious consequences" for "individual[s] or entit[ies]," Certification at 3. Educators' speech or expressive conduct can be the source of claims arising under the Letter, reported in the DEI Portal, or pursued pursuant to the Certification, and the consequences from investigation, contractual suit, or False Claims Act litigation affects them, their reputations, and their livelihoods.[2] *See* PI Mem. at 10-11; PI Cert. Mem. at 7. This risk is multiplied because anyone can file a complaint on the "EndDEI" portal or a *qui tam* lawsuit under the False Claims Act. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) (credibility of enforcement threat "bolstered" when administrative scheme allows any person with knowledge of a purported violation to file a complaint).

Unlike in *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412-13 (2013), the Certification and the Letter apply directly to educational institutions, are by their own terms "certainly impending" due to their threats of immediate enforcement, and there is no third-party step required before the risk is effective. Defendants' claim that Plaintiffs' fears of enforcement are "speculative" because the Letter "only restates existing law" also fails, given the Department has departed from the prior understanding of the law. *See supra* pp. 2-3; PI Mem. at 25-28.

As to chill, Defendants claim that Plaintiffs' members' fear of self-censorship is subjective and speculative. As explained below, *infra* Sec. II.B.2.a., because the Letter's prohibitions

---

[2] Additionally in many states, there are state bodies that can revoke a teachers' certification and licensure if they do not comply with federal law.

encroach on curricular choices and the topics teachers can teach, without any clear guidance on what will be determined to be unlawful, this argument fails. Indeed, Plaintiffs are far from the only parties who have described feeling confused as to the prohibitions in the Letter and chilled as a result. *See* PI Mem at 39 & n. 40; Ex. 46, Hart Decl. ¶¶ 27-28 (describing teachers and administrators nationwide not knowing what is compliant with the Department's position and being chilled as a result); Ex. 47, Steele Decl. ¶¶ 32-33.

More broadly, educational institutions across the country have responded to these threats by eliminating programming and jobs, *see* PI Mem. at 39 n.41, and it is reasonable to fear that this will continue. This response is the "predictable effect of Government action," *Dep't of Com. v. New York,* 588 U.S. 752, 768 (2019), not "unfettered choices" within the scope of "broad and legitimate discretion," *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 562 (1992) (citation omitted); *see also* Opp. at 31 (conceding schools' restrictions are driven by an effort "to avoid enforcement actions by [the Department]"). Responses, including any arguable overcorrections, are caused by the vague terms of the Letter itself, and now, the steep additional penalties the Certification threatens. *See Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) ("Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.") (cleaned up); *cf. Dep't of Com.*, 588 U.S. at 768 (traceability satisfied where "third parties will likely react in predictable ways"). Likewise, Plaintiffs fear that the Department will investigate complaints consistent with its stance opposing diversity, equity, and inclusion received through the End DEI Portal is reasonable and not "imaginary or wholly speculative." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979); *see* Opp. at 27 (confirming the Department will investigate complaints consistent with its understanding of discrimination); Ex. 50, Portal Press Release (including quote describing the

portal as an opportunity for the public to report the use of "critical theory, rogue sex education and divisive ideologies" in schools). In fact, the harm is "already occurring." *New York v. Dep't of Homeland Sec.,* 475 F. Supp. 3d 208,227 (S.D.N.Y. 2020); PI Mem. at 7-11, 38-39; PI Cert. Mem. at 33-35.

Because of the "prospect of an unconstitutional enforcement," *Air Evac EMS, Inc. v. McVe*y, 37 F.4th 89, 103 (4th Cir. 2022), and the fact that "the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury,'" *Leaders of a Beautiful Struggle v. Balt. Police Dep't,* 2 F.4th 330, 346 (4th Cir. 2021) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)), Plaintiffs have also shown irreparable injury. *See* PI Mem. at 36-38; PI Cert. Mem. at 33-35.

### B.  Plaintiffs have shown a likelihood of success on the merits on their APA claims.

### 1.  The Letter is final agency action and a legislative rule.

Defendants do not contest, and therefore concede,[3] that the Certification is final agency action. *See* PI Mem. at 20-21. The Letter is also final agency action,[4] and is thus reviewable under the APA whether it is an interpretative or legislative rule.[5] Because the Letter attempts to effect a substantive change in existing law or policy, it is a legislative rule.

---

[3] *Ferdinand-Davenport v. Child's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) (finding a failure to address an argument in response constituted abandonment of a claim); *Redondo-Borges v. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 6 (1st Cir. 2005) ("Few principles are more sacrosanct in this circuit than the principle that issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (quotation marks omitted).

[4] Plaintiffs are not arguing the FAQ in isolation is a final agency action. Rather, as an additional manifestation of the Department's changed position on Title VI, and because it is directly tied to the Letter, if the Department is enjoined from enforcing the Letter because it is unlawful and violates the constitution, the FAQs should similarly be enjoined.

[5] "[I]interpretive rules may be subject to pre-enforcement judicial review" if they otherwise fulfill the hallmarks of finality articulated in *Bennett. Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014); *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 406 (D.C. Cir. 2020) (finding guidance was final agency action and an interpretive rule). Ultimately, what matters is whether the agency action at issue has "legal force or practical effect." *Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 237 n.13 (4th Cir. 2008). For the reasons described, the Letter possesses several qualities that render it final agency action regardless of the type of rule it is, and it is subject APA review on that basis.

a. *The Letter satisfies both prongs of the Bennett test.*

The government does not contest that the Letter marks the consummation of agency's decision-making process, satisfying prong one of the *Bennett* test. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *cf.* Opp. at 16-17. Nor could it, as the Letter is not "merely tentative or interlocutory in nature," *see Fund for Animals, Inc. v. Bureau of Land Mgmt.*, 460 F.3d 13, 28 (D.C. Cir. 2006), and is instead an "unequivocal statement of the agency's position" on the appropriate standard by which to make determinations on Title VI investigations and violations. *Harris v. FAA*, 353 F.3d 1006, 1010 (D.C. Cir. 2004).

The Letter satisfies Bennett's second prong because it gives rise to "direct and appreciable legal consequences." *Hawkes Co.*, 578 U.S. at 591. The Letter states that the Department will "no longer tolerate" the activities the Letter describes and that it will "take appropriate measures to assess compliance . . . **based on the understanding embodied in this letter**… beginning no later than 14 days from" the date of the Letter's issuance**.** Letter at 3 (emphasis added). Thus, by its own terms, the Letter *itself* is the basis for potential enforcement actions, and those actions will be brought swiftly and implicate an entity's federal funding. Letter at 3. Courts have concluded that much more tentative guidance documents—for instance which only describe examples that OCR "may consider" in the course of an investigation—are final agency action. *See, e.g., Tennessee v. Dep't of Educ.*, 104 F.4th 577, 598-99 (6th Cir. 2024). Additionally, the understanding embodied in the Letter diverges from that in prior guidance, *see supra* pp. 2-3, *infra* Sec. II.B.2.b., which the Department has summarily removed from its website. *See* Am. Compl. ¶ 75 n.21, *see* Dkt. 31-18 to -21, 26-29 (examples of removed guidance). Because the Letter thereby "alter[s] the legal

landscape," it constitutes final agency action. *Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426, 433 (4th Cir. 2010).[6]

While Defendants describe the Letter as simply a reiteration of existing legal requirements, which "does not bind the public or create new legal standards," Letter at 1 n.3, that language is boilerplate, and belied by their own enforcement actions. S*ee, e.g., Am. Acad. of Pediatrics v. FDA*, 379 F. Supp. 3d 461, 488 (D. Md. 2019) (finding neither the fact that an agency describes an action as "interpretive" or uses "boilerplate language" disclaiming the creation of rights determines whether the action is final); PI Mem. at 6 (describing Department's announcement of Title VI investigations against 51 IHEs). It is also belied by the actions of the administration against DEI more broadly. PI Mem. at 16 & n.14. In sum, the Department's new position, as articulated in the Letter, produces legal consequences.

> b. *The Letter is a legislative rule.*

A rule "is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *Child.'s Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 620 (4th Cir. 2018). Conversely, an interpretive rule "reflect[s] what the administrative agency thinks the statute means, and only remind[s] affected parties of existing duties." *Id.* (quotation omitted).

There can be no question that the Letter "effects a substantive change in existing law or policy." *Id*. at 620. The Letter directly contradicts the Department's existing regulations implementing Title VI, 34 C.F.R. § 100.5(i), making it, by definition, a legislative rule. *See* PI Mem. at 36; *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020) (finding that

---

[6] *See also Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 285 (2018) ("[A]n agency action is 'immediately reviewable' when it gives notice of how a certain statute will be applied."); *Genesis Healthcare, Inc. v. Becerra*, 39 F.4th 253, 262 (4th Cir. 2022) (holding that agency action giving notice of how the agency interprets the relevant statute was a final agency action even absent an enforcement action against a particular party).

contradicting an existing regulation is a hallmark of legislative rules) (cleaned up). Moreover, the Letter announces several presumptions of illegality regarding DEI programming. No prior guidance from the Department has made the determination that "DEI" programs are presumptively illegal under Title VI and *SFFA*. In fact, prior guidance, *supra* pp. 2-3, encouraged DEI programming as a means of increasing equity and remediating the effects of past discrimination.[7] Social-emotional learning, which is identified in FAQ 8 as a "veil" for "discriminatory policies," is a pedagogical approach that has been endorsed and funded by Congress. Ex. 47, Steele Decl. ¶¶ 4-6, 14, 16-18. The agency has, in other words, "change[d] the rules of the game," *Sprint Corp. v. FCC*, 315 F.3d 369, 374 (D.C. Cir. 2003), by bringing within the purview of Title VI a host of activity and speech that had previously been excluded—a quintessentially legislative action. A holistic review of *SFFA* does not support enforcing Title VI in the manner described in the Letter.

The Fourth Circuit's decision in *Jerri's Ceramic Arts v. Consumer Prod. Safety Comm'n*, 874 F.2d 205 (4th Cir. 1989), confirms the point. There, the Court held that a CPSC "Statement of Interpretation" that broadened the interpretation of "small parts" in children's toys constituted a legislative rule. *Id.* at 206. The Letter is comparable to the CPSC's Statement of Interpretation. *See id.* at 208 (relevant factors included altering a long-standing position, imposing new duties, bringing an enormous range of persons and activities within the scope of the Department's enforcement plans, increasing enforcement, and causing alarm).

It is irrelevant that the Letter states that it "does have the force and effect of law." Letter at 1 n.1. An agency's "characterization of its statement as an expansion of its policy or interpretation

---

[7] Defendants cite *Rhea Lana, Inc. v. DOL*, 824 F.3d 1023, 1028 (D.C. Cir. 2016) for the proposition that a letter reminding an entity of the Fair Labor Standards Act did not create "new legal obligations." That case is easily distinguished here, because the DCL is not merely reminding regulated entities of the existence of Title VI. Moreover, in *Rhea Lana*, the Court ultimately found the agency's letter was final agency action, because legal consequences flowed from it. *Id.* at 1029.

… does not preclude [the court] finding that it is something more." *Jerri's Ceramic Arts, Inc.*, 874 F.2d at 207. The disclaimer Defendants rely upon, moreover, is directly contradicted by the Department's warning that it will "no longer tolerate" the activities described in the Letter and will undertake enforcement actions "based on the understanding embodied in th[e] letter." Letter at 3 (emphasis added). This warning is "powerful evidence" the agency intends the rule to be binding. *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 18 (D.C. Cir.), *judgment entered*, 762 F. App'x 7 (D.C. Cir. 2019).

As a legislative rule, the Letter should have been issued via notice and comment; because it was not, the Letter can be vacated on that basis alone. *See Child.'s Hosp.*, 896 F.3d at 623.

## 2. The Departments' actions violate the APA

As an initial matter, Defendants do not defend the Certification under the APA, thereby conceding it is unlawful.[8] As to the Letter, Defendant's arguments primarily rest on an atextual reading of the Letter which asserts that it is in fact consistent with the Department's prior guidance, as well as their incorrect assertion that the Letter is not final agency action.

### a. Not in accordance with law and in excess of statutory authority

The Department argues that the Letter merely informs schools not to discriminate, ignoring the plain language of the Letter and the FAQs, which openly label diversity, equity, and inclusion concepts and practices legally suspect.[9] *See* District 4J Decl., Dkt. 31-7 (noting these concepts are part of District 4J's curriculum and school programming). In this way, the Department is exerting

---

[8] See *supra*, note 3.
[9] For example, the Letter decries the teaching of "structural racism" and takes aim at what it calls the "toxic[] indoctrinate[ion] [of] students" Letter at 2, finding that 'programs discriminate in less direct, but equally insidious, ways[,]" including by "teach[ing] students that certain racial groups bear unique moral burdens," *id.* at 3. The FAQs, in turn, assert that "social-emotional learning" and "culturally responsive" teaching are "veil[ed] discriminatory policies." FAQs at 5.

control over curricula by attempting to regulate school programming to rid it of concepts it dislikes (but which have never been found to violate Title VI). Thus, the Letter is in excess of the Department's authority on the DEOA, and is in conflict with federal laws that similarly limit the Department's authority over school curricula and programming. *See* PI Mem. at 13 n.13, 35.[10]

### b. Arbitrary and capricious

Defendants do not address any of Plaintiff's arguments as to why the Certification is arbitrary and capricious, and only attempt to address a fraction of Plaintiffs' arguments regarding the Letter.[11]

<u>Departure From Prior Guidance.</u> Defendants argue the Letter does not depart from prior guidance, as their interpretation is simply applying the "longstanding principle" that policies that classify based on race are unlawful unless they are justified by a fact-supported compelling interest. Opp. at 21. As addressed herein, the Letter does far more than that. *See also* PI Mem. at 25-28.[12]

Defendants also baldly state that they are not required to provide an explanation for the Department's departure from prior guidance, citing no case in support. Opp. at 21. That is not the

---

[10] While Defendants do not respond to any of Plaintiffs APA arguments with regard to the Certification—effectively waiving any argument that it is lawful under the APA—it is worth repeating that the Certification is clearly contrary to law insofar as it also violates the Paperwork Reduction Act. PI Cert. Mem. at 21-23.

[11] Compare Opp. at 21 (addressing departure from guidance, interpretation of SFFA, and important aspects of the problem) with PI Mem. at 24 (arguing the "letter is arbitrary and capricious because it fails to acknowledge or explain the Department's changed position, rely on prior factual findings and available evidence, account for existing federal and state legal requirements, consider important aspects of the problem, and grapple with the substantial reliance interests").

[12] Directly above that argument, Defendants state that DEI programs involve race consciousness, and that those programs (again with no specification as to the programs, or examples) "preference certain racial groups," making those programs more susceptible to discriminating based on race. Opp. at 21. This statement gets to the heart of the confusion the Letter has introduced. Race consciousness, in and of itself, is not illegal. Nor does race consciousness inherently preference certain groups – but by tying these concepts together, the Department appears indicates that it will view anything that is race-conscious as inherently discriminatory, regardless of whether it results in differential treatment. The "EndDEI" portal is a manifestation of that understanding, as is the multitude of actions the administration has taken to eliminate any grants or funding for things that merely mention race.

law. An agency cannot depart from prior policy sub silentio. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Whether or not that policy was "interpretative" is not relevant.[13]

**SFFA Interpretation.** Defendants argue that the Letter is in fact consistent with the Department's prior guidance on SFFA. That is plainly incorrect. *See supra* pp. 2-3, PI Mem. 27-28.

**Important Aspects of Problem.** Defendants' only argument as to why the agency did not consider the effect of the Letter on school curriculum is their assertion that the Letter does not impact curriculum. That is incorrect, as described *supra* Sec. II.B.2.a. As to considering inconsistent laws, there again, Defendants start from the proposition that the Letter is coextensive with Title VI and prior department guidance, which, for the reasons described herein, is not persuasive. Finally, Defendants' argument as to the correctness of the Letter's position on the elimination of standardized testing pointedly does not address the cases Plaintiffs cite showing that the Department's current position on Title VI has been rejected by courts post-*SFFA*. *See* PI Mem. at 29-31, 31 n.28. As Defendants have not rebutted Plaintiffs' arguments, including not even addressing several key points or the Certification, Plaintiffs have met their burden to show that the Letter and the Certification are arbitrary and capricious.

### C. Plaintiffs have also shown a likelihood of success on their claim that the Letter and Certification are unconstitutionally vague.

---

[13] *See e.g.*, *Encino Motorcars, LLC v. Navarro,* 579 U.S. 211, 217 (2016) (pointing to an opinion letter issued by the agency followed by an amendment to the agency's "Field Operations Handbook" as the basis for longstanding guidance); *Kentucky v. EPA*, 123 F.4th 447, 468 (6th Cir. 2024) (explaining the "mandate to address reliance interests applies just as much to an agency's departure from informal guidance as it does to its departure from formal regulations") (citing *Perez Mortg. Bankers Ass'n*, 575 U.S. 92, 105–06 (2015)); *New York v. Scalia*, 490 F. Supp. 3d 748, 793 (S.D.N.Y. 2020) (finding agency action arbitrary and capricious where it failed to explain departure from prior interpretative guidance).

### 1. The void for vagueness doctrine applies here.

Defendants make no persuasive arguments to avoid void for vagueness review. First, as discussed above, the Letter does have the force of law and is binding on regulated entities.[14] Second, the void for vagueness doctrine is not limited to statutes; Defendants' citation to *Wills v. Pszczolkowski*, 125 F.4th 534, 539 (4th Cir. 2025) is inapposite.[15] Rather, courts regularly review executive and regulatory statements of law for vagueness.[16] Third, Defendants' attempt to evade vagueness review by citing to *United States v. Sun,* 278 F.3d 302 (4th Cir. 2002), is similarly unavailing. As an initial matter, *Sun* recognizes that facial vagueness challenges "involv[ing] First Amendment freedoms," such as this case, are permissible. *Id.* at 309. But more importantly, the Supreme Court recognizes facial vagueness challenges. *See Johnson v. United States*, 576 U.S. 591, 593 (2015).

---

[14] The Government's reliance on *Beckles v. United States*, 580 U.S. 256, 263 (2017), and its assertion that the DCL is "non-binding" are unpersuasive. Opp. At 24. As *Beckles* itself clarifies, the federal sentencing guidelines present a distinct context: they are directed at courts possessing otherwise unfettered discretion. *Beckles*, 580 U.S. at 894–95. Unlike the sentencing guidelines in *Beckles*, the Letter is directed toward members of the education community—not an entity with unchecked authority. These entities are entitled to clear notice of the rules governing their conduct and possess Fifth Amendment rights. Moreover, ED's discretion here is not unfettered; it is limited by its congressional authorization, which the Letter exceeds. *See* PI Mem. at 35.

[15] There, the Fourth Circuit considered a vagueness challenge to a proportionality test used by West Virginia courts in the context of a habeas petition. *Id.* The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governed and severely limited the Court's review of Plaintiffs claim, restricting review to only whether the state court's ruling was "an unreasonable application" of "clearly established Federal law"—there three Supreme Court cases relied on by petitioner. *Id.* at 538–539. The Fourth Circuit found that cases relied on by petitioner invalidated *statutes* for vagueness, the petitioner did not identify instances where the void-for-vagueness doctrine was applied to *judicial decisions*, and that the court was prevented from entertaining any argument that the holdings of the cases extended to judicial decisions. *Id*. at 539–540. As such, *Wills* does not stand for the proposition that only statutes can be evaluated for unconstitutional vagueness, rather the language Defendants cite to is clearly cabined to the facts of the case.

[16] *See e.g.*, *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 1:25-CV-00333-ABA, 2025 WL 573764, at *19 (D. Md. Feb. 21, 2025), *opinion clarified*, No. 25-CV-0333-ABA, 2025 WL 750690 (D. Md. Mar. 10, 2025) (finding Executive Order was vague); *U.S. Lab. Party v. Pomerleau*, 557 F.2d 410, 412 (4th Cir. 1977) (finding anti-noise ordinances were vague); *Nitzberg v. Parks*, 525 F.2d 378 (4th Cir. 1975) (finding County board of education's regulations were on their face void for vagueness and overbreadth).

### 2.   The Letter and Certification are void for vagueness.

As Defendants have not offered any arguments related to the Certification, they have waived them.[17] Defendants' arguments regarding the Letter, Opp. at 25-27, are unpersuasive.

First, Defendants' argument that the Department was not required to issue the Letter, *id*. at 25, misses the point of the due process notice requirement. The Department has announced new requirements for compliance but fails to give clear notice of how a person could actually meet those obligations; therefore, there is nothing counterintuitive in holding the Department accountable for creating obligations and not clearly explaining them.[18]

Second, the Government fails to engage directly with the Letter's vague terminology, arguing instead that the Letter "does not define ED's understanding of the scope of prohibited conduct under Title VI by reference to 'DEI.'*" Id.* at 26. But this fails to account for the actual text of the Letter, which concludes that "DEI programs" "discriminate in less direct, but equally insidious, ways," Letter at 3, and is no response to the numerous additional vague prohibitions Plaintiffs identify. PI Mem. at 21-22. Nor does the Government's reference to the statement in FAQs that "[w]hether a policy or program violates Title VI does not depend on the use of specific terminology such as 'diversity,' 'equity,' or 'inclusion,'" Opp. at 26 (quoting FAQs at 6), answer Plaintiffs' arguments. The statement in the FAQs that currently appears live on ED's website is: "whether an initiative constitutes unlawful discrimination does not turn *solely* on whether it is labeled "DEI" or uses terminology such as "diversity," "equity," or "inclusion,"" Ex. 49, Revised

---

[17] See *supra*, note 3.

[18] This is particularly true where an object of administration is to "EndDEI," in all its forms. Promulgating vague guidance has the natural and predictable effect of chilling a broader range of DEI-related speech, as opposed to isolated enforcement actions or specific guidelines. As ending this form of disfavored speech is an explicit goal of this administration, the Letter is consistent with that object.

FAQs at 6 (emphasis added),[19] which effectively concedes "labels" will be part of the consideration—if not the primary factor. In any event, the FAQs do not alter the terms of the Letter, which promises enforcement based on the understanding embodied within it. Letter at 3.

Similarly, citing an isolated statement in the four-page Letter, the Government argues the Letter is limited to addressing disparate treatment discrimination. Opp. at 26 (citing Letter at 2). But the Letter and FAQs articulate liabilities untethered to any standard in case law. *See* PI Mem. 29-31.

Further, the Letter and FAQs fail to explain how any existing legal standard leads to the conclusions it asserts: that it would be "'unlawful" to act "to increase racial diversity," Letter at 3; that DEI programs "deny students the ability to participate fully in the life of a school," *id.*; and that social and emotional learning and culturally responsive teaching are "veil[ed] discriminatory policies," FAQs at 5.

Finally, Defendants' argument that the End DEI Portal will not increase the likelihood of arbitrary enforcement ignores the Department's own statements with regards to its purpose. The EndDEI Portal specifically solicits complaints only regarding "divisive ideologies and indoctrination," without further elaboration as to the actual law governing DEI. EndDEI Portal, Dkt. 31-13. The complaints received are to be used "as a guide to identify potential areas for investigation." Ex. 50, Portal Press Release. Given this announcement, it is reasonable to assume that ED will engage in enforcement consistent with its stated intent. *See also* Mar. 14 Investigations Press Release, Dkt. 31-35) (stating ED's intent to "reorient civil rights enforcement").

> **D.  Plaintiffs have also shown a likelihood of success on their First Amendment claims.**

---

[19] The Department apparently updated the FAQs document at some point since it was originally issued on February 28, 2025.

The Department fails to address Plaintiffs' claim or to meaningfully distinguish binding precedent that demonstrates that the Letter, the FAQs, and the Certification violate the First Amendment. Instead, the Department relies almost entirely on a baseless argument that the Letter does not infringe on protected expression and cannot violate the First Amendment if it only bans unlawful racial harassment. Neither argument is persuasive.

While the Department now insists schools "remain entitled to take a positive view, negative view, or any other view" on diversity, equity, and inclusion, Opp. at 27, the Letter, under the auspices of the federal government, disparages "American educational institutions," which it baselessly accuses of "embrac[ing] pervasive and repugnant race-based preferences." Letter at 1. It also accuses educational institutions of "toxically indoctrinat[ing] students … under the banner of 'diversity, equity, and inclusion'"and "stigmatiz[ing] students who belong to particular racial groups based on crude racial stereotypes." Letter at 1-3. The Letter implicitly and explicitly threatens educators that it "will no longer tolerate the overt and covert racial discrimination" that it accuses schools of fostering and promises "loss of federal funding" for noncompliance. Letter at 3, 4.

Rather than confronting Plaintiffs' claims on the merits, the Department argues that creating a racially hostile environment, engaging in racial harassment, or general racial discrimination are not protected by the First Amendment. That is beside the point, as it assumes that the Letter is coextensive with Title VI and the Equal Protection Clause, when by its terms it suggests a broad range of diversity, equity, and inclusion concepts are illegal with no legal or factual basis. The Letter, the FAQs, and the Certification universally chill their protected expression and association on a range of topics including diversity, equity, and inclusion, and threaten consequences for expressing views disfavored by the Department. The Department does

16

nothing to rebut Plaintiffs' arguments that the Letter, FAQs, and Certification constitute unlawful discrimination based on viewpoint and content, amount to unlawful conditions on funding, and are unconstitutionally overbroad.[20]

And the Department barely attempts to distinguish binding precedent; when it does, its arguments are unpersuasive. The Department does not even mention Plaintiffs' claim that the Letter, FAQs, and Certification infringe on the freedom of association. Nor does the Department address the precedent Plaintiffs cite to demonstrate that the Letter, FAQs, and Certification constitute an impermissible restriction on funding.[21] And while the Department, in a separate section, attempts to distinguish *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024), the attempted distinction fails. *See* Opp. at 28. Contrary to the Department's claim, *Vullo*'s four-part test, when applied, demonstrates the perverse effect of the Department's Letter, FAQs, and Certification. *See, e.g.*, PI Cert. Mem. at 18-19; *see also, e.g.*, *Vullo*, 602 U.S. at 180 (reaffirming its six-decades old holding that "[g]overnment officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors") (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). Instead, the Department relies on two-decades old Supreme Court cases not on point.[22] Likewise, the Department does not address Plaintiffs' precedents

---

[20] *Compare* PI Mem. at 15-19; PI Cert. Mem. at 16-20 *with* Opp. at 28-30.

[21] *Compare* PI Mem. at 16-17 (citing Supreme Court and other precedent that holds that the government cannot condition funding as a means to restrict expression of disfavored views), PI Cert. Mem. at 17-18 (same and discussing the Supreme Court's four-part test for considering if a government action is coercive) *with* Opp. at 30-31 (arguing that the conditions on federal funding imposed by the Letter, FAQs, and Certifications are not coercive without addressing any of Plaintiffs' precedents).

[22] *South Dakota v. Dole* concerned a condition on funding imposed by Congress, not the Executive Branch, and the Court relied heavily on Congress's constitutional spending powers to support its conclusion. 483 U.S. 203, 205 (1987); *see also Rust v. Sullivan*, 500 U.S. 173, 197 (1991) (citing *South Dakota* and distinguishing it and the similar class of cases from the "unconstitutional conditions" cases where "the Government has placed a condition on the *recipient* of the subsidy … [even] outside the scope of the federally funded program") (emphasis original). And the Supreme Court's holding in *Walker v. Texas Div., Sons of Confederate Veterans, Inc.* is wholly divorced from the government imposing a post hac condition on funding. 576 U.S. 200, 207 (2015) (finding that a private party could not force the government to engage in particular speech). Neither case supports the Department's position here.

related to chilling speech, academic freedom, and viewpoint and content-based discrimination.[23]

In fact, the cases the Department relies on overwhelmingly support Plaintiffs' position.[24]

Plaintiffs have established a likelihood of success on their First Amendment claims.

### E.  Balance of equites, scope of relief, stay of injunction, and bond

Plaintiffs' request for relief is already narrowly tailored: the Court should require that the

Department restore and maintain the *status quo* prior to the Letter. Nothing in Plaintiffs' request

can be construed as stopping the Department from enforcing Title VI and *SFFA*; the Department

is free to do so but must do so within the bounds of the law.

The exigencies of this case require nationwide relief. "When a reviewing court determines

that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their

application to the individual petitioners is proscribed." *Corner Post, Inc. v. Bd. of Governors of

Fed. Rsrv. Sys.*, 603 U.S. 799, 831 (2024) (*quoting Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21

(D.C. Cir. 1989)). Similarly, "where a law is unconstitutional on its face, and not simply in its

application to certain plaintiffs, a nationwide injunction is appropriate." *PFLAG, Inc. v. Trump*,

No. CV 25-337-BAH, 2025 WL 510050, at *24 (D. Md. Feb. 14, 2025) (citation omitted). Here,

applying an injunction exclusively to Plaintiffs and their members is impractical and not

---

[23] *Compare* PI. Mem. at 12-16 (citing Supreme Court and other precedent setting forth the standards for chilled speech, academic freedom, and viewpoint and content-based discrimination); PI Cert. Mem. at 16-20 (same) *with* Opp. at 27-30 (failing to address any of Plaintiffs' First Amendment precedents when asserting that the Letter, FAQs, and Certification do not violate the First Amendment).

[24] *See, e.g.*, *United States v. Miselis*, 972 F.3d 518, 536-37 (4th Cir. 2020) (striking down statutory language as overbroad where it referred to "abstract advocacy"); *Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233, 243 (4th Cir. 1997) (reiterating that "even speech advocating lawlessness has long enjoyed protections under the First Amendment," and including cited language in parenthetical the citation for *U.S. v. Varani*, 435 F.2d 758 (6th Cir. 1970), a criminal appeal concerning threats made by a federal government official acting in his official capacity that cites federal criminal statutes outlining offenses for perjury, bribery, extortion and threats, and conspiracy); *Dambrot v. Central Michigan Univ.*, 55 F.3d 1177, 1183-84 (6th Cir. 1995) (finding a University policy unconstitutionally overbroad because the "broad scope of the policy's language presents a 'realistic danger' the University could compromise the protection afforded by the First Amendment" and unconstitutionally vague because it did "not provide fair notice of what speech will violate the policy" but instead "wholly delegated" the decision of what violated the policy); *Gartenberg v. Cooper Union for the Advancement of Sci. and Art*, 2025 WL 401109 at *15 (S.D.N.Y. Feb. 5, 2025) (noting that the challenged speech "cannot itself support a claim for an objectively hostile educational environment").

administrable, as Plaintiffs are located in IHEs and LEAs across the country, and would cause further confusion in schools and educational institutions throughout the nation. In these exigent circumstances, there is no narrower injunction that can provide complete relief.

Staying the requested injunction, to permit Defendants' anticipated appeal, would allow the Certification and other enforcement efforts to take effect, resulting in immediate further injury to Plaintiffs. Moreover, a stay would be inappropriate where the Government has not identified any injury to ED and particularly where Defendants have consistently argued that the Letter changes nothing and has no immediate effect.

Finally, Plaintiffs respectfully request that due to the remote risk of harm to Defendants, and significant burden on Plaintiffs, the Court decline the Government's request for an injunction bond, Opp. at 33-34, or alternatively set a nominal bond. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999) (describing that where a district court determines the risk of harm is remote or circumstances warrant it a nominal bond may suffice.) (citing *International Controls Corp. v. Vesco*, 490 F.2d 1334 (2d Cir.1974)). A district court may "set an injunction bond . . . 'in such sum as the court deems proper.'" *Thomas v. Andino*, 613 F. Supp. 3d 926, 956 (D.S.C. 2020) (quoting *Hoechst Diafoil Co.*, 174 F.3d at 421); *see also* PI Mem. at 40 n.42; Pl Cert. Mem at 36 n.50. Here, no bond or a nominal bond, at most, is proper.

## III.    CONCLUSION

For the foregoing reasons, and those articulated in Plaintiffs' briefing on its Preliminary Injunction Motions, Plaintiffs respectfully request that the Court grant Plaintiff's Motions (Dkt. 31, 37) and issue a preliminary injunction consistent with that requested in the Proposed Orders (Dkt 31-2, 37-2), and/or an APA § 705 stay of the effective date of the Certification.

Dated: April 17, 2025                    Respectfully submitted,

*/s/ Brooke Menschel*
Brooke Menschel (Bar No. 31492)
Madeline H. Gitomer (Bar No. 31518)
Kali Schellenberg**
Victoria S. Nugent (Bar No. 15039)
Andrew Bookbinder (Bar No. 31486)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
bmenschel@democracyforward.org
mgitomer@democracyforward.org
kschellenberg@democracyforward.org
vnugent@democracyforward.org
abookbinder@democracyforward.org

*Counsel for Plaintiffs*
** Admitted *Pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on the date below, I electronically filed the foregoing with the Clerk of the Court of the United States Court of the District of Maryland by using the CM/ECF system. I also certify that the foregoing document is being served on Defendant's counsel of record and that service will be accomplished by the CM/ECF system.

This 17th day of April 2025

/s/ *Brooke Menschel*
Brooke Menschel (Bar No. 31492)
*Counsel for Plaintiffs*