# EXHIBIT 46

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **American Federation of Teachers,** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **U.S. Department of Education,** *et al.*, <br><br> Defendants. | Civil Case No. 1:25-cv-00628 |

### DECLARATION OF DR. RAYMOND C. HART

I, Raymond C. Hart, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am over eighteen years old, of sound mind, and fully competent to make this declaration. I also have personal knowledge of the factual statements contained herein. I make this declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

2. I am the Executive Director of the Council of the Great City Schools (CGCS). I have served in this role since July 1, 2021.

3. I have more than 30 years of experience in education issues, with a focus on research and evaluation, seeking to understand what helps students succeed, how to develop effective teachers, and how to ensure the development of literacy skills.

4. Founded in 1956, the Council of the Great City Schools now represents 78 of the nation's largest urban public school systems. Our member districts are in the vast majority of

1

states and represent the geographic, ethnic, language, and cultural diversity of our country. Our member districts collectively serve 7.84 million students, from Anchorage, Alaska, to Miami-Dade, Florida. The districts sit in large cities like New York City (pop. 8.2 million) and smaller cities like Richmond, Virginia (pop. 230,000).

5. In my role as Executive Director of CGCS, I provide leadership for the organization, including our efforts to support our member school systems and advocacy to lawmakers regarding the needs and successes of big-city schools.

6. The Council promotes urban education through research, instruction, management, technology, legislation, communications, and other special projects.

7. Shortly after April 3, I began to hear from many of our member districts that were alarmed by a letter their state education agencies had received from the U.S. Department of Education.

8. The letter requires each state education agency, as well as every school district, to sign a certification that would require each district to certify that it complies with Title VI, but also with the Department's position that Title VI prohibits many diversity, equity, and inclusion activities.

9. The certification was originally due within ten days, on April 13, but I understand that it is now due April 24. Our members are profoundly concerned about responding for a number of reasons.

10. First, there is a lack of clarity about what signatories are asked to certify. Our member districts comply with Title VI and have submitted assurances of compliance with the statute and its implementing regulations on prior occasions. But they have never before been

2

asked to certify adherence to undefined policies announced by a new presidential administration. They have never before been asked to certify that they do not utilize or engage in "illegal DEI."

11. Our member districts span 39 states and two territories and have a broad array of state and local considerations.

12. Many of our member districts offer and sponsor programming and activities that include diversity, equity, or inclusion principles. Many of these programs and activities are evidence-based and have been determined for years to be legal. Some are even required by federal, state or local law or curricular standards.

13. Second, our members are concerned that the certification puts them in an untenable position– that failure to certify will be read as an admission of illegal conduct and a basis for withholding funds and that certification will lead to prosecution based on the administration's new interpretations of discrimination.

14. Our member districts believe that the Department – in publishing the Dear Colleague Letter and FAQs and seeking new certifications – plans to enforce a different interpretation of Title VI and SFFA centered on what the Department refers to as "illegal DEI."

15. Dozens of our member districts have sought guidance from CGCS on the meaning of "illegal DEI." CGCS has not been able to provide concrete answers because the Department has not defined "illegal DEI." Instead, the Department has incorrectly highlighted concepts and pedagogical methods like teaching about historical racism, building social-emotional learning skills, and employing culturally responsive teaching as vehicles for illegal discrimination.

16. Our member districts are receiving different directions and advice from their state education agencies. Some are being directed to sign the certification within days. Others are

being told that their state will not require them to sign the certification. Regardless of the advice given by the state education agency, our member districts are concerned about a loss of funding and enforcement actions against them based on the Department's new interpretation of law.

17. The consequences of any action or inaction on the certification are severe.

18. Our members are deeply alarmed by the prospect of investigation and enforcement by the Department under Title VI and the False Claims Act based on the Department's statements in the Dear Colleague Letter, the related FAQs published February 28, and the Department's request for new certifications. And because the False Claims Act also allows for citizen suits filed by relators, many of our member districts are very concerned about an influx of very costly litigation that will take resources and attention away from educating their students.

19. Member districts that do not sign the certification and see federal funds withheld or clawed back will not be able to cover the lost funding.

20. Our member districts educate millions of students throughout the United States, and our schools rely heavily on federal funding to provide our students with a robust education.

21. Federal funding allows our member districts to dedicate the resources needed to students that have too often been systemically marginalized.

22. Federal funds are used by our member districts to assist low-income students of all races and ethnicities.

23. If this federal funding were terminated, even for a short time, many of our member districts would need to lay off educators and staff, cut programming, and shut down key services to students and the community.

24. The penalties associated with False Claims Act violations would be even worse and would be unsurmountable for many of our districts.

25. Our member districts work hard to comply with civil rights laws, many of which were passed to expand opportunity to the students we serve.

26. The Department's unexplained change in position on what Title VI means has put our member districts in an impossible situation. They have no way of knowing what is or is not compliant with the Department's new position.

27. Our member districts would need to scale back programming that has never been deemed illegal and their educators would feel the need to self-censor in an effort to try to comply with what they *think* the Department might require, which may run afoul of state law or education standards. Or, they would continue to keep in place the activities they believe comply with Title VI and worry that the entirety of their federal funding would be threatened without due process.

28. Students in our member districts show enormous promise and have great educational needs. Our members rely on federal funding to support their efforts, and they also rely on Department guidance to be clear, backed by evidence and explanation, and supportive of our nation's districts.

29. The short deadline for compliance does not give school districts sufficient time to determine what and how to respond to this certification and puts enormous pressure on them to make significant decisions quickly and without the Department guidance needed.

_____
Raymond C. Hart

_April 16, 2025_____
Date