**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| **AMERICAN FEDERATION** | * | |
| **OF TEACHERS**, *et al.*, | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | **Civil Case No.: SAG-25-628** |
| **v.** | * | |
| | * | |
| **DEPARTMENT OF** | * | |
| **EDUCATION**, *et al.*, | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

<u>**MEMORANDUM OPINION**</u>

This case is about the substantive and procedural legality of recent actions by the United States Department of Education ("DOE"). On February 14, 2025, DOE published a "Dear Colleague Letter" ("the Letter"). According to the government, the Letter merely reminded Title VI funding recipients of their obligation to comply with existing civil rights law. Some readers, however, saw the Letter much differently. Concerned that their First Amendment rights were under threat, the Plaintiffs—American Federation of Teachers ("AFT"), American Federation of Teachers–Maryland ("AFTMD"), American Sociological Association ("ASA"), and Eugene, Oregon School District 4J ("District 4J")—filed this lawsuit against Defendants DOE, Linda McMahon, in her official capacity as Secretary of Education, and Craig Trainor, in his official capacity as Acting Assistant Secretary for the Office for Civil Rights (collectively, "the government" or "DOE").

But the story continues. As the parties briefed the preliminary injunction motion Plaintiffs filed to enjoin the enforcement and implementation of the Letter ("the Letter Motion"), ECF 31, DOE further announced that it would require states and school districts to affirmatively certify

their compliance with DOE's interpretations of Title VI and *Students for Fair Admissions v. Harvard* ("*SFFA*"), 600 U.S. 181 (2023), within ten days ("the Certification Requirement"). DOE later extended the deadline until April 24, 2025. Plaintiffs filed a second preliminary injunction motion, this time seeking to halt the quickly impending deadline for states and school districts to certify ("the Certification Motion"). ECF 37. The government opposed both preliminary injunctions. ECF 42. Plaintiffs submitted a consolidated reply. ECF 51. The American Civil Liberties Union of Maryland and PEN American, Inc. filed an amicus brief in support of the Plaintiffs. ECF 35-1. Students for Fair Admissions filed an amicus brief in support of the government. ECF 45-1.[1] This Court heard legal arguments from Plaintiffs and the government on April 18, 2025.

As a colleague aptly noted recently, "elections have consequences and the President is entitled to enact his agenda." *Woonasquatucket River Watershed Council v. Dep't of Agric.*, Civil No. 25-97-MSM, – F. Supp. 3d – , 2025 WL 116157, at *2 (D.R.I. Apr. 15, 2025). The "wisdom" of decisions by the Executive branch "is none of our concern." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 35 (2020). But while "[t]he Executive is inherently focused on ends," the Judicial role is, and must be, focused on "means." *Abrego Garcia v. Noem*, No. 25-1404, 2025 WL 1135112, at *2 (4th Cir. Apr. 17, 2025). We "are constitutionally required to weigh in" in cases "about the procedure (or lack thereof) that the government follows in trying to enact [its] policies." *Woonasquatucket*, 2025 WL 116157, at *2 (quoting *California*, 591 U.S. at 35).

This is one such case. This Court takes no view as to whether the policies at issue here are good or bad, prudent or foolish, fair or unfair. But this Court is constitutionally required to closely

---

[1] Both amici's motions for leave to file an amicus brief, ECF 35, 45, are granted.

scrutinize whether the government went about creating and implementing them in the manner the law requires.

The government did not. The Plaintiffs are likely to succeed on the merits of their Administrative Procedure Act ("APA") claim, have demonstrated that they will be irreparably harmed absent preliminary relief, and have shown the equities and public interest favor them. The law accordingly requires this Court to stay the Letter pending final resolution by this Court. Plaintiffs' Letter Motion, ECF 31, is granted in part and denied in part. But because Plaintiffs' Amended Complaint contains no challenge to the Certification Requirement, the Certification Motion, ECF 37, is denied.

## Table of Contents

I.  Background ........................................................................................................... 4
    A.  Plaintiffs ..................................................................................................... 4
       i.  American Federation of Teachers ...................................................... 4
       ii.  American Sociological Association ................................................... 4
       iii.  American Federation of Teachers – Maryland ................................. 4
       iv.  District 4J ......................................................................................... 5
    B.  Factual Background ..................................................................................... 5
       i.  The Dear Colleague Letter ............................................................... 5
       ii.  FAQs ................................................................................................ 7
       iii.  The End DEI Portal ........................................................................ 10
       iv.  Initial Enforcement Actions ........................................................... 10
       v.  The Certification Requirement ....................................................... 11
    C.  Procedural History .................................................................................... 12
II.  Legal Standard ................................................................................................... 13
III.  The Certification Motion .................................................................................. 15
IV.  The Letter Motion ............................................................................................. 17
    A.  Standing .................................................................................................... 17
    B.  Final Agency Action ................................................................................. 23
V.  Preliminary Injunction Factors ......................................................................... 26

A.   Likelihood of Success on the Merits ................................................. 26

i.   Administrative Procedure Act ...................................... 27

B.   Irreparable Harm ........................................................................ 43

C.   Public Interest and Balance of the Equities ........................................ 45

VI.  Remedy ................................................................................................ 46

VII. Conclusion ........................................................................................... 48

## I.    BACKGROUND

### A.   <u>Plaintiffs</u>

The Plaintiffs are two national organizations, one Maryland organization, and a school district located in Eugene, Oregon.

#### i.    *American Federation of Teachers*

AFT is a national labor union representing 1.8 million members "who are employed as pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals." ECF 14 ¶ 19. It is an affiliate of the AFL-CIO. *Id.*

#### ii.   *American Sociological Association*

ASA "is the national professional membership organization for sociologists and others who are interested in sociology." *Id.* ¶ 20. ASA's approximately 9,000 members include students, scholars, and teachers in a variety of educational settings, and persons employed by government agencies, non-profit organizations, and private companies. *Id.*

#### iii.  *American Federation of Teachers – Maryland*

AFTMD is a Maryland-based affiliate of AFT. *Id.* ¶ 21. AFTMD's members include over 18,000 pre-K through 12th grade teachers, paraprofessionals, school personnel, and higher education faculty and staff. *Id.*

### iv.    District 4J

District 4J is a school district located in southern Oregon, mostly covering the city of Eugene. *Id.* ¶ 22. The district serves over 16,000 students. *Id.* About 35% of students in District 4J are "Black, Indigenous, Latino/a, or otherwise people of color." *Id.*

## B.  Factual Background

### i.    The Dear Colleague Letter

On February 14, 2025, Acting Assistant Secretary [of Education] for Civil Rights Craig Trainor issued the Letter. ECF 31-14. The Letter purports to "clarify and reaffirm the nondiscrimination obligations of schools and other entities that receive federal financial assistance" required by Title VI, "the Equal Protection Clause of the United States Constitution, and other relevant authorities," following the Supreme Court's 2023 decision in *SFFA*.

The Letter begins by stating that in recent years, educational institutions' "embrace of pervasive and repugnant race-based preferences and other forms of racial discrimination have emanated through every level of academia." ECF 31-14 at 1. As examples of this discrimination, the Letter mentions the use of race as a factor in admissions, financial aid, hiring, training, and "other institutional programming." *Id.* It also mentions separate graduation ceremonies, dorms, and "other facilities" for certain races. *Id.* It continues that "[e]ducational institutions have toxically indoctrinated students with the false premise that the United States is built upon 'systemic and structural racism' and advanced discriminatory policies and practices. Proponents of these discriminatory practices have attempted to further justify them…under the banner of 'diversity, equity, and inclusion' ('DEI'), smuggling racial stereotypes and explicit race-consciousness into everyday training, programming, and discipline." *Id.* at 2.

It then discusses DOE's current interpretation of *SFFA*, which is, "[i]f an educational institution treats a person of one race differently than it treats another person because of that person's race, the educational institution violates the law." *Id.* And "[a]lthough some programs may appear neutral on their face, a closer look [could] reveal[] that they are, in fact, motivated by racial considerations." *Id.* Being motivated by race-based factors, the Letter continues, "remains impermissible." *Id.* at 2–3 ("The Department will no longer tolerate the overt and covert racial discrimination that has become widespread in this Nation's educational institutions. The law is clear: treating students differently on the basis of race to achieve nebulous goals such as diversity, racial balancing, social justice, or equity is illegal under controlling Supreme Court precedent.").

The Letter describes two examples of what would be "impermissible." First, "[r]elying on non-racial information as a proxy for race, and making decisions based on that information, violates the law. That is true whether the proxies are used to grant preferences on an individual basis or a systematic one. It would, for instance, be unlawful for an educational institution to eliminate standardized testing to achieve a desired racial balance or to increase racial diversity." *Id.* at 3. Second, "[o]ther programs discriminate in less direct, but equally insidious, ways. DEI programs, for example, frequently preference certain racial groups and teach students that certain racial groups bear unique moral burdens that others do not. Such programs stigmatize students who belong to particular racial groups based on crude racial stereotypes. Consequently, they deny students the ability to participate fully in the life of a school." *Id.*

The Letter concludes by reiterating that it is "notice of the Department's existing interpretation of federal law" and pledging that DOE "will vigorously enforce the law…as to all…educational institutions, as well as state educational agencies." *Id.* Those entities were advised that enforcement would begin "no later than 14 days" from the date of the Letter. *Id.* They were

accordingly instructed to take the following actions: "(1) ensure that their policies and actions comply with existing civil rights law; (2) cease all efforts to circumvent prohibitions on the use of race by relying on proxies or other indirect means to accomplish such ends; and (3) cease all reliance on third-party contractors, clearinghouses, or aggregators that are being used by institutions in an effort to circumvent prohibited uses of race." *Id.*

The Letter included a link to an "end DEI" portal on DOE's website, *id.*, for "students, parents, teachers and the broader community to report illegal discriminatory practices at institutions of learning." ECF 31-16.

### ii.  FAQs

"[T]o anticipate and answer questions," stemming from the Letter, DOE published "Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act" ("FAQs"). ECF 31-17. The FAQs apply "to racial classifications, racial preferences, and racial stereotypes, as well as how OCR will interpret [*SFFA*] in its enforcement of Title VI…and its implementing regulations." *Id.* at 1. DOE updated the FAQs on April 9, 2025. ECF 51-4.

The first seven questions and answers discuss the Administration's interpretation of *SFFA* and its application to Title VI generally. Question 8 asks expressly whether DEI programs are unlawful. *Id.* at 6. The answer provides:

> Schools may not intentionally discriminate on the basis of race, color, or national origin in their programs or activities. Many schools have advanced racially discriminatory policies and practices under the banner of "DEI" initiatives. Other schools have sought to veil racially discriminatory policies with terms like "social-emotional learning" or "culturally responsive" teaching. But whether an initiative constitutes unlawful discrimination does not turn solely on whether it is labeled "DEI" or uses terminology such as "diversity," "equity," or "inclusion." OCR's assessment of school

policies and programs depends on the facts and circumstances of each case.

Schools may not operate policies or programs under any name that intentionally treat students differently based on race, engage in racial stereotyping, or create hostile environments for students of particular races. For example, schools with programs focused on interests in particular cultures, heritages, and areas of the world would not in and of themselves violate Title VI, assuming they are open to all students regardless of race. Nor would educational, cultural, or historical observances— such as Black History Month, International Holocaust Remembrance Day, or similar events—that celebrate or recognize historical events and contributions, and promote awareness, so long as they do not engage in racial exclusion or discrimination. However, schools may not sponsor programming that creates a hostile environment based on race for students who do participate.

*Id.* Question 9 asks whether statements in the Letter that DEI programs "deny students the ability to fully participate in the life of a school" by "stigmatiz[ing] students that belong to particular racial groups" based on "crude racial stereotypes," and teach that students in some racial groups "bear unique moral burdens that others do not" mean that students and teachers may not discuss topics relating to DEI or race. *Id.* The answer reads:

OCR enforces federal civil rights law consistent with the First Amendment of the U.S. Constitution. Nothing in Title VI or its implementing regulations, authorizes a school to restrict any rights otherwise protected by the First Amendment, nor does the Dear Colleague Letter indicate as much.

Additionally, the Department of Education Organization Act, 20 U.S.C. § 3403(b), and the Elementary and Secondary Education Act, 20 U.S.C. § 7907(a), prohibit the Department from exercising control over the content of school curricula. However, the First Amendment rights of students, faculty, and staff, and the curricular prerogatives of states and local school agencies do not relieve schools of their Title VI obligations to refrain from creating hostile environments through race-based policies and stereotypes; nor does it relieve them of their duty to respond to racial harassment that creates a hostile environment.

In determining whether a racially hostile environment exists, OCR will examine the facts and circumstances of each case,

including the nature of the educational institution, the age of the students, and the relationships of the individuals involved. For example, an elementary school that sponsors programming that acts to shame students of a particular race or ethnicity, accuse them of being oppressors in a racial hierarchy, ascribe to them less value as contributors to class discussions because of their race, or deliberately assign them intrinsic guilt based on the actions of their presumed ancestors or relatives in other areas of the world could create a racially hostile environment, by interfering with or limiting the students' ability to participate in or benefit from the school's program or activity. But exploration of similar themes in a class discussion at a university or other college-level programs or activities would be less likely to create a racially hostile environment. In all cases, the facts and circumstances of the discussion or activity will dictate the answer to that inquiry.

However, the more extreme practices at a university—such as requiring students to participate in "privilege walks" that are designed to make them feel guilty about being part of a certain race, segregating them by race for presentations and discussions with guest speakers, pressuring them to participate in protests or take certain positions on racially charged issues, investigating or sanctioning them for dissenting on racially charged issues through DEI or similar university offices, mandating courses, orientation programs, or trainings that are designed to emphasize and focus on racial stereotypes, and assigning them coursework that requires them to identify by race and then complete tasks differentiated by race—are all potential forms of school-on-student harassment that could create a hostile environment under Title VI. Specifically, such conduct could be deemed to create a hostile environment if, viewed by a reasonable person, of the same race and age, under similar circumstances, it is sufficiently severe, pervasive, or persistent so as to interfere with or limit the ability of an individual to participate in or benefit from the school's program or activity. Moreover, schools must not discriminate against students based on race in how they discipline or sanction students in response to complaints or allegations of harassment, or in response to speech that would be protected under the First Amendment, whether through use of "bias response teams," mandatory trainings, or compelled statements. Nor can schools use race as a reason not to discipline or sanction a student for conduct that would otherwise warrant these corrective measures if applied to members of another race.

*Id.* at 6–7. Question 10 discusses school admissions, and essay prompts. Specifically, the Answer

notes that while *SFFA* expressly permits an applicant to discuss how race has impacted his or her

life, DOE was concerned that universities may be using essays as a "loophole." *Id.* at 8. Question 11 clarifies that the Letter also prohibits schools from engaging with third parties that "engage in racial preferences." *Id.* Questions 13 describes factors OCR might consider in assessing non-compliance with Title VI, and notes that, "[a] school's history and stated policy of using racial classifications and race-based policies to further DEI objectives, 'equity,' a racially-oriented vision of social justice, or similar goals will be probative in OCR's analysis of the facts and circumstances of an individual case." *Id.* at 9. Question 14 describes OCR's process for sanctioning a school it finds out of compliance. *Id.* at 10. Question 15 offers resources to learn more. *Id.*

### iii.    The "End DEI" Portal

In the Letter, DOE provided the link to a portal for "students, parents, teachers, and the broader community" to report discrimination. ECF 31-16. Its web address is "enddei.ed.gov." *Id.* The portal displays the following message prominently: "Schools should be focused on learning. The U.S. Department of Education is committed to ensuring all students have access to meaningful learning free of divisive ideologies and indoctrination. This submission form is an outlet for students, parents, teachers, and the broader community to report illegal discriminatory practices at institutions of learning. The Department of Education will utilize community submissions to identify potential areas for investigation." *Id.*

### iv.    Initial Enforcement Actions

On March 14, 2025, DOE announced 51 Title VI investigations, specifically citing to the Letter. ECF 31-35. 45 investigations were based on universities collaborating with "the Ph.D. Project," an organization that seeks to help minority students obtain business degrees, and, according to DOE, limits eligibility for its program based on race. *Id.* The press release also announced that seven schools were being investigated for "impermissible race-based scholarships

and race-based segregation." *Id.* at 4. More than 20 of the investigated schools employ members of the Plaintiff organizations. ECF 31-1 at 6.

### v.    The Certification Requirement

On April 3, 2025, DOE advised state education agencies ("SEAs") that they and every school district within them ("local education agencies" or "LEAs") must certify their compliance with the administration's interpretation of Title VI and *SFFA* no later than April 13, 2025. ECF 37-8 (transmittal email to agencies); ECF 37-9 (certification language and "Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification"). DOE sent letters announcing the Certification Requirement to state-level officials who oversee K–12 schools. In a release announcing the letters, Acting Assistant Secretary Trainor stated that "many schools flout or outright violate" federal antidiscrimination law "by using DEI programs to discriminate against one group of Americans to favor another based on identity characteristics." ECF 37-7. The press release referenced the Letter and FAQs as the "background" for the certifications. *Id.*

SEAs and LEAs are required to return the following signed certification:

> On behalf of [SEA/LEA], I acknowledge that I have received and reviewed this Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and *SFFA v. Harvard*. I further acknowledge that compliance with the below and the assurances referred to, as well as this certification, constitute a material condition for the continued receipt of federal financial assistance, and therefore certify our compliance with the below legal obligations.

ECF 37-9.

The "Reminder of Obligations" begins by reminding DOE's funding recipients that their acceptance of the funds is conditioned on compliance with Title VI. *Id.* It then describes *SFFA* as stating that "the Equal Protection Clause and Title VI prohibit race-based action, with only the

narrowest of exceptions." *Id.* at 2. "Given the text of Title VI and the assurances you have already given, any violation of Title VI—including the use of Diversity, Equity, & Inclusion ("DEI") programs to advantage one's [*sic*] race over another—is impermissible. The use of certain DEI practices can violate federal law. The continued use of illegal DEI practices may subject the individual or entity using such practices to serious consequences, including" (1) termination of funding; (2) actions to recover previously issued funding; and (3) False Claims Act liability. *Id.* at 2–3.

DOE required states to certify their own compliance and to collect and transmit certifications from their LEAs. ECF 37-8. It also directed states to "report the signature status for each of your LEAs, any compliance issues found within your LEAs, and your proposed enforcement plans for those LEAs." *Id.* OCR eventually extended the certification deadline from April 13, 2025 until April 24, 2025. ECF 42.

### C. <u>Procedural History</u>

Plaintiffs filed this lawsuit on February 25, 2025. ECF 1. On March 5, 2025, Plaintiffs—including new addition District 4J—amended their complaint. ECF 14. The Amended Complaint, which remains operative, includes three counts: a Free Speech and Free Association claim under the First Amendment (Count One); a Due Process Vagueness claim under the Fifth Amendment (Count Two); and an Administrative Procedure Act claim (Count Three). *Id.* The Amended Complaint seeks (1) a declaratory judgment that the February 14, 2025 Letter is unlawful; (2) that the Letter be declared unlawful and set aside under the APA as arbitrary and capricious, contrary to constitutional right, in excess of statutory authority, and without observance of proper procedure required by law; and (3) a preliminary injunction enjoining Defendants from enforcing or implementing the Letter. *Id.*

Plaintiffs filed their first preliminary injunction motion, ECF 31, on March 28, 2025. As noted above, the government subsequently announced the certification requirement on April 3, 2025. On April 7, 2025, the government delayed the certification deadline to April 24, 2024. The following day, in a related case in the United States District Court for the District of New Hampshire, to avert a temporary restraining order, the government agreed not to "initiate any enforcement action, investigation, or otherwise take action" based on certification or lack thereof until after April 24. The government also agreed not to "initiate any enforcement action, investigation, or otherwise take action based on the Dear Colleague Letter issued on February 14, 2025, and subsequent actions implementing the Letter" until after April 24. *See Nat'l Educ. Ass'n v. Dep't of Educ.*, Civil No. 25-91-LM, ECF 45-1 (D.N.H. Apr. 8, 2025) [the New Hampshire Agreement].

Without further amending their Amended Complaint, Plaintiffs filed an expedited preliminary injunction seeking to enjoin the Certification Requirement on April 9, 2025. ECF 37. Both the Letter Motion and the Certification Motion are now ripe. The parties addressed both motions at the April 18, 2025 motions hearing. The Court invited the parties to provide supplemental filings no later than April 21 to address certain issues that arose during the hearing. Each party submitted a supplement. ECF 57, 58.

## II.  LEGAL STANDARD

A preliminary injunction is warranted when the movant demonstrates four factors: (1) that the movant is likely to succeed on the merits, (2) that the movant will likely suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors preliminary relief, and (4) that injunctive relief is in the public interest. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (quoting *Winter v. Natural Res. Def. Council, Inc.*,

555 U.S. 7, 20 (2008)); *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023). Where the government is a party the balance of equities and public interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The movant, here the Plaintiffs, must establish all four elements to prevail. *Pashby v. Delia*, 709 F.3d 307, 320–21 (4th Cir. 2013).

A preliminary injunction affords '"an extraordinary and drastic remedy' prior to trial." *Ultimate Outdoor Movies, LLC v. FunFlicks, LLC*, No. SAG-18-2315, 2019 WL 2642838, at *6 (D. Md. June 27, 2019) (quoting *Munaf v. Green*, 553 U.S. 674, 689–90 (2008)); *see also MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (stating preliminary injunctive relief is an "extraordinary remed[y] involving the exercise of very far-reaching power [that is] to be granted only sparingly and in limited circumstances.") (citation omitted). Since preliminary injunctions are intended to preserve the status quo during the pendency of litigation, injunctions that "alter rather than preserve the status quo" are particularly disfavored. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019). Courts should grant such "mandatory" preliminary injunctions only when "the applicant's right to relief [is] indisputably clear." *Id.*

Section 705 of the APA permits a court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of review proceedings" where "required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020) (quoting *Dist. of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d 1, 16 (D.D.C. 2020)).

## III.   THE CERTIFICATION MOTION

Plaintiffs' request for an independent preliminary injunction against DOE's Certification Requirement suffers a fatal flaw—there are no facts relating to certification in the Amended Complaint. To find a likelihood of success on the merits, this Court would have to conclude that Plaintiffs were likely to succeed on the merits of a particular count in the Amended Complaint. *See Profiles, Inc. v. Bank of Am. Corp.*, 453 F. Supp. 3d 742, 747 (D. Md. 2020). There are no counts relating to the Certification Requirement, and it is unclear what those counts would be.[2] As the government noted at the motions hearing, without notice having been provided in the Amended Complaint, it could not know what it was defending against. To the extent that Plaintiffs believe the Certification Requirement is an outflow of the Letter, they could have framed their challenge to the Certification Requirement in that light (that is to say, they could have amended their original preliminary injunction motion to reference the Certification Requirement as evidence of the Letter's enforcement). They did not—they brought a separate preliminary injunction motion, seeking different relief, for related, but ultimately distinct, reasons.

This Court "does not have the authority to issue an injunction based on claims not pled in the complaint." *See LA Alliance for Hum. Rts. v. Cnty. of Los Angeles*, 14 F.4th 947, 957 (9th Cir. 2021) (cleaned up); *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997) ("The purpose of interim equitable relief is to protect the movant, during the pendency of the action, from being harmed or further harmed in the manner in which the movant contends it was or will be harmed *through the illegality alleged in the complaint*." (emphasis added)); *Devose*

---

[2] For example, in their preliminary injunction brief, Plaintiffs argue that the Certification Requirement violates the Paperwork Reduction Act. ECF 37-1 at 21–23. Are Plaintiffs bringing a substantive claim under the PRA? Are they merely using a potential PRA issue as an example of how the Certification Requirement is not in accordance with the law under the APA?

*v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) ("[A] party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint."); *Colvin v. Caruso*, 605 F.3d 282, 300 (6th Cir. 2010) ("[The plaintiff] had no grounds to seek an injunction pertaining to allegedly impermissible conduct not mentioned in his [operative] complaint.").

This situation is not as clear cut as many the cases above. The Certification Requirement is at least somewhat related to the facts and legal theories presented in the Amended Complaint. Plaintiffs seem to espouse two different narratives surrounding the Certification: on the one hand, that it is just one of several actions implementing the Letter (like the FAQs or the end DEI portal), and on the other, that it is an independent final agency action imposing harms apart from the Letter. Both of those things could be true. But if the Certification is just another step towards implementing the Letter in a new way, it is hard to see how relief on Certification alone would redress Plaintiffs' harms. If, instead, this is a "whack-a-mole" situation, where the Certification Requirement is just one in a series of new implementations of the Letter that will be imposed on short timetables, only taking action against the Letter would solve the problem. And if the Certification is a wholly independent final agency action, and its harms are not the same harms stemming from the Letter, this Court lacks the authority to enjoin it because the claim has not been properly presented in this case. In other words, in this Court's analysis of the issues before it, the alleged harms that stem from facts in the Complaint are traceable to the Letter, not just to the Certification, and any alleged harms that are traceable to the Certification apart from the Letter are

not in the Complaint and not before the Court.[3] The second motion seeking a separate preliminary injunction, ECF 37, must therefore be denied.[4]

## IV.   THE LETTER MOTION

### A.   **Standing**

Standing is an "irreducible constitutional minimum" of federal jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Standing is "built on a single basic idea—the idea of separation of powers." *United States v. Texas*, 599 U.S. 670, 675 (2023). Where a plaintiff lacks standing, "there is no case or controversy for the federal court to resolve." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Castillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019) (Barrett, J.)).

---

[3] This Court also remains unpersuaded that the named Plaintiffs have met their burden of showing standing to mount an independent challenge to the Certification Requirement, even had it been part of the Amended Complaint. *See Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013) (burden to demonstrate standing falls on party invoking federal jurisdiction). The declaration filed by the school district Plaintiff, District 4J, discusses the "impossible choice" between (1) certifying and either suppressing speech or risking FCA liability, or (2) not certifying and losing federal funding. ECF 37-4 (4J Decl.). But the State of Oregon announced that it would not certify compliance, nor would it ask its school districts to certify their compliance. *See* Ltr. From C. Williams to U.S. Dept. of Education (April 10, 2025), https://perma.cc/EYJ2-STLV; Fed. R. Evid. 201. There is no "impossible choice" left for District 4J. The organizational Plaintiffs fare no better. Because they are not the regulated party, their standing burden is higher. *Food & Drug Admin v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024). Plaintiffs provide no declaration from an individual member to support their Certification injunction, but rather rely on AFT's bare-bones assertion that teachers are experiencing uncertainty due to Certification. ECF 37-5 (AFT Certification Decl.). That is insufficient to meet the heightened burden of associational standing.

[4] At the hearing, Plaintiffs requested an opportunity to seek leave to file a new amended complaint to add an express challenge to the Certification Requirement. As of writing, Plaintiffs have not sought leave to amend the Complaint. This Court sees no reason to restrict Plaintiffs' standard ability to seek leave to amend their pleading. It simply lacks jurisdiction to award the requested preliminary injunctive relief in the case's present posture.

"For a plaintiff to get in the federal courthouse door and obtain a judicial determination of what the governing law is, the plaintiff cannot be a mere bystander, but instead must have a 'personal stake' in the dispute." *All. for Hippocratic Med.*, 602 U.S. at 379 (quoting *TransUnion*, 594 U.S. at 423); *see also* Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983) (describing the fundamental question of standing as "What's it to you?"). Standing "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State*, 454 U.S. 464, 472 (1982); *see also* John Roberts, *Article III Limits on Statutory Standing*, 42 Duke L.J. 1219, 1220 (1993) (describing standing as a reflection of the "properly limited…role of courts in a democratic society"). This inquiry "serves to protect the autonomy of those who are most directly affected so that they can decide whether and how to challenge the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at 379–80.

Standing "is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Standing consists of three elements: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504 U.S. at 560–61).

Where a government action "require[s] or forbid[s] some action by the plaintiff…standing is usually easy to establish." *All. for Hippocratic Med.*, 602 U.S. at 382. When a plaintiff seeks to challenge the government's regulation of someone else, by contrast, "standing is not precluded, but it is ordinarily much more difficult to establish." *Id.* (quoting *Lujan*, 504 U.S. at 562). "That is

often because unregulated parties may have more difficulty establishing causation—that is, linking their asserted injuries to the government's regulation (or lack of regulation) of someone else." *Id.*

To establish injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). A future injury must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 389, 409 (2013). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *All for Hippocratic Med.*, 602 U.S. at 381.

As Plaintiffs rightly note, only one plaintiff must have standing for this case to proceed. *Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*, 983 F.3d 671, 681 (4th Cir. 2020); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986). District 4J has standing. Plaintiffs have put forth ample factual allegations in the Amended Complaint and have provided declarations demonstrating that District 4J receives about $40 million dollars a year in federal funding, including Title I funding for low-income students and Individuals with Disabilities Education Act funding to support students with disabilities. ECF 14 ¶ 117.

District 4J alleges that the Letter concretely impacts the content it teaches. For example, District 4J has been actively preparing to implement social studies coursework to "address contributions from persons who are Native Americans, are of diverse racial and ethnic backgrounds, or are immigrants or refugees," in order to comply with Oregon law. *Id.* ¶ 53. "The ideas and topics that these state curricula and lessons require appear to be in conflict with what the Letter attempts to prohibit, which leaves school districts, like Plaintiff District 4J,…unclear as to how to meet their obligations under [state] law while also protecting the federal funding the Letter threatens." *Id.* ¶ 54. District 4J "selects and implements curricula that include teaching on…

diversity, structural racism, and similar topics," and is "reasonably concerned that continuing to implement its adopted curricula in compliance with state law would result in the loss of federal funding." *Id.* ¶ 126. "Without clarity [on the meaning of the Letter]…District 4J…fear[s] they may have to abandon their lawful efforts and speech related to diversity, equity, and inclusion, or else lose federal funds that support their valuable programs" *Id.* ¶ 127.

Moreover, one of District 4J's stated goals is to "increase equitable outcomes and achievements" for its students. *Id.* ¶ 120. District 4J is concerned that its "commit[ment] to eliminating gaps in opportunities and barriers to access" for all students could be interpreted as "smuggling racial stereotypes into everyday programming" based on the Letter. *Id.* Similarly, District 4J fears continuing diversity, equity, and inclusion programming and teaching "could subject them…to enforcement actions, even though they believe they are acting in full compliance with state and federal law." *Id.* ¶ 124.

In sum: District 4J alleges it has been put in an "impossible position, not knowing what conduct, speech, perspectives, lessons, programs, activities, or meetings [DOE] would consider prohibited by the Letter." *Id.* ¶ 138. They are thus experiencing a "chilling effect of their First Amendment rights" because they "fear that many activities central to their work, their missions, and their employment could jeopardize their federal funding." *Id.* ¶¶ 138–39.

All of that is more than sufficient to establish injury in fact. District 4J has alleged a "credible threat of [enforcement or investigation]" based on its intent to engage in what it believes is protected First Amendment activity. *Susan B. Anthony List v. Driehaus*, 473 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). District 4J is undoubtedly

regulated by the Letter as a recipient of federal funds[5], and it has outlined a reasonable, non-speculative belief that its First Amendment activity, and in particular its curricular choices, could subject it to investigation and potential sanction. District 4J has set forth a reasonable view that its conduct is proscribed by the Letter's prohibitions. *Id.* at 162; *Babbitt*, 442 U.S. at 302 (law in question "on its fact proscribe[d]" the speech at issue). Here, like in *Babbitt*, District 4J believes its speech activity is lawful and does not admit to intending to behave unlawfully; rather they intend to engage in the substantive speech the Letter declares unlawful. *Id.* The Letter's repeated references to enforcement and terms that carry enforcement consequences lends credibility to the imminence of possible enforcement.

"In First Amendment cases, the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression." *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) (cleaned up). To demonstrate injury in fact based on the chilling of speech, the chilling effect must be objectively reasonable and not subjective or speculative. *Id.* at 236. As the Supreme Court has explained, standing requirements are relaxed in First amendment cases because

> Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged.

*Sec. of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984). The face of the Letter addresses "teach[ing]" about "structural racism," and frames it as the kind of "stereotyping" and

---

[5] At the hearing, when asked "who the colleague is" in the context of the Dear Colleague Letter, the government represented "colleague" meant "schools and states."

"stigmatizing" the Letter terms illegal discrimination. ECF 31-14 at 2–3. District 4J says the Letter is chilling its speech regarding race-related topics. The chilling effect District 4J says it and its employees are experiencing seems "objectively reasonable" in the context of a purportedly binding document that calls their expressive activity unlawful. The Certification Requirement, with its three-week deadline, underscores that the harm is imminently impending. Here especially, the Plaintiffs are essentially put to a choice of self-censorship or risking enforcement. That is precisely the concern elucidated in *Joseph H. Munson*.

District 4J has also demonstrated that it has suffered, and will continue to "suffer [a] legal wrong *because of an agency action*," and to be "adversely affected or aggrieved by agency action." 5 U.S.C. § 702 (emphasis added). District 4J alleges that the agency's failure to comply with the APA, and in particular its notice-and-comment requirement, deprived it of the opportunity to raise important reliance interests and its fears regarding the suppression of lawful speech. Unsurprisingly, because Plaintiffs allege they are being injured in part because the rule was procedurally defective, the ways in which that are being injured are traceable to those deficiencies.

The government's primary argument against standing echoes its primary argument overall—the Letter is "nothing new," a mere restatement of existing anti-discrimination law. And if that is the case, the harms Plaintiffs say they are experiencing stem from Title VI and the Equal Protection Clause, not the Letter. For reasons that will be discussed in more detail below, this Court disagrees. The Letter clearly puts curriculum and teachers' speech into play by labeling as "stereotyping," "stigmatizing," and "discriminatory" teaching (1) about structural racism, and (2) that some races may bear unique moral burdens that others do not. Discrimination (along with stereotyping and stigmatizing conduct) is legally actionable under Title VI. Those speech-and-teaching related provisions, at a minimum, are new, and appear to carry legal consequences to the

reasonable reader. Plaintiffs persuasively contend that the Letter's language obliges them to choose between being injured through suppressing their speech or through facing enforcement for exercising their constitutional rights.

Where the Letter goes further than existing law, the harms Plaintiffs experience due to that overreach are clearly traceable to the Letter itself. Relief relating to the Letter would redress those harms, or, at this preliminary stage, would maintain the status quo to prevent future harms while awaiting final disposition.

In sum, District 4J has established standing to challenge the Letter.[6]

## B. **Final Agency Action**

The APA permits judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Final agency actions are those that "mark the consummation of the agency's decisionmaking process" and "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). "An agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations—is a legislative rule," which is always a final agency action. *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014). Similarly, "[a]n agency action that sets forth legally binding requirements" is a legislative rule. *Id.* An interpretive rule can still be final agency action, and thus subject to judicial review, if it satisfies the test from *Bennett*. *Id.* "The most important

---

[6] Plaintiffs primarily rely on District 4J's standing, but also mention harms uniquely experienced by the teachers who are members of the other Plaintiff organizations. While this Court need not find that the organizations have independent associational standing, it will consider facts relating to all of the Plaintiffs in addressing the preliminary injunction factors.

factor concerns the actual legal effect (or lack thereof) of the agency action in question on regulated entities." *Id.* at 252.

The Letter is not "of a merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 178. The government accordingly does not contest that the Letter is "the consummation of the agency's decisionmaking process." Instead, it focuses on *Bennett*'s second prong, arguing that because the Letter states that it does not have the force and effect of law and that it does not create new law "it cannot plausibly have finally determined anyone's rights or obligations or ha[ve] direct legal consequences." ECF 42 at 17. But this Court need not credit that boilerplate language, particularly where the text of the letter "commands," "requires," "orders," and "dictates." *See, e.g.*, *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000); *Am. Acad. of Pediatrics v. FDA*, 379 F. Supp. 3d 461, 488 (D. Md. 2019). And "an agency's reading of a rule must reflect fair and considered judgment to receive…deference." *Kisor v. Wilkie*, 588 U.S. 558, 579 (2019) (citation and internal quotation marks omitted); *see also id.* (courts "should decline to defer to a merely convenient litigating position or *post hoc* rationalization advanced to defend past agency action against attack" (cleaned up)). Here, where the rule itself is unambiguously contrary to the government's view, the government's interpretation is owed no deference whatsoever. *Id.* at 574–75 ("The regulation just means what it means—and the court must give it effect, as the court would any other law.").

An "agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002). Both reasons apply here. The Letter sets forth the agency's position on what the law means, and binds any "colleague" or entity subject to DOE regulations, who may lose federal funding if they do not comply. *See U.S. Army Corps of*

*Eng'rs v. Hawkes Co.*, 578 U.S. 590, 600 (2016) (agency action was final where failure to comply carried penalties). DOE is also applying the Letter as if it is binding. It has referenced the Letter as the basis for its investigations of 51 colleges. ECF 31-35. And it has continued to take actions to implement the Letter via the FAQs, the end DEI portal, and the Certification Requirement. ECF 37-7; ECF 51-5.

But most importantly, the Letter's directives are changes from prior law that appear binding. Again, the government's insistence that the Letter merely restates schools' obligations under civil rights law is unpersuasive. Title VI and *SFFA* have never been interpreted to preclude teaching about concepts relating to race. The Administration could have issued, and perhaps was trying to issue, a guidance simply clarifying that it intended to prioritize Title VI enforcement actions pertaining to discrimination against all groups, even those in the majority. But it went much farther than that by expanding the definitions of "stereotyping," "stigmatizing," and "discrimination" to reach entirely new categories of conduct. And it did so in a way that, at a minimum, appears legally binding to the reasonable reader.

The government's conduct surrounding the Letter belies its position. For one, in the New Hampshire Agreement just weeks ago, the government agreed not to "initiate any enforcement action, investigation, or otherwise take action based on the Dear Colleague Letter issued on February 14, 2025, and subsequent actions implementing the Letter" until April 24, 2025. But the next sentence reads, "This would not preclude enforcement actions, investigations, or other actions based on Title VI in general or the *Students for Fair Admissions* case." *Id.* That distinction would make no sense if the government saw no daylight between the requirements of the Letter and the requirements of "Title VI in general or [*SFFA*]."

The multitude of ways the government has implemented the Letter paint a similar picture. If the Letter said nothing new, then why does it link to a new reporting portal specifically looking for instances of "divisive ideologies" and "indoctrination," when there has always been a portal for anyone to report race discrimination or racially hostile environments? Why did states and schools need to certify their compliance with "existing law," when they all certified their compliance with Title VI's dictates last spring? Why did DOE remove prior guidances regarding Title VI and *SFFA* if they are consistent with DOE's current views? Why did DOE need twelve single-spaced pages of frequently asked questions—which the government referenced repeatedly in explaining the Letter—to explain what the Letter means? Why did DOE need to write a four-page Letter to remind schools that it was enforcing existing law, even if it had different enforcement priorities? Why did DOE announce it would "take appropriate measures to assess compliance…based on the understanding embodied in [the L]etter beginning no later than 14 days" from the Letter's issuance if it was always the law? It does not add up, and certainly contributes to the reasonable perception that the Letter imposes new legal obligations.

The Letter was a final agency action and is subject to review.

## V.    PRELIMINARY INJUNCTION FACTORS

### A.    <u>Likelihood of Success on the Merits</u>

"To obtain preliminary…relief, Plaintiffs bear the burden to show that they are likely to succeed on one of their claims." *Profiles, Inc.*, 453 F. Supp. 3d at 747. The Court "only needs to find that Plaintiffs are likely to succeed on one[claim] in order for this factor to weigh in favor of [preliminary relief]" *PFLAG, Inc. v. Trump*, No. 25-337, – F. Supp. 3d – , 2025 WL 685124, at *14 (D. Md. Mar. 4, 2025) (quoting *Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, No. 25-239, – F. Supp. 3d – , 2025 WL 368852, at *9 (D.D.C. Feb. 2, 2025) (cleaned up)). This Court

will accordingly start and end with Plaintiffs' APA claim, and will reserve judgment on their standalone constitutional claims for a later stage of the litigation.

### i. Administrative Procedure Act

Plaintiffs raise several different challenges under the APA: (1) the Letter is a legislative rule that did not go through notice and comment; (2) the Letter is not in accordance with the law and in excess of statutory authority; (3) the Letter is arbitrary and capricious; and (4) the Letter is contrary to constitutional rights. Although Plaintiffs need only show they are likely to prevail on one APA claim to obtain preliminary relief, this Court will address them all to facilitate its assessment of the proper scope of preliminary relief.

### a. Type of Agency Action

Having already found the Letter to constitute a final agency action, the key practical difference between a legislative rule and an interpretive rule is whether the agency was required to employ a notice and comment process. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96–97 (2015). It is true that Dear Colleague Letters are generally interpretive rules, and usually do not require notice and comment. But the label an agency places on a rule is not determinative; rather, courts must look to the rule's contents and effects. *Cf. Kisor*, 588 U.S. at 579 ("The rule means what it means."). Were that not the case, agencies would have little incentive to go through the more burdensome processes for promulgating legislative rules.

Legislative rules are "statement[s] of general or particular applicability and future effect" that "implement, interpret, or prescribe law or policy," and have the "force and effect of law." *See Perez*, 575 U.S. at 95–96. A rule "is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 620 (4th Cir. 2018);

*Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020) (contradicting a regulation "manifest[s] intent to…speak with the force of law."). Legislative rules, "pursuant to properly delegated authority," have "the force of law and create[] new law or impose[] new rights or duties." *Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*, 874 F.2d 205, 207 (4th Cir. 1989) (citations omitted). Interpretive rules, by contrast, "simply state what the administrative agency thinks the statute means, and only' remind' affected parties of existing duties." *Children's Hosp.*, 896 F.3d at 620 (citation omitted). Interpretive rules truly are "clarification[s] or explanation[s] of an existing statute or rule." *Id.*

The Letter is a legislative rule. Although this Court does not doubt that the government intended to issue an interpretive rule, because the Letter prescribes new law and policy, and has the force and effect of law, it surpasses the bounds of an interpretive rule. As this Court discussed above, the Letter "effects a substantive change in existing law or policy" by imposing new legal obligations on regulated parties. It also supplements Title VI by extending it to cover classroom speech and curriculum. It conflicts with 34 C.F.R. § 100.5(i), a regulation implementing Title VI, which outlines "circumstances [where] an applicant or recipient [of federal funds] may properly give special consideration to race, color, or national origin to make the benefits of its program more widely available to such groups [that are] not…being adequately served." Because the Letter substantively alters the legal landscape in ways that have the force and effect of law, it must be a legislative rule. To simply "remind" parties of existing duties, the government would have needed to limit its guidance to a restatement of existing law. The government could have outlined its new enforcement priorities well within those bounds, but it could not extend Title VI to reach new categories of conduct.

The Letter is a legislative rule and is subject to all APA requirements for promulgating a legislative rule.

b. Notice and Comment

Legislative rules must go through notice and comment. 5 U.S.C. § 706(2)(D) (agency action must be set aside where implemented "without observance of procedure required by law"); *Perez*, 575 U.S. at 97. The government does not dispute this inflexible requirement, but instead strained to argue at hearing that the government already satisfied notice-and-comment requirements by providing, in footnote 3 of the Letter, mailing and email addresses for anyone "interested in commenting." ECF 31-14.

The requirements for notice-and-comment rulemaking are exacting. *See* 5 U.S.C. § 553; *North Carolina Growers' Assn. v. United Farm Workers*, 702 F.3d 755, 768 (4th Cir. 2012) ("The statutory requirements in § 553(b) are clear, and they constitute an important part of the APA's procedural safeguards related to agency rulemaking."). First, the agency must publish a notice of proposed rulemaking in the Federal Register. 5 U.S.C. § 553(b). That notice must include (1) a statement of the time, place, and nature of public rulemaking proceedings; (2) reference to the legal authority under which the rule is proposed; (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved; and (4) the Internet address of a summary of not more than 100 words in length of the proposed rule, in plain language, that shall be posted on the Internet website under section 206(d) of the E-Government Act of 2002. *Id.*

Then, the agency must provide "interested persons" the opportunity "to participate in the rulemaking through submission of written data, views, or arguments." *Id.* § 553(c). Public comment periods usually last 30–60 days. The agency must then consider all relevant comments. *Id.* The final rule must include a preamble explaining the rule's basis and responding to issues

raised in comments. *Id.* Final rules must be published in the Federal Register 30 days before their effective date (or 60 days for major rules). *Id.* § 553(d).[7]

There is a limited exception to notice and comment for "good cause." *See* 5 U.S.C. § 553(b)(B) (allowing exception "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest"). Here, though, the government never expressly invoked it, and it could not have demonstrated its reliance on the exception in the agency record, because the government has represented that no agency record exists. *See* ECF 58 at 1; *North Carolina Growers*, 702 F.3d at 768 (declining to "impose a rigid requirement that an agency must explicitly invoke the good cause exception," but requiring agency record to "manifest plainly" the agency's decision to rely on good cause exception).

Needless to say, the requirements of notice and comment are more demanding than an after-the-fact opportunity to send an email. Plaintiffs are likely to succeed on the merits of their APA claim because they have shown a likelihood that the Letter is a legislative rule, and it certainly did not go through the APA's notice-and-comment procedures.

---

[7] The government argued that the Letter was announced 14 days prior to its implementation, so interested parties could ostensibly comment before enforcement began. But that is not what the Letter says. ECF 31-14 at 3 ("The Department intends to take appropriate measures to assess compliance…*no later than 14 days from today's date*." (emphasis added)). "No later than" means on or before, and implies that DOE could begin "tak[ing] appropriate measures" at any point after it issued the Letter. The 14 days acted as a deadline for the government to take action but did not ensure readers any grace period whatsoever before "measures to assess compliance" began.

The government also raised at the hearing, for the first time, that the Plaintiffs did not provide any comments via the email address or mail after the fact, and it believes they therefore waived their objection to notice-and-comment. This Court cannot find that the Plaintiffs relinquished their right to comment on the Letter by declining to pursue an opportunity that did not present a meaningful chance to have their views heard and incorporated into the Letter prior to its implementation.

c. Not in Accordance with Law

Plaintiffs next argue that the Letter must be held unlawful and set aside because it is "not in accordance with the law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2). Specifically, Plaintiffs argue that the Letter exceeds the authority Congress delegated to DOE in the Department of Education Organization Act, Pub. L. 96-88, 93 Stat. 668 (1979) ("the DEOA").

"Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024); 5 U.S.C. § 706 (courts must "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning…of the terms of an agency action"). The DEOA provides that DOE cannot exercise "direction, supervision, or control" over "the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, over any accrediting agency or association, or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system." 20 U.S.C. § 3403(b).

Plaintiffs argue that the Letter violates the DEOA by "directing what educators and institutions can teach in ways that are not required by Title VI." ECF 31-1 at 35. While insisting that view is incorrect, the government studiously avoids disclaiming that the Letter reaches at least some curricular choices. The government insists that the Letter "merely informs schools that they must not discriminate among students when implementing their curricula and must avoid stereotyping and stigmatizing based on race," and therefore it is not directing educators and institutions about what they can or cannot teach. ECF 42 at 20. According to the government, "There is a critical distinction between ED prescribing curricula or exercising control over school

administration and ED requiring that schools act in a nondiscriminatory manner in implementing their curricula and executing administrative decisions so that they avoid stereotyping and stigmatizing based on race." *Id.*

The government also relies heavily on the FAQs—revised on April 9—to support its position that the Letter does not regulate curriculum. DOE's approach to the curriculum problem in the FAQs is emblematic of the government's approach in general: "the [DEOA]…prohibit[s] the Department from exercising control over the content of school curricula. However…" ECF 51-4 at 6. The "however" is followed by a 491-word explanation in which DOE describes the possible ways various undefined curricular choices might constitute "stereotyping," or "racial harassment." *Id.* The FAQs essentially provide that it will be a "fact specific inquiry" whether DOE believes curricular choices or content taught constitute "stigmatizing," "stereotyping," or "racial harassment." At best, the FAQs lack sufficient clarity to override the express terms of the Letter. More likely, they contribute to the reasonable perception that DOE is regulating the content of curriculum.

This Court must concern itself with what the Letter actually says, not what the government says the Letter says. The Supreme Court has cautioned lower courts to "decline to defer to a merely convenient litigating position or *post hoc* rationalization advanced to defend past agency action against attack." *Kisor*, 588 U.S. at 579 (cleaned up). On this point, at a minimum, the Letter is unambiguous and the government is not entitled to any deference. The Letter terms "teach[ing] students that certain racial groups bear unique moral burdens that others do not" "stigmatiz[ing]," "stereotyp[ing]," and "deny[ing] students the ability to participate fully in the life of a school." ECF 31-14 at 3. It similarly refers to "toxically indoctrinat[ing] students with the false premise that the United States is built upon systemic and structural racism" as a "discriminatory practice[]."

*Id.* at 2. It is hard to square those statements with the government's current pronouncement that the Letter does not prescribe curricular choices.[8] Indeed, the government has stated that it believes it *can* regulate the content of curriculum if it is "discriminatory," "stigmatiz[ing]," "stereotyp[ing]," or "deny[ing] students the ability to participate fully in the life of a school."

By declaring broad categories of classroom speech discriminatory, in the context of a Letter threatening enforcement actions for discriminatory practices, DOE is exercising "direction, supervision, or control" over "the curriculum, program of instruction, administration, or personnel of [schools.]" Although the government attempts to insert nuance after the fact, the strident tone of the Letter is devoid of it. As this Court already concluded, there is no basis in Title VI or *SFFA* for concluding that discussion of race—in the two ways highlighted in the Letter or otherwise—is

---

[8] At the motions hearing, the government attempted to parse the language of the Letter to argue it did not term teaching about structural racism a "discriminatory practice." The passage reads,

> Educational institutions have toxically indoctrinated students with the false premise that the United States is built upon "systemic and structural racism" and advanced discriminatory policies and practices. Proponents of these discriminatory practices have attempted to further justify them—particularly during the last four years—under the banner of "diversity, equity, and inclusion" ("DEI"), smuggling racial stereotypes and explicit race-consciousness into everyday training, programming, and discipline.

ECF 31-14 at 2. The government's argument, essentially, is that the "and" in the first sentence should be read to separate the clause about systemic and structural racism from "advanced discriminatory practices." The plain meaning of the text contradicts that reading. By using the catch-all "these discriminatory practices" in the following sentence, the Letter implies that immediately preceding concepts, "toxically indoctrinating…" and "advanced discriminatory practices," are discriminatory practices. If "discriminatory practices" only referred to "advanced discriminatory practices," the catch-all would appear to be superfluous, and the choice of the word "these" to address only one non-specific category of things would be awkward. Items in a list, moreover, are presumed to be of a similar nature. Applying these basic grammatical principles to determine its plain meaning, the Letter says that "toxically indoctrinat[ing] students…" with a particular viewpoint is a discriminatory practice.

ever, or especially always, discrimination.[9] The government cannot proclaim entire categories of classroom content discriminatory to side-step the bounds of its statutory authority.

Plaintiffs are likely to succeed on the merits of their claim that the Letter exceeds DOE's statutory authority by exercising control over the content of curriculum.

d. Arbitrary and Capricious

An agency's decision is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *West Virginia v. Thompson*, 475 F.3d 204, 212 (4th Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The scope of this review is narrow and deferential. *State Farm*, 463 U.S. at 43; *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) ("To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."). Plaintiffs offer five different reasons that the Letter must be set aside as arbitrary and capricious. 5 U.S.C. § 706(2)(A); *State Farm*, 463 U.S. at 43 ("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not

_____

[9] In a last-ditch effort, the government argues that the DEOA should not be read to frustrate the purposes of Title VI. This Court sees no conflict between the statutes—DOE is not permitted to exercise control over curriculum, but is required to enforce anti-discrimination law. Everyone agrees that there are circumstances where conduct in a classroom, including, perhaps, through the content taught, could arise to harassment or discrimination. But the government is not entitled to declare broad categories of classroom speech discriminatory as a matter of law to expand the scope of its authority. Prior guidance issued by DOE reflected this more nuanced position: DOE would not entertain complaints "based on the content of a school's academic course materials" "absent allegations of discrimination." ECF 31-26.

intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."). A court "may not supply a reasoned basis for the agency's action the agency itself has not given." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

Perhaps unsurprisingly, every reason Plaintiffs argue the Letter is arbitrary and capricious ultimately ties back to government's failure to recognize that the Letter went beyond merely restating settled principles of civil rights law. Because the government insists that the Letter required no particular process, and has created no administrative record underlying it, it failed to consider a number of required factors. To affect the kind of policy change the Letter does, the government was required to carefully consider the choice it was making, the evidence underlying it, and the interests it might impact. The Court takes no view on how the government's decision might change upon considering these factors. But the government was required to consider them. Because the underlying issues here have already been addressed at length, the Court will not belabor the point.

i.    *Change in Position*

Plaintiffs first argue that DOE failed to provide an explanation for its change in position. An agency is required to "display awareness that it is changing position" and "show that there are good reasons" for its new policy. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not…depart from a prior policy *sub silentio*."). Failing to acknowledge or explain a change is evidence that the government has "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. The government argues that it did not depart

from anything, and if it did, it only departed from interpretive rules, so it did not have to explain the reasons for its departure.

This Court has already rejected the notion that the Letter merely restates existing law.[10] If anything, the government's repeated assertions that the Letter says nothing new indicate that it is still either unaware or unwilling to admit that it has changed positions. The government changed its position by asserting that certain discussions of race constitute discriminatory practices that violate Title VI and *SFFA*. Prior guidance explained that so long as all students were welcome, "hosting meetings, focus groups, or listening sessions on race-related topics likely would not, by itself, raise concerns under Title VI." ECF 31-26 at 10. Similarly, it used an elementary school's requirement that all students read a book about race discrimination and racial justice and a high school requirement that students take a Mexican American history course as examples of school policies that would likely not raise Title VI concerns. *Id.* at 6–7.

The Letter also marks a significant change in position in DOE's interpretation of *SFFA*. A prior guidance—that has now been removed from the DOE website—interpreting *SFFA* provided that "nothing in the *SFFA* decision prohibits institutions from continuing to seek the admissions and graduation of diverse student bodies, including along the lines of race and ethnicity, through means that do not afford individual applicants a preference on the basis of race in admissions decisions." ECF 31-19 at 3. The prior guidance also advised schools that race-neutral efforts to promote diversity and increase opportunity for all students were lawful. *Id.* The Letter, by contrast,

---

[10] At the motions hearing, the government's presentation focused heavily on its intent to reinforce the principle that anti-discrimination law protects majority groups. Neither Plaintiffs nor the Court disagree, and had the Letter constrained itself to that point it would not have communicated any change in existing law. A change in Title VI enforcement priorities to focus on so-called "reverse discrimination" cases is within the administration's purview.

says that even race-neutral policies, such as eliminating standardized testing, would be "unlawful" if "motivated by racial considerations" or a desire to "increase racial diversity." ECF 31-14 at 2–3. The change in position is not explained.

This Court is most concerned by DOE's change in position regarding its authority to regulate curriculum, and its decision to prospectively categorize content as discriminatory. It has not acknowledged that the change occurred or explained the reasoning for that change. The agency was required to demonstrate self-awareness where it changed positions and to explain the reasons for those changes in position. It did not. This supports a finding that the Letter is arbitrary and capricious.

ii.    *Prior Factual Findings and Evidence*

Agency actions are arbitrary and capricious where they lack a "factual basis." *AFL-CIO v. Fed. Labs. Rels. Auth.*, 25 F.4th 1, 10 (D.C. Cir. 2022). The government has clarified that there is no administrative record underlying the Letter. *See* ECF 58. The Letter does not contain any factual citations or references to any facts supporting its assertions. For example, the Letter provides no factual basis for its conclusion that "Educational institutions have toxically indoctrinated students with the false premise that the United States is built upon 'systemic and structural racism' and advanced discriminatory practices and policies." ECF 31-14 at 2. Nor does it provide any evidence that educational institutions "have discriminated against…white and Asian students" or "embrace[d] pervasive and repugnant race-based preferences." *Id.* at 1. Some of the Letter is merely reflective of the administration's viewpoint, as the government has vigorously asserted. The government certainly is entitled to its viewpoint, and is not required to provide factual bases for its viewpoints as a general matter. But where it seeks to use those viewpoints to alter the legal landscape and impose new obligations on regulated persons, it must consider evidence and

demonstrate such consideration. The Letter provides no line at all distinguishing viewpoint from binding policymaking. This too supports a finding that the Letter is arbitrary and capricious.

    *iii.*    *Existing State and Federal Standards*

"A material misapprehension of the baseline conditions existing in advance of an agency action can lay the groundwork" for a court to find it was arbitrary and capricious. *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012). The government, at a minimum, misapprehended the scope of Title VI and *SFFA*. Even extrapolating *SFFA*'s holding, as the government does, to extend far beyond college admissions, it does not proscribe any particular classroom speech, or relate at all to curricular choices. Nor does Title VI. These fundamental misunderstandings shape the government's view that it did not announce any change in law or policy. It is not that the government is precluded from taking (or advocating) a broader view of *SFFA* or Title VI than prior administrations have—it is free to do that. But to avoid a material misapprehension of baseline conditions in the APA context, the government must indicate that it is cognizant of what existing law is and where it is supplementing that law with its own views.

Here, the misapprehension led DOE to issue a guidance that conflicts with its own regulations and case law. The Letter's position regarding race-neutral means of increasing all forms of diversity, for example, is directly contradicted by binding precedent in this Circuit. *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 885–86 (4th Cir. 2023) ("To the extent the Board may have adopted the challenged admissions policy out of a desire to increase the rates of Black and Hispanic student enrollment at TJ—that is, to improve racial diversity and inclusion by way of race neutral measures—it was utilizing a practice that the Supreme Court has consistently declined to find constitutionally suspect."), *cert. denied*, No. 23-170, – S. Ct. – , 2024 WL 674659

(Feb. 20, 2024); *id.* at 886 ("An Equal Protection plaintiff alleging purposeful racial discrimination must show at least some specific intent to target a certain racial group and to inflict adverse effects upon that group."). And 34 C.F.R. § 100.5 provides that educational institutions "may properly give special consideration to race, color, or national origin to make the benefits of its program more widely available to such groups, not then being adequately served" if "[e]ven though an [institution] has never used discriminatory policies, the services and benefits of the program it or activity it administers may not in fact be equally available to some racial or nationality groups." The Letter thus interprets *SFFA* to apply far more broadly, and to entirely different categories of conduct, than merely preventing using race as a factor in "zero-sum" opportunities like admissions, hiring, promotions, or awards.

Again, the administration is entitled to its own views, including on how court cases and laws should be interpreted. It is entitled to develop and pursue its own enforcement priorities within the law. But it is not entitled to misrepresent the law's boundaries, and must at a minimum acknowledge and consider the relevant legal framework as it is. It cannot blur the lines between viewpoint and law. This also supports the notion that the Letter is likely arbitrary and capricious.

   iv.    *Aspects of the Problem*

Next, Plaintiffs argue DOE was arbitrary and capricious in promulgating the Letter by failing to consider (1) "the critical role that states and localities play in education" and (2) "the impact of reversing longstanding approaches to Title VI interpretation and enforcement on underserved communities and students facing discrimination." ECF 31-1 at 31. This Court believes the concerns framed here as "aspects of the problem" are addressed under other factors and does not find this an independent reason to view the Letter as arbitrary and capricious. Plaintiffs'

primary arbitrary-and-capricious argument, that permeates throughout, is that DOE did not consider important factors it was required to consider.

v.    *Reliance Interests*

"When an agency changes course…it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *California*, 591 U.S. at 30. "It would be arbitrary and capricious to ignore such matters." *Id.* Plaintiffs argue that DOE's change in position on Title VI and *SFFA* is disruptive to teachers and educational institutions that have been operating under very different understandings of anti-discrimination law for decades.

The government argues that DOE could not possibly have considered reliance interests that were not raised to it. The problem with that is, of course, that DOE did not ask for input. School districts, schools, and teachers had no opportunity to comment on the Letter before it became effective. And their reliance interests, including but not limited to existing programs, curricula, contractual obligations, and departmental structures, were not considered. Partially, perhaps, because the government seems blind to the magnitude of the change in policy the Letter announced, it failed to account for how disruptive it would be to stakeholders. The direct prohibitions on teaching certain content paired with other vague and overbroad terms raise reasonable views that broad swaths of content might be legally suspect to this administration. The government's failure to consider reliance interests, too, counsels toward a finding that the Letter is likely arbitrary and capricious.

*          *          *

Because the government has failed to acknowledge its change in position, or to promulgate the Letter using the processes necessary for a rule that effects a substantive change in policy, it

failed to consider a number of factors required by the APA. Plaintiffs are therefore likely to succeed on the merits of their claim that the Letter is arbitrary and capricious.

### d. Contrary to Constitutional Rights

Finally, the APA requires courts to "set aside" any final agency action that is contrary to constitutional rights. 5 U.S.C. § 706(2)(B). Plaintiffs argue—both as distinct constitutional claims and claims under the APA—that the Letter is contrary to the First and Fifth Amendments.

The Letter's provisions proscribing specific forms of classroom speech likely run afoul of the First Amendment by regulating speech based on its content. Where the government "single[s] out specific subject matter for differential treatment," its regulation is "content-based." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 74 (2022). "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).

Here, the government has singled out classroom speech regarding "systemic and structural racism" and "teach[ing] students that certain racial groups bear unique moral burdens that others do not." ECF 31-14 at 2–3. The Letter improperly terms those categories of speech "discriminatory," "stereotyping," and "stigmatizing"—all terms that can give rise to enforcement under Title VI. This Court has already rejected the position that DOE could regulate the content of curriculum by dubbing certain types of content categorically discriminatory, and the same reasoning applies here.

The government strains to argue that the Letter only targets discriminatory conduct, and does not reach speech at all. ECF 42 at 28. It continues that "racial discrimination" is not a part of "academic freedom." *Id.* at 29. Finally, the government asks this Court to rely on DOE's representation in the FAQs that "[DOE] enforces federal civil rights law consistent with the First

Amendment." *Id.*; *see also* ECF 51-4 at 6. Again, this Court has already rejected the government's argument that discussing "systemic and structural racism" or "teach[ing] students that certain racial groups bear unique moral burdens that others do not" constitutes per se race discrimination. As the Fourth Circuit has recognized, "to prevent the punishment or even the chilling of entirely innocent, lawfully useful speech, the First Amendment may in some contexts stand as a bar to the imposition of liability on the basis of mere foreseeability or knowledge that the information one imparts could be misused for an impermissible purpose." *Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 247 (4th Cir. 1997). [11] Prior restraints on speech are presumptively unconstitutional, and highly disfavored. *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 733 (1931); *Patterson v. Colorado*, 205 U.S. 454, 462 (1907) ("[T]he main purpose of [the First Amendment] is 'to prevent all such *previous restraints* upon publications as had been practised by other governments,' and they do not prevent the subsequent punishment of such as may be deemed contrary to the public welfare."). Here, the government cannot justify its preemptive prohibition on speech by arguing, without justification, that it is possible the speech could be a part of unlawful harassment.

As to this very limited aspect of the Letter at least, where it regulates specific forms of speech of a particular viewpoint by declaring them discriminatory, and therefore unlawful, the Plaintiffs are likely to succeed on their First Amendment claim. This constitutional issue is inextricably bound within the other APA issues in this case, and perhaps illustrates why compliance with procedures is important. Following those procedures, at a minimum, would have

---

[11] The government relies on *Rice* for the proposition that the government may punish speech without regard for the First Amendment where it is the "vehicle of the crime." *Id.* at 244. The speech at issue here is nowhere near comparable to the challenged speech in *Rice*, a book that provided detailed instructions for would-be murderers on how to kill their victims (instructions that were followed in killing the victim/plaintiff in that case). Even in *Rice*, moreover, the speech was punished—through civil liability—only *after* it was actually used in criminal activity.

given the government more opportunity to identify the gulf between its stated intent—to issue an interpretive rule regarding its enforcement priorities—and what it actually did—issue a legislative rule that may exceed the agency's authority by impermissibly regulating curriculum, and therefore speech.

Plaintiffs are likely to succeed on the merits of their claim that the Letter is procedurally improper under the APA because portions of it are contrary to the First Amendment.[12]

\*    \*    \*

In at least four distinct ways, Plaintiffs have shown they are likely to succeed on the merits of their APA claims. This Court accordingly finds that this factor weighs strongly in favor of the Plaintiffs.

## B. **Irreparable Harm**

To establish irreparable harm, Plaintiffs must make a clear showing that they will suffer harm that is "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Grp.*, 952 F.2d 802, 812 (4th Cir. 1991). Plaintiffs must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Irreparable harm must be harm that "cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline*, 915 F.3d at 216; *see also* 11A C. Wright, A. Miller, & M. Kane, Fed. Prac. & Proc. § 2948.1 (2d ed.1995) (movant must demonstrate that

---

[12] This Court makes no finding that the Plaintiffs are likely to succeed on the merits of their Fifth Amendment vagueness challenge at this juncture. *See Nat'l Assn. of Diversity Officers. in Higher Ed. v. Trump*, No. 25-1189, ECF 29 (4th Cir. Mar. 14, 2025) (expressing doubts as to the ripeness of a pre-enforcement challenge provision that could be reasonably applied in both constitutional and unconstitutional manners).

without preliminary relief, "the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered").

Plaintiffs have alleged that the procedural violations outlined above are already harming them and will continue to harm them absent relief. Where a Plaintiff has been deprived of notice and the opportunity "to have their comments considered prior to the promulgation of a rule which threatens" serious harms to their interests, they have suffered "irreparable harm." *Ass'n of Comm. Cancer Cntrs. v. Azar*, 509 F. Supp. 3d 482, 501 (D. Md. 2020). Plaintiffs would have submitted comments had they been afforded the opportunity to do so. ECF 31-7, District 4J Decl. ¶ 44; ECF 31-5, ASA Decl. ¶ 28; ECF 31-4, AFT Decl. ¶ 29. Plaintiffs have highlighted several ways in which the deprivation of their right to comment has resulted in concrete harms.

The most concerning, of course, is the suppression of First Amendment activity. "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) ("Because there is likely a constitutional violation, the irreparable harm factor is satisfied.").

Plaintiffs argue that this has led them to believe "they must self-censor their speech, including lectures, courses, programs, and other activities." AFT Decl. ¶ 25; ECF 31-8, Gallagher Decl. ¶¶ 12–13 ("[C]ontent in my courses may be directly affected because much of it contextualizes the history of structural racism in our country…I fear that the Department may consider this to be 'toxically indoctrinating' my students regarding structural and systemic racism."); ECF 31-11, Hamako Decl. ¶ 6, 10 (fearing that course that "focuses on systems of discrimination, the history of oppression, and social and political power dynamics" will be considered a "discriminatory practice[]"); District 4J Decl. ¶¶ 12, 13, 15–18 (discussing

curriculum in District 4J, including curriculum required by State standards, that it believes conflicts with the Letter and fears it may have to discontinue).

Plaintiffs have expressed a multitude of other harms stemming from DOE's noncompliance with the APA. Had Plaintiffs been afforded the opportunity to comment, they could have raised concerns about the Letter conflicting with state standards. District 4J Decl. ¶ 13; Hamako Decl. ¶ 7. Similarly, they could have raised the speech and chilling concerns outlined above, and clarified to DOE that the Letter as written appears to regulate curriculum. So too could Plaintiffs, or other commenters, have explained where the Letter did not merely interpret existing law and thus disrupted their reliance on long-standing interpretations of Title VI. They might also have raised fears that the content they teach could subject them to investigation. 4J Decl. ¶ 16; Gallagher Decl. ¶ 20; Hamako Decl. ¶ 16.

This factor favors Plaintiffs.

### C. <u>Public Interest and Balance of the Equities</u>

The public interest and the balance of the equities merge when the government is the opposing party. *Nken*, 556 U.S. at 435. The government "is in no way harmed" by not enforcing "restrictions likely to be found unconstitutional." *Leaders of a Beautiful Struggle*, 2 F.4th at 346. "It is well-established that the public interest favors protecting constitutional rights," *id.*, and "the public undoubtedly has an interest in seeing its government institutions follow the law," *Roe v. Dep't of Def.*, 947 F.3d 207, 230–31 (4th Cir. 2020) (cleaned up).

The government has cited interests in "robust civil rights enforcement" and "implementing the President's priorities consistent with [DOE's] legal authorit[y]." ECF 42 at 32. Those are legitimate and important interests. To the extent the government truly wishes to enforce existing civil rights law—regardless of its enforcement priorities—"Nothing in Plaintiffs' request can be

construed as stopping the Department from enforcing Title VI and *SFFA*; the Department is free to do so but must do so within the bounds of the law." ECF 51 at 18. This Court agrees with the Plaintiffs that the proper remedy in this case should be limited to the Letter, and does not impede the government's ability to enforce civil rights law or to implement the President's policy priorities in a manner consistent with DOE's established legal authority.

This factor also favors Plaintiffs.

## VI.   REMEDY

Having found that Plaintiffs are likely to succeed on the merits of their APA claim, that they will be irreparably harmed absent preliminary relief, and that the public interest favors preliminary relief, this Court is left with a choice of remedy.[13] Section 705 empowers this Court to issue any "necessary and appropriate process" to "preserve status or rights" while this litigation proceeds.

This Court believes the appropriate course of action at this juncture is to temporarily stay the Letter—that is, to postpone its effective date—under 5 U.S.C. § 705 pending a final resolution in this matter. Such a stay will preserve the status quo as to the Letter set forth in the New Hampshire Agreement. As everyone agrees, staying the Letter has no impact on the government's ability to enforce Title VI consistent with long-standing principles and the dictates of *SFFA*. It is where the Letter departs from existing law that it likely is legally defective and thus harming the Plaintiffs. This Court thus believes a stay of the Letter—which would necessarily preclude

---

[13] This Court construes Plaintiffs' request to preliminarily enjoin the Letter under the APA as a request for a § 705 stay, recognizing that the APA provides this Court's authority to grant preliminary or final equitable relief in a challenge to final agency action and such a stay is a form of preliminary injunctive relief. Both parties have asked for an opportunity to re-brief these issues on summary judgment, despite the apparent lack of an administrative record to review.

enforcement based on the Letter's changes to existing law—will "preserve status or rights pending conclusion of the review proceedings," without intruding on the administration's ability to enforce existing civil rights law and pursue its enforcement priorities within its legal authority. That is, this Court believes a stay postponing the effective date of the Letter is the narrowest relief possible to protect the Plaintiffs from irreparable injury.[14]

This Court does not believe an injunction will be necessary once the stay is effected, and will deny Plaintiffs' Letter Motion insofar as it asks this Court to enjoin the FAQs and the End DEI Portal, to order DOE to enforce Title VI in line with specified prior guidances, and to order DOE to place those guidances back on its website. ECF 31-2. This Court does not believe the FAQs are final agency action subject to its authority under the APA, and the stay of the Letter will prevent enforcement of the objectionable provisions in the FAQs explaining the Letter's dictates. As for the End DEI portal, the government is entitled to express its viewpoint on its website and to maintain a reporting portal for Title VI and Equal Protection concerns, so long as it does not

---

[14] The government has requested that, if the Court were to issue a preliminary injunction, it order Plaintiffs to provide an injunction security under Fed. R. Civ. P. 65(c). This Court is not granting a preliminary injunction. The Supreme Court has explained that "An injunction and a stay have typically been understood to serve different purposes." *Nken*, 556 U.S. at 428. "[A]n injunction has a specific legal meaning, and the fact that a different procedural mechanism can achieve the same result as an injunction does not mean that the two should be deemed the same." *Nat'l TPS Alliance v. Noem*, No 25-1766-EMC. – F. Supp. 3d –, 2025 WL 957677, at *14 (N.D. Cal. Mar. 31, 2025). The APA only authorizes courts to "set aside" and "postpone" agency actions—a far narrower authority than the court's equitable power to issue preliminary injunctive relief.

The APA has no bond requirement. *See* 5 U.S.C. § 705. This Court is unaware of any other court finding that Section 705 relief requires a bond. *See, e.g., Seafreeze Shoreside, Inc. v. U.S. Dept. of Interior*, 2023 WL 3660689, at *3 (D. Mass. May 25, 2023) ("Unlike a preliminary injunction, a stay under 5 U.S.C. § 705 does not expressly require the movant post a bond."). This Court is aware that in the U.S. District Court for the District of Columbia, where preliminary relief under the APA is most frequently issued, this principle is so well-established that bond is rarely—if ever—discussed in Section 705 decisions.

actually pursue enforcement actions that are not in accordance with existing law. This Court will decline to order the new administration to espouse the viewpoints and guidances of prior administrations, or to restore those guidances to the agency website as preliminary relief. Insofar as this Court considers the Certification Requirement as an implementation of the Letter, it would of course be improper for the government to initiate enforcement based on a stayed policy, through certification or otherwise.

The government has suggested, without persuasive citation, that even APA relief should be limited to the parties in this case. The Supreme Court has stated otherwise. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 831 (2024). Here, it would make little sense to limit the stay of a Letter that is likely procedurally and substantively defective in numerous respects to the parties in this case.

### VII.  CONCLUSION

This Court ends where it began—this case is about procedure. Plaintiffs have shown that the government likely did not follow the procedures it should have, and those procedural failures have tangibly and concretely harmed the Plaintiffs. This case, especially, underscores why following the proper procedures, even when it is burdensome, is so important.

For the reasons stated above, the Letter Motion is granted in part and denied in part, and the Certification Motion is denied, in accordance with a separate Order that follows.


Dated: April 24, 2025                                    _____/s/_____

                                                        Stephanie A. Gallagher
                                                        United States District Judge