**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| **American Federation of Teachers,** *et al.*, <br><br> Plaintiffs, <br><br> **v.** <br><br> **U.S. Department of Education,** *et al.*, <br><br> Defendants. | **Civil Case No. 1:25-cv-00628** |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

STATEMENT OF MATERIAL FACTS ................................................................. SMF-1

INTRODUCTION ...................................................................................................... 1

PROCEDURAL POSTURE ........................................................................................ 2

LEGAL STANDARD .................................................................................................. 2

ARGUMENT .............................................................................................................. 3

I.    PLAINTIFFS HAVE STANDING ..................................................................... 4

II.   THE LETTER AND CERTIFICATION ARE UNLAWFUL UNDER THE
      APA .................................................................................................................... 6

      A.    The Letter and Certification are Final Agency Actions and Legislative
            Rules Requiring Notice and Comment .................................................... 6

      B.    The Certification Was Issued Without Procedure Required by the
            Paperwork Reduction Act and In Conflict with Prior Department
            Representations. ........................................................................................ 8

      C.    Both the Letter and Certification Are Arbitrary and Capricious ............ 9

            1.    The Department failed to provide an adequate explanation for
                  its change in its positions. ............................................................ 10

            2.    The Department fails to rely on prior factual findings or any
                  evidence. ....................................................................................... 12

            3.    The Department fails to account for existing federal and state
                  legal standards. ............................................................................. 13

            4.    The Department failed to consider the reliance interests of
                  schools and educators. .................................................................. 15

      D.    The Letter and Certification are Contrary to Constitutional Rights ..... 17

      E.    The Letter and Certification are in Excess of Statutory Authority and
            Not in Accordance with Law .................................................................. 17

III.  THE LETTER AND CERTIFICATION VIOLATE THE FIRST
      AMENDMENT ................................................................................................. 18

A.    The Letter and Certification Impermissibly Discriminate Based on
      Viewpoint and Content. ...............................................................................18

      1.    The Letter and Certification are viewpoint discriminatory and
            impermissibly coercive ...........................................................................19

      2.    The Letter and Certification impose unconstitutional content-
            based restrictions...................................................................................23

B.    The Letter and Certification are Facially Overbroad .............................................24

IV.    THE LETTER AND CERTIFICATION ARE UNCONSTITUTIONALLY
       VAGUE IN VIOLATION OF THE DUE PROCESS CLAUSE  ...................................26

A.    The Department of Education Has Not Given Regulated Entities Fair
      Warning......................................................................................................27

B.    The Letter and Certification are Ripe for Arbitrary Enforcement ........................31

V.    VACATUR, DECLARATORY RELIEF, AND A PERMANENT
      INJUNCTION ARE NECESSARY TO REDRESS PLAINTIFFS' INJURIES..............32

A.    Vacatur is the Appropriate Remedy to Redress Defendants' APA
      Violations ...................................................................................................33

B.    Declaratory Relief is Necessary so that Defendants Conform Their
      Conduct to the Law ....................................................................................33

C.    Plaintiffs Meet the Standard for Entry of a Permanent Injunction .......................35

CONCLUSION.......................................................................................................37

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Aetna Cas. & Surety Co. v. Quarles*, 92 F.2d 321 (4th Cir. 1937) ................................................33

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205 (2013) ...................................... 21

*Air Evac EMS, Inc. v. McVey,* 37 F.4th 89 (4th Cir. 2022) ........................................................ 36

*Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482 (D. Md. 2020).................................... 7

*Baggett v. Bullitt*, 377 U.S. 360 (1964).................................................................................... 27

*Boos v. Barry*, 485 U.S. 312 (1988)......................................................................................... 24

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.,* 89 F.4th 46

    (1st Cir. 2023), *cert. denied*, 145 S. Ct. 15 (2024)................................................... 29

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.,*

    996 F.3d 37 (2021)........................................................................................... 29

*Boutilier v. INS*, 387 U.S. 118 (1967)....................................................................................... 26

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ...................................................................... 24, 25

*Casa De Md. v. DHS*, 924 F.3d 684 (4th Cir. 2019)................................................................... 33

*Cent. Radio Co. v. City of Norfolk*, 811 F.3d 625 (4th Cir. 2016)................................................ 23

*Chamber of Com. of U.S. v. CFPB*, 691 F. Supp. 3d 730 (E.D. Tex. 2023)................................ 37

*Chamber of Com. of U.S. v. CFPB*, No. 23-40650, 2025 WL 1304573 (5th Cir. May 1, 2025).. 37

*Chi. Women in Trades v. Trump*, No. 1:25-cv-02005, 2025 WL 933871

    (N.D. Ill. Mar. 27, 2025)........................................................................... 27, 30

*City of Austin v. Reagan Nat'l Advert. Of Austin, LLC*, 596 U.S. 61 (2022)............................... 24

*Coal. for TJ v. Fairfax Cnty. Sch. Bd.,* 68 F.4th 864 (4th Cir. 2023) .......................... 5, 14, 29, 34

*Ctr. for Sci. in the Pub. Int. v. Perdue*, 438 F. Supp. 3d 546 (D. Md. 2020)................................. 3

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) ................................. 15

*Doe v. Civ. Serv. Comm'n*, 483 F. Supp. 539 (S.D.N.Y. 1980)...................................................... 33

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)................................................. 10, 12

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)........................................................ 26

*FDA v. All. For Hippocratic Med.*, 602 U.S. 367 (2024) ........................................................ 5

*Ford Motor Co. v. NLRB*, 305 U.S. 364 (1939)........................................................................ 35

*Franklin v. Massachusetts*, 505 U.S. 788 (1992)....................................................................... 35

*Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581 (4th Cir. 2012) ..................... 13

*Gen. Elec. Co. v. EPA*, 290 F.3d 377 (D.C. Cir. 2002) ........................................................... 6

*Gill v. Whitford*, 585 U.S. 48 (2018)........................................................................................ 36

*Gonzales v. Oregon*, 546 U.S. 243 (2006)............................................................................... 35

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)......................................................... 26, 29, 30

*Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610 (1976)................................... 27

*Iancu v. Brunetti*, 588 U.S. 388 (2019)..................................................................................... 19

*Johnson v. Sessions*, No. 1:15-cv-03317, 2018 WL 2762562 (D. Md. June 8, 2018)................... 3

*Johnson v. United States*, 576 U.S. 591 (2015) ........................................................................ 27

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ................................... 36

*Legal Servs. Corp v. Velazquez*, 531 U.S. 533 (2001)............................................................... 21

*Legend Night Club v. Miller*, 637 F.3d 291 (4th Cir. 2011) ....................................................... 35

*Loc. 8027 v. Edelblut*, No. 1:21-cv-01077, 2024 WL 2722254

   (D.N.H. May 28, 2024)...................................................................................... 28, 30, 32

*Loc. 8027, AFT-N.H., AFL-CIO v. Edelblut*, 651 F. Supp. 3d 444 (D.N.H. 2023) .......... 27, 30, 31

*Mayor of Balt. v. Azar,* 973 F.3d 258 (4th Cir. 2020)................................................................ 12

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)................................................ 35, 36

*NAACP v. Dep't of Educ.*, No. 1:25-cv-01120, 2025 WL 1196212

    (D.D.C. Apr. 24, 2025) ........................................................................................ passim

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 1:25-cv-00333, 2025 WL

    573764 (D. Md. Feb. 21, 2025) ............................................................................... 28

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 1:25-cv-00333, 2025 WL

    750690 (D. Md. Mar. 10, 2025).............................................................................. 28

*Nat'l Educ. Ass'n v. Dep't of Educ.,* No. 1:25-cv-00091, 2025 WL 1188160 (D.N.H. Apr. 24,

    2025) ................................................................................................................ passim

*Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014) ................................... 7

*Nat'l Rifle Ass'n of Am. v. Vullo*, 49 F.4th 700 (2d. Cir. 2022)................................... 21

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) ............................................... 21

*Newsom v. Albermarle Cnty. Sch. Bd.*, 354 F.3d 249 (4th Cir. 2003) ......................... 25

*Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) ............................................... 12

*Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*, 983 F.3d 671 (4th Cir.

    2020) ........................................................................................................................ 4

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No 1*, 551 U.S. 701 (2007)....................... 29

*Penn-America Ins. Co. v. Coffey*, 368 F.3d 409 (4th Cir. 2002).................................... 33

*Perkins Coie, LLP v. DOJ*, No. 1:25-cv-00716, 2025 WL 1276857 (D.D.C. May 2, 2025) ....... 26

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022)..... 28

*PFLAG, Inc. v. Trump,* No. 8:25-cv-00337, 2025 WL 685124 (D. Md. Mar. 4, 2025).............. 36

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ............................................... 18, 19, 23

*Ricketts v. Wake Cnty. Pub. Sch. Sys., WCPSS*, 125 F.4th 507 (4th Cir. 2025) ......................... 14

*Ridpath v. Bd. of Govs. Marshall Univ.*, 447 F.3d 292 (4th Cir. 2006)........................................ 18

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995)......................... 18, 19, 20

*Rust v. Sullivan*, 500 U.S. 173 (1991) ....................................................................................... 21

*Safe Extensions, Inc. v. F.A.A.*, 509 F.3d 593 (D.C. Cir. 2007).................................................. 13

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521 (N.D. Cal. 2020)...... 21, 28

*Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011) ...................................................................... 20

*Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023)................................................. 1, 3

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) .......................................................... 32

*Tenn. Educ. Ass'n v. Reynolds*, 732 F. Supp. 3d 783 (M.D. Tenn. 2024) ............................. 28, 32

*Texas v. Cardona*, 743 F. Supp. 3d 824 (N.D. Tex. 2024) ......................................................... 37

*TikTok Inc. v. Garland*, 145 S.Ct. 57 (2025) ............................................................................. 23

*Turner Broad. Sys. Inc. v. FCC*, 512 U.S. 622 (1994)........................................................... 18, 19

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) .................................................. 6

*United States v. Hasson*, 26 F.4th 610 (4th Cir. 2022) ............................................................... 27

*United States v. Playboy Ent. Grp.*, 529 U.S. 803 (2000) ......................................................... 18

*United States v. Sun,* 278 F.3d 302 (4th Cir. 2002) .................................................................. 27

*UnitedSteel v. Mine Safety and Health Admin.*, 925 F.3d 1279 (D.C. Cir. 2019) ...................... 10

*Vill. Of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982)..................... 27

*Virginia v. Hicks*, 539 U.S. 113 (2003)...................................................................................... 25

*White v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa*., 913 F.2d 165 (4th Cir. 1990).................. 33

**STATUTES**

18 U.S.C. § 287 ........................................................................................................... 8

20 U.S.C. § 1132-2 ................................................................................................... 17

20 U.S.C. § 1232a .................................................................................................... 17

20 U.S.C. § 7906a .................................................................................................... 17

5 U.S.C. § 702 .......................................................................................................... 33

5 U.S.C. § 703 .......................................................................................................... 33

5 U.S.C. § 704 ............................................................................................................ 6

Pub. L. No. 96–88, 93 Stat. 668 (1979) .................................................................. 17

Wash. Rev. Code Ann. § 28B.10.149 (West 2021) ................................................. 31

**REGULATIONS**

Fed. R. Civ. P. 56 ....................................................................................................... 3

34 C.F.R. § 100.5 ............................................................................................7, 14, 22

# STATEMENT OF MATERIAL FACTS[1]

The following statement of facts is based on declarations,[2] other evidence previously entered into the judicial record, and judicially noticeable documents. Defendants have represented to the Court that there is not an administrative record related to the actions challenged by Plaintiffs in the above-captioned matter. Defs.' Resp. Ct. Req. Add. Info, ECF 58.

<u>The Letter</u>[3]

On February 14, 2025, the Acting Assistant Secretary for Civil Rights Craig Trainor sent a Dear Colleague Letter ("Letter") purportedly to "clarify and reaffirm the nondiscrimination obligations of schools and other entities that receive federal financial assistance" required by Title VI, "the Equal Protection Clause of the United States constitution, and other relevant authorities," following the Supreme Court's 2023 decision in *Students for Fair Admissions v. Harvard* ("*SFFA*"), 600 U.S. 181 (2023).[4]

*Constraints on Nondiscriminatory Teaching and Learning.* The Letter alleges that educational institutions "toxically indoctrinate[] students with the false premise that the United States is built upon 'systemic and structural racism' and advance[] discriminatory policies and practices."[5] It further alleges that proponents of such seek to "smuggl[e] racial stereotypes and explicit race-consciousness" into "everyday training, programming, and discipline."[6] The Letter

---

[1] Per this Court's May 2, 2025, Order, ECF 62, Plaintiffs' Statement of Material Facts is separately paginated and not included within Plaintiffs' page limit for its Memorandum in Support of Summary Judgment.
[2] To address gaps in the record identified in this Court's April 24, 2025 Memorandum Opinion, ECF 60, Plaintiffs have included three supplemental declarations from its Plaintiffs, *see* Ex. 51-53, and one new declaration from the Coalition of Oregon School Administrators, Exhibit 54.
[3] Ex. 11, PLFS-114 , Dear Colleague Letter from Craig Trainor, Acting Assistant Sec'y for C.R., U.S. Dep't of Educ. (Feb. 14, 2025), https://perma.cc/SF4T-WA33("Letter").
[4] Letter at 1–2.
[5] Letter at 2.
[6] *Id.*

provides no evidence or support for these conclusions.[7]

*Constraints on Nondiscriminatory Student Groups, Support for Students, and Diversity, Equity, and Inclusion Programming.* The Letter claims that DEI programs "deny students the ability to participate fully in the life of a school" because they "frequently preference certain racial groups and teach students that certain racial groups bear unique moral burdens that others do not" and "stigmatize students who belong to particular racial groups based on crude racial stereotypes."[8]. The Letter does not provide support for these assertions.[9] The Letter goes on to claim that "using race" in any decisions related to any "aspects of student, academic, and campus" is prohibited by Federal law without providing any context.[10]

*Prohibitions on Admission Practices.* The Letter concludes that "relying on non-racial information as a proxy for race" also "violates the law."[11] It argues that, for example, it would be "unlawful for an educational institution to eliminate standardized testing" if one of its motives is to "increase racial diversity."[12] The Letter does not cite any statute, regulation, or case law to support that position.[13] The Letter purportedly interprets *SFFA*, which explicitly contemplates and permits a university "considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise," *SFFA*, 600 U.S. at 230. By contrast, the Letter suggests that such consideration is likely "in fact, motivated by racial considerations" and may constitute "race-based decision-making."[14] Further, the Letter implies that discrimination likely

---

[7] *See generally* Letter.
[8] Letter at 3.
[9] *See generally* Letter.
[10] Letter at 2.
[11] Letter at 3.
[12] *Id.*
[13] *See generally* Letter.
[14] Letter at 2.

exists in the case of any (1) differentiation or reliance on race, (2) decisions motivated by racial considerations, or (3) use of non-racial information as a proxy for race in decisions related to "admissions" and a host of other activities may be discrimination.[15]

*Threat of Enforcement Reverberates Across the Country.* The Letter instructs that the Department will "take appropriate measures to assess compliance with the applicable statues and regulations **based on the understanding embodied in this letter** beginning no later than [February 28, 2025]."[16] Immediately, schools and educators across the country were thrown into confusion and alarm by this sea change.[17]

<u>End DEI Portal</u>

On February 27, 2025, the administration launched a new portal—www.EndDEI.ed.gov—to "identify potential areas for investigation," despite a pre-existing portal that the Office of Civil Rights ("OCR") has long used to collect complaints of discrimination.[18] The portal purportedly aims to be a place to report "illegal discriminatory practices at institutions of learning."[19] The portal seeks information on schools that participate in diversity, equity, and inclusion efforts, which it equates to "divisive ideologies and indoctrination."[20] In the accompanying press release, the Department stated submissions will be a guide to "identify potential areas for investigation."[21]

---

[15] *See generally* Letter.
[16] Letter at 3 (emphasis added).
[17] *See e.g.*, Ex. 1, PLFS-009–10, AFT Decl. ¶¶ 24–27; Ex. 2, PLFS–020, ASA Decl. ¶ 27; Ex. 3, PLFS-029, AFT-MD Decl. ¶ 31; Ex. 4, PLFS-038, District 4J Decl. ¶ 19; Ex. 5, PLFS-061, Gallagher Decl. ¶ 28; Ex. 6, PLFS-071–72, Blee Decl. ¶ 23; Ex.7, PLFS-079, Jane Doe Decl. ¶ 9; Ex. 8, PLFS-095–96, Hamako Decl. ¶ 23; Ex. 9, PLFS-105, John Doe Decl. ¶ 26; Ex. 12, PLFS-119, Jasper Smith, *Ed. Dept.'s Broad DEI Warning Puts College Leaders in 'Enormously Complicated Situation'*, The Chronicle of Higher Ed. (Feb. 18, 2025), https://perma.cc/FN8J-3EA3.
[18] Ex. 13, PLFS-126, U.S. Dep't of Educ., *End DEI Portal*, https://perma.cc/6VJF-NTY9 (last accessed June 3, 2025).
[19] *Id.*
[20] *Id.*
[21] Ex. 50, PLFS-608, U.S. Dep't of Educ., *Portal Press Release*. The press release also includes a quote from the co-founder of Moms for Liberty accusing schools of "pushing critical theory, rogue sex education and divisive ideologies," and encouraging people to "share the receipts of the betrayal that has happened in our public schools."

The FAQs

On February 28, 2025, the Department published a "Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act"[22] ("FAQs") document purportedly "intended to anticipate and answer questions in response" to the Letter.[23] On April 9, 2025, the Department updated the FAQs. Mem. Op., ECF No. 60 at 7 (Apr. 24, 2025) ("Op."). The FAQs warn schools to avoid creating a "racially hostile environment" but do not provide an explanation of what that means or reference the well-established relevant legal standards.[24] While the FAQs acknowledge the First Amendment limitations on federal control of school curricula, they also assert without support that certain curricula, such as social-emotional learning and culturally responsive teaching, are discriminatory.[25]

The Department has, through past guidance, repeatedly explained the applicable legal standard under Title VI.[26] However, many guidance documents explaining the Title VI legal standards have been removed from the Department's website since January 20, 2025, without notice or explanation.[27] Neither the Letter nor the FAQs discuss or reference these guidance

---

[22] Ex. 14, PLFS-130, U.S. Dep't of Educ., Off. for C.R. *Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act* (Feb. 28, 2025), https://perma.cc/KB53-4SQ3("FAQs").

[23] *Id*.

[24] *Id*. at 6.

[25] *Id*. at 5. *See* Ex. 47, Steele Decl. ¶¶ 4-7 (explaining social emotional learning); ¶¶ 7-13 (describing its demonstrated positive effect on students); ¶¶ 14-18, 27-29 (noting its history of support from Congress and its use in multiple states); ¶¶ 19-22 (illustrating that it is routinely identified as a remedy for past discrimination); ¶¶ 30-33 (describing the harm and chilling effect of the Department's statements on social and emotional learning).

[26] *See* e.g., Ex. 15, PLFS-140, U.S. Dep't of Educ., Off. for C.R., *Fact Sheet: Ensuring Educational Opportunities for All Students on Equal Terms 70 Years After Brown v. Board of Education*, https://perma.cc/82A2-2TL3 (last visited June 4, 2025); Ex. 16, PLFS-145, U.S. Dep't of Educ., *Questions And Answers Regarding The Supreme Court's Decision In Students For Fair Admissions, Inc. v. Harvard College And University Of North Carolina* (Aug. 14, 2023), https://perma.cc/8QTR-8PMD("Joint FAQs"); Ex. 17, PLFS-153, U.S. Dep't of Educ., Off. for C.R., *Fact Sheet: Harassment based on Race, Color, or National Origin on School Campuses* (July 2, 2024), https://perma.cc/Z5JJ-V3WR; Ex. 18, PLFS-163, U.S. Dep't of Educ., Off. for C.R., *Resolving a Hostile Environment Under Title VI: Discrimination Based on Race, Color, or National Origin, Including Shared Ancestry or Ethnic Characteristics*, https://perma.cc/52LW-MH3E (last visited Mar. 25, 2025).

[27] A 404 "Page Not Found" error appears when attempting to access over a dozen guidances related to racial (continues on next page)

documents, explain whether those past guidance documents have been rescinded, or attempt to explain the Department's stark departure from their approach.

Enforcement Begins

On March 14, 2025, the Department announced 51 new Title VI investigations following the Letter. Forty-five of the investigations were based on allegations that colleges and universities (institutions of higher education or "IHEs") violated Title VI by partnering with The Ph.D. Project, a non-profit working to "expand the pool of workplace talent by developing business school faculty who encourage, mentor, and support tomorrow's leaders."[28] The announcement of these investigations notes that they "can result in the loss of federal funds." More than 20 of the schools targeted for investigation employ Plaintiffs' members.[29] In the time since, the Department has opened numerous additional Title VI investigations that do not explicitly reference compliance with the Letter but appear to be based on the legal interpretations therein.[30]

The Certification[31]

---

discrimination under Title VI. *See e.g.,*the *Fact Sheet: Harassment based on Race, Color, or National Origin on School Campuses*, *see* https://perma.cc/GQA6-G752 (last visited Mar. 5, 2025).

[28] Ex. 19, PLFS-174, The PhD Project, *Enriching Education for All*, https://perma.cc/CMB9-U8QM (last visited Mar. 24, 2025).

[29] AFT Decl. ¶ 30.

[30] *See infra* Sec. V.B. Since the Letter has been stayed, the Department has initiated numerous investigations and a funding termination that appear to be based, at least in part, not on existing law, but on the Letter's changes to existing law. *See, e.g.*, Ex. 57A, PLFS-823, Press Release, Dep't of Educ., U.S. Department of Education's Office for Civil Rights Launches Title VI Investigation into Fairfax County Public Schools (May 22, 2025), https://perma.cc/72JV-KA2C, (initiating an investigation into a Fairfax school for "dropp[ing] its standardized testing requirements," despite Fourth Circuit decision finding that the school's activities were not constitutionally suspect, see *Coal. for TJ v. Fairfax Cnty. Sch. Bd.,* 68 F.4th 864, 885–86 (4th Cir. 2023)). *See also* Ex. 57B, PLFS-829–830, Letter from Linda McMahon, Sec'y of Educ., to Dr. Alan Garber, Off. of the Pres., Harvard Univ. (May 5, 2025) ("Harvard Grant Termination Letter"), (Terminating funding in part because Harvard "has failed to abide by its legal obligations," including "scrapp[ing] standardized testing requirements," and "fail[ing] to abide by the United States Supreme Court's ruling demanding that it end its racial preferencing, and continu[ing] to engage in ugly racism in its undergraduate and graduate schools. . . . [Universities] should not be incubators of discrimination that encourage resentment and instill grievance and racism into our wonderful young Americans.").

[31] Ex. 43, PLFS-559, U.S. Dep't of Educ., *Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and SFFA v. Harvard* (Apr. 3, 2025), https://perma.cc/AF2G-ZL69("Certification").

On April 3, 2025, the U.S. Department announced that it "sent letters to State Commissioners overseeing K-12 State Education Agencies (SEAs) requiring them to certify their compliance" with "Title VI of the Civil Rights Act and the responsibilities outlined in Students for Fair Admissions v. Harvard."[32] The Department described the certification as required in order "to continue receiving federal financial assistance."[33] The letters, sent via e-mail, gave SEAs only 10 days to sign and return their certification and those of their local education agencies (LEAs).[34]

In announcing this demand, the Department asserted that "many schools flout or outright violate" their Title VI legal obligations "by using DEI programs to discriminate against one group of Americans to favor another based on identity characteristics."[35] Neither the press release nor the Certification give examples of what kinds of DEI practices purportedly do this, nor are there any prior discrimination findings based on these practices cited against K-12 schools.

According to the press release, the certification is sent pursuant to the Department's authority to ensure recipients of federal funding comply with federal civil rights laws.[36] No specific law or statute empowering the Department to send this certification is cited. In introducing this new certification, the Department did, however, explicitly reference the Letter as well as the FAQs.[37]

---

[32] Ex. 41, PLFS-552, Press Release, Dep't of Educ., ED Requires K-12 School Districts to Certify Compliance with Title VI and Students v. Harvard as a Condition of Receiving Federal Financial Assistance (Apr. 3, 2025), https://perma.cc/7WBU-T8QN.

[33] *Id*.

[34] Ex. 42, PLFS-557, E-mail from Dep't of Educ., Off. for C.R., *Department of Education Title VI Compliance Certification* (Apr. 3, 2025). The Department's email also required SEAs to report on the signature status of its LEAs, whether the SEA found any compliance issues, and its proposed enforcement plans.

[35] Press Release, Ex. 41, PLFS-553.

[36] *Id*.

[37] *Id.* ("These certifications are being sent out pursuant to the Department of Education's authority and responsibility to ensure that recipients of federal funding are complying with United States civil rights law. On February 14, the Office for Civil Rights (OCR) issued a Dear Colleague Letter (DCL) to educational institutions receiving federal funds notifying them that they must cease using race preferences and stereotypes as a factor in their admissions, hiring, promotion, scholarship, prizes, administrative support, sanctions, discipline, and other programs and (continues on next page)

The Certification form itself is dated April 3, 2025, and does not include an OMB control number.[38] The form includes an initial certification as follows:

> On behalf of _____[SEA/LEA], I acknowledge that I have received and reviewed this Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and SFFA v. Harvard. I further acknowledge that **compliance with the below and the assurances referred to**, **as well as this certification**, constitute a **material condition** for the continued receipt of federal financial assistance, and therefore certify our compliance with the below legal obligations.[39]

Following the form certification are the "Assurances" referenced therein, which include editorial commentary criticizing unnamed "equity mandates" by the Biden Administration, selective quotes from *SFFA*, and a few broad assertions, unsupported by any authority, suggesting that DEI programs are illegal.[40] In particular, the Department suggests *SFFA's* holding is that "the Equal Protection Clause and Title VI prohibit **race-based action**, with only the narrowest of exceptions."[41] However, the Department does not point to anything in *SFFA* that defines "race-based action" in the context of K-12 schooling or indeed anything in the decision that suggests it applies to K-12 education at all.[42] The Department also states that "any violation of Title VI— including the use of Diversity, Equity, & Inclusion ('DEI') programs to **advantage one's** [sic] **race over another**—is impermissible," and that "[t]he use of **certain DEI practices** can violate federal law."[43] But there, too, the Department provides no additional information as to what constitutes "advantaging" one race over another or what "certain DEI practices" violate federal

---

activities. Two weeks later, OCR published Frequently Asked Questions to anticipate and answer questions that may arise in response to the DCL.")

[38] *See generally* Certification.

[39] *Id*. at 1 (emphasis added).

[40] *Id*. at 1-4.

[41] *Id*. at 2 (emphasis added).

[42] *See generally id.*

[43] *Id*. at 3 (emphasis added).

law. Finally, the Assurances proclaim that "[t]he continued use of **illegal DEI practices** may subject the individual or entity using such practices to serious consequences,"[44] again providing no information on what will be considered as "illegal DEI" in the context of these Assurances.

At the end of the Assurances, the Department enumerates "serious consequences" for the "continued use of illegal DEI" by "individual[s] or entit[ies] using such practices."[45] The Assurances do not state whether these consequences apply to other purported violations of Title VI. Thus, by the terms of the Certification, the consequences only apply to "continued use of illegal DEI."[46] The listed consequences are: (1) termination of funds under Title VI; (2) prosecution for breach of contract and restitution; and, (3) liability and prosecution under the False Claims Act ("FCA"), including treble damages. The Certification explicitly stipulates to materiality—an essential element of false claims liability.[47] The FCA also raises the prospect of criminal enforcement, which brings additional financial penalties and the possibility of imprisonment for up to five years. *See* 18 U.S.C. § 287.

As with the Letter, the abrupt issuance of the Certification reverberated throughout the K-12 educational community.[48] Schools around the country began making changes to policies, curriculum, and programming as a result.[49] At least 25 states declined to sign the Certification

---

[44] *Id*. (emphasis added).

[45] *Id*.

[46] *Id*.

[47] *Id. See NAACP v. Dep't of Educ.*, No. 1:25-cv-01120, 2025 WL 1196212, at *5 (D.D.C. Apr. 24, 2025) ("*NAACP Op.*") (finding the Certification "stipulate[s]e to the element of materiality in a [FCA] action, which concretely alters schools' litigation posture and susceptibility to monetary penalties.").

[48] Ex. 46, PLFS-579, Hart Decl. ¶¶ 7, 10–13, 15–29 (explaining alarm among member districts across 39 states and two territories, and difficult position and enormous pressure the certification puts on schools); Ex. 54, PLFS-643 , Parent Decl. ¶ 12(describing shock caused by Certification from district leaders in Oregon); *see e.g.*, Ex. 56A, PLFS-763.

[49] In Des Moines, Iowa, rather than risk $70 million in funding, the school district responded by moving to remove references to Black and Latinx students in goals for student performance. Ex. 56B, PLFS-772. Waterloo Community Schools' first graders were withdrawn from the University of Northern Iowa's 19th Annual African American Read-In. *NAACP*, ECF No. 13-2, Graves Decl. ¶¶ 8–10. Virginia Beach Public Schools voted to suspend all educational (continues on next page)

form by April 24, 2025.[50] In cases where a SEA did sign, some LEAs within the states refused, or

signed with caveats noting the issues with the Certification.[51]

Additional Defendant Statements

On June 4, 2025, Defendant McMahon was unable to state, when asked by a Member of

Congress under oath, whether the following topics were "illegal DEI": "a lesson plan on the Tulsa

Race Massacre"; the book "Through My Eyes by Ruby Bridges"; and "social studies standards

that teach that President Biden won the 2020 election."[52] Defendant McMahon also routinely

mentions the Department's actions to "suspend[] grants for illegal DEI programs,"[53] and otherwise

discusses "illegal DEI" without clarification.[54]

Harm[55]

For Plaintiffs and Plaintiffs' members, the Letter and the Certification have caused

uncertainty about whether certain education practices are permitted by the Department; chilled

---

program offerings that do not comply with the Letter, FAQs, and Certification, including the district's "Equity Plan." *NAACP*, ECF No. 13-6, Ex. B to Bailey Decl.

[50] *See* Ex. 56I, PLFS-816; Ex. 55A-55X (collecting official SEA and LEA responses to Certification).

[51] *See* Ex. 55V, PLFS-739 (letterfrom Loudon County, Virginia refusing to sign); Ex. 56E, PLFS-792 (describing separate certification submitted by Fairfax County, Virginia); Ex. 56C, PLFS-776 (at least 13 LEAs in New Hampshire did not have certifications in the state online system, and several others had been rescinded); Ex. 56D, PLFS-788 (describing Grantham, NH and Portsmouth, NH rescinding their certifications); Ex. 55Y, PLFS-757 (certification of superintendent in New Hampshire, noting lack of clarity in Certification); Ex. 56F, PLFS-798 (Fifteen LEAs in Ohio refused to sign the certification); Ex. 56G, PLFS-803 (describing Columbus City Schools sending SEA a statement that the certification request was vague and lacked definition of DEI); Ex. 56H, PLFS-807 (describing one Kentucky superintendent including in addendum to Certification that "It is with great disgust and sadness that I am signing this document. . .The fact that federal funds would be withheld from our neediest students—simply because of a refusal to sign a document that serves to further divide our country—is deeply troubling.")

[52] Ex. 58A, PLFS-838, *Linda McMahon, Sec'y of Educ., 2026 Budget, in Hearing on Education Department Policies and Priorities*, House Committee on Education and the Workforce, 119th Cong. (Jun. 4, 2025) (testimony of Sec. of Ed. McMahon).

[53] Ex. 58C, PLFS-846 (testifying before House Appropriations subcommittee); Ex. 58D,PLFS-849 (same).

[54] *See* Ex. 58B, PLFS-844 (tweeting that "New Hampshire's certification tracker is a model of transparency for other states and territories. NH is working hard to ensure taxpayer dollars are not supporting illegal DEI policies and practices in the classroom. Way to go, @NHEdCommr".)

[55] Additional background facts about Plaintiffs are provided in this Court's Memorandum Opinion, Op. at 4-5 and Plaintiffs' Declarations, Exs. 1–4, PLFS-001–053.

their speech, conduct, and associational rights; created fears of investigation for lawful conduct; threatened loss of federal funding; and implicated extraordinary legal consequences via the FCA, which allows for third-party enforcement and raises the specter of criminal charges—all without allowed Plaintiffs and others to bring attention to these issues via notice and comment.[56]

*Uncertainty.* Plaintiffs and their members have no way of knowing whether the work they do is prohibited by the Letter, and whether they will be targeted by the Department.[57] Rather than being able to focus on their students and their work, educators have had to spend significant time trying to interpret the Letter and anticipate compliance scenarios.[58] The Certification is a means to enforce the understanding embodied in the Letter, and as such, further amplifies Plaintiffs' and their members' uncertainty.[59] The Certification also contains its own vague prohibitions on DEI-related activities, creating additional uncertainty.[60]

*Chilled First Amendment Speech & Activities.* Plaintiffs and their members fear "they must self-censor their speech, including lectures, courses, and other activities" due to the Letter.[61] At the higher education level, compliance with the Letter could necessitate significant changes to university courses, potentially leading to faculty position eliminations, fewer class sections, or even department closures.[62] These alterations threaten to impede research, prevent publication, and undermine academic integrity by restricting discussions and access to relevant scholarship on

---

[56] If given the opportunity, Plaintiffs would have commented on the Letter and the Certification. *See* District 4J Decl. ¶ 44; ASA Decl. ¶ 28; AFT Decl. ¶ 29; Ex. 51, District 4J Jonak Decl. ¶ 26, PLFS-619; Ex. 52, AFT Suppl. Decl. ¶ 5, PLFS-632.

[57] *See* AFT Decl. ¶ 28; AFT-MD Decl. ¶ 30; Gallagher Decl. ¶ 14; Blee Decl. ¶ 17; Jane Doe Decl. ¶¶ 8–9; Hamako Decl. ¶¶ 10–12, 23.

[58] *See* John Doe Decl. ¶ 28 (describing time taken away from teaching and learning to deal with the Letter); *see also* District 4J Decl. ¶ 42 (describing alarm and fear at all levels of district staff and leadership, and teachers taking time to reach out to leadership about the impact of the letter); Gallagher Decl. ¶¶ 25–28; Jane Doe Decl. ¶ 16.

[59] Ex. 53, PLFS-636–37, Jane Doe Suppl. Decl. ¶ 12; Ex. 38, PLFS-505, District 4J Cert. Decl. ¶ 18.

[60] Ex. 39, PLFS-536, AFT Cert. Decl. ¶ 15; District 4J Cert. Decl. ¶ 18; Jane Doe Suppl. Decl. ¶ 10.

[61] AFT Decl. ¶ 25; *see* John Doe Decl. ¶ 27.

[62] Hamako Decl. ¶ 12.

topics like race and ethnicity, which are integral to fields such as sociology.[63] At all education levels, topics and themes that have long been part of Plaintiffs' members' teaching, as well as student organizations and cultural centers, are now potentially suspect and may require censoring or removal.[64] Teachers who take part in that work, such as sponsoring affinity groups, fear they will be targeted, potentially depriving students of these vital resources.[65] In some cases, the Letter also conflicts with state standards,[66] and complicates curriculum planning.[67]

The Certification amplifies the Letter's effects, while also creating its own chill by increasing fear among Plaintiffs and the education community that they must eliminate any teaching, program, activity, lesson, association, or policy that the Department could decide falls under its broad view of illegal DEI.[68] Consequently, the Letter and Certification are effectively dictating curriculum for educational institutions, to the detriment of students.[69]

*Fear of Investigation.* Plaintiffs and their members fear that their work will lead to investigations, forcing them and their "institution[s] into an impossible choice of deciding between continuing to teach in a free and proper manner or face the threat of a costly and drawn-out federal investigation."[70] The risk of investigation "negatively influenc[es] the work and careers" of

---

[63] John Doe Decl. ¶ 25; ASA Decl. ¶¶ 18–19; *see also* Blee Decl. ¶ 16, 25.
[64] *See* Hamako Decl. ¶¶ 10–12, 22; Blee Decl. ¶ 16; Gallagher Decl. ¶¶ 19, 27, 29–33; Jane Doe Decl. ¶ 22-24; John Doe Decl. ¶ 32.
[65] ASA Decl. ¶ 26; *see* AFT Decl. ¶ 26 (expressing similar concerns); AFT-MD Decl. ¶ 29 (same).
[66] For example, District 4J is required by state law to teach a Native American curriculum, a genocide curriculum, and use inclusive instructional materials and incorporate Social and Emotional Learning standards. District 4J Decl. ¶¶ 11–17. Similarly, "all degree-seeking students attending a Washington state community or technical college are required to take a DEI and antiracism program" in accordance with "Washington State law RCW 28B.10.149." Hamako Decl. ¶ 7.
[67] *See* District 4J Decl. ¶ 13.
[68] *See id.* ¶ 33; AFT Cert. Decl. ¶ 19.
[69] *See* District 4J Decl. ¶ 14 (the Letter forces schools to pull back on their curriculum and efforts to promote critical thinking, equitable outcomes, and a sense of belonging for students); District 4J Cert. Decl. ¶ 23 ("[T]he [] certification requirement, when paired with the Letter, appears to be an attempt by the Department to exert federal control and limitations over state and local curriculums, programming, and teaching.").
[70] John Doe Decl. ¶ 28; *see* District 4J Decl. ¶ 16 (explaining that complying with mandatory state curriculum topics (continues on next page)

Plaintiffs' members and "impact[s] the learning and future of their students by depriving them of essential courses and learning."[71] Plaintiffs fear the risk of potential investigation is increased by the 'End DEI' portal, which solicits discrimination complaints with misleading statements about DEI.[72] The Certification also compounds the risk of investigation for K-12 institutions and individuals by adding a separate basis for investigation (compliance with the Certification), as well as potential investigation under the FCA.[73] Being subject to an investigation risks devastating reputational consequences, for both individual educators and their institutions.[74] It also places Plaintiffs' members' jobs and livelihoods at risk.[75]

*Risk of Funding Loss and Other Penalties.* Plaintiffs fear the Letter and/or the Certification will lead to the loss of federal funding for their institutions.[76] The threat itself is enough to negatively affect programming, as it puts pressure on institutions to change anything that may be targeted by the administration.[77] For District 4J, if federal funding were eliminated, it would need to shorten the school year, layoff dozens of educators, increase class sizes, reduce course offerings, and would be unable to provide critical services to its students, including those with high academic

---

may subject the District to investigation); Blee Decl. ¶ 12 (discussing potential of costly investigation); Jane Doe Decl. ¶ 8 (same); Hamako Decl. ¶ 16 (same); Gallagher Decl. ¶ 20 (same).

[71] AFT-MD Decl. ¶ 27; *see* ASA Decl. ¶ 24 (similar); John Doe Decl. ¶ 32.

[72] *See* Blee Decl. ¶ 12; Jane Doe Decl. ¶ 8 (describing compounded risk due to "Department's apparent encouragement" of complaints from the public based on the Letter).

[73] District 4J Cert. Decl. ¶ 18; Jane Doe Suppl. Decl. ¶ 12.

[74] *See* Gallagher Decl. ¶ 13; John Doe Decl. ¶ 28; Hamako Decl. ¶ 10; Blee Decl. ¶ 12.

[75] Pl's. Mem. of Law in Supp. of Mot. for Prelim. Inj., ECF No. 31-1, at 9–11, 37–38 (Mar. 28, 2025); AFT Cert. Decl. ¶ 17 (noting risk to members' jobs); District 4J Cert. Decl. ¶¶ 30; Jane Doe Decl. ¶ 20.

[76] John Doe Decl. ¶ 12; Blee Decl. ¶ 21; AFT-MD Decl. ¶ 31; Hamako Decl. ¶ 23; ASA Decl. ¶ 25; AFT Decl. ¶ 24; District 4J Cert. Decl. ¶ 17; AFT Cert. Decl. ¶ 16.

[77] For example, IHEs will feel "pressure to preemptively end some or all" programs that the Department might target. Blee Decl. ¶ 36; John Doe. Decl. ¶ 21 ("[T]he threat of the Dear Colleague Letter language may force my institution to proactively take action to prevent any reduction in federal funds"). Obvious targets are identity-oriented cultural centers, which may be "close[d] []entirely instead of risking having federal funds revoked." Hamako Decl. ¶ 31. At the high school level, schools "may be forced to choose between offering [culture and race-related] courses and maintaining the high standards of [their programming] or eliminating them to keep . . . federal funding safe from the threat of the Dear Colleague Letter." *See also* District 4J Cert. Decl. ¶¶ 23, 30; AFT Cert. Decl. ¶ 30; Jane Doe Suppl. Decl. ¶ 17 (explaining threat of certification on programming).

needs and those with disabilities.[78] For one Plaintiff member's institution, a loss of funding would likely mean cutting the Asian American and Native American Pacific Islander-Serving Institutions Program, "which would decimate programming at [his school]."[79] For Plaintiffs' and their members nationwide, the losses would have widespread effects and put their own jobs at risks.[80]

Moreover, in the Certification, the Department has threatened to claw back already-distributed funds, and threatened FCA liability, which is an incredibly serious risk to schools and their educators.[81] District 4J estimates that it has received almost $80 million in federal funding over the last three years.[82] Losing one year of funding would result in lost instruction time, staff layoffs, and program reductions—losing three years of funding, or facing treble damages of that amount, would be shattering, requiring massive layoffs or school closures.[83] The financial risks this represents trickle down to all members of K-12 education, as any educator's speech could potentially trigger enforcement or FCA litigation.[84] On top of this, LEAs are forced to choose whether to certify compliance, knowing that either option comes with substantial consequences: loss of federal funding, or substantial risks of investigation and even criminal prosecution for conducting programming associated with diversity, equity, and inclusion.[85]

---

[78] District 4J Decl. ¶¶ 38, 40.
[79] Hamako Decl. ¶ 23.
[80] John Doe Decl. ¶ 27 ("My institution relies significantly on federal funding, and losing that funding would result in issues across the board."); AFT-MD Decl. ¶ 30 (noting risk to members' jobs); ASA Decl. ¶ 27 (same); Hamako Decl. ¶ 10 (noting risk to his job); Gallagher Decl. ¶ 13, 14 (same); Blee Decl. ¶ 12 (same); Jane Doe Decl. ¶ 8 (same).
[81] District 4J Cert. Decl. ¶¶ 18–19, 25; Jane Doe Suppl. Decl. ¶¶ 12–13; AFT Cert. Decl. ¶¶ 21–22; Parent Decl. ¶ 23.
[82] District 4J Cert. Decl. ¶ 29.
[83] District 4J Cert. Decl. ¶ 30; District 4J Cert. Decl. ¶ 31 (losing three years of funds "would require layoffs of over half the teacher workforce or the shuttering of district schools for 55 days", a "devastating and unprecedented event, that would greatly harm [the] district's students, families, and . . . educators.").
[84] AFT Cert. Decl. ¶¶ 18, 21; Jane Doe Suppl. Decl. ¶ 12.
[85] *See* District 4J Cert. Decl. ¶¶ 20, 25, 32; AFT Cert. Decl. ¶¶ 16, 20; Jane Doe Suppl. Decl. ¶ 12.

## INTRODUCTION

The Department of Education's Letter and Certification attempt to categorize broad swaths of curriculum as discriminatory and compel educational institutions and teachers to abandon all diversity, equity, and inclusion initiatives—without regard to legality, procedure, or consideration of the rights of those affected. This approach has destabilized schools and educators and threatens consequences that would not only harm Plaintiffs and their members, but also negatively impact students' ability to learn, and our education system's commitment to achievement for all. The Department is allowed to have its own views on these issues, and it is permitted to develop its own enforcement priorities. But it must follow the Constitution, laws passed by Congress, and judicial interpretations of both. Our educators and students deserve no less.

On April 24, 2025, this Court found that the Letter issued by the Department likely violated the Administrative Procedure Act in multiple ways and was likely contrary to the First Amendment of the Constitution. Less than two months later, there have been no developments that would change such a conclusion. There has been no evidence presented to challenge the facts set forth by Plaintiffs, and Defendants have conceded that there is no administrative record to serve as the foundation for this agency action.

Shortly after the Court's ruling on the motions for preliminary injunction, Plaintiffs filed a Second Amended Complaint incorporating facts and claims related to Certification. The Certification is legally deficient for many of the same reasons as the Letter, and thus has been enjoined by another district court. Here too, there has been no evidence presented to challenge the facts set forth by Plaintiffs, and no administrative record produced.

Ultimately, as this Court previously concluded, it "must concern itself with what the Letter actually says, not what the government says the Letter says." Op. at 32. The same is true for the

Certification. There is no genuine dispute as to material fact. As a matter of law, the Letter and the Certification violate the APA, the First Amendment, and the Fifth Amendment. They have imposed significant harms on Plaintiffs and their members. Plaintiffs respectfully request this Court grant summary judgment in their favor and enter the relief requested in Plaintiffs' accompanying Motion.

## PROCEDURAL POSTURE

Plaintiffs AFT, AFT-MD, and ASA filed this action on February 25, 2025 to challenge the Letter. Compl., ECF No. 1. Plaintiffs amended their complaint to add District 4J as a Plaintiff. First Am. Compl., ECF No. 14. Plaintiffs subsequently sought two preliminary injunctions: one to enjoin the Dear Colleague Letter, ECF No. 31, and one to enjoin the Certification, ECF No. 37. The Court granted preliminary relief with respect to the Dear Colleague Letter, finding that in "at least four distinct ways, Plaintiffs have shown [that] they are likely to succeed on the merits of their APA claims." Op. at 43. The Court denied relief in conjunction with the motion for preliminary injunction of the Certification because Plaintiffs' Amended Complaint contained no challenge to the Certification Requirement.[86] On May 6, 2025, Plaintiffs filed a Second Amended Complaint, ECF No. 64-1, to incorporate facts and claims related to the Certification Requirement. Plaintiffs now move for summary judgment on all counts in their Second Amended Complaint.

## LEGAL STANDARD

Typically, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[86] The Court noted that "[i]nsofar as this Court considers the Certification Requirement as an implementation of the Letter, it would of course be improper for the government to initiate enforcement based on a stayed policy, through certification or otherwise." Op. at 48. The Certification Requirement has been preliminarily enjoined nationwide in *NAACP*.

2

Fed. R. Civ. P. 56(a). Claims seeking review of an agency action under the APA are adjudicated without a trial or discovery on the basis of an existing administrative record and accordingly are properly decided on summary judgment. *Johnson v. Sessions*, No. 1:15-cv-03317, 2018 WL 2762562, at *5 (D. Md. June 8, 2018). "Summary judgment thus serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Ctr. for Sci. in the Pub. Int. v. Perdue*, 438 F. Supp. 3d 546, 557 (D. Md. 2020).

## ARGUMENT

Defendants' issuance of the Letter and Certification are unlawful. The Letter and Certification radically change the Department's interpretation of Title VI and *SFFA* without proper procedure and in conflict with the Constitution, numerous statutes, and longstanding case law. These actions offered no meaningful opportunity for public input, were announced without fulsome public explanation, and are supported by no administrative record.

Plaintiffs are entitled to summary judgment because they have standing to challenge the Department's promulgation of the Letter and Certification, and the Letter and the Certification are unlawful for multiple distinct reasons—each of which is a sufficient and independent basis to set aside these agency actions. ***First,*** the Letter and Certification are subject to the APA and violate it in a number of ways: the Letter and Certification are improperly promulgated legislative rules, issued without the required notice and comment; the Certification was not issued pursuant to proper procedure under the Paperwork Reduction Act and contravenes Department policy; the Letter and Certification are arbitrary and capricious; and they are not in accordance with law and exceed the Department's statutory authority. ***Second***, the Letter and Certification violate the First Amendment. ***Third***, the Letter and Certification violate the Fifth Amendment. Because there is no

dispute as to any material facts, Plaintiffs are entitled to summary judgment in their favor on all claims, and the Letter and Certification should be vacated. They should also be declared unlawful, and the Defendants should be enjoined from any enforcement based explicitly on the Letter or Certification, or based on the unlawful statements and interpretations therein.

## I.    PLAINTIFFS HAVE STANDING.

As the Court explained in granting Plaintiffs' motion for preliminary injunction, Plaintiffs have standing to challenge the Letter. District 4J's allegations of harm are "more than sufficient to establish injury in fact," Op. at 20, and only one plaintiff must have standing for this case to proceed. *Outdoor Amusement Bus. Ass'n v. DHS*, 983 F.3d 671, 681 (4th Cir. 2020). But each other Plaintiff—two unions and a professional association—"also mention[s] harms uniquely experience by the teachers who are [their] members," and the Letter "clearly puts [their] speech into play." Op. at 22–23. As the Court concluded with respect to 4J, the harms "are clearly traceable to the Letter itself," and setting aside the Letter "would redress those harms." Op. at 23.

Two other courts considering similar claims have found that similarly situated plaintiffs have standing to bring similar claims. The NEA court determined that it is "beside the point" whether Defendants could subject individual teachers to consequences based on the Letter. Instead, self-censoring by teachers was "caused by defendants' actions: promulgating a vague and threatening letter with the promise of swift enforcement and harsh penalties based on ill-defined criteria," and thus, plaintiffs' educator members had associational standing. *Nat'l Educ. Ass'n v. Dep't of Educ.,* No. 1:25-cv-00091, 2025 WL 1188160, at *4 (D.N.H. Apr. 24, 2025) ("*NEA* Op.").

Plaintiffs also have standing to challenge the Certification. As the *NAACP* court concluded, the Certification will "force schools and teachers to steer clear of offering courses and teaching topics that touch on undefined concepts such as diversity, equity, and inclusion," in order to

comply with its requirements. *NAACP* Op. at *5 (citation modified). That, the NAACP court determined, "is sufficient to establish an injury-in-fact," and such injuries are traceable to the Certification and redressable by setting it aside. *Id.*

Plaintiff 4J is directly subject to the Certification. Where a government action "require[s] or forbid[s] some action by the plaintiff...standing is usually easy to establish." *FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 382 (2024). Plaintiff 4J has set forth numerous, uncontested allegations about the harms it will face should it be required to sign the Certification—or alternatively, the harms it will face if it does not.[87] The potential harm that Plaintiff 4J faces is not simply the "impossible choice" between signing or not signing the Certification; it is the potential penalties that follow either course of action.[88] The State of Oregon announcing it would not require its LEAs to sign does nothing to allay those harms, as the Department has not accepted Oregon's position and Plaintiff 4J has not received any assurance it is sufficient to preserve federal funding for Oregon school districts.[89] The continuing threat of loss of funds and prosecution is evident in the lawsuit Oregon, with other states, filed to challenge the Certification on April 25, 2024—the day after this Court stayed enforcement of the Letter but not the Certification.[90]

The enforcement threatened by Defendants directly impacts Associational Plaintiffs' members. Educators' speech or expressive conduct can be the source of claims arising pursuant to the Certification, and the consequences from funding loss, investigation, contractual suit, FCA litigation affects them, their reputations, and their livelihoods.[91] As the court in NEA concluded,

---

[87] *See supra* SMF–10-14; District 4J Cert. Decl. ¶¶ 18-20; District 4J Jonak Decl. ¶¶ 14–25.
[88] *Id.*
[89] District 4J Jonak Decl. ¶¶ 6-15. *See also* Parent Decl. ¶¶ 19–22 (explaining Oregon school districts still face uncertainty and chaos due to the Certification).
[90] *See* Complaint, *New York v. Dep't of Educ.*, No. 1:25-cv-11116 (D. Mass. Apr. 25, 2025), ECF No. 1; District 4J Jonak Decl. ¶17; Parent Decl. ¶ 18.
[91] *See* Jane Doe Suppl. Decl. ¶ 12; AFT Cert. Decl. ¶¶ 18–20.

Plaintiffs' members have standing to challenge the Certification, because any other determination would have the court "overlook a threat in the April 3 certification that '[t]he continued use of illegal DEI practices may subject the individual or entity using such practices to serious consequences.'" *NEA* Op. at *28 (quoting Certification). Just as Plaintiffs' members have been chilled by the Letter, they have been chilled by the Certification and thus have standing to challenge its implementation.[92]

## II.    THE LETTER AND CERTIFICATION ARE UNLAWFUL UNDER THE APA

There is no dispute of material fact with respect to Plaintiffs' APA claims. Plaintiffs are entitled to summary judgment as a matter of law on Counts 3 and 6.

### A.    The Letter and Certification are Final Agency Actions and Legislative Rules Requiring Notice and Comment

As the Court previously found, the Letter is a final agency action because it is not "of a merely tentative or interlocutory nature," and "appears legally binding," thus satisfying the *Bennett* test. Op. at 24–25 (*citing Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002)); *see also* 5 U.S.C. § 704. The Certification also meets these requirements, as it purports to bind signatories to its terms in order for them to continue to receive federal financial assistance, and creates legal penalties for lack of compliance. *See U.S. Army Corps of Eng'rs v. Hawkes Co*., 578 U.S. 590, 600 (2016) (finding agency action was final where failure to conform leaves the regulated party at risk of significant criminal and civil penalties).

The Letter is also "a legislative rule . . . because the Letter prescribes new law and policy, and has the force and effect of law, [thus] surpass[ing] the bounds of an interpretive rule." Op. at 28. Specifically, the Letter "imposes new obligations on regulated parties," "supplements Title VI

---

[92] *See* Jane Doe Suppl. Decl. ¶ 17; AFT Cert. Decl. ¶¶ 15, 21.

by extending it to cover classroom speech and curriculum" and "conflicts with 34 C.F.R. § 100.5(i), a regulation implementing Title VI, which outlines 'circumstances [where] an applicant or recipient [of federal funds] may properly give special consideration to race.'" Op. at 28. As it "substantively alters the legal landscape" by enforcing compliance "based on the understanding embodied in [the] letter" it is a legislative rule.[93] Op. at 26, 28; *see also Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 620 (4th Cir. 2018) ("[A] rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy").

The Certification is also transparently legislative—it imposes, as a condition for federal funding, new legally binding obligations and prohibitions that go beyond underlying law. *See Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014) ("An agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action or violations of those obligations—is a legislative rule."). The Certification requires adherence to a set of new Assurances that echo the statements presented in the Letter and thereby "prescribes new law and policy" and does not simply "remind" parties of existing duties.[94] Op. at 28. Thus, it is also a legislative rule.

As legislative rules, the Letter and Certification were subject to the APA's notice-and-comment requirements. Because neither the Letter nor the Certification adhered to these procedural requirements, Plaintiffs were denied the right to comment, and both must be held unlawful and set aside.[95]

---

[93] Letter at 3.

[94] *See also* Cert. PI at Sec. I.C.1;Reply at Sec. II.B.1.

[95] *See* District 4J Decl. ¶ 44; ASA Decl. ¶ 28; AFT Decl. ¶ 29; District 4J Jonak Decl. ¶ 26; AFT Suppl. Decl. ¶ 5; *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 500–01 (D. Md. 2020) (finding deprivation of opportunity to participate in notice and comment process was irreparable harm).

**B.    The Certification Was Issued Without Procedure Required by the Paperwork Reduction Act and In Conflict with Prior Department Representations.**

The Certification was issued without observance of procedure required by the Paperwork Reduction Act ("PRA"), 44 U.S.C. §§ 3501 *et seq.,* in violation of the APA, 5 U.S.C. § 706(2)(D). The Department also did not comply with prior Department representations regarding administrative burdens on regulated entities, and thus the Certification was also issued arbitrarily and capriciously. 5 U.S.C. § 706(2)(A). For these reasons, it should be set aside.

The Department did not follow the process required by the PRA when it issued the Certification, and it was never approved by OMB. The PRA aims to "minimize the paperwork burden" that the government may require for various institutions, including education institutions and states. 44 U.S.C. § 3501(1). An agency that proposes to collect information first conducts its own "evaluation of the need for the collection of information" and the burden collecting such information would create. *Id.* § 3506 (c)(1)(A)(i). Often, the agency must go through a notice and comment period with respect to the proposal. *Id.* §§ 3506(c)(2)(A); 3507(a)–(b). OMB may not act on the agency's request until after the comment period has closed. *Id.* § 3507(b). Before approving a proposed collection, OMB must "determine whether the collection of information by the agency is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility." *Id.* § 3508. Once OMB grants approval, the agency may proceed with its collection, and OMB issues a control number that must be displayed on the collection-of-information form. *Id.* §§ 3507(a)(2)–(3). That process did not occur here.

Indeed, for prior "Assurances of Compliance—Civil Rights" forms, the Department has

sought and obtained approval by OMB under the PRA.[96] The prior assurance form itself includes the statement that "[a]ccording to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number." *Id.* Based on this requirement alone, the Certification is unlawful.

But beyond that, the Certification is at odds with Department representations both approved by OMB and presented to regulated entities less than a year ago in its *Supporting Statement for a Paperwork Reduction Act Submission.*[97] That OMB submission states that "Respondents only need to sign the Assurance of Compliance – Civil Rights Certificate form once . . . and the signed forms apply to all future applications by the respondents for Federal financial assistance from, or funds made available through, the Department. Once OCR has a completed Assurance of Compliance – Civil Rights Certificate from a respondent, OCR does not ask that respondent again for another completed form."[98] Yet less than a year later, the Department again asks not just the SEAs, but each school district as well, to complete an additional certification. Except in this instance, it is one not issued in accordance with the PRA. The Certification should be set aside.

## C.    Both the Letter and Certification Are Arbitrary and Capricious

The Letter and the Certification are each arbitrary and capricious in multiple ways, any one of which is a sufficient basis on which to set the acts aside. *See* 5 U.S.C. § 706(2)(A). Defendants have represented there is no administrative record to support either action challenged by Plaintiffs. As the Court previously concluded with respect to the Letter, there has been no process, record, or explanation to justify the choices made in its issuance, Op. at 35; the same is also true for the

---

[96] *See* Ex. 45, PLFS-575, Dep't of Educ., Off. for C.R., Assurance of Compliance—Civil Rights Form, OMB No. 1870-0503, https://perma.cc/9A9G-RHA6.
[97] Ex. 44, PLSF-564, Off. of Mgmt. & Budget, *Supporting Statement for a Paperwork Reduction Act Submission*, OMB No. 1870-0503 (revised June 11, 2024).
[98] *Id*. at 5–6.

Certification, which is now squarely before the Court.

To satisfy the APA, "the government was required to carefully consider the choice it was making, the evidence underlying it, and the interests it might impact." *Id*. The Department failed to do so in issuing the Letter and Certification. Specifically, the Department did not: adequately acknowledge or explain the Department's changed position, rely on prior factual findings or any evidence, account for existing federal and state legal standards, or grapple with the substantial reliance interests.

### 1.   The Department failed to provide an adequate explanation for its change in its positions.

While an agency may have latitude to change its policies, that "flexibility" has "limits." *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1284 (D.C. Cir. 2019). An agency must "display awareness that it is changing position" and "show that there are good reasons" for its new policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("*Fox I*"). Here, the Department fails to acknowledge, much less explain, the stark conflict between this Letter and its prior guidance on Title VI and *SFFA,* and between the Certification and that same guidance.

Through issuance of the Letter, the Department *sub silentio* changed positions in three key areas of education in which Plaintiffs engage: teaching and learning;[99] student groups, support,

---

[99] *Compare* Ex. 23, PLFS-196, U.S. Dep't of Educ., Off. for C.R*., Race and School Programming*, 6 (Sept. 25, 2023), https://perma.cc/2752-CRW3("instruction in or training on the impact of racism or systemic racism" is not categorically prohibited by Title VI) *with* Letter at 2, (categorizing such lessons as toxic indoctrination) and FAQs at 5–7 (stating without explanation that "social-emotional learning" and "culturally responsive teaching" often "veil discriminatory policies").

and DEI programming;[100] and higher education practices following *SFFA*.[101] The Court has already highlighted several of the resulting conflicts: that the Letter "mark[ed] a significant change in position in [the Department's] interpretation of *SFFA*"; that the Department changed its longstanding positions by asserting that "certain discussions of race constitute discriminatory practices that violate Title VI and SFFA"; that the Department departed from "prior guidance . . . advis[ing] schools that race-neutral efforts to promote diversity and increase opportunities for all students were lawful"; and that the Department changed positions "regarding its authority to regulate curriculum, and its decision to prospectively categorize content as discriminatory." Op. at 36–37. Defendants have added nothing to the record to change these conclusions with respect to the Letter; indeed, no administrative record exists.

The Certification represents the same abrupt and unexplained departure from the Department's prior positions on diversity, equity, and inclusion programs, and an abrupt shift in position on the scope and holding of *SFFA*. With no explanation or examples, the Department states that the "continued use of illegal DEI practices may subject the individual or entity using such practices to serious consequences."[102] Contrast this with prior guidance, that provides specific

---

[100] *Compare* Ex. 24, PLFS-215, U.S. Dep't of Educ., Off. of the Under Sec'y, *Strategies for Increasing Diversity and Opportunity in Higher Education* (Sept. 28, 2023), https://perma.cc/XTP4-SRAL(supporting campuses that "provide a welcoming and supportive environment for students from all backgrounds through affinity groups [and] diversity, equity, and inclusion (DEI) programming") and Ex. 25, PLFS-282, U.S. Dep't of Educ., Off. for C.R., *Fact Sheet: Diversity and Inclusion Activities Under Title VI* (Jan. 2023), https://perma.cc/4G25-JKZJ(stating that Title VI does not categorically prohibit "diversity, equity, and inclusion training," "cultural competency training," or investigations or reports concerning "racial disparities within a school") *with* Letter at 3.
[101] *Compare* Ex. 16, PLFS-146, Joint FAQs at 5 (stating that race-neutral efforts to increase "equal opportunity for all students," such as eliminating legacy admissions, are lawful and "nothing in the *SFFA* decision prohibits institutions from continuing to seek the admissions and graduation of diverse student bodies") *with* Letter at 2–3 (stating that institutions violate *SFFA* and Title VI if they are "motivated by racial considerations" to "increase racial diversity").
[102] *Compare Race and School Programming*, Ex. 23, PLFS-206 (stating that the following likely do not raise concerns under Title VI: groups open to all students, even if recruitment efforts are focused on students of a particular race or national origin; extracurricular groups formed around the goal of sharing common experiences, including those with race-related themes; mentorship programs focused on the experience of particular racial groups (continues on next page)

examples and is robustly supported by references to relevant case law and statutory provisions.[103] Further, most of the Department's prior guidance addressing *SFFA* was targeted at institutes of higher education—an acknowledgement that the case was about the use of race in university admission decisions. *See SFFA*, 600 U.S. at 208. The Certification, without acknowledgement or explanation, extends the scope of *SFFA* to a broad array of K-12 school activities, ostensibly prohibiting almost any "race-based action" or DEI practice in schools. Certification at 3.

Any reasons mentioned by the Department for issuing the Letter or the Certification have not been "reasonably explained," nor are they substantively reasonable. *See Ohio v. EPA*, 603 U.S. 279, 292 (2024). In sum, the Department's many reversals, without acknowledgment or explanation, render the Letter and the Certification arbitrary and capricious.[104] *See Fox I*, 556 U.S. at 515; *see also City of Columbus*, 523 F. Supp. 3d at 754.

2. **The Department fails to rely on prior factual findings or any evidence.**

As an initial matter, the absence of an administrative record to support the Letter or the Certification itself is a concession by the government that it hasn't considered any relevant facts or evidence, or connected the facts to their limited public explanation of either action. The APA requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action including 'a rational connection between the facts found and the choice made.'" *Mayor of Balt. v. Azar,* 973 F.3d 258, 275 (4th Cir. 2020) (citation modified). As this Court previously determined, the Letter "does not contain any factual citations or references to any facts supporting

---

that are voluntary and open to all students) *with Fact Sheet: Diversity and Inclusion Activities Under Title VI*, Ex. 25, PLFS-282 (stating that Title VI does not categorically prohibit "diversity, equity, and inclusion training,") with Certification at 2–3 (not defining "illegal DEI practices" or "race-based action" but prohibiting them categorically).
[103] Joint FAQs at 3–4 (describing how pathway programs that promote and maintain a diverse student applicant pool allow institutions to better attain student body diversity and its related educational benefits).
[104] *See* PI at pp. 5–6, Sec. I.C.2.a.; Cert. PI at Sec. I.C.3.a; Reply at pp. 2–3,11–12 (describing in detail the Department's prior guidance and how it conflicts with the Department's positions in the Letter and Certification).

its assertions." Op. at 37.[105] The factual assertions in this Letter (*e.g.*, that "DEI programs . . . frequently preference certain racial groups and teach students that certain racial groups bear unique moral burdens that others do not . . . [and] deny students the ability to participate fully in the life of a school") contradict the Department's prior factual conclusions.[106] Similarly, the Department examines no data to support its claims at the heart of the Certification's Assurances, including the assertion that diversity, equity, and inclusion programs "advantage one's race over another."[107]

In both the Letter and the Certification, the Department's bald statements about purportedly pervasive discrimination are simply "unsupported assertion[s]" that cannot support the agency's decision-making. *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 605 (D.C. Cir. 2007). As the Court concluded previously, "where [the government] seeks to use [its] viewpoints to alter the legal landscape and impose new obligations on regulated persons, it must consider evidence and demonstrate such consideration." Op. at 37–38. Neither the Letter nor the Certification does so, and thus are arbitrary and capricious.

### 3. The Department fails to account for existing federal and state legal standards.

As the Court concluded previously, the government, "at a minimum, misapprehended the scope of Title VI and SFFA," in issuing the Letter, and this misapprehension led the Department "to issue a guidance that conflicts with its own regulations and case law." Op. at 38 (finding that the Letter directly contradicts binding precedent in the Fourth Circuit); *see also Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012) ("A material misapprehension of the baseline conditions existing in advance of an agency action can lay the groundwork for an

---

[105] *See also* Letter at 2–3 (discussing the prevalence of racism and "toxic indoctrination" at schools and that DEI preferences some races, without any factual evidence).
[106] Letter at 3.
[107] Certification at 3; *see supra* SMF–6-8.

arbitrary and capricious decision.").

In both the Letter and the Certification, the Department fails to grapple with the case law that informs how courts interpret Title VI or with the Department's own Title VI regulations.[108] *SFFA* held that raced-based college admissions programs are prohibited. 600 U.S. at 230. It did not, however, outlaw diversity, equity, and inclusion programs, and it did not discuss K-12 schools. The Letter and Certification offer no basis to apply *SFFA* outside of institutes of higher education and the admissions process. In the Letter, the Department claims *SFFA* "applies more broadly" than its holding so as to give the baseless impression that any acknowledgement of race or "DEI"-related activity is unlawful. And the Certification makes a glaring leap from *SFFA's* central holding (that university admissions programs "may never use race as a stereotype or negative" and fail to pass strict scrutiny if they do) to a presumption that many DEI practices in K-12 schools are "in violation of federal law."[109]

Furthermore, as this Court found, "the Letter's position regarding race-neutral means of increasing all forms of diversity, for example, is directly contradicted by binding precedent in this Circuit" and Department regulation. Op. at 39.[110] The same is true for the Certification, which can

---

[108] The FAQs only compound this issue. In the FAQs, the Department either ignores or misstates the standard for determining whether a racially hostile environment exists. *Compare Ricketts v. Wake Cnty. Pub. Sch. Sys*, 125 F.4th 507, 521 (4th Cir. 2025) (setting forth standard), *with* FAQ 9 at 6 (discussing racially hostile environments with no articulation of the relevant legal standard). In FAQ 13, after referring to the *Arlington Heights* analysis for determining whether an act was motivated by a racially discriminatory purpose, the Department adds an additional factor divorced from the case law and seemingly aimed at punishing schools for prior legal behavior. FAQ 13 ("A school's history and stated policy of using racial classifications and race-based policies to further DEI objectives, 'equity,' a racially oriented vision of social justice, or similar goals will be probative in OCR's analysis of the facts and circumstances of an individual case.").

[109] Certification at 3.

[110] Referencing 34 C.F.R. § 100.5 (explaining schools "may properly give special consideration to race, color, or national origin to make the benefits of its program more widely available to such groups, not then being adequately served") and *Coal. for TJ*, 68 F.4th at 885–86 (finding efforts to "improve racial diversity and inclusion by way of race-neutral measures" is a "practice that the Supreme Court has consistently declined to find constitutionally suspect").

be reasonably read to prohibit activities increasing forms of diversity as "illegal DEI."[111]

As the Court concluded, the Department "is not entitled to misrepresent the law's boundaries, and must at a minimum acknowledge and consider the relevant legal framework as it is. It cannot blur the lines between viewpoint and law." Op. at 39. Where the Department does so—as it does in the Letter and Certification—its acts are arbitrary and capricious.

### 4. The Department failed to consider the reliance interests of schools and educators.

The Court previously found, with respect to the Letter, that the government "failed to account for how disruptive [it] would be to stakeholders." Op. at 40 "When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) (citations omitted). Same too with respect to the Certification.

Plaintiffs and educational institutions nationwide have been operating according to the understanding of Title VI and the Equal Protection clause embodied in the case law, regulations, and the Department's prior guidance for decades. Countless curricular and extracurricular activities have been developed based on those understandings.[112] Through the Letter and Certification, the Department is now seemingly prohibiting many of these practices.[113, 114] Forcing

---

[111] Certification at 3.

[112] *See supra* SMF–10–11; Hamako Decl. ¶ 12; Gallagher Decl. ¶ 27; Blee Decl. ¶ 25; District 4J Decl. ¶ 41.

[113] *See, e.g.*, District 4J Decl. ¶¶ 11–17; Hamako Decl. ¶ 7, 23; Jane Doe Suppl. Decl. ¶ 15; District 4J Jonak Decl. ¶ ¶ 21–23.

[114] Indeed, state plans on implementation of the Every Student Succeeds Act (ESSA), which are submitted to and reviewed by the Department, frequently reference activities related to diversity, equity and inclusion. For example, the Maryland Consolidated State Plan states that in instances in which a student group (which under ESSA plans may be identified by race) is "not proficient, not making adequate progress toward proficiency, or not graduating then the accountability system should highlight equity gaps." Md. State Dep't of Educ., *Maryland Every Student Succeeds Act (ESSA) Consolidated State Plan*, at 13 (Jan. 10, 2018), https://perma.cc/HKX3-8YUJ (also stating that "the MSDE has a strong commitment to equity" *Id.* at 32.). It also states that the state will provide technical assistance to school systems on cross-cultural awareness. *Id.* at 51. The Oregon Consolidated State Plan lists as its first commitment, "Prioritizing and Advancing Equity,"notes that a school system should "[r]ecognize diversity as an asset,"and states (continues on next page)

schools and educators, including Plaintiffs, to potentially overhaul their curriculum, programming, and teaching positions imposes steep costs—particularly under the tight timelines imposed by the Letter and Certification—making it likely that schools either cannot offer replacement programming or the replacement is cobbled together quickly and may not achieve instructional goals as effectively.[115] Moreover, many schools rely on programs that may now considered unlawful under the Letter and the Certification to meet other legal requirements—for example, District 4J and Plaintiff member's community college are required by state law to offer certain courses that broadly fall under a "DEI" banner.[116]

The risk of loss of federal funding heightens these reliance concerns. Federal financial assistance makes up an average of 11% of *all funding for all* K-12 schools across the country, and in some places, much more.[117] For example, in the 2023-24 school year, District 4J received $29.5 million dollars in federal funding."[118] The threat of pulling those federal funds is an incredibly serious threat to students and teachers.[119] This leaves regulated entities, and Plaintiffs, in the impossible position of being forced to overhaul programming in an accelerated timeframe—harming students and teachers while potentially risking violations of federal law and state curriculum requirements—or risk the devastating loss of federal funding. Whatever the new administration's policy priorities with respect to civil rights enforcement, it does not have carte

---

that the SEA will use technical assistance "shaped by an equity lens… and include culturally responsive evidence-based practices." Or. Dep't of Educ., *Oregon's Consolidated State Plan Under the Every Student Succeeds Act*, at 11, 62, and 83 (Aug. 30, 2017), https://perma.cc/2TQV-BBMA. Many of the activities discussed in these plans could arguably fall under the Department's targeting of "illegal DEI."

[115] *See* District 4J Decl. ¶ 13; District 4J Jonak Decl. ¶¶ 18-19.

[116] District 4J Decl. ¶¶ 11–17; Hamako Decl. ¶¶ 7, 23.

[117] Ex. 31, PLFS-465, U.S. Dep't of Educ. Nat'l Ctr. for Educ. Stats., *Public School Revenue Sources* (May 2024), https://perma.cc/ ZY39-9KAS(elementary and secondary public schools received $101 billion in federal funds in 2021-2021).

[118] Dist. 4J Cert. Decl. ¶ 28.

[119] District 4J Decl. ¶ 40 (explaining drastic effects of spending cuts).

blanche to ignore the reliance interests created by the Department's prior policy guidance.

**D.    The Letter and Certification are Contrary to Constitutional Rights**

When final agency action is contrary to constitutional rights, the APA requires it to be "set aside." 5 U.S.C. § 706(2)(B). As explained *infra* Sec. III, IV, the Letter and the Certification violate the First and Fifth Amendments and, therefore, the APA.

**E.    The Letter and Certification are in Excess of Statutory Authority and Not in Accordance with Law.**

The APA requires that courts "hold unlawful and set aside agency action" that is "not in accordance with law" or is "in excess of statutory . . . authority." 5 U.S.C. § 706(2).

The Department of Education Organization Act ("DEOA"), Pub. L. No. 96–88, 93 Stat. 668 (1979), establishing the Department of Education, makes clear that the Department is not authorized "to exercise any direction, supervision, or control over the curriculum, program of instruction, . . . or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution." 20 U.S.C. § 3403(b). Similarly, several additional federal statutes that govern the administration of federal education programs prohibit the Department's control over curriculum and related programs. *See id.* §§ 1232a, 7906a(a), 1132-2. The Court has previously concluded that the Letter "exceeds DOE's statutory authority by exercising control over the content of curriculum," and that it may not "proclaim entire categories of classroom content discriminatory to side-step the bounds of its statutory authority." Op. at 34.[120] Defendants have not supplemented the record or otherwise provided any evidence to alter such a conclusion. Further, the Certification's vague reference to "illegal DEI" similarly will result in the Department directing

---

[120] See *supra,* SMF-9 (Defendant McMahon was unable to state whether lesson plans on the Tulsa Race Massacre or stating that President Biden won the 2020 election were "illegal DEI"). *See also* Letter at 3 (prohibiting teaching on structural racism because it "toxically indoctrinate[s] students").

what educators and institutions can teach in ways that are not required by Title VI, and thus the Certification exceeds statutory authority and is not in accordance with law for the same reasons.

## III.    THE LETTER AND CERTIFICATION VIOLATE THE FIRST AMENDMENT

The Letter and Certification are also unconstitutional, imposing viewpoint- and content-discriminatory and overbroad prohibitions that chill Plaintiffs' expression and association. This, too, is a sufficient basis to set them aside. The Department simply cannot "intimidate [educators] into silence" without implicating the First Amendment and unlawfully chilling speech. *See Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 319 (4th Cir. 2006) (citation modified).

Both this Court and the New Hampshire District Court have recognized the likelihood that the Letter violates the First Amendment. Op. at 41–43; *NEA* Op. at *23–27. The District Court for New Hampshire extended that finding to the Certification. *Id.* And even if there were no such findings already, prior restraints and content- and viewpoint-based regulations, such as the ones at issue here, are presumptively unconstitutional. Op. at 42; *NEA* Op. at *24; *See, e.g.*, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995); *Turner Broad. Sys. Inc. v. FCC*, 512 U.S. 622, 641–42 (1994); *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

Defendants have offered no evidence, nor could they, to change the Court's earlier determination or overcome the presumption of unconstitutionality. Because there is no dispute as to any material facts with respect to Plaintiffs' First Amendment claims, Plaintiffs are entitled to summary judgment as a matter of law on Counts 1 and 4.

### A.    The Letter and Certification Impermissibly Discriminate Based on Viewpoint and Content.

The Letter and Certification both discriminate against Plaintiffs' members and employees based on their viewpoint, specifically targeting speech and association that support diversity,

equity, inclusion, accessibility, social justice, and similar disfavored concepts. But the Letter and Certification also discriminate more broadly based on content, imposing a wholesale ban on discussion, expression, or association of certain topics related to those concepts. This Court has recognized as much, noting that the Letter "likely run[s] afoul of the First Amendment" because it regulates speech based on content by "proscribing specific forms of classroom speech," and that it "regulates specific forms of speech of a particular viewpoint." Op. at 41–42. The District Court for New Hampshire reached a similar conclusion, calling the Letter "textbook viewpoint discrimination," and finding a likelihood that the Department, through the Letter and Certification, is "attempting to coerce [IHEs] to punish or suppress disfavored speech based on [educators'] beliefs." *NEA* Op. at *24–26 (citation modified) (citation omitted).

> **1.    The Letter and Certification are viewpoint discriminatory and impermissibly coercive**

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger*, 515 U.S. at 828. The government has "no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed*, 576 U.S. at 163 (citation omitted). "Government action that stifles speech on account of its message, or that requires the utterance of a particular message favored by the Government, contravenes . . . essential [First Amendment] right[s]." *Turner Broad.*, 512 U.S. at 64–42. Viewpoint discrimination is a "blatant" and "egregious" violation of the First Amendment, *Reed*, 576 U.S. at 168, and "all but dispositive" in a First Amendment challenge. *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 571–72 (2011). It is "poison to a free society." *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (Alito, J., concurring). This is particularly true in higher education because "[o]ur Nation is deeply committed to safeguarding academic freedom," which is "a special concern of the First

Amendment,." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967). Educators simply do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) .

Although the government may have its own perspective on issues of diversity, equity, inclusion, and social justice, it may not "hamstring" other voices to "tilt public debate in a preferred direction." *Sorrell*, 563 U.S. at 578–79. But that's precisely what the government has done here. As this Court has recognized, the Letter "regulates specific forms of speech of a particular viewpoint by declaring them discriminatory." Op. at 42. The New Hampshire District Court reached a similar conclusion. *NEA* Op. at *24. Indeed, after a litany of unsupported allegations about the "discriminatory" expression captured through diversity, equity, and inclusion, the Letter announces that the Department "will no longer tolerate" such expression.[121] The Department does not attempt to disguise that it is targeting specific expression based on "motivating ideology," a practice expressly prohibited in *Rosenberger*, 515 U.S. at 829.

By the terms of the Letter, the Department is targeting only "[p]roponents" of inclusion and "nebulous goals such as diversity," "social justice, or equity."[122] The Department inaptly characterizes these concepts as "a shameful echo of a darker period" of de jure racial segregation,[123] describing their expression as "toxic[] indoctrinat[ion],"[124] as well as making unsupported accusations that proponents "smuggl[e] racial stereotypes" into programming,[125] labeling "DEI programs" as "insidious" discrimination that "stigmatize[s] students,"[126] and

---

[121] Letter at 2, 3.
[122] *Id.* at 3.
[123] *Id.* at 1.
[124] *Id.* at 2.
[125] *Id.* at 2.
[126] *Id.* at 3.

tagging diversity, equity, inclusion, and social justice as "overt and covert racial discrimination."[127] Likewise, the Certification paints diversity, equity and inclusion practices as "illegal" and singles out "illegal DEI" for special punishment.[128]

Nor can the government use its power of the purse or other coercion to restrict expression of disfavored views. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205, 214 (2013). Courts routinely strike down conditions on federal funding in this context. *See, e.g.*, *id.* at 218–19 (citing *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 547–49 (2001); *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 542 (N.D. Cal. 2020). The government simply "cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise." *Agency for Int'l Dev.*, 570 U.S. at 215 (citation omitted). Likewise, government officials cannot wield their power to "threat[en to] invoke[e] legal sanctions and other means of coercion" or "to threaten enforcement actions against [those who disagree] in order to punish or suppress" a disfavored viewpoint. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187–89 (2024).

Courts assessing viewpoint discriminatory coercion conduct a totality-of-the-circumstances test, considering "who said what and how, and what reaction followed." *Id.* at 191. Relevant factors regularly include: "(1) word choice and tone; (2) the existence of regulatory authority; (3) whether the speech was perceived as a threat; and, perhaps most importantly, (4) whether the speech refers to adverse consequences." *Id.* at 189 (citing this standard favorably while striking down the lower-court's application of the standard) (citation modified). The Letter and Certification both easily satisfy each of the factors. First, all three courts to consider the

---

[127] *Id.* at 3.
[128] Certification at 3.

Department's language and tone have recognized that it is threatening, vague, and hostile.[129] The language of the Letter and Certification support those conclusions.[130]

As to the second factor, the Department's Title VI regulations specifically allow schools to "properly give special consideration to race, color, or national origin to make the benefits of its program more widely available to such groups, not then being adequately served." 34 C.F.R. § 100.5(i). Nothing in Title VI or its regulations prohibit diversity-, equity- or inclusion-focused initiatives or suggest that those concepts should be barred.

Likewise, there is no question that the Letter and Certification were perceived as a threat, so the third factor, too, demonstrates their coercive nature. This Court recognized that District 4J "fears" that if it continues to engage in its work, mission, and other First Amendment protected activity, it faces a "credible threat of enforcement or investigation." Op. at 20 (citation modified). The District Court for New Hampshire recognized that because schools and educators perceive the Department's actions as a threat, it is "virtually inevitable that schools will act to limit the possibility that the Department will target them for enforcement." *NEA* Op. at *13.[131] Additional evidence in the record similarly shows that educators and educational institutions felt threatened by the Letter and Certification.[132]

---

[129] *See* Op. at 33 (describing the Letter as "threatening enforcement actions"); *id.* at 40 (noting that the Letter's use of "vague and overbroad terms" has a predictable effect of chilling speech); *see also NEA* Op. at *9 (quoting the Letter's "rhetoric" as "asserting that schools have engaged in 'shameful' and 'repugnant' practices" around diversity, equity, inclusion and related concepts); *id.* at *11 (describing the Letter's "threatening demand that schools immediately comply with the Department's interpretation of federal law"); *id.* at *14 (characterizing the Letter as "vague and threatening"); *NAACP* Op. at *6 (explaining that the Certification "threatens serious consequences for schools' failure to comply with vaguely-defined prohibitions on DEI initiatives").

[130] *See generally* Letter; Certification (suggesting diversity, equity, and inclusion initiatives "violate federal law").

[131] *See also NAACP* Op. at *7 (citing declarations that showed that "school districts rushed to indiscriminately cancel programming to comply with the Department's deadline").

[132] *See, e.g.*, Jane Doe Decl. ¶ 8 (describing fear that Letter will prevent her sponsoring a cultural group at school); Blee Decl. ¶ 12, PLFS-068 (describing the Letter as "a direct threat to [her] career, [her] field, and [her] specialization," and that her research "may be viewed by the Department . . . as 'toxically indoctrinating' students."); Hart Decl. ¶13;Parent Decl. ¶¶ 20, 26; District 4J Jonak Decl ¶22.

Finally, potential adverse consequences are discernable from the face of the Letter and the Certification. The Letter notes potential "loss of federal funding," and the Certification threatens funding termination, breach of contract suits, and False Claims Act investigations and penalties.[133]

By contrast, the Department expressly *permits* educators to develop lessons that denounce social justice, condemn diversity, or present equity in a neutral or negative light. And any educator could associate with denouncers of these concepts through official organizations or programs. By the Letter and Certification's terms, such efforts can continue to rely on federal funding. But absent a compelling justification, that type of viewpoint-discriminatory treatment based on First Amendment protected expression cannot stand. And the Department has not and cannot offer one.

### 2. The Letter and Certification impose unconstitutional content-based restrictions.

The Letter and Certification also impose unlawful content-based restrictions because they distinguish permissible from impermissible speech based on "the topic discussed or idea or message expressed." *See Reed*, 576 U.S. at 163; *see also Cent. Radio Co. v. City of Norfolk*, 811 F.3d 625, 633 (4th Cir. 2016) (quoting *Reed*). Government action is content based if it "single[s] out specific subject matter for differential treatment, even if it does not target viewpoints within that subject matter." *Reed*, 576 U.S. at 169. By contrast, government action that "neither references the content of speech . . . nor reflects disagreement with the message such speech conveys" is content neutral. *TikTok Inc. v. Garland*, 145 S.Ct. 57, 68 (2025); *see also City of Austin v. Reagan*

---

[133] Letter at 4; Certification at 3–4. *See also* Op. at 21 ("The Letter's repeated references to enforcement and terms that carry enforcement consequences lends credibility to the imminence of possible enforcement."); Op. at 33 (noting that the Letter includes language "threatening enforcement actions"); *NEA* Op. at *13 (noting that the Letter "promises swift and vigorous enforcement" against educators or schools that teach the disfavored concepts or viewpoints); *NAACP* Op. at *5–6 (noting that the Certification "emphasizes that non-compliance with the administration's interpretation of unlawful DEI will result in liability under the False Claims Act" and listing cited consequences including "the termination of federal funding, breach of contract suits brought by the Department of Justice, and liability under the False Claims Act").

*Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (law's provisions were not content-based because they did "not single out any topic or subject matter for different treatment").

There is no question here that Letter and Certification burden speech on particular content. Through the Department's actions, speech on related to diversity, equity, inclusion, and social justice are ostensibly prohibited "[while o]ther categories of speech . . . are permitted." *See Boos v. Barry*, 485 U.S. 312, 319 (1988). For instance, the Letter prohibits speech about "structural racism," but not on other content about the country's history.[134] And any speech or association related to the benefits of diversity, equity, inclusion, or related concepts is seemingly banned. By contrast, expression on topics beyond the scope of the Letter and Certification can continue, relying on the federal funding along the way. And the Certification singles out for punishment "certain DEI practices" but does not seek to punish other violations of Title VI in the same way.[135]

The government's effort, under threat of loss of funding and other penalties, to exclude specific content and viewpoints—namely any discussion of diversity, equity, inclusion, or related concepts, or speech in favor of those ideas—from the education sector through the Letter and Certification are impermissible and unconstitutional, no matter how strongly the government disfavors the viewpoint or the content.

**B.    The Letter and Certification are Facially Overbroad**

The Letter and Certification also violate the First Amendment because they are facially overbroad. The overbreadth doctrine allows challenges where, like here, a government action's "very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973); *see also Newsom v.*

---

[134] Letter at 2.
[135] Certification at 3.

*Albermarle Cnty. Sch. Bd.*, 354 F.3d 249, 257 (4th Cir. 2003) ("[T]hose who desire to engage in legally protected expression . . . may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." (citation omitted)). A facially overbroad prohibition punishes "a substantial amount of protected speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (citation modified).

Even if the Letter or Certification had any "plainly legitimate sweep," *Broadrick*, 413 U.S. at 615, which they do not, it is overshadowed by the substantial amount of protected expression that it punishes. The Fourth Circuit has previously struck down overbroad limitations on speech in such a context. In *Newsom*, the Fourth Circuit held that a dress code was unconstitutionally overbroad where its ban on depicting weapons would target significant amounts of constitutionally protected expression, including "symbols, images, and political messages that are entirely legitimate and even laudatory." 354 F.3d at 260. So too here.

The amount of protected speech chilled by the Letter, *see supra* SMF–10-11, is substantial. For example, Plaintiff ASA understands that the Letter:

> [P]rohibit[s] not only lectures, analysis, and research explicitly dealing with questions of race and ethnicity—including structural and systemic discrimination—but all the subsequent downstream sociological topics as well. Under the restrictions laid out by the Letter, our members are unable to even have basic conversations about general sociological issues such as public health policy, economic inequality, or community development without the fear of a government enforcement action.[136]

Similarly, the Certification could have identified the actual conduct it prohibited, but it did not. That leaves Plaintiffs to question whether their programs, speech, and activities connected to DEI are lawful under the Department's interpretation.[137]

---

[136] ASA Decl. ¶ 22.
[137] District 4J Cert. Decl. ¶ 16; AFT Cert. Decl. ¶ 15; Jane Doe Suppl. Decl. ¶¶ 8, 11–12.

Because both the Letter and Certification discriminate based on viewpoint and content and are facially overbroad, they violate the First Amendment.

## IV.    THE LETTER AND CERTIFICATION ARE UNCONSTITUTIONALLY VAGUE IN VIOLATION OF THE DUE PROCESS CLAUSE

The Letter and Certification not only violate the APA and the First Amendment, but are also vague in violation of the Fifth Amendment. Two other courts evaluating similar claims have determined that these claims are ripe and that plaintiffs are likely to succeed on the merits of their vagueness challenges. *NEA* Op. at *18–22; *NAACP* Op. at *6. Because there is no dispute as to any material facts with respect to Plaintiffs' Fifth Amendment claims, Plaintiffs are entitled to summary judgment as a matter of law on Counts 2 and 5.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law is void for vagueness if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citation omitted) ("*Fox II*").

In civil void-for-vagueness challenges, an enactment is only void if it is "so vague and indefinite as really to be no rule or standard at all." *Perkins Coie, LLP v. DOJ*, No. 1:25-cv-00716, 2025 WL 1276857, at *45 (D.D.C. May 2, 2025) (quoting *Boutilier v. INS*, 387 U.S. 118, 123 (1967)).[138] That some conduct may "clearly fall[] within the provision's grasp," does not save the constitutionality of a vague regulation. *United States v. Hasson*, 26 F.4th 610, 617–18 (4th Cir.

---

[138] Void-for-vagueness challenges may be brought in a variety of contexts, including to regulatory actions. *See Fox II*, 567 U.S. at 253 (evaluating FCC regulatory actions for vagueness); *Perkins Coie*, 2025 WL 1276857, at *45 (citing cases); PI Reply Mem. at 13.

2022) (citing *Johnson v. United States*, 576 U.S. 591, 602 (2015)); *see NEA* Op. at *17 (discussing standard for void-for-vagueness pre-enforcement facial challenges).[139]

The requirement to avoid vagueness is particularly high in the First Amendment context. *Vill. of Hoffman Ests. v Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982); *Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610, 620 (1976); *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964); *see also Loc. 8027, AFT-N.H., AFL-CIO v. Edelblut*, 651 F. Supp. 3d 444, 459–60 (D.N.H. 2023) ("*Edelblut I*") (finding rigorous vagueness review required for government action plausibly restricting extracurricular speech in schools). In this context, facial challenges are appropriate and essential for protecting vital First Amendment freedoms. *See United States v. Sun,* 278 F.3d 302, 309 (4th Cir. 2002) (recognizing virtue of facial vagueness challenges in the First Amendment context because the "vagueness of the statute 'on its face' . . . may in itself deter constitutionally protected and socially desirable conduct" (citation omitted)); *Hasson*, 26 F.4th at 618 (recognizing as-applied showing unnecessary in First Amendment context).[140]

## A.     The Department of Education Has Not Given Regulated Entities Fair Warning

Courts around the country have found broad bans on DEI and other "divisive" topics to be vague[141] —a finding echoed by the *NEA* and *NAACP* courts regarding the likely unconstitutional

---

[139] While Plaintiffs are not currently subject to an investigation or enforcement action, that is no barrier to relief, as explained herein. In particular, unlike in *NADOHE*, here Plaintiffs are challenging a final agency action rather than executive orders. When the Fourth Circuit stayed the preliminary injunction in *NADOHE*, the panel explained that it was not possible to fully assess the constitutionality of the executive orders or how agencies would implement them in that procedural posture on a less developed record at that time. Here, the Court has before it a record of how the Letter and the Certification, which are final agency actions, have been implemented.

[140] Plaintiffs would also satisfy the void-for-vagueness showing outside the First Amendment context, as they have shown that the Letter and Certification are vague as applied to them, and that they intend to engage in conduct which they are not sure will raise enforcement issues. *See Hasson*, 26 F.4th at 616–18.

[141] *See Chi. Women in Trades v. Trump*, No. 1:25-cv-02005, 2025 WL 933871, at *7–8 (N.D. Ill. Mar. 27, 2025) (finding certification requiring that a grantee "does not operate any DEI programs that 'violate any applicable Federal antidiscrimination laws'" was vague because the government failed to "define the term 'DEI', . . . let alone what might make any given 'DEI' program violate Federal anti-discrimination laws," as the answer was "anything but obvious" (continues on next page)

vagueness of the Letter and Certification. *NEA* Op. at *18–22; *NAACP* Op. at *6.

The Letter is vague because it fails to provide definitions and objective standards for assessing discrimination purportedly in violation of Title VI. As the *NEA* Court noted, "[t]he Letter does not make clear . . . what the Department believes constitutes a DEI program, or the circumstances in which the Department believes DEI programs run afoul of Title VI. The Letter does not even define what a "DEI program" is." *NEA* Op. at *18. Because the dictionary definition of "diversity, equity, and inclusion" is broad and value-laden, applying the term necessarily involves an "appeal[] to abstract principles" and subjective assessment. *Id.* at *19 (quoting *Tenn. Educ. Ass'n*, 732 F. Supp. 3d at 807). The Letter's language compounds the vagueness of its use of "DEI" by describing DEI in contrast to its dictionary definition, *id.* at *19, and by its characterization of toxic indoctrination as a "discriminatory practice," *id.* at *20 (describing the broad range of teaching and curriculum that this prohibition arguably extends, and its chilling effect on teachers who are members of NEA); *see supra* SMF–10-11 (chilling effect on teachers).[142]

The Certification is vague because it does not explain what its prohibitions on "race-based"

---

[142] (citation omitted)); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 1:25-cv-00333, 2025 WL 573764, at *1 (D. Md. Feb. 21, 2025) ("*NADOHE*") (finding executive orders which did not define operative terms such as "DEI," "illegal DEI," "or "illegal discrimination or preferences," or "identify the types of programs or policies the administration considers 'illegal'" were unconstitutionally vague), *opinion clarified*, No. 1:25-cv-00333, 2025 WL 750690 (D. Md. Mar. 10, 2025); *see also Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1286 (N.D. Fla. 2022) (finding banned "divisive concepts" impermissibly vague); *Tenn. Educ. Ass'n v. Reynolds*, 732 F. Supp. 3d 783, 807 (M.D. Tenn. 2024) (similar); *Santa Cruz Lesbian & Gay Cmty. Ctr.*, 508 F. Supp. 3d at 542(similar); *Loc. 8027 v. Edelblut*, No. 1:21-cv-01077, 2024 WL 2722254, at *9 (D.N.H. May 28, 2024) ("*Edelblut II*") (similar).

[142] The FAQs exacerbate this lack of clarity by expanding the categories of programs that the Department says may "veil discriminatory policies," while failing to define key phrases and disavow that a DEI-related label will be probative of the agency's determination of a Title VI violation. *NEA* Op. at *3 (citation omitted); *see* Ex. 49, Dep't of Educ., Off. for C.R., *Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act,* PLFS-597 ("Revised FAQs") Revised FAQs at 6 (stating "whether an initiative constitutes unlawful discrimination does not turn *solely* on whether it is labeled 'DEI' or uses terminology such as 'diversity,' 'equity,' or 'inclusion'") (emphasis added).

actions, practices that "advantage one race over another," "certain DEI practices," and "illegal DEI"[143] mean in practice.[144] *See NAACP* Op. at *6. Rather the Certification, alongside the FAQs and Letter, raise serious questions about what speech and programming is permitted, *see id.* (questioning whether hosting events "featuring black scholars," courses taught by professors promoting existence of systemic racism, or allowing Black student unions would be impermissible).[145] As such, the Department has provided "no clear 'boundaries of the forbidden areas' to guide schools' compliance with the certification or to limit the Department's enforcement actions." *Id.* (citing *Grayned*, 408 U.S. at 109). The Certification's reference to *SFFA* only further confuses the meaning of its vaguely described concepts, particularly as they would apply to K-12 schools, and any activities outside of college admissions, given that *SFFA* simply does not address these issues. Moreover, the Department's interpretation of *SFFA* in both the Letter and Certification adds an additional layer of uncertainty because it stands in contrast to relevant Supreme Court precedent and what courts in the Fourth and First Circuit have already found to be permissible post-*SFFA*. *See* Op. at *20.[146]

    As a result, the Letter and Certification's undefined and legally ungrounded prohibited

---

[143] Certification at 3.

[144] The vagueness of the term "illegal DEI" has only been exacerbated by Defendant McMahon's recent statements. *See supra* SMF–9.

[145] *See* Ja'han Jones, *At Confirmation Hearing, Linda McMahon Refuses to Say Black History Courses Will Be Allowed*, Yahoo News (Feb. 14, 2025), https://perma.cc/PM36-A84V ("Linda McMahon . . . was unsure during her confirmation hearing when asked whether Black history courses could run afoul of the new administration.").

[146] *See, e.g., Coal. for TJ*, 68 F.4th at 885 (finding efforts to "improve racial diversity and inclusion by way of race-neutral measures" is a "practice that the Supreme Court has consistently declined to find constitutionally suspect"); *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.*, 89 F.4th 46, 62 (1st Cir. 2023), *cert. denied*, 145 S. Ct. 15 (2024) ("*Bos. Parent II*") ("There is nothing constitutionally impermissible about a school district including racial diversity as a consideration and goal in the enactment of a facially neutral plan." (Kennedy, J., concurring in part)). *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No 1*, 551 U.S. 701, 789 (2007) (finding "[s]chool boards may pursue the goal of bringing together students of diverse backgrounds and races" through means such as "drawing attendance zones with general recognition of the demographics of neighborhoods; . . . [and] recruiting students and faculty in a targeted fashion"); *see also Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.*, 996 F.3d 37, 48 (2021) ("*Bos. Parent I*").

practices could encompass almost any conceivable aspect of a school's curriculum and programming and the speech of its educators, leading to the inevitable chill of a broad swath of activity. *See Grayned*, 408 U.S. at 108 ("Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone… than if the boundaries of the forbidden area were clearly marked."); *Edelblut II* at *12–13; *see supra* SMF–10 (describing Plaintiffs' uncertainty).[147] The Certification amplifies the situation by putting LEAs and SEAs in the impossible position of signing a purportedly binding legal document that threatens dire financial and legal risks, without clarity on its parameters, or facing the loss of critical federal funding. *See Chi. Women in Trades,* 2025 WL 933871, at *8–9 (finding certification unlawful and vague in similar circumstances). Quite simply, "the certification requirement threatens serious consequences for schools' failure to comply with vaguely defined prohibitions on DEI initiatives." *NAACP* Op. at *6. Threatening these serious penalties "without sufficiently defining the conduct that might trigger liability, violates the Fifth Amendment's prohibition on vagueness." *Id*. at 13.

Additionally, because the Department's prohibitions intersect and potentially contradict state and local licensure, professional requirements, and laws governing curriculum and instruction, the vagueness is even more problematic. *See Edelblut I*, 651 F. Supp. 3d at 462 (explaining vagueness compounded by potentially conflicting requirements to teach ostensibly banned concepts). For example, in Oregon, teachers are required by state law to teach, among other things, a Native American curriculum, and incorporate Social and Emotional Learning standards.[148] Similarly, in Washington State, all degree-seeking students attending a state

---

[147] Adding to the confusion and uncertainty is the fact that Department guidance related to racial and national origin discrimination have been removed from the Department's website. *See supra* SMF–4.
[148] District 4J Decl. ¶¶ 11–18.

community or technical college are required to take a DEI and antiracism program.[149] The Department is putting institutions and teachers in the impossible position of deciding whether to risk state consequences or federal consequences; there seemingly is no way to comply with both. *See Edelblut I,* 651 F. Supp. 3d at 462 (finding that the conflict between state curriculum requirements and bans on teaching certain concepts created a "Hobson's choice").

Furthermore, the penalties for running afoul of the Letter and Certification are significant and punitive, underscoring their vagueness and chilling effect. *NEA* Op. at \*21 ("The greater the consequences for noncompliance with a law, the more courts will insist on precision in delineating the conduct the law prohibits."). Here, the Department threatens investigations, enforcement actions, removal and clawing back of federal funding, and the invocation of the FCA[150]–which implicates treble damages, civil penalties, qui tam litigation, and potential criminal prosecution.[151] These penalties do not just fall on educational institutions, but effect individual teachers who face the prospect of "witch hunts" and potential employment consequences, including losing their licensure. *Id.* at \*22–23.[152] Plaintiffs, and educators across the county, thus face enormous pressure to cease protected First Amendment speech and conduct relating to lawful DEI activities in order to avoid stigmatization, the possibility of losing government funding, defending legal actions, and potentially ruinous legal liability.

### B.    The Letter and Certification are Ripe for Arbitrary Enforcement

The ambiguities in the Letter and Certification give the Government, and individuals

---

[149] *See* Wash. Rev. Code Ann. § 28B.10.149 (West 2021); Hamako Decl. ¶ 7.
[150] The Administration recently indicated it intends to use the FCA to vigorously enforce its viewpoint on discrimination nationwide, including by creating a separate Civil Rights Fraud section. Ex. 57C, PLFS-833, Press Release, DOJ, Justice Department Establishes Civil Rights Fraud Initiative (May 19, 2025), https://perma.cc/EZ6B-F8UX.
[151] *See* Cert. PI at 14–15.
[152] *See* Jane Doe Suppl. Decl. ¶¶ 8, 11–12.

empowered by the False Claims Act, expansive discretion to initiate investigations and lawsuits, thereby inviting arbitrary enforcement. *See Edelblut II*, 2024 WL 2722254, at *12 (finding law's lack of clarity "sow[ed] confusion and le[ft] significant gaps that can only be filled in by those charged with enforcing the [law]"); *Tenn. Educ. Ass'n*, 732 F. Supp. 3d at 807–08 (explaining act's inclusion of "value-laden" terms maximized enforcement discretion and was a "quick route to unconstitutional ambiguity"). Indeed, the Department empowered the public to aid its enforcement efforts by encouraging them to file complaints against purported violators of these amorphous concepts via the EndDEI portal,[153] and by the issuance of the Certification, which explicitly implicates the FCA qui tam provision. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) (credibility of enforcement threat "bolstered" when administrative scheme allows any person with knowledge of a purported violation to file a complaint). Being subject to a lengthy and costly investigation, or being dragged into an FCA lawsuit, is devastating to educators and educational institutions, even absent an ultimate finding of discrimination. *See supra* SMF–7. Accordingly, both the Letter and Certification are unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause.

## V.    VACATUR, DECLARATORY RELIEF, AND A PERMANENT INJUNCTION ARE NECESSARY TO REDRESS PLAINTIFFS' INJURIES

Plaintiffs have established that summary judgment in their favor is appropriate on their APA and Constitutional claims and are entitled to a remedy. To fully address Plaintiffs' injuries, vacatur, in addition to declaratory and permanent injunctive relief, is appropriate.

---

[153] *See End DEI Portal*, Ex. 13, PLFS-128. For example, those who oppose "DEI" practices have started to file complaints with OCR against diversity-related programming. *See* Ex. 22, PLFS-191, Vincent DiFonzo, *Young America's Foundation Files Complaint Against Gettysburg College to Department of Education*, The Gettysburgian (Mar. 21, 2025), https://perma.cc/P7QW-5LQF. The EndDEI Portal specifically solicits complaints only regarding "divisive ideologies and indoctrination," without further elaboration as to the actual law governing DEI. *End DEI Portal*, Ex. 13, PLFS-128.

## A.    Vacatur is the Appropriate Remedy to Redress Defendants' APA Violations

Should the Court find that the Letter and Certification violate the APA, the Court should, pursuant to the plain terms of the statute, "hold unlawful and set aside" both agency actions. 5 U.S.C. § 706(2). In the Fourth Circuit, vacatur is the appropriate remedy when an agency action violates the APA. *See Casa De Md. v. DHS*, 924 F.3d 684, 705 (4th Cir. 2019) (holding that a federal agency's policy violated the APA and needed to be "set aside"); *Kravitz v. Dep't of Com.*, 366 F. Supp. 3d 681, 755 (D. Md. 2019) (stating that the Court is required to "hold unlawful and set aside" agency action violating the APA and that vacatur is appropriate); *Children's Hosp.*, 896 F.3d at 619 (holding that agency guidance was unlawful and needed to be vacated under the APA).

Here, without a full vacatur of both the Letter and the Certification, Plaintiffs', Plaintiffs' members, and countless students, educators, and schools will continue to be injured by the specter of these unlawful Department policies.

## B.    Declaratory Relief is Necessary so that Defendants Conform Their Conduct to the Law

In addition to vacatur, forward looking declaratory relief is appropriate here, where the Department is attempting to enforce an interpretation of Title VI that is unlawful. *See White v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 913 F.2d 165, 168 (4th Cir. 1990); *see also* 5 U.S.C. § 703. A declaratory judgment rests "in the sound discretion" of the district court. *Aetna Cas. & Surety Co. v. Quarles*, 92 F.2d 321, 324 (4th Cir. 1937); *see Penn-America Ins. Co. v. Coffey*, 368 F.3d 409, 412 (4th Cir. 2002). The APA authorizes both injunctive and declaratory relief against arbitrary and unconstitutional administrative actions. 5 U.S.C. § 702; *see Doe v. Civ. Serv. Comm'n*, 483 F. Supp. 539 (S.D.N.Y. 1980).

Defendants are aggressively pursuing the interpretation of Title VI set forth in the Letter

through many avenues–the Certification itself was one such attempt. Since the Court's issuance of

a stay, Defendants have made numerous public statements questioning whether practices long

interpreted as legal under Title VI and *SFFA*, including curriculum content, are in fact "illegal

DEI."[154] Defendants have also attempted to rely on the unlawful interpretations in the Letter and

Certification for purposes of enforcement and funding terminations, though they don't explicitly

name the Letter or Certification in doing so.[155] For example, on May 22, 2025, almost a month

after the Letter was stayed, the Department announced an investigation in Fairfax County Public

Schools (FCPS) over its 2020 revision of Thomas Jefferson High School for Science and

Technology (TJ)'s admissions policy.[156] The Department alleges FCPS engaged in racial

discrimination by dropping standardized testing standards and using a holistic process in order to

achieve racial balancing at TJ—which is a key point in the Dear Colleague Letter,[157] and which

this Court determined was an unexplained change in position. Op. at 37. This enforcement action

follows a Fourth Circuit ruling that the TJ policy was lawful—a judicial ruling that this Court

determined is directly contradicted by the Letter's "position regarding race-neutral means of

increasing all forms of diversity." Op. at 38; *Coal. for TJ,* 68 F.4th at 885–86. The Department

cited Title VI, not the Letter, as the basis for this investigation. But it is clear that the actions taken

by the Department with respect to this investigation at a minimum are based on "the Letter's

changes to existing law," not the law itself. Op. at 47.[158] Therefore, Plaintiffs request that this

---

[154] *See supra* SMF–9.

[155] *See supra*, SMF–5.

[156] Ex. 57A.

[157] *See* Letter at 3 ("It would, for instance, be unlawful for an educational institution to eliminate standardized testing to achieve a desired racial balance or to increase racial diversity.")

[158] *See also* Harvard Grant Termination Letter, Ex. 57B, PLFS-829–830 (Terminating funding in part because Harvard "has failed to abide by its legal obligations," including "scrapp[ing] standardized testing requirements," and "fail[ing] to abide by the United States Supreme Court's ruling demanding that it end its racial preferencing, and continu[ing] to engage in ugly racism in its undergraduate and graduate schools… [Universities] should not be (continues on next page)

Court declare that the Letter and Certification are unlawful, and provide the additional declaratory relief set forth in Plaintiffs' underlying Motion, which will more fully address Plaintiffs' injuries.

### C.    Plaintiffs Meet the Standard for Entry of a Permanent Injunction

Defendants' attempts to rely on the legal interpretations underpinning the Letter and Certification, regardless of whether they are explicitly referenced, also necessitates injunctive relief to fully address Plaintiffs' injuries. Injunctive relief is an equitable remedy available for violations of the Constitution, as well as under the APA. *See Ford Motor Co. v. NLRB*, 305 U.S. 364, 373 (1939); *Gonzales v. Oregon*, 546 U.S. 243 (2006) (affirming an injunction against the Attorney General in an APA action); *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) ("[I]njunctive relief against executive officials . . . is within the courts' power."). A permanent injunction is appropriate where a plaintiff demonstrates four factors: "(1) that it [will suffer] an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010) (internal quotation marks and citation omitted).

The Court has found that Plaintiffs were previously suffering irreparable harm, Op. at 45, and such harm would continue should the Letter and Certification take effect. Several of those injuries—including the chilling effect on Plaintiffs' First Amendment rights—would be irreparable and have no adequate remedy at law. *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011) (granting permanent injunction and finding a "threatened injury" that "constitute[s]

---

incubators of discrimination that encourage resentment and instill grievance and racism into our wonderful young Americans.").

'direct penalization, as opposed to incidental inhibition' of First Amendment rights," cannot "be remedied absent an injunction"); *Air Evac EMS, Inc. v. McVey,* 37 F.4th 89, 103 (4th Cir. 2022). And because the final two factors combine when the Defendants is the government, "[t]here is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotation marks and citation omitted). These four factors weigh strongly in favor of a determination that an injunction is appropriate.

In the constitutional context, "where a law is unconstitutional on its face, and not simply in its application to certain plaintiffs, a nationwide injunction is appropriate." *PFLAG, Inc. v. Trump*, No. 8:25-cv-00337, 2025 WL 685124, at *31 (D. Md. Mar. 4, 2025). As Defendants' actions affect educators nationwide, such relief is appropriate here. *Id.* (explaining nationwide injunction appropriate where the "constitutional and statutory violations apply equally to all [affected] institutions that receive federal [funding]"). Moreover, as Plaintiffs' members are located in IHEs and LEAs across the country, plaintiff-specific relief, in lieu of nationwide relief, would cause further confusion in schools and educational institutions.

Should the Court grant vacatur under the APA, an injunction is still appropriate if it has "any meaningful practical effect independent of . . . vacatur." *Monsanto Co.*, 561 U.S. at 165. Here, while vacatur of the Letter and the Certification would go a significant way towards redressing Plaintiffs' injuries, only an injunction can provide complete relief. *See Gill v. Whitford*, 585 U.S. 48, 73 (2018) (citation omitted) (finding injunctions should be tailored to "redress the plaintiff's particular injury").

This case presents the circumstances under which an injunction is necessary and

36

appropriate to completely redressing Plaintiffs' injuries. Where an agency "has enacted similar guidance in the past and may attempt to do so again as an end-run to the Court's relief, a broader injunction is necessary to provide complete relief." *Texas v. Cardona*, 743 F. Supp. 3d 824, 897 (N.D. Tex. 2024). Such an injunction is appropriate where it "will not restrain agency officials from anything more than conduct based on the disputed agency [action]." *Chamber of Com. of U.S. v. CFPB*, 691 F. Supp. 3d 730, 745 (E.D. Tex. 2023), *appeal dismissed*, No. 23-40650, 2025 WL 1304573 (5th Cir. May 1, 2025); *see also Cardona*, 743 F. Supp. 3d at 898 (enjoining defendants from "implementing or enforcing" the guidance documents at issue, as well as any future guidance documents promoting a similar interpretation against plaintiffs). There are already indications that Defendants will continue to enforce their versions of Title VI and SFFA against educational institutions and educators, including Plaintiffs as described above. Moreover, vacatur may not prevent the administration from taking action against parties that did not sign the Certification by April 24, 2025. Defendants should not be able to withhold funding or otherwise take retaliatory actions because entities did not sign an unlawful certification.

Therefore, Plaintiffs request that the Defendants and all of their officers, employees, and agents, be enjoined from enforcing or taking any steps to implement the Letter or the Certification, as well provide the additional injunctive relief set forth in Plaintiffs' underlying Motion, which is necessary to fully address Plaintiffs' injuries.

## CONCLUSION

For all these reasons, this Court should grant summary judgment in Plaintiffs' favor, vacate the Letter and the Certification, and enter permanent injunctive and declaratory relief prohibiting DOE from pursuing any investigation or enforcement action based on their improper and expansive interpretation of *SFFA* and Title VI as described in the Letter and Certification.

Dated: June 5, 2025                          Respectfully submitted,

                                             */s/* Kali Schellenberg

                                             Kali Schellenberg (Bar No. 31582)
                                             Brooke Menschel (Bar No. 31492)
                                             Madeline H. Gitomer (Bar No. 31518)
                                             Victoria S. Nugent (Bar No. 15039)
                                             Andrew Bookbinder (Bar No. 31486)
                                             Democracy Forward Foundation
                                             P.O. Box 34553
                                             Washington, DC 20043
                                             (202) 448-9090
                                             kschellenberg@democracyforward.org
                                             bmenschel@democracyforward.org
                                             mgitomer@democracyforward.org
                                             vnugent@democracyforward.org
                                             abookbinder@democracyforward.org

                                             *Counsel for Plaintiffs*