**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

AMERICAN FEDERATION OF
TEACHERS, *et al.*

      Plaintiffs,

  v.

UNITED STATES DEPARTMENT OF
EDUCATION, *et al.*

      Defendants.

Case No. 1:25-cv-00628-SAG

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS OR FOR SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

INTRODUCTION ............................................................................................ 1

BACKGROUND ............................................................................................ 3

I.     ED's Authority to Effectuate Equal Education Opportunities. ......................... 3

II.    ED's Initial Guidance Following the *SFFA* Decision in 2023. ............. 4

III.   ED's Further Guidance in the DCL Issued in February 2025. ............ 5

IV.    This Litigation. ................................................................................ 7

LEGAL STANDARDS ................................................................................ 10

I.     Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction. ...................................................................................... 10

II.    Motions to Dismiss for Failure to State a Claim Under Rule 12(b)(6) or for Summary Judgment under Rule 56. ........................... 11

ARGUMENT .............................................................................................. 12

I.     This Court Lacks Jurisdiction Because Plaintiffs Cannot Establish Standing. ......................................................................................... 12

       A. Plaintiffs cannot establish injury-in-fact as a matter of law. ......... 14

II.    Plaintiffs' APA Claims are Without Merit ........................................... 17

       A. The Title VI Documents Are Not Final Agency Actions ................ 17

       B. The Title VI Documents Are Not Subject to Notice and Comment 20

III.   Plaintiffs Constitutional Claims Do Not Establish an APA Violation or Set Forth Actionable Free-Standing Constitutional Claims. ............................................................................................ 22

       A. The Title VI Documents Are Not Unconstitutionally Vague .......... 22

       B. The Title VI Documents Do Not Violate the First Amendment. .... 27
       i.   The Title VI Documents Are Not Facially Overbroad ................................ 28

       ii.  The Title VI Documents Are Not Viewpoint Discriminatory or

Impermissibly Coercive. ................................................................................ 29

IV.    Plaintiffs are Not Entitled to The Remedies they Seek, and Any Relief Awarded by the Court in Plaintiffs' Favor Should be Limited to the Parties. ................................................................................... 32

**CONCLUSION** ............................................................................................ 34

## INTRODUCTION

In 2023 the Supreme Court issued the decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ("*SFFA*"), finding that certain policies of higher education institutions violated section VI of the Civil Rights Act, prohibiting discrimination on the basis of race and national origin. Following that decision, as was typical, the U.S. Department of Education ("ED") issued updated Title VI guidance without any formal notice and comment process. In 2025, ED issued additional guidance documents—including a Dear Colleague Letter ("DCL") issued on February 14, 2025, and related "Frequently Asked Questions" document ("FAQ")—to explain its enforcement priorities based on preexisting requirements of the Equal Protection Clause of the Constitution and Title VI. In April 2025, ED also advised state education agencies of a certification requirement ("Certification"), which asked states to certify their understanding and agreement that compliance with Title VI was a condition of their receipt of federal funding.

Plaintiffs in this action filed a Second Amended Complaint after failing to secure preliminary injunctions on behalf of Plaintiffs: three nonprofit associations purporting to represent educators in Maryland and across the United States, and one school District from Eugene Oregon. In their Second Amended Complaint they contend that the DCL and Certification are improper agency rulemaking which violates the Administrative Procedure Act ("APA"), restrict their First Amendment rights to free speech and association, and are unconstitutionally vague under Fifth Amendment. After a hearing in April, the Court entered a stay, finding that the DCL should not be enforced. However, the Supreme Court's decision in *Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631 (June 27, 2025), raises a question about the propriety of a stay that provides relief beyond the named parties to this case.

Plaintiffs have filed a motion for summary judgment asking that this Court grant summary judgment in their favor and enter a permanent nationwide "universal" injunction precluding ED from enforcing, applying or taking any steps to implement the DCL or Certification "as well as any actions taken on the basis of the agency's new interpretation of Title VI" and from requiring the Certification.  Plaintiffs have also asked that this Court require that ED revoke all related guidance and prohibit ED or any other agencies or parties "including any other federal executive branch agencies, departments, and commissions" from acting in reliance on to the interpretation of Title VI reflected in the guidance, including with respect to any funding or grants. This Court should decline Plaintiffs' invitation.

*First*, neither Plaintiffs' Second Amended Complaint, nor their fifty-page Motion for Summary Judgment and *fifty-nine* accompanying exhibits demonstrate that Plaintiffs have standing.  The injuries alleged are all based on speculation about potential future enforcement actions, and injuries to States, boards of education, or universities who are not a party to this action. Plaintiffs simply cannot establish that its members or District 4J will suffer *direct*, imminent, concrete and particularized injury traceable to the challenged guidance.

*Second*, Plaintiffs cannot establish an APA violation, as the DCL and Certification are not final agency actions and lack the force of law. The DCL explains ED's interpretation of federal antidiscrimination laws, including Title VI, considering the Supreme Court's decision in *SFFA* and subsequent developments. Moreover, even if the DCL could be viewed as a final agency action, it was not required to go through formal notice-and-comment rulemaking because it is at most, an *interpretive rule*.  The Certification requirement merely requests state educational agencies who receive federal funds confirm their compliance with Title VI, which Plaintiffs acknowledge they have been asked to do in the past; this request also fails to rise to the level of final agency action.

*Fourth*, Plaintiffs' constitutional claims—whether reviewed under the APA or as standalone claims—fail as a matter of law. The DCL and Certification are facially neutral, and do not seek to restrict free speech, as clearly noted in the FAQ. Moreover, Plaintiffs fail to allege facts which support their contention that the DCL and Certification seek to restrict or discriminate based on the *contents* of their speech, particularly considering the DCL and FAQ's clear and unambiguously stated anti-discriminatory purpose. Plaintiff's Fifth Amendment vagueness claims fare no better; the challenged documents simply reiterate federal funding recipient's responsibilities under Title VI's antidiscrimination provisions and seek to provide reasonable notice of potentially unlawful, discriminatory conduct. Accordingly, the Court should dismiss Plaintiffs' Second Amended Complaint, deny their Motion for Summary Judgment, and grant judgment in Defendant's favor.

Finally, the Court's stay order applied nationwide, and its broad application should be reexamined in light of the Supreme Court's June 27, 2025, decision in the *Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025), which held that nationwide universal injunctions generally are not within the authority of the district courts, and must be limited to the parties with standing in the action before the Court. Here, no party has standing, so no relief should issue, but if the Court determines otherwise, it should at least limit any such relief to the parties.

## BACKGROUND

### I.    ED's Authority to Effectuate Equal Education Opportunities.

The opportunity to receive an education, "where the state has undertaken to provide it, is a right which must be made available to all on equal terms." *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483, 493 (1954). In that landmark decision, the Supreme Court held that "[t]o separate [students] from others of similar age and qualifications solely because of their race" not only irreparably harms the hearts and minds of students, but also violates the Equal Protection Clause

3

of the Fourteenth Amendment. *Id.* Soon thereafter, Congress reinforced this constitutional guarantee by enacting Title VI of the Civil Rights Act of 1964, which prohibits discrimination based on race, color, or national origin in any program or activity receiving federal financial assistance. 42 U.S.C. §§ 2000d–2000d-7. To implement this mandate, ED issues regulations and guidance designed to ensure equal access to education. *See* 20 U.S.C. § 3402(1); *see generally Nondiscrimination in Federally-Assisted Programs at the Department of Health Education, and Welfare—Effectuation of Title VI of the Civil Rights Act of 1964*, 29 Fed. Reg. 16298–305 (Dec. 4, 1964).

## II.    ED's Initial Guidance Following the *SFFA* Decision in 2023.

In 2023, the Supreme Court decided *SFFA*, a challenge to two schools' consideration of applicants' race as a plus factor in their higher-education admissions processes for the purposes of obtaining a diverse student body. 600 U.S. 181.  The Supreme Court held that the schools' use of race violated the Equal Protection Clause of the Fourteenth Amendment. *Id.*  The decision noted that the Court had previously recognized only two compelling interests the government may have in considering a person's race for purposes of satisfying strict scrutiny; the first being an interest in "remediating specific, identified instances of past discrimination that violated the Constitution or a statute," and the second to be "avoiding imminent and serious risks to human safety in prisons, such as a race riot." *Id.* at 207.  In handing down its ruling, the Court announced that "[t]he time for making distinctions based on race had passed" and that "[e]liminating racial discrimination means eliminating all of it."  *Id.* at 204, 206.  The Court noted that "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI."  *Id.* at 198 n.2 (quoting *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003)).

Following the decision in *SFFA*, ED, along with the U.S. Department of Justice co-authored a Dear Colleague Letter, and Frequently Asked Questions document, to help educational institutions receiving federal funding understand and navigate the implications of the Supreme Court's decision.  The guidance was issued without formal notice and comment rulemaking and explained how educational institutions could "pursue *lawful* steps to promote diversity and full inclusion. 2023 DCL at 1 (emphasis added). Importantly, the guidance reiterated ED's "continued commitment to vigorous enforcement of Titles IV and VI of the Civil Rights Act of 1964 from early childhood through postsecondary education." *Id*. at 3.

III.    **ED's Further Guidance in the DCL Issued in February 2025.**

On February 14, 2025, ED issued the DCL challenged in this case: https://perma.cc/J5PJ-DTKG.  In the DCL, ED explains that, in light of *SFFA*, the agency interprets Title VI to forbid discriminatory practices in which "an educational institution treats a person of one race differently than it treats another person because of that person's race[.]" *Id*. at 2.  ED noted that any strict scrutiny analysis of an Equal Protection issue, as well as the analysis of compliance with Title VI, would turn on that central question: does the school "treat[] a person of one race differently than it treats another person because of that person's race[?]" *Id*. at 2.  The DCL also provided further detail regarding how ED understands Title VI to apply following *SFFA*. The DCL is explicit – its "guidance does not have the force and effect of law and does not bind the public or create new legal standards." *Id*. at 1 n.3.

On February 27, 2025, ED launched the Portal, https://enddei.ed.gov/, to provide a simple method for parents, students, teachers, and the broader community to submit reports of discrimination based on race or sex in publicly-funded K-12 schools; ED could then use the

information provided to investigate whether those schools were engaging in discriminatory behavior.[1]

On March 1, 2025, ED released the FAQ "to anticipate and answer questions that may be raised" about the DCL.[2]  On April 9, 2025, ED issued a revised version of the FAQs.  *See* April 9, 2025 FAQ at https://perma.cc/43EZ-ME6A. The FAQ reiterates that ED's interpretations "do not have the force and effect of law and do not bind the public or impose new legal requirements." *Id*. at 1 n.3. They also reaffirm ED's commitment to "enforce[] federal civil rights law consistent with the First Amendment" and confirms that "[n]othing in Title VI or its implementing regulations, authorizes a school to restrict any rights otherwise protected by the First Amendment, nor does the [DCL] indicate as much." *Id*. at 6.

While the DCL and FAQ articulate ED's concerns that certain diversity, equity, and inclusion ("DEI") programs *may* illegally use suspect racial classifications when making decisions regarding burdens or benefits, they do not require a complete ban on all concepts or ideas relating to DEI.  In fact, as the FAQ emphasize, "whether an initiative constitutes unlawful discrimination does not turn solely on whether it is labeled 'DEI' or uses terminology such as 'diversity,' 'equity,' or 'inclusion.'"  *Id*.  Rather, all school programs—DEI or otherwise—must not "intentionally treat students differently based on race, engage in racial stereotyping, or create hostile environments for students of particular races."  *Id*.

---

[1]      *See* Press Release, *U.S. Dep't of Educ., U.S. Department of Education Launches "End DEI" Portal* (Feb. 27, 2025), https://perma.cc/QT6V-68L7.

[2]      *U.S. Dep't of Educ. Off. For C.R., Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act* at 1 (Mar. 1, 2025), https://perma.cc/WK7Z-JBC2.

On April 3, 2025, ED's Office for Civil Rights ("OCR") emailed the Certification letter to every State's Department of Education.[3] The Certification asked recipients to certify compliance with the legal obligations imposed by Title VI and *SFFA* as a condition of receiving federal financial assistance. *Id.* at 2–4. The email directed that:

> [w]ithin ten (10) days, please sign and return the attached certification along with the certifications of your Local Education Agencies (LEAs). Furthermore, within these ten (10) days, please report the signature status for each of your LEAs, any compliance issues found within your LEAs, and your proposed enforcement plans for those LEAs.

Pl. Exhibit 42, at ECF 37-8. On April 7, 2025, OCR sent a follow-up email notifying the recipients that ED had granted all States and LEAs a 10-day extension to provide the Certification.

## IV.    This Litigation.

Plaintiffs, American Federation of Teachers ("AFT"), American Federation of Teachers–Maryland ("AFTMD"), and the American Sociological Association ("ASA"), filed this lawsuit against ED, Linda McMahon, in her official capacity as Secretary of Education, and Craig Trainor, in his official capacity as Acting Assistant Secretary for the Office for Civil Rights (collectively, "the government" or "ED"). ECF 1. The Complaint was Amended to include claims by Plaintiff Eugene, Oregon School District 4J ("District 4J"). ECF 14.

Plaintiffs then filed a motion seeking a preliminary injunction asking that the Court enjoin ED's from implementing the DCL, and order that the DCL, FAQ and Portal be removed and replaced with ED's pre-January 2025 Title VI guidance. ECF 31. While briefing was underway, ED issued the Certification; Plaintiffs then filed a second motion for preliminary injunction,

---

[3]     *See U.S. Dep't. of Educ., Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and SFFA v. Harvard* (Apr. 3, 2025), https://perma.cc/AL43-BUMH ("Certification Letter").

seeking to excuse the State Superintendents from complying with it. ECF 37.  The government opposed both preliminary injunctions. ECF 42. Plaintiffs submitted a consolidated reply.  ECF 51. The American Civil Liberties Union of Maryland and PEN American, Inc. filed an amicus brief in support of the Plaintiffs. ECF 35-1. Students for Fair Admissions filed an amicus brief in support of the government. ECF 45-1.1 The Court heard oral argument on the motions on April 18, 2025. ECF 56, 59.  At the conclusion of the hearing the Court asked that the parties address the question of the proper scope of relief, should the Court determine that some kind of temporary relief was appropriate pending final resolution. Both parties submitted responses. ECF 57, 58.

On April 24, 2025, the Court issued a Memorandum Opinion denying Plaintiffs' motions for preliminary injunction and granting a limited stay under 5 U.S.C. §705. ECF 60.  In the Opinion the Court concluded that District 4J likely established standing and was likely to succeed on the merits of their claim that the DCL was issued in violation of Administrative Procedure Act ("APA"). Specifically, the Court reasoned that District 4J suffered an injury in fact, traceable to the DCL and redressable by the Court, because District 4J alleged that it receives federal funds, and  that the DCL is placing a chilling effect on its protected First Amendment activity, specifically, its speech regarding race-related topics in its curriculum. *See* ECF 60, Memo Op. at 19 – 23.

As to the merits, the Court found that the Plaintiffs were likely to show that the DCL violated the APA because it: (1) constituted a "final agency action" in the form of a "legislative rule" that did not go through the required notice-and-comment process; (2) exceeded ED's authority under the Department of Education Organization Act by exercising control over curricular content; (3) arbitrarily and capriciously changed civil rights policy without considering APA-required factors including underlying evidence and impacted interests; and (4) regulated classroom speech on race-related topics in violation of the First Amendment. *See* Memo Op., ECF

60 at 23 – 43. The Court declined to make any finding as to whether Plaintiffs were likely to succeed on the merits of their Fifth Amendment vagueness challenge at that juncture. *Id.* at 43 n. 12., citing *Nat'l Assn. of Diversity Officers. in Higher Ed. v. Trump*, No. 25-1189, ECF 29 (4th Cir. Mar. 14, 2025) (expressing doubts as to the ripeness of a pre-enforcement challenge provision that could be reasonably applied in both constitutional and unconstitutional manners).

As to the *scope of the remedy*, the Court held that the appropriate course of action was to issue a temporarily stay under 5 U.S.C. § 705 as to the DCL and thereby "postpone its effective date pending a final resolution in this matter." ECF 30 at 46.  The Court noted that such a stay would "necessarily preclude enforcement based on the Letter's changes to existing law" and "preserve status or rights pending conclusion of the review proceedings," without intruding on the administration's ability to enforce existing civil rights law and pursue its enforcement priorities within its legal authority. *Id.* at 46.

This Court also concluded that the FAQ was not final a agency action subject to its authority under the APA, and neither was the Certification, but that, insofar as the Certification was "an implementation" of the DCL, it would be improper for ED to initiate enforcement based on a stayed policy (the DCL), whether through the Certification or otherwise. *Id.* at 47-48.  With respect to the Portal, the Court found that ED was entitled to maintain a reporting portal, and that doing so did not violate Title VI or the Fifth Amendment, so long as it was not used to "pursue enforcement actions that are not in accordance with existing law." *Id.* Finally, the Court rejected Plaintiff's demand that ED essentially roll back the clock and *remove* the DCL and FAQ from its website and *repost* all Title VI guidance from prior to January 20, 2025. *Id.* at 48. The Court noted it would not "order the new administration to espouse the viewpoints and guidances of prior administrations, or to restore those guidances to the agency website as preliminary relief." *Id.*

On the basis of these holdings, the Court granted in part and denied in part the Plaintiffs' motions for preliminary relief and entered an order stating that "[t]he Dear Colleague Letter of February 14, 2025, is stayed pursuant to 5 U.S.C. § 705 pending final resolution by this Court." ECF 61.

After entering an order reflecting its rulings, the Court asked the parties to confer regarding a briefing schedule for cross-motions for summary judgment, ECF 61. On May 5, 2025, Plaintiffs filed a Consent Motion for Leave to file a Second Amended Complaint which asserted the same causes of action but included additional allegations regarding the Certification. ECF 64. The motion for leave to amend remains pending; the proposed Second Amended Complaint at 64-1 has been treated as the operable one for purposes of this Motion to Dismiss.

Plaintiffs filed a Motion for Summary Judgment on June 5, 2025. 66-1. On June 27, 2025, the Supreme Court issued its opinion in *Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631, *1 (U.S. June 27, 2025) (universal injunctions likely exceed the equitable authority that Congress has given to federal courts). Based on this recent Supreme Court ruling, the Plaintiffs in this case lack standing to secure national, universal injunctive relief, as that relief exceeds the powers afforded to district courts. *Id*. The Court should therefore strike or modify the temporary stay issued on April 24, 2025.

In addition, the Court should deny Plaintiffs' Motion for Summary Judgment, and grant Defendants' Motion to Dismiss or for Summary Judgment as ED's issuance of the DCL and Certification are not reviewable under the APA, and do not violate Plaintiffs First or Fifth Amendment Rights.

## LEGAL STANDARDS

## I.    Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction.

Before a court may rule on the merits of a claim, it must first determine if "it has the jurisdiction over the category of claim in suit (subject [] matter jurisdiction)." *Sinochem Int'l Co.*

*Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-102 (1998)). Dismissal under Rule 12(b)(1) is proper when the Court lacks subject-matter jurisdiction to hear and decide the claims presented.  "The plaintiff has the burden of proving that subject matter jurisdiction exists." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).  Standing is a question of subject matter jurisdiction – "it is a "threshold question in every federal case" that asks "whether the plaintiff is [a] proper party to bring [a particular lawsuit]." *Coyne v. American Tobacco Co.*, 183 F.3d 488, 496 (6th Cir. 1999); *Raines v. Byrd*, 521 U.S. 811, 818 (1997).

## II.    Motions to Dismiss for Failure to State a Claim Under Rule 12(b)(6) or for Summary Judgment under Rule 56.

The legal sufficiency of a complaint can be tested by way of a motion to dismiss under Rule 12(b)(6) when the plaintiff fails to state a claim for relief. *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017). In analyzing a Rule 12(b)(6) motion, the court must view all well-pleaded allegations in the light most favorable to the plaintiff. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).  However, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-6 (2007).  A court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Glassman v. Arlington Cty.*, 628 F.D.A. 140, 146 (4th Cir. 2010).

Summary Judgment under Rule 56 is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Burwell*, No. GJH-15-852, 2015 WL 3442013, at *5 (D. Md. May 27, 2015) (citing *Roberts v. United States*, 883 F. Supp. 2d 56, 62–63 (D.D.C. 2012)).

## III.    APA Review

Under the APA, the Court may set aside agency action which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). APA review is highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). The court is not empowered to substitute its judgment for that of the agency." *Id.* (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). If the court finds that additional notice or further explanation is required, or agency has failed to sufficiently explain its rules, the proper course, is to remand to the agency for additional investigation or explanation. *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 930 (2025).

Judicial review under the APA is foreclosed if "the agency action of which plaintiff complains fails to raise a legal issue which can be reviewed by the court by reference to statutory standards and legislative intent." *Nat'l Fed'n of the Blind v. U.S. Abilityone Comm'n*, 421 F. Supp. 3d 102, 118 (D. Md. 2019), citing *Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 346 (4th Cir. 2001). When APA review is not available, Defendant is entitled to summary judgment. *Nat'l Fed'n of the Blind v. U.S. Abilityone Comm'n*, 421 F. Supp. 3d 102, 126 (D. Md. 2019).

## ARGUMENT

### I.    This Court Lacks Jurisdiction Because Plaintiffs Cannot Establish Standing.

Standing is a "threshold jurisdictional question" which must be addressed in order to determine the power of the court to entertain the suit. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998); *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The importance of establishing standing in a case seeking injunctive relief was underscored by the Supreme Court's recent decision in *Trump v. CASA*, which held that injunctive relief should only be provided only to the extent necessary to provide complete relief to each plaintiff in the case before the Court with standing to sue. 2025 WL 1773631, at *4. As such, to establish entitlement to injunctive relief in

this case, Plaintiffs *must each establish standing* to sue as an injunction cannot, as a general rule, bind someone who is not a party to the case. *Id*. at *6.

In addition, at the summary judgment stage, a plaintiff must point to specific evidence showing that it was directly affected by the challenged action. *Texas State LULAC v. Elfant*, 52 F.4th 248, 255 n.4 (5th Cir. 2022). Specifically, a plaintiff must present evidence showing that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiffs here fail to establish any of these three elements.

To establish injury in fact, a plaintiff must show that the defendant's action affects him or her in a "personal and individual way," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992), rather than being a "generalized grievance," *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024). A plaintiff must show more than a "possible future injury" -- that harm has actually occurred or is "certainly impending." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (citations omitted). The Supreme Court has emphasized that "threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citations omitted).

Where an association like ASA, AFT and AFT-MD assert "associational standing" to sue on behalf of their members, they must show "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted, nor the relief requested requires the participation of individual members in the lawsuit." *Tanner-Brown v. Haaland*, 105 F.4th 437, 447 (D.C. Cir. 2024) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

13

Plaintiffs cannot establish standing to sue on their own behalf or associational standing to sue on behalf of their members.

**A.  Plaintiffs cannot establish injury-in-fact as a matter of law.**

The importance of establishing standing in a case seeking injunctive relief was underscored by the Supreme Court's recent decision in *Trump v. CASA,* which held that injunctive relief should only be provided only to the extent necessary to provide complete relief *to each plaintiff in the case before the Court with standing to sue*. 2025 WL 1773631, at *4.[4]  Each *Plaintiff must each establish standing to sue* as an injunction cannot, as a general rule, bind one who is not a party to the case. *Id*. at *6.

At the summary judgment stage, a plaintiff must point to specific evidence showing that it was *directly affected* by the challenged action and has "(1) suffered an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiffs here cannot establish an injury in fact which is directly traceable to ED.

In the First Amendment context, to demonstrate injury in fact, a plaintiff may show that his First Amendment activities have been chilled. *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir.2011). However, subjective or speculative accounts of such a chilling effect are not sufficient. *Id*. Any chilling effect must be objectively reasonable. *Id*. Government action will be sufficiently

---

[4]    In its opinion, the Supreme Court noted that the trend toward national injunctions was not entirely partisan, "[b]y the end of the Biden administration, we had reached 'a state of affairs where almost every major presidential act [was] immediately frozen by a federal district court.' W. Baude & S. Bray, *Comment, Proper Parties, Proper Relief*, 137 Harv. L. Rev. 153, 174 (2023). The trend has continued: During the first 100 days of the second Trump administration, district courts issued approximately 25 universal injunctions." *Trump v. CASA*, 2025 WL 1773631, at *5.

chilling when it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights. 635 F.3d at 135.

In other words, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm [.]" *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972). *But see Mangual v. Rotger–Sabat*, 317 F.3d 45, 56 (1st Cir. 2003) (recognizing injury-in-fact when a plaintiff is chilled from exercising right to free expression or forgoes expression in order to avoid enforcement consequences). *See Cooksey*, 721 F.3d. 226, 236 (2013).

Here, the Plaintiffs claim injuries in the form of chilled speech and threat of prosecution caused by the Letter and Certification.[5] However, Plaintiffs' supporting evidence is insufficient to establish injury-in-fact as a matter of law because both categories of injury are speculative and objectively unreasonable.

First, there is no genuine issue as to whether any of the Plaintiffs are direct recipients of federal funding. They are not. Plaintiffs do not allege that the Membership Associations directly receive federal funds, and, despite Plaintiffs' claims to the contrary, District 4J is not a recipient of any federal funding. To the contrary, all of District 4J's funding comes from local revenue, or the state of Oregon. *See* 4J FY 26 Budget: https://-files.-smartsites.-parents-quare.com/-3396-/adopted_budget_fy26.pdf. at p. 9 (showing that 0% of state budget comes directly from federal sources). Indeed, Plaintiff 4J did not even allege that they received the Certification email; that is because they were sent to the federal funding recipients, the State of Oregon, or the Oregon

---

[5]    Plaintiffs Second Amended Complaint and Motion for Summary Judgment (ECF 64-1, 66) do not allege injuries caused by the FAQs or EndDEI portal. As the Court stated in its Memorandum Opinion, Plaintiffs characterize those as actions implementing the Letter. See ECF 60, Memo Op. at 16.

Department of Education, none of whom are a party to this case. 4J's indirect connection does not establish standing for purposes of Plaintiffs' Motion for Summary Judgment seeking a permanent injunction.

Given that none of the Plaintiffs have been asked to sign the Certification, they cannot establish standing in their own right through an "injury-in-fact." The Court has already recognized this with respect to District 4J it its earlier ruling. As the Court has pointed out in its Memorandum Opinion, the State of Oregon announced that it would not certify compliance, nor would it ask its school districts to do so. See ECF 60, at 17, n. 3. Since the Certification does not apply to AFT, AFT-MD, and ASA, they lack standing in their own right, and the same is true for their individual members. *See id.*

Plaintiffs' declarations also fail to show that the alleged enforcement actions are sufficiently imminent, that Plaintiffs will be the targets of such actions, and that they are fairly traceable to ED. *See id.* (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014). First, there is no prior history of the Department initiating enforcement actions against teachers, school districts, or institutions based on curriculum content.

Plaintiffs purport to include exhibits they contend provide support for their claim that the DCL has already resulted in "relevant enforcement actions," -- but none of the examples provided implicate First Amendment interests. *See* Exhibit 57. In fact, two of the examples, a May 5, 2025, letter to Harvard University from Secretary of Education Linda McMahon, and a May 19, 2025, DOJ Press Release, are not enforcement actions at all. Another example is a news report about a private organization submitting a report to ED of concerns about Gettysburg College allegedly setting a 20% diversity goal in its admissions; there are no documents in the record which suggest that ED ever initiated an investigation on the basis of that report, and the complaint submitted,

again, does not involve alleged infringement of a staff or faculty member's free speech with respect to curriculum or the classroom.  The remaining example references a press release announcing an ED Office of Civil Rights investigation into whether Thomas Jefferson High School's 2020 Admissions Policy discriminates on the basis of race; the investigation has nothing to do with the school's curriculum.  *See* Exhibit 57. In short, the evidence that Plaintiffs have provided fails to demonstrate the likelihood of future enforcement based on the content of their speech, or that the fear of such enforcement is substantial and that they face a realistic danger of sustaining a direct injury. *See California v. Texas*, 593 U.S. 659 (2021).

Moreover, the question of whether these Plaintiffs or their members or employees will ever be the subject of an enforcement action based on the DCL is entirely speculative.  In fact, the letter does not mandate any investigations or enforcement actions. See generally, DCL. As such, Plaintiffs' claimed injuries depend upon a speculative chain or possibilities and guesswork as to how ED will exercise its judgment given a specific set of facts; a speculative chain is insufficient. *See Clapper*, 568 U.S. at 410, 413.  Accordingly, the chain of events is too attenuated to show that the Letter will cause Plaintiffs to self-censor or that there is an objectively reasonable threat of future enforcement.

Plaintiffs plainly cannot show any cognizable direct injury traceable to the DCL or Certification. That jurisdictional defect precludes the Plaintiffs in this case from demonstrating standing with respect to any of the claims in this case.

## II.    Plaintiffs' APA Claims are Without Merit

### A.  The Title VI Documents Are Not Final Agency Actions

The APA directs courts to review "[a]gency action made reviewable by statute and final agency action."  5 U.S.C. § 704.  Unless agency action is made reviewable by statute, a plaintiff who fails to challenge final agency action thus lacks a cause of action under the APA. *See Reliable*

*Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) ("If there was no final agency action here, there is no doubt that appellant would lack a cause of action under the APA."). Final agency actions are those that (1) "mark the consummation of the agency's decision making process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation modified).

Guidance documents—like the Title VI Documents at issue here—do not satisfy *Bennett*'s two-part test for finality because such documents "neither announced a new interpretation of the regulations nor effected a change in the regulations themselves[,]" was "purely informational in nature[,]" and had "no binding effect . . ." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004); *see also Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013) ("[I]nterpretative rules or statements of policy generally do not qualify [as final agency action] because they are not 'finally determinative of the issues or rights to which [they are] addressed.'"); *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 352 F.3d 798, 807 (D.C. Circ. 2006) (holding that a policy statement set forth in an agency letter to regulated entities outlining the agency's automobile regional recall standards was not a final agency action under the APA.). Applying *Bennett*'s two-part test, the D.C. Circuit in *Holistic Candlers* held that FDA warning letters directing manufacturers to take prompt action to comply with their statutory obligations was not final agency action because they were an "informal and advisory" means of achieving "voluntary compliance" that did "not commit FDA to taking enforcement action." *Holistic Candlers & Consumer Ass'n v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012) (citations omitted). Nor did a Consumer Product Safety Commission letter indicating that a company's product likely presented a substantial product hazard and requesting "voluntary corrective action" constitute final

18

agency action because the letter carried no legal consequences even though "there may be practical consequences" of refusing "voluntary compliance with the agency's request for corrective action." *Id*. at 731–32.

So too here. The Title VI Documents are consistent with the well-established rule that agency guidance documents are not final agency action. The DCL expressly states it is meant to "provide clarity to the public regarding *existing* legal requirements under Title VI, the Equal Protection Clause, and other federal civil rights and constitutional principles." DCL at 1 n.2 (emphasis added); *see Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 228 (D.C. Cir. 2007) (noting that non-binding disclaimers are "relevant to the conclusion that a guidance document is non-binding"). Moreover, the DCL is explicit that it "does not have the force and effect of law and does not bind the public or create new legal standards." *Id*. As such, the DCL does not determine anyone's rights or obligations or have direct legal consequences.

The same is true for the FAQ, which anticipates questions that federal-funding recipients may have regarding the DCL and expressly notes that its "contents of this Q&A document do not have the force and effect of law and do not bind the public or impose new legal requirements." FAQ at 1 n.3. The purpose of the FAQ is not to *create* rules or policies. Rather, it seeks only to "provide clarity about *existing law* for the benefit of the public." *Id*. (emphasis added). Accordingly, the FAQ is not final agency action because it "creates no new legal obligations beyond those the [statute] already imposed." *Rhea Lana, Inc. v. Dep't of Labor*, 824 F.3d 1023, 1028 (D.C. Cir. 2016).

The same can be said about the Certification – it does not create any binding consequences independent from those that are *already* imposed by Title VI, ED's enforcement regulations and other applicable provisions governing recipients of federal funding. As such it too is not a final

agency action. Title VI and the regulations prohibit discrimination "on the ground of race color or national origin." 8 C.F.R. § 100.3. The Certification reiterates the longstanding requirements that, "[e]very application for Federal financial assistance . . . shall, as a condition to its approval and the extension of any Federal financial assistance, contain assurances that the program will be conducted . . . with all requirements imposed by . . . this part." 8 C.F.R. § 100.3(a)(1); *see also* Certification at 2 (quoting *Guardians Ass'n v. Civ. Serv. Comm'n of City of N.Y.*, 463 U.S. 582, 629–30 (1983) (Marshall, J. dissenting)); *cf. Grove City Coll. v. Bell*, 465 U.S. 555, 574 (1984) ("Since Grove City operates an 'education program or activity receiving Federal financial assistance,' the Department may properly demand that the College execute an Assurance of Compliance with Title IX."). Accordingly, the Certification is not final agency action merely because it seeks voluntary compliance with existing statutory and regulatory requirements and warns of consequences for refusing to comply. *See Reliable Automatic Sprinkler Co.*, 324 F.3d at 731.

Because the DCL and Certification do not determine rights or obligations or have direct legal consequences, Plaintiffs claims do not challenge a "final agency action" and thus fail to state a valid cause of action under the APA. *See Am. Tort Reform Ass'n*, 738 F.3d at 395.

### B.  The Title VI Documents Are Not Subject to Notice and Comment

An interpretive rule is "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quoting *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 99 (1995)). While legislative rules must go through notice and comment, the APA explicitly exempts interpretive rules from such procedures. 5 U.S.C. § 553(b)(4)(A) ("Except when notice or hearing is required by statute, this subsection does not apply . . . to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice[.]"); *see Perez*, 575 U.S. at 105

20

("the text of the APA makes plain: 'Interpretive rules do not require notice and comment.'" (quoting *Shalala*, 514 U.S. at 99).

Here, even if the DCL and Certification satisfy the APA's finality requirement—which they do not—they fit comfortably within the APA's definition of an "interpretative rule[s]." 5 U.S.C. §§ 553(b)(4)(A), (d)(2). An interpretive rule "advise[s] the public of the agency's construction of the statutes and rules which it administers[.]" *Perez*, 575 U.S. at 97 (quoting *Shalala*, 514 U.S. at 99). *See also Gen. Motors Corp v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) ("An interpretative rule simply states what the administrative agency thinks the statute means" in a way that "only reminds affected parties of existing duties."). Such rules do not have the force and effect of law, which distinguishes them from "legislative rules" that are subject to more rigorous procedures. *Id*. The purpose of interpretive rules is to provide notice to regulated entities of how an agency intends to exercise its enforcement discretion. *See Ctr. For Auto Safety, Inc. v. Nat'l Highway Traffic Safety Admin.*, 342 F. Supp. 2d 1, 24 (D.D.C. 2004), *aff'd*, 452 F.3d 798 (D.C. Cir. 2006). The DCL does just that: it reiterates the agency's interpretation of Title VI and other provisions of federal antidiscrimination laws. *See* DCL at 1 ('This letter explains and reiterates *existing legal requirements* under Title VI of the Civil Rights Act of 1964," (emphasis added)). This status is reaffirmed in the FAQ. FAQ at 1 n.3.

For the reasons just discussed, the DCL and Certification are, at most, interpretive rules exempt from notice and comment and cannot serve as the basis for an APA claim. *See Perez*, 575 U.S. at 105. [6]

---

[6]    Plaintiffs also claim that the DCL and Certification are "not in accordance with law" or exceed the agency's authority. However, they acknowledge that in 2023 when the SFFA decision was issued by the Supreme Court, ED issued a Dear Colleague letter and FAQ explaining how that administration would interpret and apply the case without any notice and comment, just as was done here. Similarly, they admit

III.  **Plaintiffs Constitutional Claims Do Not Establish an APA Violation or Set Forth Actionable Free-Standing Constitutional Claims.**

Plaintiffs contend that the Title VI Documents violate the APA as not in accordance with law, based on their claim that they violate their rights under the First and Fifth Amendments . Plaintiffs' standalone constitutional challenges also fail as a matter of law and should be dismissed for failure to state a claim.

### A.  The Title VI Documents Are Not Unconstitutionally Vague

The "[v]agueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment." *United States v. Williams*, 553 U.S. 285, 304 (2008). That doctrine recognizes two due process concerns. The first rests on a "fundamental principle" of "our legal system": laws "regulat[ing] persons or entities must give fair notice of conduct that is forbidden or required." *Karem v. Trump*, 960 F.3d 656, 664 (D.C. Cir. 2020) (citation omitted). To do so, the law must "provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). The second kind of vagueness arises if the law "authorizes or even encourages arbitrary and discriminatory enforcement." *Id.*

Typically, a plaintiff "cannot complain of the vagueness of the law as applied to the conduct of others[]" when he "engages in some conduct that is clearly proscribed[.]" *Williams*, 553 U.S. at 304 (citation omitted). That "requirement" is "relaxed[,]" however, "in the First Amendment context," where plaintiffs may "argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of . . . speech." *Id.* And cases involving speech require "rigorous

---

that states receiving federal funding have been asked to certify compliance with civil rights statutes in the past. *See* ECF 66.1 at 38, Exhs. 44, 45. Plaintiffs also contend the DCL and Certification violate the Department of Education Organization Act ("DEOA"), which prohibits ED control over curriculum and related programs.  20 U.S.C. § 3403(b). ECF 66.1 at 38.

adherence" to vagueness principles "to ensure that ambiguity does not chill protected speech." *FCC v. Fox Tel. Stations Inc*., 567 U.S. 239, 253–54 (2012). Still, neither "perfect clarity" nor "precise guidance" is "required"—even when "regulations . . . restrict expressive activity." *William*s, 553 U.S. at 304 (citation omitted). So, a regulation may pass constitutional muster if it is "marked by flexibility and reasonable breadth[] rather than meticulous specificity." *Grayned v. City of Rockford*, 408 U.S. 104, 111 (1972) (internal quotation marks and citation omitted). In the context of a *facial* challenge, a plaintiff must also show that the provisions are not "valid 'in the vast majority of [their] intended applications.'" *Hill*, 530 U.S. at 733 (quoting *United States v. Raines*, 362 U.S. 17, 23 (1960)).

Plaintiffs contend the DCL is vague because it fails to define all of the terms used in the letter and include objective standards for assessing discrimination that would violate Title VI. Plaintiffs contend that since the "dictionary definition" of "diversity, equity, and inclusion" is broad and value-laden, it is necessarily a subjective assessment, and that further explanation is therefore required. Pl. MSJ at 61.1 at 49. This is plainly inconsistent with both the practices of ED and the additional information provided in the FAQ, which provides States and other federal funding recipients with additional specifics about the DCL.

The DCL "clarif[ies] and reaffirm[s] the nondiscrimination obligations of schools and other entities that receive federal financial assistance" and make clear that "discrimination on the basis of race, color, or national origin, has been, and will continue to be illegal" and, consequently, "educational institutions may neither separate or segregate students based on race, nor distribute benefits or burdens based on race." DCL at 2. Nothing in that pronouncement is new. Emphasizing that Title VI forbids racial discriminatory practices in educational settings, the DCL provides a simple test: "[i]f an educational institution treats a person of one race differently than it treats

another person because of that person's race, the educational institution violates the law." *Id*. This test allows "people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill*, 530 U.S. at 732. Plaintiffs raise several vagueness theories, none of which plausibly states a claim under the Fifth Amendment.

For that reason, a "vagueness challenge will fail" so long as the guidance provides a "comprehensible normative standard," even if "imprecise." *Nat'l Urb. League v. Trump*, No. CV 25-471 (TJK), 2025 WL 1275613, at *19 (D.D.C. May 2, 2025) (citation omitted); *see United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) ("[W]e are not concerned with vagueness in the sense that the term requires a person to conform his conduct to an imprecise but comprehensible normative standard . . ." (cleaned up)). Against that backdrop, none of the complained-of terms and language relied on by Plaintiffs in the Second Amended Complaint are "so vague that it fails to give ordinary people fair notice" of the conduct that the Title VI Documents prohibit. *Johnson v. United States*, 576 U.S. 591, 595 (2015).

Again, the DCL's generalized concerns, along with the FAQ, provide a comprehensible normative standard by contextualizing the meaning of those terms. DCL at 2 ("If an educational institution treats a person of one race differently than it treats another person because of that person's race, the educational institution violates the law."). Any alleged confusion over the scope of the term "DEI" does not make the DCL unconstitutionally vague. In fact, the FAQ explains that "whether an initiative constitutes unlawful discrimination does not turn solely on whether it is labeled 'DEI' or uses terminology such as 'diversity,' 'equity,' or 'inclusion.'" FAQ at 6. The FAQ in fact makes clear that the question of whether a school or program runs afoul of Title VI is not governed by the use of the term "DEI" – rather, the touchstone is whether that program discriminates on the basis of race under well-established Title VI principles. Similarly, the DCL's

24

test, along with its discussion about *SFFA*, provides reasonable guidance as to the term "racial preferences" or "race-based decision-making."

Plaintiffs also suggest that the DCL and Certification are unconstitutionally vague because the guidance could result in arbitrary enforcement but Plaintiffs fail to provide specific instances of such enforcement that have actually occurred with respect to their members or staff. Such apparent "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack when the provisions are valid in the vast majority of their intended applications." *Nat'l Urb. League*, 2025 WL 1275613 at *19 (citing *Hill*, 530 at 733) (cleaned up).

Plaintiffs also contend that their concerns about arbitrary enforcement are heightened by the reference to liability under the False Claims Act ("FCA") in the Certification. However, the Certification requires *funding recipients* (not individual teachers or staff members) to certify their compliance with existing legal obligations under federal antidiscrimination laws—including Title VI, 42 U.S.C. § 2000d-1—laws that are binding independent of any certification requirement. It has been true for decades that every applicant for and recipient of federal funds must provide assurances that it will comply with Title VI and all requirements imposed pursuant to any related regulations. As such, the requirement does not create any vague confusing or new requirements but merely restates existing obligations.

In fact, a similar claim was recently rejected by Judge Kelly in the District of Columbia in *Nat'l Urb. League v. Trump*, No. CV 25-471 (TJK), 2025 WL 1275613, at *19 (D.D.C. May 2, 2025). Judge Kelly rejected a claim by an organizational plaintiff that a certification requirement in an executive order[7] was unconstitutionally vague under the Fifth Amendment. *Id.* at *20. The

---

[7]    *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Exec. Order No. 14,173, 90 Fed. Reg. 8633 (Jan. 21, 2025).

Court rebuffed the organizational plaintiff's argument that any vagueness stemmed from the difficulty of determining "whether a DEI program violates federal antidiscrimination law[.]" *Id*. Seeing past the term "DEI," the Court concluded that the certification requirement at issue in that case "is straightforward[.]" *Id*. The inquiry, it reasoned, boiled down to whether the plaintiff was "violating federal anti-discrimination law[s]" and not use of the term DEI. *Id*.  Given the case law and other information describing the definition of race discrimination, the challenging parties' purported "difficulty" determining how it would be defined "does not render the provision unconstitutionally vague." *Id*. (citing *Williams*, 553 U.S. at 306). That same reasoning applies here.

The Certification plainly states that "[t]he use of certain DEI practices can violate federal law" and "[t]he continued use of *illegal* DEI practices"—*i.e.* those that violate Title VI—"may subject the individual or entity using such practices to serious consequences . . ." Certification at 3 (emphasis added).  Both the DCL and FAQ make clear that the use of the term DEI is not a violation in itself, only unlawful discrimination under Title VI presents a problem.  While it is true that the definition of discrimination in an education, employment or public accommodation context does evolve with agency guidance and court precedence, the fact that an issue is complex or hard does not render it unconstitutionally vague.  A provision is vague "not when that determination is hard" but "when there is indeterminacy as to precisely what the fact is that triggers the provision." *Nat'l Urb. League*, 2025 WL 1275613 at *19 (cleaned up) (citing *Williams*, 553 U.S. at 306).

Moreover, the Certification—on its face—makes clear that the False Claims Act imposes liability on anyone who *knowingly submits a false claim* to the Government. Certification at 4. That scienter requirement, along with the requirement that a claim for payment be submitted, "helps to ensure that innocent mistakes made in the absence of binding interpretive guidance are not converted into FCA liability[.]" *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287

(D.C. Cir. 2015); *see also id.* at 288 (the FCA does not "reach those claims made based on reasonable but erroneous interpretations of a defendant's legal obligations"). The FCA's heightened scienter requirement further ameliorates any vagueness concerns in connection to the Certification. *Vill. of Hoffman Ests.*, 455 U.S. at 499 ("And the Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed.").[8]

Because the DCL and Certification clearly describe a type of conduct that Title VI prohibits—discriminatory treatment based on race—it is not vague and does not fail to provide reasonable notice or increase the risk of arbitrary enforcement. Plaintiffs' cause of action under the Fifth Amendment, therefore, fails as a matter of law.

### B. The Title VI Documents Do Not Violate the First Amendment.

The First Amendment prohibits governments from "abridging the freedom of speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting U.S. Const. amend. I). The Supreme Court has "reject[ed] the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State." *Regan v. Tax'n with Representation of Wash.*, 461 U.S. 540, 546 (1983) (internal quotation marks and citation omitted). In other words, "even where the Constitution prohibits coercive governmental interference with specific individual rights, it does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom." *Lyng v. UAW*, 485 U.S. 360, 369 (1988) (internal quotation marks and citations omitted).

---

[8] Furthermore, the Supreme Court has held that materiality is assessed using a comprehensive inquiry based on the relevant conduct and "looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016) (citation omitted). (quotation marks and alterations omitted) 136 S. Ct. 2002 (citing 31 U.S.C. § 3729(b)(4)).

That is why the "refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity." *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 212 (2003) (plurality opinion) (quoting *Rust v. Sullivan*, 500 U.S. 173, 193 (1991)).  And for that reason, the typical "recourse" for a "party" that "objects to a condition on the receipt of federal funding" is "to decline the funds[.]" *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).

### i.   The Title VI Documents Are Not Facially Overbroad

The Plaintiffs here allege a facial First Amendment challenge.  Consequently, they must show that "a substantial number of" the Title VI Documents' "applications are unconstitutional, judged in relation to [their] plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 708 (2024) (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)). This standard is "rigorous." *Id*. at 723.

The Supreme Court recognize[s] a "First Amendment right to 'receive information and ideas.'" *Murthy*, 603 U.S. at 75; *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1976). The Court "generally treats the rights of [speakers and listeners] as 'reciprocal.'" *Libertarian Nat'l Comm., Inc. v. FEC*, 924 F.3d 533, 560 (D.C. Cir. 2019) (en banc) (Katsas, J., concurring in part) (quoting *Va. State Bd. of Pharmacy*, 425 U.S. at 757).  Put simply, "the right of one party to speak implies the right of another party to listen." *See id*. But, again, ED's Title VI Documents are concerned with programs that engage in "racial discrimination in public education[.]" *SFFA*, 600 U.S. at 204 (citing *Brown v. Board of Education*, 349 U.S. 294, 298 (1955)). For a First Amendment violation to arise, Plaintiffs would have to demonstrate that the DCL and Certification impermissibly restrict "*protected speech*." *Nat'l Urb. League*, 2025 WL 1275613 at *1. Since the DCL and Certification prohibit and seek to confirm compliance with title VI's antidiscrimination provisions, and "there is no constitutional right to operate DEI programs

28

that violate federal antidiscrimination law." *Nat'l Urb. League*, 2025 WL 1275613 at *24. To the contrary, as the Eleventh Circuit has observed, "the Supreme Court has clearly held that the First Amendment does not protect the very act of discriminating on the basis of race." *Am. All. For Equal Rights v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 777 (11th Cir. 2024) (discussing *Runyon v. McCrary*, 427 U.S. 160 (1976) and *R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992)); *see also Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 309 (D. Mass. 2024) ("The court consequently is dubious that Harvard can hide behind the First Amendment to justify avoidance of its Title VI obligations."); *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1185–92 (6th Cir. 1995) (rejecting First Amendment argument that firing educator for his harassing use of racial epithet violated his free speech).

Based on the plain language of the DCL and Certification, which remind recipients of federal funding of their existing obligations to comply with Title VI, they are not facially invalid.

### ii. The Title VI Documents Are Not Viewpoint Discriminatory or Impermissibly Coercive.

The DCL does not "ban" any speech expressing any particular viewpoint. Rather, it describes a scope of *conduct* has been long prohibited by Title VI. It is well settled that denying a student an educational opportunity on the basis of race amounts to discrimination, *see SFFA*, 600 U.S. 181, and discrimination is illegal conduct, not protected speech, *see United States v. Miselis*, 972 F.3d 518, 535 (4th Cir. 2020) ("The First Amendment protects speech (the sine qua non of expression) as opposed to mere conduct."). It is no defense that creating a racially hostile environment or engaging in racial harassment may involve speaking. After all, "[s]peech is not protected by the First Amendment when it is the very vehicle of the crime itself." *Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233, 248 (4th Cir. 1997) (citation omitted) *see also Dambrot v. Cent.*

29

*Michigan Univ.*, 55 F.3d 1177 (6th Cir. 1995) (rejecting First Amendment argument that firing teacher for his harassing use of racial epithet violated his free speech).

When speech is an integral part of a transaction involving conduct the government otherwise is empowered to prohibit, such "speech acts" may be proscribed without much, if any, concern about the First Amendment, since it is merely incidental that such "conduct" takes the form of speech. *See Rice*, 128 F.3d at 248 ("[T]he First Amendment poses no bar to the imposition of civil (or criminal) liability for speech acts…"); *Gartenberg*, 2025 WL 401109, at *12 ("[W]hen a hostile environment claim is based on both protected speech and unprotected conduct, a court must still consider the entire record in determining whether the harassment was discriminatory in nature.").

While Plaintiffs' arguments focus heavily on academic freedom, they overlook the important fact that *racial discrimination* is not part of academic freedom, and "free speech does not grant teachers a license to say or write in class whatever they may feel like." *Mailloux v. Kiley*, 448 F.2d 1242, 1243 (1st Cir. 1971). Indeed, as recipients of federal funds overseen by ED,

> colleges and universities are legally required to maintain a hostile-free learning environment and must strive to create policies which serve that purpose. While a professor's rights to academic freedom and freedom of expression are paramount in the academic setting, they are not absolute to the point of compromising a student's right to learn in a hostile-free environment. To hold otherwise under these circumstances would send a message that the First Amendment may be used as a shield by teachers who choose to use their unique and superior position to [] harass students secure in the knowledge that *whatever* they say or do will be protected.

*Bonnell v. Lorenzo*, 241 F.3d 800, 823-24 (6th Cir. 2001).

At the same time, as ED's FAQ document makes clear, schools' implementation of policies to protect against race-based hostile environment harassment must respect First Amendment rights. FAQ at 6 ("[ED] enforces federal civil rights law consistent with the First Amendment of the U.S. Constitution. Nothing in Title VI, its implementing regulations, or the Dear Colleague Letter

requires or authorizes a school to restrict any rights otherwise protected by the First Amendment."). To the extent Plaintiffs or their members fear that educational institutions will take actions *not* required by Title VI or ED, based on an incorrect understanding of the DCL, Plaintiffs' complaints about potential infringement on academic freedom by third parties should be directed at those institutions, not to ED. Because discriminatory conduct effectuated by words is neither protected speech nor an aspect of academic freedom, Plaintiffs' viewpoint censorship arguments lack merit.

The suggestion that the DCL, FAQ or certification requirement violate the First Amendment through coercion of a third party is also wrong. The government is allowed to condition school funding on nondiscrimination. Indeed, the Supreme Court has long held that the government may condition the receipt of funds on "compliance by the recipient with federal statutory and administrative directives." *S. Dakota v. Dole*, 483 U.S. 203, 206 (1987) (citation omitted). The government is also allowed to express its own viewpoint; "it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). For example, the expression of ED's views that concepts like structural racism are "toxic[]," DCL at 1, does not violate the free-speech rights of citizens who hold an opposite view.[9] *See Walker*, 576 U.S. at 207 ("[I]t is the democratic electoral process that first and foremost provides a check on government speech."). More importantly, the DCL does not threaten enforcement action against educational institutions that take a contrary view; it simply promises to "vigorously enforce the law on equal terms" under the principles of *SFFA*. DCL at 3. This is the same longstanding commitment to Title VI and Equal

---

[9]    The same is true of the online complaint portal which expresses ED's viewpoint that DEI is "divisive" and leads to "indoctrination." Regardless of ED's views on DEI programs generally, the portal only solicits reports of "illegal discriminatory practices at institutions of learning." *See* U.S. Dep't of Educ., https://perma.cc/M9QD-7DUX.

Protection that ED has always held. *See* 2023 DCL at 3 ("We close by noting our continued commitment to vigorous enforcement of Titles IV and VI of the Civil Rights Act of 1964 . . .. We will continue to use all enforcement tools at our disposal.").

With respect to enforcement, the DCL, merely explains ED's understanding of what Title VI requires of federal funding recipients.  As the FAQs emphasize, ED's evaluation of whether a recipient is discriminating on the basis of race in its programs or activities "depends on the facts and circumstances of each case," FAQ at 5.  Whatever ED's views of DEI programs generally, ED has made quite clear that its *enforcement* of Title VI will be based on whether schools are discriminating based on race, and not on any other factor. *Id.*  Since the DCL only implicates enforcement insofar as it explains ED's understanding of Title VI's requirements, it does not violate the First Amendment.

## IV.    Plaintiffs are Not Entitled to The Remedies they Seek, and Any Relief Awarded by the Court in Plaintiffs' Favor Should be Limited to the Parties.

Plaintiffs seek an order vacating the DCL and Certification, a declaration finding they violate the APA, and a permanent injunction. They have not shown they are entitled to any of the relief they seek since they lack standing, the Title VI documents are not final agency actions and are not subject to judicial review under the APA, and they have not demonstrated that the actions

challenged provide any more than an amorphous fear of indirect action that might violate their Fifth or First Amendment rights.

In considering the proper scope of its preliminary remedy in this case, the Court previously rejected the Defendants' argument that any preliminary relief should be limited to the parties in this case, finding that premise to be inconsistent with then extant Supreme Court law. ECF 60 at 48. The Court then issued a nationwide, universal stay of the DCL's effective date because of its procedural and substantive defects. *Id.* at 48.

A universal stay exceeds the proper scope of an injunction under the recent holding set forth in *Trump v. CASA*, which concludes that federal courts generally lack authority to issue injunctive relief for non-parties. *Trump v. CASA, Inc.*, 2025 WL 1773631, at *13. In *CASA*, after analyzing the power of the courts and the standing of the parties, the Supreme Court narrowed the district court injunctions "to the extent that [they] are broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at *15. The Court then ordered each of the lower courts to "move expeditiously" to limit the injunctions in a manner consistent with the Court's holding. *Id.*

As discussed in detail above, none of the parties before the Court has standing, as they are not recipients of federal funding, and they have not suffered direct harm. None are entitled to relief. Should the Court be inclined to grant some kind of relief in Plaintiffs' favor, relief should be limited to District 4J, which the Court concluded in its earlier Opinion might be able to establish standing under then-current precedent applicable to motions for preliminary injunction.

Plaintiffs request for relief also exceeds the scope of the relief that could reasonably arise under the APA. They have asked for an order declaring that certain activities be defined in a particular way, not just for the purposes of the recent ED guidance, and the parties to this case, but

presumably, for all educational institutions, nationwide. They seek an order from this Court holding that:

4) Activities, policies, and programs concerning diversity, equity, inclusion, or social justice are not per se or presumptively illegal under Title VI or the Equal Protection Clause;

5) Curriculum and classroom speech concerning race, diversity, equity, inclusion, or social justice are not per se or presumptively illegal under Title VI or the Equal Protection Clause; and

6) Race neutral means of increasing diversity are not per se or presumptively illegal under Title VI or the Equal Protection Clause.

ECF 66-2, at 2. This relief, like the other relief requested, clearly goes well beyond what is required to address the rights of the parties with standing in this case and seeks an advisory opinion that would affect dozens of school systems, universities and other institutions. That kind of challenge has not been presented here and would be outside the scope of proper relief in this case. If the Court determines that additional procedural steps are required and that the DCL or Certification should be withdrawn, modified, or republished after complying with certain procedures, Defendants respectfully request that any relief be so limited.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' Motion for Summary Judgment, grant Defendants' Motion to Dismiss or in the alternative, grant summary judgment in favor of Defendants.

Dated:   June 30, 2025                                                  Respectfully submitted,

                                                                       Kelly O. Hayes
                                                                       United States Attorney


                                                       By:  _____/s/_____
                                                                       Ariana Wright Arnold
                                                                       DMD Bar No. 23000

Charles R. Gayle
DMD Bar No. 14706
Assistant United States Attorneys
36 S. Charles St., 4th Floor
Baltimore, Maryland 21201
Ariana.Arnold@usdoj.gov
(410) 209-4813 (direct)
charles.gayle@usdoj.gov
(410) 209-4845 (direct)

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

The forgoing Response was efiled via the Court's CM-ECF system and thereby served on

counsel of record.

/s/_____
Charles R. Gayle
Assistant United States Attorney

35