# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## BALTIMORE DIVISION

AMERICAN FEDERATION OF TEACHERS
555 New Jersey Avenue NW
Washington DC 20001

AMERICAN SOCIOLOGICAL ASSOCIATION
1717 K Street NW, Suite 900
Washington DC 20006

AMERICAN FEDERATION OF TEACHERS-
MARYLAND
21 Governors Court, Suite 120
Windsor Mill, MD 21244

EUGENE SCHOOL DISTRICT 4J
200 N. Monroe Street
Eugene OR 97402

    *Plaintiffs,*

     *vs.*

U.S. DEPARTMENT OF EDUCATION
400 Maryland Avenue, SW
Washington, DC 20202

LINDA MCMAHON, in her official capacity as
Secretary of Education
for the Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

CRAIG TRAINOR, in his official capacity as
Acting Assistant Secretary for the Office for Civil
Rights,
Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

    *Defendants.*

**Case No. 25-cv-00628**
**Jury Trial Requested**

## PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Education is the gateway to opportunity in the United States. It drives individual prosperity and national economic growth and is the promise offered by the American Dream. Education is also "the very foundation of good citizenship." *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483, 493 (1954). It is a critical component of a functional democracy and the success of our society.

2.      Expansion of access to education has been a critical part of our nation's march towards greater opportunity. Though gradual and uneven, our country has expanded universal access to free education, from the establishment of the first public schools in the original colonies, to overturning "separate but equal," in *Brown v. Board of Education*, to passing the Individuals with Disabilities Education Act. Equal access to education is central to creating a vibrant society, economy, and democracy.

3.      Plaintiffs, and countless schools, organizations, and individuals across the country, recognize diversity is a critical ingredient to fostering intellectual curiosity and educational attainment. Schools, from pre-K to college, are where we learn about our world and each other. Students not only acquire knowledge and develop skills, but also wrestle with hard truths and engage with those who may have different perspectives. Schools in the United States are not only engines to create scholars, they also create community. Innovation, entrepreneurship, and the arts are born where ideas are sparked through debate and not stifled through homogeny.

4.      Equal access to education means that all students are able to obtain a high-quality education in a safe learning environment. The protection of civil rights laws, embodied in the

Fourteenth Amendment and civil rights statutes, has been essential to improving equal access to education in the United States for students from all backgrounds and all abilities.

5.     On February 14, 2025, the U.S. Department of Education Office for Civil Rights (hereinafter "OCR") published a Dear Colleague Letter that purports to only "reiterate[] existing legal requirements" related to nondiscrimination based on race, color, or national origin under Title VI of the Civil Rights Act of 1964 (the "Letter").

6.     But that is not so. This Letter radically upends and re-writes otherwise well-established law. Publication of related "Frequently Asked Questions" on March 1, 2025 ("the FAQs")—while more moderate in tone and less categorical in its attempted clarifications—does not change the intent or impact of the Letter.

7.     Contrary to the Letter's suggestions, no federal law prevents teaching about race and race-related topics, and the Supreme Court has not banned efforts to advance diversity, equity, and inclusion in education. The U.S. Department of Education ("Department") is attempting to establish a new legal regime when it has neither the lawmaking power of Congress nor the interpretative power of the courts.

8.     This effort must be viewed in the context of the administration and Department's other statements related to education: the issuance of an Executive Order "Ending Radical Indoctrination in K-12 Schooling,"[1] the cancellation of more than $220 million in capacity-building grants because grantees "have been forcing radical agendas onto states and systems, including race-based discrimination,"[2] the termination of $600 million in grants that the

---

[1] Exec. Order, Ending Radical Indoctrination in K-12 Schooling, https://perma.cc/2LM4-FL4S (2025).
[2] Press Release, U.S. Dep't of Education, U.S. Dep't of Education Cancels Divisive and Wasteful Grants under the Comprehensive Centers Program (Feb. 19, 2025), https://perma.cc/T3T7-L533.

Department said included "inappropriate and unnecessary topics" such as "Diversity, Equity, and Inclusion (DEI); social justice activism; 'anti-racism,' and instruction on white privilege and white supremacy,"[3] the cancellation of more than $350 million in contracts the Department states are "ideologically driven" (using as an example a grantee that advised a focus on equity),[4] the termination of $33 million in grants to Equity Assistance Centers because they "supported divisive training in DEI, Critical Race Theory, and gender identity,"[5] the issuance of a memo by the U.S. Department of Justice that threatens criminal investigations into policies related to "diversity, equity and inclusion,"[6] and the publication of a press release, three days after the inauguration, announcing the actions the Department has taken "to eliminate harmful Diversity, Equity, and Inclusion (DEI) initiatives" in an effort to deprioritize "divisive ideology in our schools."[7]

9.      The Letter misrepresents the state of the law under Title VI and the Constitution following the Supreme Court's 2023 decision, *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 801 (2023) ("*SFFA*"), regarding the consideration of race in college admissions. The Letter also represents a stark change from the Department's past interpretations of Title VI and the Constitution after *SFFA*.

10.     The Letter fails to provide definitions and objective standards for assessing discrimination in violation of Title VI, or for assessing what conduct is lawful. Thus, its

---

[3] Press Release, U.S. Dep't of Education, U.S. Department of Education Cuts Over $600 Million in Divisive Teacher Training Grants (Feb. 17, 2025), https://perma.cc/E9XJ-K6ZQ.
[4] Press Release, U.S. Department of Education Cancels Additional $350 Million in Woke Spending (Feb. 13, 2025), https://perma.cc/55P4-UJN8.
[5] Press Release, U.S. Department of Education Cancels Additional $350 Million in Woke Spending (Feb. 13, 2025), https://perma.cc/55P4-UJN8.
[6] Memorandum from the Attorney General on Ending Illegal DEI and DEIA Discrimination and Preferences (Feb. 5, 2025), https://perma.cc/N8FR-EWH7.
[7] Press Release, U.S. Dep't of Education, U.S. Department of Education Takes Action to Eliminate DEI (Jan. 23, 2025), https://perma.cc/8PJE-Q62L.

references to discrimination and nondiscrimination are too vague to give clear notice of what conduct is supposedly prohibited.

11.     The Letter suggests, however, that a wide variety of core instruction, activities, and programs that schools, from pre-kindergarten through post-graduate education, use to teach and support their students now may constitute illegal discrimination.

12.     For example, the Letter appears to restrict the teaching of history and other subjects that acknowledge "systemic and structural racism," claiming that such instruction is discriminatory. It is not clear how a school could teach a fulsome U.S. History course without teaching about slavery, the Missouri Compromise, the Emancipation Proclamation, the forced relocation of Native American tribes, the laws of Jim Crow, *Brown v. Board of Education*, the internment of Japanese Americans during World War II, or the Civil Rights Acts, the Fair Housing Act, and the Voting Rights Act without running afoul of this prohibition.

13.     Likewise, the Letter discourages and appears to restrict voluntary associations or student affinity groups organized around identity, such as a Black Student Union. These groups are open to all yet provide programming to support and amplify the lived experiences of students or faculty who are members of a particular racial demographic.

14.     The Letter appears to ban all programming in support of Diversity, Equity, and Inclusion ("DEI"), again despite the fact that such programming is lawful and previous presidential administrations of George W. Bush, Barack Obama, Donald Trump, and Joe Biden have supported such efforts.

15.     Finally, despite invoking the Supreme Court's 2023 decision on college admissions, the Letter goes well beyond that holding and states that many legal, evidence-based,

and well-accepted ways to foster inclusivity and increase diversity of all types are nevertheless considered discriminatory by this administration.

16.     The Letter, if implemented, would have two devastating impacts on schools. First, it would undermine schools as a training ground for informed, prepared citizens by denying students opportunities to hone critical thinking skills and expand their world views by confronting new or opposing viewpoints. And second, it would hamper efforts to further equal access to education, and the promise of opportunity, that have been a central tenet of the United States since our founding.

17.     This Letter is an unlawful attempt by the Department to impose this administration's particular views of how schools should operate as if it were the law. But it is not. Title VI's requirements have not changed, nor has the meaning of the *SFFA* decision, despite the Department's views on the matter.

18.     The Letter states that the Department will "assess compliance . . . beginning no later than [February 28]"—including the explicit threat of loss of federal funding. This Letter will immediately and irreparably harm schools, educators, students, and communities around the country at all levels by requiring them to comply with guidance that violates the First Amendment, the Fifth Amendment due to its vagueness, and the Administrative Procedure Act in multiple ways.

19.     On April 3, 2025, the Department of Education took another step to dramatically, and impermissibly, enforce the Department's new interpretation of Title VI: notifying state education agencies (SEAs) that within 10 days they, and every school district (also "local education agencies" or "LEAs") in their jurisdiction, must certify compliance with the Department's interpretation of Title VI and *Students for Fair Admission v. Harvard*.

20.     The Department failed to follow the appropriate process for issuing this Certification, including failing to follow the Paperwork Reduction Act. For that, and many other reasons, the Certification violates the APA, chills protected expression and association, imposes an unlawfully vague and overbroad requirement, and threatens to enforce yet another impermissible condition on federal funding.

## PARTIES

21.     **Plaintiff American Federation of Teachers ("AFT")**, an affiliate of the AFL-CIO, is a membership organization representing 1.8 million members, who reside in every U.S. state, the District of Columbia, Puerto Rico, Guam, and the U.S. Virgin Islands and who are employed as pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals. AFT's purpose is to promote fairness, democracy, economic opportunity, and high-quality public education, healthcare, and public services for students, their families, and communities their members serve. AFT does so by ensuring its members receive fair pay and benefits for their critical work, and by fighting for safe working conditions that also benefit students, patients and all those who use public services. Helping children and students is at the core of AFT's mission. So too is the economic security and dignity of AFT's members and their families. AFT is headquartered in Washington, DC.

22.     **Plaintiff American Sociological Association ("ASA"),** founded in 1905, is the national professional membership association for sociologists and others who are interested in sociology and the largest association of its kind in the world with about 9,000 members teaching and conducting research in the U.S. and abroad. Its mission is to serve sociologists in their work,

advance sociology as a science and profession, and promote the contributions and use of sociology to society. ASA members include students, scholars, and teachers working in a full range of educational institutions, and people employed in government agencies and nonprofit and private sector organizations.

23.    **Plaintiff AFT- Maryland**, an affiliate of the American Federation of Teachers, AFL-CIO, represents more than 18,000 members in the State of Maryland. Its members include local unions that represent pre-K through 12th grade teachers, paraprofessionals and other school-related personnel, and higher education faculty and professional staff.

24.    **Plaintiff Eugene School District 4J ("District 4J")** is a K-12 public school district in Oregon's southern Willamette Valley. It spans 155 square miles. Approximately 85% of the city of Eugene lies within the boundaries of District 4J, as does the town of Coburg, and a part of Linn County. The school district serves approximately 16,000 students through 19 elementary schools, eight middle schools, four comprehensive high schools, and one alternative high school. These students include those at five publicly funded charter schools that are separate legal entities but receive funds through the Eugene School District 4J. Approximately 35% of students in District 4J are Black, Indigenous, Latino/a, or otherwise people of color.

25.    **Defendant U.S. Department of Education** is a federal agency headquartered in Washington, DC, at 400 Maryland Avenue, SW, Washington, DC 20202.

26.    **Defendant Linda McMahon** is the Secretary for Education. She is sued in her official capacity.[8]

27.    **Defendant Craig Trainor** is the Acting Assistant Secretary for Civil Rights at the Department of Education. He is sued in his official capacity.

---

[8] Pursuant to Fed. R. Civ. P. 25(d), Secretary McMahon has been substituted as a party for Denise L. Carter, who was Acting Secretary when this litigation was originally filed.

## JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction over this matter because the claims arise

under the Constitution and laws of the United States, *see* 28 U.S.C. § 1331, and because the

Defendants are United States officials. 28 U.S.C. § 1346(a)(2).

29.     This Court has the authority to enter a declaratory judgment and to provide

preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of

Civil Procedure, under Title 28, Sections 2201 and 2202 of the United States Code, and under

the All Writs Act.

30.     Venue lies in this District because Plaintiff AFT-Maryland is headquartered in

this judicial district and each defendant is an agency of the United States or an officer of the

United States sued in his or her official capacity. 28 U.S.C. § 1391(e)(1).

## LEGAL BACKGROUND

### *Title VI of the Civil Rights Act of 1964*

31.     Title VI of the Civil Rights Act of 1964 provides:

> No person in the United States shall, on the ground of race, color, or national
> origin, be excluded from participation in, be denied the benefits of, or be
> subjected to discrimination under any program or activity receiving Federal
> financial assistance.

42 U.S.C. § 2000d. OCR enforces Title VI for all recipients of federal funds from the

Department. *See id.*; *id.* § 2000d-1; *see also* 34 C.F.R. § 100 *et seq.* (Title VI implementing

regulations for the Department). The vast majority of all schools in the country receive some

federal funds and are therefore subject to Title VI.

32.     OCR conducts rulemaking, issues policy guidance, conducts compliance reviews

and investigates complaints to ensure recipients comply with federal civil rights laws, including

Title VI. *See generally* 42 U.S.C. § 2000d.

***The Supreme Court's 2023 Decision Regarding Race In College Admissions***

33.     On June 29, 2023, the Supreme Court issued decisions in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College* and *Students for Fair Admissions, Inc. v. University of North Carolina* ("UNC"), 600 U.S. 181 (2023) (together, "*SFFA*"). The Supreme Court held that Harvard and UNC's practice of using an applicant's racial identity as a formal criterion during the admissions process in undergraduate admissions was a violation of the Fourteenth Amendment's Equal Protection Clause and Title VI of the Civil Rights Act of 1964 because the Court found that the universities' stated interests were not sufficiently compelling or narrowly tailored to justify the "race-based admissions programs" at issue.

34.     The Court's decision did not have the far-reaching effect Defendants claim. It did not extend outside of higher education admissions at all, such as to admission at K-12 schools or any other aspect of K-12 schools.[9] It did not extend beyond race-based programs at all, leaving untouched the law on race-neutral programs that is simply beyond the scope of the *SFFA* decision. Nor did it change the law in any other area of civil rights with respect to education. Yet relying on that very decision, the Department claims many things within these contexts are now unlawful.

35.     Following the *SFFA* decision, the Department issued multiple guidance documents on how schools could continue to support diversity in education, consistent with the opinion, one issued jointly with the Department of Justice.[10] In this guidance, the Department

---

[9] The Court also recognized that it might not even extend to all higher education admissions, if there were other unique factors at play, such as at military academies. *Id*. at 213 n.4. The consideration of race in admission or assignment to K-12 schools is governed by a distinct framework, not by *SFFA*. *See Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007) ("*Parents Involved*").

[10] U.S. Dep't of Educ., *Questions And Answers Regarding The Supreme Court's Decision In Students For Fair Admissions, Inc. v. Harvard College And University Of North Carolina* (Aug.

advised schools on *lawful* approaches to increasing diversity that were not affected by *SFFA*.
Together, the guidances make clear that diversity and inclusion policies and practices are not
inconsistent with existing anti-discrimination law.

### The First Amendment's Protections for Free Speech and Free Association

36.     The First Amendment provides all Americans with essential freedoms, including
the freedom of speech and the right to assemble, which create academic freedom. The First
Amendment protects the freedom of expression of all Americans, no matter their point of view.
The government may not censor, discriminate, or apply rules inconsistently based on content or
viewpoint. The First Amendment also protects the freedom of speech and freedom of expression
from laws that are so overbroad as to prohibit a substantial amount of protected speech. U.S.
Const. amend I.

37.     In higher education, the Constitution broadly protects the right of scholars,
teachers, and researchers to think, speak, teach, and associate without governmental interference.
The "essentiality of freedom in the community of American universities is almost self-evident"
and educators play a "vital role in a democracy." *Sweezy v. New Hampshire*, 354 U.S. 234, 250
(1957). Depending on substance and context, speech by teachers in public primary and
secondary schools is also entitled to some First Amendment protection. *See Pickering v. Bd. of
Educ. of Twp. High Sch. Dist.,* 391 U.S. 563 (1968).

38.     Throughout our nation's history, courts have consistently prevented various state
actors, including executive branch officials, from trampling the First Amendment rights of
federal fund recipients. *See, e.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y*, 570 U.S. 205

---

14, 2023), https://perma.cc/8QTR-8PMD (last accessed Feb. 1, 2025); U.S. Dep't of Educ., Off.
of the Undersec'y, *Strategies for Increasing Diversity and Opportunity in Higher Education*
(Sept. 28, 2023), https://perma.cc/XTP4-SRAL (last accessed Feb. 21, 2025).

(2013) (Roberts, J.) (striking down requirement that nonprofits express opposition to disfavored policies before receiving federal funds); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) (finding the government cannot force students to recite the pledge of allegiance).

### The Fifth Amendment's Protection Against Vagueness

39.     The Constitution protects people from being deprived of their rights, liberty, or property interest without due process. U.S. Const. amend. V. A federal pronouncement, such as a Dear Colleague Letter or a required certification from an enforcement agency, is unconstitutionally vague when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). In other words, the Constitution demands clarity and consistency.

### The Administrative Procedure Act's Framework for Review

40.     The Administrative Procedure Act authorizes judicial review of final agency action. 5 U.S.C. § 704. Final agency actions are those (1) that "mark the 'consummation' of the agency's decisionmaking process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).

41.     Under the APA, a court shall "hold unlawful and set aside" agency actions found to be arbitrary, capricious, contrary to constitutional rights, in excess of statutory authority, or issued without observance of procedure rights. 5 U.S.C. § 706(2)(A)-(D).

## FACTUAL ALLEGATIONS

42.     On Friday, February 14, 2025, Acting Assistant Secretary for Civil Rights Craig Trainor issued a Dear Colleague Letter regarding discrimination on the basis of race, color, or national origin.[11]

### *The Letter's Purpose, Scope, and Effect*

43.     The Letter purports to "clarify and reaffirm the nondiscrimination obligations of schools and other entities that receive federal financial assistance" required by Title VI, "the Equal Protection Clause of the United States constitution, and other relevant authorities," following *SFFA*. Letter at 1-2.

44.     The Letter applies to schools at all levels, without differentiation, as "'school' is used generally to refer to preschool, elementary, secondary, and postsecondary educational institutions[.]'" Letter at 1 n.1.

45.     The Letter identifies several practices that it forbids as "impermissible" practices whereby "the educational institution violates the law." Letter at 2.

46.     The descriptions in the Letter of what is prohibited are broad, vague, and imprecise. But to the extent the guidance within the Letter can be understood, or are read literally, the activities and programs that are described as unlawful include: classroom instruction that confronts difficult and uncomfortable subjects and imparts critical thinking skills; orientations and trainings that equip students with the communication skills and tools to navigate complex social dynamics with honesty, compassion, and empathy; and support services and extra-curricular activities that enable students to maximize learning opportunities.

---

[11] Letter from Craig Trainor, Acting Assistant Sec'y for C.R., U.S. Dep't of Educ., to Colleagues (Feb. 14, 2025), https://perma.cc/SF4T-WA33 (last accessed Feb. 21, 2025).

47.     On February 27, 2025, the Department launched a new portal—*End DEI*—on its

website through which the public can submit discrimination complaints for investigation by the

Department.[12] The limited explanatory text at the portal *equates* DEI *with* illegal discrimination

and ties both to "divisive ideologies" and "indoctrination" as follows:

> The U.S. Department of Education is committed to ensuring all students have
> access to meaningful learning free of divisive ideologies and indoctrination. This
> submission form is an outlet for students, parents, teachers, and the broader
> community to report illegal discriminatory practices at institutions of learning.
> The Department of Education will utilize community submissions to identify
> potential areas for investigation.

The portal provides no explanation that DEI programs are not only legal, but have long been

encouraged under federal law and supported by Congressional appropriations. Nor does the

portal provide any guidelines, criteria, or legal standards for determining whether and how the

perspectives targeted— "DEI," "divisive ideologies," and "indoctrination"—might be

discriminatory.

48.     Given that the Department's Office for Civil Rights has long had an online portal

for filing complaints, this new portal appears to be the new administration's targeted solicitation

for complaints reflecting a particular viewpoint on diversity, equity, and inclusion.[13]

49.     On February 28, 2025, the Department issued a guidance document titled

"Frequently Asked Questions About Racial Preferences And Stereotypes Under Title VI of the

Civil Rights Act"[14] ("FAQs") that was "intended to anticipate and answer questions in response"

---

[12] U.S. Dep't of Education, https://perma.cc/4GDL-57TS (last visited Mar. 4, 2025).

[13] U.S. Dep't of Education, File a Complaint, https://perma.cc/595N-N8RN (last visited Mar. 4, 2025).

[14] U.S. Dep't of Education, *Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act* (Feb. 28, 2025), https://perma.cc/KB53-4SQ3.

to the Letter.[15] The FAQs do not rescind the Letter or its statement that compliance will be assessed "based on the understanding embodied in this letter." While more moderate in tone and less categorical in setting forth prohibitions, the FAQs do not correct the defects in the Letter. For example:

○ The FAQs further confuse the Letter's categorical restrictions on speech and academic freedom by acknowledging the First Amendment, but then warning that classrooms will be judged on the basis of whether instruction and discussions create a "racially hostile environment" without supplying legally relevant standards. Answer to FAQ 9.

○ The FAQs acknowledge the limitations of the Department's control over the content of school curricula, but also state, with no support, that certain curricula, like social emotional learning and culturally responsive teaching, are discriminatory.

○ The FAQs further confuse the Letter's restrictions on events and celebrations, by saying they may be permissible, while also warning that such events will be judged on the basis of their specific programming and the extent to which they "discourage members of all races from attending, either by excluding or discouraging students of a particular race or races, or by creating hostile environments based on race for students who do participate." Answer to FAQ 8.

---

[15] Press Release, U.S. Dep't of Education, U.S. Department of Education Releases Frequently Asked Questions on Dear Colleague Letter About Racial Preferencing (Mar. 1, 2025), https://perma.cc/5UYY-S4VF.

    ○   The FAQs do not explicitly address affinity groups and whether such groups, which often are designed to support students of color, would be viewed by the Department as prohibited under the Letter.

    ○   The FAQs expand, without explanation or support, the "zero-sum" reasoning discussed in *SFFA*–where admission to a class of limited capacity was viewed as a finite set of opportunities or prizes–to administrative support. Answer to FAQ 6.

50.    The level at which these legal terms, like "racially hostile environment" are discussed is notable. There is significant case law that defines what conduct may or may not create a racially hostile environment. And yet, no cases are cited to provide clarity to schools or teachers, and none of the legal elements that define a "racially hostile environment" are provided.

51.    Indeed, the FAQs increase the confusion, seeming to contradict the Letter's broad language. The FAQs, for example, include an unsupported statement that "social-emotional learning" serves as a veil for discriminatory policies. This type of statement leaves schools less sure what OCR considers permissible, and increases the subjectivity and arbitrariness embodied in the Letter that has given rise to the chilling effect, due process concerns, and APA violations described here.

### *The Letter Is Intended to Constrain Nondiscriminatory Teaching and Learning*

52.    No federal law prevents teaching about race and race-related topics. And multiple federal statutes prohibit the Department from dictating institutional and educational programs

and curricular choices,[16] which are typically decisions made by states, localities, and educational institutions.

53.    The Letter appears to broadly curtail schools' and teachers' ability to determine what and how to teach, and school districts' rights and responsibilities to select curriculum and implement state and local education content standards and conduct operations in compliance with state law. It states: "Educational institutions have toxically indoctrinated students with the false premise that the United States is built upon 'systemic and structural racism' and advanced discriminatory policies and practices. . . . But under any banner, discrimination on the basis of race, color, or national origin is, and has been, and will continue to be illegal." Letter at 2. In other words, it describes teaching about "systemic and structural racism" and curriculum that includes "explicit race-consciousness" as unlawful discrimination.

54.    Although the scope of this prohibition is not clear, on its face it appears to ban any meaningful discussion of "race-conscious" curriculum topics, including the many ways in which racial discrimination was written into law from the country's earliest years—even though topics like slavery, the Emancipation Proclamation, the creation of Native American reservations and forced relocation of tribes, xenophobic responses to waves of immigration (Irish, Southern European, Eastern European, and Asian), and the Civil Rights movement, are required teaching in school by state or local education standards.

55.    In Oregon, for example:

---

[16] *See, e.g.*, 20 U.S.C. § 7906a (stating the Department may not "mandate, direct, or control" the "academic standards and assessments, curricula, or program of instruction" that States, localities, and schools use to implement requirements under federal education law); *id.* § 1232a (clarifying that no program shall authorize the Department to "exercise any direction, supervision, or control over the curriculum, [or] program of instruction), *id.* § 3403 ("No provision . . . shall be construed to authorize [the Department] . . . to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution[.]").

○ State law requires the Oregon Department of Education to develop, and school districts to offer instruction in, Ethnic Studies standards by 2026.[17] These include social studies standards on the histories, contributions, and perspectives of individuals who are Native American, or are of African, Asian, Pacific Island, Chicano, Latino, Middle Eastern or Jewish descent, which were designed recognize the "histories, contributions and perspectives of ethnic minorities and social minorities," "increase cultural competency," and "promote critical thinking regarding the interaction between systemic social structures and ethnic minority and social minority status." HB 2845 (2017), § 3(a), (b)(A)(B).[18] Schools are also required to adopt textbooks that adequately address contributions from persons who are Native American, are of diverse racial and ethnic backgrounds, or are immigrants or refugees.[19] Plaintiff District 4J is actively preparing to implement the new standards this spring.

○ Oregon public schools are required to "provide instruction about the Holocaust and genocide" so as to "enable students to evaluate the morality of the Holocaust," including to "enable students to understand the ramifications of prejudice, racism and stereotyping." ORS 329.494(2)(a), (f).

○ Oregon law requires the teaching of a curriculum relating to the Native American experience in Oregon. ORS 329.493(2), (3).

---

[17] *See* ORS § 329.045; SB 1050 (2023); HB 2845 (2017); c. 253, Or Laws 2019; *see also* ORS § 329.492 (requiring the teaching Oregon Studies, including specifically the contributions by persons of African-American, Hispanic, Native American, and Asian American heritage).

[18] *See also* Oregon Dep't of Education, *Ethnic Studies Standards FAQ*, https://perma.cc/ZVX8-BYYQ (last visited Mar. 4, 2025) (explaining the requirements of the law). These standards have been voluntarily adopted by some schools, and are scheduled to become mandatory in Oregon public schools in 2026.

[19] ORS 337.260; Or. Laws 2019, Ch. 202, §§ 3-4.

56.     The ideas and topics that these state curricula and lessons require appear to be in conflict with what the Letter attempts to prohibit, which leaves school districts, like Plaintiff District 4J, and their leadership, teachers, and staff unclear as to how to meet their obligations under law while also protecting the federal funding that the Letter threatens.

57.     The FAQs do acknowledge that the Department is not permitted to restrict Plaintiffs' and their members' First Amendment freedoms and curriculum choices. But they go on to explain that where expression or association creates a "racially hostile environment," or creates "hostile environments through race-based policies and stereotypes," that conduct will be prohibited. The FAQs state that race-based policies are any policies that "are motivated by racial considerations," sweeping in, potentially, an enormous amount of legal conduct. Under the vague explanation of this term that is offered by the FAQs, a teacher ensuring that Black students are able to voice their views during a discussion on slavery could still be prohibited by the Letter. A district policy that requires that teachers take steps to create inclusive classroom environments may be "motivated by racial considerations" and thus could still be prohibited by the Letter. And the FAQs introduce new vague warnings of additional activities that the Department may view as discriminatory, including "social-emotional learning" and "culturally responsive" teaching.

### *The Letter Is Intended to Constrain Nondiscriminatory Student Groups and Support for Students and End All Diversity, Equity, and Inclusion Programming*

58.     As an example of unlawful discrimination, the Letter states, without any factual support, that "many American schools and universities even encourage segregation by race at graduation ceremonies and in dormitories and other facilities." Letter at 1. Without providing any context or explaining the relevant legal standards, the Letter categorically asserts that "Federal law prohibits covered entities from using race in decisions pertaining to . . . . housing, graduation ceremonies, and all other aspects of student, academic, and campus life." Letter at 2.

59.    Thus, the Letter appears to broadly forbid voluntary associations or groups for students or faculty if they are connected to race, color or national origin–even if such groups are open to all. This prohibition would include: voluntary student organizations that are open to everyone but based around a protected characteristic (such as a Jamaican Students Association or Chinese-American student club or Irish-American Heritage Organization); voluntary recognition ceremonies at graduation (such as the Black Student Association or Latin American Student Association hosting a ceremony to recognize its members who are graduating); cultural centers at universities (such as an Afro-American Cultural Center); fraternities or sororities associated with particular heritage (such as historically Black fraternities or sororities or historically Italian fraternities that host programming celebrating that heritage); optional housing based on student groups (such as living in a Jewish Cultural House, open to everyone but focused on celebrating Jewish ancestry, customs, and religion), and similar activities.

60.    The February 28, 2025 FAQs do not dispel this impression. Although the FAQs state that some such activities could be lawful if they are open to all, it provides an unclear and highly subjective description of what might violate Title VI, without any clear standard or objective criteria. It fails to cite or quote the existing standard used by courts for evaluating hostile environment claim under Title VI,[20] leaving Plaintiffs and their members unsure whether the FAQs present a new standard for how OCR will evaluate a claim, how that intersects with existing precedent, and most importantly, what is permissible on their campuses.

---

[20] Although the exact formulations vary, courts typically apply a similar standard for hostile environment claims alleging deliberate indifference by the institution across Title IX (based on sex) and Title VI (based on race, color, or national origin): the harassment must be severe, pervasive, and discriminatory in effect, such that it interferes with the individual's ability to participate in or receive the benefits and educational opportunities provided by the school. *See, e.g.*, *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 665-66 & n.10 (2d Cir. 2012) (explaining standard and collecting cases).

61.     The Letter also appears to prohibit any institutional programming or support for students or faculty who may face challenges due to their actual or perceived race, color, or national origin. The Letter states, without any factual support, that "[e]ducational institutions" have "advanced discriminatory policies and practices . . . . under the banner of 'diversity, equity, and inclusion' ('DEI'), smuggling racial stereotypes and explicit race-consciousness into everyday training, programming, and discipline." Letter at 2. It also categorically states, without explaining how or on what legal basis, that "Federal law thus prohibits covered entities from using race in decisions pertaining to . . . . administrative support . . . and all other aspects of student, academic, and campus life." Letter at 2.

62.     While the Letter is far from clear, this language appears to ban, for example, a school hosting a panel discussion by alumni on the challenges Black students might have navigating the university; a training for teachers on combatting anti-semitism; or a workshop on why use of racial slurs are harmful.

63.     The Letter explicitly bans any programming designed to increase diversity, labeling all "diversity, equity, and inclusion" programs as a "discriminatory practice." Letter at 2. It further states, without any factual support, that DEI programs "frequently preference certain racial groups," and "stigmatize students who belong to particular racial groups," denying them the ability "to participate fully in the life of a school." Letter at 3.

### *The Letter Announces Prohibitions on Legal Admissions Practices*

64.     The Letter purports to rely on the holding in *SFFA*, but it goes well beyond the actual framework set forth in that decision, both in terms of the activities that the Letter prohibits and the settings to which it applies.

65.     *SFFA* held that a policy that conferred an individual student the benefit of admissions based in part on an applicant's race must be supported by a sufficient legal rationale and careful design that could survive "strict scrutiny." *SFFA* did not prohibit educational institutions from implementing a wide variety of policies and programs that pertain to diversity, equity, and inclusion and that advance their institutional missions.

66.     While the specific applications are vague, the Letter goes well beyond the scope of the narrow holding in *SFFA* and instead asserts that *any* (1) differentiation or reliance on race, (2) decisions motivated by racial considerations, or (3) use of non-racial information as a proxy for race in decisions related to "admissions, hiring, promotion, compensation, financial aid, scholarships, prizes, administrative support, discipline, housing, graduation ceremonies, and all other aspects of student, academic, and campus life" is discriminatory. Letter at 2. The February 28, 2025 FAQs do not provide any meaningful further illustration that cures the defects of the Letter.

67.     The Letter suggests, without providing a legal basis, that "eliminat[ing] standardized testing" to increase racial diversity is unlawful. Letter at 3.

68.     The Letter also appears to ban what is explicitly contemplated and permitted by *SFFA*, namely, a university "considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise." *SFFA*, 600 U.S. at 230. The Letter quotes this same sentence but ignores *SFFA*'s context, instead suggesting that such consideration would be "in fact, motivated by racial considerations" and may constitute "race-based decision-making." The Letter goes on to explicitly forbid the use of "a student's personal essays, writing samples, participation in extracurriculars, or other cues as a means of determining or predicting a student's race and favoring or disfavoring such students." Letter at 2-3.

69.     These prohibitions go well beyond what *SFFA* held and would ban campus recruitment and admissions activities long held to be legal, and untouched by *SFFA*, like efforts to recruit students and employees of all races and backgrounds (as well as income levels, geographic, rural/urban communities, family composition, first generation students or other forms of diversity) or any other characteristic the Department may associate with particular races or ethnicities.

### *The Letter is Unlawfully Vague, Conflicts with Law, and Will Chill Speech and Expression*

70.     The Letter fails to define terms or establish objective standards that would enable educators and administrators to determine when, why, and how activities and programs violate the Fourteenth Amendment and Title VI.

71.     The Letter fails to define or adequately describe many of the terms and concepts the Letter prohibits. The Letter does not define the words "diversity," "equity," "inclusion" or "DEI" and fails to describe "DEI programs" it says are discriminatory–other than to refer to them *as* discriminatory. It does not explain the differences between meaningful discussion, rigorous instruction, and "toxic indoctrination" or describe actual lessons that "toxically indoctrinate" students. It does not describe how it plans to determine that an activity is "motivated by racial considerations." It does not detail what constitutes "race-based decision-making." The Letter does not describe what information it views as "non-racial information" serving "as a proxy for race" or how determinations that such types of information are proxies will be made.

72.     For example, it is not clear which of the following activities OCR would consider a violation of the Letter:

- Teaching a college course on the history of the U.S. South and Jim Crow, urban policy and planning, modern American history, or the history of housing and segregation.

- Leading a class discussion on the history of slavery in America or Japanese internment during World War II.

- Maintaining Departments of African American Studies, Arab American Studies, Asian American Studies, or Jewish Studies.

- Hosting a celebration for Black History Month, Holi, Eid, or Lunar New Year.

- Hosting a Latin American culture club or a Japanese film club.

- Counseling a student who was called a racial or ethnic slur and is upset about that experience.

- Maintaining a school mission built around advancing excellence and equity.

- Prohibiting the use of racial slurs, explaining why students and other community members might find such slurs hurtful, and disciplining students for using racial slurs.

- Contracting with a non-profit organization dedicated to improving educational outcomes for first-generation students or students of color.

- Sponsoring a tutoring program designed to help low-income students excel, if a disproportionate number of such students are people of color.

73.    The Letter is also incompatible with federal law. Multiple federal laws *require* prioritizing equity, integration among students of different races, and equal educational opportunity.

74.    The Civil Rights Act of 1964 itself included explicit efforts to remedy discrimination in the form of segregation in public schools. It authorized the Secretary of Education to provide "technical assistance" to any school board regarding the implementation of a desegregation plan, and "effective methods of coping with special educational problems occasioned by desegregation." 42 U.S.C. § 2000c-2. Pursuant to that authority the Department created a program to fund regional Equity Assistance Centers to provide this technical assistance. 34 C.F.R. § 270 (2016).

75.    For example, Congress created the Federal TRIO program through the Higher Education Act of 1965, as amended. Congress instructs that the "Secretary shall . . . carry out a program of making grants and contracts designed to **identify qualified individuals from disadvantaged backgrounds**, to prepare them for a program of postsecondary education." 20 U.S.C. § 1070a-11(a) (emphasis added). The program supports multiple initiatives designed to identify and support students from disadvantaged backgrounds to obtain higher education.

76.    It is not clear from the Letter whether such programs would be found to "rely[]on non-racial information as a proxy for race" and "violate[] the law" in OCR's review. *See* Letter at 3.

77.    The vagueness and apparent contradictions created by the Letter make it impossible for Plaintiffs' members to know how to comply with its requirements and thus will restrict their ability to do their jobs and serve their students. These defects are not cured by the FAQs.[21]

---

[21] Moreover, the administration appears to have removed the websites that contained prior OCR guidance on identifying and combatting racial discrimination from the OCR website. A 404 "Page Not Found" error appears when attempting to access over a dozen of these sites, including: the Department's *Fact Sheet: Ensuring Educational Opportunities for All Students on Equal Terms 70 Years After Brown v. Board of Education*, *see* https://perma.cc/5X43-BQNT (last

78.     The overbreadth and vagueness of the law, and the content-based restrictions it places on speech and expression, will force Plaintiffs' members to choose between chilling their constitutionally protected speech and association or risk losing federal funds and being subject to prosecution. Notwithstanding an acknowledgment of First Amendment rights, these defects are not cured by the FAQs. The FAQs only acknowledge well-established speech rights while at the same time suggesting, without providing any relevant legal framework or context, that the exercise of such rights might create a hostile environment through race-based policies, be inappropriate among certain age groups, or give rise to unequal discipline.

79.     The only way Plaintiffs and their members can ensure they are *not* targets for enforcement is to: curtail any teaching that references diversity, equity, inclusion, race, ethnicity, national origin, or systemic discrimination; cease all teaching that voices any support for diversity, equity, inclusion or similar principles; eliminate all student groups related to race or national origin, including affinity and support groups; terminate any diversity, equity, and inclusion programming; and, immediately terminate any admissions, financial aid, student life, or other campus activities that this administration could label as concerning diversity, equity, inclusion, race, ethnicity, or national origin. This kind of censorship, which restricts speech and forces people to forgo participating in associations and other lawful activities, will hurt students, faculty, and their learning communities.

**The Certification's Purpose, Scope, and Effect**

---

visited Mar. 5, 2025); the *Fact Sheet: Harassment based on Race, Color, or National Origin on School Campuses*, *see* https://perma.cc/GQA6-G752 (last visited Mar. 5, 2025); and the fact sheet on *Resolving a Hostile Environment Under Title VI: Discrimination Based on Race, Color, or National Origin, Including Shared Ancestry or Ethnic Characteristics*, *see* https://perma.cc/RS3R-942K (last visited Mar. 5, 2025).

80.     On April 3, 2025, the U.S. Department of Education announced that it "sent letters to State Commissioners overseeing K-12 State Education Agencies (SEAs) requiring them to certify their compliance" with "Title VI of the Civil Rights Act and the responsibilities outlined in Students for Fair Admissions v. Harvard" as a condition of continued federal funding.[22]

81.     The letters, sent via e-mail, state in their entirety:

 Within ten (10) days, please sign and return the attached certification along with the certifications of your Local Education Agencies (LEAs). Furthermore, within these ten (10) days, please report the signature status for each of your LEAs, any compliance issues found within your LEAs, and your proposed enforcement plans for those LEAs. Thank you for your prompt attention to this matter.[23]

82.     In the press release announcing this demand, Acting Assistant Secretary for Civil Rights Craig Trainor, speaking for the Department, stated that many schools "violate" their Title VI legal obligations "by using DEI programs to discriminate against one group of Americans to favor another based on identity characteristics."[24] There are no examples of what types or kinds of DEI practices purportedly do this given, nor are there any prior discrimination findings based on these practices cited against K-12 schools.

83.     In introducing this new certification, the Department explicitly referenced the Letter and FAQs, stating in the "Background" section:

These certifications are being sent out pursuant to the Department of Education's authority and responsibility to ensure that recipients of federal funding are complying with United States civil rights law. On February 14, the Office for Civil Rights (OCR) issued a Dear Colleague Letter (DCL) to educational institutions receiving federal funds notifying them that they must cease using race preferences and stereotypes as a factor in their admissions, hiring, promotion, scholarship, prizes, administrative support, sanctions, discipline, and other programs and activities. Two weeks later, OCR published

---

[22] Dkt. 37-7, Press Release, *Dep't of Educ., ED Requires K-12 School Districts to Certify Compliance with Title VI and Students v. Harvard as a Condition of Receiving Federal Financial Assistance* (Apr. 3, 2025), https://perma.cc/7WBU-T8QN, PLFS-552.

[23] Dkt. 37-8, E-mail from Off. for C.R., Department of Education Title VI Compliance Certification (Apr. 3, 2025), PLFS-557.The deadline was later extended to April 24.

[24] *Id.*

Frequently Asked Questions to anticipate and answer questions that may arise in response to the DCL.[25]

84.    The Certification form is titled "Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and *SFFA v. Harvard*" and is dated April 3, 2025.[26] The form does not include an OMB control number.

85.    The form includes an initial certification as follows:

On behalf of _____ [SEA/LEA], I acknowledge that I have received and reviewed this Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and SFFA v. Harvard. I further acknowledge that compliance with the below and the assurances referred to, as well as this certification, constitute a material condition for the continued receipt of federal financial assistance, and therefore certify our compliance with the below legal obligations.[27]

Below the certification is a space to fill in signature, date, and "Title and District or State."[28]

86.    Following the certification are 2.5 pages of assurances ("the Assurances"). The Assurances echo the Letter and include editorial commentary criticizing unnamed "equity mandates" by the Biden Administration, selective quotes from *SFFA*, and a few broad assertions, unsupported by any authority, suggesting that DEI programs are illegal.

87.    In particular, the Department suggests *SFFA's* holding is that "the Equal Protection Clause and Title VI prohibit **race-based action**, with only the narrowest of exceptions."[29] The Department also states that "any violation of Title VI—including the use of Diversity, Equity, & Inclusion ('DEI') programs to **advantage one's** [sic] **race over another**—

---

[25] *Id*

[26] Dkt. 37-9, U.S. Dep't of Educ., *Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and SFFA v. Harvard* (Apr. 3, 2025), https://perma.cc/AF2G-ZL69, PLFS-560.

[27] *Id*.

[28] *Id*.

[29] *Id*. at 2 (emphasis added).

is impermissible," and that "[t]he use of **certain DEI practices** can violate federal law."[30]
Finally, the assurances proclaim that "[t]he continued use of **illegal DEI practices** may subject
the individual or entity using such practices to serious consequences."[31]

88.    The Certification is an implementation of the Dear Colleague Letter and means of
enforcing the Department's viewpoint on DEI. As a separate document that the agency has
presented as legally binding, however, the Certification creates additional and separate legal
consequences and harms.

89.        At the end of the Assurances, the Department enumerates consequences for
the "continued use of illegal DEI."[32] The listed consequences are: (1) termination of funds under
Title VI; (2) prosecution for breach of contract and restitution; and, (3) liability and prosecution
under the False Claims Act ("FCA"), including treble damages.

90.    In an email, dated as recently as April 22, 2025, the agency confirmed the April 24
deadline and reiterated that signing the Certification was a condition of receiving federal funding.
The email also noted that LEAs can send their Certifications to the Department directly.

### *The Letter is Final Agency Action Subject to the Court's Review*

91.    The Administrative Procedure Act authorizes judicial review of final agency
action. 5 U.S.C. § 704.

92.    Final agency actions are those (1) that "mark the 'consummation' of the agency's
decisionmaking process" and (2) "by which rights or obligations have been determined, or from
which legal consequences will flow." *Bennett*, 520 U.S. at 178 (quotation marks omitted).

---

[30] *Id*. at 3 (emphasis added).
[31] *Id*. (emphasis added).
[32] *Id*.

93.    The Letter marks the consummation of the Department's decisionmaking process because it announces the agency's final position, speaking with the agency's voice. The Letter imposes numerous new requirements and prohibitions on Plaintiffs and all education institutions—immediately, indicating that it reflects the agency's final position—many of which go well beyond the Department's statutory authority and violate the Constitution in multiple ways. That the Letter asserts that it does not "create new legal standards" does not change that the Letter serves as the final word and is the consummation of the Department's decision to impose new requirements on educational institutions. Letter at 1. The Letter states it will "take appropriate measures to assess compliance with the applicable statues and regulations **based on the understanding embodied in this letter** beginning no later than 14 days from today's date." Letter at 3 (emphasis added).

94.    Further, the Letter marks the consummation of the Department's decisionmaking process because it is signed by the (Acting) Assistant Secretary for Civil Rights, who is the official with the authority to determine the agency's position on this matter.

95.    Legal consequences will surely flow from the Letter, as it threatens *immediate* action for non-compliance (enforcement "**beginning no later than 14 days from today's date**"). Letter at 3 (emphasis added). Recipients are also instructed to cease *lawful* activities to increase diversity under the guise of instructing educational institutions to "cease . . . relying on proxies" and on "third-party contractors, clearinghouses, or aggregators" that OCR incorrectly describes as "circumvent[ing] prohibited uses of race." *Id.*

96.    In other words, the Letter's new, incorrect, overbroad, and vague reading of *SFFA* imposes immediate legal consequences on recipients of federal financial assistance—

consequences that do not flow from Title VI or the Equal Protection Clause themselves. It is therefore final agency action.

### The Certification is Final Agency Action Subject to the Court's Review

97.     The Certification requires that LEAs and SEAs certify compliance with the agency's interpretation of Title VI, as articulated in the assurances, which goes beyond what Title VI requires, creating a new obligation from which legal consequences will flow. It is binding on its face.

98.     The Certification also requires the LEAs and SEAs acknowledge that compliance with the agency's interpretation of Title VI articulated in the assurances, as well as with the Certification itself, "constitute a material condition for the continued receipt of federal financial assistance."[33] This language is designed to trigger liability under the FCA, which the Certification discusses as a potential consequence for the "continued use of illegal DEI."[34]

99.     Additionally, not signing the Certification also risks legal consequences, notably the cessation of federal funding.

100.    The Certification is an outflow of the Letter and an attempt to enforce the Letter. But it is also a final agency action, reflecting the consummation of the Department's decisionmaking process (including as to the purported need for a new certification), and imposing additional, independent legal obligations.

### The Letter Violates Multiple Provisions of the APA

101.    The Letter is arbitrary and capricious. It fails to acknowledge, much less sufficiently explain, the change in position from prior guidance issued by OCR and the

---

[33] *Id*.
[34] *Id*.

Department. Agencies cannot depart from prior policies without acknowledging that they are making such a change and explaining their reasoning for doing so.

102.    For example, in August 2023, OCR and the Department of Justice jointly released a "Frequently Asked Questions" guidance document about *SFFA* that advises that "existing practices that can lawfully be used" to "achieve diverse student bodies," including "targeted outreach, recruitment, and pipeline or pathway programs" to ensure a diverse applicant pool, and that "*SFFA* does not require institutions to ignore race when identifying prospective students for outreach and recruitment."[35] *Id.* at 3-4. And in September 2023, the Department issued a guidance document entitled "Strategies for Increasing Diversity and Opportunity in Higher Education"[36] that explicitly encourages the pursuit of diversity, affinity groups, and DEI programming. The Letter does not explain whether any or all of these activities are now considered unlawful under the Letter's interpretation of Title VI, and if so, why the Department changed its position.

103.    The Department also failed to consider or explain the implications for existing reliance interests. Plaintiffs' members, educational institutions, and other third parties relied on the guidance documents previously in place to inform their compliance efforts.

104.    The Letter is so vague in what it purports to prohibit that it is necessarily arbitrary and capricious. Because the agency failed to clearly explain what is prohibited and why, the agency has failed to provide the "reasoned decisionmaking" required by the APA.

105.    The Letter fails to account for other legal requirements that may be implicated by the changes it implements. The Letter does not explain how the Department intends to enforce

---

[35] *Questions And Answers Regarding The Supreme Court's Decision In Students For Fair Admissions, Inc. v. Harvard College And University Of North Carolina*, *supra* note 10.
[36] *Strategies for Increasing Diversity and Opportunity in Higher Education*, *supra* note 10.

the Letter while also complying with the requirements set forth in the statutes that prohibit the Department from dictating institutional and educational programs and curricular choices.

106.     The Letter is contrary to the First Amendment and the Fifth Amendment.

107.     The Letter is not in accordance with law in multiple respects. It is not in accordance with Title VI, in violation of the APA, because, among other reasons, it impermissibly expands the scope and application of the law. The Letter extends well beyond Title VI to prohibit policies that aim to enhance diversity and equal access to educational opportunities.

108.     The Letter is not in accordance with multiple statutes that prohibit the Department from dictating institutional and educational programs and curricular choices. The Department, through the Letter, exercises direction and control over the curriculum and programs of instruction in schools across the country, in violation of these statutes. Doing so violates numerous federal statutes.[37]

109.     The Letter is in excess of statutory authority because it contravenes the law it purports to interpret, Title VI of the Civil Rights Act of 1964. Title VI does not forbid the activities described in the Letter. Among other things, Title VI does not forbid seeking to increase diversity through race-neutral admission processes, nor does it forbid teaching history, supporting student groups, or sponsoring diversity, equity, and inclusion programming.

110.     Because the agency's guidance is contrary to Title VI, it is in excess of the agency's statutory authority to promulgate regulations under or enforce Title VI and therefore in violation of the Administrative Procedure Act.

---

[37] See *supra* note 16.

111.    The Letter violates the APA provision requiring notice and comment rulemaking. The Letter purports to merely advise of an interpretation of Title VI, but it in fact imposes new burdens and infringes on substantial rights and interests of Plaintiffs and many others. Indeed, the Letter explicitly instructs entities receiving federal financial assistance to immediately align compliance with "the applicable statutes and regulations ***based on the understanding embodied in this letter.***" *See* Letter at 4 (emphasis added). This is in contrast to the typical interpretative rules (known as guidance documents) that OCR issues regarding Title VI, which use much less definitive language.

112.    Ad hoc comments solicited after the Letter has been issued, as invited by a footnote in the Letter, are not a sufficient substitute for the complete notice and comment rulemaking that is required by the Administrative Procedure Act. *See* Letter at 1 n.3.

113.    Moreover, the Letter directly contradicts the existing regulations implementing Title VI. Contradicting an existing notice and comment rule is a "quintessentially legislative" action, and such actions must be done through notice and comment rulemaking.

### *The Certification Violates Multiple Provisions of the APA*

114.    The Certification is another way the Department has determined to implement its decisionmaking set forth in the Letter, and thus also represents an abrupt and unexplained departure from the Department's prior positions as described above, *supra* ¶¶ 101-102.

115.    Like the Letter, *supra* ¶¶ 101-105, because it fails to acknowledge or explain the Department's changed position, rely on prior factual findings and available evidence, account for existing federal and state legal requirements (including the Paperwork Reduction Act, described below), consider important aspects of the problem, and grapple with the substantial reliance interests, the Certification is arbitrary and capricious.

116.    As the Certification extends beyond the bounds of Title VI and its implementing regulations at the Department, it is in excess of the statutory authority conferred on the Department, for the same reasons as the Letter.

117.    Additionally, Defendants issued the Certification not in accordance with the Paperwork Reduction Act ("PRA") or laws that govern when and how a certification may be required or issued.

118.    For prior Assurances of Compliance – Civil Rights forms, the Department has sought and obtained approval by OMB under the PRA.[38] Indeed, this form includes the statement that "[a]ccording to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number."[39]

119.    The Certification is also at odds with what the Department represented to the government less than a year ago in its *Supporting Statement for a Paperwork Reduction Act Submission*.[40]

120.    To the extent that the Assurances section of the Certification itself serves as agency guidance, such guidance is contrary to existing Title VI regulations. Contradicting an existing notice and comment rule is a "quintessentially legislative" action, and such actions must be done through notice and comment rulemaking.

### *The Activities Banned By the Letter Support Education and Are Not Discriminatory*

121.    Despite significant steps forward since the Supreme Court decided *Brown v. Board of Education* in 1954, racial inequalities in education have persisted. Efforts have

---

[38] *See* Dkt. 37-11, Dep't of Educ., Off. for C.R., Assurance of Compliance – Civil Rights Form, OMB Approval No. 1870-0503, https://perma.cc/9A9G-RHA6, PLFS-575.
[39] *Id.*
[40] Dkt. 37-10, Off. of Mgmt. & Budget, *Supporting Statement for a Paperwork Reduction Act Submission,* OMB No. 1870-0503 (revised June 11, 2024), PLFS-565.

consistently taken place, in every facet of our nation and society, to attempt to identify and end race-based discrimination, and to work to further racial equality in our country—an undertaking that continues today.

122.     The activities in which Plaintiffs engage are important components of this undertaking. Many of them are now ostensibly prohibited by this Letter.

### *Freedom to Teach is Essential to Delivering Quality Education*

123.     It is foundational to all Plaintiffs' missions, and their members' jobs, that they are able to provide rigorous, academic instruction in all subjects, including history, sociology, and literature.

124.     That racial discrimination was written into the laws of the United States is a historical fact that cannot be erased by a Dear Colleague Letter. Black Americans were enslaved by law, laws prevented Black Americans from owning property, attending public schools, and voting. This is, by definition, a legal structure that imposes differences based on race. It is therefore not possible to teach bare factual information about history without acknowledging structural racism—but doing so would now seem to constitute illegal discrimination in the eyes of the Department of Education.

125.     Moreover, classroom lessons that accurately reflect our nation's history and values not only promote equality, but lead to increased educational opportunity for all students. Teaching topics like history, sociology, and literature without excluding key issues because they somehow reference race or ethnicity is a benefit to students, not a harm. The freedom to explore and examine new ideas is a critical part of education. Attempts to diminish those freedoms through misinformation, selective teaching, or censorship is a disservice to students.

### *Student Groups, Support for Students, and Diversity, Equity, and Inclusion Programming Create Increased Opportunities for Educational Attainment*

126.    Diversity, equity, inclusion, and accessibility principles promote the fair treatment and full participation of *all* people, including groups that have historically been overlooked, underrepresented or subject to discrimination on the basis of identity or disability. While DEI (or DEIA) is a relatively new acronym, the work it refers to—promoting equal opportunity—is not.

127.    The Letter states, with no supporting evidence or authority, that diversity, equity, and inclusion is a discriminatory undertaking for "smuggling racial stereotypes into training, programming, and discipline." Letter at 3. In fact, diversity, equity, and inclusion programs began as an effort to comply with and further the ideals of the Civil Rights Act.[41] As the acronym gained popularity, a broader set of efforts to improve equity and diversity in various spheres of life began to be labeled "DEI programs."

128.    Efforts to improve equity, increase equal opportunity, reduce the racial achievement gap, and ensure that all children can learn and succeed are not new in education, nor are they discriminatory. Principles of diversity, equity, inclusion, and accessibility are foundational to the nation's promise of equality for all and equal justice under the law and are deeply embedded in Plaintiffs' missions, programs, and day-to-day work in service of students, teachers, and schools.

129.    Student groups play a key role in supporting individuals who have historically been underrepresented or subject to discrimination in educational settings.

130.    Studies have shown that student groups can advance feelings of inclusion and support, generate new and creative ideas, reduce stress, increase cultural awareness, and improve

---

[41] Frank Dobbin and Alexandra Kalev, *The Origins and Effects of Corporate Diversity Programs*, Oxford Handbook of Diversity and Work 253 (2013), https://papers.ssrn.com/sol3/Delivery.cfm?abstractid=2274946.

self-esteem and confidence of the students that participate.[42]

131.    Similarly, support groups that offer resources like mentorship, leadership
opportunity, academic support and advising, scholarship assistance, and emotional support can
lead to better educational outcomes, higher student retention, and a more inclusive school
environment.[43]

132.    Despite what the Letter claims, the establishment of voluntary student groups,
including affinity and support groups, is not itself discrimination, which is why OCR has advised
in the past these types of student groups, including ones that are race-related, are lawful "so long
as they are open to ALL students regardless of race." *See, e.g.*, Off. of C.R. August 2023 Dear
Colleague Letter[44]; *see also* Fact Sheet[45] ("Title VI does not, for example, categorically prohibit
activities such as: diversity, equity, and inclusion training; instruction in or training on the impact
of racism or systemic racism"). This confusion is not cured by the FAQs.

### *Diversity Considerations in Legal Admissions and Scholarship Awards Overcome Barriers to Opportunity*

133.    The decision in *SFFA* was limited to the legality of "racial classification" as an

---

[42] Lori D. Patton, *Culture Centers in Higher Education: Perspectives on Identity, Theory, and Practice* 6 (1st ed. 2010).

[43] Chithira Johnson, et al., *Student support in higher education: campus service utilization, impact, and challenges*, 8 Heliyon 12 e12559 (Dec. 22, 2022), https://perma.cc/C359-JHXR (describing how support services such as tutoring, mentoring, counseling services, early intervention systems, and financial aid assistance will improve study participants' academic deficiencies and increase persistence beyond the first year.); Sheilynda Stewart et al., *Factors Influencing College Persistence for First-Time Students*, 38 J. of Dev. Educ. 12, 12 (2015) (stating, "[i]mplications from this study suggest that support services such as tutoring, mentoring, counseling services, early intervention systems, and financial aid assistance will improve study participants' academic deficiencies and increase persistence beyond the first year.").

[44] Sch. Law Ctr., *Race and School Programming* (Sept. 25, 2023)*,* https://schoollawcenter.com/2023/09/race-and-school-programming/.

[45] U.S. Dep't of Educ., OCR, *Fact Sheet: Diversity and Inclusion Activities Under Title VI* (Jan. 31, 2023), https://perma.cc/VWQ7-USQ9 (last accessed Feb. 16, 2025).

explicit factor in admission programs in undergraduate higher education programs, and set forth standards that a race-conscious admissions program must meet to be narrowly tailored. *SFFA*, 600 U.S. at 226.

134.    The Supreme Court explicitly *permitted* a university "considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise." *SFFA*, 600 U.S. at 230.

135.    Yet the Letter claims to ban this as well. Letter at 2-3.

136.    *SFFA* also did not prohibit universities from using, in admissions, non-racial factors that may incidentally correlate to race. Yet the Letter suggests that consideration of unnamed factors that may *correlate* with race is prohibited as discriminatory. Letter at 3.

137.    Implicit in this statement is a warning that the Department has already judged and found diversity considerations pretextual and thus discriminatory—even though factors like household income and familial educational attainment cut across racial groups.

138.    Moreover, changes to school practices that might increase racial diversity might also have numerous benefits to universities beyond diversity. For example, there are many reasons a school may reduce its reliance on standardized testing that have nothing to do with race: reducing undue stress on students; promoting a deeper understanding of the subject matter; or increasing the availability of instructional time.[46] Similarly, scholarships for low-income

---

[46] Jennifer A. Heissel, et al., *Testing, Stress, and Performance: How Students Respond Physiologically to High-Stakes Testing* (Nat'l Bureau of Econ. Rsch., Working Paper 25305, 2018), https://www.nber.org/papers/w25305 (stating, "[t]his study examined whether children responded physiologically to high-stakes testing in naturalistic settings, and how any responses were associated with performance on the highstakes test. Children displayed a statistically significant increase in cortisol level in anticipation of high-stakes testing"); Dillon H. Murphy, et al., *The Value of Using Tests in Education as Tools for Learning—Not Just for Assessment*, 35 Educ. Psych. Rev. No. 89 (2023) https://link.springer.com/article/10.1007/s10648-023-09808-3 (discussing how less testing allows for more instructional time, enabling teachers to engage

students are critical to maintaining our nation's promise of prosperity for all, separate and apart from any effect on racial diversity.[47] Such goals are genuine and laudable and not mere "proxies" for race.

### The Letter Will Significantly Impact Plaintiffs' Activities and Cause Them Immediate Harm

***Plaintiffs and their Members Rely on Federal Support to Advance their Critical Work and Missions***

139.    AFT, AFT-Maryland, and ASA Plaintiffs' members (together, "Plaintiffs' members") work at educational institutions that receive federal funds through numerous Department of Education programs. They are subject to OCR enforcement.

140.    Plaintiffs' members also conduct lawful activities that contribute to equal access to educational opportunities for all students.

141.    Plaintiff District 4J runs 32 schools[48] that receive federal funds through numerous Department of Education programs, including: Title I of the Elementary and Secondary Education Act (ESEA), which provides funding for schools that serve a disproportionate number of low-income students; and the Individuals with Disabilities Education Act, which provides funding to schools to support the needs of students with disabilities. In the 2021-2022 academic

---

students in meaningful learning experiences and promote a deeper understanding of the subject matter.)

[47] Coll. Futures Found., *Strategic Scholarship Giving for Student Success: Insights and Approaches from 10 Years of Grantmaking*, at 5 (2015) https://collegefutures.org/wp-content/uploads/2015/12/strategic-scholarship-giving-for-student-success-dec-2015-report-college-futures.pdf (discussing how about "95% of the California State University freshmen who received [College Futures Foundation] scholarships in 2009 returned for a second year of study, while only 82% of CSU freshmen from the same class statewide returned").

[48] District 4J also authorizes five public charter schools that also receive federal funding.

year, the school district received over $40 million from the Department of Education, amounting to 13% of its overall funding.[49]

142.    The Letter states that OCR intends to begin assessing compliance with the significant new legal requirements it sets forth "no later than 14 days" from February 14, 2025, and threatens losses of federal funding for violations.

143.    Many of Plaintiffs' members conduct activities, and have for years, that could now, within days, result in a loss of federal funding for their institutions depending on how the Dear Colleague Letter is interpreted and enforced.

144.    Plaintiff District 4J is committed to eliminating gaps in opportunities and barriers to access, which can correlate with a student's race, ethnicity, gender, gender identity, disability, socioeconomic status, or geographic location. Plaintiff District 4J has several goals for its schools and students—one of which is to "increase equitable outcomes and achievements," to ensure that a student's demographic characteristics do not limit a student's success in school and life. Given the Letter's position that all diversity, equity, and inclusion programs engage in "smuggling racial stereotypes" into everyday programming, Plaintiff District 4J is concerned that the Department could view goals central to its work as themselves violative of the Letter.

145.    Plaintiff District 4J sponsors and hosts activities, and its teachers act as advisors for activities that could now result in the loss of federal funding for its schools depending on how the Dear Colleague Letter is interpreted and enforced.

---

[49] Nat'l Ctr. for Educ. Stats., *Search for Public School Districts: Eugene SD 4J*, https://perma.cc/H4YA-MSY5 (last visited Feb. 28, 2025).

146.    Plaintiffs' members and Plaintiff District 4J are concerned that loss of federal funding for their institutions will undermine academic freedom, free expression, and make schools less inclusive and equitable.

147.    The Letter, which characterizes all diversity, equity, and inclusion efforts as "insidious," directly undermines the missions and needs of Plaintiffs, their members, and their schools.

148.    Based on the Letter, Plaintiffs' members and Plaintiff District 4J have a reasonable fear that continuing such activities could subject them or their institutions to enforcement actions, even though they believe they are acting in full compliance with state and federal law.

149.    For Plaintiffs' members whose teaching or other work focuses on topics related to diversity or equity, there is concern that their work might endanger their own institutions and lead to adverse employment consequences.

150.    Plaintiff District 4J, which selects and implements curricula that include teaching on topics related to diversity, structural racism, and similar topics—including portions required by state law—is reasonably concerned that continuing to implement its adopted curricula in compliance with state law would result in the loss of federal funding, depending on how the Dear Colleague Letter is interpreted and enforced.

151.    Without clarity, Plaintiff District 4J and Plaintiffs' members fear they may have to abandon their lawful efforts and speech related to diversity, equity, inclusion, or else lose federal funds that support their valuable programs.

***Banning the Freedom to Teach***

152.    Plaintiffs' members teach lessons that may jeopardize their schools' federal funding. At both the K-12 and higher education levels, Plaintiffs' members teach about issues like Latin American independence, social justice movements in the United States, ethnic studies, Black abolition, and other topics that may discuss historic "systemic and structural racism." Plaintiffs' members plan classroom activities to honor Dr. Martin Luther King Jr., and to celebrate Black History Month. At the K-12 level, some of these lessons may be mandated by the school, district, or state.

153.    Indeed, this is precisely the case for Plaintiff District 4J. District 4J's curriculum includes teaching about structural racism, some of which is required by state law. District 4J requires instruction about the histories and contributions of individuals from diverse racial and ethnic backgrounds, about the Holocaust and other genocides, and about Tribal History, all of which is required by state law. District 4J, in partnership with Lane Community College, provides the opportunity for high school students to earn high school and college credits in Ethnic Studies 101. These lessons or programs could be in conflict with the Letter's prohibition on reference to systemic or structural racism, or its warning that incorporating race-consciousness into teaching will itself be considered discrimination under the Letter.

154.    Plaintiffs' members run and participate in multi-disciplinary programs that examine how systems of power manifest and operate in the U.S. Plaintiffs' members work at and in institutions that include programs on African and African American Studies or Ethnic studies. Some work at institutions where students can minor in DEI.

155.    Plaintiffs' members and Plaintiff District 4J fear that their conduct could be prohibited by the Letter and result in the loss of funding for their schools, which could harm their

ability to do their jobs and in the case of Plaintiff District 4J, harm its ability to implement curriculum required by state law and deemed essential by its school board.

156.    Plaintiffs' members who work in K-12 schools, and Plaintiff District 4J, fear that they will be put in the position between choosing to ignore or violate the applicable state education standards and curricular requirements, or risk their school's federal funding.

157.    Based on the Letter, Plaintiffs and their members and Plaintiff District 4J have a reasonable fear that continuing such activities would be considered, by OCR, race-based discrimination that could lead to a loss of funding for their programs and schools.[50]

***Banning Student Groups, Support for Students, and Diversity, Equity, and Inclusion Programming***

158.    Plaintiffs and their members sponsor, host, and supervise student clubs, some of which include affinity and support groups. Many students find it helpful to have these types of student groups—which are voluntary and open to all students—based on race or other aspects of

---

[50] Indeed, there is other evidence to suggest that the fear held by Plaintiffs is credible. Multiple federal agencies have ordered a pause of all activities and events related to things like MLK Jr. Day and Black History Month. For example, the Department of Defense cancelled observances of MLK Jr. Day, Black History Month, National Hispanic Heritage Month, and Holocaust Days of Remembrance; the Jimmy Carter Presidential Library cancelled book talks at the direction of the National Archives, including a book talk regarding the history of schools during the civil rights movement. *See* Tara Copp, *Pentagon agency halts MLK Day, Black History Month, other celebrations*, Mil. Times (Jan. 29, 2025), https://www.militarytimes.com/news/pentagon-congress/2025/01/30/pentagon-agency-halts-mlk-day-black-history-month-other-celebrations/; Jennifer Schuessler, *Amid Changes at the National Archives, the Carter Library Cancels a Civil Rights Book Event*, N.Y. Times (Feb. 22, 2025), https://www.nytimes.com/2025/02/22/arts/national-archives-carter-library-cancels-event.html. At the same time, President Trump invited Tiger Woods to the White House to celebrate Black History Month, demonstrating the impossible vagueness that recipients of federal funds are being asked to navigate. *See* Matt Brown and Michelle L. Price, *Trump holds Black History Month event as some agencies skip recognition after anti-DEI* order, AP News (Feb. 21, 2025), https://apnews.com/article/trump-black-history-month-54b47c00249e9c9dc723c5f2c9ebcca9. And since the initial complaint in this matter was filed, the Department of Education launched an "End DEI" website. *See* ¶ 47.

their identity. Teachers may supervise a Black Student Association. Teachers may supervise a first-generation college student group.

159.    For example, Plaintiff District 4J hosts Black Student Union Affinity Groups, which are open to all students and coordinated by a District employee. This and other affinity groups also provide to students and their families a variety of resources, including links to other resources for members, such as the "Black Mental Health Alliance" and "Therapy for Black Men." Plaintiff District 4J also hosts multiple other student groups, which are open to all students, such as the Latinx Student Union Affinity Group, the Asian, Pacific Islander Student Union Affinity Group, the Native American Student Union Affinity Group, and the Jewish Student Union. Each affinity group is supported by a program coordinator, who is an employee of a school in the district or the district itself.

160.    Plaintiffs' members participate in student programs dedicated to providing high-level research and learning opportunities for first-generation undergraduates so they can more successfully apply to graduate programs and advanced STEM employment opportunities.

161.    Plaintiffs' members run, work in, and benefit from higher education initiatives and organizations that may be banned by the Letter. For example, Plaintiffs' members work at and with university multicultural centers, which run identity-based programs and hold diversity events. They hold events and lectures to honor important events, individuals, groups, and ideas. For example, an AFT Plaintiff member works with a diversity center that includes in its events a day of remembrance for interned Japanese Prisoners of War. Plaintiffs' members work at institutions that hold a Martin Luther King Jr. annual lecture. Plaintiffs' members work at institutions that hold diversity conferences. Plaintiffs' members direct initiatives at their universities that are designed to help underrepresented students and faculty succeed, particularly

if they are first-generation students or faculty. Plaintiffs' members organize and take part in voluntary graduation ceremonies for certain identity-based communities. All of these initiatives and organizations are run in an effort to increase educational equality and further education attainment of the university and college students with whom Plaintiffs' members work. The February 28, 2025 FAQ does not provide sufficient clarity or certainty about what is permitted to cure the Letter's defects.

162.    Plaintiff District 4J and Plaintiffs' members have been put in an impossible position, not knowing what conduct, speech, perspectives, lessons, programs, activities, or meetings the Department would consider prohibited by the Letter. Plaintiffs and their members fear that many of the activities central to their work, their missions, and their employment could jeopardize their federal funding, should the Letter be enforced.

163.    Plaintiffs and their members are all already experiencing a chilling effect of their First Amendment rights because they do not know what is exactly prohibited by the Letter and are afraid the above-described activities could threaten their federal funding due to the Letter.

### Banning Legal Admissions and Scholarship Practices

164.    Plaintiffs' members serve on admissions and scholarship committees, including ones that implement holistic interview programs and recruitment outreach efforts designed to increase diversity among teachers and students. Plaintiffs' members work to broaden the pool of applicants for new faculty positions, including advertising at conferences with more diverse attendance or reaching out to recruit faculty from historically minority institutions. Plaintiffs' members benefit from such efforts, which have resulted in greater diversity in accepted student classes, an increase in student retention, and higher performance among students.

165.    Plaintiffs' members run, work in, and benefit from higher education best practices and recruitment programs that may be banned by the Letter. For example, Plaintiffs' members work in and support graduate programs that have eliminated the use of GRE scoring and GPA cutoffs, which disproportionately narrow the applicant field. Plaintiffs' members serve on faculty selection teams that are dedicated to finding creative funding solutions for graduate applicants who lack the funding to support their research. Plaintiffs' members advocate for new outreach and recruitment efforts aimed at conferences for minority communities and historically underrepresented groups. Plaintiffs' members lead departmental diversity, equity, and inclusion committees dedicated to identifying aspects of the department preventing positive change and fostering a more equitable environment for all members of the department. Plaintiffs' members are part of faculty associations that foster equity and inclusion among faculty. All of these higher education best-practices and recruitment programs are dedicated to increase the educational equality and further education attainment of the university and college students with whom Plaintiffs' members' work.

### *The Certification Will Harm Plaintiffs*

166.    Because the Certification is an implementation of the Letter, the Certification creates the same injuries and harm at the K-12 level for Plaintiffs and their members, including to their critical work and missions, freedom to teach, and support for students and student groups, *see supra*, ¶¶ 139-163. It also amplifies that harm due to its imposition of new obligations and penalties.

167.    The Certification also contains vague language, including an ambiguous reference to "illegal DEI." Because Plaintiffs, their members, and others are unable to determine what

activities are and are not covered by the Certification, it also creates similar harms with respect to the chilling of DEI-related speech and activities.

168.    In the days leading up to the certification deadline, a number of States advised the Department that they would not complete the requested certifications and would not require their LEAs to make such certifications. The Department has given no sign that they accept the position of these States. Instead, the Department renewed its demand for certification on April 22, 2025, prompting 19 Attorneys General, including the Attorney General for Oregon, to sue on April 25, 2025, seeking declaratory relief and to enjoin the Certification's implementation and vacate it under the APA.[51]

169.    The Department's demand creates an impossible choice: LEAs can either sign the Certification, despite not knowing the meaning of its key terms and having serious concerns about its legality, or they can decline to sign the Certification, which the Department has indicated is a material condition for the continued receipt of federal financial assistance. If they sign, they subject themselves to potential FCA enforcement as well as breach of contract claims. If they do not sign, the Department may terminate federal funding. Whatever they decide, the result could be devastating for their schools, educators, and students. An SEA declining to sign its certification and instructing LEAs in the state that they need not sign the certification does not lessen the burden for these districts. Because the SEA can provide no assurances regarding the Department's actions, each LEA must still grapple with this impossible choice.

170.    Even for LEAs that don't view this as an impossible choice—either because their SEA has instructed them not to sign the certification, or because they feel obligated to do so—the

---

[51] *State of New York, et al. v. U.S. Department of Education, et al.*, No. 1:25-cv-11116 (D. Mass).

harms are significant, as described above. It is not only the tension that the impossible choice presents. It is the risk of the result of either choice made.

171.    For District 4J, the certification requirement represents not only a doubling down of the Department's changes to its prior interpretations of Title VI but a new and threatening mode of enforcement that further chills protected speech and expression.

172.    District 4J estimates that the amount of federal funding it will have received over the most recent three years is almost $80 million dollars. If the district lost federal funding, even for one year, the District would need to lose two weeks' instruction time, or – alternatively – the district would have to lay off approximately 110 teachers (about 10% of the teacher workforce), or some other combination of lost instruction time, staff layoffs and program reductions. Were the district to have to return three years of funding, or face treble damages of a similar amount, the district would be shattered. It would require layoffs of over half the teacher workforce or the shuttering of district schools for 55 days (or some similarly destructive combination), a devastating and unprecedented event, that would greatly harm the district's students, families, and educators.

173.    Educators—including hundreds of thousands of AFT members who work in K-12 institutions in every state, and members of AFT-MD and ASA—face harms as well. Knowing that Certification bans at least *some* DEI activities (without specifying which), they must self-censor their speech and association, and there is a reasonable likelihood that their school will censor their lawful speech and activities. If they are not censored, they not only risk subjecting their school to investigation and loss of federal funding, but also to FCA suits and penalties, including treble damages. This self-censorship is not a choice that educators want to make, but rather is a result of the vague and threatening language in the Certification itself.

174.    As with the Letter, had Plaintiffs had a chance to comment on the Department's

changes through a notice and comment process, they would have.

## CLAIMS FOR RELIEF

### Count One
### First Amendment - Free Speech and Free Association

175.    The preceding allegations are incorporated herein as if repeated fully.

176.    Plaintiffs state this cause of action against all Defendants.

177.    The Letter violates First Amendment protections for free speech, free expression,

and free association, because its threat of "loss of federal funding" impermissibly restricts the

exercise of Plaintiffs' and their members' constitutionally protected First Amendment rights,

based on content and viewpoint.

178.    Efforts to suppress speech based on the government's opposition to the speaker's

view are unconstitutional.

179.    For example, the Letter penalizes the protected speech of Plaintiffs and their

members by threatening to bring enforcement actions and ultimately withhold federal funds for

conducting any diversity, equity, and inclusion programs, or teaching lessons that may reference

race or historical events that impacted specific racial groups or ethnicities.

180.    The Letter makes threats of investigations and enforcement actions against any

school that conducts diversity, equity, and inclusion activities or programs, hosts student groups,

or uses undefined proxies in admissions or any other aspect of school life.

181.    The Letter places unconstitutional conditions on federal funding in violation of

the First Amendment.

182.    Indeed, even being investigated for violations of these new requirements the

Letter has purportedly categorized as violations of civil rights law carries its own consequences

for schools, including the costs of conducting investigations, the potential costs of litigation, and the need to redirect dedicated resources from other purposes to engage with the civil compliance investigation. Those harms are separate and apart from the reputational harm that besets a school identified for investigation.

183.    The freedom of speech of individual Association Plaintiffs' members is likewise impinged due to the threats of investigation of their institutions.

184.    These First Amendment violations have injured and continue to injure Plaintiffs and their members.

185.    Accordingly, the Letter violates the First Amendment.

## Count Two
## Fifth Amendment - Due Process Vagueness

186.    The allegations in paragraphs 1-174 are incorporated herein as if repeated fully.

187.    Plaintiffs state this cause of action against all Defendants.

188.    The Letter violates the Fifth Amendment to the United States Constitution, because it fails to provide a person of ordinary intelligence fair notice of what is prohibited and is so standardless that it authorizes or encourages seriously discriminatory enforcement.

189.    Many of the key words and concepts in the Letter are not defined or explained. Plaintiffs and their members are left to guess whether their conduct, expression, association will lead to termination of federal funds for the educational institutions in which they work. Plaintiffs and their members will be forced to decide whether to comply with their licensure and professional requirements or jeopardize their institution's federal funding.

190.    Furthermore, the Letter lends itself to subjective interpretation and arbitrary or even discriminatory enforcement. The Letter will allow OCR to exercise unfettered discretion to

determine whether a program or activity violates federal civil rights law, as it is misconstrued under the Letter.

191.    Accordingly, the Letter is unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause.

## Count Three
### Administrative Procedure Act - 5 U.S.C. § 706(2)

192.    The allegations in paragraphs 1-174 are incorporated herein as if repeated fully.

193.    Plaintiffs state this cause of action against all Defendants.

194.    The Letter is final agency action that is subject to judicial review. 5 U.S.C. § 706.

195.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory … authority …"; or done "without observance of procedure required by law." 5 U.S.C. § 706(2).

196.    The Letter, in purporting to interpret Title VI of the Civil Rights Act of 1964, is not in accordance with several laws in violation of 5 U.S.C. § 706(2)(A), including Title VI of the Civil Rights Act of 1964 and 20 U.S.C. § 7906a; 20 U.S.C. § 1232a; 20 U.S.C. § 3403.

197.    The Letter is contrary to the First Amendment and the Due Process Clause in violation of 5 U.S.C. § 706(2)(B).

198.    The Letter is in excess of the agency's authority in violation of 5 U.S.C. § 706(2)(C), because it contravenes the law it purports to interpret, Title VI of the Civil Rights Act of 1964, and because Title VI does not forbid the activities described in the Letter.

199.    The Letter is arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A) because, it at least:

○ Fails to acknowledge, much less sufficiently explain, the change in position from prior guidance issued by OCR and the Department of Education;

○ Fails to consider or explain the implications for existing reliance interests;

○ Is so vague in what it purports to prohibit that it fails to provide the "reasoned decisionmaking" required by the APA; and

○ Fails to account for other legal requirements that may be implicated by the changes it implements, such as how the Department intends to enforce the Letter while also complying with the requirements set forth in the statutes that prohibit the Department from dictating institutional and educational programs and curricular choices.

200.     The Letter is without observance of procedure required by law in violation of 5 U.S.C. § 706(2)(D) because the Letter is a legislative rule that must be promulgated through notice and comment rulemaking.

## Count Four
## First Amendment - Free Speech and Free Association

201.     The allegations in paragraphs 1-174, and in Count One paragraphs 176-185, are incorporated herein as if repeated fully.

202.     The Certification violates First Amendment protections for free speech, free expression, and free association, because its threat of "loss of federal funding" for failure to sign, and loss of funding and other legal consequences if signed, impermissibly restricts the exercise of Plaintiffs' and their members' constitutionally protected First Amendment rights, based on content and viewpoint.

203.     The Certification places unconstitutional conditions on federal funding in violation of the First Amendment.

204.    Indeed, even being investigated for violations based on the Certification or having to defend a FCA case creates harmful consequences, including to the reputations of schools and educators.

205.    The freedom of speech of individual Association Plaintiffs' members is likewise impinged due to the threats of investigation and litigation against their institutions.

206.    These First Amendment violations have injured and continue to injure Plaintiffs and their members.

207.    Accordingly, the Certification violates the First Amendment.

**Count Five**
**Fifth Amendment - Due Process Vagueness**

208.    The allegations in paragraphs 1-174, and in Count Two paragraphs 187-191, are incorporated herein as if repeated fully.

209.    The Certification violates the Fifth Amendment to the United States Constitution, because it fails to provide a person of ordinary intelligence fair notice of what is prohibited and is so standardless that it authorizes or encourages seriously discriminatory enforcement.

210.    In the Certification, the Department takes the position that Title VI and *SFFA* prohibit "race-based" actions, practices that "advantage one race over another," and "certain DEI practices." The Department gives no information as to what these prohibitions mean in practice.

211.    As a result, LEAs and SEAs must either take steps to revise their programmatic activity to avoid running afoul of these broad prohibitions, decline to make a certification and lose their funding, or risk making a certification that will be deemed false and subject them to liability under the FCA. This puts them in an impossible, and constitutionally untenable position.

212.    Plaintiffs and their members are left to guess whether their conduct, expression, association will lead to serious consequences for the educational institutions in which they work.

Plaintiffs and their members will also be forced to decide whether to comply with their licensure and professional requirements or risk those serious consequences.

213.    Furthermore, the lack of clarity in the Certification gives the Government and individuals empowered by the FCA expansive discretion to initiate investigations and lawsuits thereby inviting arbitrary enforcement.

214.    Accordingly, the Certification is unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause.

**Count Six**
**Administrative Procedure Act - 5 U.S.C. § 706(2)**

215.    The allegations in paragraphs 1-174, and in Count Three paragraphs 193-200, are incorporated herein as if repeated fully.

216.    The Certification is final agency action. 5 U.S.C. § 706.

217.    The agency promulgated the Certification without following the process required by the Paperwork Reduction Act, therefore the Certification is not in accordance with law in violation of 5 U.S.C. § 706(2)(A), is arbitrary and capricious, and was done without observance of procedure in violation of 5 U.S.C. § 706(2)(D).

218.    The Certification is also not in accordance with law, contrary to constitutional right, in excess of the agency's authority, and arbitrary and capricious for the same reasons as the Letter, *see supra* ¶¶ 195-200.

219.    To the extent that the Assurances section of the Certification presents its own enforceable requirements or guidance, the Certification is a legislative rule that was improperly published without promulgation through notice and comment rulemaking.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs pray that this Court:

a.  Enter a declaratory judgment that the February 14, 2025 Letter is unlawful and unconstitutional;

b.  Declare unlawful and set aside the February 14, 2025 Letter as arbitrary and capricious; contrary to constitutional right; in excess of statutory authority; and without observance of proper procedure required by law, 5 U.S.C. § 706(2)(A)-(D);

c.  Enter a preliminary injunction enjoining Defendants and all of their officers, employees, and agents, from enforcing or taking any steps to implement or apply the February 14, 2025 Letter;

d.  Enter a declaratory judgment that the Certification is unlawful and unconstitutional;

e.  Declare unlawful and set aside the Certification as arbitrary and capricious; contrary to constitutional right; in excess of statutory authority; and without observance of proper procedure required by law, 5 U.S.C. § 706(2)(A)-(D);

f.  Enter a stay under 5 U.S.C. 705 or a preliminary injunction enjoining Defendants and all of their officers employees, and agents from enforcing or taking any steps to implement the Certification;

g.  Enter a permanent injunction enjoining Defendants and all of their officers, employees, and agents, from enforcing or taking any steps to implement or apply the February 14, 2025 Letter or the Certification, as well as any actions taken on the basis of the agency's new interpretation of Title VI embodied therein;

h.  Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements as appropriate; and

i.  Grant such other relief as the Court deems necessary, just, and proper.

Dated: May 6, 2025

Respectfully submitted,

*/s/ Victoria S. Nugent*

Victoria S. Nugent (Bar No. 15039)
Madeline H. Gitomer (Bar No. 31518)
Brooke Menschel (Bar No. 31492)
Andrew Bookbinder (Bar No. 31486)
Kali Schellenberg (Bar No. 31582)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
vnugent@democracyforward.org
mgitomer@democracyforward.org
bmenschel@democracyforward.org
abookbinder@democracyforward.org
kschellenberg@democracyforward.org

*Counsel for Plaintiffs*