# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

---

**American Federation of Teachers**, *et al.*,

      Plaintiffs,

      v.

**U.S. Department of Education**, *et al.*,

      Defendants.

---

Civil Case No. 1:25-cv-00628

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 3

    I.    Each Plaintiff Has Established Standing to Challenge the Letter and
        Certification ...................................................................................................... 3

        A.    District 4J, a Federal Funding Recipient, is Directly Injured by
              Defendants ........................................................................................... 3

        B.    The Associational Plaintiffs' Have Established Likely Injury
              Due to the Predictable Effect of Defendants' Actions ................................ 5

        C.    Plaintiffs' Harms are Imminent and Traceable to the Letter and
              Certification ......................................................................................... 5

    II.    Defendants Fail to Rebut Plaintiffs' APA claims with Relevant
        Evidence or Case Law ....................................................................................... 7

        A.    The Letter and Certification are Final Agency Actions and
              Legislative Rules .................................................................................. 7

        B.    The Departments' Actions Violate the APA ............................................. 10

    III.    The Letter and Certification are Both Unconstitutionally Vague ........................ 10

        A.    The Letter and Certification Provide No Standard of Conduct ................ 11

        B.    The Letter and Certification Invite Arbitrary Enforcement ...................... 12

        C.    *National Urban League* is Legally and Factually Distinct from
              this Case ............................................................................................. 12

    IV.    The Letter and Certification Violate the First Amendment.................................. 14

        A.    The Letter and Certification Extend Far Beyond Prohibitions
              Under Title VI or Reminding Schools of Preexisting
              Obligations ......................................................................................... 14

        B.    The Letter and Certification Impermissibly Condition Funding
              in a Viewpoint Discriminatory Fashion ................................................ 15

    V.    The Relief Requested by Plaintiffs is Necessary and in Accordance
        with *CASA* ...................................................................................................... 17

        A.    Vacatur is the Appropriate Remedy Under the APA, and *CASA*
              Does Not Change That........................................................................... 17

        B.    Declaratory and Injunctive Relief are Necessary to Provide
              Complete Relief to Plaintiffs ................................................................ 19

CONCLUSION................................................................................................................ 20

# TABLE OF AUTHORITIES

## CASES

*AFGE. v. Off. of Special Couns.*, 1 F.4th 180 (4th Cir. 2021) ........................................... 6

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430 (2020) ............................... 17

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146 (D.C. Cir. 1993) .................... 17

*Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387 (D.C. Cir. 2013 .............................................. 9

*Ass'n of Colls. for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822 (D. Md. 2025) ....................... 14

*Benham v. City of* Charlotte, 635 F.3d 129 (4th Cir. 2011) ............................................... 6

*Bonnell v. Lorenzo*, 241 F. 3d 800 (6th Cir. 2001) ......................................................... 15

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ............................................................... 14

*Brown v. Bd. of Educ.*, 349 U.S. 294 (1955) ............................................................... 15

*Chi. Women in Trades v. Trump*, No. 25-cv-02005, 2025 WL 1114466 (N.D. Ill. Apr. 14, 2025) ....................................................................................................... 14

*Coates v. City of Cincinnati*, 402 U.S. 611 (1971) ......................................................... 10

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024) ..................... 17, 18

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798 (D.C. Cir. 2006)......... 9

*Dambrot v. Central Michigan University*, 55 F. 3d 1177 (6th Cir. 1995) .................................... 15

*Dep't of Com. v. New York*, 588 U.S. 752 (2019) ......................................................... 5

*Doctors for Am. v. Office of Personnel Mgmt.*, No. 25-322 , 2025 WL 1836009 (D.D.C. July 3, 2025) ....................................................................................................... 18

*FDA v. All. For Hippocratic Med.*, 602 U.S. 367 (2024) ............................................... 4, 5

*Gen. Elec. Co. v. EPA*, 290 F.3d 377 (D.C. Cir. 2002) ..................................................... 7

*Gentile v. State Bar of Nev.*, 501 U.S. 1030 (1991) ....................................................... 13

*Haitian Evangelical Clergy Assoc. v. Trump*, 25-cv-1464, 2025 WL 1808743 (E.D.N.Y. July 1, 2025) ....................................................................................................... 18

*Hill v. Colorado*, 530 U.S. 703 (2000) .......................................................................................11

*Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940 (D.C. Cir. 2012) ........................ 8, 9

*Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420 (D.C. Cir. 2004) ............................................ 9

*Kestenbaum v. President and Fellows of Harvard College*, 743 F. Supp. 3d 297 (D. Mass. 2024).................................................................................................................... 15

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967)................................ 13

*Kisor v. Wilkie*, 588 U.S. 558 (2019) ............................................................................................ 7

*Lyng v. International Union*, 485 U.S. 360 (1988) ...................................................................... 16

*Mailloux v. Kiley*, 448 F.2d 1242 (1st Cir. 1971) ........................................................................ 15

*NAACP v. Dep't of Educ.*, No. 25-cv-01120, 2025 WL 1196212 (D.D.C. Apr. 24, 2025).....5, 6, 11

*NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449 (1958)................................................... 12

*Nat'l Educ. Ass'n v. Dep't of Educ.*, No. 25-cv-00091, 2025 WL 1188160 (D.N.H. Apr. 24, 2025) .........................................................................................5, 11, 19, 20

*National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) ................................................ 13

*National Urban League v. Trump*, No. 25-cv-471 (TJK), 2025 WL 1275613 (D.D.C. May 2, 2025)............................................................................................ 12, 13, 14

*Nitzberg v. Parks*, 525 F.2d 378 (4th Cir. 1975) ........................................................................ 13

*North Carolina v. Covington*, 581 U.S 486 (2017) ...................................................................... 20

*Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972) ......................................................... 13

*Perkins Coie LLP v. DOJ*, No. 25-cv-00716, 2025 WL 1276857 (D.D.C. May 2, 2025) ........... 14

*Regan v. Taxation with Representation of Washington*, 461 U.S. 540 (1983) ....................... 16, 17

*Rice v. Paladin Enters. Inc.*, 128 F.3d 233 (4th Cir. 1997) ......................................................... 15

*S. Educ. Found. v. U.S. Dep't of Educ.*, No. 25-cv-1079, 2025 WL 1453047 (D.D.C. May 21, 2025)............................................................................................................ 14

*S.F. A.I.D.S. Found. v. Trump*, No. 25-cv-01824, 2025 WL 1621636 (N.D. Cal. June 9, 2025).. 14

*S.F. Unified Sch. Dist. v. AmeriCorps*, No. 25-cv-2425, 2025 WL 1713360 (N.D. Cal. June 18, 2025) ................................................................................................................ 14

*Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635 (4th Cir. 2018) ............................. 17, 18

*Students for Fair Admissions v. President and Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ................................................................................................................................ 15

*Trump v. CASA*, No. 24A88, 2025 WL 1773631 (U.S. June 27, 2025) ............................. 2, 17, 19

*U.S. Lab. Party v. Pomerleau*, 557 F.2d 410 (4th Cir. 1977) ........................................................ 13

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) ................... 13

*Walker v. Kennedy*, 20-CV-2834, 2025 WL 1871070 (E.D.N.Y. July 8, 2025) ........................... 18

*White v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 913 F.2d 165 (4th Cir. 1990) .................. 19

**STATUTES**

18 U.S.C. § 287 ............................................................................................................................. 13

20 U.S.C. § 6333 ............................................................................................................................. 4

5 U.S.C. § 706 .............................................................................................................................. 18

**OTHER AUTHORITIES**

Eugene Sch. Dist. 4J, *Eugene School District 4J Adopted Budget 2025-2026*, https://perma.cc/TGX8-WSCQ .............................................................................................. 4

# INTRODUCTION

Educators and a school district ("Plaintiffs") face threats of investigations, crippling financial cuts, and legal liability stemming from the Department of Education's Dear Colleague Letter, which announced a novel interpretation of Title VI, and subsequent documents interpreting and enforcing it. They brought this litigation to vindicate their constitutional rights and require the Department to comply with its Administrative Procedures Act obligations. After reviewing dozens of declarations and hundreds of pages of briefs, and hearing hours of argument, the Court determined that the Department and its leaders ("Defendants") "could have outlined [their] new enforcement priorities" by "a restatement of existing law," but they "could not extend Title VI to reach new categories of conduct." Op. at 28, ECF 60. Yet, as the Court recognized, that is precisely what Defendants did in issuing the Dear Colleague Letter. *See id.*

Defendants have mustered no material evidence or pertinent authority to oppose Plaintiffs' motion for summary judgment. Instead, Defendants ask the Court to ignore the determinations that support its preliminary injunction order, ignore the plain language of the Letter, the Certification, and supporting documents, ignore Plaintiffs' factual record that shows significant harm and how Defendants are enforcing the interpretation set forth in the Letter, and ignore binding Supreme Court and Fourth Circuit precedent.

Defendants insist that the Letter and Certification merely "remind" funding recipients of "existing obligations to comply with Title VI." *See, e.g.*, Defs.' Br. at 29, ECF 72-1. The Court has already found otherwise. *See, e.g.*, Op. at 28, ECF 60. Second, Defendants continue to imply that diversity, equity, and inclusion, or any acknowledgement of race, necessarily "creat[es] a racially hostile environment or [involves] racial harassment." *See* Defs.' Br. at 29, ECF 72-1. The Court

1

has already dismissed this argument, too. *See, e.g.*, Op. at 33 n.8; 41–42, ECF 60. Only four discrete issues require resolution now, and all should be decided in Plaintiffs' favor:

- **The Educators' Standing:** Because Plaintiff 4J established standing for the APA claims at the preliminary injunction stage, the Court did not decide whether the Plaintiff associations representing their members interests—the American Federation of Teachers ("AFT"), AFT-Maryland and the American Sociological Association ("ASA")—had standing for either the APA or constitutional claims. Plaintiff 4J maintains its standing, and AFT, AFT-Maryland, and ASA have all demonstrated their associational standing to pursue both the APA and constitutional claims, with respect to both the Letter and Certification, on behalf of their members.

- **The Certification's APA Deficiencies**: Plaintiffs' APA claims related to the Certification are ripe for determination. Because the Certification violates the APA for similar reasons as the Letter, and was additionally promulgated contrary to the Paperwork Reduction Act, it must be vacated.

- **The Constitutional Rights Violated:** The Court's rationale for determining, at the preliminary injunction stage, that the Letter likely violates the APA because it is contrary to constitutional rights applies equally to the Certification. That same reasoning demonstrates that the Constitutional claims, too, should be decided in Plaintiffs' favor as to both the Letter and the Certification.

- **The Relevance of *Trump v. CASA*:** This is the Court's first opportunity to assess whether the recent ruling in *Trump v. CASA*, No. 24A88, 2025 WL 1773631 (U.S. June 27, 2025), imposes constraints on the Court's ability to grant the relief Plaintiffs seek. Contrary to Defendants' argument, *CASA* does not preclude Plaintiffs' requested relief. The Court in *CASA* was explicit that it does not apply to the remedial framework provided by the APA. *Id.* at *6 n.4; *8 n.10.

Defendants have not justified any departure from the Court's earlier order, much less the complete reversal that would be required to dismiss Plaintiffs' claims. The reasoning set forth in the Court's preliminary injunction order supports granting summary judgment to the Plaintiffs, vacating the rule, and issuing a permanent injunction. Plaintiffs respectfully request that the Court order such relief.

## ARGUMENT[1]

### I.    Each Plaintiff Has Established Standing to Challenge the Letter and Certification

The record demonstrates that each Plaintiff has established an "injury in fact" that is traceable to the Letter and Certification. Defendants' arguments otherwise are unpersuasive. First, Defendants argue that Plaintiffs cannot establish an injury in fact unless they are direct federal funding recipients and were asked to sign the Certification. But Defendants fail to acknowledge that District 4J *is* a funding recipient and required to sign. Moreover, Defendants disregard the proper framework for establishing injury in fact, under which all three associational Plaintiffs have standing. Second, Defendants argue that Plaintiffs have failed to show their injuries are fairly traceable to Defendants' actions because enforcement actions are not sufficiently imminent and ultimately speculative. That disregards the evidence in the record. Both arguments fail to withstand scrutiny, and each Plaintiff has established standing to challenge the Letter and Certification.

#### A.  District 4J, a Federal Funding Recipient, is Directly Injured by Defendants

Defendants' argument that District 4J does not receive federal funding can be easily dismissed. Defendants rely entirely on one page of a 92-page adopted budget, which shows only a portion of the District's revenue.[2] A few pages later, the "Total Revenue" shows all sources of

---

[1] Defendants' motion is styled as a motion to dismiss and a motion for summary judgment. Plaintiffs have demonstrated that there are no disputed issues of material fact and that they win on the law. Because Plaintiffs meet the more stringent standard for a motion for summary judgment, they also withstand Defendants' motion to dismiss.
[2] *See* Defs.' Br. at 15, ECF 72-1 (citing pg. 9 of District 4J's budget, showing "General Fund" revenues).

funding, including "Federal Sources."[3] Likewise, District 4J's declarations describe the amount and importance of the federal funding it receives.[4]

That District 4J's funding is passed through the State Education Agency ("SEA") is irrelevant. Receipt of federal funds is the Department's basis for enforcing federal civil rights statutes at the Local Education Agency ("LEA") level, and the reason why District 4J is a "colleague" addressed by the Dear Colleague Letter and subject to the Certification. Op. at 21 n.5, ECF 60 (clarifying that government admitted at oral argument that schools are "colleagues").[5]

Defendants are also wrong that District 4J was not "asked" to sign the Certification. In fact, Defendants *required* SEAs *and* LEAs to sign on penalty of loss of funds.[6] Neither Oregon's decision to not collect LEA signatures, nor that the Certification was sent directly to SEAs, protect school districts like District 4J from the harms the Certification imposes.[7] District 4J's allegations about the harms it would face from the Certification remain unrebutted.[8] Where, as here, a government action "require[s] or forbid[s] some action by the plaintiff…standing is usually easy to establish." *See FDA. v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024).

---

[3] Eugene Sch. Dist. 4J, *Eugene School District 4J Adopted Budget 2025-2026*, at 15, https://perma.cc/TGX8-WSCQ (showing revenues from all funding sources, including federal).

[4] Ex. 4 ¶ 38, ECF 31-7; *id.* ¶¶ 39–40; Ex. 38 ¶ 28, ECF 37-4 (describing that the District received $29.5 million dollars in 2022-23, $34.5 million in 2023-24, and roughly $14.9 million for 2024-2025); *id.* ¶¶ 29–31 (describing consequences of loss of funds).

[5] This understanding is reiterated in federal statutes dictating LEA funding. *See e.g.*, 34 C.F.R. §§ 100.13(g)(1)(ii) & (2)(ii) (including local education agencies as entities covered by Title VI due to receipt of federal funding from Department of Education, and describing how governmental entities which receive assistance through a State or local government are covered by Title VI and its regulations); 20 U.S.C. § 6333 (describing allocations to LEAs under Title I-A of the Elementary and Secondary Education Act).

[6] *See* Ex. 41, ECF 37-7 (press release entitled "ED Requires *K-12 School Districts* to Certify Compliance with Title VI and Students v. Harvard as a Condition of Receiving Federal Financial Assistance") (emphasis added); Ex. 42, ECF 37-8; Ex. 43, ECF 37-9. Defendants have not disavowed that requirement, and District 4J has no assurance that it will not face funding cuts.

[7] *See* Ex. 51 ¶¶ 6–15, ECF 66-6; *see also* Ex. 54 ¶¶ 19–21, ECF 66-9 (explaining Oregon school districts still face uncertainty and chaos due to the Certification).

[8] *See* Pls.' Br. at SMF-10–14, ECF 66-1; Ex. 38 ¶¶ 18–20, ECF 37-4; Ex. 51 ¶¶ 14–25, ECF 66-6.

### B. The Associational Plaintiffs' Have Established Likely Injury Due to the Predictable Effect of Defendants' Actions

Defendants' arguments about associational Plaintiffs' injuries fare no better. First, Defendants do not address that AFT, AFT-MD, and ASA's members are directly regulated by the Certification, which threatens educators, stating "[t]he continued use of illegal DEI practices may subject *the individual* or entity using such practices to serious consequences," Certification at 3 (emphasis added).[9] Even if they were not, though, Plaintiffs need not be directly regulated to establish standing. Last year the Supreme Court reiterated that an unregulated party may have standing where a "regulated (or regulable) third party to the government action" will "likely react in predictable ways that in turn will likely injure the plaintiffs." *Hippocratic Med.*, 602 U.S. at 383 (citation modified); *see also Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (concluding that "primarily future injuries" dependent, in part, on the conduct of third parties are sufficient to confer standing where they rely on the "predictable effect of Government action on the decisions of third parties"). But Defendants do not even address this standard. As discussed *infra* Sec. I.C., associational Plaintiffs' injuries are a "predictable" result of actions that their employers—subject to the Letter and Certification—take to comply with Defendants' demands.

### C. Plaintiffs' Harms are Imminent and Traceable to the Letter and Certification

Defendants' argument that Plaintiffs lack standing because the Department has not yet enforced the Letter or the Certification against them defies law and logic. It should be expected that Plaintiffs have not lost funding or faced enforcement actions described in the Letter while the

---

[9] The district courts in New Hampshire and the District of Columbia also found educator and member standing. *See NAACP v. Dep't of Educ.*, No. 25-cv-01120, 2025 WL 1196212 (D.D.C. Apr. 24, 2025) ("*NAACP* Op."); *Nat'l Educ. Ass'n v. Dep't of Educ.*, No. 25-cv-00091, 2025 WL 1188160 (D.N.H. Apr. 24, 2025) ("*NEA* Op."). The *NEA* court found that "it is virtually inevitable that schools will act to limit the possibility that the Department will target them for enforcement by, for example, eliminating teaching positions that involve race or censoring teachers who teach about race." *NEA* Op. at *13 (detailing numerous instances of censorship of educators as a result of the Letter and Certification). Similarly, the *NAACP* court found that the Certification will "force schools and teachers" to "steer clear" of teaching certain topics. *NAACP* Op. at *5 (quotation marks omitted).

Letter's enforcement has been stayed. But that does not preclude standing. Instead, the Court recognized that "the Plaintiffs are essentially put to a choice of self-censorship or risking enforcement." Op. at 22, ECF 60. Defendants admit that a plaintiff can establish injury in fact by "show[ing] that his First Amendment activities have been chilled." Defs.' Br. at 14, ECF 72-1; *see also AFGE. v. Off. of Special Couns.*, 1 F.4th 180, 187 (4th Cir. 2021) ("[I]njury-in-fact may be established []by . . . a 'sufficient showing of self-censorship which occurs when a claimant is chilled from exercising his right to free expression'") (citation omitted). Defendants argue that Plaintiffs' chilled speech is "objectively unreasonable," but do not address associational Plaintiffs' evidence. *See* Defs.' Br. at 14–17, ECF 72-1. And as the Fourth Circuit recognized in *Benham v. City of Charlotte*, the Defendants' principal case, while "any chilling effect must be objectively reasonable," a litigant "need not show [they] ceased [the targeted] activities altogether to demonstrate an injury in fact." 635 F.3d 129, 135 (4th Cir. 2011) (quotation omitted).

Nor do Defendants' conclusory assertions that Plaintiffs' harms are not "sufficiently imminent" or traceable to Defendants undermine Plaintiffs' injury in fact. This Court has already found that the Letter makes credible and specific enforcement threats. *See, e.g.*, Op. at 21, ECF 60 ("The Letter's repeated references to enforcement and terms that carry enforcement consequences lends credibility to the imminence of possible enforcement.").[10] Until or unless Defendants revoke the Letter and Certification, the resulting chilled speech and self-censorship are directly traceable to them. Plaintiffs' undisputed allegations that, as a result of the vague and threatening language of the Letter and Certification and other related evidence, they reasonably

---

[10] *See also NAACP* Op. at *5 (discussing Certification's emphasis "that non-compliance with the administration's interpretation of unlawful DEI will result in liability under the False Claims Act").

fear that they will be subject to discipline and are self-censoring their protected speech, are more than sufficient to establish injury in fact, even without formal enforcement.[11]

## II.    Defendants Fail to Rebut Plaintiffs' APA claims with Relevant Evidence or Case Law

This Court has already rejected Defendants' only argument to rebut Plaintiffs' APA claims regarding the Letter: that it is not final agency action or a legislative rule. Op. at 26, 28–29, ECF 60; Defs.' Br. at 17–21, ECF 72-1. Yet Defendants advance the same argument as to the Certification. Defs.' Br. at 17–21, ECF 72-1. It is no more effective. Defendants fail to rebut Plaintiffs' facts or present new facts or law to warrant a change in the Court's earlier determination that the Letter is a final agency action. That reasoning is equally applicable to the Certification.

### A.  The Letter and Certification are Final Agency Actions and Legislative Rules

The Court already recognized that the Letter "sets forth the agency's position on what the law means" and threatens federal funding if entities do not comply. Op. at 24, ECF 60. Despite its continued assertions, "the government's insistence that the Letter merely restates schools' obligations under civil rights law is unpersuasive." *Id.* at 25. The Certification, too, "is applied by the agency in a way that indicates it is binding," *Id.* at 24 (citing *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002)). These conclusions, and the reasoning behind them, are sufficient to reject Defendants' argument that the Letter and Certification are "agency guidance documents [that] are not final agency action." Defs.' Br. at 19, ECF 72-1.

Disclaimers in the documents claiming that they do not create new legal standards or have the force and effect of law do not prove otherwise. The Court "need not credit that boilerplate

---

[11] *See* Ex. 5 ¶ 28, ECF 31-8; Ex. 6 ¶ 22, ECF 31-9; Ex. 7 ¶ 30, ECF 31-10; Ex. 8 ¶ 16, ECF 31-11; Ex. 9 ¶ 21, ECF 31-12; Ex. 53 ¶ 12, ECF 66-8.

language," Op. at 24, ECF 60, particularly where an agency's reading does not reflect "fair and considered judgment." *Kisor v. Wilkie*, 588 U.S. 558, 579 (2019).

Defendants have presented no evidence, in an administrative record, declaration, or otherwise, to change the Court's earlier conclusion. Further, with respect to the Certification, Defendants assertion that "it does not create any binding consequences independent from those that are *already* imposed by Title VI," Defs.' Br. at 19, ECF 72-1, ignores the document's requirement that SEAs and LEAs certify "compliance with the below" as a material condition for receipt of federal funding. The terms "below," so termed "Assurances," go well beyond Title VI requirements. *See* Pls.' Br. at SMF-7–8, 7, ECF 66-1; Pls.' PI Cert Br. at 29–30, ECF 37-1. With these Assurances that SEAs and LEAs must agree to, unexplained and untethered to any existing law and precedent, the Certification imposes new requirements and is not just a reminder, despite Defendants' assertions to the contrary.

Moreover, while Dear Colleague Letters "are generally interpretative rules, and usually do not require notice and comment," the "label an agency places on a rule is not determinative." Op. at 27, ECF 60. Defendants' assertions that the Letter and Certification "comfortably fit" within the definition of interpretative rules are unsupported by evidence or case law. "[T]he Letter prescribes new law and policy, and has the force and effect of law, [and thus] it surpasses the bounds of an interpretative rule." Op. at 28, ECF 60. The same is true for the Certification. It conditions federal funding on Assurances that unlawfully expand the reach of the Equal Protection Clause and Title VI, in conflict with Title VI existing regulations. *See* Pls.' PI Cert Br. at 29–30, ECF 37-1. The Court has already concluded that "the government's interpretation is owed no deference whatsoever" where its "directives are changes from prior law that appear binding." Op. at 23–24, ECF 60.

Defendants' effort to equate "warning letters" focused on statutory obligations in *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012), with the Letter and Certification is unpersuasive. *See* Defs.' Br. at 18, ECF 72-1. The *Holistic Candlers* court found that FDA warning letters, issued to specific manufacturers questioning whether their actions complied with statutory obligations, did not constitute a final agency action, in part because the letters did not compel recipients to take any action. *Holistic Candlers*, 664 F.3d at 944 (letters "plainly do not mark the consummation of the FDA's decision making" or "represent a decision determining rights or obligations, or one from which legal consequences flow").[12] Those circumstances are demonstrably different from here, where the agency is imposing obligations that exceed its statutory authority and conflict with existing regulation. The *Holistic Candlers* court made this precise point, distinguishing the FDA letters from an EPA letter that *was* final agency action because it "expressed EPA's 'unequivocal position' that it could require labeling changes" without abiding by procedures set forth under the relevant statute and "gave no indication that [its was] subject to further agency consideration or possible modification." *Id.* at 945 (citation omitted). Defendants fail to respond to Plaintiffs' allegations and the Court's preliminary findings (with respect to the Letter) that show the Letter and Certification are *not* similar to agency advice letters, because they express the Department's unequivocal positions about what conduct is prohibited, give no indication that these positions are subject to further agency consideration, and go well beyond what the relevant statutes require or permit.

---

[12] Defendants' other authority does not change this either. They cite only out-of-circuit cases that rely on different factual determinations. *See, e.g.*, *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) ("The answer seems obvious once we examine the concrete impact the EPA Letter had on IEDA and its members - in short, none whatsoever."); *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 808–09 (D.C. Cir. 2006) (policy guidelines not final agency action in part because they used "conditional" language and confirmed agency's position "remains flexible"); *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013) ("Of course, if an agency issues a statement that is labeled an interpretative rule or a policy statement and it has all of the indicia of a final legislative rule, then the rule will be subject to review.").

**B.  The Departments' Actions Violate the APA**

Defendants' APA arguments rise and fall on whether the Letter and Certification are final actions or legislative rules. Plaintiffs have provided significant evidence and supporting case law demonstrating that these are final agency actions not issued in accordance with the APA.[13] Defendants address none of it. *See generally* Defs.' Br. at 17–21, ECF 72-1. The Court has already found that the Letter likely violates the APA because it eschewed required notice-and-comment, is arbitrary and capricious, is not in accordance with law, and is contrary to constitutional rights. Op. at 29–43, ECF 60. Defendants' failure to produce an administrative record or any evidence to rebut the Court's prior findings and Plaintiffs' allegations only bolsters the strength of Plaintiffs' claims and the Court's original ruling. Similarly, because Defendants have not produced any evidence or responded to any of Plaintiffs' substantive APA claims with respect to the Certification, the Court should find in Plaintiffs' favor on those claims as well. *See* Pls.' Br. at 6–18, ECF 66-1.[14]

**III.    The Letter and Certification are Both Unconstitutionally Vague**

Defendants' vagueness arguments are simply re-cast arguments this Court already rejected: 1) that the Department is merely restating the requirements of Title VI, and 2) that any risk of enforcement against Plaintiffs is speculative. These arguments depend on ignoring the documents' actual language. Though Defendants rely heavily on *National Urban League,* it provides them no lifeline because it is legally and factually distinct. Because the Letter and Certification are replete with language untethered and contrary to Title VI and its regulations, rather than providing a "comprehensible normative standard," they provide no "standard of conduct" at all, *Coates v. City*

---

[13] *See* Pls.' Br. at 6–17, ECF 66-1; Pls.' PI Cert Br. at 20–32, ECF 37-1; Pls.' PI. Br. at 23–35, ECF 31-1.
[14] Moreover, Defendants fail to explain how the Certification could be issued consistent with the APA without adhering to the Paperwork Reduction Act, thus conceding it was improperly issued. *See* Pls.' Br. at 8–9, ECF 66-1.

*of Cincinnati*, 402 U.S. 611, 614 (1971), and invite arbitrary enforcement via capacious language and encouragement of third-party claims.

### A. The Letter and Certification Provide No Standard of Conduct

Defendants assert that the Letter and Certification establish a comprehensible normative standard by echoing Title VI's prohibition against differential treatment based on race. Defs.' Br. at 23, ECF 72-1. However, this argument, substantiated by cherry-picked quotes, fails to account for the actual text of the Letter, Certification, and FAQs, which diverge significantly from Title VI.[15] *See* Op. at 32, ECF 60 (noting "[t]his Court must concern itself with what the Letter actually says, not what the government says the Letter says"). Attempting to now cabin instances of vague and contradictory language in the Letter and Certification by Title VI does not bridge the "gulf between [the government's] stated intent" and "what it actually did." *Id.* at 43. In other words, Defendants cannot both redefine Title VI discrimination to encompass DEI, curricular content, and teaching methodologies without explanation, and claim that "discriminat[ion] on the basis of race under well-established Title VI principles" still provides a clear standard of conduct, Defs.' Br. at 24, ECF 72-1. *NAACP* Op. at *6 (in context, documents provide no clear "'boundaries of the forbidden areas' to guide schools' compliance with the certification or to limit the Department's enforcement actions"); *NEA* Op. at *19–21.[16]

---

[15] The Letter, for instance, inextricably links diversity, equity, and inclusion programs with discrimination without defining what constitutes a "DEI program" or the circumstances under which it violates Title VI. *See NEA* Op. at *18. Furthermore, Defendants offer no explanation for how their assertions—that classroom teaching is "toxic indoctrination," social and emotional learning "smuggles" racial stereotypes, or diversity cognizance is tantamount to discrimination—align with Title VI. The Certification, which is a mechanism for enforcing the Department's new interpretation of Title VI, adds additional vagueness through its Assurances. *See* Pls.' PI. Cert. Reply Br. at 11–12, ECF 51. The FAQs exacerbate the documents' misstatements of law, *see NEA* Op. at *21, and otherwise "lack sufficient clarity to override the express terms of the Letter," Op. at 32, ECF 60.

[16] Likewise, because both the Letter and Certification reach beyond Title VI, they are invalid in the vast majority of their applications. *See* Defs.' Br. at 23, ECF 72-1 (citing *Hill v. Colorado*, 530 U.S. 703, 733 (2000)). If the Letter and Certification only served to "remind recipients of federal funding of their existing obligations to comply with Title VI" as Defendants claim, Defs.' Br. at 29, ECF 72-1, there would be no possibility of enforcement based on the "understanding" in the Letter or potential violations of the "assurances" in the Certification.

**B. The Letter and Certification Invite Arbitrary Enforcement**

Because the Letter and Certification go beyond Title VI and include vague language that unlawfully expands the sphere of potentially discriminatory conduct, they open the door for Defendants and private parties to engage in arbitrary enforcement—and directly encourage such enforcement. It is unsurprising that Plaintiffs do not point to concrete evidence of enforcement: the Letter and the Certification have been stayed and enjoined by this and other courts since April 24, the day the Certification was slated to go into effect. Even so, more than 50 investigations citing the Letter have been opened since it was issued.[17] And, while Defendants argue the FCA's scienter requirement negates potential enforcement issues, that argument ignores that their documents attempt to set forth the standard regulated parties would be judged as "knowing." It also ignores the reality of FCA cases, which take time and resources to fight, and can exact enormous legal fees and reputational harm regardless of the final judgment. Additionally, the Certification threatens the removal of federal funding and contract claims, neither of which have a scienter requirement, and both of which would depend on the analysis of ill-defined terminology.

**C. *National Urban League* is Legally and Factually Distinct from this Case**

Defendants repeatedly rely on *National Urban League v. Trump*, No. 25-cv-471 (TJK), 2025 WL 1275613 (D.D.C. May 2, 2025), a factually and legally distinct litigation where a district court declined to preliminarily enjoin executive orders that instructed agencies to cancel grants and contracts related to "DEI" and require a certification concerning similar concepts. Putting aside whether the court's analysis in that case is legally sound, the court's vagueness analysis was driven by its context: cuts to discretionary grant funding for nonprofits based on executive orders.

---

[17] *See* Pls.' Br. at SMF-5, ECF 66-1.

The context differs in three important ways for purposes of this Court's analysis. First, the court found that plaintiffs likely had no protected due process interest in their contracts for discretionary grant funding, and therefore no basis for a due process claim. *Id.* at *17–18. Here, Plaintiffs' First Amendment, reputational, and property interests are implicated, and Defendants have not contested Plaintiffs' due process interests. *See, e.g.*, *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958) (recognizing First Amendment rights are "an inseparable aspect of the 'liberty' assured by the Due Process Clause").

Second, the *National Urban League* court's analysis is inextricable from its executive order context. Because the executive orders were directed to the President's subordinates and did not directly forbid or require any conduct by plaintiffs, the "fair notice" and "arbitrary enforcement" inquiries were, respectively, a "poor fit" and a "square peg for a round hole." *Nat'l Urb. League*, 2025 WL 1275613, at *18–19. Here, both analyses apply straightforwardly because the Letter and Certification are directed to school districts and the behavior and speech of educators.

Finally, *National Urban League* applied a "relaxed" standard to analyze text that is meaningfully different from the text here. The court's "relaxed standard" was based on three aspects of the executive orders: civil enforcement, economic regulation,[18] and discretionary grant funding.[19] This is not a "business regulation" nor a case where the government is awarding discretionary and selective subsidies. *See Vill. of Hoffman Ests.*, 455 U.S. at 498; *Finley*, 524 U.S. at 589. Moreover, the Certification *does* invoke potential criminal enforcement,[20] and even if it did

---

[18] This distinction came from *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982), which relied on dictum from *Papachristou v. City of Jacksonville* for the proposition that "greater leeway" on vagueness is appropriate "[i]n the field of regulatory statutes governing business activities," 405 U.S. 156, 162 (1972).

[19] Here the court relied on *National Endowment for the Arts v. Finley*, a case evaluating the addition of "imprecise considerations" to the "already subjective" National Endowment of Arts grant selection process. 524 U.S. 569, 590 (1998). The *Finley* Court, after determining that the plaintiffs' First Amendment rights were not violated, found that because the government was awarding "selective subsidies," rather than acting as sovereign regulator, the consequences of imprecision were "not constitutionally severe." *Id.* at 589.

[20] The invocation of the FCA raises the specter of criminal penalties. *See* 18 U.S.C. § 287.

13

not, courts regularly find vagueness in the civil context, particularly where First Amendment rights are implicated.[21] Additionally, the very short certification statement there is meaningfully different from the multitude of vague statements here, which impose numerous unclear obligations on Plaintiffs.[22] Thus, nothing in *National Urban League* supports Defendants' atextual arguments.

## IV.    The Letter and Certification Violate the First Amendment

Defendants' First Amendment argument also fails. Defendants build their First Amendment defense on the same failed assertions that the Letter and Certification merely "remind" federal funding recipients of "existing" Title VI obligations, and that any recognition of race in education is necessarily unlawful. *See, e.g.*, Defs.' Br. at 28–31, ECF 72-1. The Court has already rejected both arguments, *see, e.g.*, Op. at 28–29, 33 n.8, 41–42, ECF 60, and should do so again now.

### A.    The Letter and Certification Extend Far Beyond Prohibitions Under Title VI or Reminding Schools of Preexisting Obligations

This Court has already rejected the notion that "the Letter only targets discriminatory conduct, and does not reach speech at all" because "discussing 'systemic and structural racism' or 'teach[ing] students that certain racial groups bear unique moral burdens that others do not'" do

---

[21] *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1033–34 (1991); *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 599 (1967); *U.S. Lab. Party v. Pomerleau*, 557 F.2d 410, 412 (4th Cir. 1977); *Nitzberg v. Parks*, 525 F.2d 378 (4th Cir. 1975).

[22] Specifically, there, the challenged certification provision required entities to certify they "do not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Nat'l Urb. League*, 2025 WL 1275613, at *20. The "incriminating fact" was, according to the court, whether there was a violation of "federal antidiscrimination law." *Id.* Here, the Certification's prohibitions are not-so textually cabined, both on their face and as an implementation of the Letter, such that it is entirely unclear what the standard of conduct being prohibited is. *See* Certification at 2–3 (prohibiting "race-based" actions, practices that "advantage one race over another," "certain DEI practices," and "illegal DEI"). Further, numerous courts have reached the opposite conclusion of *National Urban League*, finding that the use of the undefined phrase "DEI" in executive orders is impermissibly vague. *See, e.g.*, *Perkins Coie LLP v. DOJ*, No. 25-cv-00716, 2025 WL 1276857, at *45 (D.D.C. May 2, 2025); *S.F. A.I.D.S. Found. v. Trump*, No. 25-cv-01824, 2025 WL 1621636, at *21 (N.D. Cal. June 9, 2025); *S.F. Unified Sch. Dist. v. AmeriCorps*, No. 25-cv-2425, 2025 WL 1713360, at *18–21 (N.D. Cal. June 18, 2025); *Chi. Women in Trades v. Trump*, No. 25-cv-02005, 2025 WL 1114466, at *11 (N.D. Ill. Apr. 14, 2025); *S. Educ. Found. v. U.S. Dep't of Educ.*, No. 25-cv-1079, 2025 WL 1453047 (D.D.C. May 21, 2025); *Ass'n of Colls. for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 856 (D. Md. 2025) *reconsideration denied*, No. 25-cv-00702, 2025 WL 863319 (D. Md. Mar. 19, 2025) (same).

not constitute "per se race discrimination." Op. at 41–42, ECF 60; *see also id.* at 33 n.8. Defendants offer no new explanation or authority that would warrant revisiting that conclusion.

A regulation is only facially overbroad if "a substantial number of applications are unconstitutional judged in relation to their plainly legitimate sweep." Defs.' Br. at 28, ECF 72-1 (citation modified up); *see also* Pls.' Br. at 25, ECF 66-1 (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973) (same proposition)). But that is precisely what Plaintiffs have shown. *See, e.g.*, Pls.' PI Br. at 19–20, ECF 31-1; Pls.' Br. at 24–25, ECF 66-1. Because Plaintiffs' evidence demonstrates the far reach of the Letter and Certification, and Defendants fail to address it or counter Plaintiffs' arguments, the Court should find the Letter and Certification unconstitutionally facially overbroad.

## B. The Letter and Certification Impermissibly Condition Funding in a Viewpoint Discriminatory Fashion

Defendants' arguments about funding conditions and viewpoint discrimination rest on the same two mischaracterizations of the Letter and Certification. First, they argue they may, without violating the Constitution, prohibit conduct that denies students equal educational opportunities, creates racially hostile environments, or constitutes racial harassment. That is undisputed. But Defendants overlook that the Letter and Certification target speech and conduct beyond what is unlawful under Title VI. *See* Op. at 33 n.8, 41–42, ECF 60; *see also* Pls.' Br. at 20, ECF 66-1. Once again, they fail to provide any evidence or precedent that suggests the Court should reconsider its earlier conclusion. *Compare* Defs.' Br. at 30, ECF 72-1 (citing *Rice v. Paladin Enters. Inc.*, 128 F.3d 233, 248 (4th Cir. 1997)), *with* Op. at 42 n.11, ECF 60 (rejecting the analogy to *Rice*, noting that the "speech at issue here is nowhere near comparable to the challenged speech" in that case).[23]

---

[23] None of the other precedent that Defendants rely on is persuasive, either. Other than support for undisputed propositions, *e.g.*, Defs.' Br. at 28, ECF 72-1, Defendants' overbreadth defense relies principally on an out-of-context

Defendants' suggestion that the FAQs "make[] clear" the scope of the Letter and Certification, *see* Defs.' Br. at 30, ECF 72-1, is no more convincing, and is belied by the documents' plain language. As the Court previously concluded, "[a]t best, the FAQs lack sufficient clarity to override the express terms of the Letter." Op. at 32, ECF 60; *see also, supra*, Sec. III.

Moreover, while Defendants may condition funding on nondiscrimination, that is just not what the Letter (as the Court has recognized, Op. at 45–46, ECF 60), or Certification do. Defendants continue conflating the government expressing its own view with punishing those who disagree with that view. This Court has already rejected that effort. Per the Court, the "Letter provides no line at all distinguishing viewpoint from binding policymaking" and Defendants are " not entitled to misrepresent the law's boundaries" and "cannot blur the lines between viewpoint and law." Op. at 37–38, 39, ECF 60. Defendants have introduced nothing to support revisiting that conclusion.

Defendants cast Plaintiffs' financial coercion argument as a bare demand for the government to fund speech it disagrees with, unrelated to any constitutional violation, and ignoring that it has unlawfully baked such a demand into a requirement to comply with Title VI. Defs.' Br. at 27–28, ECF 72-1. Defendants' cherry-picked case cites do not support their argument. *Lyng v.*

---

citation to *SFFA v. Harvard* and unpersuasive out-of-circuit citations. Defendants' cited *SFFA* language merely quotes *Brown v. Board of Education* as observing that "racial discrimination in public education is unconstitutional." 600 U.S. 181, 204 (2023) (quoting *Brown*, 349 U.S. 294, 298 (1955)). But *SFFA* made no statement about the content of the Letter or Certification, nor could it, as they did not exist when *SFFA* was ordered. Nor do *Kestenbaum v. President and Fellows of Harvard College*, *Dambrot v. Central Michigan University*, *Mailloux v. Kiley*, or *Bonnell v. Lorenzo* support Defendants. *Kestenbaum* was a district court decision where individual and organizational plaintiffs alleged Title VI violations and other claims. The court maintained in part and dismissed in part the Title VI claim, noting that although the court was "dubious that Harvard can hide behind the First Amendment to justify avoidance of its Title VI obligations . . . whether this argument has any teeth is a decision best reserved for a later day." 743 F. Supp. 3d 297, 309 (D. Mass. 2024). Likewise, Defendants cite *Dambrot* for the undisputed proposition that certain speech is not protected by the First Amendment. The Sixth Circuit's conclusion that use of a racial slur in front of students was not protected under the First Amendment came in the context of finding that the university discriminatory harassment policy was unconstitutionally facially overbroad. 55 F. 3d 1177, 1184–85 (6th Cir. 1995). And Defendants cites to the more-than five decades old First Circuit's *Mailloux*, 448 F.2d 1242 (1st Cir. 1971), and Sixth Circuit's 24-year-old *Bonnell*, 241 F. 3d 800 (6th Cir. 2001), do not rebut Plaintiffs' argument that the Letter and Certification reach and punish protected speech, including lawful diversity, equity, and inclusion that Defendants seek to unlawfully chill.

16

*International Union*, 485 U.S. 360 (1988) found no unconstitutional condition in a statute that barred someone from food stamp eligibility because of lost income from a striking household member. The Court found no unconstitutional condition because the statute "require[d] no exaction from any individual; it d[id] not 'coerce' belief; and it d[id] not require [funding recipients] to . . . support political views with which they disagree." *Id.* at 369.[24] By contrast, that is precisely what the Letter and Certification do—by requiring educational institutions to rework broad swaths of curricula, activities, and policies to eliminate discussion of targeted concepts as a condition of funding, the Letter and Certification require schools to support views with which they disagree.

## V.    The Relief Requested by Plaintiffs is Necessary and in Accordance with *CASA*

### A.  Vacatur is the Appropriate Remedy Under the APA, and *CASA* Does Not Change That

Vacatur is the appropriate remedy when an agency action violates the APA. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 831 (2024) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."). Defendants' request for remand should be denied. *See* Defs.' Br. at 34, ECF 72-1. Remand is appropriate when "there is at least a serious possibility that the [agency] will be able to substantiate its decision on remand." *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 655 (4th Cir. 2018) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). Here, there is no "serious possibility" that remand will allow the agency to substantiate the Letter or

---

[24] Likewise, *Regan v. Taxation with Representation of Washington*, 461 U.S. 540 (1983), specifically acknowledged that "the government may not deny a benefit to a person because he exercises a constitutional right" and left untouched the framework for evaluating unconstitutional conditions on funding. *Id.* at 545–46. It merely acknowledged that the framework was inapplicable to the facts there. *Id.*; *see also Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 437 (2020) ("[*Regan*] simply explained that a speech restriction on a corporate entity did not prevent a separate affiliate from speaking, a point that is not disputed in this case.").

Certification, as they are procedurally and substantively deficient in myriad ways under the APA. Thus, vacatur is the only appropriate remedy under the APA. *Id.*

Defendants incorrectly argue that *CASA* limits the Court's ability to vacate the Letter and Certification. Defs.' Br. at 33, ECF 72-1. Notwithstanding Defendants' characterization of vacatur as a "nationwide, universal stay," Op. at 33, ECF 60, *CASA* does not support this assertion. *CASA* "rest[ed] solely on the statutory authority that federal courts possess under the Judiciary Act of 1789" to craft injunctive remedies. 2025 WL 1773631, at *6 n.4. It expressly did not reach the scope of relief available under the APA. *Id.* at *8 n.10 (APA relief is a "distinct question"); *see also Doctors for Am. v. Office of Personnel Mgmt.*, No. 25-322 , 2025 WL 1836009, at *22 (D.D.C. July 3, 2025) (explaining that "as this is a case involving APA vacatur, not a universal or national injunction, . . . [*CASA*] does not apply" and vacatur, rather than the challenged actions "application to the individual petitioners [being] proscribed," is appropriate); *Haitian Evangelical Clergy Assoc. v. Trump*, 25-cv-1464, 2025 WL 1808743, at *6-7 (E.D.N.Y. July 1, 2025) (explaining that *CASA* "explicitly distinguished between injunctions and orders pursuant to 5 U.S.C. § 706(2)" and concluding that the court has the authority to provide APA relief). Thus Fourth Circuit precedent recognizing vacatur as an appropriate remedy under 5 U.S.C. § 706 remains undisturbed. *See Sierra Club*, 909 F.3d at 655 ("The Supreme Court has recognized that Section 706(2)(A) requires federal courts to set aside federal agency action that is not in accordance with law.") (citation modified); *see also Corner Post*, 603 U.S. at 842 (J. Kavanaugh, concurring) ("The federal courts have long interpreted the APA to authorize vacatur of agency actions. Both the text and the history of the APA support that interpretation, and courts have had no real difficulty applying the remedy in practice."); *cf Walker v. Kennedy*, 20-CV-2834, 2025 WL 1871070, at *7 (E.D.N.Y. July 8, 2025) ("CASA does not require the Court to reconsider its stay of [the challenged rule]" under the APA). The "common and

contemporaneous meaning," *Corner Post*, 603 U.S. at 830, of APA's authorization to reviewing courts to "set aside" agency action, 5 U.S.C. § 706, is that a court can vacate unlawful agency action.

### B. Declaratory and Injunctive Relief are Necessary to Provide Complete Relief to Plaintiffs

Declaratory and injunctive relief are necessary to address Plaintiffs' constitutional injuries, and to provide complete relief to Plaintiffs with respect to their APA claims. Both forms of relief are appropriate here, where the Department is attempting to enforce an unlawful interpretation of Title VI. *See White v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 913 F.2d 165, 168 (4th Cir. 1990). Such relief is not an "advisory opinion," as Defendants argue, but instead involves a "case or controversy" regarding the legality of the Letter, the Certification, and the changes to existing law therein, in which a "judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Id.* (cleaned up).

Nothing in *CASA* limits the Court's ability to enter the declaratory judgments and injunctive relief that Plaintiffs request. *See generally* MSJ, ECF 66. *CASA* reiterated that "a court of equity may fashion a remedy that awards complete relief," which it clarified to mean "complete relief between the parties." *CASA*, 2025 WL 1773631, at *12. The Court left it to district courts to determine, in the first instance, what type of injunction offers complete relief to plaintiffs. *Id.* Further, Defendants cite nothing in *CASA* to support their contention that relief should be limited to District 4J. *CASA* did not change the legal standard under which standing is evaluated, and in any case, Plaintiffs have successfully demonstrated standing to challenge the Letter and Certification on behalf of their members. *See generally* Pls.' Br. at 4-6, ECF 66-1; *supra* Sec. I.

Though the *NEA* preliminary injunction was issued prior to *CASA*, it addressed the relevant issues, including the Supreme Court's skepticism of nationwide injunctions and the need for relief tailored to plaintiffs. *NEA* Op. at *30 ("The court is mindful, however, that the scope of a district

court's authority to issue nationwide injunctions is unsettled."). The *NEA* court acknowledged a nationwide injunction may not be appropriate but determined that the government's request to "limit the injunction to the plaintiffs and their members" was "too narrow a remedial line to properly account for equitable principles of necessity, fairness, and workability." *Id*. at *31.

> If the court simply enjoined the defendants from enforcing the 2025 Letter against the plaintiffs and their members, that would not necessarily prevent defendants from enforcing the Letter against institutions that employ or work with plaintiffs or their members. And if defendants can enforce the letter against such institutions, the precise harms that flow to the plaintiffs from the 2025 Letter's enforcement are likely to occur.

*Id.*

Thus, the *NEA* court concluded that "to afford complete relief as to the plaintiffs before this court, it is necessary to enjoin the defendants from enforcing the [] Letter and its implementation measures against one category of non-parties to the case: entities receiving federal funding that employ or contract with plaintiffs or plaintiffs' members." *Id.*

The *NEA* court's "equitable weighing process" to determine "what is necessary, what is fair, and what is workable" was reasonable. *Cf. id.* (citing *North Carolina v. Covington*, 581 U.S 486, 488 (2017) (citation modified). Because injunctive relief is necessary to address Plaintiffs' standalone constitutional claims and any future enforcement of the Letter or Certification's "changes to existing law," Op. at 47, ECF 60, injunctive relief is appropriate as to Plaintiffs or any entities receiving federal funding that employ or contract with Plaintiffs or their members.[25]

## CONCLUSION

For the foregoing reasons, Plaintiffs' respectively request that Defendants Motion to Dismiss or For Summary Judgment, ECF 72, be denied, and Plaintiffs Motion for Summary Judgment, ECF 66, be granted.

---

[25] Plaintiffs will submit a revised proposed order that conforms to this more specific request for injunctive relief.

Dated: July 18, 2025

Respectfully submitted,

*/s/ Madeline H. Gitomer*

Madeline H. Gitomer (Bar No. 31518)
Kali Schellenberg (Bar No. 31582)
Brooke Menschel (Bar No. 31492)
Andrew Bookbinder (Bar No. 31486)
Victoria S. Nugent (Bar No. 15039)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
mgitomer@democracyforward.org
kschellenberg@democracyforward.org
bmenschel@democracyforward.org
abookbinder@democracyforward.org
vnugent@democracyforward.org

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on the date below, I electronically filed the foregoing with the Clerk of the Court of the United States Court of the District of Maryland by using the CM/ECF system. I also certify that the foregoing document is being served on Defendant's counsel of record and that service will be accomplished by the CM/ECF system.

This 18th day of July 2025

/s/ *Madeline H. Gitomer*
Madeline H. Gitomer (Bar No. 31518)
*Counsel for Plaintiffs*