## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

AMERICAN FEDERATION OF
TEACHERS, *et al.*

      Plaintiffs,

  v.

UNITED STATES DEPARTMENT OF
EDUCATION, *et al.*

      Defendants.

Case No. 1:25-cv-00628-SAG

## DEFENDANTS' REPLY IN FURTHER SUPPORT OF MOTION TO DISMISS OR
## FOR SUMMARY JUDGMENT AND IN RESPONSE TO PLAINTIFFS' OPPOSITION

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................................1

ARGUMENT ................................................................................................................................2

   I.  Plaintiffs Have Not Established Standing................................................................................2

      A.  District 4J Does Not Have Standing ..........................................................................3

      B.  AFT, AFT-MD and ASA Cannot Establish Standing................................................5

   II.  Plaintiffs' APA Claims Fail As A Matter of Law .................................................................8

      A.  The Title VI Documents are Interpretive Rules ...........................................................8

      B.  The Title VI Documents do not violate the APA's notice
           and comment requirement............................................................................................ 10

      C.  The Title VI Documents are within the Department's statutory
           authority and consistent with applicable law ............................................................. 11

      D.  The Title VI Documents are not arbitrary and capricious ......................................... 12

   III. The Title VI Documents Do Not Violate the Constitution................................................. 14

      A.  The Title VI Documents Do Not Violate the First Amendment ................................. 14

      B.  The Title VI Documents Are Not Unconstitutionally Vague ...................................... 17

   IV. Plaintiffs Are Not Entitled to the Relief Sought and Cannot Request
      an Order Directing the Activities of Other Government Agencies .................................. 19

CONCLUSION............................................................................................................................ 20

## INTRODUCTION

The Department of Education ("ED") is committed to the principle of color-blind, nondiscrimination in American educational institutions. To reinforce this commitment, earlier this year ED issued a series of communications beginning with a February 14, 2025, Dear Colleague Letter ("DCL"), a Frequently Asked Questions document ("FAQ") which provided support and answers to questions about the DCL, and an April 3, 2025, Request for Certification under Title VI and *SFFA v. Harvard* ("Certification"). Plaintiffs' Second Amended Complaint challenges the DCL and Certification, (collectively referred to hear as the "Title VI Documents"). However, the Title VI documents are just that: *guidance* to educational institutions about compliance with executive branch policy priorities which include vigorous enforcement of existing law under the Fourteenth Amendment and Title VI of the Civil Rights Act of 1966.

The Plaintiffs in this case, three associations which advocate on behalf of different types of educators and a single Oregon school district, have explained in detail their discontent with ED's executive branch policy priorities, and asked the Court to take judicial action on that basis. Their disagreement with ED's priorities and/or fear of the way those priorities may manifest in the future are insufficient. They cannot show that the Title VI documents caused them to suffer a concrete, particularized imminent injury redressable by this Court. Rather, the injuries they allege are vague, conclusory, speculative, and insufficient to establish an actual case or controversy as required for Article III standing.

Plaintiffs also seek to challenge the Title VI Documents under the Administrative Procedures Act (APA). Since they are interpretive rules which provide guidance, and are not legislative rules, they are not final agency action subject to APA review. Even if they were, the Title VI Documents are not subject to notice and comment, and are neither arbitrary and capricious, nor contrary to existing law.

Plaintiffs also contend that the Title VI Documents violate their Constitutional rights under the First and Fifth Amendments. This contention is misplaced; in fact, the Title VI documents are intended and drafted to reinforce the existing obligations of federally funded educational institutions to protect students from speech that results in discrimination or creates a racially hostile learning environment and provide guidance and notice about ED's enforcement priorities.

Finally, Plaintiffs' request for relief from this Court well exceed the scope of the facts and causes of action set forth in the Second Amended Complaint or their Motion for Summary Judgment. As such, even if they can demonstrate standing or entitlement to some kind of relief, it must be limited to what is necessary to remedy their specific claims and established injuries.

## ARGUMENT

### I.  Plaintiffs Have Not Established Standing to Challenge the Title VI Documents.

Plaintiff Oregon School District 4J ("District 4J") argues that it has standing under the APA to challenge the Title VI documents based on the fear of employees and administrators that courses, curriculum and instruction may violate the Title VI documents. However, these fears are *objectively unreasonable* given the guidance provided in the DCL and FAQ regarding those issues, and the fact that the State of Oregon has made clear they will not comply with the Certification requirement or ask District 4J to do so. *See* ECF 60 at 17 n. 3. For the same reason, AFT, AFT-MD and ASA (the "Association Plaintiffs") also cannot establish standing; their members' purported fear of future enforcement is *objectively unreasonable* and cannot establish the "injury-in-fact" required to demonstrate standing.

Plaintiffs' standing to challenge the *Constitutionality* of the Title VI documents is equally lacking. Standing is not dispensed in gross; plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek. *Murthy v. Missouri*, 603 U.S. 43, 61

(2024). Litigants may establish the requisite ongoing injury when seeking to enjoin government policies they allege violate the First Amendment in one of two ways. *See Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018). First, they may show that they intend to engage in conduct at least arguably protected by the First Amendment and which would be proscribed by the policy they wish to challenge, *and* that there is a "credible threat" that the policy will be enforced against them if they do so. *Id.* Second, they may instead make a "sufficient showing of self-censorship, based on a credible threat of enforcement which has an objectively reasonable and sufficient "chilling effect" such that it effectively infringes on their right to free expression. *Id.* Either way, a credible threat of enforcement is critical; without one, a plaintiff cannot establish either a realistic threat of legal sanction if he engages in the speech in question, or an objectively good reason for "self-censoring" instead. *Id.* Here, because Plaintiffs' Constitutional and related APA claims rely upon a credible fear of future enforcement and self-censorship, and they cannot establish either, they fail to establish standing as a matter of law.

### A.     District 4J Does Not Have Standing.

Plaintiffs devote only three pages of their Opposition to Defendants' Motion to Dismiss or for Summar Judgment to standing. *See* ECF 78 at 26-28. In that argument, they cite to other cases, with different Plaintiffs who have different interests, and/or opinions that address only preliminary motions, *not* opinions on motions to dismiss or for summary judgment. *Here and now*, the Defendants have moved to Dismiss or for Summary Judgment. ECF 72. To withstand Defendants' motion, Plaintiffs must show that they have standing to pursue the claims as plead in their Second Amended Complaint at ECF at 76.

District 4J's standing argument with respect to the DCL is entirely reliant on this Court's preliminary injunction opinion, which found that the harms articulated by 4J were sufficient to

establish standing at the preliminary injunction stage based on their receipt of federal funding. ECF 60 at 19-20. However, as discussed in more detail in Defendants' motion at ECF 72-1 at 18-20, and below, District 4J is not a direct recipient of funds; those funds are distributed to the State of Oregon. District 4J also discussed the harm the DCL created, since the District was in the process of implementing Oregon state educational standards that appeared to conflict with the DCL. ECF 76 at ¶¶ 55-56. The state of Oregon's curriculum changes referenced by District 4J *began years ago*, and if the State of Oregon wants to receive federal education funds, it must ensure that its policies, programs and practices comply with current governing federal law and related guidance. The fact that an agency may issue new guidance which recipients of funding have to adjust to and comply with if they want that funding to continue is not sufficient to establish standing.

In response to Defendants' contention that the harm articulated by District 4J is speculative, they contend that the Certification requirement is sufficient to take their enforcement fear from the realm of the possible, to objectively credible. ECF 78 at 27. They also argue that the State of Oregon's decision not to comply with the Certification requirement does nothing to allay the harms they fear, since ED may act on Oregon's refusal, and District 4J has not received any assurance that the current level of federal funding that flows through the State of Oregon will be preserved. ECF 78 at 27.

However, District 4J's funding comes from local sources and the State of Oregon. ECF 72-1 at 18-20. Neither ED nor this Court can guarantee that the State of Oregon, who is not a party to this case, will continue to provide any particular level of funding to District 4J. As such, there is no clearly discernable and direct harm or "impossible choice" for District 4J which is directly caused by the Certification requirement; the threat of a reduction of funding to the State of Oregon

is entirely theoretical, and it is impossible to determine precisely how that would impact 4J at this stage given the State of Oregon's position.

This Court's previously expressed skepticism regarding District 4J's standing to challenge the Certification is well founded in light of the legal standards set forth in other cases where plaintiffs were required to demonstrate a clear and credible threat in order to establish standing to make a pre-enforcement challenge. For example, in *Abbott v. Pastides*, the Fourth Circuit found that the plaintiffs failed to establish standing for their First Amendment "chilled speech" and "vagueness" claims because they could not demonstrate a credible threat that the defendants would enforce the challenged policy in the future. *See* 900 F.3d 160, 170 (4th Cir. 2018) (Court found USC students challenging harassment policy who received a notice of charge based on an event they held, which was later withdrawn could not establish standing to challenge the policy based on their claim that they reasonably feared future discipline if they engaged in similar speech activities). The Court specifically held that even where the University had initiated a specific charge against the student group they failed to establish "an ongoing First Amendment injury sufficient to confer standing" in the absence of any evidence that the process imposed a significant burden that infringed on those rights "independent of any ultimate sanction." *Abbott* at 179. Under that standard, even if this Court were to consider the Certification requirement akin to a threatened administrative inquiry, District 4J simply cannot show how the threat of an inquiry into a practice that could be prohibited by Title VI would impose a "significant burden" sufficient to implicate their constitutional rights.

## B. AFT, AFT-MD and ASA Cannot Establish Associational Standing.

The three Association Plaintiffs contend that they have established associational standing. ECF 78 at 26-27. To do so, they must demonstrate that at least one of their individual members

has suffered an injury in-fact, caused by defendants, and redressable by the court. *See Maryland Shall Issue, Inc. v. Anne Arundel County*, 662 F.Supp.3d 557, 569 (D. Md., Mar. 21, 2023). The Supreme Court has repeatedly denied associational standing where an organization fails "to make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Id.* citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 235 (1990). When the plaintiff is an unregulated party causation ordinarily hinges on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well. *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 383 (2024). The causation requirement precludes standing when there is a speculative or attenuated link, and it is therefore not predictable how third parties will react to government action or cause downstream injury to plaintiffs. *Id*. Attenuated links are precluded where the government action is so far removed from its distant (even if predictable) ripple effects that plaintiffs cannot establish Article III standing. *Id.*[1] Moreover, the threatened injury to the party "must be certainly impending to constitute injury in fact and that allegations of possible future injury are not sufficient." *See Clapper v. Amnesty Intern. USA*, 568 U.S. 398 (2013).

Here, the Association Plaintiffs advance two theories for showing that they are likely to suffer an injury caused by the DCL and/or Certification. First, they contend that the Certification threatens their individual members with individual future enforcement by stating "[t]he continued use of illegal DEI practices may subject the individual or entity using such practices to serious

---

[1]    While the focus of *FDA v. Alliance for Hippocratic Medicine* was organizational standing, in his concurrence, Justice Thomas aptly noted that associational standing presents an even greater challenge since "[t]he party who needs the remedy—the injured member—is not before the court. Without such members as parties to the suit, it is questionable whether "relief to these nonparties ... exceed[s] constitutional bounds." *Id.* at 400 (Thomas, concurring).

consequences." ECF 78 at 27-28. They would have the Court conclude that the injury is objectively reasonable so long as an individual educator states that the possible threat of future enforcement has had a chilling effect. *Id.* These fears are purely subjective, and therefore unreasonable, primarily because ED has no authority to take disciplinary action against individual teachers— ED's investigations would be directed to the federal funding recipients, i.e., the schools. 42 U.S.C. 2000d-1. The Association Plaintiffs respond by contending that an individual educators' speech or expressive conduct "can be the source of claims arising pursuant to the Certification, and the consequences from funding loss, investigation, contractual suit, [or] FCA litigation" and that those claims affect them "their reputations, and their livelihoods." ECF 78 at 26-27. This type of vague language about reputational harm or potential actions by third parties is simply insufficient. It relies on speculative and highly attenuated chain of possibilities regarding the likelihood that ED would launch an investigation against a third party (a funding recipient), and that the result of that investigation, regardless of outcome, would directly harm an individual member in some unspecified way. However, standing simply cannot rest on the speculative decisions of independent third parties. *See Clapper* at 414 (we decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors).

Plaintiffs' second associational standing theory is that it has provided sufficient information to establish that its members are directly harmed by the reactions of educational institutions, like its members' employers, who are directly regulated by the DCL and Certification. *See* ECF 78 at 26-28. This theory fails as well because it too relies on a speculative and attenuated chain of possibilities that are neither direct, nor predictable.[2] The fear by individual members that they will

---

[2]    The actions by educational institutions are not predictable at all as evidenced by the varied responses to the Certification; some states refused to comply, others responded with an assurance which included language different from that used in the Certification request, and others simply signed and returned it.

be harmed is not objectively reasonable if it is dependent on the possibility that their employer institutions will take actions *not required by Title VI or ED*, based on an incorrect or inaccurate reading of the DCL guidance.  For example, individual members have indicated that they fear that their academic freedom in the classroom will be curtailed.  However, that fear is insufficient where it is traceable to unreasonable actions by the members' employer rather than guidance provided by ED. *See Lujan*, 504 U.S. at 560 (the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court). The fear of the individual members is also unreasonable given that the DCL does not prohibit teachers from teaching certain books about race, racism, slavery, gender, or any other topic. *See* 2025 DCL at 3 (advising schools to ensure their policies comply with civil rights laws, their programs do not use racial proxies, and that their contractors also comply—not addressing teachers or directing curricula change). ED has also long made clear that, pursuant to its statutory authority, it does not "exercis[e] control over the content of school curricula," 2023 FAQ at 6.

Given the inability of the Association Plaintiffs to demonstrate an unbroken chain of causation from the DCL and Certification which causes an objectively reasonable harm, they cannot establish a live case or controversy under Article III. Accordingly, this Court should dismiss the claims of the Association Plaintiffs for lack of standing.

## II.    Plaintiffs' APA Claims Fail As A Matter of Law.

### A.    The Title VI Documents are Interpretive Rules.

In *NAACP v. Department of Education*, the District Court for the District of Columbia found that the Title VI documents are "interpretive rules" because: (1) they have not been published in the Code of Federal Regulations, (2) the Department did not explicitly invoke its general legislative authority, and (3) the language of the documents make clear the they were issued

to advise the public of the agency's construction of the statutes and rules which it administers. *See NAACP*, ECF 30 at 8. This analysis counters Plaintiffs' contentions that the Title VI Documents are binding, legislative rules that constitute final agency action subject to challenge under the APA.

The *NAACP* Court observed that "the conditional language throughout underscores that these are guidance documents." *See NAACP*, ECF 30 (quoting *Ctr. For Auto Safety v. NHTSA*, 452 F.3d 798, 809 (D.C. Cir. 2006). Moreover, the *NAACP* Court expressly rejected Plaintiffs' contention that the Letter imposes new obligations, stating that "the Letter itself does not impose any new obligations; rather it merely reminds readers of the preexisting obligation to ensure their policies comply with Title VI." *See NAACP*, ECF 30 at 8. The NAACP court went on to explain that the Title VI documents "do not extend SFFS to an entirely new statutory provision but rather continues to focus on Title VI" and do not amount to the type of reverse-course that requires a legislative rule. *See NAACP*, ECF 30 at 9. Additionally, the Title VI documents do not fully reject DEI activities; instead, the FAQ clarifies that the determination of unlawful discrimination "does not turn solely" on the DEI label. *Id.* The Title VI Documents "also note that celebrating cultural and historical events such as Black History Month or discussing themes such as racism in class would not be inherent violations." *See id.* (quoting FAQ at 6, 7).

Plaintiffs contend that Title VI documents impose "binding consequences" because the Certification conditions federal funding on terms and assurances that "go well beyond Title VI requirements." ECF 77 at 13. This assertion overlooks the fact that the associational Plaintiffs are not required to sign the Certification, and that due to State of Oregon's announcement that it would not certify compliance, "there is no impossible choice left for District 4J." *See* ECF 60 at 17 n. 3. The State of Oregon did not view the Certification as imposing "binding consequences" and Defendants respectfully request that this Court consider reassessing its previous conclusion.

Accordingly, the Court should dismiss Plaintiffs' APA claims because the Title VI documents are not final agency actions.

**B.    The Title VI Documents do not violate the APA's notice and comment requirement.**

Plaintiffs' argument that the Title VI Documents are procedurally invalid because they did not go through notice-and-comment rulemaking applies the wrong procedural requirement. While legislative rules must go through notice and comment, the APA explicitly exempts interpretive rules like the Title VI Documents from such procedures. 5 U.S.C. § 553(b)(4)(A) ("Except when notice or hearing is required by statute, this subsection does not apply. . . to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice."); *see also Perez*, 575 U.S. at 105 (the text of the APA makes plain: interpretive rules do not require notice and comment). "The absence of a notice-and-comment obligation makes the process of issuing interpretive rules comparatively easier for agencies than issuing legislative rules. But that convenience comes at a price: Interpretive rules 'do not have the force and effect of law and are not accorded that weight in the adjudicatory process.'" *Perez*, 575 U.S. at 97 (quoting *Shalala*, 514 U.S. at 99). As was just discussed, the DCL is an interpretive rule; therefore, it is exempt from notice and comment. *Id*. The Court's prior conclusion that the DCL is a legislative rule rests on the premise that ED created "new" obligations or threatened "serious consequences." *See* Order, at 73. But reiterating that violations of Title VI may trigger enforcement is not new law—it is the existing statutory framework. The DCL does not prescribe new standards or require schools to adopt particular policies—it clarifies what existing law already prohibits.

### C.    The Title VI Documents are within the Department's statutory authority and consistent with applicable law.

Plaintiffs' arguments that the DCL and FAQ are outside ED's statutory authority and contrary to law are without merit. Plaintiffs contend that the documents violate the Department of Education Organization Act's ("DEOA") provision that ED shall not exercise "direction, supervision, or control" over, *inter alia*, "the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, over any accrediting agency or association, or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system." 20 U.S.C. § 3403(b). But Plaintiffs do not identify any portion of the documents that actually conflicts with the DEOA.  Instead, Plaintiffs cite, as an example, the DCL's purported inconsistency with the DEOA. ECF 78 at 39-40. However, this is a red herring; the DCL does not give ED the right to control the education being provided; ED is not exercising "any role either in the day-to-day operation of the city schools, or in the *setting* of policy on a city or statewide basis." *Grimes v. Cavazos*, 786 F. Supp. 1184, 1187 (S.D.N.Y. 1992) (emphasis added). The DCL does not set policy, nor prescribe curricula or control school administration; it merely informs schools of their existing obligations under the Equal Protection Clause and Title VI: that they must not discriminate among students when implementing their curricula and must avoid stereotyping and stigmatizing based on race. Plaintiffs' conflation of the control of school administration and the reminder of legal obligations would leave little room for ED to enforce the civil rights laws. *See id*.

The DCL falls well within ED's authority.  Courts have consistently recognized that ED may investigate whether school programs violate Title VI—even when those programs relate to instruction. *See Castaneda v. Pickard*, 648 F.2d 989, 1008–09 (5th Cir. 1981) (ED may review bilingual programs for compliance with Title VI). ED's enforcement role does not transform

interpretive guidance into curriculum control, and the DEOA should not be read in a manner that would frustrate Title VI's nondiscrimination requirements. *See 289 Kilvert, LLC v. SBC Tower Holdings LLC*, 133 F.4th 1, 3 (1st Cir. 2025) (we do not interpret a statute's text in a vacuum; we read the words in their context and with a view to their place in the overall statutory scheme); *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 500 (2018) (applying the interpretive "canon against reading conflicts into statutes"). In sum, while the DEOA and other statutes make clear that ED does not have direct *control of* curriculum, those statutes do not prohibit enforcement of civil rights statutes that prohibit discrimination *within* curriculum.

### D.    The Title VI Documents are not arbitrary and capricious.

Plaintiffs contend that the DCL is arbitrary and capricious on the basis that it (1) fails to explain its departure from ED's prior guidance; (2) does not rely on prior factual findings or any evidence; (3) fails to account for existing federal and state standards; and (4) fails to adequately consider the reliance interests of schools and educators. ECF 78 at 32-38. Arbitrary and capricious review is "deferential," *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) and examines whether the agency's decision "was the product of reasoned decisionmaking," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). Under this standard, the DCL's guidance is reasonable and reasonably explained and satisfies the deferential "arbitrary and capricious" standard as a matter of law. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 417 (2021).

This Court noted in its earlier opinion that while Dear Colleague Letters are generally interpretive rules, the DCL here prescribes "new law and policy, has the force and effect of law, and surpasses the bounds of an interpretive rule." ECF 60 at 28. That conclusion relies predominantly on the fact that the DCL provides significant additional guidance regarding "DEI

programs." That is not a radical departure from previous guidance, as Plaintiffs suggest. The term DEI has only become common during the last five years, as such, its absence in earlier guidance is not surprising. More importantly, regardless of the language or terminology used, the requirements of Title VI have not changed; race-based practices may run afoul of Tile VI and the equal protection clause. The DCL adheres and expressly connects its guidance to Title VI and the analysis in the 2023 *SFFA* decision and explains how race-based practices may violate Title VI. That is all the APA requires.[3] The 2025 DCL corresponds to both *SFFA* and ED's earlier discussions. *Compare* 2023 FAQ at 3 (quoting *SFFA*, 600 U.S. at 231) (a student must be "'treated based on his or her experiences as an individual' and 'not on the basis of race.'") *with* 2025 DCL at 2 ("race based decision-making . . . remains impermissible."); 2025 FAQ at 8.

Plaintiffs' contention that the DCL is also arbitrary and capricious because it evidences a failure to consider important aspects of the problem, including the interaction with other federal and state laws also fails as a matter of law because no such requirement applies to interpretative rules. Regardless, the issues Plaintiffs identify do not add up to an APA violation.

Quite simply, all educational funding recipients were and remain obligated to comply with Title VI, and ED is not responsible for school curricula. Neither the 2023 nor the 2025 Title VI guidance in the DCL prescribe requirements for a particular State or institution's school curriculum. So, ED need not have considered whether or how any State or institution would need

---

[3]    The lack of notice and comment for the DCL letter is not a basis for this Court to rule against ED. ED's prior guidance, which Plaintiffs asked be reinstated in their motion for preliminary injunction, was also an interpretative rule that did not have the force and effect of law, and did not go through any notice and comment process. As such, ED was not required to provide a notice and comment rulemaking process even if the DCL presented a "departure" from that prior guidance. In the event any explanation was required, it was provided. The DCL explains that it would be unlawful for schools to use practices that appear race neutral as a covert means of selecting or rejecting students because of their race, 2025 DCL at 2–3—exactly what the Supreme Court held would not satisfy strict scrutiny in *SFFA*, 600 U.S. at 230-31 ("[A] student must be treated based on his or her experiences as an individual—not on the basis of race.").

to modify their curriculum or any costs they might incur in doing so.  As is true of any change in federal guidance, the proper implementation is a matter for each State's school system, none of whom are parties to this case.  Nor did ED need to consider state education standards.  If state requirements conflicted with *SFFA or Title VI,* those standards would violate the Fourteenth Amendment's guarantee of Equal Protection.  In sum, because ED explained the basis for its guidance, anchored its reasoning in *SFFA's* binding precedent, and reasonably interpreted its enforcement responsibilities under Title VI, the DCL is not arbitrary and capricious.

**III.    The Title VI Documents Do Not Violate the Constitution.**

Plaintiffs' constitutional claims similarly fail as a matter of law. Plaintiffs' First Amendment claims fail because to the extent the documents at issue address speech or expressive activity, they simply reiterate the well-established principle that speech that amounts to racial harassment and creates a hostile environment is unlawful under Title VI; harassment—including race-based harassment—is conduct that the First Amendment does not protect. Plaintiffs' Fifth Amendment vagueness claim is misplaced, as the framework for such claims is meant to apply to binding actions with the force of law. In any event, the DCL is clear about the conduct that is prohibited: discrimination that treats a person differently on the basis of race.

**A.    The Title VI Documents Do Not Violate the First Amendment.**

The Title VI Documents are not facially overbroad and do not discriminate against viewpoints because they reinforce preexisting legal obligations. As the *NAACP Court* stated, the Title VI Documents "merely remind[s] readers of the preexisting obligation to ensure their policies comply with Title VI" and "do not extend SFFA…but continue to focus on Title VI."  The DCL does not "suppress" any *protected* speech expressing any particular viewpoint. It describes a scope of conduct that has been long prohibited by Title VI. It is well settled that denying a student an

educational opportunity on the basis of race violates the law. *See SFFA*, 600 U.S. 181. It is no defense that creating a racially hostile environment or engaging in racial harassment may involve speaking. *See Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 309 (D. Mass. 2024) ("The court consequently is dubious that Harvard can hide behind the First Amendment to justify avoidance of its Title VI obligations."); *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177 (6th Cir. 1995) (rejecting First Amendment argument that firing teacher for his harassing use of racial epithet violated his free speech).

When speech is an integral part of a transaction involving conduct, the government otherwise is empowered to prohibit, such "speech acts" may be proscribed without much, if any, concern about the First Amendment, since it is merely incidental that such "conduct" takes the form of speech. *See Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 248 (4th Cir. 1997) ("[T]he First Amendment poses no bar to the imposition of civil (or criminal) liability for speech acts"); *Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 262 (S.D.N.Y. Feb. 5, 2025), *reconsideration denied*, No. 24 CIV. 2669 (JPC), 2025 WL 602945 (S.D.N.Y. Feb. 25, 2025) ("when a hostile environment claim is based on both protected speech and unprotected conduct, a court must still consider the entire record in determining whether the harassment was discriminatory in nature.").

Plaintiffs fail to grapple with this well-established distinction between protected viewpoint expression and unprotected discriminatory conduct. Title VI does not authorize ED to penalize viewpoints—only discriminatory acts. While Plaintiffs focus heavily on academic freedom, they overlook that racial discrimination is not part of academic freedom, and "free speech does not grant teachers a license to say or write in class whatever they may feel like." *Mailloux v. Kiley*, 448 F.2d 1242, 1243 (1st Cir. 1971) (per curiam). Indeed, as recipients of federal funds overseen

by the Department, education institutions are legally required to maintain a hostile-free learning environment and must strive to create policies which serve that purpose. While academic freedom and freedom of expression are paramount in the academic setting, they are not absolute to the point of compromising a student's right to learn in an environment free from discrimination. To hold otherwise under these circumstances would send a message that the First Amendment may be used as a shield by teachers who choose to use their unique and superior position to [] harass students secure in the knowledge that *whatever* they say or do will be protected. *Bonnell v. Lorenzo*, 241 F.3d 800, 823–24 (6th Cir. 2001).

To the extent Plaintiffs or their members fear that educational institutions may restrict certain viewpoints in response to the ED's guidance, those concerns reflect discretionary decisions by independent institutions—not government-imposed orthodoxy. The DCL simply does not mandate classroom content; it explains how certain practices may, in context, raise Title VI concerns if they result in race-based stereotyping or exclusion. *See* 2025 Letter 2, 4; 2025 FAQ at 6–7. The First Amendment does not prevent the Department from reminding schools that federally funded programs may not discriminate. As discussed in the standing analysis above, to the extent any chilling effects have resulted, they stem not from the DCL, but from institutions' own interpretations and decisions to self-censor; these actions by third parties cannot convert ED's advisory guidance into unconstitutional viewpoint discrimination. The fact is that those third parties are the ones regulated by the government; such an indirect chain of causation is not sufficient to transform lawful guidance into viewpoint discrimination.

Because discriminatory conduct effectuated by words is neither protected speech nor an aspect of academic freedom, Plaintiffs' viewpoint censorship arguments fail as a matter of law.

**B.      The Title VI Documents Are Not Unconstitutionally Vague.**

Plaintiffs still fail to show that the Title VI documents are void for vagueness under the Fifth Amendment. In their Opposition, Plaintiffs argue that the DCL and Certification fail to provide fair warning and are so vague as to create a situation where they are ripe arbitrary enforcement. ECF 78 at 48-55. However, Plaintiffs overstate existing law. The Supreme Court has never required perfect clarity and precise guidance, even for laws that restrict expressive activity. *See Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). Words marked by flexibility and reasonable breadth, rather than meticulous specificity are generally not unconstitutionally vague. *NAACP* Op. at 23 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110). A vagueness challenge will fail so long as the Title VI Documents provide a "comprehensible normative standard," even if imprecise. *Nat'l Urb. League v. Trump*, No. CV 25-471-TJK, 2025 WL 1275613, at * 18 (D.D.C. May 2, 2025). Under this framework, the DCL provides fair notice of compliance with Title VI.

Title VI authorizes the Department to take enforcement actions when it believes a recipient of federal funding may be violating individuals' civil rights. Under 42 U.S.C. § 2000d-1, "[e]ach Federal department and agency which is empowered to extend Federal financial assistance," including ED, is "authorized and directed" to effectuate Title VI by securing compliance through "the termination of or refusal to grant or to continue assistance." Plaintiffs ignore this statutory framework which expressly conditions funding on compliance with nondiscrimination obligations and instructs ED to act where discrimination is suspected.

ED is not required to issue *any* notice of how it intends to use its enforcement discretion before it does so. Throughout Title VI, Congress instructs when agencies are required to give recipients notice or opportunity for a hearing. *See, e.g.*, *id*. (allowing termination of funding only "after opportunity for [a] hearing"); *id*. § 2000d-5 (requiring ED to provide recipients notice of

-17-

deferred action on any application for funds). ED's own regulations also specify when notice is to be provided to recipients, and none of these notice requirements precedes the opening of an investigation. 34 C.F.R. §§ 100.7, 100.8, 100.10.

Thus, because ED could enforce Title VI without issuing the DCL, Plaintiffs' vagueness claim essentially argues that the DCL provides less notice than required – when none was required at all. They point to no precedent supporting such a conclusion. Plaintiffs' position risks discouraging agencies from issuing interpretive guidance—undermining transparency and contradicting longstanding precedent encouraging clarification of enforcement priorities.

The DCL also is not unconstitutionally vague because it clearly describes ED's understanding of Title VI's prohibition on race discrimination. As explained in the DCL, ED understands Title VI forbids discriminatory practices which "treat[] a person of one race differently than it treats another person because of that person's race." DCL at 2.

At the preliminary injunction stage, the Court noted that the language in the guidance regarding certain content was "paired with other vague and overbroad terms" raising concerns. ECF 60 at 40. However, the Court "ma[de] no finding that the Plaintiffs are likely to succeed on the merits of their Fifth Amendment vagueness challenge at this juncture." ECF 60 at 43 n. 12.  In their Second Amended Complaint and Opposition, Plaintiffs contend that the failure of ED to define terms like "diversity," "equity," and "inclusion," creates a lack of clarity that makes it difficult for regulated parties to know what is expected of them.  However, this argument misses the point.  ED never defined DEI as the "incriminating fact," for a Title VI violation. *Williams*, 553. U.S. at 306. Rather, ED explained that "whether an initiative constitutes unlawful discrimination ***does not*** turn solely on whether it is labeled 'DEI' or uses terminology such as 'diversity,' 'equity,' or 'inclusion.'" 2025 FAQ at 6. (emphasis added).  Instead, ED defined the "incriminating fact" as "treat[ing] a person of one race differently than [a school] treats another person because of that person's race." 2025 DCL at 2.

Thus, ED was crystal clear about what the conduct is that regulated parties need to steer clear from. As such, Plaintiffs concern for undefined terms, which ED has made clear are not by themselves indicative of prohibited actions, does not render the guidance unconstitutionally vague.

Moreover, it has always been the case that the exact facts sufficient to establish Title VI discrimination, or indeed, *any kind of discrimination*, will vary based on the circumstances. As such, it is impossible for ED to issue guidance that will account for every eventuality. The DCL is unconstitutionally vague simply because "it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved." *Williams*, 553 U.S. at 306. Much more is needed to show unconstitutional vagueness.

Because the DCL clearly describes a type of conduct that Title VI prohibits— differential treatment based on race—it is not vague and does not increase the risk of arbitrary enforcement, and the complaint portal does not change the ED's longstanding commitment to independently investigating and assessing the facts reported in each case.

## IV. Plaintiffs Are Not Entitled to the Relief Sought and Cannot Request an Order Directing the Activities of Non-Party Executive Agencies.

In response to the challenges raised in Defendant's Motion Plaintiffs submitted a revised order. ECF 79. The modified order still well exceeds the scope of both the Second Amended Complaint, and that which could logically flow from the facts and arguments in Plaintiffs' cross motion. The order Plaintiffs have submitted asks for an order not only declaring the Title VI documents void but one which concludes that a wide-ranging and unidentified set of potential programming is compliant with Title VI, and asks that the Court preclude ED, or any other Executive Agency from taking any action contrary to this Court's interpretation of Title VI, including, presumably, inquiries, investigations or actual actions based on such investigations. Plaintiffs' request is so broad, that it essentially asks this Court to define and opine on Title VI,

dozens of federal regulations, and the Supreme Court's decision in *SFFA v. Harvard*. ECF 79 at 2-3. Such a declaration would affect every school system, university or program that receives federal educational funding, and would bind both ED any other executive agency that in any way engages with ED, *even though those entities and agencies are not parties to this case*.[4] Affording relief beyond the parties nonetheless raises substantial questions about federal courts' constitutional and equitable powers. *Dep't of Homeland Sec. v. New York*, 589 U. S. ____ , 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) (when a court orders the government to take (or not take) some action with respect to those who are strangers to the suit, it is hard to see how the court could still be acting in the judicial role of resolving cases and controversies under Article III).

As such, even if the Court is inclined to include one of the Plaintiffs can establish standing, and entitlement to injunctive or declaratory relief, it is clear that the proper scope of relief should be narrowly tailored to the party or parties with standing, the claims on which they have established entitlement to relief, and provide no more relief than necessary to remedy their purported injuries.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' Motion for Summary Judgment, grant Defendants' Motion to Dismiss or in the alternative, grant summary judgment in favor of Defendants.

---

[4] For example, in one part of their proposed order, Plaintiffs have asked the Court to declare that certain types of programing categorically do not violate Title VI (ECF 79 at 2), and in another they state that the declaration and order should apply to all persons, including any other federal executive branch agencies, departments, and commissions, and their heads, officers, agents, and subdivisions that assume responsibility for the Department's enforcement of civil rights laws against educational institutions. ECF 79 at 3. Such an order would apply broadly to anyone who awards federal funding to educational institutions, including other executive agencies who are not a party to this case.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

By: _____/s/_____
Charles R. Gayle
DMD Bar No. 14706
Ariana Wright Arnold
DMD Bar No. 23000
Assistant United States Attorneys
36 S. Charles St., 4th Floor
Baltimore, Maryland 21201
Ariana.Arnold@usdoj.gov
(410) 209-4813 (direct)
Charles.Gayle@usdoj.gov
(410) 209-4845 (direct)

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of August 2025, the foregoing Reply was efiled and thereby served on counsel of record.

/s/ Ariana Wright Arnold
Ariana Wright Arnold
Assistant United States Attorney