**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| **AMERICAN FEDERATION** | * | |
| **OF TEACHERS**, *et al.*, | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | **Civil Case No.: SAG-25-628** |
| **v.** | * | |
| | * | |
| **DEPARTMENT OF** | * | |
| **EDUCATION**, *et al.*, | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

<u>**MEMORANDUM OPINION**</u>

On February 14, 2025, the United States Department of Education ("DOE") published a "Dear Colleague Letter" ("the Letter") explaining the new administration's positions with respect to diversity, equity, and inclusion ("DEI") principles and federal antidiscrimination law. A few weeks later, DOE issued an announcement that it would require states and school districts to affirmatively certify their compliance with DOE's interpretations of Title VI and *Students for Fair Admissions v. Harvard* ("*SFFA*"), 600 U.S. 181 (2023), within ten days ("the Certification Requirement"). Those documents, and whether they created new legal obligations or merely restated existing law, have been the focus of this litigation.

Although this Court found to the contrary at an earlier stage of this proceeding, ECF 60, the government[1] continues to insist that the Letter merely reminded Title VI funding recipients of

---

[1] Defendants DOE, Linda McMahon, in her official capacity as Secretary of Education, and Craig Trainor, in his official capacity as Acting Assistant Secretary for the Office for Civil Rights are referred to collectively as, "the government" or "DOE." Declarants, the parties, and other courts occasionally refer to DOE as "ED" or "USDOE."

their obligation to comply with existing civil rights law, and the Certification Requirement merely required states and school districts to affirm their compliance with that existing law. Plaintiffs—American Federation of Teachers ("AFT"), American Federation of Teachers–Maryland ("AFTMD"), American Sociological Association ("ASA"), and Eugene, Oregon School District 4J ("District 4J")—maintain that the Letter and Certification Requirement are procedurally and substantively improper under the Administrative Procedure Act ("APA"), First Amendment, and Fifth Amendment.

In April of this year, this Court stayed the Letter under Section 705 of the APA. ECF 61. In that same order, this Court declined to rule on the Certification Requirement because Plaintiffs failed to plead facts relating to Certification in their Amended Complaint. *Id.*; ECF 60. Around the same time, similar lawsuits proceeded in other courts. The United States District Court for the District of New Hampshire granted a preliminary injunction ("the New Hampshire injunction") enjoining the government from "enforcing or implementing" the Letter, the frequently asked questions ("FAQs") associated with the Letter, the End DEI portal, and the Certification Requirement. *Nat'l Educ. Ass'n v. Dep't of Educ. ("NEA")*, No. 25-91, – F. Supp. 3d – , 2025 WL 1188160 (D.N.H. Apr. 24, 2025). The United States District Court for the District of Columbia denied a motion for preliminary injunction as to the Letter but granted a nationwide preliminary injunction as to the Certification Requirement. *Nat'l Ass'n for the Advancement of Colored People v. Dep't of Educ. ("NAACP")*, No. 25-1120, – F. Supp. 3d – , 2025 WL 1196212 (D.D.C. Apr. 24, 2025). In sum: at present, the Letter is stayed and enjoined, and the Certification Requirement is enjoined twice over.

This case presents in an unusual posture—the government concedes that there is no administrative record, ECF 58, and, but for a handful of recently initiated DEI-related

investigations, there have been no new factual developments since this Court's ruling in April. The parties' submissions largely mirror their preliminary injunction briefs and contain the same arguments. Plaintiffs filed a Second Amended Complaint, ECF 76, which added three counts and new factual allegations relating to the Certification Requirement. Plaintiffs moved for summary judgment. ECF 66. The government opposed, and also filed a motion to dismiss for failure to state a claim, or in the alternative for summary judgment, which this Court will construe as a motion for summary judgment. ECF 71. Plaintiffs opposed the government's motion and filed a reply in support of their own. ECF 77. The government filed a reply in support of its motion. ECF 82.

As to the Letter, the parties essentially ask this Court to decide the same issues, on the same record, for a second time. It should come as little surprise that this Court reaches the same conclusion as to the merits. In the interests of judicial economy, where this Court has reached the same conclusion after considering the issues anew, it largely repeats its previous analysis verbatim. But the Certification Requirement is now properly before this Court for the first time. So, although this opinion retreads some previously covered terrain, at least as to the Certification Requirement, this Court will provide new analysis. And, as the government is careful to note, this case now raises important remedies questions in light of the Supreme Court's decision in *Trump v. CASA, Inc.*, 145 S.Ct. 2540 (2025). Because the only new information for this Court to assess in this opinion is purely of a legal nature, the facts are undisputed, and this Court already held a full-day motions hearing about both of the documents at issue, no additional hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025).

It bears repeating that "elections have consequences and the President is entitled to enact his agenda." *Woonasquatucket River Watershed Council v. Dep't of Agric.*, Civil No. 25-97-MSM, – F. Supp. 3d – , 2025 WL 116157, at *2 (D.R.I. Apr. 15, 2025). The role of courts is not to assess

whether executive decisions are wise. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 35 (2020). But courts "are constitutionally required to weigh in" in cases "about the procedure (or lack thereof) that the government follows in trying to enact [its] policies." *Woonasquatucket*, 2025 WL 116157, at *2 (quoting *California*, 591 U.S. at 35).

This case illustrates why following procedures is so important. The stringent procedures outlined by the APA are not hollow gestures designed to manufacture the appearance of fair and reasoned decisionmaking; they exist to ensure that agencies stay within the bounds of their delegated authority and exercise that authority within the constraints of the law more broadly. *See Nat'l Fed'n. of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute."). Still here, this Court takes no view as to whether the policies at issue in this case are good or bad, prudent or foolish, fair or unfair. But, at this stage too, it must closely scrutinize whether the government went about creating and implementing them in the manner the law requires. Here, it did not. And by leapfrogging important procedural requirements, the government has unwittingly run headfirst into serious constitutional problems.

Plaintiffs have shown that neither challenged agency action was promulgated in accordance with the procedural requirements of the APA, and that both actions run afoul of important constitutional rights. Both challenged actions accordingly must be vacated. The administration is entitled to express its viewpoints and to promulgate policies aligned with those viewpoints. But it must do so within the procedural bounds Congress has outlined. And it may not do so at the expense of constitutional rights.

Plaintiffs' motion for summary judgment, ECF 66, is GRANTED in part and DENIED in part. The government's motion to dismiss, or in the alternative for summary judgment, ECF 72, is construed as a motion for summary judgment and is also GRANTED in part and DENIED in part.

The Dear Colleague Letter of February 14, 2025, and the accompanying Certification Requirement are HELD UNLAWFUL and VACATED pursuant to the APA.

TABLE OF CONTENTS

I.     Background ................................................................................................. 6

   A.    Factual Background ............................................................................. 6

      i.    The Dear Colleague Letter .............................................................. 6

      ii.   FAQs .............................................................................................. 8

      iii.  The "End DEI" Portal .................................................................... 11

      iv.   Enforcement Actions ...................................................................... 12

      v.    The Certification Requirement ....................................................... 13

   B.    Procedural History ............................................................................... 15

II.    Legal Standards ......................................................................................... 17

   A.    Administrative Procedure Act............................................................. 17

   B.    Summary Judgment ............................................................................. 18

III.   Reviewability ............................................................................................ 20

   A.    Standing ............................................................................................... 20

      i.    District 4J ........................................................................................ 22

      ii.   Associational Plaintiffs .................................................................. 30

   B.    Final Agency Action ........................................................................... 34

      i.    The Letter ........................................................................................ 35

      ii.   The Certification Requirement ....................................................... 39

IV.    Discussion .................................................................................................. 40

   A.    Administrative Procedure Act............................................................. 40

      i.    Notice and Comment ...................................................................... 40

      ii.   Paperwork Reduction Act .............................................................. 41

      iii.  Arbitrary and Capricious................................................................ 42

      iv.   Not in Accordance with Law .......................................................... 51

      v.    Contrary to Constitutional Rights .................................................. 55

   B.    Substantive Constitutional Claims ..................................................... 69

V.     Remedies .................................................................................................... 69

VI.    Conclusion ................................................................................................. 75

I.    **BACKGROUND**

The factual background of this case—which is essentially limited to descriptions of the challenged documents and the process (or lack thereof) that went into creating them—is undisputed and has not changed since this Court's opinion in April. The Court thus largely repeats its recitation of the facts from its prior opinion, making alterations where necessary.

A.    Factual Background

i.    *The Dear Colleague Letter*

On February 14, 2025, Acting Assistant Secretary (of Education) for Civil Rights Craig Trainor issued the Letter. ECF 31-14. The Letter purports to "clarify and reaffirm the nondiscrimination obligations of schools and other entities that receive federal financial assistance" required by Title VI, "the Equal Protection Clause of the United States Constitution, and other relevant authorities," following the Supreme Court's 2023 decision in *SFFA*. *Id.*

The Letter begins by stating that in recent years, educational institutions' "embrace of pervasive and repugnant race-based preferences and other forms of racial discrimination have emanated through every level of academia." *Id.* at 1. As examples of this discrimination, the Letter mentions the use of race as a factor in admissions, financial aid, hiring, training, and "other institutional programming." *Id.* It also mentions separate graduation ceremonies, dorms, and "other facilities" for certain races. *Id.* It continues that "[e]ducational institutions have toxically indoctrinated students with the false premise that the United States is built upon 'systemic and structural racism' and advanced discriminatory policies and practices. Proponents of these discriminatory practices have attempted to further justify them…under the banner of 'diversity, equity, and inclusion' ('DEI'), smuggling racial stereotypes and explicit race-consciousness into everyday training, programming, and discipline." *Id.* at 2.

It then discusses DOE's current interpretation of *SFFA*, which is, "[i]f an educational institution treats a person of one race differently than it treats another person because of that person's race, the educational institution violates the law." *Id.* And "[a]lthough some programs may appear neutral on their face, a closer look [could] reveal[] that they are, in fact, motivated by racial considerations." *Id.* Being motivated by race-based factors, the Letter continues, "remains impermissible." *Id.* at 2–3 ("The Department will no longer tolerate the overt and covert racial discrimination that has become widespread in this Nation's educational institutions. The law is clear: treating students differently on the basis of race to achieve nebulous goals such as diversity, racial balancing, social justice, or equity is illegal under controlling Supreme Court precedent.").

The Letter describes two examples of what DOE considers "impermissible." First, "[r]elying on non-racial information as a proxy for race, and making decisions based on that information, violates the law. That is true whether the proxies are used to grant preferences on an individual basis or a systematic one. It would, for instance, be unlawful for an educational institution to eliminate standardized testing to achieve a desired racial balance or to increase racial diversity." *Id.* at 3. Second, "[o]ther programs discriminate in less direct, but equally insidious, ways. DEI programs, for example, frequently preference certain racial groups and teach students that certain racial groups bear unique moral burdens that others do not. Such programs stigmatize students who belong to particular racial groups based on crude racial stereotypes. Consequently, they deny students the ability to participate fully in the life of a school." *Id.*

The Letter concludes by reiterating that it is "notice of the Department's existing interpretation of federal law" and pledging that DOE "will vigorously enforce the law…as to all…educational institutions, as well as state educational agencies." *Id.* Those entities were advised that enforcement would begin "no later than 14 days" from the date of the Letter. *Id.* They were

accordingly instructed to take the following actions: "(1) ensure that their policies and actions comply with existing civil rights law; (2) cease all efforts to circumvent prohibitions on the use of race by relying on proxies or other indirect means to accomplish such ends; and (3) cease all reliance on third-party contractors, clearinghouses, or aggregators that are being used by institutions in an effort to circumvent prohibited uses of race." *Id.*

The Letter includes a link to an "End DEI" portal on DOE's website, *id.*, for "students, parents, teachers and the broader community to report illegal discriminatory practices at institutions of learning." ECF 31-16.

    *ii.*    *FAQs*

"[T]o anticipate and answer questions" stemming from the Letter, DOE published "Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act" ("FAQs"). ECF 31-17. The FAQs apply "to racial classifications, racial preferences, and racial stereotypes, as well as how OCR will interpret [*SFFA*] in its enforcement of Title VI…and its implementing regulations." *Id.* at 1. DOE updated the FAQs on April 9, 2025. ECF 51-4. They no longer appear on the website because of the New Hampshire injunction, but are analyzed below as they last appeared.

The first seven questions and answers discuss the Administration's interpretation of *SFFA* and its application to Title VI generally. Question 8 asks expressly whether DEI programs are unlawful. *Id.* at 6. The answer provides:

> Schools may not intentionally discriminate on the basis of race, color, or national origin in their programs or activities. Many schools have advanced racially discriminatory policies and practices under the banner of "DEI" initiatives. Other schools have sought to veil racially discriminatory policies with terms like "social-emotional learning" or "culturally responsive" teaching. But whether an initiative constitutes unlawful discrimination does not turn solely on whether it is labeled "DEI" or uses terminology such

as "diversity," "equity," or "inclusion." OCR's assessment of school policies and programs depends on the facts and circumstances of each case.

Schools may not operate policies or programs under any name that intentionally treat students differently based on race, engage in racial stereotyping, or create hostile environments for students of particular races. For example, schools with programs focused on interests in particular cultures, heritages, and areas of the world would not in and of themselves violate Title VI, assuming they are open to all students regardless of race. Nor would educational, cultural, or historical observances— such as Black History Month, International Holocaust Remembrance Day, or similar events—that celebrate or recognize historical events and contributions, and promote awareness, so long as they do not engage in racial exclusion or discrimination. However, schools may not sponsor programming that creates a hostile environment based on race for students who do participate.

*Id.* Question 9 asks whether statements in the Letter that DEI programs "deny students the ability to fully participate in the life of a school" by "stigmatiz[ing] students that belong to particular racial groups" based on "crude racial stereotypes," and teach that students in some racial groups "bear unique moral burdens that others do not" mean that students and teachers may not discuss topics relating to DEI or race. *Id.* The answer reads:

OCR enforces federal civil rights law consistent with the First Amendment of the U.S. Constitution. Nothing in Title VI or its implementing regulations, authorizes a school to restrict any rights otherwise protected by the First Amendment, nor does the Dear Colleague Letter indicate as much.

Additionally, the Department of Education Organization Act, 20 U.S.C. § 3403(b), and the Elementary and Secondary Education Act, 20 U.S.C. § 7907(a), prohibit the Department from exercising control over the content of school curricula. However, the First Amendment rights of students, faculty, and staff, and the curricular prerogatives of states and local school agencies do not relieve schools of their Title VI obligations to refrain from creating hostile environments through race-based policies and stereotypes; nor does it relieve them of their duty to respond to racial harassment that creates a hostile environment.

In determining whether a racially hostile environment exists, OCR will examine the facts and circumstances of each case, including the nature of the educational institution, the age of the students, and the relationships of the individuals involved. For example, an elementary school that sponsors programming that acts to shame students of a particular race or ethnicity, accuse them of being oppressors in a racial hierarchy, ascribe to them less value as contributors to class discussions because of their race, or deliberately assign them intrinsic guilt based on the actions of their presumed ancestors or relatives in other areas of the world could create a racially hostile environment, by interfering with or limiting the students' ability to participate in or benefit from the school's program or activity. But exploration of similar themes in a class discussion at a university or other college-level programs or activities would be less likely to create a racially hostile environment. In all cases, the facts and circumstances of the discussion or activity will dictate the answer to that inquiry.

However, the more extreme practices at a university—such as requiring students to participate in "privilege walks" that are designed to make them feel guilty about being part of a certain race, segregating them by race for presentations and discussions with guest speakers, pressuring them to participate in protests or take certain positions on racially charged issues, investigating or sanctioning them for dissenting on racially charged issues through DEI or similar university offices, mandating courses, orientation programs, or trainings that are designed to emphasize and focus on racial stereotypes, and assigning them coursework that requires them to identify by race and then complete tasks differentiated by race—are all potential forms of school-on-student harassment that could create a hostile environment under Title VI. Specifically, such conduct could be deemed to create a hostile environment if, viewed by a reasonable person, of the same race and age, under similar circumstances, it is sufficiently severe, pervasive, or persistent so as to interfere with or limit the ability of an individual to participate in or benefit from the school's program or activity. Moreover, schools must not discriminate against students based on race in how they discipline or sanction students in response to complaints or allegations of harassment, or in response to speech that would be protected under the First Amendment, whether through use of "bias response teams," mandatory trainings, or compelled statements. Nor can schools use race as a reason not to discipline or sanction a student for conduct that would otherwise warrant these corrective measures if applied to members of another race.

*Id.* at 6–7. Question 10 discusses school admissions and essay prompts. Specifically, the Answer notes that while *SFFA* expressly permits an applicant to discuss how race has impacted his or her life, DOE was concerned that universities may be using essays as a "loophole." *Id.* at 8. Question 11 clarifies that the Letter also prohibits schools from engaging with third parties that "engage in racial preferences." *Id.* Questions 13 describes factors OCR might consider in assessing non-compliance with Title VI, and notes that, "[a] school's history and stated policy of using racial classifications and race-based policies to further DEI objectives, 'equity,' a racially-oriented vision of social justice, or similar goals will be probative in OCR's analysis of the facts and circumstances of an individual case." *Id.* at 9. Question 14 describes OCR's process for sanctioning a school it finds out of compliance. *Id.* at 10. Question 15 offers resources to learn more. *Id.*

       *iii.*    *The "End DEI" Portal*

In the Letter, DOE provides the link to a portal for "students, parents, teachers, and the broader community" to report discrimination. ECF 31-16. Its web address is "enddei.ed.gov." *Id.* The portal has been taken down pursuant to the New Hampshire injunction. Before it was taken down, the portal displayed the following message prominently: "Schools should be focused on learning. The U.S. Department of Education is committed to ensuring all students have access to meaningful learning free of divisive ideologies and indoctrination. This submission form is an outlet for students, parents, teachers, and the broader community to report illegal discriminatory practices at institutions of learning. The Department of Education will utilize community submissions to identify potential areas for investigation." *Id.* DOE announced the portal in a press release, in which it stated that it would use the portal to "identify potential areas for investigation." ECF 51-5.

      *iv.    Enforcement Actions*

On March 14, 2025, DOE announced 51 Title VI investigations, specifically citing to the Letter. ECF 31-35. 45 investigations were based on universities collaborating with "the Ph.D. Project," an organization that seeks to help minority students obtain business degrees, and, according to DOE, limits eligibility for its program based on race. *Id.* The press release also announced that seven schools were being investigated for "impermissible race-based scholarships and race-based segregation." *Id.* at 4. More than 20 of the investigated schools employ members of the Plaintiff organizations. ECF 31-1 at 6.

Since the Letter was stayed, DOE has continued to initiate investigations "that do not explicitly reference compliance with the Letter but appear to be based on the legal interpretations therein." ECF 66-1 at SMF-5. For example, the government recently opened an investigation of Fairfax County (Virginia) Public Schools for "dropp[ing] its standardized testing requirements" for the competitive Thomas Jefferson High School for Science and Technology. ECF 66-12, Exh. 57A. Similarly, in a letter to the President of Harvard University terminating its federal grants, Defendant McMahon accused Harvard of "fail[ing] to abide by its legal obligations" through conduct such as "scrapp[ing] standardized testing requirements" and "fail[ing] to abide by the United States Supreme Court's ruling demanding that it end its racial preferencing, and continu[ing] to engage in ugly racism in its undergraduate and graduate schools," and serving as an "incubator[] of discrimination that encourage[s] resentment and instill[s] grievance and racism into our wonderful young Americans." *Id.*, Exh. 57B. DOE has also "determined that the New York Department of Education violated Title VI by banning the use of Native American mascots without permission from the local tribe," "commenced a probe into Evanston-Skokie (Illinois) School District for, among other things 'training seminars to increase racial literacy' and

instructing students to 'understand that our country has a racist history and is grounded in white privilege,'" and "opened an investigation into Chicago Public Schools over their black Student Success Plan." ECF 66-6 ¶ 21.

     *v.    The Certification Requirement*

On April 3, 2025, DOE advised state education agencies ("SEAs") that they and every school district within them ("local education agencies" or "LEAs") must certify their compliance with the administration's interpretation of Title VI and *SFFA* no later than April 13, 2025. ECF 37-8 (transmittal email to agencies); ECF 37-9 (certification language and "Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification"). DOE sent letters announcing the Certification Requirement to state-level officials who oversee K–12 schools. In a release announcing the letters, Acting Assistant Secretary Trainor stated that "many schools flout or outright violate" federal antidiscrimination law "by using DEI programs to discriminate against one group of Americans to favor another based on identity characteristics." ECF 37-7. The press release referenced the Letter and FAQs as the "background" for the certifications. *Id.*

> SEAs and LEAs are required to return the following signed certification:

> > On behalf of [SEA/LEA], I acknowledge that I have received and reviewed this Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and *SFFA v. Harvard*. I further acknowledge that compliance with the below and the assurances referred to, as well as this certification, constitute a material condition for the continued receipt of federal financial assistance, and therefore certify our compliance with the below legal obligations.

ECF 37-9.

The "Reminder of Obligations" begins by reminding DOE's funding recipients that their acceptance of the funds is conditioned on compliance with Title VI. *Id.* It then describes *SFFA* as

stating that "the Equal Protection Clause and Title VI prohibit race-based action, with only the narrowest of exceptions." *Id.* at 2. "Given the text of Title VI and the assurances you have already given, any violation of Title VI—including the use of Diversity, Equity, & Inclusion ("DEI") programs to advantage one's [*sic*] race over another—is impermissible. The use of certain DEI practices can violate federal law. The continued use of illegal DEI practices may subject the individual or entity using such practices to serious consequences, including" (1) termination of funding; (2) actions to recover previously issued funding; and (3) False Claims Act liability. *Id.* at 2–3.

In an email transmitting the Certification, DOE clarified that states were required to certify their own compliance and to collect and transmit certifications from their LEAs. ECF 37-8. It also directed states to "report the signature status for each of your LEAs, any compliance issues found within your LEAs, and your proposed enforcement plans for those LEAs." *Id.* OCR eventually extended the certification deadline from April 13, 2025 until April 24, 2025. *See* ECF 42.

Before April 24, 2025, at least 25 states signed the Certification form. ECF 66-11 (collecting news sources about responses to Certification Requirement); ECF 66-10 (collecting responses to Certification Requirement). Even within states that certified, many school districts either declined to sign the Certification or signed it and included addenda expressing their concerns. ECF 66-10; ECF 66-11. Many states, including those who did and did not sign

Certifications, also expressed concern with the Certification's vagueness and failure to account for the assurances schools and states submitted in 2024.[2]

B. Procedural History

Plaintiffs filed this lawsuit on February 25, 2025. ECF 1. On March 5, 2025, Plaintiffs—including a new addition, District 4J—amended their complaint. ECF 14. Plaintiffs filed their first preliminary injunction motion, ECF 31, on March 28, 2025 ("the Letter Motion"). As noted above, the government subsequently announced the Certification Requirement on April 3, 2025. On April 7, 2025, the government delayed the certification deadline to April 24, 2024. The following day, in a related case in the United States District Court for the District of New Hampshire, to avert a temporary restraining order, the government agreed not to "initiate any enforcement action, investigation, or otherwise take action" based on certification or lack thereof until after April 24. The government also agreed not to "initiate any enforcement action, investigation, or otherwise take action based on the Dear Colleague Letter issued on February 14, 2025, and subsequent actions implementing the Letter" until after April 24. *See Nat'l Educ. Ass'n v. Dep't of Educ.*, Civil No. 25-91, ECF 45-1 (D.N.H. Apr. 8, 2025) [the New Hampshire Agreement].

---

[2] *See, e.g.*, ECF 66-10, Exh. 55A ("We are concerned that ED seemingly seeks to change the terms and conditions of California's award [of federal funding] without formal administrative process. ED cannot make changes to legal assurances and impose new requirements on recipients without adhering to rulemaking procedure."); *id.*, Exh. 55E ("The requested certification and other recent communications from USDOE represent an abrupt shift from its previous positions on diversity, equity, and inclusion."); *id.*, Exh. 55C ("To the extent that USDOE may believe specific activities related to diversity, equity, and inclusion in K–12 schools could potentially violate Title VI, [the Connecticut State Department of Education] would anticipate that the USDOE would provide notice and advisement of such activities through the regulatory rulemaking process."); *id.*, Exh. 55G (Maryland signing certification, but noting that "[t]he April 3, 2025, email and the accompanying document do not provide a clear account of (1) the purpose of the request, (2) the legal authority for the request, (3) how any certification will be used, or (4) the meaning of the certification or the legal effect of signing the certification. Furthermore, the request does not comply with the requirements of the Paperwork Reduction Act, 44 U.S.C. §§ 3501–3521.").

Without further amending their Amended Complaint, Plaintiffs filed an expedited preliminary injunction seeking to enjoin the Certification Requirement on April 9, 2025 ("the Certification Motion"). ECF 37. The parties addressed both preliminary injunction motions at the all-day motions hearing held on April 18, 2025.

On April 24, 2025, this Court granted the Letter Motion in part and denied the Certification Motion. ECF 60, 61. The Court stayed the Letter under Section 705 of the APA, postponing its effective date pending final resolution of this litigation. *Id.* at 47. The Court declined to grant an affirmative injunction in addition to the stay. *Id.* The Court did not stay or otherwise enjoin the FAQs. *Id.* As to the End DEI portal, the Court agreed that the government could lawfully maintain a reporting portal expressing its viewpoint so long as it did not pursue enforcement actions outside the bounds of existing law. *Id.* The Court also declined to enjoin or stay the Certification Requirement, finding Plaintiffs has not pled facts—or counts—relating to Certification in the operative complaint.

Plaintiffs sought leave to amend their complaint, ECF 64, which this Court granted. ECF 74. The Second Amended Complaint includes six counts. ECF 76. Counts One and Four are First Amendment – Free Speech and Free Association claims pertaining to the Letter and the Certification Requirement, respectively. *Id.* Counts Two and Five are Fifth Amendment – Due Process Vagueness claims stemming from the Letter and the Certification Requirement, respectively. *Id.* Count Three is an APA claim alleging that the Letter is arbitrary and capricious, not in accordance with the law, contrary to constitutional right, in excess of statutory authority, and done without observance of procedure required by law. *Id.* Count Six is an APA claim alleging that the Certification Requirement is not in accordance with law, arbitrary and capricious, done without observance of procedure, contrary to constitutional right, and in excess of the agency's

authority. *Id.* The Second Amended Complaint also includes myriad factual allegations relating to the Certification Requirement. *See, e.g.*, *id.* ¶¶ 19–20, 80–90, 97–100, 114–120, 166–174.

The government maintains that there is no agency record underlying either of the challenged actions, ECF 58, and the parties have conducted no discovery. The pending cross-motions for summary judgment will accordingly be decided on essentially the same record this Court used to decide Plaintiffs' motions for preliminary relief—primarily the challenged documents, their implementing and interpretive documents, and declarations submitted by the parties.

## II.    LEGAL STANDARDS

Plaintiffs move for summary judgment on all of their claims, and Defendants move for summary judgment in the alternative on all of Plaintiffs' claims.

### A.    Administrative Procedure Act

As to Plaintiffs' APA claims, Section 706 of the APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," or decisions made "without observance of procedures required by law." 5 U.S.C. § 706(2)(A), (D). APA claims "are adjudicated without a trial or discovery, on the basis of an existing administrative record, [and accordingly] are properly decided on summary judgment." *Audobon Naturalist Soc'y of the Cent. Atl. States, Inc. v. Dep't of Transp.*, 524 F. Supp. 2d 642, 659 (D. Md. 2007); *see also* 10B Wright and Miller, *Federal Prac. & Proc. 3d* § 2733 (2007). But the ordinary summary judgment standard set forth in Rule 56 "does not apply because of the limited role of a court in reviewing the administrative record." *Deese v. Esper*, 483 F. Supp. 3d 290, 304 (D. Md. 2020) (citation omitted). "Rather, summary judgment is the mechanism by which the court decides as a matter of law

whether the administrative record permitted the agency to make the decision is did." *Id.* (citations omitted).

"Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). "Deference is due where the agency has examined the relevant data and provided an explanation of its decision that includes 'a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43(1983)). But a court must "vacate agency action if it is not 'based on a consideration of the relevant factors' or where 'there has been a clear error of judgment.'" *Defs. of Wildlife v. U.S. Dep't of the Interior*, 931 F.3d 339, 345 (4th Cir. 2019) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)); *see also id.* ("[W]e must ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its action."). "'Generally, an agency decision is arbitrary and capricious if 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *State Farm*, 463 U.S. at 43) (noting that, "[u]nder *State Farm*, 'the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'").

B. <u>Summary Judgment</u>

Plaintiffs' substantive constitutional claims are assessed under the traditional summary judgment standard. Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment

is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that there is no genuine dispute of material fact. *See Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment is warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348–49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.  REVIEWABILITY

### A.  Standing

Standing is an "irreducible constitutional minimum" of federal jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Standing is "built on a single basic idea—the idea of separation of powers." *United States v. Texas*, 599 U.S. 670, 675 (2023). Where a plaintiff lacks standing, "there is no case or controversy for the federal court to resolve." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Castillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019) (Barrett, J.)); *see Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013) (burden to demonstrate standing falls on party invoking federal jurisdiction).

"For a plaintiff to get in the federal courthouse door and obtain a judicial determination of what the governing law is, the plaintiff cannot be a mere bystander, but instead must have a 'personal stake' in the dispute." *Food & Drug Admin v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) (quoting *TransUnion*, 594 U.S. at 423); *see also* Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983) (describing the fundamental question of standing as "What's it to you?"). Standing "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State*, 454 U.S. 464, 472 (1982); *see also* John Roberts, *Article III Limits on Statutory Standing*, 42 Duke L.J. 1219, 1220 (1993) (describing standing as a reflection of the "properly limited…role of courts in a democratic society"). This inquiry "serves to protect

the autonomy of those who are most directly affected so that they can decide whether and how to challenge the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at 379–80.

Standing "is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Standing consists of three elements: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504 U.S. at 560–61).

Where a government action "require[s] or forbid[s] some action by the plaintiff…standing is usually easy to establish." *All. for Hippocratic Med.*, 602 U.S. at 382. When a plaintiff seeks to challenge the government's regulation of someone else, by contrast, "standing is not precluded, but it is ordinarily much more difficult to establish." *Id.* (quoting *Lujan*, 504 U.S. at 562). "That is often because unregulated parties may have more difficulty establishing causation—that is, linking their asserted injuries to the government's regulation (or lack of regulation) of someone else." *Id.*

To establish injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). A future injury must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 389, 409 (2013). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *All. for Hippocratic Med*, 602 U.S. at 381.

The government challenges each Plaintiff's standing on each count, although it appears to concede that District 4J has standing. ECF 72-1 at 33. The government states that it challenges Plaintiffs' standing under both a 12(b)(1) and summary judgment standard. ECF 72-1. Although its arguments almost exclusively pertain to the evidence Plaintiffs have put forth to meet their

burden, and not the facts alleged in the Second Amended Complaint, this Court will consider both the sufficiency of the complaint and the evidence Plaintiffs have adduced in support of their standing. Because the speech and associational injuries Plaintiffs rely on are common to the two challenged documents, this Court will consider them together.

Plaintiffs allege they are experiencing injuries in the form of (1) uncertainty about whether certain educational practices are permitted; (2) chilling of their speech, conduct, and associational rights; and (3) fears of investigation, losing federal funds, and FCA liability for lawful conduct. ECF 66-1 at SMF-9–10. Those are, essentially, First and Fifth Amendment injuries, which Plaintiffs allege stem from the government's failure to adhere to the procedural requirements set forth by Congress in the APA.

### i.    District 4J

This Court continues to believe that District 4J has standing to challenge the Letter under the First Amendment, Fifth Amendment, and APA. District 4J has also shown that it has standing to challenge the Certification requirement.

District 4J is a school district located in southern Oregon, mostly covering the city of Eugene. ECF 76 ¶ 24. The district serves over 16,000 students. *Id.* About 35% of students in District 4J are "Black, Indigenous, Latino/a, or otherwise people of color." *Id.* Plaintiffs have put forth ample factual allegations in the Second Amended Complaint, have submitted multiple declarations, and have provided budget reports demonstrating that District 4J receives about $40 million dollars a year in federal funding, including Title I funding for low-income students and Individuals with Disabilities Education Act funding to support students with disabilities. *Id.* ¶ 141;

Eugene School District 4J Adopted Budget 2025-2026, at 15, https://perma.cc/TGX8-WSCQ; ECF 31-7 ¶¶ 38–40; ECF 37-4 ¶ 27–29.[3]

District 4J is regulated by the Letter as a recipient of federal funds. Indeed, at the motions hearing in this case, the government conceded that in the context of the Dear Colleague Letter, "colleague" meant "schools and states." As to the Certification Requirement, District 4J's standing is even more straightforward because (notwithstanding the existing injunctions) District 4J is required to sign the certification or to risk losing its federal funding. ECF 37-7; ECF 37-8; ECF 37-9. As to both the Letter and the Certification Requirement, District 4J is required or forbidden to take certain actions, and its standing is not difficult to establish. *See All. for Hippocratic Med.*, 602 U.S. at 382.

District 4J alleges that the Letter and Certification will cause it First and Fifth Amendment injuries by directly proscribing certain classroom speech (in particular, speech relating to race) and outlining vague standards that may force teachers and schools to avoid teaching on certain topics for fear that they could face sanctions. *See generally* ECF 31-7 (describing programs District 4J believes may be impacted); ECF 37-4 at ¶¶12–33. As "an implementation of the Dear Colleague Letter and means of enforcing the Department's viewpoint on DEI," the Certification Requirement "creates the same injuries and harms" as the Letter to Plaintiffs' critical work and missions, freedom of speech, and support for students and student groups." ECF 76 ¶¶ 88, 166. The speech harms stemming from them, as Plaintiffs allege, are common.

---

[3] The government argues here, for the first time, that District 4J is not a recipient of federal funding. ECF 72-1 at 15. The government is mistaken—page 15 of the 92-page budget report *cited by the government* lists "federal grants received" by District 4J as a part of its annual budget. *See* Eugene School District 4J Adopted Budget 2025-2026, at 15, https://perma.cc/TGX8-WSCQ.

District 4J has been actively preparing to implement social studies coursework to "address contributions from persons who are Native Americans, are of diverse racial and ethnic backgrounds, or are immigrants or refugees," in order to comply with Oregon law. ECF 76 ¶ 55; ECF 31-7 ¶ 11–17. "The ideas and topics that these state curricula and lessons require appear to be in conflict with what the Letter attempts to prohibit, which leaves school districts, like Plaintiff District 4J,…unclear as to how to meet their obligations under [state] law while also protecting the federal funding that the Letter threatens." ECF 76 ¶ 56. District 4J "selects and implements curricula that include teaching on… diversity, structural racism, and similar topics," and is "reasonably concerned that continuing to implement its adopted curricula in compliance with state law would result in the loss of federal funding." *Id.* ¶ 150; ECF 31-7 ¶ 13. "Without clarity [on the meaning of the Letter]…District 4J…fear[s] they may have to abandon their lawful efforts and speech related to diversity, equity, and inclusion, or else lose federal funds that support their valuable programs" ECF 76 ¶ 151; ECF 31-7 ¶¶ 14, 42; ECF 37-4 ¶¶ 18, 23.

One of District 4J's stated goals, moreover, is to "increase equitable outcomes and achievements" for its students. ECF 76 ¶ 144. District 4J is concerned that its "commit[ment] to eliminating gaps in opportunities and barriers to access" for all students could be interpreted as "smuggling racial stereotypes into everyday programming" based on the Letter. *Id.* Similarly, District 4J fears continuing diversity, equity, and inclusion programming and teaching "could subject them…to enforcement actions, even though they believe they are acting in full compliance with state and federal law." *Id.* ¶ 148. The Certification Requirement adds further potential for consequences from "the continued use of illegal DEI," including the loss of federal funding, FCA liability, and contract suits to clawback previously issued funds. *Id.* ¶ 89–90. The Certification Requirement "creates an impossible choice" because LEAs like District 4J "can either sign the

Certification, despite not knowing the meaning of its key terms and having serious concerns about its legality, or they can decline to sign the Certification, which the Department has indicated is a material condition for continued receipt of federal funds." *Id.* ¶ 169. District 4J feels the certification is forcing it "to consider whether to chill a wide range of speech and activities in order to not potentially run afoul of [DOE]—and to make such determinations in an incredibly compressed timeframe." ECF 37-4 ¶ 33.

In sum: District 4J alleges it has been put in an "impossible position, not knowing what conduct, speech, perspectives, lessons, programs, activities, or meetings [DOE] would consider prohibited by the Letter." ECF 76 ¶ 162. The same is true of the Certification Requirement, although the duty to affirmatively certify compliance backed by the threat of False Claims Act liability adds higher stakes. *Id.* at 169–70; *id.* at 171 ("For District 4J, the certification requirement represents not only a doubling down of the Department's changes to its prior interpretations of Title VI but a new and threatening mode of enforcement that further chills speech and expression."); ECF 37-4 ¶¶ 20, 25, 32. District 4J's employees are thus experiencing a "chilling effect of their First Amendment rights" because they "fear that many activities central to their work, their missions, and their employment could jeopardize their federal funding." ECF 76 at ¶¶ 162–63. Losing federal funding could force District 4J to fire teachers, shorten the school year, increase class sizes, reduce course offerings, and eliminate or downsize programs for gifted and disabled students. ECF 31-7 ¶¶ 38–40.[4]

---

[4] A clawback of federal funding or facing treble damages under the FCA "would require layoffs of over half the teacher workforce or the shuttering of district schools for 55 days." ECF 37-4 ¶¶ 30–31.

All of that is more than sufficient to establish injury in fact as to its First Amendment claim. District 4J has alleged a "credible threat of [enforcement or investigation]" based on its intent to engage in what it believes is protected First Amendment activity. *Susan B. Anthony List v. Driehaus*, 473 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). The imminence of that threat is underscored by the government's continuing efforts to enforce the spirit of the Letter. *See* ECF 66-12. District 4J is directly regulated by both the Letter and the Certification Requirement, and it has outlined a reasonable, non-speculative belief that its First Amendment activity, and in particular its curricular choices, could subject it to investigation and potential sanction. District 4J has also set forth a reasonable view that its conduct is proscribed by the Letter and Certification's prohibitions. *Id.* at 162; *Babbitt*, 442 U.S. at 302 (law in question "on its face proscribe[d]" the speech at issue). Here, like in *Babbitt*, District 4J believes its speech activity is lawful and does not admit to any intent to behave unlawfully; rather it intends to engage in the substantive speech the Letter declares unlawful. *Id.* The Letter's repeated references to enforcement and terms that carry enforcement consequences lends credibility to the imminence of possible enforcement. The Certification Requirement provides an even more direct threat by forcing schools to certify that they are complying with DOE's current interpretations of Title VI without fully understanding what they are, and with an apparent departmental understanding that proscribes speech District 4J believes is lawful.

"In First Amendment cases, the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression." *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) (cleaned up). To demonstrate injury in fact based on the chilling of speech, the chilling effect must be objectively

reasonable and not subjective or speculative. *Id.* at 236. As the Supreme Court has explained, standing requirements are relaxed in First Amendment cases because

> Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged.

*Sec. of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984). The face of the Letter addresses "teach[ing]" about "structural racism," and frames it as the kind of "stereotyping" and "stigmatizing" the Letter terms illegal discrimination. ECF 31-14 at 2–3. District 4J says the Letter and Certification are chilling its speech regarding race-related topics. The chilling effect District 4J says it and its employees are experiencing seems "objectively reasonable" in the context of two purportedly binding documents that call their expressive activity unlawful. The Certification Requirement underscores that the harm is imminently impending. District 4J and its employees are essentially put to a choice of self-censorship or risking enforcement actions. That is precisely the concern elucidated by *Joseph H. Munson*. This Court accordingly finds that District 4J has shown adequate First Amendment injuries in fact.

District 4J's Fifth Amendment injuries are closely related to its First Amendment injuries. District 4J argues that the Letter and Certification Requirement are unconstitutionally vague because they purport to prohibit broad swaths of conduct and speech related to DEI without clarifying what activities might subject regulated entities to enforcement. Almost everyone agrees that the term "DEI" is a capacious one, including both lawful conduct and speech that express important democratic values, and some conduct that may violate federal civil rights law as it has long been understood. Here, like in *NAACP*, Plaintiffs "allege[] that the provisions of the

challenged documents are so vague that schools would be uncertain whether the documents covered them." *NAACP*, 2025 WL 1196212, at *5. And "the certification requirement goes beyond merely articulating general guidance on legal educational offerings" but rather, "emphasizes that non-compliance with the administration's interpretation of unlawful DEI will result in liability under the False Claims Act," and that "compliance with the administration's interpretation of prohibited DEI constitutes a material condition for federal funding." *Id.* (internal quotation marks omitted). Those clear statements of the consequences of noncompliance paired with unclear guidelines about what conduct is prohibited would lead the reasonable person to veer toward overcompliance. *See* ECF 76 ¶¶ 167–71 (District 4J does not know what speech or conduct the Certification Requirement proscribes, and it is chilling 4J's speech that it believes is lawful); *id.* ¶ 173 ("This self-censorship is not a choice that educators want to make, but rather is a result of the vague and threatening language in the Certification itself."); *id.* ¶ 77 ("The vagueness and apparent contradictions created by the Letter make it impossible for Plaintiffs[] to know how to comply with its requirements and thus will restrict their ability to do their jobs and serve their students."). That is sufficient to find an injury-in-fact under the Fifth Amendment.

District 4J has also demonstrated that it has suffered and will continue to "suffer [a] legal wrong *because of an agency action*," and to be "adversely affected or aggrieved by agency action." 5 U.S.C. § 702 (emphasis added). District 4J alleges that the agency's failure to comply with the APA, and in particular its notice-and-comment requirement, deprived it of the opportunity to raise its important reliance interests and its fears regarding the suppression of lawful speech stemming from the Letter. In a declaration from its superintendent, District 4J has attested that "[h]ad the Department of Education promulgated the Dear Colleague Letter via the standard notice and comment process, the district would have submitted a comment addressing how the language of

the Letter would impact our work." ECF 31-7 ¶ 44. It also would have commented on the Certification Requirement. ECF 66-6 ¶ 26. District 4J argues that the Certification furthers these harms by making them more imminent and requiring the district to take affirmative steps. Similarly for the Certification, Plaintiffs allege that its procedural deficiencies—for example, failure to comply with the Paperwork Reduction Act—led to more substantive problems like the chilling of lawful speech. Unsurprisingly, because Plaintiffs allege they are being injured in part because the rule is procedurally defective, the ways in which they are being injured are traceable to those deficiencies. They have shown that their speech and vagueness harms are traceable to DOE's failure to adhere to appropriate procedure.

The government's primary argument against standing still echoes its primary argument overall—the Letter is a mere restatement of existing anti-discrimination law, and the Certification merely serves as another opportunity to commit to complying with that existing law. And if that is the case, the harms District 4J say it is experiencing stem from Title VI and the Equal Protection Clause, not the Letter or the Certification Requirement. For reasons that will be discussed in more detail below, this Court still disagrees. The Letter clearly puts curriculum and teachers' speech into play by labeling as "stereotyping," "stigmatizing," and "discriminatory" teaching (1) about structural racism, and (2) that some races may bear unique moral burdens that others do not. Discrimination (along with stereotyping and stigmatizing conduct) is and has been legally actionable under Title VI. But those speech-and-teaching related provisions, at a minimum, are new, and appear to carry legal consequences to the reasonable reader. The requirement to affirmatively certify compliance, backed by threats of enforcement and FCA liability, underscores the imminence of that harm. District 4J persuasively contends that the Letter's language, and the

Certification's implementation of it, obligates it to choose between being injured through suppressing its speech or through facing enforcement for exercising its constitutional rights.

Where the Letter goes further than existing law, the harms District 4J and its teachers experience due to that overreach are clearly traceable to the Letter itself. The Certification requirement intensifies those harms by putting school districts, like District 4J, to an affirmative choice of either suppressing speech they believe is lawful or continuing their speech and risking enforcement actions or the loss of funding. District 4J has alleged, and provided declarations that attest, that the Certification's vagueness is causing further uncertainty and chilling its speech. Plaintiffs' requested relief would redress those harms.[5]

In sum, District 4J has established standing to challenge the documents under the APA, First Amendment, and Fifth Amendment. It has done so whether considering the allegations set forth in the Second Amended Complaint independently, or evaluating the record as a whole.

### ii.    *Associational Plaintiffs*

The Associational Plaintiffs—AFT, AFTMD, and ASA—seek to sue on behalf of their members. "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *United Food & Com.*

---

[5] Plaintiffs have requested multiple forms of relief. This Court's conclusion, for purposes of standing analysis, that their harms would be redressed by the relief they are seeking should not be taken as an endorsement of any or every remedy they are requesting. This Court will further consider the appropriateness of each of Plaintiffs' proposed remedies below.

*Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). The second two factors are not disputed.[6]

This Court thus need only consider whether the organizations' members have standing. In other words, whether educators and other staff members at educational institutions (for clarity, "teachers") would have standing to sue in their own right. The standing analysis for the teachers is similar to that outlined above for District 4J—indeed, the 12(b)(1) analysis is identical, as Plaintiffs described the impact of the policies on all teachers, and this Court will not repeat it. Although teachers are not regulated by the Letter or Certification directly, they can establish their standing by showing that a "regulated (or regulable) party to the government action" will "likely react in predictable ways that in turn will likely injure the plaintiffs." *All. for Hippocratic Med.*, 602 U.S. at 383. Thus, although teachers themselves are not personally facing funding cuts, nor are they being asked to certify anything, they may establish standing by showing that the suppression of their First Amendment activity is the "predictable effect of [g]overnment action on the decisions of" their employers. *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (noting that Article III "requires no more than *de facto* causality" so "traceability is satisfied" through proof of "predictable effect[s]").

--------

[6] As at the preliminary injunction stage, the government has only addressed whether the Plaintiff organizations' members have standing. Two of the associations—AFT and AFTMD—are teachers' unions, and thus the regulation of educational speech is obviously germane to their organizations' purposes. ECF 76 ¶¶ 21, 23. ASA, by contrast, is a less obvious plaintiff in this case because not all sociologists are educators, and the association's mission is "to serve sociologists in their work, advance sociology as a science and profession, and promote the contributions and use of sociology to society." *Id.* ¶ 22. Nevertheless, as ASA has clarified through declarations, its members rely on the teaching and research conducted at educational institutions, and many of them are educators themselves whom individually have standing. The field of sociology, to wit, heavily focuses on the study of race and racism. This Court accordingly concludes that the study and teaching of race-related topics, which Plaintiffs believe are impacted by the documents, are germane to ASA's purpose.

This Court agrees with the court in *NEA* that "it is virtually inevitable that schools will act to limit the possibility that the Department will target them for enforcement by, for example, eliminating teaching positions that involve race or censoring teachers who teach about race." *NEA*, 2025 WL 1188160, at *13. The Letter and Certification both make credible and specific threats of enforcement relating to classroom speech. That speech, of course, is the speech of teachers, who have substantial First Amendment interests in their academic freedom. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). It is predictable that states and schools faced with funding cuts, investigations, enforcement actions, or FCA liability will take actions to limit speech by teachers that might expose them to those consequences. *See NAACP*, 2025 WL 1196212 at *5 (finding that the Certification Requirement "will force schools and teachers to steer clear of offering courses and teaching topics that touch on undefined topics such as diversity, equity, and inclusion."); ECF 66-8 ¶ 17 (declaration of AFTMD member teacher) (changes in policy, if allowed to go into effect "would place tremendous pressure on me and the teachers at my school to modulate our speech and courses so as not to draw attention to the district"); ECF 31-4 ¶ 25 (AFT members fear "they must self-censor their speech, including lectures, courses, and other activities").

But the teachers are also faced with a more direct pressure to self-censor that is far from unreasonable. *See NEA*, 2025 WL 1188160, at *4 (finding self-censorship by teachers reasonable because it was "caused by defendants' actions: promulgating a vague and threatening letter with the promise of swift enforcement and harsh penalties based on ill-defined criteria."). Plaintiffs have provided multiple declarations by members outlining their speech harms. *See, e.g.*, ECF 31-8 ¶ 28 ("I feel that the Dear Colleague Letter places both me and my school in an impossible situation where we need to choose between our institutional and personal values or maintaining

our federal funding."); ECF 31-9 ¶ 23 ("I don't know if my work is considered to be toxically indoctrinating students by the Department of Education."); ECF 31-10 ¶¶ 8–9; ECF 31-11 ¶¶ 23–24; ECF 31-13 ¶ 25; ECF 51-1 ¶¶ 7, 12–13, 15–29; ECF 66-8 ¶¶ 10–13. When faced with the prospect of their school losing funding, or possible personal investigation, a "person of ordinary firmness" would be deterred from engaging in speech they believe might trigger those consequences. *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011) (First Amendment injury is cognizable where government conduct would be "likely to deter a person of ordinary firmness from the exercise of First Amendment rights"); *see also NEA*, 2025 WL 1188160, at *14 (declining to "overlook a threat in the April 3 certification that '[t]he continued use of illegal DEI practices may subject the individual or entity using such practices to serious consequences.'"); ECF 66-8 ¶ 13 ("Every day I think about how the actions of one teacher in the school district could impact tens of thousands of students in a devastating way….The thought of being the cause for funding cuts is…terrifying to me.").

Because of both the Letter and the Certification Requirement, individual teachers are uncertain whether the content they are teaching, and have historically taught, is now prohibited, and accordingly are being chilled from continuing that teaching. *See, e.g.*, ECF 51-1 ¶ 26–27 ("Our member districts would need to scale back programming that has never been deemed illegal and their educators would feel the need to self-censor in an effort to try to comply with what they think the Department might require, which may run afoul of state law or education standards. Or, they would continue to keep in place the activities they believe comply with Title VI and worry that the entirety of their federal funding would be threatened without due process."); ECF 31-4 ¶ 28; ECF 31-6 ¶ 30; ECF 31-8 ¶¶ 14–15; ECF 31-9 ¶¶ 16–17; ECF 31-10 ¶¶ 8–9; ECF 31-11 ¶¶ 10–12; ECF

37-5 ¶¶ 15–16; ECF 66-8 ¶¶ 10, 12. The Associational Plaintiffs' members have established First and Fifth Amendment injuries.

Associational Plaintiffs' members have also demonstrated that they have suffered and will continue to "suffer [a] legal wrong *because of an agency action*," and to be "adversely affected or aggrieved by agency action." 5 U.S.C. § 702 (emphasis added). Like District 4J, Plaintiffs' members have tied their speech harms to the procedural defects of both the Letter and Certification. AFT and ASA would have commented on the Letter and Certification had they been given the opportunity. ECF 66-7 ¶ 5; ECF 31-4 ¶ 29; ECF 31-5 ¶ 28. In their comments, they would have raised the injuries they are now experiencing and their reliance interests in continuing to teach using their existing curriculum. They have also established an APA injury.

All of the teachers' injuries are traceable to the Letter and the Certification Requirement. Each document both directly regulates teachers' speech and imposes obligations on their employers such that the predictable outcome is that teachers' speech will be regulated. *See All. for Hippocratic Med.*, 602 U.S. at 383. The remedies Plaintiffs are seeking—actions to void or bar enforcement of both documents—would redress their harms.

\*    \*    \*

In sum: every Plaintiff has standing for every claim and for each challenged document, under both a motion to dismiss and a summary judgment standard.

## B. Final Agency Action

The APA permits judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Final agency actions are those that "mark the consummation of the agency's decisionmaking process" and "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154,

178 (1997). "An agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations—is a legislative rule," which is always a final agency action. *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014). Similarly, "[a]n agency action that sets forth legally binding requirements" is a legislative rule. *Id.* An interpretive rule can still be final agency action, and thus subject to judicial review, if it satisfies the test from *Bennett. Id.* "The most important factor concerns the actual legal effect (or lack thereof) of the agency action in question on regulated entities." *Id.* at 252.

       *i.    The Letter*

      Nothing has changed this Court's previous assessment that the Letter was a final agency action. The Letter is not "of a merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 178. The government accordingly does not contest that the Letter is "the consummation of the agency's decisionmaking process." Instead, it still focuses on *Bennett*'s second prong, arguing that because the Letter states that it does not have the force and effect of law and that it does not create new law "it does not determine anyone's rights or obligations or have direct legal consequences." ECF 72-1 at 19. But this Court need not credit that boilerplate language, particularly where the text of the letter "commands," "requires," "orders," and "dictates." *See, e.g.*, *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000); *Am. Acad. of Pediatrics v. FDA*, 379 F. Supp. 3d 461, 488 (D. Md. 2019). And "an agency's reading of a rule must reflect fair and considered judgment to receive…deference." *Kisor v. Wilkie*, 588 U.S. 558, 579 (2019) (citation and internal quotation marks omitted); *see also id.* (courts "should decline to defer to a merely convenient litigating position or *post hoc* rationalization advanced to defend past agency action against attack" (cleaned up)). Here, where the rule itself is unambiguously contrary to the government's view, the

government's interpretation is owed no deference whatsoever. *Id.* at 574–75 ("The regulation just means what it means—and the court must give it effect, as the court would any other law.").

An "agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002). Both reasons apply here. The Letter sets forth the agency's position on what the law means, and binds any "colleague" or entity subject to DOE regulations, who may lose federal funding if it does not comply. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 600 (2016) (agency action was final where failure to comply carried penalties). Before it was enjoined and stayed, DOE was applying the Letter as if it were binding. It referenced the Letter as the basis for its investigations of 51 colleges. ECF 31-35. And before the Letter was enjoined and stayed, DOE continued to take actions to implement the Letter via the FAQs, the end DEI portal, and the Certification Requirement. ECF 37-7; ECF 51-5.

But most importantly, the Letter's directives are changes from prior law that sound binding. Again, the government's insistence that the Letter merely restates schools' obligations under civil rights law is unpersuasive. Title VI and *SFFA* have never been interpreted to preclude teaching about concepts relating to race. The Administration could have issued, and perhaps was trying to issue, a guidance simply clarifying that it intended to prioritize Title VI enforcement actions pertaining to discrimination against all groups, even those in the majority. But it went much farther than that by expanding the definitions of "stereotyping," "stigmatizing," and "discrimination" to reach entirely new categories of conduct. And it did so in a way that, at a minimum, appears legally binding to the reasonable reader.

The government's conduct surrounding the Letter belies its position. For one, in the New Hampshire Agreement in April, the government agreed not to "initiate any enforcement action,

investigation, or otherwise take action based on the Dear Colleague Letter issued on February 14, 2025, and subsequent actions implementing the Letter" until April 24, 2025. But the next sentence reads, "This would not preclude enforcement actions, investigations, or other actions based on Title VI in general or the *Students for Fair Admissions* case." *Id.* That distinction would make no sense if the government saw no daylight between the requirements of the Letter and the requirements of "Title VI in general or [*SFFA*]."

The multitude of ways the government implemented the Letter paint a similar picture. If the Letter says nothing new, then why does it link to a new reporting portal specifically looking for instances of "divisive ideologies" and "indoctrination," when there has always been a portal for anyone to report race discrimination or racially hostile environments? Why did states and schools need to certify their compliance with "existing law," when they all certified their compliance with Title VI's dictates last spring? Why did DOE remove prior guidances regarding Title VI and *SFFA* if they are consistent with DOE's current views? Why did DOE need twelve single-spaced pages of frequently asked questions—which the government referenced repeatedly in explaining the Letter—to explain what the Letter means? Why did DOE need to write a four-page Letter to remind schools that it was enforcing existing law, even if it had different enforcement priorities? Why did DOE announce it would "take appropriate measures to assess compliance…based on the understanding embodied in [the L]etter beginning no later than 14 days" from the Letter's issuance if it was always the law? It does not add up, and certainly contributes to the reasonable perception that the Letter imposes new legal obligations.

The Letter is a final agency action and is subject to review. This Court also continues to view the Letter as a legislative rule because "it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or

policy." *Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 620 (4th Cir. 2018); *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020) (contradicting a regulation "manifest[s] intent to…speak with the force of law."). Legislative rules, "pursuant to properly delegated authority," have "the force of law and create[] new law or impose[] new rights or duties." *Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*, 874 F.2d 205, 207 (4th Cir. 1989) (citations omitted). Although its propriety is suspect, the text of the Letter has the force of law, creates new law, and imposes new duties.

The Letter does not merely "remind" regulated parties of existing duties or "clarify" the law. *Children's Hosp.*, 896 F.3d at 620 (citation omitted) (describing limited scope of legislative rules). Because the Letter "effects a substantive change in existing law or policy" by imposing new legal obligations on regulated parties, it surpasses the bounds of an interpretive rule. It also supplements Title VI by extending it to cover classroom speech and curriculum. It conflicts with 34 C.F.R. § 100.5(i), a regulation implementing Title VI, which outlines "circumstances [where] an applicant or recipient [of federal funds] may properly give special consideration to race, color, or national origin to make the benefits of its program more widely available to such groups [that are] not…being adequately served." Because the Letter substantively alters the legal landscape in ways that have the force and effect of law, it must be a legislative rule. To simply "remind" parties of existing duties, the government would have needed to limit its guidance to a restatement of existing law. The government could have outlined its new enforcement priorities well within those bounds, but it could not extend Title VI to reach new categories of conduct.

The Letter is a legislative rule, subject to all requirements for promulgating a legislative rule.

ii.    *The Certification Requirement*

So too is the Certification Requirement. Again, the writing is on the wall—it defies logic that DOE would need every local and state educational institution in the country to certify its compliance with existing law for the second time in less than a year. This Certification must be different.

Beyond its novel legal requirements, however, the Certification Requirement is a straightforward final agency action because it is binding—recipients of federal funding are required to certify to continue receiving their relied-upon funds. *See Gen. Elec. Co.*, 290 F.3d at 383. This is clearly a document "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178. Absent this Court's stay and the various injunctions, signing the Certification was mandatory for recipients of federal funding; thus, it is clear that the Certification Requirement creates "legal consequences." The Certification Requirement contains repeated threats of enforcement action both for noncompliance with the policies underlying the certification and for failing to certify. It does not even contain a disclaimer to proclaim that it is not binding (as the Letter does); it obviously is binding. *See* ECF 37-9. The email distributing the certifications underscores that signing was mandatory, or at a minimum that consequences would flow from failing to sign. ECF 37-8 (requiring states to report on "the signature status" for their school districts).

The Certification Requirement is a final agency action and is subject to review. It also imposes a new legally binding obligation on recipients of federal funding. *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014) ("An agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action or violations of those obligations—is a legislative rule."). Like the Letter, the

Certification Requirement goes beyond merely reminding parties of existing duties or clarifying the law; it imposes affirmative obligations to certify compliance with new undefined legal requirements. The Certification Requirement is therefore a legislative rule subject to the notice and comment procedures required by the APA.

## IV.  DISCUSSION

### A.  Administrative Procedure Act

Plaintiffs raise several different challenges under the APA, any of which is independently sufficient to warrant vacatur. Where their challenges to the Letter and the Certification Requirement are closely related, this Court considers them together. The government does not address the vast majority of Plaintiffs' APA arguments, instead relying on their familiar refrain that the Letter and Certification were neither final agency actions nor legislative rules. This Court has now twice rejected that argument.

#### i.  Notice and Comment

Legislative rules must go through notice and comment. 5 U.S.C. § 706(2)(D) (agency action must be set aside where implemented "without observance of procedure required by law"); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96–97 (2015). The government does not dispute this inflexible requirement, but instead strained to argue at the April motions hearing that the government had already satisfied notice-and-comment requirements as to the Letter by providing, in a footnote, mailing and email addresses for anyone "interested in commenting." ECF 31-14.

This Court already rejected that argument. ECF 60 at 29–30. The requirements for notice-and-comment rulemaking are exacting. *See* 5 U.S.C. § 553; *North Carolina Growers' Assn. v. United Farm Workers*, 702 F.3d 755, 768 (4th Cir. 2012) ("The statutory requirements in § 553(b) are clear, and they constitute an important part of the APA's procedural safeguards related to

agency rulemaking."). An after-the-fact opportunity to send an email does not satisfy them. Although there is a limited exception to notice and comment for "good cause," *See* 5 U.S.C. § 553(b)(B), the government has not expressly invoked it, and it could not have demonstrated its reliance on that exception in the agency record, because no agency record exists. *See* ECF 58 at 1; *North Carolina Growers*, 702 F.3d at 768 (requiring agency record to "manifest plainly" the agency's decision to rely on the good cause exception).

The government's attempt to justify its failure to follow notice-and-comment procedures for the Letter rings hollow, and it cannot muster excuse as to the Certification Requirement. Both documents violate 5 U.S.C. § 706(2)(D) because they were issued without adherence to the procedures required by law.

> ii. *Paperwork Reduction Act*

Plaintiffs next argue that the Certification Requirement was issued without observance of procedure required by law because it did not comply with the Paperwork Reduction Act ("PRA"), 44 U.S.C. §§ 3501 *et seq.* The PRA requires agencies seeking to collect information from regulated entities to conduct a formal "evaluation of the need for the collection of information" and consider the burdens of collecting that information. *Id.* § 3506(c)(1)(A)(i–vi). That evaluation usually requires (and in this case would have required) notice and comment. *Id.* §§ 3506(c)(2)(A); 3507(a)–(b). The Office of Management and Budget ("OMB") must approve all collections of information, and "determine whether the collection…is necessary for the proper performance of the functions of the agency." *Id.* § 3508. When OMB approves a collection of data, it issues a control number that must be displayed on collection forms. *Id.* § 3507(a)(3).

The government does not address the PRA, much less dispute that it failed to follow its requirements. Plaintiffs raise the important point that DOE has complied with the PRA in the past,

and in seeking to collect similar certifications from its funding recipients less than a year ago (1) included statements clarifying that "no persons are required to respond to a collection of information unless such collection displays a valid OMB control number;" and (2) represented to OMB that the assurance was necessary and not overly burdensome in part because OCR would not require any future certification from any respondent who had already done one. ECF 37-11; ECF 37-10.

The government's failure to comply with, or apparently even consider, the PRA also lends support for Plaintiffs' argument that the Certification is arbitrary and capricious—of all things the government ought to have considered, it is surprising that it issued the Certification Requirement without any apparent awareness that it had circulated a similar certification less than a year before. Failing to account for the PRA corresponded with a failure to acknowledge or explain DOE's change in position or to consider baseline conditions. Many states noted in their responses to the certification that they had already certified compliance with Title VI and *SFFA* in 2024, and questioned why they were being asked to certify again. *See* ECF 66-10 (collecting responses from states).

Accordingly, this Court concludes that the Certification Requirement is procedurally defective and arbitrary and capricious for failing to consider the requirements of the PRA.

### iii.    *Arbitrary and Capricious*

An agency's decision is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *West Virginia v. Thompson*, 475 F.3d 204, 212 (4th Cir. 2007) (quoting *State Farm*,

463 U.S. at 43). The scope of this review is narrow and deferential. *State Farm*, 463 U.S. at 43; *see also Citizens to Preserve Overton Park*, 401 U.S. at 416 ("To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."); 5 U.S.C. § 706(2)(A); *State Farm*, 463 U.S. at 43 ("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."). A court "may not supply a reasoned basis for the agency's action the agency itself has not given." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

Although Plaintiffs offer a multitude of theories under which this Court could find the Letter and the Certification Requirement arbitrary and capricious, each of those reasons is rooted in the government's failure to recognize that it went beyond merely restating settled principles of civil rights law. Indeed, the government's briefing in this case—postdating this Court's express finding to the contrary—borders on flippant in its repeated insistence that it did not need to employ any process to tell schools to comply with Title VI. Because the government insists that the Letter and Certification Requirement required no particular process, and has created no administrative record underlying either of them, it failed to consider a number of required factors (or, indeed, to consider anything at all). No reasoned bases for the government's decisions are apparent from the very sparse record, and this Court cannot provide them. *See id.* To affect the kind of policy change the Letter does, the government was required to carefully consider the choice it was making, the evidence underlying it, and the interests it might impact. And to require regulated parties to take affirmative actions (such as certification) based on those policy changes, the government was

43

required to consider the impact of that requirement. Because the underlying issues here have already been addressed at length, the Court will not belabor the point.[7]

### 1.    Change in Position

Plaintiffs first argue that DOE failed to provide an explanation for its change in position. An agency is required to "display awareness that it is changing position" and "show that there are good reasons" for its new policy. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not…depart from a prior policy *sub silentio*."). Failing to acknowledge or explain a change is evidence that the government has "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. The government argues that it did not depart from anything, and if it did, it only departed from interpretive rules, so it did not have to explain the reasons for its departure.

This Court has already rejected the notion that the Letter merely restates existing law.[8] If anything, the government's repeated assertions that the Letter says nothing new evince that it is still either unaware or unwilling to admit that it has changed positions. The government changed its position by asserting that certain discussions of race constitute discriminatory practices that

---

[7] This Court also notes that, to the extent that Defendants rely on the premise that the Certification and Letter were interpretive rules as dispositive, arbitrary-and-capricious review still applies with full force to interpretive rules. *See Perez*, 575 U.S. at 106 (noting that arbitrary-and-capricious review is a substantial check on unreasonable or improperly promulgated interpretive rules).

[8] At the motions hearing, the government's presentation focused heavily on its intent to reinforce the principle that anti-discrimination law protects majority groups. The government's briefing here repeats that point. Neither Plaintiffs nor the Court disagree, and, had the Letter constrained itself to that point, it would not have communicated any change in existing law. Similarly, if the aim of the Certification Requirement was to assure compliance with Title VI as it protects majority groups, the government could have plainly said that. A change in Title VI enforcement priorities to focus on so-called "reverse discrimination" cases is within the administration's purview.

violate Title VI and *SFFA*. Prior guidance explained that so long as all students were welcome, "hosting meetings, focus groups, or listening sessions on race-related topics likely would not, by itself, raise concerns under Title VI." ECF 31-26 at 10. Similarly, prior guidance used an elementary school's requirement that all students read a book about race discrimination and racial justice and a high school requirement that students take a Mexican American history course as examples of school policies that would likely not raise Title VI concerns. *Id.* at 6–7. The Letter and Certification Requirement, and accompanying guidance, call these settled practices into question.

The Letter and Certification also mark a significant change in position regarding DOE's interpretation of *SFFA*. A prior guidance—that was removed from the DOE website some time in Winter, 2025—interpreting *SFFA* provided that "nothing in the *SFFA* decision prohibits institutions from continuing to seek the admissions and graduation of diverse student bodies, including along the lines of race and ethnicity, through means that do not afford individual applicants a preference on the basis of race in admissions decisions." ECF 31-19 at 3. The prior guidance also advised schools that race-neutral efforts to promote diversity and increase opportunity for all students were lawful. *Id.* The Letter, by contrast, says that even race-neutral policies, such as eliminating standardized testing, would be "unlawful" if "motivated by racial considerations" or a desire to "increase racial diversity." ECF 31-14 at 2–3. And the Certification applies *SFFA* anew both to K–12 school activities and to any "race-based action" or "DEI practice" in schools. ECF 37-9. Those significant changes in position are not explained.

DOE's most concerning change in position regards its authority to regulate curriculum and its decision to prospectively categorize content as discriminatory. It still has not acknowledged that the change occurred or explained the reasoning for that change. The agency was required to

demonstrate self-awareness where it changed positions and to explain the reasons for those changes in position. It did not. This supports a finding that the Letter is arbitrary and capricious.

As to the Letter, this Court retains the same concerns it expressed at the preliminary injunction stage about the multitude of unexplained changes in departmental position. Although the Certification Requirement, as an implementation of the Letter, expresses fewer changes directly, it too espouses and expands on DOE's changed interpretation of *SFFA*. The government was required to consider and explain those changes in position.

2.    Prior Factual Findings and Evidence

Agency actions are arbitrary and capricious when they lack a "factual basis." *AFL-CIO v. Fed. Labs. Rels. Auth.*, 25 F.4th 1, 10 (D.C. Cir. 2022). Agencies are required to "examine the relevant data and articulate [] satisfactory explanation[s] for its action[s] including a rational connection between the facts found and the choice made." *Mayor of Balt. v. Azar*, 973 F.3d 258, 275 (4th Cir. 2020) (cleaned up). There is no administrative record underlying either the Letter or the Certification Requirement. *See* ECF 58. Neither document contains any factual citations nor references any facts supporting its assertions. For example, the Letter provides no factual basis for its pronouncement that "Educational institutions have toxically indoctrinated students with the false premise that the United States is built upon 'systemic and structural racism' and advanced discriminatory practices and policies." ECF 31-14 at 2. Nor does it provide any evidence that educational institutions "have discriminated against…white and Asian students" or "embrace[d] pervasive and repugnant race-based preferences." *Id.* at 1. The Certification includes similar statements about "DEI programs" "advantag[ing] one's [sic] race over another," ECF 37-9 at 3, although it is essentially devoid of any references to facts or examples.

Some of the statements in the Letter and Certification are merely reflective of the administration's viewpoint, as the government has vigorously asserted. The government certainly is entitled to its viewpoint, and it is not required to provide factual bases for its viewpoints as a general matter. But where it seeks to use those viewpoints to alter the legal landscape and to impose new obligations on regulated persons, it must consider evidence and demonstrate appropriate consideration of relevant facts. The Letter and Certification provide no line at all distinguishing viewpoint from binding policymaking. They either make factual assertions without support, or fail to consider facts at all. This is particularly concerning in light of the documents' vague language and threats of enforcement. This too supports a finding that both documents are arbitrary and capricious.

### 3. Existing State and Federal Standards

"A material misapprehension of the baseline conditions existing in advance of an agency action can lay the groundwork" for a court to find it was arbitrary and capricious. *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012). The government, at a minimum, misapprehended the scope of Title VI and *SFFA* in both the Letter and the Certification. Even extrapolating *SFFA*'s holding, as the government does, to extend far beyond college admissions, it certainly does not proscribe any particular classroom speech, or relate at all to curricular choices. Nor does Title VI. These fundamental misunderstandings shape the government's view that it did not announce any change in law or policy. It is not that the government is precluded from taking (or advocating) a broader view of *SFFA* or Title VI than prior administrations have—it is free to do that. But to avoid a material misapprehension of baseline conditions in the APA context, the government must indicate that it is cognizant of what existing law is and where it is supplementing that law with its own views. Even post-dating this

Court's initial decision (and those of two other courts), it has continued to misstate the holding of *SFFA* in documents announcing new enforcement actions. *See* ECF 66-12.

Here, the misapprehension led DOE to issue a purported "guidance" that conflicts with its own regulations and existing case law. The Letter's position proscribing race-neutral means of increasing all forms of diversity, for example, is directly contradicted by binding precedent in this Circuit. *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 885–86 (4th Cir. 2023) ("To the extent the Board may have adopted the challenged admissions policy out of a desire to increase the rates of Black and Hispanic student enrollment at TJ—that is, to improve racial diversity and inclusion by way of race neutral measures—it was utilizing a practice that the Supreme Court has consistently declined to find constitutionally suspect."), *cert. denied*, No. 23-170, – S. Ct. – , 2024 WL 674659 (Feb. 20, 2024); *id.* at 886 ("An Equal Protection plaintiff alleging purposeful racial discrimination must show at least some specific intent to target a certain racial group and to inflict adverse effects upon that group.").[9] And 34 C.F.R. § 100.5 provides that educational institutions "may properly give special consideration to race, color, or national origin to make the benefits of its program more widely available to such groups, not then being adequately served" if "[e]ven though an [institution] has never used discriminatory policies, the services and benefits of the program it or activity it administers may not in fact be equally available to some racial or nationality groups." The Letter thus interprets *SFFA* to apply far more broadly, and to entirely

_____

[9] Plaintiffs note that the government recently initiated an enforcement action against Fairfax County Public Schools for this very admissions policy. *See* ECF 66-12. While the specifics of that action are beyond the scope of this case, it is probative of the government's continuing misunderstanding of Title VI and *SFFA*, even after guidance from three separate courts on the issue.

different categories of conduct, than merely preventing using race as a factor in "zero-sum" opportunities like admissions, hiring, promotions, or awards.[10]

Again, the administration is entitled to its own views, including on how court cases and laws should be interpreted. It is entitled to develop and pursue its own enforcement priorities within the law. But it is not entitled to misrepresent the law's boundaries, and must at a minimum acknowledge and consider the relevant legal framework as it is. It cannot blur the lines between its viewpoint and existing law. This also supports the notion that Letter and Certification are arbitrary and capricious.

### 4.    Reliance Interests

"When an agency changes course…it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *California*, 591 U.S. at 30. "It would be arbitrary and capricious to ignore such matters." *Id.* Plaintiffs argue that DOE's change in position on Title VI and *SFFA* is disruptive to teachers and educational institutions that have been operating under very different understandings of anti-discrimination law for decades. The Letter and Certification together serve as an immediate demand to reverse course, backed by threats of serious consequences.

Plaintiffs argue that the Letter and Certification's apparent prohibitions will "[f]orc[e]" them "to potentially overhaul their curriculum, programming, and teaching positions." ECF 66-1 at 15–16; ECF 31-11 ¶¶ 7, 12, 23; ECF 31-8 ¶ 27; ECF 31-9 ¶¶ 25–29; ECF 31-7 ¶¶ 11–18; ECF 66-8 ¶ 15; ECF 66-6 ¶¶ 21–23 (noting awareness of investigations into schools for having a "Black

---

[10] The Certification references, and requires states and schools to certify their compliance with, those same overbroad understandings. Although the Certification itself includes less particularized statements (in other words, vague ones), it clearly incorporates the same interpretations and mistaken baselines undergirding the Letter.

Student Success Plan," "training seminars to increase racial literacy," and "banning the use of Native American mascots without permission"). Disregarding the current stay and injunctions, the Letter and Certification each required compliance and threatened to begin enforcement within days. Because developing curriculum and programming to meet instructional goals and student needs is time consuming and costly, teachers, schools, and school districts will likely be unable to offer replacements, or replacements will be "cobbled together quickly and may not achieve instructional goals as effectively." ECF 66-1 at 16; *see also* ECF 31-7 ¶ 13 ("[S]electing curriculum and instructional materials…is a significant undertaking involving large numbers of stakeholders, review and piloting of instructional materials, selection of materials, teacher training and ultimately, implementation of the curriculum in the classroom."); ECF 66-6 ¶ 18–19 ("In general, administering the entire District and all of our schools requires detailed advanced planning, and the idea we could lose funds midstream and somehow find a suitable way to pivot is not realistic.").

School districts, schools, and teachers had no opportunity to comment on the Letter before it became effective, nor were they given a chance to comment on the Certification Requirement.[11] And their reliance interests, including but not limited to existing programs, curricula, contractual obligations, and departmental structures, were not considered. In an earlier stage of this litigation, indeed, the government strained to argue that the impetus was on the Plaintiffs to raise their reliance interests. Had the government sought comments on the Certification Requirement, for example, states could have raised the certifications they signed last year and their concerns about the PRA. But the government never asked, and it provided tiny windows between the

---

[11] Although many states provided feedback in their responses, they had no opportunity to raise their concerns prior to submitting their actual certification responses.

announcements of these large-scale policy shifts and their implementations. Partially, perhaps, because the government seems blind to the magnitude of the change in policy the Letter announced and the Certification Requirement amplified, it failed to account for how disruptive it would be to stakeholders. The direct prohibitions on teaching certain content paired with other vague and overbroad terms raise reasonable views that broad swaths of content might be legally suspect to this administration. The Certification Requirement ups the ante by requiring states and schools to represent to the government that they are complying with its unclear requirements. The government's failure to consider reliance interests, too, counsels toward a finding that the Letter and Certification are arbitrary and capricious.

*      *      *

In promulgating the Letter and Certification, the government announced large-scale policy changes without considering whether they were appropriate based on existing facts and law, or the extent to which they would disrupt schools and teachers' status quo to the detriment of students' learning. Both the Letter and Certification are arbitrary and capricious for failing to account for facts, law, baseline conditions, or reliance interests.

### iv.    *Not in Accordance with Law*

Plaintiffs next argue that the Letter must be held unlawful and set aside because it is "not in accordance with the law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2). Specifically, Plaintiffs argue that the Letter exceeds the authority Congress

delegated to DOE in the Department of Education Organization Act, Pub. L. 96-88, 93 Stat. 668 (1979) ("the DEOA").[12] On second look, this Court still finds that Plaintiffs are correct.

"Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024); 5 U.S.C. § 706 (courts must "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning…of the terms of an agency action"). The DEOA provides that DOE cannot exercise "direction, supervision, or control" over "the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, over any accrediting agency or association, or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system." 20 U.S.C. § 3403(b).

This Court already found that the Letter exercises control over the content of curriculum. ECF 60 at 34. While insisting that view is incorrect, the government studiously avoids disclaiming that the Letter reaches at least some curricular choices. The government insists that the Letter "merely informs schools that they must not discriminate among students when implementing their curricula and must avoid stereotyping and stigmatizing based on race," and therefore it is not directing educators and institutions about what they can or cannot teach. ECF 42 at 20. According to the government, "There is a critical distinction between ED prescribing curricula or exercising control over school administration and ED requiring that schools act in a nondiscriminatory manner in implementing their curricula and executing administrative decisions so that they avoid

---

[12] Although Plaintiffs include a stray sentence seeking to apply this same analysis to the Certification Requirement, ECF 66-1 at 18, this Court is not convinced that merely referencing "illegal DEI" directs curricular choices as directly as the terms the Court has highlighted in the Letter.

stereotyping and stigmatizing based on race." *Id.* That "critical distinction" is not apparent to this Court.

The government also relies heavily on the FAQs—revised on April 9—to support its position that the Letter does not regulate curriculum. The government's approach to the curriculum problem in the FAQs is emblematic of its approach in general: "the [DEOA]…prohibit[s] the Department from exercising control over the content of school curricula. However…" ECF 51-4 at 6. The "however" is followed by a 491-word explanation in which DOE describes the possible ways various undefined curricular choices might constitute "stereotyping," or "racial harassment." *Id.* The FAQs essentially provide that it will be a "fact specific inquiry" whether DOE believes curricular choices or content taught constitute "stigmatizing," "stereotyping," or "racial harassment." The broader context provided by the Letter and FAQs in fact suggests that broad swaths of classroom speech may be suspect, a stark contrast from DOE's previous position that essentially no classroom speech was suspect. At best, the FAQs lack sufficient clarity to override the express terms of the Letter. More likely, they contribute to the reasonable perception that DOE is regulating the content of curriculum.

This Court must concern itself with what the Letter actually says, not what the government says the Letter says. The Supreme Court has cautioned lower courts to "decline to defer to a merely convenient litigating position or *post hoc* rationalization advanced to defend past agency action against attack." *Kisor*, 588 U.S. at 579 (cleaned up). On this point, at a minimum, the Letter is unambiguous and the government is not entitled to any deference. The Letter terms "teach[ing] students that certain racial groups bear unique moral burdens that others do not" "stigmatiz[ing]," "stereotyp[ing]," and "deny[ing] students the ability to participate fully in the life of a school." ECF 31-14 at 3. It similarly refers to "toxically indoctrinat[ing] students with the false premise

that the United States is built upon systemic and structural racism" as a "discriminatory practice[]." *Id.* at 2. It is hard to square those statements with the government's current pronouncement that the Letter does not prescribe curricular choices.[13] Indeed, the government has stated that it believes it *can* regulate the content of curriculum if it is "discriminatory," "stigmatiz[ing]," "stereotyp[ing]," or "deny[ing] students the ability to participate fully in the life of a school."

By declaring broad categories of classroom speech discriminatory, in the context of a Letter threatening enforcement actions for discriminatory practices, DOE is exercising "direction, supervision, or control" over "the curriculum, program of instruction, administration, or personnel of [schools.]" Although the government attempts to insert nuance after the fact, the strident tone

---

[13] At the motions hearing, the government attempted to parse the language of the Letter to argue it did not term teaching about structural racism a "discriminatory practice." The passage reads,

> Educational institutions have toxically indoctrinated students with the false premise that the United States is built upon "systemic and structural racism" and advanced discriminatory policies and practices. Proponents of these discriminatory practices have attempted to further justify them—particularly during the last four years—under the banner of "diversity, equity, and inclusion" ("DEI"), smuggling racial stereotypes and explicit race-consciousness into everyday training, programming, and discipline.

ECF 31-14 at 2. The government's argument, essentially, is that the "and" in the first sentence should be read to separate the clause about systemic and structural racism from "advanced discriminatory practices." The plain meaning of the text contradicts that reading. By using the catch-all "these discriminatory practices" in the following sentence, the Letter implies that immediately preceding concepts, "toxically indoctrinated students" and "advanced discriminatory practices," are discriminatory practices. If "discriminatory practices" only referred to "advanced discriminatory practices," the catch-all would appear to be superfluous, and the choice of the word "these" to address only one non-specific category of things would be awkward. Items in a list, moreover, are presumed to be of a similar nature. Applying these basic grammatical principles to determine its plain meaning, the Letter says that "toxically indoctrinat[ing] students…" with a particular viewpoint (that of "proponents" of diversity, equity, and inclusion") is a discriminatory practice.

of the Letter is devoid of it. As this Court already concluded, there is no basis in Title VI or *SFFA* for concluding that discussion of race—in the two ways highlighted in the Letter or otherwise—is ever, or especially always, discrimination.[14] The government cannot proclaim entire categories of classroom content discriminatory to side-step the bounds of its statutory authority.

The Letter exceeds DOE's statutory authority by exercising control over the content of curriculum.

### v.    *Contrary to Constitutional Rights*

Finally, the APA requires courts to "set aside" any final agency action that is contrary to constitutional rights. 5 U.S.C. § 706(2)(B). Plaintiffs argue—both as distinct constitutional claims and claims under the APA—that the Letter and Certification are contrary to the First and Fifth Amendments.

### 1.    First Amendment

#### a.    The Letter

The Letter's provisions proscribing specific forms of classroom speech run afoul of the First Amendment by regulating speech based on its content. Where the government "single[s] out specific subject matter for differential treatment," its regulation is "content-based." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 74 (2022). "It is axiomatic that the

---

[14] The government argues that the DEOA should not be read to frustrate the purposes of Title VI. This Court sees no conflict between the statutes—DOE is not permitted to exercise control over curriculum, but is required to enforce anti-discrimination law. Everyone agrees that there are circumstances where conduct in a classroom, including, perhaps, the content taught, could amount to harassment or discrimination. But the government is not entitled to preemptively declare broad categories of classroom speech discriminatory as a matter of law to expand the scope of its authority. That is a prior restraint on speech. Prior guidance issued by DOE reflected this more nuanced position: DOE would not entertain complaints "based on the content of a school's academic course materials" "absent allegations of discrimination." ECF 31-26.

government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). When the government regulates speech based on its content or viewpoint, its actions are presumptively unconstitutional. *Id.* at 828–29.

Here, the government has singled out classroom speech regarding "systemic and structural racism" and "teach[ing] students that certain racial groups bear unique moral burdens that others do not." ECF 31-14 at 2–3. The Letter improperly terms those categories of speech "discriminatory," "stereotyping," and "stigmatizing"—all terms that can give rise to enforcement under Title VI. This Court has already rejected the position that DOE could regulate the content of curriculum by dubbing certain types of content categorically discriminatory, and the same reasoning applies here. The Letter is "textbook viewpoint discrimination." *NEA*, 2025 WL 1188160, at *24–26.

The government strains to argue that the Letter only targets discriminatory conduct, and does not reach speech at all. It continues that "racial discrimination" is not a part of "academic freedom." Finally, the government asks this Court to rely on DOE's representation in the FAQs that "[DOE] enforces federal civil rights law consistent with the First Amendment." That promise, which the government has echoed time and time again, rings empty. Again, this Court has already rejected the government's argument that discussing "systemic and structural racism" or "teach[ing] students that certain racial groups bear unique moral burdens that others do not" constitutes per se race discrimination. As the Fourth Circuit has recognized, "to prevent the punishment or even the chilling of entirely innocent, lawfully useful speech, the First Amendment may in some contexts stand as a bar to the imposition of liability on the basis of mere foreseeability or knowledge that the information one imparts could be misused for an impermissible purpose." *Rice v. Paladin*

*Enters., Inc.*, 128 F.3d 233, 247 (4th Cir. 1997). [15] And to be clear, the speech proscribed by the Letter is not always, often—or perhaps ever—discriminatory or unlawful by itself. Prior restraints on speech are presumptively unconstitutional, and highly disfavored. *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 733 (1931); *Patterson v. Colorado*, 205 U.S. 454, 462 (1907) ("[T]he main purpose of [the First Amendment] is 'to prevent all such *previous restraints* upon publications as had been practised by other governments,' and they do not prevent the subsequent punishment of such as may be deemed contrary to the public welfare."). Here, the government cannot justify its preemptive prohibition on speech by arguing, without justification, that it is possible the speech could be a part of unlawful harassment. Even if the speech itself were more suspect, a prior restraint on that speech would not be constitutionally permissible.

The government cannot proclaim that it "will no longer tolerate" speech it dislikes because of its "motivating ideology"—that is a "blatant" and "egregious" violation of the First Amendment. *Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015) (quoting *Rosenberger*, 515 U.S. at 829); ECF 31-14 at 2–3. The Letter says expressly that it is targeting "[p]roponents" of diversity, equity, inclusion, and social justice. ECF 31-14 at 3. As Plaintiffs put, and the government does not dispute, "a person who…opposes DEI or who opposes the concepts that are discussed in the Letter is perfectly free to use federal funds to exercise their expression and do so without the fear that they will be punished or have funds taken away as a result." ECF 59 at 103:19–23. That is clear viewpoint discrimination.

---

[15] The government continues to rely on *Rice* for the proposition that the government may punish speech without regard for the First Amendment where it is the "vehicle of the crime." *Id.* at 244. The speech at issue here is nowhere near comparable to the challenged speech in *Rice*, a book that provided detailed instructions for would-be murderers on how to kill their victims (instructions that were followed in killing the victim/plaintiff in that case). Even in *Rice*, moreover, the speech was punished—through civil liability—only *after* it was actually used in criminal activity.

As this Court has expressed repeatedly, the government is entitled to its viewpoint. But it may not "hamstring the opposition" or "burden protected expression" in its efforts to "tilt public debate in [its] preferred direction." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 578–79 (2011); *Rumsfeld v. Forum for Academic & Institutional Rights*, 547 U.S. 47, 61 ("[F]reedom of speech prohibits the government from telling people what they must say."). Nor can the government use its power over funding to coerce the suppression of speech it disfavors. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205, 214 (2013) (noting that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected…speech"); *see also Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 187–89 (2024) (government officials cannot "threaten enforcement actions against…regulated entities…in order to punish or suppress" the speech of others); *see also id.* (rejecting contention that such conduct is merely the government's expression of its own viewpoint).

As to this very limited aspect of the Letter at least, where it regulates specific forms of speech of a particular viewpoint by declaring them discriminatory, and therefore unlawful, the Letter violates the First Amendment.[16] "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Vullo*, 602 U.S. at 187. This constitutional issue is inextricably bound within the other APA issues in this case, and illustrates why compliance with procedures is important. Following those procedures, at a minimum, would have given the government more opportunity to identify

---

[16] Plaintiffs also argue that the Letter discriminates based on content and is facially overbroad. Having already found that the Letter runs afoul of the First Amendment in one respect, this Court declines to opine on additional constitutional issues. *See United States v. Chatrie*, 136 F.4th 100, 101 (4th Cir. 2025) (Diaz, C.J., concurring) ("[J]udicial modesty sometimes counsels that we not make grand constitutional pronouncements merely because we can.").

the gulf between its stated intent—to issue an interpretive rule regarding its enforcement priorities—and what it actually did—issue a legislative rule that far exceeds the agency's delegated authority by impermissibly proscribing speech based on its viewpoint.

Plaintiffs have proven that the Letter is procedurally improper under the APA because portions of it are contrary to the First Amendment.

b.    The Certification Requirement

The same result does not follow for the Certification Requirement. While the Letter directly proclaims specific speech of a particular viewpoint discriminatory and unlawful, the Certification is far more equivocal. Whereas Plaintiffs cite to specific viewpoint discriminatory language in the Letter, the only similar statements it can muster from the Certification are vague ones about "illegal DEI" and "certain DEI practices." *See* ECF 66-1 at 21. Although there are other problems with those statements, which this Court will address later, they do not in themselves suppress speech at all, particularly based on viewpoint or content. This Court's reasoning above was heavily informed by direct language in the Letter proscribing protected speech. The Certification does not proscribe any particular speech; it is too vague to do so. Although Plaintiffs persuasively frame the Certification as a part of a broader effort to suppress disfavored speech, the face of the document does not proscribe or regulate speech. This Court accordingly cannot find that it violates the First Amendment based on viewpoint or content discrimination.

Plaintiffs also argue that the Certification is facially overbroad.[17] Although the doctrines of vagueness and overbreadth have overlapping rationales, Plaintiffs' arguments ultimately sound

---

[17] The government's response, that the Certification is not overbroad because it merely restates Title VI and *SFFA*, does not merit further discussion because, as discussed above, the government misapprehends their reach.

in vagueness. Facial overbreadth challenges lie where a statute has some "plainly legitimate sweep" but also punishes or regulates a "substantial amount of protected speech." *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003). The problem with terms like "illegal DEI" and "certain DEI practices" is less that they necessarily encompass lawful protected speech—they might or might not—and more that it is difficult, if not impossible, to know what "certain" practices the government now thinks are "illegal," resulting in the chilling of lawful speech . That is a vagueness problem.

An overbreadth problem exists where the government action proscribes protected speech on its face, in the context of an action that also addresses some conduct the government may permissibly regulate. *Newsom v. Albemarle County School Board*, 354 F.3d 249 (4th Cir. 2003) provides a helpful illustration. A middle school dress code banned students from wearing "messages on clothing, jewelry, and personal belongings that relate to weapons." *Id.* at 252. The Fourth Circuit found that dress code overbroad because the ban on "messages…that relate to weapons" necessarily encompassed "lawful, nonviolent, and nonthreatening symbols of not only popular, but important organizations and ideals." *Id.* at 259–60. In other words, the ban unambiguously applied to all messages relating to weapons, even constitutionally protected ones, and thus it was facially overbroad. While schools can appropriately regulate violent, threatening, or disruptive messaging, not all speech that relates to weapons is violent, threatening, or disruptive. As the Fourth Circuit highlighted, the Seal of the Commonwealth of Virginia features a woman holding a spear, and thus the school dress code would have unambiguously prohibited students from "wear[ing] or carry[ing] any items bearing the Seal. *Id.* at 260. Similarly, the symbol of the University of Virginia (which is located in Albemarle County, Virginia) includes two crossed sabers, undoubtedly weapons, and thus students would have been unable to wear any UVA gear

featuring the symbol. *Id.* The dress code at issue contained no language suggesting any limitations or exceptions for permissible speech. *Id.*

The Certification Requirement is very different. Whereas in the Letter, lawful speech was necessarily prohibited, the Certification Requirement has limiting factors. They are not clear limiting factors, to be sure, and again, other problems flow from the vague language. But there is a significant difference between punishing "illegal DEI" and "all messages relating to DEI," just as there would have been a substantial difference in prohibiting "disruptive messages about weapons" and "all messages related to weapons." Each of the former provisions are unclear about what their limitations are, leaving regulated persons to guess whether their conduct is allowed; each of the latter provisions unambiguously restricts at least some constitutionally protected speech. Both are problematic, but in different ways.

The Certification Requirement is not facially overbroad because it does not unambiguously punish protected speech. Plaintiffs have not therefore shown that the Certification Requirement violates the First Amendment.

1.      Fifth Amendment

An "enactment is void for vagueness if its prohibitions are not clearly defined" and it fails to "give [a] person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972) ("Living under a rule of law entails various suppositions, one of which is that [persons] are entitled to be informed as to what the State commands or forbids."). As the Supreme Court explained in *F.C.C. v. Fox Tel. Stations*, 567 U.S. 239, 253 (2012), this doctrine reflects two important due process concerns: "first, that regulated parties should know what is required of them so they may act accordingly; [and] second, precision and guidance are necessary so that those

enforcing the law do not act in an arbitrary or discriminatory way." "This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *Id.*

Vagueness concerns are especially salient where arguably vague provisions may intrude on First Amendment freedoms. *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982). Facial vagueness challenges are permitted in the First Amendment context because vagueness on the face of a statute or regulation "may in itself deter constitutionally protected and socially desirable conduct." *United States v. Sun*, 278 F.3d 302, 309 (4th Cir. 2002); *see also Fox*, 567 U.S. at 253 (applying vagueness review to regulatory action); *Nat'l Ass'n for the Advancement of Colored People v. Button*, 371 U.S. 415, 433 (1963) ("These [First Amendment] freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions."). To the extent the government argues their challenge should be rejected because the Letter is not vague in every respect, the Supreme Court clarified in *Johnson v. United States*, 576 U.S. 591, 602 (2015), that it does not render "a vague provision…constitutional merely because there is some conduct that clearly falls within the provision's grasp." *See also United States v. Hasson*, 26 F.4th 610, 616–19 (4th Cir. 2022) (noting *Johnson*'s rejection of "vague-in-all-its-applications standard").

The Fourth Circuit's guidance from *National Association of Diversity Officers in Higher Education v. Trump* is relevant here. *See* Order Granting Defendants' Motion for a Stay Pending Appeal, *Nat'l Ass'n of Diversity Officer in Higher Educ. v. Trump ("NADOHE")*, No. 25-1189 (4th Cir. Mar. 14, 2025), ECF 29. In *NADOHE*, the Fourth Circuit stayed the district court's preliminary injunction, finding "vagueness principles [not] outcome determinative," at an early

stage "where the [Executive] Orders [at issue] only purport to direct executive policy and actors" and the administration had not yet pursued any enforcement or implementation at odds with the First or Fifth Amendments. *Id.* at 4–5 (Diaz, C.J., concurring). The impetus behind that preliminary view, however, was "that agency action that goes beyond the narrow scope set out in [that decision] could implicate Fifth Amendment vagueness concerns." *Id.* at 5; *id.* at 7 (Harris, J., concurring) ("Agency enforcement actions that go beyond the Orders' narrow scope may well raise serious First Amendment and Due Process concerns."). On their faces, the Executive Orders challenged in *NADOHE* "do not purport to establish the illegality of all efforts to advance diversity, equity, and inclusion, and they should not be so understood." *Id.* at 7. All three members of the panel highlighted that a challenge to a "particular agency action implementing the Executive Orders," would be different. *See id* at 9 (Rushing, J., concurring).

This is one such case. Before this Court are two specific agency actions that require schools and educators to comply with them or face substantial enumerated sanctions. At a minimum, this Court believes a full consideration of Plaintiffs' vagueness claims is appropriate.

### a.    The Letter

Plaintiffs argue that the Letter is unconstitutionally vague because of it attaches consequences to violating provisions rooted in "broad and value-laden" terms like DEI that mean very different things to different people. The Letter proclaims that "DEI programs…frequently preference certain racial groups," "stigmatize students," and "deny students the ability to participate fully in the life of a school." ECF 31-14 at 3. In the sentence that immediately follows, the Letter states that DOE "will no longer tolerate overt and covert discrimination." *Id.* The obvious inference is that at least some "DEI programs," in DOE's view, constitute illegal "discrimination." But "[t]he Letter does not make clear…what [DOE] believes constitutes a DEI

program, or the circumstances in which [DOE] believes DEI programs run afoul of Title VI. The Letter does not even define what a 'DEI program' is." *NEA*, 2025 WL 1188160, at *18. DOE pledges to "vigorously enforce" the understandings outlined in the Letter. ECF 30-14 at 3.

Laws that regulate conduct based on "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings" raise vagueness concerns. *United States v. Williams*, 553 U.S 285, 306 (2008). The Letter leaves it entirely within DOE's discretion to decide what conduct counts as DEI at all, and what conduct is unlawful DEI. "DEI as a concept is broad: one can imagine a wide range of viewpoints on what the values of diversity, equity, and inclusion mean when describing a program or practice." *NEA*, 2025 WL 1188160, at *19. The Letter's other language only muddles the situation further: for example, it suggests one "nefarious" aspect of "DEI programs" is that they "smuggl[e]…race-consciousness into everyday training, programming, and discipline." ECF 31-14 at 3. Does that mean that any race-consciousness whatsoever amounts to impermissible DEI? The motivating concern behind First Amendment rooted vagueness is that vague laws may cause "citizens to 'steer far wider of the unlawful zone' than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. at 109. The Letter threatens revoking schools' federal funding, a sanction that would hurt students, the nightmare of any educator or school. *See* ECF 66-8 ¶ 13 ("Every day I think about how the actions of one teacher in the school district could impact tens of thousands of students in a devastating way.…The thought of being the cause for funding cuts is…terrifying to me."). It is thus reasonable to assume that in this context, without knowing what, if any, teaching or programming relating to race could draw the administration's ire, teachers and school districts may steer clear of it all together. Plaintiffs have provided ample evidence that is the case. *See, e.g.*, ECF 66-11 (collecting

sources describing state responses, including Iowa schools removing all references to Black and Latinx students from their goals for student performance); ECF 31-4 ¶ 25; ECF 31-12 ¶ 27.

The broad language is also ripe for arbitrary enforcement. "A vague law impermissibly delegates basic policy matters to [enforcers] for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 108–09. Just as teachers and schools cannot predict what conduct is permitted by the Letter, the government is empowered to enforce it as it wishes. And if the government has been clear in any respect, it has stated over and over that it disfavors its concept of "DEI" and wishes to end it altogether.

Again, the government's primary defense is that the Letter merely reiterates that discrimination is illegal. That defies logic. The government also continues to rely heavily on the FAQs' statement that DOE's determination of whether any programming is unlawful "does not turn solely on whether it is labeled 'DEI' or uses terminology such as 'diversity,' 'equity,' or 'inclusion'" and states that the Department's "assessment of school policies and programs depends on the facts and circumstances of each case." ECF 51-4 at 6. But that is not especially helpful—if anything, the broader context of the FAQs suggests that this means conduct that does *not* bear express DEI labels, like "social and emotional learning," may be equally suspect. And the Letter's broader context suggest that any race-consciousness whatsoever could be defined as "DEI."

The Letter does not, despite the government's assertions, provide any "comprehensible normative standard," even an "imprecise" one, for regulated persons like Plaintiffs to understand what conduct it prohibits. ECF 72-1 at 24 (quoting *Nat'l Urb. League v. Trump*, No. 25-cv-471,

2025 WL 1275613, at *19 (D.D.C. May 2, 2025)).[18] The universe of documents in this case makes clear that the government has not articulated, nor perhaps considered, the distinction between "treat[ing] a person of one race differently than…another person because of that person's race" in a legally actionable way and race-consciousness generally. This Court agrees with the *NAACP* court that asking whether an action treats a person differently than another person because of their race "hardly provides sufficient guidance" in the broader context of these documents, which suggest merely acknowledging the existence of race might be discrimination. 2025 WL 1196212, at *6.

The crux of the problem, in this Court's view, is that the Letter says to teachers and schools "if you engage in DEI practices we deem impermissible, you will be punished" but does not provide any clarity on what DEI practices are impermissible. Nor does it even define what a DEI practice is. It is impossible to determine what conduct triggers the prohibitions and sanctions of the Letter. That enables the government to enforce the Letter arbitrarily, and chills the lawful and societally beneficial speech of regulated persons who do not understand what DEI- or race-related speech might be allowed. "The vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. Am. Civil. Lib. Union*, 521 U.S. 844, 871–72 (1997). The Letter is accordingly unconstitutionally vague.

---

[18] The government relies heavily on *National Urban League*, an out-of-circuit district court case that discusses one of the same executive orders at issue in *NADOHE*. But this Court relies on the Fourth Circuit's guidance, and finds *National Urban League* inapposite for the same reasons discussed above. Vagueness is a context-specific endeavor, and, as this Court has described at length, the context here is very different than the context presented by the executive orders. A finding that the terms "illegal DEI" and "DEI" were not unconstitutionally vague in that setting is not dispositive of those same terms' constitutionality in this setting.

b.    <u>Certification</u>

The Certification Requirement is also unconstitutionally vague. The Certification Requirement threatens serious consequences—the loss of federal funding, breach of contract suits from the Department of Justice to claw back previously issued federal funds, and FCA liability—if a school fails to abide by "vaguely-defined prohibitions on DEI initiatives." *NAACP*, 2025 WL 1196212, at *6. This Court agrees with the *NAACP* court that "threatening penalties under those legal provisions, without sufficiently defining the conduct that might trigger liability, violates the Fifth Amendment's prohibition on vagueness." *Id.*

The Certification threatens serious consequences if schools engage in "certain DEI practices," "illegal DEI practices," or DEI practices that "advantage one race over another." ECF 37-9 at 3. It neither defines "DEI" nor delineates between permissible and "illegal" DEI. It is similarly "unclear what it means to 'advantage' one race over another." *NAACP*, 2025 WL 1196212, at *6. The government strains to rescue the Certification Requirement by pointing to the Letter and the FAQs. But those documents, as discussed above, only muddy the waters further. Because the terms at issue are so broad and involve inherent value judgments, they leave regulated persons without proper notice of what conduct they must certify they are not engaging in, and they empower the government to enforce the Certification Requirement arbitrarily. "The Certification amplifies the situation by putting [school districts and states] in the impossible position of signing a purportedly legally binding document that threatens dire financial and legal risks, without clarity on its parameters, or facing the loss of federal funding." ECF 66-1 at 30. The chilling effect of its vague provisions, paired with direct threats of severe sanctions for any misstep, raises serious constitutional concerns.

The Certification is particularly ripe for arbitrary enforcement. The Certification invokes the *qui tam* provision of the FCA, which empowers citizens to enforce the FCA, and, in this context "illegal DEI practices." ECF 37-9 at 4. The government may seek to revoke future funds, claw back previously issued funds, or pursue FCA liability if it decides a certifying school is engaging in "illegal DEI." The Certification, even read in light of its accompanying documents, does not clarify what conduct triggers its prohibitions.

In sum, by attaching serious consequences to compliance with standardless terms, the Certification Requirement runs afoul of the Fifth Amendment's Due Process protections against unreasonably vague laws. It therefore violates the APA in that respect as well.

\*      \*      \*

The Letter and Certification were each enacted without any discernable process. It is not surprising that by failing to tread carefully, particularly in an area involving academic freedom, free speech rights, and controversial topics on which Americans hold a diversity of opinions, the government ran afoul of the Constitution and several statutes. This Court does not deny that the procedures required by the APA are strenuous and may delay the swift decisionmaking that an administration would prefer. But Congress outlined those procedures to ensure that agencies take care to make reasonable decisions that do not conflict with other laws, accidentally cause significant disruptions of reliance interests, or, most significantly, violate the Constitution. Agencies are required to have reasoned bases for their decisions and to explain those bases to the public. DOE was required to exercise great care when issuing regulations that changed long-standing legal frameworks, and it still appears unconcerned regarding the chaos it has caused for those it regulates. The Letter and Certification are unlawful and violate the Administrative Procedure Act.

B.  Substantive Constitutional Claims

Plaintiffs' substantive constitutional claims only differ from their APA-based constitutional claims in one respect—to prevail, Plaintiffs must show that no genuine issue of material fact exists. This Court finds they have met that burden. There are no factual disputes in this case, much less material ones. This Court will not repeat its previous constitutional analysis, which applies with equal force to Plaintiffs' substantive constitutional claims, but notes that, to the extent the government still disputes whether the challenged actions were final agency actions, its constitutional analysis would apply even if they were not.

V.  **REMEDIES**

"When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to individual petitioners is proscribed." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 831 (2024) (Kavanaugh, J., concurring) (citation omitted). This Court believes the ordinary remedy is the best one here—the Letter and Certification Requirement must be vacated under Section 706 of the APA.

Nothing in *Trump v. CASA* alters the availability or form of APA relief. The Supreme Court found in *CASA* that the Judiciary Act of 1789, and its grant of injunctive authority to federal courts, likely did not authorize universal injunctions. *See CASA*, 145 S.Ct. at 2548. "A universal injunction can be justified only as an exercise of equitable authority," and "Congress has granted federal courts no such power." *Id.* at 2550. The Judiciary Act of 1789 endowed federal courts with jurisdiction over suits in equity, and accordingly the Supreme Court has held that Congress's "statutory grant encompasses only those sorts of remedies traditionally accorded by courts of equity at our country's inception." *Id.* at 2551 (internal quotation marks omitted). The Supreme

Court was thus primarily concerned with limiting injunctive powers to those which Congress affirmatively granted to federal courts. *CASA* expressly did not "resolve[] the distinct question [of] whether the Administrative Procedure Act authorizes federal courts to vacate agency action." *Id.* at 2554 n.10 (quoting 5 U.S.C. § 706).

Like every other court to consider this issue since *CASA*, this Court believes the APA has always expressly authorized vacatur, and *CASA* did not change that.[19] APA suits are not suits in equity. The APA is a direct statutory grant of federal court jurisdiction over cases arising from final agency actions. Congress explicitly provided one mandatory remedy for APA violations by stating that a "reviewing court *shall*…hold unlawful and set aside" unlawful agency actions. The APA thus provides a far narrower authority than the broad equitable powers contemplated by the Judiciary Act of 1789—it *only* permits a court to "hold unlawful and set aside" an unlawful agency action. "[A]n injunction has a specific legal meaning, and the fact that a different procedural mechanism can achieve the same result as an injunction does not mean that the two should be

---

[19] *See, e.g.*, *Doctors for Am. v. Office of Personnel Mgmt.*, No. 25-cv-322 , 2025 WL 1836009, at *22 (D.D.C. July 3, 2025) ("[A]s this is a case involving APA vacatur, not a universal or national injunction,… [CASA] does not apply."); *Haitian Evangelical Clergy Assoc. v. Trump*, No. 25-1464, 2025 WL 1808743, at *6–7 (E.D.N.Y. July 1, 2025) (*CASA* "explicitly distinguished between injunctions and orders pursuant to 5 U.S.C. § 706(2)" and granting APA relief); *Walker v. Kennedy*, No. 20-cv-2834, 2025 WL 1871070, at *7 (E.D.N.Y. July 8, 2025) ("*CASA* does not require the Court to reconsider its stay."); *Ass'n of Am. Univs. v. Dep't of Defense*, No. 25-cv-11740, – F. Supp. 3d. – , 2025 WL 2022628, at *27 (D. Mass. July 18, 2025) (finding that "a stay under the APA" is not "subject to the same limitations espoused in *CASA*"); *Am. Gateways, Inc. v. Dep't of Justice*, No. 25-cv-1370, 2025 WL 2029764, at *11 (D.D.C. July 21, 2025) (noting that "the APA requires [courts] to hold unlawful and set aside arbitrary and capricious agency action" and "[t]hat the invalidated agency action was a nationwide policy does not mean [p]laintiffs are seeking relief on behalf of…organizations who are not parties to this suit.…Rather, they are seeking the very relief mandated by Congress in the APA."); *Refugee & Immigrant Ctr. for Educ. And L. Servs. v. Noem*, No. 25-306, – F. Supp. 3d – , 2025 WL 1825431, at * 51 (D.D.C. July 2, 2025) (noting that binding precedent and the text of the APA plainly authorize vacatur); *Cornerstone Credit Union League v. Consumer Fin. Protec. Bur.*, No. 25-cv-16, – F. Supp. 3d – , 2025 WL 1920148, at *13 n.10 (E.D. Tex. July 11, 2025).

deemed the same." *Nat'l TPS Alliance v. Noem*, No 25-1766-EMC. – F. Supp. 3d –, 2025 WL 957677, at *14 (N.D. Cal. Mar. 31, 2025) ("[T]he distinction between an injunction and a vacatur is material."). Here especially, where the Supreme Court has been clear that the statutory origin of remedial authority is outcome determinative, APA relief cannot be collapsed into other injunctive-type relief, even if it looks similar in effect. *Cf. CASA*, 145 S.Ct. at 2567 (Kavanaugh, J., concurring) (referring to "preliminarily setting aside or declining to set aside an agency rule under the APA" as "the functional equivalent of a universal injunction" and noting that it, like class-action relief, is still an available remedy).

"The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur of unlawful agency rules." *Corner Post*, 603 U.S. at 826 (Kavanaugh, J., concurring). But further, "[t]he APA authorizes the *universal* vacatur of rules." Mila Sohoni, *The Past and Future of Universal Vacatur*, 133 Yale L. J. 2304, 2310 (2024) (emphasis added). "When a federal court sets aside an agency action, the federal court vacates that order—in much the same way that an appellate court vacates the judgment of a trial court." *Corner Post*, 603 U.S. at 830 (Kavanaugh, J., concurring). To set aside means to vacate. *See id.* This Court believes it is redundant, moreover, to refer to "universal vacatur," because a vacatur is by definition universal. APA suits ultimately target the rule, and not necessarily the application of it to a particular person. *See id.* at 838 ("[T]he APA…empower[s] the judiciary to act directly against the final agency action."). Because the APA allows "any person who has been adversely affected or aggrieved by a final agency action to obtain judicial review in a federal district court," foreclosing vacatur could deny many non-regulated persons who are aggrieved by unlawful agency actions the right to relief

they have long enjoyed. *Id.* at 828–29. It would be a radical change in administrative law, and inconsistent with the text and history of the APA, to bar vacatur as a remedy.[20]

This case illustrates why vacatur is necessary to grant many plaintiffs full relief: an order enjoining the government from enforcing the Letter and the Certification Requirement against Plaintiffs alone would do little to help the millions of teachers who are members of the Plaintiff associations or who work for District 4J. The negative impact the agency action has on them does not necessarily stem from DOE enforcing the new rules *against them*, but rather the harms they are likely to experience because of the threats of enforcement (or actual investigations or enforcement) to their states, school districts, and others who are and are not plaintiffs here. "Vacatur is therefore essential to fulfill the basic presumption of judicial review" for at least the Associational Plaintiffs' membership. *See id.* at 831. It would be practically unworkable to vacate

---

[20] Justice Kavanaugh's concurrence in *Corner Post* provides helpful background on the text and history of the APA:

> The text and history of the APA authorize vacatur. The text directs courts to "set aside" unlawful agency actions. 5 U.S.C. § 706(2)(A). When Congress enacted the APA in 1946, the phrase "set aside" meant "cancel, annul, or revoke." Black's Law Dictionary 1612 (3d ed. 1933); see also Black's Law Dictionary 1537 (4th ed. 1951) (same); Bouvier's Law Dictionary 1103 (W. Baldwin ed. 1926) ("To annul; to make void; as, to set aside an award"). At that time, it was common for an appellate court that reversed the decision of a lower court to direct that the lower court's "judgment" be "set aside," meaning vacated. *E.g.*, *Shawkee Mfg. Co. v. Hartford-Empire Co.*, 322 U.S. 271, 2741944). Likewise, Congress used the phrase "set aside" in many pre-APA statutes that plainly contemplated the vacatur of agency actions.
>
> The APA incorporated that common and contemporaneous meaning of "set aside."

603 U.S. at 829–31 (Kavanaugh, J., concurring).

a policy that is procedurally defective as to only a few people. It is nonsensical, moreover, that an agency would conduct notice-and-comment rulemaking applicable to only the parties to a certain lawsuit and leave the defective rule in place for everyone else. The uniform remedy of vacatur avoids a hodgepodge of rules on the same topic subject to different requirements.

Supreme Court and Fourth Circuit law recognize vacatur as the final remedy in APA cases. *See Sierra Club v. U.S. Army Corps of Engineers*, 909 F.3d 635, 655 (4th Cir. 2018) ("The Supreme Court has recognized that Section 706(2)(A) requires federal courts to set aside federal agency action that is not in accordance with law."); *see also Corner Post*, 603 U.S. at 842 (Kavanaugh, J., concurring) ("The federal courts have long interpreted the APA to authorize vacatur of agency actions. Both the text and the history of the APA support that interpretation, and courts have had no real difficulty applying the remedy in practice."); *cf. West Virginia v. Env't Prot. Agency*, 577 U.S. 1126 (2016) (staying EPA rule pending final resolution). Because those precedents have not changed, the Supreme Court expressly disclaimed any intent to alter them, and the APA plainly authorizes federal courts to vacate unlawful final agency actions, this Court finds that vacatur is now, as it has always been, the proper remedy in this APA case. The Letter and the Certification Requirement are held unlawful and set aside; they are vacated in their entirety.

This Court does not believe that any further remedy is necessary to afford complete relief to the Plaintiffs, and therefore denies their requests for further declaratory and injunctive relief. *See* ECF 79 (revised proposed order). Plaintiffs ask this Court to declare: (1) any signed Certification null and void; (2) the Letter unlawful; (3) the Certification Requirement unlawful; (4) that "Activities, policies, and programs concerning diversity, equity, inclusion, or social justice are not per se or presumptively illegal under Title VI or the Equal Protection Clause;" (5) that "Curriculum and classroom speech concerning race, diversity, equity, inclusion, or social justice

are not per se or presumptively illegal under Title VI or the Equal Protection Clause;" and (6) that "Race neutral means of increasing diversity are not per se or presumptively illegal under Title VI or the Equal Protection Clause." *Id.* Plaintiffs' request for declaratory relief is underscored by their concern that the government continues to perpetuate interpretations of Title VI and *SFFA* regarding diversity, equity, and inclusion that are at odds with the rulings of this Court and the courts in New Hampshire and the District of Columbia that have passed on these issues. Although Plaintiffs may be right that DOE is more broadly enforcing "an unlawful interpretation of Title VI," that unlawful interpretation in the ether is not before this Court; specific agency actions are. This Court does not need to independently enter a declaratory judgment to find the Letter and Certification unlawful; it has already held that they are. As to Plaintiffs' other requests for declaratory relief, this Court declines to render broad-based opinions on the law outside the context of a concrete case or controversy.

And as to Plaintiffs' requests for injunctive relief, this Court finds that vacating the two final agency actions should afford the parties complete relief. Plaintiffs essentially ask this Court to enter an injunction to forbid the government from enforcing the Letter and Certification or the understandings of Title VI and *SFFA* this Court has found unlawful against them.[21] Of course, vacating a rule means that it is void, null, and nonexistent; the government cannot continue to enforce it, implement it, or otherwise use it. *See Corner Post*, at 838 (Kavanaugh, J., concurring)

---

[21] Plaintiffs wisely restricted their amended request for injunctive relief to one applicable to their members or entities that employ or contract with their members. ECF 79. They also ask this Court to enjoin the FAQs, but do not seek relief specific to the End DEI portal. This Court does not believe the FAQs are final agency action subject to its authority under the APA, and the vacatur of the Letter will prevent enforcement of the objectionable provisions in the FAQs explaining the Letter's dictates. If the agency reissues similar rules pursuant to proper administrative processes, this Court presumes that it will either amend the current FAQs or reissue them entirely to accurately address questions arising from a new, different rule.

("The text of § 706(2) directs federal courts to vacate agency actions in the same way that appellate courts vacate the judgment of trial courts."); *Env't Def. v. Leavitt*, 329 F. Supp. 2d 55, 64 (D.D.C. 2004) ("When a court vacates an agency's rules, the vacatur restores the status quo before the invalid rule took effect and the agency must 'initiate another rulemaking proceeding if it would seek to confront the problem anew.'"); M. Sohoni, *supra*, at 2024 n.4 (noting that vacatur "means the invalidation of a rule, not just 'as to the plaintiffs' but 'as to anyone,' with the effect of restoring the status quo before the rule's adoption."). The principle that an agency should not continue to use a vacated rule is the natural outflow of vacatur; an affirmative injunction is not necessary to implement this Court's ruling.

This Court also denies the government's request for a limited remand. A limited remand is only merited where "there is at least a serious possibility that the [agency] will be able to substantiate its decision on remand." *Sierra Club*, 909 F.3d at 655 (noting that remand is not appropriate where the agency action was "legally deficient" or "exceeded the [agency's] statutory authority"). A remand does not make sense here. The government did not employ *any* process in promulgating either document, and both have serious statutory and constitutional issues. If the government seeks to reinstate similar policies, it must go through the full processes required by the APA for the first time. It would hardly be a limited remand to require the government to start over.

## VI.  CONCLUSION

The Court again must conclude that, by seeking to substantially alter the legal obligations of schools and educators without employing the procedures necessary to implement such a change, the government ran afoul of the APA's procedural requirements. The regulation of speech cannot be done casually. After ample opportunity to acknowledge the supposedly unintended impacts of

these policies on teachers' freedom of speech, the government still downplays the massive change

it announced through the Letter and Certification Requirement. The government did not merely

remind educators that discrimination is illegal: it initiated a sea change in how the Department of

Education regulates educational practices and classroom conduct, causing millions of educators to

reasonably fear that their lawful, and even beneficial, speech might cause them or their schools to

be punished. The law does not countenance the government's hasty and summary treatment of

these significant issues.

For the reasons stated above, the Letter and Certification Requirement are held unlawful

and aside under 5 U.S.C. § 706. Plaintiffs' motion for summary judgment is granted as to Counts

One, Two, Three, Five, and Six, and denied as to Count Four. The government's motion, construed

as a motion for summary judgment, is granted as to Count Four, and denied as to all other counts.

A separate Order follows.

Dated: August 14, 2025                                    _____/s/_____
                                                          Stephanie A. Gallagher
                                                          United States District Judge