IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |
|---|---|
| **American Federation of Teachers,** *et al.*,<br><br><br>Plaintiffs,<br><br><br> **v.**<br><br><br>**U.S. Department of Education,** *et al.*,<br><br><br>Defendants. | Civil Case No. 1:25-cv-00628 |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

Plaintiffs American Federation of Teachers-Maryland (AFT-MD) and the American Sociological Association (ASA) hereby submit this memorandum in support of their Motion for Attorneys' Fees under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412. The Court should award Plaintiffs $162,442.11 attorneys' fees. For the following reasons, Plaintiffs have established their eligibility for an award of fees under 28 U.S.C. § 2412, and that the amount of the award that they request is reasonable.

**BACKGROUND**

**A.  Dear Colleague Letter and Certification Requirement**

On February 14, 2025, the then-Acting Assistant Secretary for Civil Rights at the Department of Education, Craig Trainor sent a Dear Colleague Letter (Letter) purportedly to "clarify and reaffirm the nondiscrimination obligations of schools and other entities that receive

1

federal financial assistance" required by Title VI, "the Equal Protection Clause of the United States constitution, and other relevant authorities," following the Supreme Court's 2023 decision in *Students for Fair Admissions v. Harvard (SFFA)*, 600 U.S. 181 (2023).[1] However, the Letter went much further than existing law by expanding the definitions of "stereotyping," "stigmatizing," and "discrimination" to reach entirely new categories of conduct, such as teaching concepts related to race. *Am. Fed'n of Teachers v. Dep't of Educ. (AFT II)*, 796 F. Supp. 3d 66, 100 (D. Md. 2025). The Letter's language appeared binding, and the Department stated that it would enforce the Letter beginning no later than February 28, 2025.[2]

Less than two months later, on April 3, 2025, the Department announced that it "sent letters to State Commissioners overseeing K-12 State Education Agencies (SEAs) requiring them to certify their compliance" with "Title VI of the Civil Rights Act and the responsibilities outlined in Students for Fair Admissions v. Harvard."[3] The Department described the certification as required in order "to continue receiving federal financial assistance."[4] The letters, sent via e-mail, gave SEAs only 10 days to sign and return their certification and those of their local education agencies (LEAs).[5] The Certification also warned that "continued use of illegal DEI practices may subject the individual or entity . . . to serious consequences," including the termination of federal funding, actions to recover previously issued funding, and False Claims Act liability.[6]

---

[1] ECF 31-14, Letter at 1–2.
[2] ECF 31-14, Letter at 3 (emphasis added).
[3] ECF 37-7, Ex. 41, PLFS-552, Press Release, Dep't of Educ., ED Requires K-12 School Districts to Certify Compliance with Title VI and Students v. Harvard as a Condition of Receiving Federal Financial Assistance (Apr. 3, 2025), https://perma.cc/7WBU-T8QN.
[4] *Id.*
[5] ECF 37-8, Ex. 42, PLFS-557, E-mail from Dep't of Educ., Off. for C.R., *Department of Education Title VI Compliance Certification* (Apr. 3, 2025). The Department's email also required SEAs to report on the signature status of its LEAs, whether the SEA found any compliance issues, and its proposed enforcement plans.
[6] ECF 37-9, Certification at 3-4.

### B. Procedural History

Plaintiffs filed this lawsuit on February 25, 2025. ECF 1. On March 5, 2025, Plaintiffs amended their complaint and added a party, Eugene School District 4J. ECF 14. On March 6, 2025, this Court ordered Plaintiffs to show cause as to why the lawsuit should be heard in the District of Maryland. ECF 16. Plaintiffs filed an initial response to the Court's March 6 Order, and when the government filed an unsolicited response to the March 6 Order, Plaintiffs filed a response correcting the government's factual assertions and addressing the government's legal analyses regarding venue. *See* ECF 18, 28. The Court ultimately determined that venue was appropriate in the District of Maryland. ECF 29.

On March 28, 2025, Plaintiffs filed a motion seeking to preliminarily enjoin enforcement of the Letter. ECF 31. After the government issued its Certification on April 3, Plaintiffs filed a second motion seeking a preliminary injunction barring enforcement of the Certification on April 9, 2025. ECF  37. The government filed a consolidated opposition on April 14, 2025, and Plaintiffs filed a consolidated reply on April 17, 2025. ECF 42, 51. The parties addressed both preliminary injunction motions at an all-day motions hearing held on April 18, 2025. On April 24, 2025, this Court granted preliminary relief with respect to the Letter, finding that in "at least four distinct ways, Plaintiffs have shown [that] they are likely to succeed on the merits of their APA claims." *Am. Fed'n of Teachers v. Dep't of Educ. (AFT I)*, 779 F. Supp. 3d 584, 621 (D. Md. 2025). The Court denied relief in conjunction with the motion for preliminary injunction of the Certification because the Certification – issued after the operative Complaint was filed – was not sufficiently tethered to allegations or a Prayer for Relief in the pleadings. *Id.* at 604–06. The Court suggested that this defect could be remedied by amending the Complaint. *See id.* at 606 n.4.

On May 6, 2025, Plaintiffs sought leave to file a Second Amended Complaint to incorporate facts and claims related to the Certification, ECF 64, which this Court granted. ECF 74. On June 5, Plaintiffs moved for summary judgment on all six counts in their Second Amended Complaint. ECF 66. On August 14, this Court granted Plaintiff's Summary Judgment motion on all but one count, holding the Letter and Certification unlawful and setting them aside under 5 U.S.C. § 706. *AFT II*, 796 F. Supp. 3d at 123.

The government initially appealed this Court's order, ECF 87, but it later withdrew its appeal. The U.S. Court of Appeals for the Fourth Circuit dismissed the government's appeal on January 22, 2026. ECF 89.

**ARGUMENT**

**I.      This motion is timely.**

EAJA requires a party seeking fees to submit an application for such fees "within thirty days of final judgment in the action." 28 U.S.C. § 2412(d)(1)(B). "[F]inal judgment" is statutorily defined as "a judgment that is final and not appealable, and includes an order of settlement." 28 U.S.C. § 2412(d)(2)(G). In this case, the Court entered judgment under Federal Rule of Civil Procedure 54(b) in favor of all Plaintiffs on August 14, 2025. ECF 83. On October 13, 2025, the government filed a timely notice of appeal, ECF 85. On January 22, 2026, the Fourth Circuit entered an order dismissing the government's appeal pursuant to the parties' joint stipulation. ECF 89. Therefore, the Court's judgment became "final and not appealable," at the earliest, on January 22, 2026, and this motion is filed within thirty days of that date.

**II.     Plaintiffs AFT-MD and ASA are organizations that are fee-eligible parties.**

EAJA defines a fee-eligible "party," in relevant part, as any "organization, the net worth of which did not exceed $7,000,000 at the time the civil action was filed, and which had not

4

more than 500 employees at the time the civil action was filed," or any "organization described in section 501(c)(3) of the Internal Revenue Code of 1986. . . regardless of the net worth of such organization." 28 U.S.C. § 2412(d)(2)(B). Plaintiffs' declarations submitted in support of this motion establish that Plaintiffs AFT-MD and ASA meet these criteria. Declaration of Kenya Campbell, Exhibit 2; Declaration of Heather Washington, Exhibit 3. Plaintiffs have assigned any awards of fees and costs to their counsel, Democracy Forward Foundation, which prosecuted this case on their behalf pro bono. Ex. 2 ¶ 5–7; Ex. 3 ¶ 5–7.

### III.    Plaintiffs are prevailing parties.

A Court may only grant an EAJA fee award to a "prevailing party" in a civil action against the United States. 28 U.S.C. § 2412(d)(1)(A). A "prevailing party" is one who "has been awarded some relief by a court." *Buckhannon Bd. Care & Home Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 603 (2001). Such relief must effect a "material alteration of the legal relationship of the parties" and contain a "judicial *imprimatur* on the change." *Id.* at 604–05 (quotation omitted). An "enforceable judgment[ ] on the merits" is a classic example of a court action that confers prevailing party status. *Id.* at 604. This Court's judgment holding the Letter and Certification unlawful and setting them aside under 5 U.S.C. § 706 unquestionably made the Plaintiffs the prevailing parties in this action. *See* ECF 83; ECF 84.

### IV.    The government's position was not substantially justified.

Once petitioners establish their status as a prevailing party, they are entitled to fees and other expenses "unless the court finds that the position of the United States was substantially justified." *U.S. v. 515 Granby*, LLC, 736 F.3d 309, 314–15 (4th Cir. 2013) (quoting 28 U.S.C. § 2412(d)(1)(A)). "The United States has the burden of showing that its position was substantially justified." *Id.* at 315. To meet that burden, the United States must demonstrate that its position

"has a reasonable basis in law and fact" to a "degree that could satisfy a reasonable person" and that is "more than merely undeserving of sanctions for frivolousness." *Id.* (quoting *Pierce v. Underwood*, 487 U.S. 552, 565-66 & n.2 (1988)). Courts in the Fourth Circuit evaluate "the government's prelitigation and litigation postures together" to "determine, from the totality of the circumstances, whether the government acted reasonably in causing the litigation or in taking a stance during the litigation." *Id.* This standard aligns with the purpose of the EAJA to "prevent the government from unjustifiably forcing litigation." *Id.* at 316 (citing H.R. Rep. No. 98–992, at 9 (1984)). Here, the government cannot demonstrate either that its actions in promulgating the Letter and Certification, or its legal position in defending these actions, were substantially justified.

A.      **The government lacked substantial justification for its pre-litigation conduct.**

The government's enactment of the Letter and Certification was fundamentally flawed in numerous respects as detailed by this Court in two decisions. *See AFT II*, 796 F. Supp. 3d 66 (D. Md. 2025); *AFT I*, 779 F. Supp. 3d 584 (D. Md. 2025). An overview of those flaws reveals that the agency's prelitigation conduct was not substantially justified for at least three reasons.

***First***, the agency failed—and in fact made no attempt—to comply with black-letter procedural requirements under the Public Records Act (PRA) and the Administrative Procedure Act (APA). With respect to the former, not even the government "dispute[s] that it failed to follow [the PRA's] requirements." *AFT II*, 796 F. Supp. 3d at 103. That statute required the agency to provide a public comment period and obtain approval from the Office of Management and Budget before collecting information through the Certification. *Id.* Although these requirements indisputably applied to the Certification, the government simply ignored them. *Id.*

6

So too with the APA's notice-and-comment and reasoned decisionmaking requirements.[7] As this Court noted, the "requirements for notice-and-comment rulemaking are exacting" and "clear." *AFT II*, 796 F. Supp. 3d at 102. Yet the government once again "leapfrogg[ed]" this "important procedural requirement[]," *id.* at 82, providing schools and teachers "no opportunity to comment," *id.* at 108. Likewise, the reasoned decisionmaking requirements were wholly ignored. Although the Letter and Certification "announced large-scale policy changes," the government "created no administrative record," "failed to consider a number of required factors (or, indeed, to consider anything at all)," did not "consider[] whether [the Letter and Certification] were appropriate based on existing facts and law," and ignored "the extent to which [these actions] would disrupt schools and teachers' status quo to the detriment of students' learning." *AFT II,* 796 F. Supp. 3d at 104, 108–09. In sum, this is not a case in which the agency followed *some* amount of process that "could satisfy a reasonable person" under the PRA and APA. *515 Granby*, 736 F.3d. at 315. Rather, the government failed to provide "any discernable process" whatsoever. *AFT II,* 796 F. Supp. 3d at 118.[8]

**Second**, the government indisputably exceeded its statutory authority under the Department of Education Organization Act, which prohibits the agency from "exercis[ing] 'direction, supervision, or control' over 'the curriculum'" of schools run by state and local school systems. *AFT II,* 796 F. Supp. 3d at 109 (quoting 20 U.S.C. § 3403(b)). Yet, the Letter was "unambiguous" in its prescription of "curricular choices." *Id.* at 110. And despite the government's after-the-fact arguments to the contrary, the Court found that the Letter's "strident

___

[7] Although the government argued during litigation that the notice-and-comment requirements did not apply because neither the Letter nor the Certification were legislative rules, that position was not substantially justified as detailed further below. *Infra* at 9–11.

[8] These procedural flaws were not harmless errors. As the Court correctly noted, the procedural "APA issues" were "inextricably bound" up with the Constitutional violations in this case and thus "illustrate[] why compliance with procedures is important." *AFT,* 796 F. Supp. 3d at 113.

tone" was "devoid" of "nuance" regarding the Letter's attempt to "regulate the content of curriculum if it is 'discriminatory,' 'stigmatizing,' 'stereotyp[ing],' or 'deny[ing] students the ability to participate fully in the life of the school.'" *Id.* (quoting the Letter at ECF 31–14 at 3).[9] In other words, the statutory violation was not a close call; the Letter was clearly beyond the agency's authority.

**Third**, the Letter and Certification flagrantly violated Plaintiffs' constitutional rights. To begin, the Letter was a "blatant and egregious violation of the First Amendment." *Id.* at 112 (quotations omitted). By explicitly "proclaim[ing] that [the agency] 'will no longer tolerate' speech it dislikes because of its motivating ideology," *id.* at 112 (quoting ECF 31-15 at 2–3), the "Letter is textbook viewpoint discrimination," *id.* at 111. These First Amendment harms were compounded by the unconstitutionally vague prohibitions found in both the Letter and Certification in violation of the Fifth Amendment. *Id.* at 114–19. In so holding, this Court noted that "an enactment is void for vagueness if its prohibitions are not clearly defined.'" *Id.* at 114 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). In this case, not only did the Letter and Certification fail to provide sufficiently *clear* definitions of the prohibited activities, they failed to provide *any* definitions at all. *See id.* at 116 ("The Letter does not even define what a 'DEI program' is."); *id.* at 118 ("The Certification . . . neither defines 'DEI' nor delineates between permissible and 'illegal' DEI."). As this Court emphasized, the dangers of such vague prohibitions are exacerbated by the agency's "pledges to 'vigorously enforce' the understandings outlined in the Letter," *id.* at 116, and threat of "serious consequences" for failure to comply with

---

[9] Nor was the government substantially justified in its position that it could "side-step the bounds of its statutory authority" on the grounds that "entire categories of classroom content" were "discriminatory." *AFT,* 796 F. Supp. 3d at 111. As the Court noted several times, "there is *no basis* in Title VI or [*Students for Fair Admission v. Harvard*, 600 U.S. 181 (2023)] for concluding that discussion of race—in the two ways highlighted in the Letter or otherwise—is ever, or especially always, discrimination." *Id.* at 110–11 (emphasis added).

the "standardless terms" in the Certification, *id.* at 118. Yet again, these legal infirmities do not fall within a gray area such that reasonable people could disagree on the merits. Rather, the government's conduct amounted to "textbook" and "egregious" constitutional violations.

### B.    The government lacked substantial justification for its legal position in defending its conduct.

The government also lacked a substantial justification for the arguments it made during litigation. The heart of the government's defense—across nearly all of the merits issues—is that the Letter and Certification merely restated existing legal prohibitions of discrimination found in Title VI, the Supreme Court's recent decision in *SSFA*, and previous agency guidance. *See, e.g.*, ECF 41 at 1–4; ECF 72-1 at 2–3. Relying on this premise, the agency argued:

- (1) that neither document was final agency action subject to review under the APA because the documents merely provided "clarity" on "existing legal requirements," ECF 72-1 at 17–20;

- (2) that neither document was a legislative rule subject to the APA's notice-and-comment requirement because the documents "only remind[] affected parties of existing duties," ECF 72-1 at 20–21;

- (3) that the agency was not required to explain its departure from prior agency positions because it had not, in fact, departed from anything, ECF 41 at 21–22;

- (4) that the agency was permissibly regulating discrimination under existing laws, rather than impermissibly regulating curriculum in violation of its organic statute, ECF 41 at 20;

- (5) that the Letter targeted only conduct that is discriminatory under existing law, rather than reaching protected speech, ECF 72-1 at 28–29, 31; and

- (6) that neither document was impermissibly vague because both "simply reiterate federal funding recipient's responsibilities under Title VI's antidiscrimination provisions," ECF 72-1 at 3.

But the Court repeatedly judged as baseless, the agency's core position that the Letter and Certification served only to restate and enforce Title VI and *SFFA*. Indeed, the Letter and Certification expanded the scope of discriminatory conduct well beyond Title VI and SFFA, including—for example—by prohibiting certain curricular choices, such as "teach[ing] students

9

that certain racial groups bear unique moral burdens that others do not." *AFT II*, 796 F. Supp. 3d at 83 (quoting the Letter). As this Court noted again[10] and again[11] and again,[12] "there is *no basis* in Title VI or SFFA for concluding that discussion of race—in the two ways highlighted in the Letter or otherwise—is ever, or especially always, discrimination." *Id.* at 110–11 (emphasis added).

Beyond the lack of legal support for the government's position, the Court took pains to note that the government's *own conduct* belied its litigation stance:

> If the Letter says nothing new, then why does it link to a new reporting portal specifically looking for instances of "divisive ideologies" and "indoctrination," when there has always been a portal for anyone to report race discrimination or racially hostile environments? Why did states and schools need to certify their compliance with "existing law," when they all certified their compliance with Title VI's dictates last spring? Why did DOE remove prior guidances regarding Title VI and SFFA if they are consistent with DOE's current views? Why did DOE need twelve single-spaced pages of frequently asked questions—which the government referenced repeatedly in explaining the Letter—to explain what the Letter means? Why did DOE need to write a four-page Letter to remind schools that it was enforcing existing law, even if it had different enforcement priorities? Why did DOE announce it would "take appropriate measures to assess compliance ... based on the understanding embodied in [the L]etter beginning no later than 14 days" from the Letter's issuance if it was always the law? It does not add up[.]

*Id.* at 100–01.

Moreover, the government doubled down on this position in opposing Plaintiffs' summary judgment motion in July, despite the Court's explicit findings to the contrary in its April order. *See id.* at 80 ("Although this Court found to the contrary . . . , the government continues to insist that the Letter merely reminded . . . recipients of . . . existing civil rights law, and the Certification . . .

---

[10] *Id.* at 100 ("Title VI and SFFA have *never* been interpreted to preclude teaching about concepts relating to race." (emphasis added)).

[11] *Id.* at 106 ("Even extrapolating *SFFA*'s holding, as the government does, to extend far beyond college admissions, it certainly does not proscribe any particular classroom speech, or relate at all to curricular choices. Nor does Title VI.").

[12] *Id.* at 107 ("The Letter thus interprets *SFFA* to apply far more broadly, and to entirely different categories of conduct, than merely preventing using race as a factor in 'zero-sum' opportunities like admissions, hiring, promotions, or awards.").

10

merely required [recipients] to affirm their compliance with that existing law."). Indeed, the Court noted no less than three times that it had already "rejected that argument." *Id.* at 102, 105, 111–12. Nevertheless, the "government's briefing in this case—postdating this Court's express finding the contrary" continued to "border[] on flippant in its repeated insistence that" the Letter and Certification "merely restat[ed] settled principles of civil rights laws." *Id.* at 104.

Compounding the fundamental weakness of its central argument, the government's ancillary defenses were equally feeble. To take just one example, the agency's position was "strained" and "rings hollow," where it argued that the Letter met the APA's notice-and-comment requirements by "providing, in a footnote, mailing and email addresses for anyone 'interested in commenting.'" *Id.* at 102. As the Court noted, the "clear" "requirements for notice-and-comment rulemaking" found in Section 553(b) are not met by an "after-the-fact opportunity to send an email." *Id.* at 102-03. And the Court properly noted that numerous other secondary arguments were equally "strained." *See id.* at 108 ("the government strained to argue that the impetus was on the Plaintiffs to raise their reliance interests"); *id.* at 111 ("The government strains to argue that the Letter . . . does not reach speech at all"); *id.* at 118 ("The government strains to rescue the Certification Requirement by pointing to the Letter and the FAQs.").

\* \* \* \* \*

Prior to litigation, the Letter and Certification were ill-conceived from the start: they were enacted without regard for important procedural requirements designed "to ensure that agencies stay within the bounds of their delegated authority and exercise that authority within the constraints of the law more broadly." *Id.* at 81. Unsurprisingly, the failure to follow procedural safeguards resulted in the government "run[ning] headfirst into serious constitutional problems." *Id.* at 82. These problems only compounded during litigation. The government began this case by

constructing its defense around a central argument that this Court determined was unfounded in law: that the Agency was merely restating and enforcing existing anti-discrimination law. Despite this Court's April order, the agency remained "unwilling to admit" the folly of that position. *Id.* at 105. Accordingly, the government cannot meet its burden of demonstrating substantial justification for its prelitigation conduct and litigation positions.

**V.      No special circumstances exist that would make the award of fees unjust.**

A fee award is also barred if the Court finds "that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A). As with substantial justification, the burden is on the government to show special circumstances. *Taucher v. Brown-Hruska*, 396 F.3d 1168, 1173 (D.C. Cir. 2005) (citing *Air Transp. Ass'n of Canada v. FAA*, 156 F.3d 1329, 1332 (D.C. Cir. 1998)). Traditional equitable principles, including the doctrine of "unclean hands," govern the special circumstances inquiry. *See Priestley v. Astrue*, 651 F.3d 410, 416–18 (4th Cir. 2011); *Transp. Ass'n*, 156 F.3d at 1333. Plaintiffs are aware of no special circumstances that would disqualify them from a fee award.

**VI.      Plaintiffs' attorneys' time records reflect a reasonable number of hours.**

"The EAJA provides that attorneys for a prevailing party should be paid 'for all time reasonably expended on a matter.'" *Hyatt v. Barnhart*, 315 F.3d 239, 254 (4th Cir. 2002) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 430 n.4 (1983)). To support a fee award, a fee applicant "should submit evidence supporting the hours worked." *Kirk T. v. Saul*, 489 F. Supp. 3d 411, 415 (D. Md. 2020) (quoting *Hyatt*, 315 F.3d at 253). Plaintiffs have attached time records[13] to their motion detailing the services provided by Attorneys Andrew Bookbinder,

---

[13] A party who has established eligibility for a fee award is entitled to compensation for time reasonably expended on litigating the fee motion. *Comm'r, I.N.S. v. Jean*, 496 U.S. 154, 163–65 (1990). The attached time records end on October 13, 2025 when the government noticed the appeal. Plaintiffs seek no compensation for time expended between October 13, 2025 and January 22, 2026 related to the appeal. Plaintiffs reserve the right to supplement their

Madeline Gitomer, Rachel Homer, Brooke Menschel, Victoria Nugent, and Kali Schellenberg. *See* Attorney Fee Records, Exhibit 4. As explained in the Declaration of Victoria S. Nugent, Exhibit 1, filed herewith, the hours for which fees are sought total 1,257 and were reasonably expended.

Plaintiffs have not included the time spent on this motion for attorneys' fees in the pending request, but respectfully reserve the right to supplement their fee request with such hours if further litigation of the motion is required.

**VII.    The Court should adjust the statutory rate to \$258 per hour for the work of Plaintiffs' attorneys.**

EAJA instructs that "attorney fees shall not be awarded in excess of \$125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A). Courts "generally" award "compensation under standard EAJA rates, adjusted for cost-of-living increases." *J.O.P. v. U.S. Dep't of Homeland Sec.*, No. 19-cv-01944-SAG, 2025 WL 1940353, at \*4 (D. Md. July 15, 2025). The formula for determining the cost-of-living enhancement is to multiply the \$125 statutory rate by the ratio of the Consumer Price Index in the year the services were rendered to the Consumer Price Index in 1996, when the \$125 statutory rate was set. *See Yonas A v. Kijakazi,* No. 22-cv-775-BAH, 2023 WL 2264643, at \*1 n.2 (D. Md. Feb. 28, 2023) (granting an adjustment based on the Consumer Price Index). For 2025, the adjusted rate is \$258.46.[14] Accordingly, the hours reasonably expended by Attorneys

---

billing statements to reflect time reasonably expended on this fee petition if they are forced to file a response to a government opposition.

[14] *Statutory Maximum Rates Under the Equal Access to Justice Act,* U.S. Courts for the Ninth Circuit, https://www.ca9.uscourts.gov/attorneys/statutory-maximum-rates/ (last visited February 17, 2026) (providing the EAJA rates for years 2016 through 2025).

Bookbinder, Gitomer, Homer, Menschel, Nugent, and Schellenberg should be compensated at a rate of $258.46 per hour.

VIII.   **The Calculation of Fees Is Based on the Number of Hours, Multiplied by the Hourly Rate, Discounted by the Ratio of Eligible Plaintiffs**

As explained in the Nugent Declaration, Exhibit 1, Plaintiffs removed time from this submission that can be attributed exclusively to client service of the plaintiffs that are not eligible for EAJA fees (American Federation of Teachers and District 4J). The time presented in the application represents the work counsel did perform – and would have performed had AFT-Maryland and ASA been the only plaintiffs in the matter.

Courts reviewing EAJA fee petitions generally apportion the total attorneys' fees equally among eligible and ineligible plaintiffs, and order payment of fees to eligible plaintiffs according to their portion. *See e.g.*, *Sierra Club v. U.S. Army Corp of Eng'rs*, 776 F.2d 383, 393–94 (2d Cir. 1985) (awarding EAJA fees based on ratio of eligible plaintiffs to total plaintiffs). Therefore, Plaintiffs here only seek their shares – fifty percent – of the value of their counsel's reasonably expended hours. Plaintiffs therefore ask for $162,442.11 based on 1,257 hours, at a rate of $258.46 multiplied by .50.

## CONCLUSION

Plaintiffs' attorneys have reasonably expended time on this matter that should be compensated under the Equal Access to Justice Act in the amount of $162,442.11. The Court should grant Plaintiffs' Motion for Attorneys' Fees and enter an order directing Defendants to pay Plaintiffs $162,442.11.

Dated: February 20, 2026                                Respectfully submitted,

/s/ Kali Schellenberg

Kali Schellenberg (Bar No. 31582)
Victoria S. Nugent (Bar No. 15039)
Madeline H. Gitomer (Bar No. 31518)
Brooke Menschel (Bar No. 31492)
Andrew Bookbinder (Bar No. 31486)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kschellenberg@democracyforward.org
vnugent@democracyforward.org
mgitomer@democracyforward.org
bmenschel@democracyforward.org
abookbinder@democracyforward.org

*Counsel for Plaintiffs*